## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AKORN, INC., *et al.*,[1] | ) Case No. 20-11177 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DEBTORS' MOTION SEEKING
## ENTRY OF AN ORDER (A) AUTHORIZING AND
## APPROVING BIDDING PROCEDURES, (B) SCHEDULING AN
## AUCTION AND A SALE HEARING, (C) APPROVING THE FORM
## AND MANNER OF NOTICE THEREOF, (D) ESTABLISHING NOTICE
## AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
## EXECUTORY CONTRACTS AND LEASES, AND (E) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion:[2]

### Preliminary Statement

1.      As described in further detail in the First Day Declaration, the Debtors, with the

assistance of their advisors, conducted a robust marketing process for a potential going-concern

transaction of the Debtors' business in the months leading up to commencement of these

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are:  Akorn, Inc. (7400); 10 Edison Street LLC (7890); 13 Edison Street LLC; Advanced Vision Research, Inc. (9046); Akorn (New Jersey), Inc. (1474); Akorn Animal Health, Inc. (6645); Akorn Ophthalmics, Inc. (6266); Akorn Sales, Inc. (7866); Clover Pharmaceuticals Corp. (3735); Covenant Pharma, Inc. (0115); Hi-Tech Pharmacal Co., Inc. (8720); Inspire Pharmaceuticals, Inc. (9022); Oak Pharmaceuticals, Inc. (6647); Olta Pharmaceuticals Corp. (3621); VersaPharm Incorporated (6739); VPI Holdings Corp. (6716); and VPI Holdings Sub, LLC.  The location of the Debtors' service address is:  1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.

[2]     A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Duane Portwood in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on May 20, 2020 (the "Petition Date").  Capitalized terms used but not otherwise defined in this motion shall have the meanings ascribed to them in the First Day Declaration or the Stalking Horse APA (as defined herein), as applicable.

chapter 11 cases, which included outreach to dozens of financial and strategic partners, substantial due diligence conducted by multiple parties, and initial indications of interest at valuations sufficient to fully pay the outstanding balance of the Debtors' secured term loan obligations. As the Debtors' nearly four-month marketing process drew to a close in late March, a confluence of factors adversely impacted interested parties' valuation levels, including perceived operational risks associated with the Debtors' ongoing FDA remediation efforts, perceived risks around obtaining approvals for new products in their pipeline, and the impact of the COVID-19 pandemic on capital markets and the availability of financing. Ultimately, the Debtors did not receive any binding bids sufficient to fully repay the term loan obligations.

2. As a result, on March 28, 2020, an immediate event of default under the term loan credit agreement occurred, and, consequently, the Debtors and an ad hoc group of lenders under the term loan credit agreement (the "Ad Hoc Group") pivoted to a pre-negotiated set of alternative milestones that contemplated a credit bid to serve as the "stalking horse" for a further marketing process to be conducted inside the Debtors' chapter 11 cases. The Ad Hoc Group and their advisors swiftly engaged with the Debtors' management, and conducted substantial due diligence. After arms'-length negotiation, on May 20, 2020, the Debtors agreed to an asset purchase agreement and restructuring support agreement with the Ad Hoc Group that, among other things, provides for a credit bid valued at approximately $1.05 billion as of the expected closing of the sale transaction, which bid will serve as the baseline bid as the Debtors further market-test the transaction in chapter 11. The Debtors are confident that interest from prospective purchasers will continue during the postpetition marketing process and generate a value-maximizing bid for the Debtors' assets or, if no higher or otherwise better bids materialize, facilitate a sale to the Ad Hoc

Group that will reduce the Debtors' go-forward leverage and otherwise position the Debtors for future success.

3.        But time is of the essence.  Given the uncertainty in the marketplace, the Debtors believe it is critical that the sale be consummated on the expedited timeline set forth herein in order to capitalize on the Ad Hoc Group's bid and avoid the value-destructive consequences of a protracted chapter 11 process.  Moreover, the sale timeline was specifically designed to balance the twin goals of (a) running a robust postpetition marketing process and (b) minimizing any potential business disruption.

4.        By this motion, the Debtors seek authority to capitalize on their efforts, conduct a postpetition process to market test the transaction contemplated by the Ad Hoc Group's bid, and consummate the sale to the Ad Hoc Group or a successful topping bidder.

## **Jurisdiction and Venue**

5.        The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with the motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.        Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.    The statutory bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006(a), and Local Rules 2002-1, 6004-1, and 9006-1.

## Background

8.    Akorn, Inc., together with its Debtor and non-Debtor subsidiaries (collectively, "Akorn") is a specialty pharmaceutical company that develops, manufactures, and markets generic and branded prescription pharmaceuticals, branded as well as private-label over-the-counter consumer health products, and animal health pharmaceuticals.  Akorn is an industry leader in the development, manufacturing, and marketing of specialized generic pharmaceutical products in alternative dosage forms.  Headquartered in Lake Forest, Illinois, Akorn has approximately 2,180 employees worldwide and maintains a global manufacturing presence, with pharmaceutical manufacturing facilities located in Illinois, New Jersey, New York, Switzerland, and India.  Akorn's operations generated approximately $682 million in revenue and approximately $124 million of Adjusted EBITDA in 2019.  The Debtors commenced these chapter 11 cases to conduct an orderly sale process that will position the Debtors for sustained future success by right-sizing their balance sheet and addressing their litigation overhang.

9.    On the Petition Date, each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no committees have been appointed or designated.

**Relief Requested**

10.     The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Bidding Procedures Order"):

       (a)     authorizing and approving the Bidding Procedures attached to **Exhibit 1** to the Bidding Procedures Order as (the "Bidding Procedures");

       (b)     approving the form and manner of notice of the sale hearing (the "Sale Hearing") with respect to the sale (the "Sale") of the Acquired Assets (as such term is defined in the Stalking Horse APA), attached as **Exhibit 2** to the Bidding Procedures Order (the "Sale Hearing Notice");

       (c)     scheduling the auction (the "Auction") (if necessary) and Sale Hearing;

       (d)     approving procedures (the "Assumption Procedures") for the assumption and assignment of executory contracts and leases (the "Assigned Contracts"), including notice of proposed cure amounts; and

       (e)     granting related relief.

11.     Lastly, the Debtors will seek entry of an order at the Sale Hearing (the "Sale

Order"), substantially in the form attached hereto as **Exhibit B**:

       (a)     authorizing and approving the Sale to the Stalking Horse Bidder or otherwise Successful Bidder (as defined in the Bidding Procedures) on the terms substantially set forth in the Successful Bid;

       (b)     authorizing and approving the Sale of the Acquired Assets free and clear of liens, claims, encumbrances, and other interests to the extent set forth in the Stalking Horse APA attached as **Exhibit 1** to the Sale Order or asset purchase agreement with a Successful Bidder;

       (c)     authorizing the assumption and assignment of the Assigned Contracts as set forth in the Stalking Horse APA or asset purchase agreement with a Successful Bidder; and

       (d)     granting any related relief.

12.     In support of the Debtors' request for entry of the orders, the Debtors submit the Buchsmann Declaration[3] and the First Day Declaration.[4]

**The Proposed Sale**

**I.     The Prepetition Marketing Process.**

13.     In January 2020, the Debtors, with the assistance of PJT Partners, Inc. ("PJT"), the Debtors' proposed investment banker, initiated a comprehensive marketing process for a going-concern sale of some or all of the Debtors' assets to a third-party purchaser.  Beginning in January 2020, PJT directly reached out to various strategic and financial buyers.  During the first round of the marketing process, PJT contacted sixty-nine potentially-interested parties (including both strategic purchasers in the pharmaceutical industry and financial purchasers), of which approximately thirty-seven entered into confidentiality agreements with the Debtors.  Several of the parties who completed significant diligence in the Debtors' prior efforts to raise out-of-court financing in the summer and fall of 2019 were invited to participate in the sale process, and parties who executed a confidentiality agreement received a copy of the Debtors' investor presentation and access to a virtual data room containing more than fifty files with certain information about the Debtors' business.  In addition, parties were offered the opportunity to participate in thirty-minute telephone conferences with the Debtors' management team.  PJT also instructed bidders to submit preliminary indications of interest by January 30, 2020.

---

[3]     The *Declaration of Mark Buschmann in Support of the Debtors' Motion for Entry of an Order (I) (A) Approving Bidding Procedures, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, and (D) Establishing Procedures for the Assumption and Assignment of Contracts and Leases, (II) (A) Approving the Asset Purchase Agreement, (B) Authorizing the Sale of Assets, and (C) Authorizing the Assumption and Assignment of Contracts and Leases, and (III) Granting Related Relief* (the "Buschmann Declaration"), a copy of which is attached hereto as **Exhibit C**.

[4]     The Debtors reserve the right to file and serve any supplemental pleading or declaration that the Debtors deem appropriate or necessary in their reasonable business judgment, including any pleading summarizing the competitive bidding and sale process and the results thereof, in support of their request for entry of the Bidding Procedures Order or the Sale Order.

14.     Several parties submitted non-binding indications of interest that contemplated a going-concern sale of the Debtors' business.  Based on the overall quality of the bid, value, and certainty of execution, the Debtors selected bidders to advance to the second round of the sale process.  These parties were invited to participate in a second round of bidding with access to further diligence, including site visits and discussions with the Debtors' management team.  Additionally, bidders received access to a second round virtual data room containing over 26,000 documents about the Debtors' business.  During the second round, the Debtors and PJT held in-person management meetings, responded to hundreds of diligence inquiries, conducted numerous follow-up calls, and hosted site visits at the Debtors' manufacturing sites.  On February 28, 2020, the Debtors uploaded a form of asset purchase agreement to the virtual data room.  PJT instructed bidders to submit updated indications of interest by March 9, 2020.

15.     Notwithstanding this significant, month's-long process and initial interest, the Debtors ultimately did not receive a binding bid that was sufficient to pay the outstanding amount of obligations of their term loan.  In response to these disappointing results, the Debtors swiftly pivoted to negotiating the terms of a comprehensive restructuring transaction with the Ad Hoc Group.  After good-faith, arm's-length negotiations regarding definitive documentation, the Ad Hoc Group and the Debtors reached an agreement that culminated in the Ad Hoc Group submitting a "stalking horse" credit bid to serve as the floor for further marketing of the Debtors' assets in bankruptcy (such bid, the "Stalking Horse" and such bidder, the "Stalking Horse Bidder").

## II.     The Stalking Horse Bidder and the Bidding Procedures.

16.     On May 20, 2020, the Debtors and the Stalking Horse Bidder reached agreement on the form of asset purchase agreement (including all exhibits and schedules related thereto, the "Stalking Horse APA").  Pursuant to the Sale , the Stalking Horse Bidder proposes to acquire the

Acquired Assets for total consideration valued at approximately $1.05 billion as of the expected

Closing Date, subject to certain adjustments (the "Purchase Price").

17.     Pursuant to the Bidding Procedures, the Debtors will solicit any higher or otherwise

better proposals according to the following proposed schedule, subject to Court approval and

availability:

| Event | Date |
|---|---|
| Bid Deadline | August 3, 2020 |
| Auction | August 10, 2020 |
| Contract Objection Deadline | August 15, 2020 |
| Sale Objection Deadline | August 15, 2020 |
| Sale Hearing | August 20, 2020 |

The Debtors believe this timeline is appropriate in light of the circumstances of these chapter 11

cases.

18.     The Debtors believe the Bidding Procedures will provide sufficient time for any

potential topping bidder to put forth an actionable competing bid.  During the Debtors' robust

prepetition marketing process, relevant information regarding the Debtors' business was made

available in the virtual data room, allowing potential bidders to conduct diligence on the Debtors'

business, and the Debtors and their advisors began marketing the Debtors' assets prior to the

commencement of these chapter 11 cases.  To the extent that any potential bidder has not

previously conducted such diligence, such bidder will have immediate access to, subject to the

execution of an appropriate confidentiality agreement, the information regarding the Debtors'

assets contained in the virtual data room.

19.     In light of the foregoing, the Debtors have determined that the Bidding Procedures

are in the best interests of the Debtors' estates, will establish whether and to what extent a market

exists for the Debtors' assets, and provide interested parties with sufficient opportunity to

participate.

## II.    Material Terms of the Stalking Horse APA.

20.    The following chart summarizes the terms and conditions of the Stalking Horse APA attached to the Sale Order as **Exhibit 1** and discloses certain information required pursuant to Local Rule 6004-1:[5]

| Stalking Horse APA Provision | Summary Description |
|---|---|
| **Stalking Horse APA Parties**<br><br>*See* Preamble | <u>Seller</u>:  Each of the Debtors<br><br><u>Purchaser</u>:  An entity to be formed in advance of the hearing on approval of the Bidding Procedures |
| **Purchase Price**<br><br>**Local Bankr. R. 6004-1(b)(iv)(N)**<br><br>*See* § 2.1 | The aggregate consideration to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities, (ii) the credit bid of all of the Loan Agreement Indebtedness (the "<u>Credit Bid Amount</u>") (such portion of the Purchase Price, the "<u>Credit Bid Portion</u>") and (iii) an amount in cash equal to the amount set forth in the Wind-Down Budget (the "<u>Wind-Down Amount</u>"). |
| **Acquired Assets**<br><br>*See* § 1.1 | "<u>Acquired Assets</u>" means all of the properties, rights, interests and other assets of Sellers as of the Closing of every kind and nature, whether tangible or intangible (including goodwill), real, personal, or mixed, known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP or specifically referred to in this Agreement, including any such properties, rights, interests, and other assets acquired by Sellers after the date hereof and prior to the Closing in accordance with Section 6.1, including the following properties, rights, interests and other assets of Sellers, but excluding in all cases, the Excluded Assets:<br><br>• other than any Excluded Cash, (i) all Cash and Cash Equivalents and (ii) all deposits (including maintenance deposits, customer deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments that have been prepaid by any Seller and are not referenced in Section 1.1(f) or Section 1.1(p);<br><br>• subject to Section 1.5, all Contracts to which any Seller is a party, including the Contracts listed on Schedule 1.1(b), and all purchase orders (the "<u>Assigned Contracts</u>"), and which schedule may be modified from time to time after the date hereof in accordance with Section 1.5, and, in each case, all rights under any such Assigned Contracts;<br><br>• all trade and non-trade accounts receivable, notes receivable, negotiable instruments and chattel paper owned or held, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto, but, in each case, for purposes of this Section 1.1(c), excluding any |

[5]    This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Stalking Horse APA, the Stalking Horse APA shall govern in all respects. All references to schedules or sections in the following summary shall refer to schedules or sections of the Stalking Horse APA

| Stalking Horse APA Provision | Summary Description |
|---|---|
|  | intercompany Indebtedness among Sellers and any amounts owing from any Excluded Subsidiary; provided, however, that Acquired Assets shall include the intercompany receivable described on Schedule 1.1(c);

• other than any Documents whose transfer to Purchaser is prohibited by applicable Law, and subject to Section 1.2(c), all Documents, including (i) all Regulatory Documentation and Tax Returns (subject to Section 6.2(c) and Sellers' right to retain copies of such Tax Returns) (and any related work papers) relating to the other Acquired Assets or Assumed Liabilities, and (ii) subject to Section 6.2(c) and Sellers' right to retain copies thereof, those prepared or received by or on behalf of any Seller in connection with the sale of the Acquired Assets, this Agreement, or the transactions contemplated hereby, including (A) all records and reports prepared or received by Sellers, any of their respective Affiliates or Advisors in connection with the sale of the Acquired Assets and the transactions contemplated hereby, and (B) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets;

• the Owned Real Property listed on Schedule 1.1(e) (the "Acquired Owned Real Property");

• the Leased Real Property listed on Schedule 1.1(f) (the "Acquired Leased Real Property"), including any Leasehold Improvements and all permanent fixtures, improvements, and appurtenances thereto and including any security deposits or other deposits delivered in connection therewith;

• other than the assets set forth on Schedule 1.1(g)(i), all tangible assets (including Equipment, accessories, materials, machinery and all other similar items of tangible personal property or capital assets) of Sellers, including any tangible assets of Sellers located at any Acquired Leased Real Property or Acquired Owned Real Property or any location set forth on Schedule 1.1(g)(ii) and any other tangible assets on order to be delivered to any Seller;

• all rights against third parties (including suppliers, vendors, merchants, manufacturers and counterparties to leases, licensees, licensors or of the Company or any of its Subsidiaries arising under or related to any Assigned Contract, other Acquired Asset or Assumed Liability), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (including Tax refunds (i) with respect to the Acquired Assets, except to the extent any anticipated Tax refund is taken into account in reducing the Wind-Down Amount, and/or (ii) arising from the carryback of any net operating loss to a prior taxable year, whenever received, or the amount of any cash with respect to such Tax refund, including any amount received in respect of the federal income Tax refund filings described on Schedule 1.1(h), Actions, rights of set off, rights of recovery, rights of subrogation, rights of recoupment, rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties or other similar rights, in each case with respect to Assumed Liabilities or arising from the use, ownership, |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | possession, operation, business integration operation, sale or lease of any Acquired Assets;<br><br>• to the extent transferrable under applicable Law, all of the rights, interests and benefits accruing under all Permits and Governmental Authorizations, and all pending applications therefor;<br><br>• subject to Section 6.15, all shares of capital stock or other equity interests that any Seller owns, directly or indirectly, in the Subsidiaries set forth on Schedule 1.1(j) (the "Acquired Subsidiaries"), including any securities convertible into, or exchangeable or exercisable for, any such shares of capital stock or other equity interests, investments or contributions in the Acquired Subsidiaries;<br><br>• the sponsorship of each Assumed Benefit Plan and all right, title and interest in any assets thereof or relating thereto;<br><br>• all Company Owned Intellectual Property, all rights to collect royalties and proceeds in connection therewith, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Company Owned Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world;<br><br>• all goodwill, payment intangibles and general intangible assets and rights of Sellers;<br><br>• all Inventory of Sellers whether or not obsolete or carried on Sellers' books of account, in each case, with any transferable warranty and service rights related thereto;<br><br>• all Product Registrations, Registration Information, and all other data and information regarding the development and commercialization of the Products, including all safety and efficacy databases, clinical data, non-clinical data and related books and records;<br><br>• all credits, prepaid expenses, deferred charges, advance payments, refunds, rights of set-off, rights of recovery, security deposits, prepaid items and duties to the extent related to the other Acquired Assets (including Assigned Contracts) or the Assumed Liabilities;<br><br>• except with respect to any Excluded Confidentiality Arrangements, all rights and obligations under non-disclosure, confidentiality, and similar arrangements with (or for the benefit of) employees and agents of Sellers or with third parties (including any non-disclosure, confidentiality agreements or similar arrangements entered into in connection with or in contemplation of the filing of the Bankruptcy Case and the Auction contemplated by the Bidding Procedures Order);<br><br>• (i) all Avoidance Actions relating to the Acquired Assets and/or Assumed Liabilities, including actions relating to vendors and service providers that are counterparties to Assigned Contracts or relating to Assumed Liabilities |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | (collectively, the "<u>Acquired Avoidance Actions</u>") and (ii) all rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment existing as of the Closing of any Seller against any Transferred Employee or any employee of any Acquired Subsidiary;<br><br>• all insurance benefits, including rights and proceeds, to the extent arising from or relating to any of the Acquired Assets or Assumed Liabilities (including returns and refunds of any premiums paid, or other amounts due back to Sellers, with respect to cancelled policies); and<br><br>• except for the Excluded Bank Accounts, all of Sellers' bank accounts.<br><br>• At any time at least one (1) Business Day prior to the Closing, Purchaser may, in its sole discretion and by written notice to the Company, designate any of the Acquired Assets (other than (A) any purchase orders (except a purchase order entered into in connection with, or otherwise governed by, any Excluded Contract) and any Assumed Benefit Plans, and (B) any Contracts, the treatment of which are the subject of Section 1.5(b)) as additional Excluded Assets, which notice shall set forth in reasonable detail the Acquired Assets so designated.  Purchaser acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to designate any Acquired Assets as Excluded Assets pursuant to the operation of this paragraph.  Notwithstanding any other provision hereof to the contrary, the Liabilities of Sellers under or related to any Acquired Asset designated as an Excluded Asset pursuant to this paragraph will constitute Excluded Liabilities |
| **Assumed Liabilities**<br><br>*See* § 1.3 | On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, Purchaser or a Designated Purchaser shall assume from Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall convey, transfer, and assign to Purchaser or a Designated Purchaser, only the following Liabilities (and no other Liabilities, which other Liabilities shall be retained by Sellers), without duplication and only to the extent not paid, performed, discharged or otherwise satisfied prior to the Closing (collectively, the "<u>Assumed Liabilities</u>"):<br><br>• all Liabilities of Sellers arising from the Assigned Contracts, solely to the extent arising from periods occurring after the Closing and excluding, for the avoidance of doubt, any Liabilities contemplated by Section 1.4(e);<br><br>• all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "<u>Cure Costs</u>");<br><br>• all Liabilities arising out of the ownership or operation of the Acquired Assets, in each case, by Purchaser solely to the extent arising from periods occurring after the Closing and excluding, for the avoidance of doubt, any Liabilities contemplated by Section 1.4(e);<br><br>• all (i) accrued trade and non-trade payables, (ii) open purchase orders (except a purchase order entered into in connection with, or otherwise governed by, any Excluded Contract), (iii) Liabilities arising under drafts or checks outstanding at Closing, (iv) accrued royalties, (v) accrued compensation, employee expenses and benefits in each case for |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | Transferred Employees, but excluding workers' compensation claims for injuries occurring prior to the Closing, and (vi) all Liabilities arising from rebates, returns, recalls, chargebacks, coupons, discounts, failure to supply claims and similar obligations, in each case, to the extent (and solely to the extent) (x) incurred in the Ordinary Course and otherwise in compliance with the terms and conditions of this Agreement (including Section 6.1) and (y) not arising under or otherwise relating to any Excluded Asset; |
| | • Assumed Taxes; |
| | • subject to Section 6.15, the sponsorship of, and all Liabilities at any time arising under, pursuant to or in connection with, the Seller Plans (the "Assumed Benefit Plans"), and all Liabilities for compliance with the requirements of Section 4980B of the Code with respect to all individuals who are "M&A qualified beneficiaries" as such term is defined in Treasury Regulations §54.4980B-9; |
| | • to the extent, and solely to the extent, arising from Purchaser's failure to comply with Section 6.3,  all Liabilities related to Purchaser's selection of employees, including any failure to extend offers of employment, pursuant to Section 6.3 and any Liabilities for severance or under the WARN Act, in each case, that (i) constitute bankruptcy administrative expenses of Sellers and (ii) result from or arise out of Purchaser's failure to make an offer of employment to any employees or any Sellers' subsequent termination of such employee's employment in connection with or following the Closing; |
| | • all Liabilities owing to any Subsidiary of the Company, other than to an Excluded Subsidiary; |
| | • Liabilities arising under Section 503(b)(9) of the Bankruptcy Code; |
| | • all Liabilities and obligations of Sellers for compliance with ISRA at the Acquired Leased Real Property in New Jersey; and |
| | • all Liabilities, if any, set forth on Schedule 1.3(k). |
| **Excluded Assets**<br><br>*See* §1.2 | Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, or convey, and Sellers shall retain all right, title and interest to, in and under the following assets, properties, interests and other interests of such Seller (collectively, the "Excluded Assets"):<br><br>• any Excluded Cash, if applicable, and any retainers or similar amounts paid to Advisors or other professional service providers (which amounts shall be taken into account in the Wind-Down Budget and determining the Wind-Down Adjustment Amount);<br><br>• each Contract of any Seller that is listed on Schedule 1.2(b), which schedule may be modified from time to time after the date hereof in accordance with Section 1.5 (the "Excluded Contracts"); |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | • all Documents (i) to the extent (and solely to the extent) exclusively related to any of the Excluded Assets or Excluded Liabilities; (ii) minute books, organizational documents, stock registers and such other similar books and records of any Seller (excluding, for the avoidance of doubt, the Acquired Subsidiaries) as pertaining to ownership, organization or existence of such Seller (other than Tax Returns described in Section 1.1(d)), or any corporate seal of any Seller (other than an Acquired Subsidiary); or (iii) that any Seller is required by applicable Law to retain; provided that, to the extent not prohibited by applicable Law, Purchaser shall have the right to make copies of such Documents (or any portions thereof); <br><br>• all materials, Documents, reports and records of a Seller or any of its Affiliates that are subject to any attorney-client privilege and the transfer of which to Purchaser would result in the waiver of any such privilege ("Retained Privileged Materials"); <br><br>• without prejudice to Section 6.9, all current and prior director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries under such insurance policies; <br><br>• all membership interests or other equity interests of any Seller or any of their respective Subsidiaries (excluding the Acquired Subsidiaries) (the "Excluded Subsidiaries"), or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests of such Excluded Subsidiaries but excluding, for the avoidance of doubt, any investment or contribution described on Schedule 1.2(f); <br><br>• other than the Acquired Avoidance Actions, all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment existing as of the Closing of any Seller, in each case, solely to the extent (y) related to any other Excluded Assets or any Excluded Liabilities and (z) not against any Transferred Employee or employee of any Acquired Subsidiary; <br><br>• Sellers' claims or other rights under this Agreement, including the right to be paid the Purchase Price hereunder at the Closing in accordance with the terms hereof, or Sellers' rights under any agreement, certificate, instrument, or other document executed and delivered between any Seller and Purchaser in connection with the transactions contemplated hereby entered into on or after the date hereof; <br><br>• subject to Section 1.1(h) all Tax attributes that are not transferred by the operation of applicable Tax Law; <br><br>• all real estate and all interests in real estate (including any Leasehold Improvements thereon), other than the Acquired Owned Real Property and the Acquired Leased Real Property (including, for the avoidance of doubt, any Leasehold improvements thereon); |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | • every asset of Sellers that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) in compliance with the terms and conditions of this Agreement (including Section 6.1) or (ii) if Purchaser otherwise agrees, in writing after the date hereof, to such conveyance or other disposition;<br><br>• the tangible assets (including Equipment, accessories, materials, machinery and all other similar items of tangible personal property or capital assets) of Sellers expressly set forth on Schedule 1.1(g)(i);<br><br>• any Excluded Confidentiality Arrangements, if applicable;<br><br>• the Excluded Bank Accounts (but not, for the avoidance of doubt, any Cash and Cash Equivalents, or any other property or assets, held or deposited in such Excluded Bank Accounts other than Excluded Cash, if any);<br><br>• any asset, property, interest or other interest of a Seller which is an Excluded Asset by operation of Section 6.15; and<br><br>• the properties and assets set forth on Schedule 1.2(p). |
| **Excluded Liabilities**<br><br>*See* §1.4 | Purchaser and the Designated Purchaser(s) (if any) shall not assume and shall not be deemed to have assumed, nor shall be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Sellers or relating to the Acquired Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing prior to or on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities, and Sellers shall be solely and exclusively liable for any and all such Liabilities, including those Liabilities set forth below (collectively, the "Excluded Liabilities"):<br><br>• except to the extent of any Liabilities expressly assumed pursuant to Section 1.3, all Liabilities arising out of, relating to or otherwise in respect of the Acquired Assets or the operation of the business of Sellers arising on or prior to the Closing;<br><br>• all Liabilities to the extent relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;<br><br>• except to the extent of any Liabilities expressly assumed pursuant to Sections 1.3(g) and 1.3(i), any and all Liabilities in respect of the Excluded Contracts and any other Contracts to which any Seller is party or is otherwise bound that are not Assigned Contracts;<br><br>• except to the extent of any Liabilities expressly assumed pursuant to Sections 1.3(d) or 1.3(h), any and all Liabilities of Sellers for Indebtedness; |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | <ul><li>all Liabilities arising from or related to any Action (whether civil, criminal, administrative, investigative, or informal) against the Company or any of its Subsidiaries (including, for the avoidance of doubt, any Action related to fraud, breach of fiduciary duty, misfeasance or under any other theory relating to conduct, performance or non-performance of the Company or any of its Subsidiaries, or any of their respective directors, officers, or employees), or related to the Acquired Assets or the Assumed Liabilities, pending or threatened or having any other status or with respect to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing Date (including any breach, default, failure to perform, torts related to performance, violations of Law, infringements or indemnities, guaranties and overcharges, underpayments or penalties, whether in respect of any Contract, agreement, arrangement, promise or understanding of any kind), including any successor liability claims or that may be owed to or assessed by, any Governmental Body or other Person, and whether commenced, filed, initiated, or threatened prior to, on or following the Closing;</li><li>except to the extent of any Liabilities expressly assumed pursuant to Sections 1.3(g) or 6.3 and without prejudice to Section 10.2 or Section 1.3(b), all costs and expenses incurred or to be incurred by Sellers in connection with the drafting, preparation, negotiation, diligence, execution, and performance of this Agreement and the consummation of the transactions contemplated hereby;</li><li>except to the extent of any Liabilities expressly assumed pursuant to Sections 1.3(d), 1.3(f), 1.3(g) or 6.3, all Liabilities related to any current or former employee of the Company or of any Subsidiary of the Company (other than all Liabilities related to the Transferred Employees arising on or after the date such applicable Employee becomes a Transferred Employee, including under the WARN Act);</li><li>all Liabilities for any Taxes (including Taxes payable by reason of contract, assumption, transferee or successor Liability, operation of Law, pursuant to Treasury Regulation Section 1.1502-6 (or any similar provision of any state or local law) or otherwise: (i) arising or relating to any Pre-Closing Tax Period (including any Straddle Period Taxes), (ii) owed by any of Sellers (whether or not relating to a Pre-Closing Tax Period), including pursuant to any Tax sharing, Tax indemnity or similar agreement or arrangement to which any Seller (or any Affiliate thereof) is obligated under or a party to, (iii) arising in connection with the consummation of the transactions contemplated by this Agreement, and (iv) Taxes arising from or in connection with an Excluded Asset), in each case, other than to the extent such Tax is an Assumed Tax;</li><li>except to the extent of any Liabilities expressly assumed pursuant to Sections 1.3(d), 1.3(f) or 6.3, all Liabilities arising out of, relating to, or with respect to any and all Employees and contractors of the Company or any of its Subsidiaries arising at any time on or prior to the Closing;</li></ul> |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | • except to the extent of any Liabilities expressly assumed pursuant to Sections 1.3(f) or 6.3, and without prejudice to Section 1.5, all Liabilities of Sellers arising out of any Contract, agreement, Permit, franchise or claim that is not transferred to Purchaser as part of the Acquired Assets or, is not transferred to Purchaser because of any failure to obtain any Consent or Governmental Authorization required for such transfer;<br><br>• subject to Section 1.3(j), all Liabilities of Sellers arising under or pursuant to Environmental Laws, including with respect to any real property owned, operated, leased or otherwise used by Sellers, whether or not used in the Ordinary Course, including any Liabilities for noncompliance with Environmental Laws or the Release of Hazardous Substances, to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the Closing, whether known or unknown as of the Closing;<br><br>• drafts or checks outstanding as of the Closing (except to the extent expressly stated as an Assumed Liability in Section 1.3(d)); and<br><br>• all Liabilities set forth on Schedule 1.4(m). |
| **Representations and Warranties of Sellers**<br><br>*See §3* | The Stalking Horse Purchase Agreement contains customary representations and warranties, including, but not limited to, representations of Seller regarding: (a) organization and qualification; (b) authorization of agreement; (c) conflicts; consents; (d) equity interests of non-debtor subsidiaries; (e) financial statements; internal controls; SEC reports; (f) real property; (g) title to property; (h) sufficiency of assets; (i) insurance; (j) contracts; (k) litigation; (l) permits; compliance with laws; (m) anti-corruption and international trade compliance; (n) environmental matters; (o) intellectual property; (p) tax matters; (q) sellers plans; (r) employees; (s) affiliate transactions; (t) brokers; (u) inventory; (v) customers and suppliers; (w) product liability; (x) health care regulatory matters; (y) absence of certain changes; (z) bank accounts; and (aa) no other representations or warranties. |
| **Representations and Warranties of Purchaser**<br><br>*See §4* | The Stalking Horse Purchase Agreement contains customary representations and warranties, including, but not limited to, representations of Purchaser regarding: (a) organization and qualification; (b) authorization of agreement; (c) conflicts; consents; (d) financing; (e) brokers; (f) credit bid; (g) no litigation; (h) certain agreements; (i) investment representations; investigation; and (j) no additional representations or warranties. |
| **Agreements with Management**<br><br>**Local Bankr. R. 6004-1(b)(iv)(B)**<br><br>*See §4.8* | As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of the Company or any of its Subsidiaries or board of directors (or applicable governing body of any Subsidiary), any holder of equity or debt securities of the Company or its Subsidiaries, or any lender or creditor of the Company or its Subsidiaries, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the transactions contemplated by this Agreement or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of the Company to entertain, negotiate or participate in any such transaction. |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| **Good Faith Deposit**<br><br>Local Bankr. R. 6004-1(b)(iv)(F) | No good faith deposit is required. |
| **Tax Exemption**<br><br>Local Bankr. R. 6004-1(b)(iv)(I)<br><br>*See* §9.1 | Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, value added, motor vehicle registration, excise, documentary, stamp, or other similar Taxes and all filing and recording charges (and any interest, penalties and additions with respect to such Taxes and fees) payable by reason of the consummation of the transactions contemplated by this Agreement, including the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby in any U.S. or foreign jurisdiction (the "<u>Transfer Taxes</u>") shall be borne by Purchaser, regardless of the party on whom liability is imposed under the provisions of the Laws relating to such Transfer Taxes.  For the avoidance of doubt, Transfer Taxes shall not include any income or similar taxes.  The party customarily responsible under applicable Law shall file all necessary Tax Returns with respect to Transfer Taxes.  Sellers and Purchaser shall cooperate to ensure that all such Transfer Taxes are timely paid and all Tax Returns related to the Transfer Taxes are timely filed.  Sellers and Purchaser shall use commercially reasonable efforts and cooperate in good faith to exempt all such transactions from any Transfer Taxes. Sellers shall, and shall cause their Subsidiaries (as applicable), or Purchaser (or its subsidiaries) shall, as applicable, as soon as practicable after any payment of any Transfer Taxes to the relevant Governmental Body, deliver to the non-paying party the original or a certified copy of a receipt issued by the relevant Governmental Body evidencing such payment and any tax certificates or forms in respect of such Transfer Taxes and any other form or other information that could aid in the recovery of any such Transfer Taxes in a form reasonably satisfactory to the non-paying party. |
| **Requested Findings as to Successor Liability**<br><br>Local Bankr. R. 6004-1(b)(iv)(L)<br><br>*See* §6.13 | The Parties intend that, to the fullest extent permitted by applicable Law (including under Section 36 of the Bankruptcy Code), upon the closing, Purchaser shall not be deemed to:  (a) be the successor of any Seller, (b) have, de facto, or otherwise, merged with or into Sellers, (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers or (d) be liable or have any Liability for any acts or omissions of Sellers in the conduct of their businesses or arising under or related to the Acquired Assets other than as expressly set forth and agreed in this Agreement.  Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that Purchaser shall have no Liability for any Encumbrance (other than the Assumed Liabilities and Permitted Encumbrances on the Acquired Assets) against Sellers or any of Sellers predecessors or Affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or in connection with the transactions contemplated to occur on the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the businesses of Sellers, the Acquired Assets or any Liability of Sellers arising prior to, or relating to any period occurring prior to, the Closing Date.  The Parties agree that the Sale Order shall contain provisions substantially in the form set forth in this Section 6.13. |
| **Sale of Unexpired Leases Free and Clear** | Sellers acknowledge and agree, and the Sale Order shall provide that, except as otherwise provided in Section 1.3, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances of, against or created by Sellers or their bankruptcy estate, to the |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| Local Bankr. R. 6004-1(b)(iv)(M) *See* §5.4 | fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Acquired Assets.  On the Closing Date, the Acquired Assets shall be transferred to Purchaser free and clear of all obligations, Liabilities and Encumbrances, other than Permitted Encumbrances and the Assumed Liabilities to the fullest extent permitted by Section 363 of the Bankruptcy Code. |

## The Bidding Procedures Order

### I.    The Bidding Procedures.

21.    To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures, attached as **Exhibit 1** to the Bidding Procedures Order.[6]

22.    The proposed Bidding Procedures are designed to permit a fair, efficient, competitive, and value-maximizing auction process for the Debtors' assets, consistent with the timeline of these chapter 11 cases, to confirm that the Stalking Horse Bid is the best offer, or promptly identify the alternative bid that is higher or otherwise better.

23.    The Bidding Procedures will provide potential bidders with ample notice and time to conduct thorough due diligence to submit binding bids in advance of the Sale Hearing.  The Debtors and their advisors have already commenced a marketing and sale process to confirm the market value of the Debtors' assets.  In creating the Bidding Procedures, the Debtors are seeking to balance their interests in consummating the Sale on a timeline that ensures the Stalking Horse Bidder's willingness to provide a floor offer while at the same time preserving the opportunity to attract the highest or otherwise best offer.  The Bidding Procedures are designed to encourage all

---

[6]    This summary is qualified in its entirety by the Bidding Procedures attached as **Exhibit 1** to the Bidding Procedures Order. All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings given to such terms in the Bidding Procedures. To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

prospective bidders to put their best bid forward, bring finality to the Debtors' restructuring process, and create a path towards entry of the Sale Order that embodies the highest or otherwise best available recoveries to the Debtors' stakeholders.

24.     Because the Bidding Procedures are attached as **<u>Exhibit 1</u>** to the proposed Bidding Procedures Order, they are not restated fully herein. Generally speaking, however, the Bidding Procedures establish, among other things:[7]

- the Debtors will serve the Bidding Procedures Order (setting forth the Sale Schedule), Bidding Procedures, Sale Notice, and Cure Notice upon the Notice Parties as soon as practicable after entry of the Bidding Procedures Order;

- the availability of, access to, and conduct during due diligence by Acceptable Bidders;

- the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be "Qualified Bids" sufficient to trigger the Auction, including the minimum consideration that must be provided, the terms and conditions that must be satisfied, and the deadline that must be met by any bidder to be considered a "Qualified Bidder" and participate in the Auction;

- the manner in which Qualified Bids will be evaluated by the Debtors to determine the initial leading Qualified Bid for the Auction;

- the conditions for having the Auction and procedures for conducting the Auction, if any; and

- various other matters relating to the sale process generally, including the designation of the Back-Up Bid, return of any good faith deposits, and certain reservations of rights.

25.     Importantly, the Bidding Procedures recognize and comply with the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified bid proposals and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

---

[7]    The following summary is provided for convenience purposes only. To the extent any of the terms described below are inconsistent with the Bidding Procedures, the Bidding Procedures control in all respects. Capitalized terms used in this summary but not defined herein shall have the meanings ascribed to them in the Bidding Procedures

II.      **Form and Manner of Sale Hearing Notice.**

26.      Within five (5) business days after entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors will cause the notice, substantially in the form attached as **<u>Exhibit 2</u>** to the Bidding Procedures Order (the "<u>Sale Hearing Notice</u>"), to be served on the following parties or their respective counsel, if known: (a) the Notice Parties (as defined in the Bidding Procedures); (b) counsel to the Stalking Horse Bidder; (c) all parties to the Assigned Contracts to be assumed and assigned as part of the proposed Sale; (d) all parties who have expressed a written interest in some or all of the Debtors' assets; (e) all known holders of liens, encumbrances, and other claims secured by the Debtors' assets; (f) the Internal Revenue Service; (g) all applicable state and local taxing authorities; (h) the Food and Drug Administration; (i) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (j) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

27.      In addition, within five (5) business days after entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors will provide notice of the Sale Hearing through the publication of the Sale Hearing Notice on the website of the Debtors' proposed noticing and claims agent to be retained in these chapter 11 cases, Kurtzman Carson Consultants LLC, at www.kccllc.net/akorn.

28.      The Debtors respectfully submit that the Sale Hearing Notice is reasonably calculated to provide interested parties with notice of the Sale and Sale Hearing and an opportunity to respond accordingly.

III.      **Summary of the Assumption Procedures.**

29.      The Debtors seek entry of the Assumption Procedures to facilitate the fair and orderly assumption and assignment of the Assigned Contracts in connection with the Sale.

Because the Bidding Procedures Order sets forth the Assumption Procedures in detail, they are not restated herein.  Generally, however, the Assumption Procedures:  (a) outline the process by which the Debtors will serve notice to all counterparties to the Assigned Contracts regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right and the procedures to object thereto; and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Assigned Contracts to the extent necessary.

## Basis for Relief

### I.    The Relief Sought in the Bidding Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved.

30.    Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.  *See, e.g.*, *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'" (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *In re Schipper*); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656–7 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

31.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir  2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the

estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Res.*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

32.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g.*, *Integrated Res.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

33.    The Debtors believe that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Debtors' assets.  The proposed Bidding Procedures will allow the Debtors to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Debtors' assets and who can demonstrate the ability to close a transaction.  Specifically, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

34.    At the same time, the Bidding Procedures provide the Debtors with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale.  Entering into the Stalking Horse APA with the Stalking Horse Bidder ensures that the Debtors obtain fair market value by setting a minimum purchase price for the Debtors' assets that will be tested in the marketplace.  As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable and at or above market.

35.    The Debtors submit that the proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved by this Court and courts in other districts.  *See e.g. In re Dura Automotive Sys., LLC,* No. 19-12378 (KBO) (Bankr. D. Del. Nov. 19, 2019); *In re PES Holdings, LLC,* No. 19-11626 (KG) (Bankr. D. Del. Nov. 14, 2019); *In re Z Gallerie, LLC*, No. 19-10488 (KBO) (Bankr. D. Del. Mar. 11, 2019); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019); *In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Aug. 6, 2019).[8]

**II.     The Form and Manner of the Sale Hearing Notice Should Be Approved.**

36.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

---

[8]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

37.     As noted above, within five (5) business days of entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors will serve the Sale Hearing Notice upon the following parties or their respective counsel, if known:  (a) the Notice Parties (as defined in the Bidding Procedures); (b) counsel to the Stalking Horse Bidder; (c) all parties to executory contracts and leases to be assumed and assigned, or rejected as part of the proposed Sale; (d) all parties who have expressed a written interest in some or all of the Debtors' assets; (e) all known holders of liens, encumbrances, and other claims secured by the Debtors' assets; (f) the Internal Revenue Service; (g) all applicable state and local taxing authorities; (h) the Food and Drug Administration; (i) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (j) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

38.     In addition, within five (5) business days after entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors will provide notice of the Sale Hearing through the publication of the Sale Hearing Notice on the website of the Debtors' proposed noticing and claims agent to be retained in these chapter 11 cases, Kurtzman Carson Consultants LLC, www.kccllc.net/akorn.

39.     The Debtors submit that notice of this motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Hearing Notice, the contract notice, and the Assumption Notice as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, the Debtors request that this Court approve the form and manner of the Sale Hearing Notice.

**III.    The Assumption Procedures Are Appropriate and Should Be Approved.**

40.    As set forth above, the Sale contemplates the assumption and assignment of contracts to the Stalking Horse Bidder or Successful Bidder arising from the Auction, if any. In connection with this process, the Debtors believe it is necessary to establish the Assumption Procedures by which:  (a) the Debtors and contract counterparties can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code; and (b) such counterparties can object to the assumption and assignment of contracts and/or related cure amounts.

41.    As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any contract be deemed to consent to the assumption and assignment of the applicable contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure amounts identified in the contract notice. *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

42.    The Debtors believe that the Assumption Procedures are fair and reasonable, provide sufficient notice to parties to the executory contracts and leases, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof.  Accordingly, the Debtors request the Court approve the Assumption Procedures set forth in the Bidding Procedures Order.

**IV.    The Sale Should Be Approved as an Exercise of Sound Business Judgment.**

43.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed

transaction. *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc's, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

44.     Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *Integrated Res.*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

### A.     A Sound Business Purpose Exists for the Sale.

45.     As set forth above, the Debtors have a sound business justification for selling the Acquired Assets. *First*, the Debtors believe the Sale will maximize the Acquired Assets' going-concern value by allowing a party to bid on business assets that would have substantially less value on a stand-alone basis. Moreover, because the Stalking Horse APA contemplates the assumption of certain of the Debtors' estates' contracts and other obligations, it will result in payment in full for a number of the Debtors' estates' creditors.

46.     *Second*, the sale of the Acquired Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Acquired

Assets.  Consequently, the ultimately successful bid, after being subject to a "market check" in the form of the Auction, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Acquired Assets and will provide a greater recovery for their estates than any known or practicably available alternative.  *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

47.     Thus, the Debtors submit that the Successful Bidder's purchase agreement will constitute the highest or otherwise best offer for the Acquired Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  As such, the Debtors' determination to sell the Acquired Assets through an Auction process and subsequently to enter into the Successful Bidder's purchase agreement will be a valid and sound exercise of the Debtors' business judgment.  The Debtors will submit evidence at the Sale Hearing to support these conclusions.  Therefore, the Debtors request that the Court make a finding that the proposed sale of the Acquired Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

**B.      Adequate and Reasonable Notice of the Sale Will Be Provided.**

48.     The Sale Hearing Notice:  (a) will be served in a manner that provides parties in interest notice of the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale. Significantly, the form and manner of the Sale Hearing Notice will have been approved by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served on parties in interest.

C.      **The Sale and Purchase Price Reflects a Fair Value Transaction.**

49.     It is well-settled that, where there is a court-approved auction process, a full and

fair price is presumed to have been obtained for the assets sold, as the best way to determine value

is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*,

526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL

1820326, *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an

auction procedure," "the auction procedure has developed over the years as an effective means for

producing an arm's length fair value transaction.").

50.     Moreover, as described herein, even as the Debtors move forward with the Sale,

PJT will continue to market the Debtors' assets and solicit other offers consistent with the

Bidding Procedures, including, for example, by contacting previously solicited parties, continuing

to provide acceptable bidders with data room access and requested information, considering a

variety of alternative transaction structures, and otherwise assisting the Debtors with all efforts to

increase transaction value.  In this way, the number of bidders that are eligible to participate in a

competitive Auction process will be maximized, or, if no Auction is held because no Auction is

necessary, the Stalking Horse APA's purchase price will, conclusively, be fair value.

D.      **The Sale Has Been Proposed in Good Faith and Without Collusion, and
        the Stalking Horse Bidder or Successful Bidder Is a "Good-Faith Purchaser."**

51.     The Debtors request that the Court find the Stalking Horse Bidder and/or other

Successful Bidder arising from the Auction, if any, are entitled to the benefits and protections

provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Acquired

Assets.

52.     Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease or property does

> not affect the validity of a sale or lease under such authorization to
> an entity that purchased or leased such property in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).

53.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith." While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made. *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.* ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Servs., Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

54.     The Debtors submit that the Stalking Horse Bidder, or any other Successful Bidder arising from the Auction, is or would be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code, and the Stalking Horse APA, or any marked versions thereof, are or would be good-faith agreements on arms'-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.[9]   ***First***, as set forth in more detail above, the

---

[9]   The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder arising from the Auction. Pursuant to the Bidding Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures. In addition, the Debtors will not choose as the Successful Bidder or Backup Bidder (as defined in the Bidding Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard

consideration to be received by the Debtors pursuant to the Stalking Horse APA is substantial, fair, and reasonable. *Second*, the parties entered into the Stalking Horse APA in good faith and after extensive, arm's-length negotiations, during which all parties were represented by competent counsel, and any sale agreement with a Successful Bidder will be the culmination of a competitive Auction process in which all parties will presumably be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis. *Third*, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale or Stalking Horse APA to be avoided under section 363(n) of the Bankruptcy Code. And, with respect to potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. *Finally*, the Stalking Horse Bidder's offer was evaluated and approved by the Debtors in consultation with their advisors, and any other bids that the Debtors ultimately determine to be a successful bid will have been evaluated in a similar fashion. Accordingly, the Debtors believe that the Stalking Horse Bidder (or other Successful Bidder arising from the Auction, if any) and Stalking Horse APA (or marked version thereof) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

### E.    The Sale Should be Approved "Free and Clear" Under Section 363(f).

55.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of

---

of section 363(m) of the Bankruptcy Code has been satisfied.

a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

56.     Section 363(f) of the Bankruptcy Code is drafted in the disjunctive.   Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtors' sale of the Acquired Assets free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be assumed liabilities under the applicable purchase agreement. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

57.     The Debtors submit that any interest that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.   The Debtors accordingly request authority to convey the Acquired Assets to the Stalking Horse Bidder or other Successful Bidder arising from the Auction, if any, free and clear of all liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the Sale.

**F.      Credit Bidding Should Be Authorized Under Section 363(k) of the Bankruptcy Code.**

58.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such

claim against the purchase price of such property." 11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) of the Bankruptcy Code allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value.  *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district court and bankruptcy courts that creditors can bid the full face value of their secured claims under section 363(k)").

59.     In this district, absent cause for restricting credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim.  *See e.g. In re Dura Automotive Systems, LLC,* No. 19-12378 (KBO) (Bankr. D. Del. Nov. 19, 2019); *In re PES Holdings, LLC*, No. 19-11626 (KG) (Bankr. D. Del. Nov. 14, 2019) (order approving bid procedures which authorized parties with secured claims to credit bid); *In re Z Gallerie, Inc.*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 11, 2019) (same); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019) (same); *In re GST Autoleather Inc.*, No. 17-12100 (LSS) (Bankr. D. Del. Nov. 15, 2017) (same).

60.     Here, the Stalking Horse APA contemplates consideration in the form of a credit bid of the outstanding obligations under the Debtors' term loan credit facility.  The administrative agent under the term loan credit facility, for itself and for and on behalf of the term loan lenders, is entitled to credit bid some or all of the claims secured by its collateral pursuant to section 363(k) of the Bankruptcy Code.  Accordingly, the credit bid contemplated by the Stalking Horse APA should be authorized.

V.     **The Assumption and Assignment of Contracts Should Be Approved.**

    A.     **The Assumption and Assignment of Contracts Reflects the Debtors' Reasonable Business Judgment.**

61.     To facilitate and effectuate the sale of the Acquired Assets, the Debtors are seeking authority to assign or transfer executory contracts to the Stalking Horse Bidder or other Successful Bidder arising from the Auction, if any, to the extent required by such bidders.

62.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign their executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g.*, *Grp. of Inst'l Invrs. v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr. Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code."); *In re Network Access Sols., Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard").

63.     Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale as a sound exercise of the Debtors' business

judgment:  *First*, the Assigned Contracts are necessary to operate the Acquired Assets and, as such, they are essential to inducing the best offer for the Acquired Assets.  *Second*, it is unlikely that any purchaser would want to acquire the Acquired Assets unless a significant number of the contracts and leases needed to manage the day-to-day operations were included in the transaction. *Third*, the Stalking Horse APA provides that the assumption and assignment of the Assigned Contracts is integral to, and inextricably integrated in, the Sale.  *Finally*, the Assigned Contracts will be assumed and assigned though the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

64.     Accordingly, the Debtors submit that the assumption and assignment of the Assigned Contracts by way of the Assumption Procedures should be approved as an exercise of their business judgment.

**B.     Defaults Under the Assigned Contracts Will Be Cured Through the Sale.**

65.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."  *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

66.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied because the Stalking Horse APA requires that the Debtors cure all defaults associated with, or that are required to properly assume, the

Assigned Contracts.  *See* Stalking Horse APA § 1.5.  Because the Assumption Procedures (once approved) provide a clear process by which to resolve disputes over cure amounts or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

### C.    Non-Debtor Parties Will Be Adequately Assured of Future Performance.

67.    Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case."  *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605−06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

68.    The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Stalking Horse Bidder (or other Successful Bidder arising from the Auction, if any) will be satisfied.  As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness, and ability of the

interested party to perform under the Assigned Contracts) and will demonstrate such financial wherewithal, willingness, and ability to perform under the Assigned Contracts assigned to the Stalking Horse Bidder or any Successful Bidder arising from the Auction.  Further, the Assumption Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Stalking Horse Bidder or any Successful Bidder arising from the Auction to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or proposed cure amounts.  The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign the Assigned Contracts as set forth in the Stalking Horse APA.

## VI.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.

69.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."   Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

70.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure."   10 *Collier on Bankruptcy*  ¶ 6004.10

(15th rev. ed. 2006).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id.*

71.     To maximize the value received for the Acquired Assets, the Debtors seek to close the Sale as soon as possible after the Sale Hearing.  Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

### Notice

72.     The Debtors will provide notice of this motion to:  (a) the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) Wilmington Savings Fund Society, FSB, in its capacity as successor administrative agent under the Term Loan Credit Agreement, or any of its predecessors or successors (the "Term Loan Agent"); (d) counsel to the Term Loan Agent; (e) counsel to the Ad Hoc Group; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the Food and Drug Administration; (i) the Drug Enforcement Administration; (j) the Securities Exchange Commission; (k) the state attorneys general for all states in which the Debtors conduct business; (l) counsel to the Stalking Horse Bidder; (m) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or interest in any of the Debtors' assets; and (m) any party that requests service pursuant to Bankruptcy Rule 2002.

### No Prior Request

73.     No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Wilmington, Delaware
May 21, 2020

/s/ *Paul N. Heath*

| **RICHARDS, LAYTON & FINGER, P.A.** | **KIRKLAND & ELLIS LLP** |
|---|---|
| Paul N. Heath (No. 3704) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Amanda R. Steele (No. 5530) | Patrick J. Nash, Jr., P.C. (*pro hac vice* admission pending) |
| Zachary I. Shapiro (No. 5103) | Gregory F. Pesce (*pro hac vice* admission pending) |
| Brett M. Haywood (No. 6166) | Christopher M. Hayes (*pro hac vice* admission pending) |
| One Rodney Square | 300 North LaSalle Street |
| 920 N. King Street | Chicago, Illinois 60654 |
| Wilmington, Delaware 19801 | Telephone:     (312) 862-2000 |
| Telephone:     (302) 651-7700 | Facsimile:      (312) 862-2200 |
| Facsimile:      (302) 651-7701 | Email:     patrick.nash@kirkland.com |
| Email:     heath@rlf.com | gregory.pesce@kirkland.com |
| steele@rlf.com | christopher.hayes@kirkland.com |
| shapiro@rlf.com | |
| haywood@rlf.com | -and- |

*Proposed Co-Counsel for the*
*Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Nicole L. Greenblatt, P.C. (*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:     nicole.greenblatt@kirkland.com

*Proposed Co-Counsel for the*
*Debtors and Debtors in Possession*

**EXHIBIT A**

**Bidding Procedures Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AKORN, INC., *et al.*,[1] | ) Case No. 20-11177 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**ORDER (A) AUTHORIZING AND
APPROVING BIDDING PROCEDURES, (B) SCHEDULING AN
AUCTION AND A SALE HEARING, (C) APPROVING THE FORM
AND MANNER OF NOTICE THEREOF, (D) ESTABLISHING NOTICE
AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND LEASES, AND (E) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (a) authorizing and approving the bidding procedures attached hereto as **Exhibit 1** (the "Bidding Procedures"). (b) scheduling an Auction and a Sale Hearing with respect to the Sale of all or substantially all of the Debtors' assets or sub-groups thereof (the "Acquired Assets", as further defined in the Stalking Horse APA and the Sale Hearing Notice), (c) approving the form and manner of notice of the Auction, the Sale, and the Sale Hearing, and (d) establishing notice and procedures for the assumption and assignment of certain executory contracts and leases; it appearing that the relief requested is in the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are:  Akorn, Inc. (7400); 10 Edison Street LLC (7890); 13 Edison Street LLC; Advanced Vision Research, Inc. (9046); Akorn (New Jersey), Inc. (1474); Akorn Animal Health, Inc. (6645); Akorn Ophthalmics, Inc. (6266); Akorn Sales, Inc. (7866); Clover Pharmaceuticals Corp. (3735); Covenant Pharma, Inc. (0115); Hi-Tech Pharmacal Co., Inc. (8720); Inspire Pharmaceuticals, Inc. (9022); Oak Pharmaceuticals, Inc. (6647); Olta Pharmaceuticals Corp. (3621); VersaPharm Incorporated (6739); VPI Holdings Corp. (6716); and VPI Holdings Sub, LLC.  The location of the Debtors' service address is:  1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

best interests of the Debtors' estates, their creditors, and other parties in interest; the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; notice of the Motion having been adequate and appropriate under the circumstances; and after due deliberation and sufficient cause appearing therefor, **THE COURT FINDS THAT:**

A.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.     Good and sufficient notice of the Motion, the Bidding Procedures, and the relief sought in the Motion has been given under the circumstances, and no other or further notice is required except as set forth herein.  A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties in interest.

C.     The bases for the relief requested in the Motion are:  (i) sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"); (ii) Rules 2002(a)(2), 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and (iii) Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

D.     The Debtors have articulated good and sufficient reasons for this Court to: (i) approve the Bidding Procedures; (ii) schedule the Auction and Sale Hearing; (iii) approve the

forms and manner of notice of the Auction, Sale, and Sale Hearing; and (iv) approve the procedures for the assumption and assignment of the Contracts, including notice of proposed cure amounts.

E.      The Bidding Procedures and the Stalking Horse APA were negotiated by the parties at arms' length and in good faith by the Debtors and the Stalking Horse Bidder.

F.      The Debtors and their advisors engaged in a robust and extensive marketing and sale process prior to the commencement of these chapter 11 cases, the Bidding Procedures are designed to continue that robust and extensive marketing and sale process following entry of this Order in order to solicit the highest or otherwise best value for the Acquired Assets.  The Bidding Procedures are reasonably designed to enable the Debtors to receive bids for the Acquired Assets and represent the best method for maximizing the realizable value of the Acquired Assets for the benefit of the Debtors' estates.

G.      The sale notice, substantially in the form attached hereto as **Exhibit 2** (the "Sale Hearing Notice"), is reasonably calculated to provide interested parties with timely and proper notice of the proposed sale, including, without limitation:  (i) the date, time, and place of the Auction (if one is held); (ii) the Bidding Procedures; (iii) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (iv) reasonably specific identification of the assets to be sold; (v) instructions for obtaining copies of the Stalking Horse APA; (vi) a description of the Sale as being free and clear of liens, claims, encumbrances, and other interests (except as set forth in the applicable Purchase Agreement), with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the Sale proceeds; and (vii) notice of the proposed assumption and assignment of Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse APA (or to another

Successful Bidder arising from the Auction, if any), and no other or further notice of the sale shall be required.

H.      The Motion, this Order, and the assumption and assignment procedures set forth herein are reasonable and appropriate.

I.      The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Order is in the best interests of the Debtors and their estates, creditors, interest holders, and all other parties in interest.

J.      The Bidding Procedures comply with the requirements set forth by Local Rule 6004-(1)(c).

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as set forth herein.

2.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are hereby overruled.

**I.      Important Dates and Deadlines.**

| Event | Date |
|---|---|
| Bid Deadline | August 3, 2020 |
| Auction | August 10, 2020 |
| Contract Objection Deadline | August 15, 2020 |
| Sale Objection Deadline | August 15, 2020 |
| Sale Hearing | August 20, 2020 |

3.      ***Notice of Successful Bidde*r**.  As soon as reasonably practicable after closing the Auction, if any, and in any event not less than 24 hours following closing the Auction, the Debtors

4

shall cause a notice of Successful Bid and Successful Bidder, and the Qualified Bid Documents for the Successful Bid and Backup Bid, to be filed with the Bankruptcy Court.

4.    ***Sale Hearing***.  The Sale Hearing shall commence on or before August 20, 2020, at __:__ a.m. (prevailing Eastern Time) before the Honorable [●], at the Court, 824 North Market Street, 6th Floor, Courtroom No. [●], Wilmington, Delaware 19801.  Upon entry of this Order, the Debtors are authorized to perform any obligations of the Debtors set forth in the Stalking Horse APA or other applicable Purchase Agreement that are intended to be performed prior to the Sale Hearing or entry of the Sale Order.  The Sale Hearing may be adjourned by announcement in open Court or on the Court's calendar without any further notice required.

5.    ***Sale Objection Deadline***.  Objections, if any, to the Sale must be made on or before August 15, 2020, at 5:00 p.m. (prevailing Eastern Time) (the "Sale Objection Deadline").  Objections must:  (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received*** no later than the Sale Objection Deadline by the following parties:

| Counsel to the Debtors | Co-Counsel to the Debtors |
|---|---|
| Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attn.: Patrick J. Nash, Jr<br>Gregory F. Pesce<br>Christopher M. Hayes<br><br>Kirkland & Ellis LLP<br>601 Lexington Ave<br>New York, New York 10022<br>Attn. Nicole L. Greenblatt | Richards, Layton, & Finger, P.A.<br>920 N. King Street<br>Wilmington, Delaware 19801<br>Attn.: Paul N. Heath<br>Paul N. Heath<br>Amanda R. Steele<br>Zachary I. Shapiro<br>Brett M. Haywood |

| Counsel to the Committee (if any) | The United States Trustee |
|---|---|
| [●] | Office of the United States Trustee for the District of Delaware 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 Attn.: Jane M. Leamy |
| **Counsel to the Stalking Horse Bidder** | **Co-Counsel to the Stalking Horse Bidder** |
| Gibson Dunn & Crutcher 200 Park Avenue, New York, New York 10166 Attn.: Scott J Greenberg Michael J. Cohen | Young Conaway Stargatt & Taylor 1000 North King Street Wilmington, DE 19801 Attn: Robert S. Brady |
| **Counsel to the Ad Hoc Group** | **Co-Counsel to the Ad Hoc Group** |
| Gibson Dunn & Crutcher 200 Park Avenue, New York, New York 10166 Attn.: Scott J Greenberg Michael J. Cohen | Young Conaway Stargatt & Taylor 1000 North King Street Wilmington, DE 19801 Attn: Robert S. Brady |
| **Counsel to the Term Loan Agent under the Debtors' Term Loan Agreement** ||
| Wilmer Cutler Pickering Hale and Dorr LLP 7 World Trade Center, 250 Greenwich Street, New York, NY 10007 Attn: Andrew Goldman ||

6.     A party's failure to timely file or make an objection in accordance with this Order shall forever bar the assertion of any objection to the Motion, entry of the Sale Order, and/or consummation of the Sale with the Successful Bidder pursuant to the applicable Purchase Agreement, including the assumption and assignment of the Contracts to the Successful Bidder pursuant to the applicable Purchase Agreement, and shall be deemed to constitute any such party's consent to entry of the Sale Order and consummation of the Sale and all transactions related thereto, including, without limitation, such assumption and assignment. All rights to the extent they exist are reserved for a party to later seek relief from the Court, and the Debtors and all other parties reserve all defenses.

7.   ***Bid Deadline***.   The deadline by which all Bids for the Debtors' Acquired Assets must be ***actually received*** by the parties specified in the Bidding Procedures is 5:00 p.m. (prevailing Eastern Time), on August 3, 2020 (the "Bid Deadline").

8.   ***Auction***.   August 10, 2020 at [●] a/p.m. (prevailing Eastern Time), is the date and time of the Auction, if one is needed.   Such Auction will be held at the offices of counsel to the Debtors:   Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022-4611, or such later time on such day or other place as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids.   In the event that the Auction cannot be held at a physical location, the Auction will be conducted via a virtual meeting.   The Auction shall be transcribed by a court reporter.

**II.   Auction, Bidding Procedures, and Related Relief.**

9.   The Bidding Procedures, substantially in the form attached hereto as **<u>Exhibit 1</u>**, are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to the proposed sale of the Acquired Assets.   Any party desiring to bid on the Acquired Assets or a portion thereof shall comply with the Bidding Procedures and this Order in all respects.   The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures.

10.   The Stalking Horse Bidder is deemed a Qualified Bidder, and the Stalking Horse Bid as set forth in the Stalking Horse APA is deemed a Qualified Bid.   The Stalking Horse Bidder will credit bid the Credit Bid Amount (as such term is defined in the Stalking Horse APA) to the extent permitted by section 363(k) of the Bankruptcy Code.

11.   If the Debtors do not receive any Qualified Bids (other than the Stalking Horse Bid):   (a) the Debtors will not hold the Auction; (b) the Stalking Horse Bidder will be deemed the

Successful Bidder for the Acquired Assets; and (c) the Debtors shall be authorized to seek approval of the Stalking Horse APA at the Sale Hearing.

12.     If the Debtors receive one or more Qualified Bids from Qualified Bidders (other than the Stalking Horse Bidder), then the Debtors shall conduct the Auction in accordance with the Bidding Procedures.

13.     If one or more Qualified Bid(s) exist for acquiring specific sub-groups of the Debtors' Acquired Assets, then the Debtors may, in the exercise of their reasonable business judgment (in consultation with the Consultation Parties), first conduct a Sub-Auction for each of the businesses or Acquired Assets that has at least one Qualified Bid pursuant to the Bid Procedures.

14.     Pursuant to Local Rule 6004-1(c)(ii):  (a) each bidder participating at the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale, as set forth in the Bidding Procedures; (b) the Auction shall be conducted openly; and (c) the Auction shall be transcribed or videotaped.

15.     The Debtors may, in consultation with the Consultation Parties, (a) determine which Qualified Bid is the highest or otherwise best offer; (b) reject, at any time before entry of an Order of the Bankruptcy Court approving the Successful Bid, any Bid (other than the Stalking Horse Bid) that, in the discretion of the Debtors, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, (iii) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders; and (c) at or before the conclusion of the Auction, may impose additional terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates in these chapter 11 cases.

16.    No person or entity shall be entitled to any expense reimbursement, break-up fees, "topping," termination, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this court any request for expense reimbursement or any fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

17.    Except as otherwise provided in this Order, the Debtors, in their business judgment, further reserve the right, as they may reasonably determine to be in the best interests of their estates, subject to the terms and conditions under the Bid Procedures and in consultation with the Consultation Parties, to: (i) determine which Potential Bidders are Qualified Bidders; (ii) determine which Bids are Qualified Bids; (iii) determine which Qualified Bid is the highest or otherwise best proposal, the Successful Bid, and which is the next highest or otherwise best proposal, or the Backup Bid, in each case in accordance with the Bid Assessment Criteria; (iv) reject any bid that is (A) not in conformity with the requirements of the Bid Procedures or the requirements of this Order or the Bankruptcy Code, or (B) contrary to the best interests of the Debtors and their estates; (v) waive terms and conditions set forth herein with respect to all Qualified Bidders to the extent permissible under this Order or the Bid Procedures; (vi) impose additional terms and conditions with respect to all Qualified Bidders other than the Stalking Horse Bidder; and (vii) modify the Bid Procedures or withdraw the request to sell the Acquired Assets, as applicable, to the Successful Bidder or Backup Bidder, as applicable, at any time with or without prejudice.

**III.    Assumption and Assignment Procedures.**

18.    The procedures set forth below regarding the assumption and assignment of the Contracts (each, an "Assigned Contract", and collectively, the "Assigned Contracts") proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the

Stalking Horse Bidder (or other Successful Bidder, if any) pursuant to section 364(f) of the Bankruptcy Code in connection with the Sale (the "Assumption Procedures") are hereby approved to the extent set forth herein.

19.    These Assumption Procedures shall govern the assumption and assignment of all of the Debtors' Assigned Contracts to be assumed and assigned in connection with the Sale under the Stalking Horse APA, subject to the payment of any payments necessary to cure any defaults arising under any Assigned Contract (the "Cure Payments"):

a.    **Contract Assumption Notice**.  Within one (1) business day of entry of this Order (the "Assumption and Assignment Service Deadline"), the Debtors shall serve a notice of contract assumption (the "Contract Assumption Notice"), in substantially the form attached hereto as **Exhibit 3**, via overnight delivery or email on all counterparties, whose assumed contracts are included in such bid and that are subject to the Contract Assumption Notice, to the extent applicable all potential Assigned Contracts and provide a copy of the same to the Stalking Horse Bidder.  The Contract Assumption Notice shall inform each recipient of (i) the timing and procedures relating to such assumption and assignment,  to the extent applicable, (ii) the title of the executory contract or lease, (iii) the name of the counterparty to the executory contract or lease, (iv) Debtors' good faith estimates of the Cure Payments (if any) required in connection with the executory contract or lease, (v) the identity of the Stalking Horse Bidder (as assignee, if applicable), and (vi) the Sale Objection Deadline; *provided*, *however*, that service of a Contract Assumption Notice does not constitute an admission that such contract is an executory contract or that such stated Cure Payment constitutes a claim against the Debtors or a right against the Stalking Horse Bidder (or other Successful Bidder, and all rights with respect thereto being expressly reserved).  Further, the inclusion of a contract on the Contract Assumption Notice is not a guarantee that such contract will ultimately be assumed and assigned.  Any determination of whether such contract is an executory contract or can be rejected will be made in accordance with the Bankruptcy Code, the Bankruptcy Rules, and all applicable orders of this Court.

b.    **Cure Payments**.  The payment of the applicable Cure Payments by the Debtors and/or Stalking Horse Bidder, as applicable, shall (i) effect a cure of all defaults existing thereunder, (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default, and (iii) together with the assumption of the Assigned Contracts by the Debtors and the assignment of the Assigned Contracts to the Stalking Horse Bidder (or other Successful Bidder), constitute adequate assurance of future performance

thereof.

c.  **Supplemental Contract Assumption Notice**. To the extent the Debtors, at any time after the Assumption and Assignment Service Deadline (i) identify additional Assigned Contracts to be assumed and assigned to the Stalking Horse Bidder or Successful Bidder (the "<u>Additional Assigned Contracts</u>"), (ii) remove Assigned Contracts from the list of executory contracts and leases ultimately selected as Assigned Contracts that the Stalking Horse or a Successful Bidder, as applicable, proposes be assumed and assigned to it in connection with a Sale, (iii) and/or modify the previously stated Cure Payment associated with any Assigned Contracts, the Debtors will promptly file with this Court and serve by first-class mail a supplemental notice of contract assumption (a "<u>Supplemental Assumption Notice</u>") on each of the counterparties to such Assigned Contracts and their counsel of record, if any.   Each Supplemental Assumption Notice will include the same information with respect to listed Assigned Contracts as was included in the Contract Assumption Notice.  The Stalking Horse Bidder may designate Additional Assigned Contracts to be assumed and assigned up to two business days prior to closing, and may remove Assigned Contracts from the list of Assigned Contracts up to two business days prior to closing.

d.  **Objections**.  Objections, if any, to the proposed assumption and assignment or the Cure Payment proposed with respect thereto, must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy  Rules,  and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed cure amount, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Clerk of this Court and served upon (w) proposed counsel and co-counsel to the Debtors, (x) counsel to the Stalking Horse Bidder, (y) the Notice Parties (as defined in the Bidding Procedures), and (z) any other party  that has filed a notice of appearance in these chapter 11 cases, so as actually to be received on or before the Sale Objection Deadline or deadline set forth in the Supplemental Assumption Notice, as applicable.

e.  **Dispute Resolution**. In the event that the Debtors and the non-Debtor counterparty cannot resolve any objection to the Cure Payment, the Assigned Contract may be assumed by the Debtors and assigned to the Stalking Horse Bidder or Successful Bidder, as applicable, *provided* that the Debtors shall segregate the cure amount that the counterparty asserts is required to be paid, pending a resolution of the dispute by the Court or mutual agreement by the parties.  Any objection to the proposed assumption and assignment of a contract or related cure proposed in connection with the Sale that remains unresolved as of the Sale Hearing, shall be heard at the Sale Hearing (or at a later date as fixed by the Court).

f.  **Contract Assumption**.  No Assigned Contract shall be deemed assumed

and assigned pursuant to section 365 of the Bankruptcy Code until the later of (i) the date the Court has entered an order assuming and assigning such Assigned Contracts or (ii) the date the Sale has closed.

20.      Any party failing to timely file an objection to the cure amount or the proposed assumption and assignment of an Assigned Contract or Additional Assigned Contract listed on the Contract Assumption Notice is deemed to have consented to (a) such Cure Payment, (b) the assumption and assignment of such Assigned Contract or Additional Assigned Contract, (c) the related relief requested in the Motion, and (d) the Sale.  Such party shall be forever barred and estopped from objecting to the Cure Payments, the assumption and assignment of the Assigned Contract, or Additional Assigned Contract, adequate assurance of future performance, the relief requested in the Motion, whether applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Stalking Horse Bidder or Successful Bidder, as applicable, for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Debtors and the Stalking Horse Bidder or Successful Bidder, as applicable, with respect to such party's Assigned Contract or Additional Assigned Contract.

21.      The Assumption Procedures are appropriate and fair to all counterparties and comply in all respects with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  The Contract Assumption Notice is:  (a) reasonably calculated to (i) provide sufficient, effective notice to all counterparties and any other affected parties of the Debtors' intent to assume and assign to any Successful Bidder some or all of the Assumed Contracts and (ii) afford the counterparties the opportunity to exercise any rights affected by the Motion and the relief granted by this Order pursuant to Bankruptcy Rules 2002(a)(2), 6004, and 6006; and (b) hereby approved.

12

#### IV.     Sale Hearing Notice.

22.     The Sale Hearing Notice, substantially in the form attached hereto as **Exhibit 2**, is hereby approved.   Within five (5) business days following entry of this Order, or as soon as reasonably practicable thereafter, the Debtors shall cause the Sale Hearing Notice to be served on the following parties or their respective counsel, if known:  (a) the Notice Parties (as defined in the Bidding Procedures); (b) counsel to the Stalking Horse Bidder; (c) all parties to executory contracts and leases to be assumed and assigned, or rejected as part of the proposed Sale; (d) all parties who have expressed a written interest in some or all of the Acquired Assets; (e) all known holders of liens, encumbrances, and other claims secured by the Acquired Assets; (f) the Internal Revenue Service; (g) all applicable state and local taxing authorities; (h) the Food and Drug Administration; (i) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (j) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties").  On or about the same date, the Debtors will publish the Sale Hearing Notice on the website of the Debtors' claims and noticing agent and will also publish a notice substantially similar to the Sale Hearing Notice in the *New York Times* (national edition) and such other publications as the Debtors may deem appropriate in their discretion.

#### V.     Miscellaneous.

23.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

24.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

25.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

26.     This Court exclusive retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2020
Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT 1

**Bidding Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AKORN, INC., *et al.*,[1] | ) Case No. 20-11177 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## BIDDING PROCEDURES

On May 20, 2020, Akorn, Inc. (the "<u>Selling Debtor</u>"), entered into an asset purchase agreement (the "<u>Stalking Horse APA</u>") with [●] ("<u>Purchaser</u>" or the "<u>Stalking Horse Bidder</u>") pursuant to which Purchaser proposes to, among other things, purchase, acquire, and take assignment and delivery of certain assets (the "<u>Acquired Assets</u>") and assume certain liabilities (the "<u>Assumed Liabilities</u>") of the Selling Debtor, and the other Debtors, identified in Section 1.1 of the Stalking Horse APA.

On [●], 2020, the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") entered an order [Docket No. [●]] (the "<u>Bidding Procedures Order</u>"),[2] by which the Court authorized the Debtors to solicit bids for and conduct an auction (the "<u>Auction</u>") for a sale or disposition (collectively, the "<u>Sale</u>," and each, a "<u>Sale Transaction</u>") of all or substantially all of the Debtors' assets or sub-groups thereof free and clear of all liens, claims, encumbrances, and other interests (other than those permitted by an applicable Stalking Horse Agreement) and in accordance with the following procedures (the "<u>Bidding Procedures</u>").

Set forth below are the Bidding Procedures that will be employed in connection with the Sale of substantially all of the Debtors' assets or sub-groups thereof.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are:  Akorn, Inc. (7400); 10 Edison Street LLC (7890); 13 Edison Street LLC; Advanced Vision Research, Inc. (9046); Akorn (New Jersey), Inc. (1474); Akorn Animal Health, Inc. (6645); Akorn Ophthalmics, Inc. (6266); Akorn Sales, Inc. (7866); Clover Pharmaceuticals Corp. (3735); Covenant Pharma, Inc. (0115); Hi-Tech Pharmacal Co., Inc. (8720); Inspire Pharmaceuticals, Inc. (9022); Oak Pharmaceuticals, Inc. (6647); Olta Pharmaceuticals Corp. (3621); VersaPharm Incorporated (6739); VPI Holdings Corp. (6716); and VPI Holdings Sub, LLC.  The location of the Debtors' service address is:  1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.

[2]     Terms utilized but not otherwise defined herein shall have the meanings ascribed to them in the Stalking Horse APA or the Bidding Procedures Order, as applicable.

**ANY PARTY INTERESTED IN BIDDING ON THE ACQUIRED ASSETS SHOULD CONTACT THE DEBTORS' PROPOSED ADVISORS, AS FOLLOWS:**

| | | |
|---|---|---|
| PJT Partners, Inc.<br>280 Park Ave<br>New York, New York 10017<br>Attn: Tom Davidson,<br>Mark Buschmann<br>Michael O'Hara,<br>Tarek Aguizy, and<br>Harold Kim | Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attn.: Richard J. Campbell,<br>P.C. and<br>Steve Toth | Richards, Layton, & Finger,<br>P.A.<br>920 N. King Street<br>Wilmington, Delaware 19801<br>Attn.: Paul N. Heath<br>Paul N. Heath<br>Amanda R. Steele<br>Zachary I. Shapiro<br>Brett M. Haywood |

## I.  DESCRIPTION OF THE ACQUIRED ASSETS.

The Debtors are seeking to sell the Acquired Assets, which include the Debtors' owned real property, unexpired leases, executory contracts, and certain equipment, inventory, supplies, intellectual property, insurance proceeds, receivables, prepaid expenses and deposits, and books and records, in each case, free and clear of all liens, claims, interests, or other encumbrances. The Acquired Assets are specifically identified in the Stalking Horse APA and the Sale Hearing Notice.

## II.  PARTICIPATION REQUIREMENTS.

### A.  Potential Bidders.

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity interested in the Acquired Assets or part of the Acquired Assets (other than the Stalking Horse Bidder) (a "Potential Bidder") must deliver to each of the Debtors' advisors the following documents and information (collectively, the "Preliminary Bid Documents"):

　　　　1.　　an executed confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement");

　　　　2.　　proof by the Potential Bidder of its financial capacity to close a proposed Sale Transaction(s), which may include audited financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the desired Acquired Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors and their advisors; and

　　　　3.　　a non-binding preliminary indication of the amount of the cash purchase price in U.S. Dollars or other consideration that the Potential Bidder is prepared to pay or deliver in exchange for the acquisition of some or all of the Acquired Assets.

With respect to items 2 and 3 above, such information shared with the Debtors' advisors shall be shared with the Consultation Parties' advisors no later than 48 hours after such receipt.

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors and their advisors regarding the ability of such Potential Bidder, as applicable, to consummate its contemplated transaction; *provided* that the Consultation Parties and their respective advisors shall be permitted to submit reasonable requests for information from Potential Bidders only through the Debtors and their advisors and, for the avoidance of doubt, shall not be permitted to directly contact any Potential Bidder and/or its respective advisor(s).

### B.        Obtaining Due Diligence.

The Debtors (in consultation with the Consultation Parties), with their advisors will determine and notify each Potential Bidder whether such Potential Bidder has submitted adequate Preliminary Bid Documents so that such Potential Bidder may submit a Bid (each, an "<u>Acceptable Bidder</u>", and each such bid, an "<u>Acceptable Bid</u>").   Notwithstanding anything herein to the contrary, the Debtors reserve the right to work with Potential Bidders (in consultation with the Consultation Parties) to aggregate bids into a consolidated Acceptable Bid, or otherwise improve bids to be Acceptable Bids, prior to the Bid Deadline (defined herein).  The Stalking Horse Bidder shall be deemed an Acceptable Bidder, and the bid as set forth in the Stalking Horse APA (the "<u>Stalking Horse Bid</u>") an Acceptable Bid.  For the avoidance of doubt, the Prepetition Secured Parties shall be deemed an Acceptable Bidder.

Only Acceptable Bidders shall be eligible to receive due diligence information and access to the Debtors' electronic data room and to additional non-public information regarding the Debtors and the Acquired Assets.

The Debtors and their advisors shall coordinate all reasonable requests from Acceptable Bidders for additional information and due diligence access; *provided* that (i) the Debtors shall have the right (in consultation with the Consultation Parties) to limit the information and due diligence provided to competitors and (ii) the Debtors may (in consultation with the Consultation Parties) decline to provide such information, after prior notice to Acceptable Bidders who, at such time and in the Debtors' reasonable business judgment, have not established, or who have raised doubt, that such Acceptable Bidders intends in good faith to, or has the capacity to, consummate a proposed Sale Transaction.  The due diligence period will end on the Bid Deadline and, subsequent to the Bid Deadline, the Debtors shall have no obligation to furnish any due diligence information.  Additional due diligence will not be provided after the Bid Deadline, unless otherwise deemed reasonably appropriate by the Debtors (in consultation with the Consultation Parties). The Debtors and the Consultation Parties, and each of their representatives and advisors, are not responsible for, and will bear no liability with respect to, any information obtained by any Acceptable Bidder in connection with any Sale or Sale Transaction.

### III.    REQUIREMENTS FOR QUALIFIED BIDS.

Any binding proposal, solicitation, or offer (each, a "Bid") will be considered a qualified bid only if the Bid is submitted in writing by an Acceptable Bidder, by the Bid Deadline, and is deemed to comply with all of the following in the Debtors' business judgment (in consultation with the Consultation Parties) (a "Qualified Bid" and such bidder a "Qualified Bidder"); *provided* that the Prepetition Secured Parties shall be deemed a Qualified Bidder (and any bid submitted by them, a Qualified Bid) without the need to satisfy any of the other requirements placed on Acceptable Bidders hereunder:

1.    ***Purpose***.  Each Qualified Bidder must state that the Bid includes an irrevocable and binding offer by the Qualified Bidder to purchase some or all of the Acquired Assets (identified with specificity) and specify the Debtors' liabilities that the Qualified Bidder seeks to assume.

2.    ***Assets and Liabilities***.  The Bid must clearly identify the following:  (a) the Acquired Assets, or the portion thereof, to be purchased; and (b) the liabilities and obligations to be assumed, including any indebtedness to be assumed; if any.

3.    ***Purchase Price.***  The Bid must clearly set forth the cash purchase price, and any other non-cash consideration (with the form of such consideration specified), to be paid.  If the Bid proposes an acquisition of only certain of the Acquired Assets, the purchase price must be applied to each Acquired Asset or package of Acquired Assets in that Bid.

4.    ***Deposit***.  Each Bid must be accompanied by a good faith deposit in the form of cash (or other form acceptable to the Debtors in their reasonable discretion, subject to consultation with the Consultation Parties) in an amount equal to not less than ten (10) percent of the aggregate purchase price of the Bid to be held in an escrow account to be identified and established by the Debtors (the "Deposit").

5.    ***Marked Agreement.***   Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents").  The Bid Documents shall include a schedule of Assigned Contracts (as defined in the Stalking Horse APA) to the extent applicable to the Bid, and a clearly marked version of the Stalking Horse APA and the Sale Order showing all changes requested by the Acceptable Bidder, as well as all other material documents integral to such Bid.

6.    ***Committed Financing***.  To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the proposed transactions set forth in its Bid with cash on hand, each Bid must include committed financing documented to the satisfaction of the Debtors (in consultation with the Consultation Parties) that demonstrates that the Acceptable Bidder has received sufficient unconditional debt and/or equity funding commitments to satisfy the Acceptable Bidder's Purchase Price and other obligations under its Bid, including providing adequate assurance of future performance under all contracts proposed

to be Assigned Contracts by such Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors (in consultation with the Consultation Parties).

7. ***Contingencies; No Financing or Diligence Outs.*** A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence.

8. ***Identity.*** The Bid must fully disclose the identity of each person or entity that (a) will directly or indirectly own and/or control five percent or more (individually or collectively) of the equity and/or voting securities of the Qualified Bidder, including its full legal name, jurisdiction of incorporation or formation and its location in the Qualified Bidder's corporate structure, that will be bidding for some or all of the Acquired Assets or otherwise participating in connection with such Bid, (b) will directly or indirectly own and/or control any amount of equity and/or voting securities of the Potential Bidder, (c) for trusts and similar legal arrangements that meet the criteria for subparts (a) and (b) above, (w) each trust's settlor (the provider of funds), (x) each trustee or person or entity exercising control over each trust, (y) any person with the power to remove any trustee and (z) the beneficiaries of such trust(s) or similar legal arrangement, (d) for foundations that meet the criteria for subparts (a) and (b) above, (x) the founders of such foundation, (y) the key individuals who control such foundation and (x) such foundation's source of funds and (e) has a connection or agreement with any Debtor or with any other prospective bidder for some or all of the Acquired Assets or any officer, director or equity security holder of any Debtor.

9. ***Irrevocable.*** An Acceptable Bidder's Bid must be irrevocable and binding; *provided* that if the Bid is not selected as the Successful Bid or Backup Bid (defined below), the Bid may be revoked after consummation of the Successful Bid or Backup Bid.

10. ***Backup Bidder.*** Each Bid must contain an agreement for the Acceptable Bidder to be a Backup Bidder (as defined below) if such bidder's Qualified Bid is selected as the next highest or next best bid after the Successful Bid.

11. ***As-Is, Where-Is.*** The Bid must include the following representations and warranties: (a) expressly state that the Acceptable Bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' businesses and the Acquired Assets prior to submitting its bid; and (b) a statement that the Acceptable Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Acquired Assets in making its Bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the Acquired Assets or the completeness of any information provided in

connection therewith, except as expressly stated in the representations and warranties contained in the Acceptable Bidder's proposed asset sale agreement ultimately accepted and executed by the Debtors.

12. **_Authorization._** The Bid must include evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Debtors with respect to the submission, execution, and delivery of its Bid and Bid Documents, participation in the Auction, and closing of the proposed transaction(s) contemplated in such Bid. The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Acceptable Bidder.

13. **_Disclaimer of Fees._** Each Bid (other than the Stalking Horse Bid) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, "topping" or termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

14. **_Time Frame for Closing._** A Bid by an Acceptable Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations in the Debtors' business judgment) to be consummated, if selected as the Successful Bid (as defined herein), within a time frame reasonably acceptable to the Debtors (in consultation with the Consultation Parties). The Acceptable Bidder must commit to closing the proposed Sale(s) contemplated by the Bid as soon as practicable and provide perspective on any potential regulatory issues that may arise in connection with such Acceptable Bidder's acquisition of the Acquired Assets including timing for resolution thereof; _provided_ that the closing of the transaction shall not be later than the milestones set forth in the Standstill Agreement.

15. **_Adherence to Bid Procedures._** Each Bid must include (a) a statement that the Acceptable Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code; and (b) that the Bid constitutes a _bona fide_ offer to consummate the proposed transactions, and agrees to be bound by these Bidding Procedures.

16. **_Postpetition Financing Order._** All Bids must be in accordance with the terms and conditions of any order authorizing the use of cash collateral and providing postpetition financing.

17. *Joint Bids.*   The Debtors will be authorized to approve joint Bids in their discretion (in consultation with the Consultation Parties) on a case-by-case basis.

18. *Cooperation*.   The Acceptable Bidder must provide a covenant to cooperate with the Debtors to provide pertinent factual information regarding such Bidder's operations reasonably required to analyze issues arising with respect to any applicable laws or regulatory requirements.

19. *No Collusion*.   The Acceptable Bidder must acknowledge in writing that (a) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids or the Sale, specifying that it did not agree with any Potential Bidders, Acceptable Bidders or Qualified Bidders to control price; and (b) it agrees not to engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids, the Auction, or the Sale.

20. *Other Information*.   The Bid contains such other information as may be reasonably requested by the Debtors and the Consultation Parties with such requests made through the Debtors.

## IV.   BID DEADLINE.

An Acceptable Bidder that desires to make a bid must transmit via email (in .pdf or similar format) or deliver written copies of its bid to the following parties so as to be received not later than **5:00 p.m. (prevailing Eastern Time) on August 3, 2020** (the "Bid Deadline"): (i) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Nicole L. Greenblatt, email: ngreenblatt@kirkland.com, and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn:  Patrick J. Nash, email: patrick.nash@kirkland.com, Richard J. Campbell, email: rcampbell@kirkland.com, Steve Toth, email:  steve.toth@kirkland.com, Gregory F. Pesce, email:  gregory.pesce@kirkland.com, Christopher M. Hayes, email: christopher.hayes@kirkland.com  (ii) proposed Delaware counsel to the Debtors, Richards, Layton & Finger, P.A., 920 N. King Street, Wilmington, Delaware 19801, Attn:  Paul Heath, email: heath@rlf.com; and (iii) the Debtors' proposed investment banker, PJT Partners, Inc., 280 Park Ave, New York, New York 10017, Attn: Tom Davidson, email:  davidson@pjtpartners.com, Mark Buschmann, email:  buschmann@pjtpartners.com, Michael O'Hara, email: ohara@pjtpartners.com, Tarek Aguizy, email: aguizy@pjtpartners.com, Harold Kim, email kimh@pjtpartners.com.

The Debtors will provide copies of all Bids via electronic mail within 24 hours of receiving any Final Bid to the Consultation Parties and to the Office of the United States Trustee.

## V.   QUALIFIED BIDDERS.

No later than 24 hours prior to the commencement of the Auction, the Debtors (in consultation with the Consultation Parties) shall notify each Acceptable Bidder whether such party is a Qualified Bidder.  Promptly upon designating the Qualified Bidders, the Debtors shall provide the adequate  assurance information received from the applicable Qualified Bidder to the Consultation Parties pursuant to such Qualified Bidder's proposed transaction.

If any Bid is determined by the Debtors (in consultation with the Consultation Parties) not to be a Qualified Bid, the Debtors will refund such Acceptable Bidder's Deposit on or before the date that is five (5) Business Days after the Bid Deadline.

The Debtors may accept (in consultation with the Consultation Parties), as a single Qualified Bid, multiple bids for non-overlapping material portions of the Acquired Assets such that, when taken together in the aggregate, such bids would otherwise meet the standards for a single Qualified Bid.  The Debtors may permit (in consultation with the Consultation Parties) otherwise Qualified Bidders who submitted bids by the Bid Deadline for less than a substantial (but nevertheless a material) portion of the Acquired Assets but who are not identified as a component of a single Qualified Bid consisting of such multiple bids, to participate in the Auction and to submit *higher or otherwise better* bids that in subsequent rounds of bidding may be considered, together with other bids for non-overlapping material portions of the Acquired Assets, as part of such a single Qualified Bid for overbid purposes.  The Debtors (in consultation with the Consultation Parties) may conduct the Auction in any manner to facilitate a sale of all or different subgroupings of the Debtors' assets, including conducting multiple Auctions for different subgroupings of the Debtors' Acquired Assets (each, a "Sub-Auction").

Between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the prior written consent of the Debtors (in consultation with the Consultation Parties), a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors (in consultation with the Consultation Parties) regarding the ability of such Qualified Bidder to consummate its contemplated transaction.  Failure by a Qualified Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors (in consultation with the Consultation Parties) to determine that such bidder is no longer a Qualified Bidder or that a bid made by such bidder is not a Qualified Bid.

Notwithstanding anything to the contrary herein, the Stalking Horse Bidder is deemed to be a Qualified Bidder, and the Stalking Horse Bid shall be deemed to be a Qualified Bid, such that the Stalking Horse Bidder shall not be required to submit an additional Qualified Bid.

## VI.    RIGHT TO CREDIT BID.

Any Qualified Bidder who has a valid and perfected lien on any Acquired Assets of the Debtors' estates (a "Secured Creditor") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy

Code; provided that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured.

Notwithstanding anything to the contrary contained herein, the Prepetition Secured Creditors shall have the right to credit bid all or any portion of the aggregate amount of their applicable outstanding secured obligations pursuant to section 363(k) of the Bankruptcy Code, and any such credit bid will be considered a Qualified Bid to the extent such bid is received by the Bid Deadline and complies with section 363(k) of the Bankruptcy Code; *provided that* a credit bid shall not constitute a Qualified Bid if the bid does not (a) include a cash component sufficient to pay in full, in cash, all claims for which there are valid, perfected, and unavoidable liens on any assets included in such Bid that are senior in priority to those of the party seeking to credit bid (unless such Secured Creditor consents to alternative treatment) or (b) comply with the terms of the priority scheme contained in the Credit Agreement and the Bidding Procedures Order.

## VII.    THE AUCTION.

If the Debtors receive a Qualified Bid (other than the Stalking Horse Bid), the Debtors shall conduct the Auction to determine the Successful Bidder with respect to the Acquired Assets or portion of the Acquired Assets.  If one or more Qualified Bid(s) exist for acquiring specific sub-groups of the Debtors' Acquired Assets, then the Debtors may, in the exercise of their reasonable business judgment (in consultation with the Consultation Parties), first conduct a Sub-Auction for each of the businesses or Acquired Assets that has at least one Qualified Bid pursuant to the Bid Procedures.  If the Debtors do not receive a Qualified Bid (other than the Stalking Horse Bid), the Debtors will not conduct the Auction and will designate the Stalking Horse's Qualified Bid as the Successful Bid.

No later than 24 hours prior to the commencement of the Auction or specific Sub-Auction, the Debtors will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, as determined in the Debtors' reasonable business judgment (in consultation with the Consultation Parties) (the "Baseline Bid"), and provide copies of the Bid Documents supporting the Baseline Bid to all Qualified Bidders.  The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors (in consultation with the Consultation Parties) reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things:  (a) the number, type, and nature of any changes to the Stalking Horse APA requested by the Qualified Bidder, including the type and portion of the Acquired Assets sought and Assumed Liabilities to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Bidder's ability to close the proposed Sale Transaction(s), the conditions thereto, and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transactions contemplated by the Bid Documents; and (e) the tax consequences of such Qualified Bid (collectively, the "Bid Assessment Criteria").

The Auction shall take place at **[●] (prevailing Eastern Time) on August 10, 2020**, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or such later date, time and location as designated by the Debtors (in consultation with the

Consultation Parties), after providing notice to the Notice Parties. In the event that the Auction cannot be held at a physical location, the Auction will be conducted via a virtual meeting. The Debtors shall have the right to conduct any number of Auctions on that date, if the Debtors determine, in their reasonable business judgment (in consultation with the Consultation Parties), that conducting such Auctions would be in the best interests of the Debtors' estates.

### A.    Participants and Attendees.

The Debtors and their advisors shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a written transcript of the Auction and of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid (defined below).

Only Qualified Bidders that have submitted Qualified Bids by the Bid Deadline are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors (in consultation with the Consultation Parties) in accordance with these Bidding Procedures. Qualified Bidders participating in the Auction must appear in person (or through a duly authorized representative), telephonically, or through a video teleconference. The Auction will be conducted openly and all creditors may be permitted to attend; *provided* that the Debtors may (in consultation with the Consultation Parties) establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany each Qualified Bidder or creditor at the Auction. Any creditor and its advisors wishing to attend the Auction may do so by contacting, no later than three (3) Business Days prior to the start of the Auction, the Debtors' advisors; *provided that* the Ad Hoc Group Advisors shall be permitted to attend the Auction without any prior notice to the Debtors' advisors.

Each Qualified Bidder participating in the Auction will be required to confirm in writing and on the record at the Auction that (i) it has not engaged in any collusion with respect to the submission of any bid or the Auction and (ii) each Qualified Bid it submits at the Auction is a binding, good faith and bona fide offer to purchase the Acquired Assets identified in such bid.

### B.    Auction Procedures.

The Auction or Sub-Auction shall be governed by the following procedures, subject to the Debtors' right to modify such procedures in their reasonable business judgment (in consultation with the Consultation Parties), and upon approval by the Purchaser pursuant to the Stalking Horse APA:

1.    ***Baseline Bids.***  Bidding shall commence at the amount of the Baseline Bid.

2.    ***Minimum Overbid.***  Qualified Bidders may submit successive bids higher than the previous bid, based on and increased from the Baseline Bid for the relevant Acquired Assets (each such bid, an "Overbid"). Any Qualified Bidder's initial Overbid shall be made in increments of at least $5,000,000 in cash, cash equivalents, or such other consideration that the Debtors deem equivalent (in

consultation with the Consultation Parties). The Debtors may, in their reasonable business judgment (in consultation with the Consultation Parties), announce increases or reductions to initial or subsequent Overbids at any time during the Auction or specific Sub-Auction.

3.    ***Highest or Best Offer.*** After the first round of bidding and between each subsequent round of bidding, the Debtors (in consultation with the Consultation Parties) shall announce the bid that they believe in their reasonable business judgment to be the highest or otherwise best offer for the relevant Acquired Assets (the "Leading Bid") and describe the material terms thereof. Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge of the Leading Bid. To the extent not previously provided (which is determined by the Debtors), a Qualified Bidder submitting a subsequent bid must submit, as part of its subsequent bid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) demonstrating such Qualified Bidder's ability to close the transaction at the Purchase Price contemplated by such subsequent bid.

4.    ***Rejection of Bids.*** The Debtors may, in their reasonable business judgment (in consultation with the Consultation Parties) reject, at any time before entry of an order of the Court approving a Qualified Bid, any bid that the Debtors determine is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders.

5.    ***No Round-Skipping***.    Round-skipping, as described herein, is explicitly prohibited. To remain eligible to participate in the Auction or specific Sub-Auction for a particular Acquired Assets, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtors in their reasonable business judgment (in consultation with the Consultation Parties), such Qualified Bidder shall be disqualified from continuing to participate in the Auction for such Acquired Assets; *provided* that with the consent of the Consultation Parties, the Debtors may adopt and utilize the Auction procedures other than the foregoing procedure for any round of bidding.

6.    ***Additional Information***. The Debtors (in consultation with the Consultation Parties) shall have the right to request any additional financial information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors

believe is reasonably necessary to clarify and evaluate any bid made by a Qualified Bidder during the Auction or Sub-Auction.

7. ***Modification of Procedures.*** The Debtors may announce, at the Auction, modified or additional procedures for conducting the Auction or otherwise modify these Bidding Procedures *provided*, that at no point may the form of currency be in a form other than cash unless a hybrid offer is made that provides for sufficient cash to pay the term loans off in cash at par plus any accrued interest and any applicable fees.   All such modifications and additional rules will be communicated in advance to each of the Consultation Parties, Prospective Bidders, and Qualified Bidders; *provided*, that, to the extent such modifications occur at the Auction, disclosure of such modifications shall be limited to those in attendance at the Auction.

The Auction or specific Sub-Auction shall include open bidding in the presence of all other Qualified Bidders.  All Qualified Bidders shall have the right to submit additional bids and make modifications to any prior Qualified Bid or Overbid at the Auction to improve their bids; *provided* that any Overbid made by a Qualified Bidder (including with respect to any Backup Bid (defined below)) must remain open and binding on the Qualified Bidder until the earlier of (a) the closing of a Sale Transaction for the applicable Acquired Assets pursuant to the Successful Bid and (b) 45 days after the date of the Sale Hearing, unless otherwise decided (in consultation with the Consultation Parties).   The Debtors may, in their reasonable business judgment (in consultation with the Consultation Parties), negotiate with any and all Qualified Bidders participating in the Auction or specific Sub-Auction.

### C.    Adjournment of the Auction.

The Debtors reserve the right, in their reasonable business judgment (in consultation with the Consultation Parties), to adjourn the Auction one or more times to, among other things, (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt or equity funding commitments to consummate the proposed Sale Transaction(s) at the prevailing bid amount.

### D.    Successful Bidder.

Immediately prior to the conclusion of the Auction or specific Sub-Auction, the Debtors shall (i) determine (in consultation with the Consultation Parties) consistent with these Bidding Procedures, which bid constitutes the highest or otherwise best bid(s) for the applicable Acquired Assets (each such bid, a "Successful Bid"); and (ii) notify all Qualified Bidders at the Auction for the applicable Acquired Assets of the identity of the bidder that submitted the Successful Bid (each such bidder, the "Successful Bidder") and the amount of the purchase price and other material terms of the Successful Bid.

The Debtors shall file a notice identifying the Successful Bidder and Backup Bidder (if selected) by 5:00 p.m. (prevailing Eastern Time) as soon as reasonably practicable after closing the Auction, if any, and in any event not less than 24 hours following closing the Auction.

## VIII.   BACKUP BIDDER.

Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction or Sub-Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid as compared to the Successful Bid at the Auction or Sub-Auction for the Acquired Assets or sub-group thereof, as determined by the Debtors in the exercise of their reasonable business judgment (in consultation with the Consultation Parties) (the "Backup Bid"), shall be required to serve as a backup bidder (the "Backup Bidder"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated.  In the case of the Stalking Horse Bidder, it shall agree to serve as the Backup Bidder only to the extent provided in Sections 5.1(e) and 8.1(h) of the Stalking Horse APA.

The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors at the conclusion of the Auction or relevant Sub-Auction at the same time the Debtors announce the identity of the Successful Bidder.

The Backup Bid shall remain binding on the Backup Bidder until the earlier of (a) the closing of a Sale Transaction for the applicable Acquired Assets pursuant to the Successful Bid and (b) 45 days after the date of the Sale Hearing, unless otherwise decided.  If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.

The Debtors will be authorized, but not required, to consummate (in consultation with the Consultation Parties) all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.

## IX.   ACCEPTANCE OF SUCCESSFUL BID

The Debtors' presentation of a particular Qualified Bid to the Court for approval does not constitute the Debtors' acceptance of such Qualified Bid.  The Debtors will be deemed to have accepted a Bid only when the Bid has been approved by the Court at the Sale Hearing (defined below).  The Debtors shall seek approval by the Court to consummate the Backup Bid, solely in the event the Successful Bidder fails to close the transaction as provided in the Successful Bid and with all rights reserved against the Successful Bidder.

X.      **FREE AND CLEAR OF ANY AND ALL ENCUMBRANCES**

All rights, titles and interests in and to the Acquired Assets subject thereto shall be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the "Encumbrances"), subject only to the Assumed Liabilities and Permitted Encumbrances (each as defined in the Stalking Horse APA or in another Successful Bidder's purchase agreement), if any, in accordance with Bankruptcy Code section 363(f), with such Encumbrances to attach to the net proceeds (if any) received by the Debtors from the Sale of the Acquired Assets in accordance with the Bankruptcy Code, applicable non-bankruptcy law and any prior orders of the Court.

XI.     **NOTICE PARTIES.**

The term "Notice Parties" as used in these Bidding Procedures shall mean (i) Wilmer Cutler Pickering Hale and Dorr LLP, as counsel to Wilmington Savings Fund Society, FSB (in its capacity as successor administrative agent under the Term Loan Credit Agreement, or any of its predecessors or successors (the "Term Loan Agent") to the Debtors' term loan lenders' party to that certain Term Loan Agreement, dated as of April 17, 2014 (as the same shall have been amended, supplemented, or otherwise modified from time to time), among Akorn Inc., the Loan Parties (as defined in the Term Loan Agreement) and the lenders from time to time party thereto (the "Term Loan Lenders"), (ii) Gibson, Dunn & Crutcher, LLP, as counsel to the ad hoc group of the Debtors' Term Loan Lenders (the "Ad Hoc Group"), Young Conaway Stargatt & Taylor as co-counsel to the Ad Hoc Group, and Greenhill & Co. LP, as financial advisor to the Ad Hoc Group (collectively, the "Ad Hoc Group Advisors"), (iii) the U.S. Trustee for the District of Delaware, and (iv) counsel to any official committee appointed in these Chapter 11 Cases.

XII.    **CONSULTATION BY THE DEBTORS**

The Debtors shall consult with the Consultation Parties (as defined below) as explicitly provided for in these Bidding Procedures. Each reference in these Bidding Procedures to "consultation" (or similar phrase) with the consultation Parties shall mean consultation in good faith. The following parties will constitute the "Consultation Parties": (a) the Ad Hoc Group (including the Ad Hoc Group Advisors); and (b) counsel to any official committee appointed in these Chapter 11 Cases. Notwithstanding anything to the contrary herein, during any period in which a Consultation Party (i) has submitted a Qualified Bid and has become a Qualified Bidder hereunder, or (ii) submits (or indicates its intent to submit) a Credit Bid, such Consultation Party shall no longer be considered a Consultation Party for purposes of these Bidding Procedures unless and until such party unequivocally revokes its bid and waives its right to continue in the Auction process.

XIII.   **RESERVATION OF RIGHTS.**

**The Debtors reserve the right to, in their reasonable business judgment (in consultation with the Consultation Parties) to modify these Bidding Procedures in good faith, to further the goal of attaining the highest or otherwise best offer for the Acquired Assets, or impose, at or prior to selection of the Successful Bidder, additional customary terms and conditions on the Sale of the Acquired Assets, including, without limitation:**

**(a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction (if held) without further notice; (c) adding or modifying procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction and/or adjourning the Sale Hearing (as defined below) in open court (if held); (d) canceling the Auction or electing not to hold an Auction; (e) rejecting any or all Bids or Qualified Bids; (f) adjusting the applicable minimum Overbid increment, including by requesting that Qualified Bidders submit last or final bids on a "blind basis"; and (g) selecting a draft purchase agreement agreed to by a Qualified Bidder in connection with a Qualified Bid to serve as the purchase agreement that will be executed by the Successful Bidder or Successful Bidders, as applicable and with any necessary adjustments for the assets and liabilities being purchased and assumed, upon conclusion of the Auction, if held; *provided*, however, that that any changes to the dates and deadlines set forth herein shall: (i) comply with the milestones agreed upon in the Standstill Agreement or (ii) shall be made only with the consent of the Ad Hoc Group; *provided*, further, that any modification to the form of currency used for payment, prior to the fulfillment of any obligations owed to each of the Term Loan Lenders, shall be made only with the consent of the Ad Hoc Group and not until the Term Loan Lenders are paid off fully in cash.  The Debtors shall provide reasonable notice of any such modification to any Qualified Bidder, including any Stalking Horse Bidders**.

## XIV.  CONSENT TO JURISDICTION.

All Potential Bidders, Acceptable Bidders and Qualified Bidders shall be deemed to have consented to the exclusive jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures, and/or the Bid Documents, as applicable.

## XV.  SALE HEARING.

A hearing to consider approval of the sale of the Debtors' Acquired Assets to the Successful Bidder, Backup Bidder (if applicable), or to approve the Stalking Horse APA if no Auction is held (the "Sale Hearing"), is currently scheduled to take place on **August 20, 2020**, at [●], (prevailing Eastern Time), before the Honorable [●], at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, [●]th Floor, Courtroom No. [●], Wilmington, Delaware 19801.

**The Sale Hearing may be continued to a later date by the Debtors (in consultation with the Consultation Parties) by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder).**

At the Sale Hearing, the Successful Bidder and the Backup Bidder must acknowledge on the record at the start of the hearing that in connection with submitting their Bids, they did not engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids, the Auction or the Sale, specifying that they did not agree with any Potential Bidders, Acceptable Bidders or Qualified Bidders to control the price or any other terms of the Sale.

Objections to the sale of any Acquired Assets free and clear of liens, claims, interests, and encumbrances pursuant to sections 363(f) of the Bankruptcy Code to the Successful Bidder(s) and/or a Backup Bidder, as applicable, any of the relief requested in the motion, and entry of any order approving the sale (the "Sale Order") must (i) be in writing and specify the nature of such objection; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and all orders of the Court; and (iii) be filed with the Court and served on the Notice Parties by August 15, 2020 at 4:00 p.m. (prevailing Eastern Time).

## XVI.  FIDUCIARY OUT.

Nothing in these Bidding Procedures will require the board of directors, board of managers, or such similar governing body of a Debtor or non-debtor affiliate to take any action, or to refrain from taking any action, with respect to the Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body reasonably determines in good faith that taking such action, or refraining from taking such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

## XVII.  RETURN OF DEPOSIT.

The Deposit of the Successful Bidder shall be applied to the purchase price of such transaction at closing.  The Deposits for each Qualified Bidder shall be held in one or more accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Stalking Horse Bidder, the Successful Bidder, and the Backup Bidder) on or before the date that is five (5) Business Days after the Auction.  The Stalking Horse Bidder's Deposit shall be returned in accordance with the terms of the Stalking Horse APA.  The Backup Bidder's Deposit shall be held in escrow until the closing of the Sale with the Successful Bidder.  In the event the Successful Bidder fails to close and the Debtors opt to close on the Sale Transaction(s) set forth in the Backup Bid, the Backup Bidder's Deposit shall be applied to the purchase price of such transaction(s) at closing.  In the event of a breach or failure to consummate a Sale by the Successful Bidder or the Backup Bidder, as applicable, the defaulting Successful Bidder's Deposit or Backup Bidder's Deposit, as applicable, shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder or Backup Bidder, as applicable, subject to the terms of the Stalking Horse APA.  For the avoidance of doubt, any forfeited Successful Bidder's Deposit or Backup Bidder's Deposit shall become Collateral of the Term Loan Lenders under the Term Loan Agreement.

\*     \*     \*     \*     \*

# **EXHIBIT 2**

**Sale Hearing Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AKORN, INC., *et al.*,[1] | ) Case No. 20-11177 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**NOTICE OF SALE BY AUCTION AND SALE HEARING**

    **PLEASE TAKE NOTICE** that on [●], 2020, the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") filed the *Debtors' Motion Seeking Entry of an Order (A) Approving Bidding Procedures, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Establishing Procedures for the Assumption and Assignment of Certain Executory Contracts and Leases, and (E) Granting Related Relief* [Docket No. [●]] (the "<u>Sale Motion</u>")[2] with the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") seeking, among other things, entry of an order (the "<u>Sale Order</u>") authorizing and approving: (a) the sale of the Debtors' Assets to [●] (the "<u>Stalking Horse Bidder</u>"), free and clear of liens, claims, encumbrances, and other interests, except as set forth in the Stalking Horse APA, or an alternative asset purchase agreement with a Successful Bidder at auction (the "<u>Sale</u>"); and (b) the assumption and assignment of executory contracts and unexpired leases (collectively, the "<u>Contracts</u>").

    **PLEASE TAKE FURTHER NOTICE** that the Debtors are soliciting offers for the purchase of the Assets consistent with the bidding procedures (the "<u>Bidding Procedures</u>") approved by the Court by entry of an order on [●], 2020 [Docket No. [●]] (the "<u>Bidding Procedures Order</u>"). **<u>All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order.</u>** To the extent that there are any inconsistencies between this notice and the Bidding Procedures or Bidding Procedures Order, the Bidding Procedures or Bidding Procedures Order, as applicable, shall govern in all respects.

    **PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive qualified competing bids within the requirements and time frame specified by the Bidding Procedures, the Debtors will conduct an auction (the "<u>Auction</u>") of the Assets **on August 10, 2020 at [● a.m/p.m.] (prevailing**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Akorn, Inc. (7400); 10 Edison Street LLC (7890); 13 Edison Street LLC; Advanced Vision Research, Inc. (9046); Akorn (New Jersey), Inc. (1474); Akorn Animal Health, Inc. (6645); Akorn Ophthalmics, Inc. (6266); Akorn Sales, Inc. (7866); Clover Pharmaceuticals Corp. (3735); Covenant Pharma, Inc. (0115); Hi-Tech Pharmacal Co., Inc. (8720); Inspire Pharmaceuticals, Inc. (9022); Oak Pharmaceuticals, Inc. (6647); Olta Pharmaceuticals Corp. (3621); VersaPharm Incorporated (6739); VPI Holdings Corp. (6716); and VPI Holdings Sub, LLC. The location of the Debtors' service address is: 1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.

[2]    Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Sale Motion.

**Eastern Time)** at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022-4611 (or at any other location as the Debtors may hereafter designate on proper notice).

      **PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale at a hearing scheduled to commence on or before **August 20, 2020, at [● a.m/p.m.] (prevailing Eastern Time)** (the "Sale Hearing") before the Honorable [●], United States Bankruptcy Judge for the Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom No. [●], Wilmington, Delaware 19801.

      **PLEASE TAKE FURTHER NOTICE** that, except as otherwise set forth in the Bidding Procedures Order with respect to any objections to proposed cure amounts or the assumption and assignment of Contracts, objections to the relief requested in the Sale Motion ***must***:  (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual bases for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received* on or before August 15, 2020 at 10:00 a.m. (prevailing Eastern Time)** by the following parties:

| Counsel to the Debtors | Co-Counsel to the Debtors |
|---|---|
| Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attn.: Patrick J. Nash, Jr<br>Gregory F. Pesce<br>Christopher M. Hayes<br><br>Kirkland & Ellis LLP<br>601 Lexington Ave<br>New York, New York 10022<br>Attn. Nicole L. Greenblatt | Richards, Layton, & Finger, P.A.<br>920 N. King Street<br>Wilmington, Delaware 19801<br>Attn.: Paul N. Heath<br>Paul N. Heath<br>Amanda R. Steele<br>Zachary I. Shapiro<br>Brett M. Haywood |
| **Counsel to the Committee (if any)** | **The United States Trustee** |
| [●] | Office of the United States Trustee<br>for the District of Delaware<br>844 King Street, Suite 2207, Lockbox 35,<br>Wilmington, Delaware 19801<br>Attn.: Jane M. Leamy |
| **Counsel to the Stalking Horse Bidder** | **Co-Counsel to the Stalking Horse Bidder** |
| Gibson Dunn & Crutcher<br>200 Park Avenue,<br>New York, **New York** 10166<br>Attn.: Scott J Greenberg<br>Michael J. Cohen | Young Conaway Stargatt & Taylor<br>1000 North King Street<br>Wilmington, DE 19801<br>Attn:  Robert S. Brady |

| Counsel to the Ad Hoc Group | Co-Counsel to the Ad Hoc Group |
|---|---|
| Gibson Dunn & Crutcher<br>200 Park Avenue,<br>New York, New York 10166<br>Attn.: Scott J Greenberg<br>Michael J. Cohen | Young Conaway Stargatt & Taylor<br>1000 North King Street<br>Wilmington, DE 19801<br>Attn: Robert S. Brady |
| Counsel to the Term Loan Agent under the Debtors' Term Loan Agreement | |
| Wilmer Cutler Pickering Hale and Dorr LLP<br>7 World Trade Center,<br>250 Greenwich Street,<br>New York, NY 10007<br>Attn: Andrew Goldman | |

## CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT.**

**PLEASE TAKE FURTHER NOTICE** that copies of the Sale Motion, Bidding Procedures, and Bidding Procedures Order, as well as all related exhibits, including the Stalking Horse APA and the proposed Sale Order, are available: (a) free of charge upon request to Kurtzman Carson Consultants LLC (the notice and claims agent retained in these chapter 11 cases) by calling (877) 725-7539 (U.S./Canada) or (424) 236-7247 (International); (b) by visiting the website maintained in these chapter 11 cases at www.kccllc.net/akorn; or (c) for a fee via PACER by visiting http://www.deb.uscourts.gov.

*[Remainder of page intentionally left blank]*

**PLEASE TAKE FURTHER NOTICE** that you may obtain additional information concerning the above-captioned chapter 11 cases at the website maintained in these chapter 11 cases at www.kccllc.net/akorn.

Wilmington, Delaware
May __, 2020

/s/
_____

**RICHARDS, LAYTON & FINGER, P.A.**
Paul N. Heath (No. 3704)
Amanda R. Steele (No. 5530)
Zachary I. Shapiro (No. 5103)
Brett M. Haywood (No. 6166)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:          heath@rlf.com
                steele@rlf.com
                shapiro@rlf.com
                haywood@rlf.com


*Proposed Co-Counsel for the*
*Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (*pro hac vice* admission pending)
Gregory F. Pesce (*pro hac vice* admission pending)
Christopher M. Hayes (*pro hac vice* admission pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                gregory.pesce@kirkland.com
                christopher.hayes@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Nicole L. Greenblatt, P.C. (*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          nicole.greenblatt@kirkland.com

*Proposed Co-Counsel for the*
*Debtors and Debtors in Possession*

**EXHIBIT 3**

**Contract Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AKORN, INC., *et al.*,[1] | ) | Case No. 20-11177 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## NOTICE TO CONTRACT PARTIES TO POTENTIALLY
## ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES

> **YOU ARE RECEIVING THIS NOTICE BECAUSE YOU**
> **OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO AN**
> **EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR MORE**
> **OF THE DEBTORS AS SET FORTH ON EXHIBIT A ATTACHED HERETO.**

**PLEASE TAKE NOTICE** that on [●], 2020, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order (A) Authorizing and Approving Bidding Procedures, (B) Scheduling an Auction and a Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Establishing Notice and Procedures for the Assumption and Assignment of Certain Executory Contracts and Leases, and (E) Granting Related Relief* [Docket No. [●]] (the "Bidding Procedures Order"),[2] authorizing the Debtors[3] to conduct an auction (the "Auction") to select the party to purchase the Debtors' assets. The Auction will be governed by the bidding procedures approved pursuant to the Bidding Procedures Order (attached to the Bidding Procedures Order as Exhibit 2, the "Bidding Procedures").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures and the terms of any Successful Bid, the Debtors **may** assume and assign to the Successful Bidder the contract or agreement listed on **Exhibit A** to which you are a counterparty, upon approval of the Sale. The Debtors have conducted a review of their books and records and have determined that

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Akorn, Inc. (7400); 10 Edison Street LLC (7890); 13 Edison Street LLC; Advanced Vision Research, Inc. (9046); Akorn (New Jersey), Inc. (1474); Akorn Animal Health, Inc. (6645); Akorn Ophthalmics, Inc. (6266); Akorn Sales, Inc. (7866); Clover Pharmaceuticals Corp. (3735); Covenant Pharma, Inc. (0115); Hi-Tech Pharmacal Co., Inc. (8720); Inspire Pharmaceuticals, Inc. (9022); Oak Pharmaceuticals, Inc. (6647); Olta Pharmaceuticals Corp. (3621); VersaPharm Incorporated (6739); VPI Holdings Corp. (6716); and VPI Holdings Sub, LLC. The location of the Debtors' service address is: 1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order or the Sale Motion.

[3] This relief granted in the Bidding Procedures Order is solely limited to the Debtors.

the cure amount for unpaid monetary obligations under such Assigned Contracts is as set forth on **Exhibit A** attached hereto (the "Cure Amounts").

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed Cure Amounts, object to a proposed assignment to the Successful Bidder of any Assigned Contract, or object to the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Assigned Contract, your objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Amounts, state the correct cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served and **actually received no later than August 15, 2020, at 5 p.m. (prevailing Central Time)** (the "**Cure Objection Deadline**") by the Court and the following parties:  (i) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Nicole L. Greenblatt, email: nicole.greenblatt@kirkland.com, and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn:  Patrick J. Nash, Jr. P.C., Gregory F. Pesce, and Christopher M. Hayes, email: patrick.nash@kirkland.com, gregory.pesce@kirkland.com, and christopher.hayes@kirkland.com; (ii) proposed Delaware counsel to the Debtors, Richards, Layton & Finger, 920 N. King Street, Wilmington, Delaware 19801, Attn: Paul M. Heath, Amanda R. Steele, Zachary I. Shapiro, and Brett M. Haywood, email: heath@rlf.com, steele@rlf.com, shapiro@rlf.com, and haywood@rlf.com; (iii) counsel to the Stalking Horse Bidder and counsel to the Ad Hoc Group, Gibson Dunn & Crutcher, 200 Park Avenue, New York, New York, 10166, Attn: Scott J Greenberg and Michael J. Cohen, e-mail:  sgreenberg@gibsondunn.com and mcohen@gibsondunn.com; (iv) co-counsel to  the Stalking Horse Bidder and co-counsel to the Ad Hoc Group, Young Conaway Stargatt & Taylor, 1000 North King Street, Wilmington, DE 19801, Attn: Robert S. Brady, e-mail: rbrady@ycst.com (v) counsel to the Term Loan Agent under the Debtors' Term Loan Agreement, Wilmer Cutler Pickering Hale and Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, NY 10007, Attn: Andrew Goldman, email: andrew.goldman@Wilmerhale.com   (vi) the counsel to the agent under any post-petition financing, (vii) the Office of the U.S. Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Jane M. Leamy, email: Jane.M.Leamy@usdoj.gov, (viii) counsel to any official committee appointed in these Chapter 11 Cases; and (ix) any other party that has filed a notice of appearance in these chapter 11 cases.

**PLEASE TAKE FURTHER NOTICE** that if no objection to (a) the Cure Amounts(s), (b)  the proposed assignment and assumption of any Assigned Contract, or (c) adequate assurance of the Successful Bidder's ability to perform is filed by the Cure Objection Deadline, then (i) you will be deemed to have stipulated that the Cure Amounts as determined by the Debtors are correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional cure amount under the proposed assigned Assigned Contract, and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assignment to the Successful Bidder on the grounds that the Successful Bidder has not provided adequate assurance of future performance as of the closing date of the Sale.

**PLEASE TAKE FURTHER NOTICE** that any objection to the proposed assumption and assignment of an Assigned Contract or related Cure Amounts in connection with the

Successful Bid that otherwise complies with these procedures yet remains unresolved as of the commencement of the Sale Hearing, shall be heard at a later date as may be fixed by the Court.

**PLEASE THAT FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Assigned Contract on the Cure Notice does not require or guarantee that such Assigned Contract will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors and the Successful Bidder with respect to such Executory Contracts and/or Unexpired Leases are reserved.  Moreover, the Debtors explicitly reserve their rights, in their reasonable discretion, to seek to reject or assume each Assigned Contract pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors and/or the Successful Bidder, as applicable, to designate any Assigned Contract as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that, nothing herein (i) alters in any way the prepetition nature of the Assigned Contracts or the validity, priority, or amount of any claims of a counterparty to any Assigned Contract against the Debtors that may arise under such Assigned Contract, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Assigned Contract against the Debtors that may arise under such Assigned Contract.

**PLEASE TAKE FURTHER NOTICE** that you may obtain additional information concerning the above-captioned chapter 11 cases at the website maintained in these chapter 11 cases at www.kccllc.net/akorn.

[*Remainder of page intentionally left blank*]

Wilmington, Delaware
May __, 2020

/s/
_____
**RICHARDS, LAYTON & FINGER, P.A.**
Paul N. Heath (No. 3704)
Amanda R. Steele (No. 5530)
Zachary I. Shapiro (No. 5103)
Brett M. Haywood (No. 6166)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:      (302) 651-7701
Email:           heath@rlf.com
                       steele@rlf.com
                       shapiro@rlf.com
                       haywood@rlf.com

*Proposed Co-Counsel for the*
*Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (*pro hac vice* admission pending)
Gregory F. Pesce (*pro hac vice* admission pending)
Christopher M. Hayes (*pro hac vice* admission pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           patrick.nash@kirkland.com
                       gregory.pesce@kirkland.com
                       christopher.hayes@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Nicole L. Greenblatt, P.C. (*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:           nicole.greenblatt@kirkland.com

*Proposed Co-Counsel for the*
*Debtors and Debtors in Possession*

# EXHIBIT B

**Sale Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AKORN, INC., *et al.*,[1] | ) Case No. 20-11177 (___) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## ORDER (A) APPROVING THE ASSET PURCHASE AGREEMENT, (B) AUTHORIZING THE SALE OF ASSETS, (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (D) GRANTING RELATED RELIEF

Upon the motion (the "Motion") of the above-captioned debtors and debtors-in-possession (collectively the "Debtors" or "Seller") for an order, pursuant to sections 363(b), 363(f), and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006(f), 9013, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") authorizing and approving, among other things, (a) entry into that certain *Asset Purchase Agreement*, dated May 20, 2020 (the "APA"),[2] with [●] (the "Purchaser"), a copy of which is annexed hereto as **Exhibit A**, (b) the proposed sale (the "Sale") of substantially all of the assets (the "Acquired Assets") of the Debtors

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are:  Akorn, Inc. (7400); 10 Edison Street LLC (7890); 13 Edison Street LLC; Advanced Vision Research, Inc. (9046); Akorn (New Jersey), Inc. (1474); Akorn Animal Health, Inc. (6645); Akorn Ophthalmics, Inc. (6266); Akorn Sales, Inc. (7866); Clover Pharmaceuticals Corp. (3735); Covenant Pharma, Inc. (0115); Hi-Tech Pharmacal Co., Inc. (8720); Inspire Pharmaceuticals, Inc. (9022); Oak Pharmaceuticals, Inc. (6647); Olta Pharmaceuticals Corp. (3621); VersaPharm Incorporated (6739); VPI Holdings Corp. (6716); and VPI Holdings Sub, LLC.  The location of the Debtors' service address is:  1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or in the APA, as applicable.

free and clear of all liens, claims, encumbrances, and interests (together, the "Encumbrances") pursuant to the terms of the APA, (b) assumption and assignment of those contracts of the Debtors identified in the APA (the "Assigned Contracts") and assignment of the Assigned Contracts to Purchaser, and (c) other related relief; and the Court having entered an order [Docket No. [____]] (the "Bid Procedures Order") approving the bid procedures (the "Bid Procedures"); an Auction having been conducted pursuant to the terms of the Bid Procedures Order on August 10, 2020; and the Debtors having identified the bid by Purchaser made at the Auction as the highest or otherwise best bid for the Acquired Assets; and the Court having conducted a hearing on the Motion on August 20, 2020 (the "Sale Hearing"), at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having (i) reviewed and considered the Motion, all relief related thereto, the objections thereto, and statements of counsel and the evidence presented in support of the relief requested by the Debtors in the Motion at the Sale Hearing and (ii) found that, after an extensive marketing process by the Debtors, Purchaser has submitted the highest or otherwise best bid for the Acquired Assets; and that adequate and sufficient notice of the Bid Procedures, the APA, and all transactions contemplated thereunder and in this Sale Order were given pursuant to and consistent with the Bid Procedures Order; and that reasonable and adequate notice of the Motion and Bid Procedures Order having been provided to all persons required to be served in accordance with the Bankruptcy Code and the Bankruptcy Rules; and that all interested parties having been afforded an opportunity to be heard with respect to the Motion and all relief related thereto; and that jurisdiction exists for the Court to consider the Motion and after due deliberation thereon; and upon the arguments and statements in support of the Motion presented at the Sale Hearing before the Court; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties

2

in interest; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon; and good and sufficient cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:[3]

A.      **Jurisdiction and Venue.**  This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these chapter 11 cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      **Statutory Predicates**.  The statutory bases for the relief sought in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, and Local Rule 6004-1.

C.      **Final Order.**  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, waives any stay, and expressly directs entry of judgment as set forth herein.

D.      **Notice**.  As evidenced by the certificates of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, APA, Sale Hearing, Sale, and transactions contemplated thereby has been provided in accordance with the Bid Procedures Order, sections 363 and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9008.  The Debtors have complied with all obligations to provide notice of the Motion as set forth

---

[3]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  *See* Bankruptcy Rule 7052.

in the Bid Procedures Order.  The notices described above were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, APA, Auction, or Sale Hearing is or shall be required.  The disclosures made by the Debtors concerning the Motion, the APA, the Auction, and Sale Hearing were good, complete, and adequate.  The requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

E.      In accordance with the Bid Procedures Order, the Debtors have served a notice of the Assigned Contracts (the "Cure Notice"), which Cure Notice [Docket No. __] identifies all defaults and actual pecuniary loss to the non-Debtor party resulting from such defaults including, but not limited to, all claims, demands, charges, rights to refunds, and monetary and non-monetary obligations that the non-Debtor parties can assert under the Assigned Contracts, whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate, relating to money now owing or owing in the future, arising under or out of, in connection with, or in any way relating to the Assigned Contracts (the foregoing amounts as stated in the Cure Notice, collectively referred to as the "Cure Amounts") upon each non-Debtor counterparty to an Assigned Contract.  The service and provision of the Cure Notice were good, sufficient, and appropriate under the circumstances, and no further notice need be given in respect of assumption and assignment of the Assigned Contracts or establishing a Cure Amount for the respective Assigned Contract.  Non-Debtor counterparties to the Assigned Contracts have had an adequate opportunity to object to assumption and assignment of the applicable Assigned Contract and the Cure Amount set forth in the Cure Notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the non-Debtor counterparty from accepting performance by, or rendering performance to, Purchaser for purposes of section 365(c)(1) of the Bankruptcy Code).  The deadline to file an

objection to the stated Cure Amounts (a "Cure Objection") has expired and, to the extent any such party timely filed a Cure Objection, all such Cure Objections have been resolved, withdrawn, overruled, or continued to a later hearing by agreement of the parties.  To the extent that any such party did not timely file a Cure Objection by August 15, 2020 at 5 p.m. (prevailing Central Time) (the "Cure Objection Deadline"), such party shall be deemed to have consented to the (i) assumption and assignment of the Assigned Contract and (ii)  proposed Cure Amount set forth on the Cure Notice.

F.      **Corporate Authority**.  (i) The Debtors have full corporate power and authority to execute the APA and all other documents contemplated thereby, and the Debtors' sale of the Acquired Assets has been duly and validly authorized by all necessary corporate action, (ii) the Debtors have all of the corporate power and authority necessary to consummate the transactions contemplated by the APA, (iii) the Debtors have taken all corporate action necessary to authorize and approve the APA and the consummation of the transactions contemplated thereby, and (iv) no consents or approvals, other than those expressly provided for in the APA, are required for the Debtors to consummate such transactions.

G.      The APA was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia.  Neither the Debtors nor Purchaser is entering into the transactions contemplated by the APA fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

H.      The Debtors are the sole and lawful owner of the Acquired Assets.  Subject to sections 363(f) and 365(a) of the Bankruptcy Code, the transfer of each of the Acquired Assets to Purchaser, in accordance with the APA will be, as of the Closing Date (as defined in the APA), a

legal, valid, and effective transfer of the Acquired Assets, which transfer vests or will vest Purchaser with all right, title, and interest of the Debtors to the Acquired Assets free and clear of all Encumbrances.  Claims, as defined in the Asset Purchase Agreement, shall include, but not be limited to, all debts arising under, relating to, or in connection with any act of the Debtors or claims liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, restrictive covenants, covenants not to compete, rights to refunds, escheat obligations, interests, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement  applicable law, equity, or otherwise (including, without limitation, rights with respect to claims and Encumbrances (i) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtors' or Purchaser's interests in the Acquired Assets, or any similar rights, (ii) in respect of taxes owed by the Debtors for periods prior to the Closing Date, including, but not limited to, sales, income, use, or any other type of tax, or (iii) in respect of restrictions, rights of first refusal, charges, or interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attributes of ownership) relating to, accruing, or arising any time prior to the Closing Date, with the exception of the Assumed Liabilities or Permitted Encumbrances.

I.      **Sale in Best Interests of the Debtors' Estates**.  Good and sufficient reasons for approval of the APA and the transactions to be consummated in connection therewith have been articulated, and the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest.  The Debtors have demonstrated both (i) good, sufficient, and sound business purposes and justifications and (ii) compelling circumstances for

6

the Sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, outside of a plan of reorganization, in that, among other things, the immediate consummation of the Sale to Purchaser is necessary and appropriate to maximize the value of the Debtors' estates.

J.      The Sale must be approved and consummated promptly in order to preserve the viability of the Debtors' businesses as a going concern and to maximize the value of the Debtors' estates.  Time is of the essence in consummating the Sale.  Given all of the circumstances of these chapter 11 cases and the adequacy and fair value of the Purchase Price, the proposed Sale constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

K.      The consummation of the Sale and the assumption and assignment of the Assigned Contracts are legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), and 365 of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the transaction.

L.      **Good Faith of Purchaser and Seller**.  The APA was negotiated, proposed, and entered into by the Debtors and Purchaser without collusion, in good faith, and as the result of arm's length bargaining positions and is substantively and procedurally fair to all parties. Purchaser is not an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.  Neither any of the Debtors nor Purchaser has engaged in any conduct that would cause or permit the APA to be avoided under section 363(n) of the Bankruptcy Code. Specifically, Purchaser has not acted in a collusive manner with any person and the Purchase Price was not controlled by any agreement among bidders.  Purchaser is purchasing the Acquired Assets,

in accordance with the APA, in good faith, and is a good faith purchaser within the meaning of

section 363(m) of the Bankruptcy Code and is therefore entitled to all of the protections afforded

by such provision and otherwise has proceeded in good faith in all respects in connection with the

Debtors' chapter 11 cases.  As demonstrated by (i) any testimony and other evidence proffered or

adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale

Hearing, substantial marketing efforts and a competitive sale process were conducted in

accordance with the Bid Procedures Order and, among other things: (a) the Debtors and Purchaser

complied with the provisions in the Bid Procedures Order; (b) Purchaser agreed to subject its bid

to the competitive bid procedures set forth in the Bid Procedures Order; (c) Purchaser in no way

induced or caused the chapter 11 filing by the Debtors; and (d) all payments to be made by

Purchaser in connection with the Sale have been disclosed.

M.    **Highest or Otherwise Best Offer.**    The Debtors conducted the Auction in

accordance with, and have otherwise complied in all material respects with, the Bid Procedures

Order.  The Auction established in the Bid Procedures Order afforded a full, fair, and reasonable

opportunity for any person or entity to make a higher or otherwise better offer to purchase the

Acquired Assets.  The Auction was duly noticed and conducted in a non-collusive, fair, and

good-faith manner, and a reasonable opportunity was given to any interested party to make a higher

or otherwise better offer for the Acquired Assets.  The APA constitutes the highest or otherwise

best offer for the Acquired Assets and will provide a greater recovery for the Debtors' estates than

would be provided by any other available alternative.  The Debtors' determination that the APA

constitutes the highest or otherwise best offer for the Acquired Assets is a valid and sound exercise

of their fiduciary duties and constitutes a valid and sound exercise of the Debtors' business

judgment.

N.    **Consideration**.  The consideration provided by Purchaser pursuant to the APA (a) is fair and reasonable, (b) is the highest or otherwise best offer for the Acquired Assets, and (c) constitutes reasonably equivalent value and fair consideration (as those terms are defined in each of the Uniform Voidable Transactions Act (formally the Uniform Fraudulent Transfer Act), Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code) under the laws of the United States, any state, territory, possession, or the District of Columbia.  No other person or entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than Purchaser.  Approval of the Motion, the APA, and the consummation of the transactions contemplated thereby is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

O.    **No Successor.** The transactions contemplated under the APA do not amount to a consolidation, merger, or *de facto* merger of Purchaser and the Debtors and/or the Debtors' estates; there is not substantial continuity between Purchaser and the Debtors; there is no continuity of enterprise between the Debtors and Purchaser; Purchaser is not a mere continuation of the Debtors or their estates; and Purchaser is not a successor or assignee of the Debtors or their estates for any purpose, including, but not limited to, under any federal, state, or local statute or common law, or revenue, pension, ERISA, tax, labor, employment, environmental, escheat, or unclaimed property laws, or other law, rule, or regulation (including. without limitation. filing requirements under any such laws, rules. or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation or doctrine or common law, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule. or regulation or doctrine. and Purchaser and its affiliates shall have no liability or obligation under the Workers Adjustment and Retraining Act (the "<u>WARN Act</u>"),  929 U.S.C. §§ 210 et seq.

9

or the Comprehensive Environmental Response Compensation and Liability Act and shall not be deemed to be a "successor employer" for purposes of the Internal Revenue Code of 1986, Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, the Americans with Disability Act, the Family Medical Leave Act, the National Labor Relations Act, the Labor Management Relations Act, the Older Workers Benefit Protection Act, the Equal Pay Act, the Civil Rights Act of 1866 (42 U.S.C. 1981), the Employee Retirement Income Security Act, the Multiemployer Pension Protection Act, the Pension Protection Act, and/or the Fair Labor Standards Act. Except for the Assumed Liabilities or Permitted Encumbrances, the (i) transfer of the Acquired Assets to Purchaser and (ii) assumption and assignment to Purchaser of the Assigned Contracts do not and will not subject Purchaser to any liability whatsoever with respect to the operation of the Debtors' business before the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based on, in whole or in part, directly or indirectly, any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability.

P.      **Free and Clear**.  The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full and therefore, the Debtors may sell the Acquired Assets free and clear of any Encumbrances in the property, other than as expressly contemplated by the APA. Purchaser would not have entered into the APA and would not consummate the transactions contemplated thereby if the Sale to Purchaser and the assumption of any Assumed Liabilities or Permitted Encumbrances by Purchaser were not free and clear of all Encumbrances other than the Assumed Liabilities or Permitted Encumbrances. The Debtors may sell the Acquired Assets free and clear of any Encumbrances of any kind or nature whatsoever because, in each case, one or more of the standards

10

set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Each entity with an

Encumbrance, lien, claim, or interest in the Acquired Assets to be transferred on the Closing Date:

(i) has, subject to the terms and conditions of this Sale Order, consented to the Sale or is deemed

to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept

money satisfaction of such Encumbrance, lien, claim, or interest; or (iii) otherwise falls within the

provisions of section 363(f) of the Bankruptcy Code.  Those holders of Encumbrances who did

not object to the Motion are deemed, subject to the terms of this Sale Order, to have consented

pursuant to section 363(f)(2) of the Bankruptcy Code.  All holders of Encumbrances are adequately

protected by having their Encumbrances attach to the cash proceeds received by the Debtors that

are ultimately attributable to the property against or in which such Encumbrances are asserted,

subject to the terms of such Encumbrances with the same validity, force, and effect, and in the

same order of priority, which such Encumbrances now have against the Acquired Assets or their

proceeds, if any, subject to any rights, claims, and defenses the Debtors or their estates, as

applicable, may possess with respect thereto.

Q.    **Cure/Adequate Assurance**.  The assumption and assignment of the Assigned

Contracts pursuant to the terms of this Sale Order is integral to the APA and is in the best interests

of the Debtors and their estates, their creditors, and all other parties in interest, and represents the

reasonable exercise of sound and prudent business judgment by the Debtors.  Payment of the Cure

Amounts by the Debtors shall (i) to the extent necessary, cure or provide adequate assurance of

cure, within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code, and

(ii) to the extent necessary, provide compensation or adequate assurance of compensation to any

party for any actual pecuniary loss to such party resulting from a default prior to the date hereof

with respect to the Assigned Contracts, within the meaning of sections 365(b)(1)(B) and

365(f)(2)(A) of the Bankruptcy Code.  Purchaser's financial wherewithal to consummate the transactions contemplated by the APA and the evidence presented at the Sale Hearing demonstrating Purchaser's ability to perform the obligations under the Assigned Contracts after the Closing Date shall constitute adequate assurance of future performance within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable), and 365(f)(2)(B) of the Bankruptcy Code.

R.      Any objections to the assumption and assignment of any of the Assigned Contracts by Purchaser in accordance with the APA are hereby overruled.  To the extent that any counterparty failed to object to the proposed Cure Amounts timely, such counterparty is deemed to have consented to such Cure Amounts and the assumption and assignment of its respective Assigned Contract(s) to Purchaser in accordance with the APA.

NOW, THEREFORE, IT IS ORDERED THAT:

1.      **Motion is Granted**.  The Motion and the relief requested therein is GRANTED and APPROVED as set forth herein.

2.      **Objections Overruled**.  Any objections to the entry of this Sale Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing (the full record of which is incorporated herein by reference), by stipulation filed with the Court, or by representation by the Debtors in a separate pleading, and all reservations of rights included therein, if any, are hereby denied and overruled on the merits with prejudice.

3.      **Approval**.  The APA, and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved in all respects.  Pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, the Debtors are hereby authorized to (a) execute any additional instruments

or documents that may be reasonably necessary or appropriate to implement the APA, provided

that such additional documents do not materially change its terms adversely to the Debtors' estates,

(b) consummate the Sale in accordance with the terms and conditions of the APA and the

instruments to the APA contemplated thereby, and (c) execute and deliver, perform under,

consummate, implement, and close fully the transactions contemplated by the APA, including the

assumption and assignment to Purchaser (in accordance with the APA) of the Assigned Contracts,

together with all additional instruments and documents that may be reasonably necessary or

desirable to implement the APA and the Sale.  Purchaser shall not be required to seek or obtain

relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its

remedies under the APA or any other Sale-related document.  The automatic stay imposed by

section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the

preceding sentence and the other provisions of this Sale Order; *provided, however*, that this Court

shall retain exclusive jurisdiction over any and all disputes with respect thereto.

4.      This Sale Order shall be binding in all respects upon the Debtors, their estates, all

creditors of, and holders of equity interests in, the Debtors, any holders of Encumbrances or other

interests in, against, or on all or any portion of the Acquired Assets (whether known or unknown),

Purchaser, and all successors and assigns of Purchaser, the Acquired Assets, and any trustees, if

any, subsequently appointed in the Debtors' chapter 11 cases or upon a conversion to chapter 7

under the Bankruptcy Code of the Debtors' chapter 11 cases.  This Sale Order and the APA shall

inure to the benefit of the Debtors, their estates and creditors, Purchaser, and the respective

successors and assigns of each of the foregoing.

5.      **Transfer of Acquired Assets Free and Clear of Encumbrances**.  Pursuant to

sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Debtors are authorized to transfer

13

the Acquired Assets to Purchaser in accordance with the APA, and such transfer shall constitute a legal, valid, binding, and effective transfer of such Acquired Assets and shall vest Purchaser with title in and to the Acquired Assets and, other than the Assumed Liabilities or Permitted Encumbrances, Purchaser shall take title to and possession of the Acquired Assets free and clear of all Encumbrances and other interests of any kind or nature whatsoever, including, but not limited to, successor or successor-in-interest liability and Claims in respect of the Excluded Liabilities, with all such Encumbrances and other interests to attach to the cash proceeds received by the Debtors that are ultimately attributable to the property against or in which such Encumbrances are asserted, subject to the terms of such Encumbrances with the same validity, force, and effect, and in the same order of priority, which such Encumbrances now have against the Acquired Assets or their proceeds, if any, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

6.    Unless otherwise expressly included in the definition of "Assumed Liabilities" or "Permitted Encumbrances" in the APA, Purchaser shall not be responsible for any Encumbrances, including in respect of the following:  (a) any labor or employment agreements; (b) any mortgages, deeds of trust, and security interests; (c) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtors; (d) any other employee, worker's compensation, occupational disease, or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the WARN Act, (vii) the Age Discrimination in Employment Act, as amended, (viii) the Americans with

Disabilities Act, (ix) the Family Medical Leave Act, (x) the Labor Management Relations Act, (xi) the Multiemployer Pension Protection Act, (xii) the Pension Protection Act, (xiii) the Consolidated Omnibus Budget Reconciliation Act of 1985, (xiv) the Comprehensive Environmental Response Compensation and Liability Act, (xv) state discrimination laws, (xvi) state unemployment compensation laws or any other similar state laws, or (xvii) any other state or federal benefits or claims relating to any employment with the Debtors or any of its respective predecessors; (e) any bulk sales or similar law; (f) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, or any state or local tax laws; (g) any escheat or unclaimed property laws; (h) to the extent not included in the foregoing, any of the Excluded Liabilities under the APA;  and (i) any theories of successor or transferee liability.

7.    All persons and entities that are in possession of some or all of the Acquired Assets on the Closing Date are directed to surrender possession of such Acquired Assets to Purchaser in accordance with the APA on the Closing Date or at such time thereafter as Purchaser may request. On the Closing Date, each of the Debtors' creditors is authorized to execute such documents and take all other actions as may be reasonably necessary to release its Encumbrances or other interests in the Acquired Assets, if any, as such Encumbrances may have been recorded or may otherwise exist.

8.    If any person or entity that has filed statements or other documents or agreements evidencing Encumbrances on, against, or in, all or any portion of the Acquired Assets (other than statements or documents with respect to the Assumed Liabilities or Permitted Encumbrances) shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and

15

easements, and any other documents necessary for the purpose of documenting the release of all Encumbrances, liens, claims, interests, or other interests that the person or entity has or may assert with respect to all or any portion of the Acquired Assets, the Debtors are hereby authorized, and Purchaser is hereby authorized, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Acquired Assets.

9.     On the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer to Purchaser of the Debtors' interests in the Acquired Assets.  This Sale Order is and shall be effective as a determination that, on the Closing Date, all Encumbrances or other interest of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing Date, other than the Assumed Liabilities or Permitted Encumbrances, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected.  This Sale Order shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.  A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any

Encumbrances and other interests of record except those assumed as Assumed Liabilities or Permitted Encumbrances.

10.    **Prohibition of Actions Against Purchaser**.  Except for the Assumed Liabilities or Permitted Encumbrances, Purchaser shall not have any liability or other obligation of the Debtors arising under or related to any of the Acquired Assets or other Assumed Liabilities or Permitted Encumbrances expressly identified in the APA, including, but not limited to, any liability for any Encumbrances, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing Date.

11.    Except with respect to the Assumed Liabilities or Permitted Encumbrances, or as otherwise expressly provided for in this Sale Order or the APA, all persons and entities, including, but not limited to, all debt holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding Encumbrances or other interests of any kind or nature whatsoever against or in all or any portion of the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to the Debtors, the Acquired Assets, the operation of the Debtors' businesses prior to the Closing Date, or the transfer of the Acquired Assets to Purchaser in accordance with the APA, are hereby forever barred, estopped, and permanently enjoined from asserting against Purchaser, its successors or assigns, its property or the Acquired Assets, such persons' or entities' Encumbrances in and to the Acquired Assets, including, without

limitation, the following actions:  (a) commencing or continuing in any manner any action or other proceeding against Purchaser, its successors, assets, or properties; (b) enforcing, attaching, collecting, or recovering, in any manner, any judgment, award, decree, or order against Purchaser, its successors, or their assets or properties; (c) creating, perfecting, or enforcing any Encumbrance, lien, claim, or interest against Purchaser, its successors, their assets, or their properties; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due Purchaser or its successors; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with the Acquired Assets.

12.     To the greatest extent available under applicable law, Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Acquired Assets to the extent transferred in the APA, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to Purchaser as of the Closing Date.

13.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Acquired Assets to Purchaser in accordance with the terms of the APA and this Sale Order.

14.     Purchaser has given substantial consideration under the APA for the benefit of the Debtors, their estates, and their creditors.  The consideration given by Purchaser shall constitute

valid and valuable consideration for the releases of any potential Encumbrances pursuant to this Sale Order, which releases shall be deemed to have been given in favor of Purchaser by all holders of Encumbrances or liens against or interests in, or claims against, any of the Debtors or any of the Acquired Assets, other than with respect to the Assumed Liabilities or Permitted Encumbrances. The consideration provided by Purchaser for the Acquired Assets under the APA is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

15.    Notwithstanding the foregoing, nothing herein shall prevent (a) the Debtors from pursuing an action against Purchaser arising under the APA or the related documents, or (b) any administrative agencies, governmental, tax, and regulatory authorities, secretaries of state, federal, state, and local officials from properly exercising their police and regulatory powers.

16.    **Assumption and Assignment of Contracts.**  The Debtors are hereby authorized, in accordance with sections 105(a) and 365 of the Bankruptcy Code, to (a) assume and assign to Purchaser, in accordance with the APA, effective upon the Closing Date, the Assigned Contracts free and clear of all Encumbrances and other interests of any kind or nature whatsoever (other than the Assumed Liabilities or Permitted Encumbrances) and (b) execute and deliver to Purchaser such documents or other instruments as Purchaser deems may be reasonably necessary to assign and transfer the Assigned Contracts and the Assumed Liabilities or Permitted Encumbrances to Purchaser in accordance with the APA.

17.    With respect to the Assigned Contracts:  (a) each Assigned Contract is an executory contract or unexpired lease under section 365 of the Bankruptcy Code; (b) the Debtors may assume each of the Assigned Contracts in accordance with section 365 of the Bankruptcy Code; (c) the Debtors may assign each Assigned Contract in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assigned Contract that prohibit or condition the

19

assignment of such Assigned Contract or allow the party to such Assigned Contract to terminate, recapture, impose any penalty, condition, renewal, or extension, or modify any term or condition upon the assignment of such Assigned Contract, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (d) all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to Purchaser of each Assigned Contract, in accordance with the APA, have been satisfied; (e) the Assigned Contracts shall be transferred and assigned to, and following the Closing Date, remain in full force and effect for the benefit of Purchaser in accordance with the APA, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such assignment to and assumption by Purchaser in accordance with the APA; and (f) upon the Closing Date, in accordance with sections 363 and 365 of the Bankruptcy Code, Purchaser shall be fully and irrevocably vested in all right, title, and interest of each Assigned Contract.

18.     All defaults or other obligations of the Debtors under the Assigned Contracts arising or accruing prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured on the Closing Date or as soon thereafter as reasonably practicable by payment of the Cure Amounts by the Debtors.  To the extent that any counterparty to an Assigned Contract did not object to its Cure Amount by the Cure Objection Deadline, such counterparty is deemed to have consented to such Cure Amount and the assumption and assignment of its respective Assigned Contract(s) to Purchaser in accordance with the APA.

19.     Unless otherwise represented by the Debtors in a separate pleading, in open court at the Sale Hearing, or pursuant to a contract or lease amendment entered into by the Debtors, Purchaser, and the appropriate contract or lessor counterparty (any such amendment being deemed approved by this Sale Order), the Cure Notice reflects the sole amounts necessary under section 365(b) of the Bankruptcy Code to cure all monetary defaults under the Assigned Contracts, and no other amounts are or shall be due in connection with the assumption by the Debtors and the assignment to Purchaser of the Assigned Contracts in accordance with the APA.

20.     Upon the Debtors' assignment of the Assigned Contracts to Purchaser under the provisions of this Sale Order and any additional orders of this Court and payment of any Cure Amounts by the Debtors, no default shall exist under any Assigned Contract, and no counterparty to any Assigned Contract shall be permitted (a) to declare a default by Purchaser under such Assigned Contract or (b) otherwise take action against Purchaser as a result of Debtors' financial condition, bankruptcy, or failure to perform any of their obligations under the relevant Assigned Contract. Each non-Debtor party to an Assigned Contract hereby is also forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors or Purchaser, or the property of any of them, any default or claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the Closing, including those constituting Excluded Liabilities or, against Purchaser, any counterclaim, defense, setoff, recoupment, or any other Claim asserted or assertable against the Debtors and (ii) imposing or charging against Purchaser any rent accelerations, assignment fees, increases, or any other fees as a result of the Debtors' assumption and assignment to Purchaser of any Assigned Contract in accordance with the APA. The validity of such assumption and assignment of each Assigned Contract shall not be affected by any dispute

between the Debtors and any non-Debtors party to an Assigned Contract relating to such contract's respective Cure Amounts.

21.     Except as provided in the APA or this Sale Order, after the Closing, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assumed Liabilities or Permitted Encumbrances, and all holders of such Encumbrance, lien, claim, and interest are forever barred and estopped from asserting such Claims against the Debtors, their successors or assigns, their property, or their assets or estates.  The failure of the Debtors or Purchaser to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and Purchaser's rights to enforce every term and condition of the Assigned Contracts.

22.     Notwithstanding anything herein to the contrary and subject to the APA, prior to the Closing Date, Purchaser may remove any contract or lease from the list of Assigned Contracts (and thereby exclude such Contract from the definition of Assigned Contracts) pursuant to the procedures set forth in the APA.  To the extent applicable, the Debtors shall file a schedule of the final Assigned Contracts reasonably promptly after the Closing Date.

23.     **Good Faith**.  The transactions contemplated by the APA are undertaken by Purchaser without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assigned Contracts) with Purchaser, unless such authorization is duly stayed pending such appeal.  Purchaser is a good faith purchaser of the Acquired Assets, and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code.

24.    **Failure to Specify Provisions**.  The failure specifically to include any particular provisions of the APA in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA be authorized and approved in its entirety; *provided*, *however*, that this Sale Order shall govern if there is any inconsistency between the APA (including all ancillary documents executed in connection therewith) and this Sale Order. Likewise, all of the provisions of this Sale Order are nonseverable and mutually dependent.  To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Sale Order shall control.

25.    **Non-Material Modifications**.  The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

26.    **Amounts Payable by Debtors.**  Any amounts payable by any Debtor under the agreements or any of the documents delivered by any Debtor in connection with the APA shall be paid in the manner provided in the APA and the Bid Procedures Order, without further order of this Court, shall be allowed administrative claims in an amount equal to such payments in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code, shall have the other protections provided in the Bid Procedures Order, and shall not be discharged, modified, or otherwise affected by any reorganization plan for the Debtor, except by an express agreement with Purchaser, its successors, or assigns.

27.    **Subsequent Plan Provisions**.  Nothing contained in any chapter 11 plan confirmed in the Debtors' cases or any order confirming any such plan or in any other order in these

23

chapter 11 cases (including any order entered after any conversion of any of these cases to a case under chapter 7 of the Bankruptcy Code) or any related proceeding subsequent to entry of this Sale Order shall alter, conflict with, or derogate from, the provisions of the APA or this Sale Order.

28.    **No Stay of Order**.  Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), and pursuant to Bankruptcy Rules 7062 and 9014, this Sale Order shall not be stayed for fourteen (14) days after the entry hereof, but shall be effective and enforceable immediately upon issuance hereof.  Time is of the essence in closing the transactions referenced herein, and the Debtors and Purchaser intend to close the Sale as soon as practicable.  Any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

29.    **Calculation of Time.**  All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006.

30.    **Further Assurances**.  From time to time, as and when requested by any party, each party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the transactions contemplated by the APA, including such actions as may be necessary to vest, perfect, or confirm, of record or otherwise, in Purchaser its right, title, and interest in and to the Acquired Assets.

31.    **Retention of Jurisdiction**.  This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the APA, all amendments thereto, and any waivers and consents thereunder, and each of the agreements executed in connection therewith to which any Debtor is a party or which has been assigned by the Debtors to Purchaser in accordance with

24

the APA, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to (a) interpret, implement, and enforce the provisions of this Sale Order and the APA, (b) adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, (c) protect Purchaser against any Encumbrances or other interests in the Debtors or the Acquired Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale, and (d) enter any orders under section 363 and 365 of the Bankruptcy Code with respect to the Assigned Contracts.

Dated: _____, 2020                                   _____
Wilmington, Delaware                                          UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT A</u>**

**Asset Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF MAY 20, 2020**

**BY AND BETWEEN**

**[_____], AS PURCHASER,**

**AND**

**AKORN, INC., AS THE COMPANY,**

**AND**

**THE OTHER SELLERS NAMED HEREIN**

# TABLE OF CONTENTS

**Page**

ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION
OF ASSUMED LIABILITIES ................................................................................. 1

    1.1.    Purchase and Sale of the Acquired Assets ............................................. 1
    1.2.    Excluded Assets ..................................................................................... 4
    1.3.    Assumption of Certain Liabilities ......................................................... 6
    1.4.    Excluded Liabilities ............................................................................... 7
    1.5.    Assumption/Rejection of Certain Contracts .......................................... 9

ARTICLE II CONSIDERATION; PAYMENT; CLOSING ....................................... 12

    2.1.    Consideration; Payment ....................................................................... 12
    2.2.    Closing ................................................................................................. 13
    2.3.    Closing Deliveries by Sellers .............................................................. 13
    2.4.    Closing Deliveries by Purchaser .......................................................... 14
    2.5.    Withholding .......................................................................................... 15

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS ............. 15

    3.1.    Organization and Qualification. ........................................................... 15
    3.2.    Authorization of Agreement ................................................................. 16
    3.3.    Conflicts; Consents .............................................................................. 16
    3.4.    Equity Interests of Non-Debtor Subsidiaries ...................................... 17
    3.5.    Financial Statements; Internal Controls; SEC Reports. ...................... 18
    3.6.    Real Property. ...................................................................................... 19
    3.7.    Title to Property; Sufficiency of Assets. ............................................. 21
    3.8.    Insurance .............................................................................................. 21
    3.9.    Contracts. ............................................................................................. 22
    3.10.    Litigation ............................................................................................. 24
    3.11.    Permits; Compliance with Laws .......................................................... 24
    3.12.    Anti-Corruption and International Trade Compliance. ......................... 25
    3.13.    Environmental Matters ......................................................................... 25
    3.14.    Intellectual Property ............................................................................. 26
    3.15.    Tax Matters .......................................................................................... 29
    3.16.    Seller Plans .......................................................................................... 30
    3.17.    Employees ............................................................................................ 32
    3.18.    Affiliate Transactions .......................................................................... 33
    3.19.    Brokers ................................................................................................. 33
    3.20.    Inventory .............................................................................................. 33
    3.21.    Customers and Suppliers ...................................................................... 34
    3.22.    Product Liability .................................................................................. 34
    3.23.    Health Care Regulatory Matters .......................................................... 34
    3.24.    Absence of Certain Changes ................................................................ 37

3.25.   Bank Accounts .................................................................................. 40
3.26.   No Other Representations or Warranties .......................................... 40

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER ..................... 40

4.1.    Organization and Qualification ........................................................ 40
4.2.    Authorization of Agreement ............................................................. 40
4.3.    Conflicts; Consents .......................................................................... 41
4.4.    Financing ......................................................................................... 42
4.5.    Brokers ............................................................................................. 42
4.6.    Credit Bid ......................................................................................... 42
4.7.    No Litigation .................................................................................... 42
4.8.    Certain Arrangements ...................................................................... 42
4.9.    Investment Representation; Investigation ........................................ 42
4.10.   No Additional Representations or Warranties .................................. 42

ARTICLE V BANKRUPTCY COURT MATTERS ................................................. 43

5.1.    Bankruptcy Actions. ........................................................................ 43
5.2.    Cure Costs ........................................................................................ 44
5.3.    Sale Order ........................................................................................ 44
5.4.    Sale Free and Clear ......................................................................... 45
5.5.    Approval ........................................................................................... 45

ARTICLE VI COVENANTS AND AGREEMENTS ................................................ 46

6.1.    Conduct of Business of Sellers ........................................................ 46
6.2.    Access to Information ...................................................................... 50
6.3.    Employee Matters ............................................................................ 53
6.4.    Regulatory Matters ........................................................................... 56
6.5.    Antitrust Notification. ...................................................................... 57
6.6.    Reasonable Efforts; Cooperation ..................................................... 59
6.7.    Notification of Certain Matters ........................................................ 59
6.8.    Further Assurances ........................................................................... 60
6.9.    Insurance Matters ............................................................................. 60
6.10.   Receipt of Misdirected Assets ......................................................... 61
6.11.   Acknowledgment by Purchaser ....................................................... 61
6.12.   Directors' and Officers' Indemnification ......................................... 63
6.13.   No Successor Liability ..................................................................... 63
6.14.   Change of Name ............................................................................... 64
6.15.   Excluded Subsidiaries; Cash Repatriation ...................................... 64
6.16.   Communications with Customers and Suppliers .............................. 65
6.17.   Exclusive License ............................................................................ 65
6.18.   Treatment of Contracts .................................................................... 65
6.19.   Retained Privileged Materials ......................................................... 66

ARTICLE VII CONDITIONS TO CLOSING ....................................................... 66

7.1.   Conditions Precedent to the Obligations of Purchaser and Sellers ....................... 66
7.2.   Conditions Precedent to the Obligations of Purchaser ............................................. 67
7.3.   Conditions Precedent to the Obligations of the Company ...................................... 68

ARTICLE VIII TERMINATION .......................................................................................... 68

8.1.   Termination of Agreement...................................................................................... 68
8.2.   Effect of Termination.............................................................................................. 70

ARTICLE IX TAXES............................................................................................................. 71

9.1.   Transfer Taxes ........................................................................................................ 71
9.2.   Allocation of Purchase Price................................................................................... 71
9.3.   Cooperation ............................................................................................................. 72
9.4.   Preparation of Tax Returns and Payment of Taxes ................................................ 72
9.5.   "G" Reorganization................................................................................................. 73

ARTICLE X MISCELLANEOUS .......................................................................................... 74

10.1.   Non-Survival of Representations and Warranties and Certain Covenants;
         Certain Waivers ...................................................................................................... 74
10.2.   Expenses ................................................................................................................. 75
10.3.   Notices .................................................................................................................... 75
10.4.   Assignment ............................................................................................................. 76
10.5.   Amendment and Waiver .......................................................................................... 77
10.6.   Third Party Beneficiaries ....................................................................................... 77
10.7.   Non-Recourse .......................................................................................................... 77
10.8.   Severability ............................................................................................................. 77
10.9.   Construction ............................................................................................................ 78
10.10.  Schedules ................................................................................................................ 78
10.11.  Complete Agreement .............................................................................................. 78
10.12.  Specific Performance .............................................................................................. 79
10.13.  Jurisdiction and Exclusive Venue .......................................................................... 79
10.14.  Governing Law; Waiver of Jury Trial .................................................................... 80
10.15.  Counterparts and PDF ............................................................................................ 80
10.16.  Publicity .................................................................................................................. 81
10.17.  Bulk Sales Laws...................................................................................................... 81
10.18.  No Solicitation ........................................................................................................ 81

ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS ................. 82

11.1.   Certain Definitions.................................................................................................. 82
11.2.   Index of Defined Terms .......................................................................................... 94
11.3.   Rules of Interpretation ............................................................................................ 96

## INDEX OF EXHIBITS

EXHIBIT A    FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
AGREEMENT

EXHIBIT B    FORM OF PATENT ASSIGNMENT AGREEMENT

EXHIBIT C    FORM OF TRADEMARK ASSIGNMENT AGREEMENT

EXHIBIT D    FORM OF BIDDING PROCEDURES ORDER

EXHIBIT E    FORM OF SPECIAL WARRANTY DEED

EXHIBIT F    FORM OF ASSIGNMENT AND ASSUMPTION OF LEASE

EXHIBIT G    WIND-DOWN BUDGET

EXHIBIT H    FORM OF SALE ORDER

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of May 20, 2020, by and among [_____], a Delaware limited liability company ("Purchaser"), Akorn, Inc., a Louisiana corporation (the "Company"), and the Subsidiaries of the Company that are indicated on the signature pages attached hereto (together with the Company, each a "Seller" and collectively "Sellers").  Purchaser and Sellers are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, the Company and the other Sellers intend to file voluntary petitions for relief (collectively, the "Petitions") under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), to be jointly administered for procedural purposes (collectively, the "Bankruptcy Case");

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, Sections 105, 363 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to entry of the Sale Order; and

WHEREAS, the board of directors (or similar governing body) of each Seller has determined that it is advisable and in the best interests of such Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and each has approved the same.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, and intending to be legally bound hereby, Purchaser and Sellers hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES

1.1.    Purchase and Sale of the Acquired Assets.  On the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser or a Designated Purchaser, and Purchaser or a Designated Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to the Acquired Assets as of the Closing, free and clear of all Encumbrances other than Permitted Encumbrances.  "Acquired Assets" means all of the properties, rights, interests and other assets of Sellers as of the Closing of every kind and nature, whether tangible or intangible (including goodwill), real, personal, or mixed, known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, wherever located and whether or not required to be reflected on

1

a balance sheet prepared in accordance with GAAP or specifically referred to in this Agreement, including any such properties, rights, interests, and other assets acquired by Sellers after the date hereof and prior to the Closing in accordance with <u>Section 6.1</u>, including the following properties, rights, interests and other assets of Sellers, but excluding in all cases, the Excluded Assets:

(a)    other than any Excluded Cash, (i) all Cash and Cash Equivalents and (ii) all deposits (including maintenance deposits, customer deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments that have been prepaid by any Seller and are not referenced in <u>Section 1.1(f)</u> or <u>Section 1.1(p)</u>;

(b)    subject to <u>Section 1.5</u>, all Contracts to which any Seller is a party, including the Contracts listed on <u>Schedule 1.1(b)</u>, and all purchase orders (the "<u>Assigned Contracts</u>"), and which schedule may be modified from time to time after the date hereof in accordance with <u>Section 1.5</u>, and, in each case, all rights under any such Assigned Contracts;

(c)    all trade and non-trade accounts receivable, notes receivable, negotiable instruments and chattel paper owned or held, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto, but, in each case, for purposes of this <u>Section 1.1(c)</u>, excluding any intercompany Indebtedness among Sellers and any amounts owing from any Excluded Subsidiary; provided, however, that Acquired Assets shall include the intercompany receivable described on <u>Schedule 1.1(c)</u>;

(d)    other than any Documents whose transfer to Purchaser is prohibited by applicable Law, and subject to <u>Section 1.2(c)</u>, all Documents, including (i) all Regulatory Documentation and Tax Returns (subject to <u>Section 6.2(c)</u> and Sellers' right to retain copies of such Tax Returns) (and any related work papers) relating to the other Acquired Assets or Assumed Liabilities, and (ii) subject to <u>Section 6.2(c)</u> and Sellers' right to retain copies thereof, those prepared or received by or on behalf of any Seller in connection with the sale of the Acquired Assets, this Agreement, or the transactions contemplated hereby, including (A) all records and reports prepared or received by Sellers, any of their respective Affiliates or Advisors in connection with the sale of the Acquired Assets and the transactions contemplated hereby, and (B) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets;

(e)    the Owned Real Property listed on <u>Schedule 1.1(e)</u> (the "<u>Acquired Owned Real Property</u>");

(f)    the Leased Real Property listed on <u>Schedule 1.1(f)</u> (the "<u>Acquired Leased Real Property</u>"), including any Leasehold Improvements and all permanent fixtures, improvements, and appurtenances thereto and including any security deposits or other deposits delivered in connection therewith;

(g)    other than the assets set forth on <u>Schedule 1.1(g)(i)</u>, all tangible assets (including Equipment, accessories, materials, machinery and all other similar items of tangible personal property or capital assets) of Sellers, including any tangible assets of Sellers located at

2

any Acquired Leased Real Property or Acquired Owned Real Property or any location set forth on Schedule 1.1(g)(ii) and any other tangible assets on order to be delivered to any Seller;

(h)     all rights against third parties (including suppliers, vendors, merchants, manufacturers and counterparties to leases, licensees, licensors or of the Company or any of its Subsidiaries arising under or related to any Assigned Contract, other Acquired Asset or Assumed Liability), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (including Tax refunds (i) with respect to the Acquired Assets, except to the extent any anticipated Tax refund is taken into account in reducing the Wind-Down Amount, and/or (ii) arising from the carryback of any net operating loss to a prior taxable year, whenever received, or the amount of any cash with respect to such Tax refund, including any amount received in respect of the federal income Tax refund filings described on Schedule 1.1(h)), Actions, rights of set off, rights of recovery, rights of subrogation, rights of recoupment, rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties or other similar rights, in each case with respect to Assumed Liabilities or arising from the use, ownership, possession, operation, business integration operation, sale or lease of any Acquired Assets;

(i)     to the extent transferrable under applicable Law, all of the rights, interests and benefits accruing under all Permits and Governmental Authorizations, and all pending applications therefor;

(j)     subject to Section 6.15, all shares of capital stock or other equity interests that any Seller owns, directly or indirectly, in the Subsidiaries set forth on Schedule 1.1(j) (the "Acquired Subsidiaries"), including any securities convertible into, or exchangeable or exercisable for, any such shares of capital stock or other equity interests, investments or contributions in the Acquired Subsidiaries;

(k)     the sponsorship of each Assumed Benefit Plan and all right, title and interest in any assets thereof or relating thereto;

(l)     all Company Owned Intellectual Property, all rights to collect royalties and proceeds in connection therewith, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Company Owned Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world;

(m)     all goodwill, payment intangibles and general intangible assets and rights of Sellers;

(n)     all Inventory of Sellers whether or not obsolete or carried on Sellers' books of account, in each case, with any transferable warranty and service rights related thereto;

(o)     all Product Registrations, Registration Information, and all other data and information regarding the development and commercialization of the Products, including all safety and efficacy databases, clinical data, non-clinical data and related books and records;

3

(p)    all credits, prepaid expenses, deferred charges, advance payments, refunds, rights of set-off, rights of recovery, security deposits, prepaid items and duties to the extent related to the other Acquired Assets (including Assigned Contracts) or the Assumed Liabilities;

(q)    except with respect to any Excluded Confidentiality Arrangements, all rights and obligations under non-disclosure, confidentiality, and similar arrangements with (or for the benefit of) employees and agents of Sellers or with third parties (including any non-disclosure, confidentiality agreements or similar arrangements entered into in connection with or in contemplation of the filing of the Bankruptcy Case and the Auction contemplated by the Bidding Procedures Order);

(r)    (i) all Avoidance Actions relating to the Acquired Assets and/or Assumed Liabilities, including actions relating to vendors and service providers that are counterparties to Assigned Contracts or relating to Assumed Liabilities (collectively, the "Acquired Avoidance Actions") and (ii) all rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment existing as of the Closing of any Seller against any Transferred Employee or any employee of any Acquired Subsidiary;

(s)    all insurance benefits, including rights and proceeds, to the extent arising from or relating to any of the Acquired Assets or Assumed Liabilities (including returns and refunds of any premiums paid, or other amounts due back to Sellers, with respect to cancelled policies); and

(t)    except for the Excluded Bank Accounts, all of Sellers' bank accounts.

At any time at least one (1) Business Day prior to the Closing, Purchaser may, in its sole discretion and by written notice to the Company, designate any of the Acquired Assets (other than (A) any purchase orders (except a purchase order entered into in connection with, or otherwise governed by, any Excluded Contract) and any Assumed Benefit Plans, and (B) any Contracts, the treatment of which are the subject of Section 1.5(b)) as additional Excluded Assets, which notice shall set forth in reasonable detail the Acquired Assets so designated. Purchaser acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to designate any Acquired Assets as Excluded Assets pursuant to the operation of this paragraph. Notwithstanding any other provision hereof to the contrary, the Liabilities of Sellers under or related to any Acquired Asset designated as an Excluded Asset pursuant to this paragraph will constitute Excluded Liabilities.

1.2.    Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, or convey, and Sellers shall retain all right, title and interest to, in and under the following assets, properties, interests and other interests of such Seller (collectively, the "Excluded Assets"):

(a)    any Excluded Cash, if applicable, and any retainers or similar amounts paid to Advisors or other professional service providers (which amounts shall be taken into account in the Wind-Down Budget and determining the Wind-Down Adjustment Amount);

(b)    each Contract of any Seller that is listed on Schedule 1.2(b), which schedule may be modified from time to time after the date hereof in accordance with Section 1.5 (the "Excluded Contracts");

4

(c)     all Documents (i) to the extent (and solely to the extent) exclusively related to any of the Excluded Assets or Excluded Liabilities; (ii) minute books, organizational documents, stock registers and such other similar books and records of any Seller (excluding, for the avoidance of doubt, the Acquired Subsidiaries) as pertaining to ownership, organization or existence of such Seller (other than Tax Returns described in Section 1.1(d)), or any corporate seal of any Seller (other than an Acquired Subsidiary); or (iii) that any Seller is required by applicable Law to retain; provided that, to the extent not prohibited by applicable Law, Purchaser shall have the right to make copies of such Documents (or any portions thereof);

(d)     all materials, Documents, reports and records of a Seller or any of its Affiliates that are subject to any attorney-client privilege and the transfer of which to Purchaser would result in the waiver of any such privilege ("Retained Privileged Materials");

(e)     without prejudice to Section 6.9, all current and prior director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries under such insurance policies;

(f)     all membership interests or other equity interests of any Seller or any of their respective Subsidiaries (excluding the Acquired Subsidiaries) (the "Excluded Subsidiaries"), or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests of such Excluded Subsidiaries but excluding, for the avoidance of doubt, any investment or contribution described on Schedule 1.2(f);

(g)     other than the Acquired Avoidance Actions, all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment existing as of the Closing of any Seller, in each case, solely to the extent (y) related to any other Excluded Assets or any Excluded Liabilities and (z) not against any Transferred Employee or employee of any Acquired Subsidiary;

(h)     Sellers' claims or other rights under this Agreement, including the right to be paid the Purchase Price hereunder at the Closing in accordance with the terms hereof, or Sellers' rights under any agreement, certificate, instrument, or other document executed and delivered between any Seller and Purchaser in connection with the transactions contemplated hereby entered into on or after the date hereof;

(i)     subject to Section 1.1(h), all Tax attributes that are not transferred by the operation of applicable Tax Law;

(j)     all real estate and all interests in real estate (including any Leasehold Improvements thereon), other than the Acquired Owned Real Property and the Acquired Leased Real Property (including, for the avoidance of doubt, any Leasehold improvements thereon);

(k)     every asset of Sellers that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) in compliance with the terms and conditions of this Agreement (including Section 6.1) or (ii) if Purchaser otherwise agrees, in writing after the date hereof, to such conveyance or other disposition;

5

(l)      the tangible assets (including Equipment, accessories, materials, machinery and all other similar items of tangible personal property or capital assets) of Sellers expressly set forth on Schedule 1.1(g)(i);

(m)      any Excluded Confidentiality Arrangements, if applicable;

(n)      the Excluded Bank Accounts (but not, for the avoidance of doubt, any Cash and Cash Equivalents, or any other property or assets, held or deposited in such Excluded Bank Accounts other than Excluded Cash, if any);

(o)      any asset, property, interest or other interest of a Seller which is an Excluded Asset by operation of Section 6.15; and

(p)      the properties and assets set forth on Schedule 1.2(p).

1.3.    Assumption of Certain Liabilities.  On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, Purchaser or a Designated Purchaser shall assume from Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall convey, transfer, and assign to Purchaser or a Designated Purchaser, only the following Liabilities (and no other Liabilities, which other Liabilities shall be retained by Sellers), without duplication and only to the extent not paid, performed, discharged or otherwise satisfied prior to the Closing (collectively, the "Assumed Liabilities"):

(a)      all Liabilities of Sellers arising from the Assigned Contracts, solely to the extent arising from periods occurring after the Closing and excluding, for the avoidance of doubt, any Liabilities contemplated by Section 1.4(e);

(b)      all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs");

(c)      all Liabilities arising out of the ownership or operation of the Acquired Assets, in each case, by Purchaser solely to the extent arising from periods occurring after the Closing and excluding, for the avoidance of doubt, any Liabilities contemplated by Section 1.4(e);

(d)      all (i) accrued trade and non-trade payables, (ii) open purchase orders (except a purchase order entered into in connection with, or otherwise governed by, any Excluded Contract), (iii) Liabilities arising under drafts or checks outstanding at Closing, (iv) accrued royalties, (v) accrued compensation, employee expenses and benefits in each case for Transferred Employees, but excluding workers' compensation claims for injuries occurring prior to the Closing, and (vi) all Liabilities arising from rebates, returns, recalls, chargebacks, coupons, discounts, failure to supply claims and similar obligations, in each case, to the extent (and solely to the extent) (x) incurred in the Ordinary Course and otherwise in compliance with the terms and conditions of this Agreement (including Section 6.1) and (y) not arising under or otherwise relating to any Excluded Asset;

(e)      Assumed Taxes;

6

(f)    subject to <u>Section 6.15</u>, the sponsorship of, and all Liabilities at any time arising under, pursuant to or in connection with, the Seller Plans (the "<u>Assumed Benefit Plans</u>"), and all Liabilities for compliance with the requirements of Section 4980B of the Code with respect to all individuals who are "M&A qualified beneficiaries" as such term is defined in Treasury Regulations §54.4980B-9;

(g)    to the extent, and solely to the extent, arising from Purchaser's failure to comply with <u>Section 6.3</u>, all Liabilities related to Purchaser's selection of employees, including any failure to extend offers of employment, pursuant to <u>Section 6.3</u> and any Liabilities for severance or under the WARN Act, in each case, that (i) constitute bankruptcy administrative expenses of Sellers and (ii) result from or arise out of Purchaser's failure to make an offer of employment to any employees or any Sellers' subsequent termination of such employee's employment in connection with or following the Closing;

(h)    all Liabilities owing to any Subsidiary of the Company, other than to an Excluded Subsidiary;

(i)    Liabilities arising under Section 503(b)(9) of the Bankruptcy Code;

(j)    all Liabilities and obligations of Sellers for compliance with ISRA at the Acquired Leased Real Property in New Jersey; and

(k)    all Liabilities, if any, set forth on <u>Schedule 1.3(k)</u>.

The assumption by Purchaser (or a Designated Purchaser) of any Assumed Liability shall not, in any way, expand the rights of any third party relating thereto.

1.4.    <u>Excluded Liabilities</u>.  Purchaser and the Designated Purchaser(s) (if any) shall not assume and shall not be deemed to have assumed, nor shall be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Sellers or relating to the Acquired Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing prior to or on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities, and Sellers shall be solely and exclusively liable for any and all such Liabilities, including those Liabilities set forth below (collectively, the "<u>Excluded Liabilities</u>"):

(a)    except to the extent of any Liabilities expressly assumed pursuant to <u>Section 1.3</u>, all Liabilities arising out of, relating to or otherwise in respect of the Acquired Assets or the operation of the business of Sellers arising on or prior to the Closing;

(b)    all Liabilities to the extent relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(c)    except to the extent of any Liabilities expressly assumed pursuant to <u>Sections 1.3(d)(v)</u>, <u>1.3(g)</u>, and <u>1.3(i)</u> and without prejudice to <u>Section 6.3</u>, any and all Liabilities

7

in respect of the Excluded Contracts and any other Contracts to which any Seller is party or is otherwise bound that are not Assigned Contracts;

(d)     except to the extent of any Liabilities expressly assumed pursuant to Sections 1.3(d) or 1.3(h), any and all Liabilities of Sellers for Indebtedness;

(e)     all Liabilities arising from or related to any Action (whether civil, criminal, administrative, investigative, or informal) against the Company or any of its Subsidiaries (including, for the avoidance of doubt, any Action related to fraud, breach of fiduciary duty, misfeasance or under any other theory relating to conduct, performance or non-performance of the Company or any of its Subsidiaries, or any of their respective directors, officers, or employees), or related to the Acquired Assets or the Assumed Liabilities, pending or threatened or having any other status or with respect to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing Date (including any breach, default, failure to perform, torts related to performance, violations of Law, infringements or indemnities, guaranties and overcharges, underpayments or penalties, whether in respect of any Contract, agreement, arrangement, promise or understanding of any kind), including any successor liability claims or that may be owed to or assessed by, any Governmental Body or other Person, and whether commenced, filed, initiated, or threatened prior to, on or following the Closing;

(f)     except to the extent of any Liabilities expressly assumed pursuant to Section 1.3(g) and without prejudice to Sections 10.2, 6.3 or 1.3(b), all costs and expenses incurred or to be incurred by Sellers in connection with the drafting, preparation, negotiation, diligence, execution, and performance of this Agreement and the consummation of the transactions contemplated hereby;

(g)     except to the extent of any Liabilities expressly assumed pursuant to Sections 1.3(d), 1.3(f), or 1.3(g) and without prejudice to Section 6.3, all Liabilities related to any current or former employee of the Company or of any Subsidiary of the Company (other than all Liabilities related to the Transferred Employees arising on or after the date such applicable Employee becomes a Transferred Employee, including under the WARN Act);

(h)     all Liabilities for any Taxes (including Taxes payable by reason of contract, assumption, transferee or successor Liability, operation of Law, pursuant to Treasury Regulations Section 1.1502-6 (or any similar provision of any state or local law) or otherwise: (i) arising or relating to any Pre-Closing Tax Period (including any Straddle Period Taxes), (ii) owed by any of Sellers (whether or not relating to a Pre-Closing Tax Period), including pursuant to any Tax sharing, Tax indemnity or similar agreement or arrangement to which any Seller (or any Affiliate thereof) is obligated under or a party to, (iii) arising in connection with the consummation of the transactions contemplated by this Agreement, and (iv) Taxes arising from or in connection with an Excluded Asset), in each case, other than to the extent such Tax is an Assumed Tax;

(i)     except to the extent of any Liabilities expressly assumed pursuant to Sections 1.3(d) or 1.3(f) and without prejudice to Section 6.3, all Liabilities arising out of, relating to, or with respect to any and all Employees and contractors of the Company or any of its Subsidiaries arising at any time on or prior to the Closing;

(j)      except to the extent of any Liabilities expressly assumed pursuant to Section 1.3(f) and without prejudice to Sections 1.5 or 6.3, all Liabilities of Sellers arising out of any Contract, agreement, Permit, franchise or claim that is not transferred to Purchaser as part of the Acquired Assets or, is not transferred to Purchaser because of any failure to obtain any Consent or Governmental Authorization required for such transfer;

(k)      subject to Section 1.3(j), all Liabilities of Sellers arising under or pursuant to Environmental Laws, including with respect to any real property owned, operated, leased or otherwise used by Sellers, whether or not used in the Ordinary Course, including any Liabilities for noncompliance with Environmental Laws or the Release of Hazardous Substances, to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the Closing, whether known or unknown as of the Closing;

(l)      drafts or checks outstanding as of the Closing (except to the extent expressly stated as an Assumed Liability in Section 1.3(d)); and

(m)      all Liabilities set forth on Schedule 1.4(m).

Purchaser hereby acknowledges and agrees that no Liability of any Non-Debtor Subsidiary shall be an Excluded Liability and that all Liabilities of any Non-Debtor Subsidiary as of the Closing shall continue to be the Liabilities of such Non-Debtor Subsidiary following the Closing; provided, and notwithstanding the foregoing provisions of this sentence to the contrary, Sellers hereby acknowledge and agree that any Liability of an Excluded Subsidiary (other than Sellers) shall, at and following the Closing, not be an Assumed Liability.

1.5.      Assumption/Rejection of Certain Contracts.

(a)      Assumption and Assignment of Executory Contracts.  Schedule 1.5(a) sets forth a list of all executory Contracts (including all Leases with respect to Leased Real Property) to which, to the Knowledge of Sellers, one or more Sellers are party or to which any of their assets are bound and which are to be included in the Assigned Contracts.  From time to time, and as reasonably requested by Purchaser, Sellers shall update Schedule 1.5(a).  Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired leases that are Assigned Contracts and take all other actions necessary or otherwise required to cause such Contracts to be assumed by Sellers and assigned to Purchaser or any other Designated Purchaser pursuant to Section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts as of the Closing (including (x) serving on all non-Seller counterparties to all of their Contracts a notice specifically stating that Sellers are or may be seeking the assumption and assignment of such Contract(s) and of the deadline for objecting to the Cure Costs or any other aspect of the proposing assumption and assignment of their Contracts to Purchaser and (y) taking, as promptly as practicable, all other actions reasonably requested by Purchaser to facilitate any negotiations with the counterparties to such Assigned Contracts and to obtain an Order, including a finding that the proposed assumption and assignment of the Assigned Contracts to Purchaser satisfies all applicable requirements of Section 365 of the Bankruptcy Code).  The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, Sellers shall assign or cause to be assigned to Purchaser or a Designated Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate

9

description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, a notice filed in connection with the motion for approval of the Sale Order or a separate motion for authority to assume and assign such Assigned Contracts. Such exhibit shall also set forth Sellers' good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Sellers based on Sellers' books and records or as otherwise determined by the Bankruptcy Court. At the Closing and subject to the last paragraph of Section 1.1 and Section 1.5(b), Sellers shall, pursuant to the Sale Order, and the Assignment and Assumption Agreement(s), assume and assign to Purchaser or a Designated Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by any such Seller to Purchaser or a Designated Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code. At the Closing, Purchaser (i) shall pay all Cure Costs and (ii) shall, assume or cause to be assumed, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform (or cause to be fully satisfied, discharged and performed) all of the obligations (other than any Excluded Liabilities) that are Assumed Liabilities under each Assigned Contract pursuant to Section 365 of the Bankruptcy Code and the Assignment and Assumption Agreements, as applicable.

(b)    Excluding or Adding Assigned Contracts Prior to Closing. Without prejudice to Section 6.18(a), Purchaser shall have the right to notify Sellers in writing of any Assigned Contract (other than any purchase order, unless such purchase order was (x) entered into in connection with, or is otherwise governed by, any Excluded Contract, or (y) entered into in breach of this Agreement after the date hereof) that it does not wish to assume or a Contract to which any Seller is a party that Purchaser wishes to add as an Assigned Contract up to one (1) Business Day prior to the Closing and (i) any such previously considered Assigned Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed added to the Schedules related to Excluded Contracts, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by Sellers to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price. Purchaser may request, in its reasonable business judgment, certain modifications and amendments to any Contract as a condition to such Contract becoming an Assigned Contract, and Sellers shall use their reasonable best efforts to obtain such modifications or amendments; provided, however, that, for so long as Sellers use their reasonable best efforts to obtain such modifications or amendments, the failure to obtain any such modifications or amendments shall, in and of itself, not be a condition to Purchaser's obligation to consummate the transactions contemplated by this Agreement on the Closing Date. All reasonable and documented costs and expenses payable prior to Closing in connection with transferring any Assigned Contracts as contemplated by this Agreement (other than the Cure Costs) shall be borne by Sellers.

(c)    Non-Assignment. Notwithstanding the foregoing, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract (1) expires by its terms on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder or (2) requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the

10

sale or transfer to Purchaser of the applicable Seller's rights under such Contract in accordance with applicable Law, and such Consent or Governmental Authorization has not been obtained.  In the event that any Contract that would otherwise have been assigned to Purchaser or a Designated Purchaser is deemed not to be assigned pursuant to clause (ii) of the first sentence of this Section 1.5(c), the Closing shall, subject to the satisfaction of the conditions set forth in Article VII, nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earliest of (w) such time as such Consent or Governmental Authorization is obtained, (x) the expiration of the term of such Contract in accordance with its current term, (y) the execution of a replacement Contract by Purchaser or a Designated Purchaser and (z) the closing of the Bankruptcy Case, Sellers and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to any such Assigned Contract, under which (1) Purchaser shall receive the claims, rights, remedies and benefits under, or arising pursuant to, the terms of such Assigned Contract with respect to which the Consent and/or Governmental Authorization has not been obtained and (2) subject to receiving any such claims, rights, remedies and benefits, Purchaser shall thereafter assume and bear all Assumed Liabilities with respect to such Assigned Contract from and after the Closing (as if such Assigned Contract had been transferred to Purchaser as of the Closing) in accordance with this Agreement (including by means of any subcontracting, sublicensing or subleasing arrangement).  Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Assigned Contract after the Closing, such Assigned Contract shall promptly be transferred and assigned to Purchaser or a Designated Purchaser in accordance with the terms of this Agreement, the Sale Order and the Bankruptcy Code, and otherwise without any further additional consideration.  Without limitation of the foregoing, prior to the Closing, Sellers shall cooperate with Purchaser in connection with obtaining any Consent, including by providing Purchaser with reasonable access to and facilitating discussions with the applicable counterparties (provided Purchaser shall provide Sellers a reasonable opportunity to consult with Purchaser, and, if reasonably practicable, an opportunity to be present (but not participate) at any meeting) in respect of such Consents, and shall use reasonable best efforts to assist Purchaser with obtaining such Consents as promptly as practicable after the date hereof and prior to the Closing.

(d)     With respect to any Permit(s) reasonably required to operate the business of Sellers, Sellers shall, and shall cause their Subsidiaries to, use reasonable best efforts to obtain or cause to be obtained or made any Consent or Governmental Authorization required to sell, assign, transfer or convey such Permits at the Closing, and Purchaser shall provide reasonable cooperation to Sellers and their Subsidiaries in connection therewith as reasonably requested by Sellers, in each case to the extent obtaining or making any such Consent or Governmental Authorization is allowed to occur prior to the Closing pursuant to applicable Law.  If any such Consent or Governmental Authorization is not obtained prior to the Closing, then, until the earlier of such time as (i) such Consent or Governmental Authorization is obtained by Sellers, (ii) Purchaser separately obtains any such Permit (sufficient to conduct the business of the Company and its Subsidiaries in the Ordinary Course) and (iii) the closing of the Bankruptcy Case, Sellers shall, and shall cause their respective Subsidiaries to continue to, use reasonable best efforts to obtain, or cause to be obtained, such Consent or Governmental Authorization, and Purchaser shall provide reasonable cooperation to Sellers, subject to any approval of the Bankruptcy Court that may be required, and Sellers shall,

11

and shall cause their Subsidiaries to enter into an arrangement reasonably acceptable to Purchaser intended to both (x) provide Purchaser, to the fullest extent not prohibited by applicable Law, the claims, rights, remedies and benefits under, and pursuant to, such Permit(s) and (y) cause Purchaser, subject to Purchaser receiving such claims, rights, remedies and benefits, to assume and bear all Assumed Liabilities with respect to such Permits from and after the Closing (as if such Permit had been transferred to Purchaser as of the Closing) in accordance with this Agreement (including by means of any subcontracting, sublicensing or subleasing arrangement). Upon obtaining the relevant Consent or Governmental Authorization, each Seller shall, and shall cause any of its applicable Subsidiaries to, promptly sell, convey, assign, transfer and deliver to Purchaser such Permit for no additional consideration. All reasonable and documented costs and expenses payable prior to Closing in connection with transferring any Permits as contemplated by this Agreement shall be borne by Sellers.

## ARTICLE II

## CONSIDERATION; PAYMENT; CLOSING

2.1.    <u>Consideration; Payment</u>.

(a)    The aggregate consideration (collectively, the "<u>Purchase Price</u>") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities, (ii) the credit bid of 100% of the Loan Agreement Indebtedness (the "<u>Credit Bid Amount</u>") (such portion of the Purchase Price, the "<u>Credit Bid Portion</u>") which amount shall be satisfied by discharging all Loan Agreement Indebtedness pursuant to section 363(k) of the Bankruptcy Code and (iii) an amount in cash equal to the amount set forth opposite "Total Wind-Down Budget Amount" in the Wind-Down Budget (the "<u>Wind-Down Amount</u>"). At the Closing, in lieu of paying all or any portion of the Wind-Down Amount, Purchaser may, by delivery of a written notice to Sellers at least two (2) Business Days prior to the Closing Date, instruct Sellers to retain a portion of, and not to exceed, the cash expected to be actually held at Closing by Sellers (net of written but uncashed checks) in an amount set forth in such notice and such cash shall constitute "Excluded Cash" hereunder and reduce, on a dollar for dollar basis, the Wind-Down Amount to be paid by Purchaser at the Closing.

(b)    In accordance with <u>Section 2.1(a)</u>, Purchaser shall satisfy the Purchase Price at the Closing as to the Credit Bid Portion by discharging Sellers, and Sellers shall be deemed to be discharged, from the Loan Agreement Indebtedness in an aggregate amount equal to the Credit Bid Amount (for the avoidance of doubt, any Encumbrance and security interest of Purchaser on any asset of Sellers that is not an asset being purchased by Purchaser pursuant to this Agreement shall not be released and will continue to secure the remaining outstanding amount of the Loan Agreement Indebtedness).

(c)    Notwithstanding anything to the contrary in this Agreement, to the extent that the actual amount paid by Sellers to wind down the bankruptcy estate of Sellers for the aggregate amount of any (i) claims asserted pursuant to Section 503(b)(9) of the Bankruptcy Code, (ii) Taxes, (iii) fees and expenses of professionals engaged by Sellers, or (iv) other amounts contemplated by the Wind-Down Budget (including administrative and priority claims not assumed by Purchaser), in each case, to the extent set forth therein and, in each case, whether due

to settlement or otherwise is less than the Wind-Down Amount (the amount of such difference, the "Wind-Down Adjustment Amount"), the Purchaser shall be entitled to receive the Wind-Down Adjustment Amount, and, promptly following the determination of such amount (and in no event later than two (2) Business Days following such determination), Sellers shall deliver, or cause to be delivered, to Purchaser an aggregate amount equal to the Wind-Down Adjustment Amount in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Purchaser.

2.2.    Closing.  The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 300 North LaSalle, Chicago, Illinois 60654) at 8:00 a.m. Chicago time on the third (3rd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree in writing.  The date on which the Closing actually occurs is referred to herein as the "Closing Date."

2.3.    Closing Deliveries by Sellers.  At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)    a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by Sellers;

(b)    a short-form patent assignment agreement substantially in the form of Exhibit B, duly executed by Sellers;

(c)    a short-form trademark assignment agreement substantially in the form of Exhibit C, duly executed by Sellers;

(d)    an assignment and assumption of lease for the leases related to the Acquired Leased Real Property (the "Acquired Leases") substantially in the form of Exhibit F (the "Assignment and Assumption of Lease"), duly executed by Sellers;

(e)    each Seller (or, if a Seller is a disregarded entity within the meaning of Treasury Regulations Section 1.1445-2(b)(2)(iii) the entity that is treated as the transferor of the relevant Acquired Assets) shall deliver a certificate to Purchaser satisfying the requirements of Treasury Regulations Section 1.1445-2(b);

(f)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the Company certifying that the conditions set forth in Sections 7.2(a), 7.2(b) and 7.2(c) have been satisfied;

(g)    a special warranty deed (or general warranty deed if it is customary for a commercial seller to deliver a general warranty deed in any jurisdiction in which Acquired Owned Real Property is located) without any covenants by Sellers substantially in the form of Exhibit E

13

for each Acquired Owned Real Property, in each case (i) in proper form for recordation or equivalent in accordance with applicable Law, (ii) sufficient to vest in Purchaser good and marketable title in, and fee simple ownership of, each Acquired Owned Real Property, subject only to the Permitted Encumbrances, together with (iii) any certificates, affidavits, forms and such other documents reasonably requested by Purchaser that are customary for presentation or submission when transferring real property or recording deeds in jurisdictions where the Acquired Owned Real Property is located (without expanding or supplementing any of the representations and warranties hereunder or Purchaser's remedies with respect thereto, except as customarily required by title insurance companies in connection with the transfer of and insuring title to, in each applicable jurisdiction, commercial real estate or interests therein);

(h)    such customary affidavits and indemnities as Purchaser's title insurance company may reasonably require (including a so-called gap indemnity) in order to issue at the Closing owner's (and lender's, if applicable) title insurance policy (or policies) insuring Purchaser's (and lender's, if applicable) fee simple title to (or in the case of a lender, security interest in) the Acquired Owned Real Property, subject to no exceptions other than Permitted Encumbrances (without expanding or supplementing any of the representations and warranties hereunder or Purchaser's remedies with respect thereto, except as customarily required by title insurance companies in connection with the transfer of and insuring title to, in each applicable jurisdiction, commercial real estate or interests therein); and

(i)    the Seller FDA Transfer Letters, dated as of the Closing Date.

2.4.    Closing Deliveries by Purchaser.  At the Closing, Purchaser shall deliver or cause to be delivered to (or at the direction of) the Company:

(a)    the Assignment and Assumption Agreement, duly executed by Purchaser;

(b)    an Assignment and Assumption of Lease for each Acquired Lease, duly executed by Purchaser;

(c)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied;

(d)    documentation establishing that a Remediation Certification, Remediation Funding Source/Cost Review Form and Remediation Funding Source have been submitted to the New Jersey Department of Environmental Protection for the Acquired Leased Real Property in New Jersey as set forth in Section 6.4(b);

(e)    a notice concerning the beneficial owners of the Swiss Company pursuant to art. 697j of the Swiss Code of Obligations, duly signed for and behalf of Akorn Luxembourg (the sole shareholder of the Swiss Company), reflecting the status of the ownership of the Swiss Company immediately after Closing; and

(f)    satisfaction of the Purchase Price as to the Credit Bid Portion by discharging Sellers, and Sellers shall be deemed to be discharged, from the Loan Agreement Indebtedness in an aggregate amount equal to the Credit Bid Amount.

14

2.5.    Withholding.    Purchaser shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any Seller such amounts as Purchaser is required to deduct and withhold under the Code, or any Tax law, with respect to the making of such payment; provided, however, that at least ten (10) Business Days prior to the Closing, except with respect to compensatory payments or to the extent a Seller fails to provide the documentation described in Section 2.3(e), Purchaser must notify such Seller of any potentially applicable withholding requirement and, in the event such Seller informs Purchaser that it believes such deduction or withholding is inapplicable, the Parties shall use commercially reasonable efforts to cooperate to eliminate or reduce any such withholding obligation.  To the extent that amounts are properly withheld and paid to the applicable Governmental Body, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as (i) disclosed in the forms, reports, schedules, statements, exhibits and other documents filed with the SEC by the Company to the extent publicly available on the SEC's Electronic Data Gathering Analysis and Retrieval System during the twelve (12) months preceding the date hereof (other than any disclosures set forth in any risk factor section, in any section relating to forward looking statements and any other disclosures included therein to the extent they are predictive, cautionary or forward-looking in nature) (the "Filed SEC Documents") or (ii) set forth in the disclosure schedules delivered by the Company concurrently herewith (the "Schedules") and subject to Sections 6.7 and 10.10, Sellers, jointly and severally, represent and warrant to Purchaser as follows as of the date hereof and as of the Closing Date:

3.1.    Organization and Qualification.

(a)    The Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Louisiana and has all requisite corporate power and corporate authority necessary to carry on the its business as it is now being conducted, subject to the provisions of the Bankruptcy Code. The Company is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law), in each case, as a "foreign" entity by the applicable Secretary of State of such jurisdiction, in each jurisdiction in which the nature of its business or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  True and complete copies of the Company's articles of incorporation and bylaws are included in the Filed SEC Documents, each of which are in full force and effect, and the Company is not in violation of any of the provisions thereof, except as would not reasonably be expected to be material to the Company.

(b)    Each of the Company's Subsidiaries is duly organized, validly existing and in good standing (where such concept is recognized under applicable Law) under the Laws of the jurisdiction of its organization, has all requisite corporate or similar organizational power and authority necessary to carry on its business as it is now being conducted, subject to the provisions

15

of the Bankruptcy Code.  Each of the Company's Subsidiaries organized in the United States is duly licensed or qualified, in each case, as a "foreign" entity by the applicable Secretary of State of such jurisdiction, to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except where the failure to be so qualified, licensed, and in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  True and complete copies of each such Subsidiary's organizational documents have been made available by the Company to Purchaser prior to the date of this Agreement, each of which are in full force and effect, and each such Subsidiary is not in violation of any of the provisions of its organizational documents, except as would not reasonably be expected to be material to such Subsidiary.

(c)    Schedule 3.1(c) sets forth a true, complete and correct list of each jurisdiction in which the Company and each of the Company's Subsidiaries is duly licensed or qualified to do business, in each case, as a "foreign" entity by the applicable Secretary of State of such jurisdiction.

3.2.    Authorization of Agreement.  Each Seller has all necessary corporate or similar organizational power and authority to execute and deliver this Agreement and each of the other agreements contemplated hereby (each such agreement, an "Ancillary Agreement") to which it is a party and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby or thereby.  The execution, delivery and performance by each Seller of this Agreement and each of the Ancillary Agreements to which it is a party, and the consummation by such Seller of the transactions contemplated hereby or thereby, subject to requisite Bankruptcy Court approvals as described in this Agreement, have been, or with respect to any Ancillary Agreement to which such Seller is a party, will be prior to the execution and delivery thereof, duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part or on the part of any of its stockholders or other equityholders are, or will be when so executed and delivered, necessary to authorize the execution, delivery and performance by such Seller of this Agreement or any Ancillary Agreement to which it is a party and the consummation by it of the transactions contemplated hereby or thereby.  Subject to requisite Bankruptcy Court approvals, this Agreement has been, and at or prior to Closing, each Ancillary Agreement to which it is a party will be, duly executed and delivered by such Seller and, assuming due authorization, execution and delivery hereof by the other parties hereto or thereto, constitutes a legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, except that such enforceability (i) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity (clauses (i) and (ii), collectively, the "Enforceability Exceptions").

3.3.    Conflicts; Consents.  Assuming that (a) requisite Bankruptcy Court approvals are obtained, (b) the notices, authorizations, registrations, approvals, Orders, permits or consents set forth on Schedule 3.3 are made, given or obtained (as applicable), (c) the requirements of the HSR Act and any other applicable antitrust, competition or merger control Laws promulgated by any Governmental Body ("Foreign Competition Laws") are complied with, and (d) any filings required

by any applicable federal or state securities or "blue sky" Laws are made, the execution and delivery by Sellers of this Agreement and each Ancillary Agreement, and the consummation by Sellers of the transactions contemplated hereby or thereby, and the performance and compliance by Sellers with any of the terms or provisions hereof or thereof, do not and will not (i) conflict with or violate any provision (1) of the Company's articles of incorporation or bylaws or (2) of the similar organizational documents of any of the Company's Subsidiaries, (ii) conflict with or violate any Law or Order applicable to the Company, any of its Subsidiaries or any of the Acquired Assets or by which the Company, any of its Subsidiaries or any of the Acquired Assets may be bound or affected, (iii) require consent from any party in connection with the transfer of any Acquired Owned Real Property or Acquired Leased Real Property, (iv) conflict with, violate or constitute a breach of or default (with or without notice or lapse of time, or both) under, or result in the acceleration of any obligation under or give rise to a right of termination, modification, acceleration or cancelation of any obligation or to the loss of any benefit under, any of the terms or provisions of any Material Contract, Permit, loan or credit agreement or other Contract to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or to which any of the Acquired Assets is subject, or (v) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of the Company or any of its Subsidiaries, except, in the case of clauses (iii), (iv) and (v), as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets or the Assumed Liabilities, taken as a whole.

3.4.    <u>Equity Interests of Non-Debtor Subsidiaries</u>.

(a)    The authorized and outstanding capital stock or other equity interests of each of the Subsidiaries of the Company, other than Sellers (such Subsidiaries, the "<u>Non-Debtor Subsidiaries</u>"), are as set forth on <u>Schedule 3.4(a)</u>. All of the outstanding capital stock or other equity interests of the Non-Debtor Subsidiaries have been duly authorized, validly issued, fully paid and are non-assessable (where such concepts are legally recognized in the jurisdictions of organization of such Non-Debtor Subsidiaries). Except as set forth on <u>Schedule 3.4(a)</u>, there are no outstanding options, warrants, convertible, exercisable or exchangeable securities, "phantom" stock rights, stock appreciation rights, stock-based performance units, rights to subscribe to, purchase rights, calls or commitments relating to the issuance, purchase, sale or repurchase of any capital stock or other equity interests issued by the Non-Debtor Subsidiaries containing any equity features, or Contracts, commitments, understandings, arrangements or other obligations by which any of the Non-Debtor Subsidiaries is bound to issue, deliver or sell, or cause to be issued, delivered or sold, additional capital stock or other equity interests, or options, warrants, convertible, exercisable or exchangeable securities, "phantom" stock rights, stock appreciation rights, stock-based performance units, rights to subscribe to, purchase rights, calls or commitments relating to any capital stock or other equity interests of the Non-Debtor Subsidiaries, or that otherwise give any Person the right to receive any benefits or rights similar to any rights enjoyed by or accruing to the holders of shares of capital stock or other equity securities of any Non-Debtor Subsidiary (including any rights to receive any payment in respect, or based on the price or value, thereof). None of the Company or any Subsidiary of the Company is a party to any shareholders' agreement, voting trust agreement, registration rights agreement or other similar agreement or understanding relating to any such securities or any other agreement relating to the disposition, voting or dividends with respect to any such securities. Except as set forth on <u>Schedule 3.4(a)</u>, the Company or one or more of the other Sellers own all of the outstanding capital stock or other

17

equity interests of the Non-Debtor Subsidiaries, free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)    Except as set forth on Schedule 3.4(b), there are no other corporations, limited liability companies, partnerships, joint ventures, associations or other entities or Persons in which the Company or any of the Company's Subsidiaries own as of the date of this Agreement, of record or beneficially, any direct or indirect equity or other interest or any right (contingent or otherwise) to acquire the same.

3.5.    Financial Statements; Internal Controls; SEC Reports.

(a)    The consolidated financial statements of the Company (including all related notes or schedules) included or incorporated by reference in the Company SEC Documents, as of their respective dates of filing with the SEC (or, if such Company SEC Documents were amended prior to the date hereof, the date of the filing of such amendment, with respect to the consolidated financial statements that are amended or restated therein), (i) complied as to form in all material respects with the published rules and regulations of the SEC with respect thereto, (ii) are consistent in all material respects with the books and records of the Company and its Subsidiaries, (iii) have been prepared in all material respects in accordance with GAAP (except, in the case of unaudited quarterly statements, as permitted by Form 10-Q of the SEC or other rules and regulations of the SEC) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto or as permitted by Regulation S-X), and (iv) fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods shown.  The books and records of the Company and its Subsidiaries have been, and are being, maintained in all material respects in accordance with GAAP (to the extent applicable) and reflect only actual transactions.

(b)    The Company has established and maintains disclosure controls and procedures and a system of internal controls over financial reporting (as such terms are defined in paragraphs (e) and (f), respectively, of Rule 13a-15 under the Exchange Act) as required by Rule 13a-15 under the Exchange Act.  The accounting controls of the Company have been and are sufficient to provide reasonable assurances that (i) all transactions are executed in accordance with management's general or specific authorization, (ii) all transactions are recorded as necessary to permit the accurate preparation of financial statements in accordance with GAAP (except, in the case of unaudited quarterly statements, as permitted by Form 10-Q of the SEC or other rules and regulations of the SEC) and to maintain proper accountability for such items, (iii) access to assets is permitted only in accordance with management's general or specific authorization, (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences, (v) violations of the applicable Anti-Corruption Laws will be prevented and detected, and (vi) the Company does not maintain any off-the-books accounts or more than one set of books and financial records.  Neither the Company nor, to the Knowledge of Sellers, the Company's independent registered public accounting firm, has identified or been made aware of "significant deficiencies" or "material weaknesses" (as defined by the Public Company Accounting Oversight Board) in the design or operation of the Company's internal controls over financial reporting which would reasonably be expected to adversely affect in any material respect the Company's ability to record, process, summarize and

18

report financial data, in each case which has not been subsequently remediated. The Company has disclosed, based on its most recent evaluation of the Company's internal control over financial reporting prior to the date hereof, to the Company's auditors and audit committee any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting. A true, correct and complete summary of any such disclosures made by management to the Company's auditors and audit committee is set forth on Schedule 3.5(b).

(c)     Schedule 3.5(c) lists all Indebtedness for borrowed money of any Non-Debtor Subsidiaries.

(d)     None of the Acquired Subsidiaries has any Liabilities of any nature, whether accrued, absolute, contingent or otherwise, known or unknown, whether due or to become due and whether or not required to be recorded or reflected on a balance sheet under GAAP, except (i) to the extent accrued or reserved against in the audited consolidated balance sheet of the Company and its Subsidiaries as of the date of the most recent audited balance sheet included in the Annual Report on Form 10-K filed by the Company with the SEC on February 26, 2020 (without giving effect to any amendment thereto filed on or after the date hereof), (ii) for liabilities and obligations incurred in the Ordinary Course since December 31, 2019, (iii) as will be paid off or discharged prior to or at the Closing without any Liability to Purchaser and its Affiliates, (iv) as arise under this Agreement or the Ancillary Agreements or (v) as are not, and would not reasonably be expected to be, material to the Company and its Subsidiaries, taken as a whole.

3.6.    Real Property.

(a)     The Company or one of its Subsidiaries, as applicable, has good and marketable fee simple title to the real estate owned by the Company or any of its Subsidiaries (together with all buildings and other structures, facilities or improvements located thereon and all easements, licenses, rights and appurtenances of the Company or such Subsidiary, as applicable, relating to the foregoing) (the "Owned Real Property") free and clear of all Encumbrances, including any leases, subleases, licenses, concessions or other agreements by or pursuant to which the Company or its Subsidiaries, as applicable, grants to any party or parties the right of use or occupancy of any portion of the Owned Real Property (other than Permitted Encumbrances). Schedule 3.6(a) sets forth the address and owner of all such Owned Real Property. All buildings, structures, improvements and fixtures located on, under or within the Owned Real Property, and all other material aspects of each parcel of Owned Real Property (including heating, cooling and ventilation, electrical, plumbing, drainage, sprinkler and other mechanical or other systems or improvements) are in good operating condition and repair, reasonable wear and tear excepted and taking into account the relative ages and/or service period of such assets, and are structurally sound and free of any material defects that would reasonably be expected to be materially adverse to the Company and its Subsidiaries, taken as a whole. Except as set forth on Schedule 3.6(a), the Company and its Subsidiaries do not own any real property. The Company has delivered or made available to Purchaser complete and correct copies of the following, if any, in the possession of the Company or any Subsidiary: title insurance policies and land survey documents with respect to current title to the Owned Real Property.

(b)      Except as set forth on Schedule 3.6(b): (i) there are no outstanding options, repurchase rights or rights of first refusal to purchase or lease any Owned Real Property, or any portion thereof or interest therein, or any other real property, to which the Company or its Subsidiaries are a party; (ii) except as would not reasonably be expected to be material to the ownership, use or operation thereof, the buildings and improvements on the Owned Real Property are located within the boundary lines of the Owned Real Property, are not encroached upon, are not in violation in any material respect of any applicable setback requirements, Law, restriction or similar agreement and do not encroach in any material way on any other property or any easement that may burden the Owned Real Property; (iii) the Owned Real Property has reasonable direct vehicular access to at least one public roadway and the Company and its Subsidiaries have not received any written notice of any fact or condition that will result in the termination of any existing access to or from any of the Owned Real Property and any public right of ways and roads; (iv) neither the Company nor any of its Subsidiaries is a lessor under, or otherwise a party to, any lease, sublease, license, concession or other agreement pursuant to which the Company or any of its Subsidiaries has granted to any Person the right to use or occupy all or any portion of the Owned Real Property; (v) there is no, and neither the Company nor its Subsidiaries has received written notice from any Governmental Body regarding, presently pending or threatened condemnation or eminent domain proceedings or their local equivalent affecting or relating to any of the Owned Real Property; and (vi) it is not the case that, and neither the Company nor its Subsidiaries has received written notice from any Governmental Body or other Person that, the use and occupancy of any of the Owned Real Property, as currently used and occupied, and the conduct of the business thereon, as currently conducted, violates in any material respect any deed restrictions, contractual obligation (including requirements of any Encumbrances), or applicable Law consisting of building codes, zoning, subdivision or other land use or similar Laws.

(c)      The Company or one of its Subsidiaries, as applicable, has a good and valid leasehold interest to all real property leased by the Company (the "Leased Real Property"), free and clear of all Encumbrances (other than Permitted Encumbrances).  Schedule 3.6(c) sets forth a true, correct and complete list of all leases, licenses, subleases and other use agreements with respect to such Leased Real Property, and all amendment, supplements, addendums and guarantees thereto (collectively, the "Leases") along with the address of each such Leased Real Property and all parties to each Lease.  Except pursuant to the Leases, neither the Company nor any of its Subsidiaries lease, sublease, license or, except with respect to the Owned Real Property, use or occupy any real property.  The Company has made available to Purchaser true, correct and complete copies (in all material respects) of the Leases and any estoppels or subordination, non-disturbance and attornment agreements relating thereto.

(d)      With respect to the Leased Real Property, except as set forth on Schedule 3.6(d): (i) the Company or a Subsidiary of the Company is in exclusive possession thereof; (ii) the Leases are valid, binding and in full force and effect and there are no unwritten or oral modifications by the Company or any of its Subsidiaries to the Leases or any course of dealing or business operations involving the Company or its Subsidiaries that could reasonably be construed as a modification to the Leases that would reasonably be expected to be material to the Company and its Subsidiaries; (iii) neither the Company nor any of its Subsidiaries is a lessor under, or otherwise a party to, any lease, sublease, license, concession or other agreement pursuant to which the Company or any of its Subsidiaries has granted to any Person the right to use or occupy all or any portion of the Leased Real Property; (iv) except as a result of the commencement

20

of the Bankruptcy Case, neither the Company nor its Subsidiaries nor, to the Knowledge of Sellers, any landlords are in default under any of the Leases in any material respect, nor does any event or circumstances exist which, with the passage of time or the giving of notice would constitute such a default under any of the Leases, nor has the Company or any of its Subsidiaries received or provided written notice from or to any Person that any such default exists under any of the Leases; (v) there is no, and neither the Company nor its Subsidiaries has received written notice from any Governmental Body regarding, presently pending or threatened condemnation or eminent domain proceedings or their local equivalent affecting or relating to such Leased Real Property; and (vi) it is not the case that, and neither the Company nor its Subsidiaries has received written notice from any Governmental Body or other Person, that the use and occupancy of any of the Leased Real Property, as currently used and occupied, and the conduct of the business thereon, in the Ordinary Course, violates in any material respect any deed restrictions, contractual obligation (including requirements of any Encumbrances), or applicable Law consisting of building codes, zoning, subdivision or other land use or similar Laws.

3.7.    Title to Property; Sufficiency of Assets.

(a)    Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, (i) the Company and its Subsidiaries own good and valid title to, or hold a valid leasehold interest in, all of the Acquired Assets, whether tangible or intangible (other than Inventory sold in the Ordinary Course on or after January 1, 2020 and otherwise in accordance with this Agreement), free and clear of all Encumbrances (other than Permitted Encumbrances), and (ii) at the Closing, Sellers will transfer, convey and assign good and valid title to, or a valid leasehold interest in, all of the Acquired Assets (including record and beneficial ownership of all equity securities, or securities convertible, exchangeable or exercisable into such securities, of the Acquired Subsidiaries) free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)    Other than the Excluded Assets and any Permits, the Acquired Assets constitute all of the material assets, properties and rights held for use or necessary to operate and conduct the business of the Company and its Subsidiaries as conducted in the Ordinary Course as of the date of this Agreement.

3.8.    Insurance.  Schedule 3.8 lists each material insurance policy maintained by the Company and each of its Subsidiaries as of the date hereof.  To the Knowledge of Sellers, (a) the Company and its Subsidiaries own or hold policies of insurance, or are self-insured, of the types and in amounts providing reasonably adequate coverage against all risks customarily insured against by companies in similar lines of business as the Company and its Subsidiaries or as may otherwise be required by applicable Law and (b) all such insurance policies are in full force and effect except for any expiration thereof in accordance with the terms thereof occurring after the date of this Agreement.  The Company and its Subsidiaries have not received written notice of cancelation or modification with respect to such insurance policies other than in connection with ordinary renewals, and there is no existing default or event which, with the giving of notice or lapse of time or both, would constitute a default by any insured thereunder.  All premiums in respect of each insurance policy maintained by the Company or any of the Company's Subsidiaries have been paid when due.

3.9.   Contracts.

(a)    Schedule 3.9(a) sets forth a list of all Material Contracts as of the date of this Agreement.  For purposes of this Agreement, "Material Contract" means any Contract to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries or any of their respective properties or assets is bound (in each case, excluding any Seller Plan) that:

(i)    is or would be required to be filed as an exhibit to the Company's Annual Report on Form 10-K pursuant to Item 601(b)(10) of Regulation S-K under the Securities Act;

(ii)    relates to the formation, creation, governance, economics or control of any joint venture, partnership or other similar arrangement (including any Contract involving a sharing of revenues, profits, losses, costs or liabilities), other than (A) with respect to any partnership that is wholly owned by the Company or any of its wholly owned Subsidiaries and (B) for the avoidance of doubt, marketing, licensing, manufacturing, development and distribution Contracts entered into in the Ordinary Course;

(iii)    (A) is for Indebtedness of the Company or any of its Subsidiaries; (B) relates to the mortgaging or pledging of, or otherwise placing an Encumbrance (other than a Permitted Encumbrance) on, any of the Acquired Assets; or (C) is in the nature of a capital or direct financing lease that is required by GAAP to be treated as a long-term liability involving payments above $1,000,000 annually, in each case other than (x) Indebtedness solely between or among any of the Company and its wholly-owned Subsidiaries or (y) Liabilities which will be fully discharged under the Bankruptcy Code;

(iv)    relates to the acquisition or disposition of any business, assets or properties (whether by merger, sale of stock, sale of assets or otherwise) for aggregate consideration under such Contract in excess of $5,000,000 (A) that was entered into after January 1, 2017 or (B) pursuant to which any material earn-out, indemnification or deferred or contingent payment obligations remain outstanding (in each case, excluding for the avoidance of doubt, acquisitions of Inventory in the Ordinary Course);

(v)    under which the Company or any of its Subsidiaries is lessee of (i) any real property or (ii) material personal property with annual lease payments in excess of $500,000, in each case, owned by any other party (including the Leased Real Property);

(vi)    is a Contract (A) (other than purchase orders), with any Material Supplier or (B) for the purchase of materials, supplies, goods, services, Equipment or other assets pursuant to which the Company or any of its Subsidiaries would reasonably be expected to make payments of more than $3,000,000 during any fiscal year (other than a Contract with any Material Supplier that is otherwise disclosed in subsection (A) above);

(vii)    is a Contract (other than purchase orders) (A) with any Material Customer or (B) with a direct or indirect customer of the Company or any of its Subsidiaries (other than a Material Customer) pursuant to which the Company or any of its Subsidiaries

22

received aggregate net payments of more than $5,000,000, during the fiscal year ended December 31, 2019;

(viii)    contains any provision (A) limiting, in any material respect, the right of the Company or any of its Subsidiaries to engage in any business (including developing or commercializing any pharmaceutical products), compete with any Person, or operate anywhere in the world (other than provisions in any license agreements for Intellectual Property limiting the Company's and its Subsidiaries' use of applicable Intellectual Property of a third party to specified fields of use or specified territories), (B) granting any exclusivity right to any third party, or containing a "most favored nation" provision or any option, right of first refusal or preferential or similar right in favor of any third party or that is a "take or pay" or similar provision requiring the business to make a minimum payment for goods or services from third party suppliers irrespective of usage, in each case, other than a Contract that can be terminated by the Company or one of its Subsidiaries on ninety (90) days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any money under, such Contract;

(ix)    is a Contract (x) that contains an exclusive license of Intellectual Property to the Company or any of its Subsidiaries that is material to the business of the Company and its Subsidiaries as currently conducted or (y) pursuant to which the Company or any of its Subsidiaries has a right to use any Intellectual Property of any other Person, which Intellectual Property is material to the business of the Company and its Subsidiaries as currently conducted, excluding in each case (A) licenses that are ancillary or incidental to the sale of goods or provision of services and (B) standard licenses for computer software that is readily commercially available on a "click wrap" or other similar basis;

(x)    is a Contract with a Governmental Body;

(xi)    is a surety or guarantee agreement or other similar undertaking with respect to contractual performance;

(xii)    is a license, sublicense, development, collaboration or royalty agreement or other Contract relating to the use of any Company Owned Intellectual Property by any third party (other than licenses granted to customers, resellers and distributors in the Ordinary Course) pursuant to which the Company or any of its Subsidiaries received payments above $1,000,000 during the fiscal year ended December 31, 2019;

(xiii)    is a Contract for any interest rate, currency or commodity derivatives or hedging transaction; or

(xiv)    is a binding commitment or agreement to enter into any of the foregoing.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except with respect to any Contract that has previously expired in accordance with its terms (or, after the date of this Agreement, is

terminated, restated or replaced in compliance with this Agreement), subject to the Enforceability Exceptions, (i) each Material Contract is valid and binding on the Company and/or any of its Subsidiaries to the extent such Person is a party thereto, as applicable, and to the Knowledge of Sellers, each other party thereto, and is in full force and effect; (ii) the Company and each of its Subsidiaries, and, to the Knowledge of Sellers, any other party thereto, have performed all obligations required to be performed by it under each Material Contract; (iii) except as a result of the commencement of the Bankruptcy Case, neither the Company nor any of its Subsidiaries have given or received written notice of the existence of any breach or default on the part of the Company or any of its Subsidiaries under any Material Contract; (iv) except as a result of the Bankruptcy Case, there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of the Company or any of its Subsidiaries, or to the Knowledge of Sellers, any counterparty under such Material Contract; and (v) to the Knowledge of Sellers, the Company has not received any notice from any Person that such Person currently intends to terminate, or not renew, any Material Contract, in each instance of (ii), (iii), (iv) and (v), except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets and the Assumed Liabilities, taken as a whole.

(c)     There are no Material Contracts that cannot be readily fulfilled or performed by the Company and its Subsidiaries without undue or unusual expenditure of money or effort or any preparation, action or arrangement outside of the Ordinary Course (including, as may be a result of any pandemic (including the "Coronavirus" or "COVID-19") or any quarantine or trade restrictions related, or which would reasonably be expected to be related, thereto).

3.10.    Litigation.  Except as set forth on Schedule 3.10, there is no Action pending, or to the Knowledge of Sellers threatened, against or relating to the Company or any of its Subsidiaries, the Acquired Assets or the Assumed Liabilities that (a) if adversely determined against the Company and its Subsidiaries would reasonably be expected to result in fines or damages of more than $1,000,000 or would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (b) (i) relates to a criminal matter or (ii) calls for injunctive relief or other restriction that, if adversely determined against the Company and its Subsidiaries, would reasonably be expected to be material to the Acquired Assets and the Assumed Liabilities, taken as a whole.  Except as set forth on Schedule 3.10, since January 1, 2017, there has been no (x) such Action pending, or to the Knowledge of Sellers threatened, against the Company or any of its Subsidiaries, or (y) Order imposed (or otherwise pending or the Knowledge of Sellers threatened) upon the Company or any of its Subsidiaries, in each case, by or before any Governmental Body.

3.11.    Permits; Compliance with Laws.  Except as set forth on Schedule 3.11, the Company and each of its Subsidiaries are, and have been since January 1, 2017, in compliance in all material respects with all Laws or Orders applicable to the Company or any of its Subsidiaries or the ownership and operation of the Acquired Assets.  The Company and each of its Subsidiaries hold, and, to the extent applicable, have filed timely applications to renew, all licenses, notifications, franchises, permits, certificates, registrations, approvals, consents, waivers, clearances, exemptions, classifications and other authorizations from Governmental Bodies necessary for the lawful conduct of their respective businesses (collectively, "Permits"), except where the failure to hold the same would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets and the Assumed Liabilities, taken as a whole.  Since January 1, 2017, neither the Company nor any of its Subsidiaries has received written

24

notice from any Governmental Body (i) claiming or alleging that it is not in compliance with any applicable Law or Order applicable to any of them, or the operation of their respective businesses, in any material respect or (ii) requesting or requiring the Company or any of its Subsidiaries to take, or refrain from taking, any action in connection with the "Coronavirus" or "COVID-19" except for publicly announced notices and Orders of general applicability, in each case of (i) and (ii) except as would not, individually or in the aggregate, reasonably be expected to be material to the operation of their business in the Ordinary Course or material to the Acquired Assets and the Assumed Liabilities, taken as a whole.

3.12.    <u>Anti-Corruption and International Trade Compliance</u>.

(a)    In the last five years, neither Sellers, nor the Company and its Subsidiaries or their employees, or to the Knowledge of Sellers, any other Person acting on behalf of any of the foregoing, has directly or knowingly indirectly in connection with the business and operations of the Company and its Subsidiaries (i) made, offered, promised to make or authorized any unlawful payment, gift, or any other thing of value or advantage in violation of Anti-Corruption Laws, (ii) requested or received any payment, gift, or other thing of value or advantage in violation of Anti-Corruption Laws or (iii) otherwise violated any provision of the Anti-Corruption Laws, Anti-Money Laundering Laws, and International Trade Laws.

(b)    The Company and its Subsidiaries have implemented policies and procedures reasonably designed to prevent, detect, and deter violations of any Anti-Corruption Laws and International Trade Laws.

(c)    In the last five years, neither Sellers nor the Company and its Subsidiaries have received any notice from any Governmental Body or any other Person regarding any actual, alleged, or investigated violation of, or failure to comply with or Liability under, any Anti-Corruption Laws, Anti-Money Laundering Laws, and International Trade Laws, and to the Knowledge of Sellers there are no conditions or circumstances that would reasonably be expected to give rise to any material future Action against, or voluntary disclosure by, the Company and its Subsidiaries with respect to any Anti-Corruption Laws and International Trade Laws.

(d)    In the last five years, neither Sellers nor the Company and its Subsidiaries have: (i) acted, directly or knowingly indirectly, on behalf of a Sanctioned Person, nor are Sellers, the Company, and its Subsidiaries Sanctioned Persons; (ii) conducted any business, directly or knowingly indirectly, or engaged in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person in violation of International Trade Laws; or (iii) unlawfully directly or knowingly indirectly dealt in, or otherwise directly or knowingly indirectly engaged in, any transaction relating to, any property or interests of Sanctioned Persons in violation of International Trade Laws.

(e)    The Company and its Subsidiaries are and in the last five years have been in compliance with the customs and import Laws of Canada, India, Luxembourg, Switzerland, the United States, and of each country where the Company and its Subsidiaries conduct business.

3.13.    <u>Environmental Matters</u>.  Except as set forth on <u>Schedule 3.13</u>, (a) the Company, each of its Subsidiaries and their respective businesses are, and have been since January 1, 2017,

in compliance with all applicable Environmental Laws, except as would not, individually or in the aggregate, reasonably be expected to be material to any of the respective businesses of the Company or its Subsidiaries (to the extent such businesses are included as Acquired Assets or Assumed Liabilities), taken as a whole, (b) neither the Company nor any of its Subsidiaries have received any written notice alleging that the Company is or was in material violation of or has material liability under, or any other written request for information pursuant to, any Environmental Law, in each case to the extent the subject matter of such notice or request is still unresolved or otherwise pending, (c) the Company and its Subsidiaries possess and are in compliance with all Permits required under Environmental Laws for the operation of their respective businesses ("Environmental Permits"), except where the failure to possess or comply with such Permits would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets and the Assumed Liabilities, taken as a whole, (d) neither the execution, delivery or performance of this Agreement will result in the material modification or termination of any Environmental Permit that would, individually or in the aggregate, reasonably be expected to be material to any of the respective businesses of the Company or its Subsidiaries (to the extent such businesses are included as Acquired Assets or Assumed Liabilities), taken as a whole, and neither the Company nor any of its Subsidiaries has received any written notice regarding the revocation, suspension or material amendment of any Environmental Permit that would, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets and the Assumed Liabilities, taken as a whole, (e) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or threatened in writing or, to the Knowledge of Sellers, orally, against the Company or any of its Subsidiaries that would, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets and the Assumed Liabilities, taken as a whole, (f) neither the Company nor any of its Subsidiaries are subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved material obligations on the part of the Company or its Subsidiaries, (g) no Hazardous Substances have been Released by the Company or any of its Subsidiaries at any location or are present at the Owned Real Property or Leased Real Property, in each case that are reasonably likely to result in any material Liability to the Company or any of its Subsidiaries under Environmental Laws, (h) to the Knowledge of Sellers, no Hazardous Substances present at any real properties to which the Company or any of its Subsidiaries has sent Hazardous Substances for treatment or disposal would reasonably be expected to result in material Liability to the Company or any of its Subsidiaries under Environmental Laws, (i) neither the Company nor any of its Subsidiaries has assumed or retained by contract or operation of law or indemnified any third party against any material liability or obligation under Environmental Laws which is unresolved and of which the Company or its Subsidiaries have received written notice, and (j) the Company has provided to Purchaser copies of all final third party reports prepared at the request, or on behalf of, the Company or any of its Subsidiaries in the last three (3) years or, to the Knowledge of Sellers, earlier with respect to any material environmental or health and safety assessments, investigations, studies, audits, tests, reviews or other similar documents, in each case with respect to any environmental conditions or violation of Environmental Laws at any properties that are Acquired Assets or are owned, leased, or operated by any of the Acquired Subsidiaries that are in the possession or reasonable control of the Company or any of its Subsidiaries.

      3.14.   <u>Intellectual Property</u>.

(a)     The Company and its Subsidiaries exclusively own all of the rights, title and interest in and to the Company Owned Intellectual Property, free and clear of all Encumbrances (other than Permitted Encumbrances).   All of the Company Owned Intellectual Property is presumed valid, subsisting, and, to the Knowledge of Sellers, enforceable.  None of the Company Owned Intellectual Property is involved in any filed interference, reissue, reexamination, opposition, cancellation or similar proceeding and, to the Knowledge of Sellers, no such Action is or has been threatened with respect to any of the Company Owned Intellectual Property.  A true and complete list of all registered Company Owned Intellectual Property (including country, application number, registration number, filing date, title, owner and status) is set forth in Schedule 3.14(a).  The Company Owned Intellectual Property and the Company Licensed Intellectual Property are sufficient for the conduct of the business of the Company and its Subsidiaries in the Ordinary Course as currently conducted, in all material respects.

(b)     (i) The Company and its Subsidiaries own or have legally enforceable and sufficient rights to use all Intellectual Property that is used in and material to or otherwise necessary for the conduct of the business of the Company and its Subsidiaries in the Ordinary Course, as currently conducted, free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) the Company and its Subsidiaries have taken commercially reasonable steps in accordance with industry practice to (x) protect their rights in the Company Owned Intellectual Property that is material to the business of the Company and its Subsidiaries as currently conducted and (y) to maintain the confidentiality of non-public Intellectual Property (including trade secrets) owned by or exclusively licensed to the Company or any of its Subsidiaries that is material to the business of the Company and its Subsidiaries in the Ordinary Course, and all other non-public Intellectual Property that the Company or any of its Subsidiaries is required by the provisions of any Contract to protect as confidential; provided that nothing in this Section 3.14(b) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.14(c) and Section 3.14(d).

(c)     As of the date hereof, no Actions are pending or threatened in writing or, to the Knowledge of Sellers, orally, against the Company or its Subsidiaries, and since January 1, 2017, neither the Company nor any of its Subsidiaries has received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by the Company or any of its Subsidiaries of any Intellectual Property owned by the Company or any of its Subsidiaries or (ii) alleging that the Company or any of its Subsidiaries infringed, misappropriated or otherwise violated, or are infringing, misappropriating or otherwise violating, the Intellectual Property of any Person.  None of the Company Owned Intellectual Property that is material to the business of the Company and its Subsidiaries in the Ordinary Course is subject to any outstanding Order restricting or limiting in any material respect the use or licensing thereof by the Company or any of its Subsidiaries.

(d)     As of the date hereof, (i) to the Knowledge of Sellers, no Person has infringed, misappropriated or otherwise violated the rights of the Company or any of its Subsidiaries with respect to any Intellectual Property owned by or exclusively licensed to the Company or a Subsidiary of the Company and (ii) except as would not be material, the operation of the business of the Company and its Subsidiaries has not violated, misappropriated or infringed the Intellectual Property of any other Person and the operation of the business of the Company and

27

its Subsidiaries in the Ordinary Course as of the date of this Agreement does not violate, misappropriate or infringe the Intellectual Property of any other Person.

(e)     No present or former employee, officer or director of the Company or any of its Subsidiaries, or agent, outside contractor or consultant of the Company or any of its Subsidiaries, holds any right, title or interest, directly or indirectly, in whole or in part, in or to any Company Owned Intellectual Property that is material to the business of the Company and its Subsidiaries as currently conducted.

(f)     The Company's and its Subsidiaries' technology systems and infrastructure, including middleware, servers, workstations, routers, and all other information technology software or equipment used by the Company and its Subsidiaries are adequate for the current conduct of the business of the Company and its Subsidiaries in the Ordinary Course, in all material respects.  Each of the Company and its Subsidiaries has taken reasonable steps and implemented reasonable procedures designed to ensure that its internal computer systems used in connection with its business (consisting of hardware, software, databases or embedded control systems, "Systems") are free from disabling codes and contaminants and are sufficient in all material respects for the current needs of the business of the Company and its Subsidiaries in the Ordinary Course.  Each of the Company and its Subsidiaries has taken reasonable steps to protect the integrity and security of its respective Systems and the information stored therein from unauthorized use, access or modification.  The Company and its Subsidiaries provide for the back-up and recovery of material data and have implemented commercially reasonable disaster recovery plans, procedures and facilities and, as applicable, have taken commercially reasonable steps to implement such plans and procedures.  Since January 1, 2017, to the Knowledge of Sellers, there have been no breaches of or unauthorized intrusions into the security of any Systems, and the Company and its Subsidiaries have not experienced any incident in which Personal Information was or may have been stolen, lost, destroyed, altered or improperly accessed, disclosed or used without authorization.

(g)     Since January 1, 2017, the Company and its Subsidiaries have complied in all material respects with all applicable Laws relating to privacy, data security, data protection, and collection, storing, use, security, processing and transferring of Personal Information.

(h)     No government funding or facilities of a university, college, other educational institution or research center was used in the development of any Company Owned Intellectual Property.  No employee of the Company or any of its Subsidiaries who was involved in, or who contributed to, the creation or development of any Company Owned Intellectual Property, has performed services for the government, university, college, or other educational institution or research center with respect to technology or inventions that have been or may be incorporated into any Products or related to Company Owned Intellectual Property during a period of time during which such employee was also performing services for the Company or any of its Subsidiaries.

(i)     Except as set forth in Schedule 3.14(i), since January 1, 2017, neither the Company nor any of its Subsidiaries has transferred ownership of any Company Owned Intellectual Property that was used in the conduct of the business of the Company or any of its Subsidiaries.

28

(j)      Assuming that (A) requisite Bankruptcy Court approvals are obtained and (B) the notices, authorizations, registrations, approvals, Orders, permits or consents set forth on Schedule 3.3 are made, given or obtained (as applicable), the consummation of the transactions contemplated hereby will not result in (i) the grant of any right or license to any third party of any Intellectual Property that is owned by or exclusively licensed to the Company or any of its Subsidiaries or (ii) the loss of the Company's or any of its Subsidiaries' rights or obligations under any Contract under which Intellectual Property is licensed to the Company or any of its Subsidiaries, in each case of the immediately clauses (i) and (ii), that is material to the business of the Company and its Subsidiaries.

3.15.   Tax Matters.  Other than with respect to any Excluded Subsidiary:

(a)      The Company and each of its Subsidiaries has prepared (or caused to be prepared) and duly and timely filed (taking into account valid extensions of time within which to file) all material Tax Returns required to be filed by (or on behalf of) any of them, and all such filed Tax Returns (taking into account all amendments thereto) are true, complete and accurate in all material respects.  Neither the Company nor any of its Subsidiaries is currently the beneficiary of any extension of time within which to file any Tax Return required to be filed by either the Company or any of its Subsidiaries with respect to, or that relate to a material amount of Taxes (individually or in the aggregate) that (if unpaid) could give rise to an Encumbrance on, the Acquired Assets.

(b)      All income and other material Taxes owed by the Company and each of its Subsidiaries that are due (whether or not shown on any Tax Return) have, in all material respects, been timely paid in full or have been adequately reserved against in accordance with GAAP.

(c)      There are no Encumbrances for Taxes on any of the assets of the Company or any of its Subsidiaries, other than statutory Encumbrances for current Taxes not yet due or payable or that are being contested in good faith by appropriate Actions and for which adequate reserves have been established in the Current Financial Statements in accordance with GAAP, and no written claim for unpaid Taxes has been made by any Governmental Body that could give rise to any such Encumbrance.

(d)      (i) Neither the Company nor any of its Subsidiaries (other than any Subsidiaries identified on Schedule 3.15(d)), is, or has ever been, and (ii) none of the Subsidiaries identified on Schedule 3.15(d) is, or has been within the past five years, a member of an affiliated group of corporations filing a consolidated federal income Tax Return (other than a group the common parent of which is the Company or one of its Subsidiaries) or has any material Liability for the Taxes of any Person (other than the Company or any of its Subsidiaries) under Treasury Regulations Section 1.1502-6 (or any similar provision of any state, local or non-U.S. Law), as a transferee or successor.

(e)      No written notice from any Governmental Body of proposed adjustment, deficiency or underpayment of Taxes with respect to any Seller or the Acquired Assets has been received by any Seller that has not since been fully satisfied by payment or been finally withdrawn, and no written notification has been provided by any Governmental Body of a current intent to raise such issues.  Neither the Company nor any of its Subsidiaries has waived any statute of

limitations in respect of a material amount of Taxes (individually or in the aggregate) or agreed to any extension of time with respect to an assessment or deficiency for any such Taxes (other than pursuant to automatic extensions of time to file Tax Returns duly obtained in the Ordinary Course).

(f)     Neither the Company nor any of its Subsidiaries has participated in any "listed transaction" within the meaning of Treasury Regulations Section 1.6011-4(b)(2).

(g)     There are no pending or threatened in writing audits, investigations, disputes, notices of deficiency, assessments or other Actions or proceedings for or relating to any Liability for Taxes of the Company or any of its Subsidiaries or for Taxes relating to the Acquired Assets.

(h)     No claim has ever been made by an authority in a jurisdiction where a Seller does not file Tax Returns that such Seller is subject to taxation by that jurisdiction.

(i)     Sellers have collected or withheld all amounts required to be collected or withheld by Sellers for all material Taxes or assessments, and all such amounts have been fully and timely paid to the appropriate Governmental Body.  The Company and its Subsidiaries have complied with in all material respects all applicable Laws relating to information reporting and record retention (including to the extent necessary to claim any exemption from sales Tax collection and maintaining adequate and current resale certificates to support any such claimed exemptions) with respect to the Acquired Assets.

(j)     No Seller is a "foreign person" as that term is used in Treasury Regulations Section 1.445-2.

(k)     None of the Acquired Assets includes any stock, partnership interests, limited liability company interests, legal, or beneficial interests or any other equity interests in or of any Person, and there is no joint venture, co-tenancy, contract, or other similar arrangement involving the Acquired Assets for which an election is in effect under Section 761(a) of the Code or that could be treated as a partnership under Subchapter K of Chapter 1 of Subtitle A of the Code if no such election has been made.

(l)     None of the Assumed Liabilities includes any obligation to any Person under any Tax allocation, sharing, indemnity obligation, or similar agreement or arrangement with respect to Taxes (other than any customary commercial agreement or arrangement entered into the ordinary course of business the primary purpose of which is not the allocation of Taxes).

Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this Section 3.15 and Section 3.16 (insofar as they relate to Taxes) shall constitute the sole representation and warranties with respect to Taxes.  No representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute, in each case, for any Tax period (or any portion thereof) following the Closing.

3.16.    Seller Plans.

(a)     Schedule 3.16(a) contains a true and complete list, as of the date of this Agreement, of each material Seller Plan. With respect to each material Seller Plan (but for non-

United States material Seller Plans, only to the extent reasonably available to the Company), the Company has made available to Purchaser true and complete copies (to the extent applicable) of (i) the current plan document (or, if the Seller Plan is unwritten, a written description of the material terms thereof), including any amendments thereto other than any document that the Company or any of its Subsidiaries are prohibited from making available to Purchaser as the result of applicable Law relating to the safeguarding of data privacy, (ii) the most recent annual report on Form 5500 filed with the Department of Labor, (iii) the most recent IRS determination or opinion letter received by the Company, (iv) the most recent summary plan description, (v) each current material related insurance Contract or trust agreement, (vi) the most recent actuarial report, financial statement and trustee report, and (vii) all non-routine correspondence with the IRS or United States Department of Labor since January 1, 2017 for which a Liability remains outstanding.

(b)     Each United States Seller Plan intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination letter from the IRS or is entitled to rely upon a favorable opinion letter issued by the IRS. There are no existing circumstances or any events that have occurred that would reasonably be expected to cause the loss of any such qualification status of any such United States Seller Plan. There are no pending or, to the Knowledge of Sellers, anticipated or threatened Actions or other claims (other than routine claims for benefits) by, on behalf of, against or with respect to any Seller Plan (or, to the Knowledge of Sellers, any fiduciary thereof or service provider thereto) and no audit or other Action by a Governmental Body is pending, or, to the Knowledge of Sellers, anticipated or threatened with respect to such Seller Plan. Since January 1, 2017, the Seller Plans have complied in form and in operation in all material respects with their terms and applicable Laws, including the applicable requirements of the Code and ERISA. Except as could not reasonably be expected to result in any liability for Purchaser or its Affiliates, all contributions or premiums required to be made under the terms of each Seller Plan or by applicable Laws have been timely made in all material respects in accordance with applicable Laws and the terms of the Seller Plans.

(c)     Neither the Company nor any Subsidiary has, in the past six years, sponsored, maintained, contributed to or has been required to maintain or contribute to, or has any Liability with respect to any (i) plan that is subject to Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code, (ii) "multiemployer plan" (as defined in Sections 3(37) or 4001(a)(3) of ERISA) or (iii) "multiple employer welfare arrangement" (within the meaning of Section 3(40) of ERISA).

(d)     No Seller Plan provides or has (in the last 24 months) provided benefits or coverage in the nature of health or life insurance following retirement or other termination of employment, other than coverage or benefits required to be provided under Part 6 of Subtitle B of Title I of ERISA or Section 4980B of the Code, or any other applicable Law.

(e)     The consummation of the transactions contemplated hereby will not, either alone or in combination with another event, (i) accelerate the time of payment or vesting, or increase the amount of compensation or benefits due to any director, officer, employee or other individual service provider of the Company or any of its Subsidiaries under any United States Seller Plan, (ii) subject to Purchaser's compliance with <u>Section 6.3</u>, cause the payment of any

severance benefits to any individual, or (iii) cause the Company to transfer or set aside any assets to fund any benefits under any United States Seller Plan.

(f)     The consummation of the transactions contemplated hereby will not, either alone or in combination with another event result in any "disqualified individual" receiving any payment that would be characterized as an "excess parachute payment" (each such term as defined in Section 280G of the Code).  No director, officer, employee or other individual service provider of the Company or any of its Subsidiaries has any "gross up" agreements or other assurance of reimbursement for any Taxes resulting from any such "excess parachute payments" or with respect to any violation of Section 409A of the Code.

(g)     With respect to the Swiss Company, Sections 3.16(a) through 3.16(f) shall not apply to any pension plan maintained by the Swiss Company.  All accrued pension claims of the Swiss Company's employees are either covered by funds of a special foundation, by insurance contracts or provisions the Swiss Company has specifically established for such purpose, all pursuant to applicable laws and actuarial principles consistently applied in the past two (2) financial years.  The Swiss Company has and will have complied up to the Closing Date with all relevant social security regulations and have and will have made up to the Closing Date all deductions and payments required to be made and/or due under such regulations for all social security, employment related insurance premiums and pension plan contributions in respect of its employees.  There is no funding deficit (Unterdeckung) under any of the occupational pension plans, funds, contracts, schemes or arrangements relating to the Swiss Company or its employees.

(h)     Each Seller Plan that constitutes a "non-qualified deferred compensation plan" within the meaning of Section 409A of the Code has at all times complied in both form and operation with the requirements of Section 409A of the Code.

3.17.   Employees.

(a)     Schedule 3.17(a) lists each employee of Sellers as of the date hereof and as of the date that is three (3) Business days prior to the Closing Date (provided that Sellers shall be permitted to deliver Schedule 3.17(a) as of three (3) Business Days prior to the Closing Date until the date that is two (2) Business Days prior to the Closing Date), along with his or her (i) base salary, (ii) title/position, (iii) Fair Labor Standards Act classification, (iv) leave status, (v) date of hire and (vi) accrued paid time-off.

(b)     Neither the Company nor any of its Subsidiaries is party to any collective bargaining agreements or similar Contracts with any labor union applicable to any employees of the Company or any of its Subsidiaries.  Since January 1, 2017, no demand for recognition as the exclusive bargaining representative of any employees has been made to the Company or any of its Subsidiaries by or on behalf of any labor union and, since January 1, 2017, there have been no union organizing activities.  There is no pending or, to the Knowledge of Sellers, threatened strike, lockout, slowdown, or work stoppage by or with respect to the employees of the Company or any of its Subsidiaries and there has been no such event since January 1, 2017.  Since January 1, 2017, each of the Company and its Subsidiaries has complied in all material respects with all applicable Laws respecting employment and employment practices, including Laws concerning terms and conditions of employment, wages and hours, immigration, classification and occupational safety

32

and health.  Each of the Company and its Subsidiaries is not, and since January 1, 2017 has not been, involved in any material litigation, audit, governmental investigation, administrative agency proceeding, private dispute resolution procedure, or investigation of alleged employee misconduct, in each case with respect to employment or labor matters (including allegations of employment discrimination, retaliation, noncompliance with wage and hour Laws, the misclassification of independent contractors, violation of restrictive covenants, sexual harassment, other unlawful harassment or unfair labor practices).  The Company and its Subsidiaries have not experienced a "plant closing" or "mass layoff" or similar group employment loss as defined in the WARN Act with respect to which there is any unsatisfied liability.  During the 90-day period preceding the date hereof, no more than 10 employees at any "single site of employment" have suffered an "employment loss" as defined in the WARN Act with respect to the Company and its Subsidiaries. Since January 1, 2017, there have been no sexual harassment allegations against any officer or other key employee of the Company or its Subsidiaries.

(c)    To the Knowledge of Sellers, there are no facts that would reasonably be expected to give rise to a claim or claims of sexual harassment, other unlawful harassment or unlawful discrimination against or involving the Company or its Subsidiaries or any employee, director or independent contractor of the Company or its Subsidiaries.

(d)    Sellers have taken actions reasonably designed to protect their employees from the effects of the "Coronavirus" or "COVID-19", as described on Schedule 3.17(d).

3.18.    Affiliate Transactions.    Except as set forth on Schedule 3.18, or in the "Compensation Discussion and Analysis" or "Related Party Transactions" disclosures in the Filed SEC Documents, to the Knowledge of Sellers, no Affiliate of the Company (other than any Seller or any of their Subsidiaries), or any officer or director of the Company or any of its Subsidiaries (a) is a party to any agreement or transaction with the Company or its Subsidiaries having a potential or actual value or a contingent or actual Liability exceeding $50,000, other than (i) employment arrangements in the Ordinary Course and (ii) the Seller Plans, (b) has any material interest in any material property (whether tangible or intangible) used by the Company or its Subsidiaries or (c) owns any material interest in, or is an officer, director, employee or consultant of, any Person which is, or is engaged in business as a Material Supplier (or other professional Advisor) or Material Customer of the Company or any of its Subsidiaries.

3.19.    Brokers.    Except for PJT Partners LP and Greenhill & Co., LLC, the fees and expenses of which will be paid by the Company on or prior to the Closing Date, no broker, finder, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Company or any of its Subsidiaries.

3.20.    Inventory.    Except for those items the value of which has been reduced or written off the books and records of the Company in the Ordinary Course, all Inventory consists of a quality usable and salable in the Ordinary Course, none of which (a) is materially damaged in any significant way, except for any such damage that would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets or the Assumed Liabilities, taken as a whole or (b) is held on a consignment basis.  The Inventory conforms in all material respects to

33

all standards and Laws applicable to each item of Inventory or its use or sale imposed by any Governmental Body, and is not part of a current or past recall except for those items the value of which have been reduced or written off the books of the Company in the Ordinary Course.

3.21.   Customers and Suppliers.

(a)     Schedule 3.21(a) sets forth a true, complete and correct list of (i) the five (5) largest customers of the Company and its Subsidiaries (measured by dollar volume of sales to such customers) for the fiscal year ended December 31, 2019 (such customers collectively referred to as the "Material Customers"); and (ii) the ten (10) largest suppliers (excluding any professional Advisors) from which the Company and its Subsidiaries purchased materials, supplies, services or other goods (measured by dollar volume of purchases from such suppliers) for the fiscal year ended December 31, 2019 (such suppliers collectively referred to as "Material Suppliers"), and the amount each such Material Supplier was paid by the Company and its Subsidiaries during such period.

(b)     Except as set forth on Schedule 3.21(b), neither the Company nor any of its Subsidiaries has received any written notice that any Material Customer or Material Supplier (i) has terminated its relationship with the Company or any of its Subsidiaries, or (ii) intends to terminate its relationship with the Company or any of the Company's Subsidiaries.

(c)     As of May 18, 2020, the aggregate value of backorders is as set forth on Schedule 3.21(c).

3.22.   Product Liability.   Except as set forth on Schedule 3.22 and excluding voluntary recalls and field alerts, all products sold by the Company and its Subsidiaries since January 1, 2017, or provided, manufactured or delivered by the Company and its Subsidiaries since January 1, 2017, were designed, manufactured, prepared, assembled, packaged, labeled, sterilized, stored, serviced and processed in compliance, in all material respects, with applicable Law, applicable contractual commitments and the Company's specifications and quality standards.   Except as set forth on Schedule 3.22, there are no pending or, to the Knowledge of Sellers, threatened Actions arising out of any injury to a Person or property as a result of the ownership, design, manufacture, possession, provision, clinical development, distribution, marketing, promotion, sale, implanting, or other use of the Products sold, provided, manufactured or delivered by the Company and its Subsidiaries after January 1, 2017 and prior to the Closing Date.   All Actions (including those relating to clinical trials) against or, to the Knowledge of Sellers, involving or threatened against the Company and its Subsidiaries that are pending or were asserted since January 1, 2017 and that relate in any way to the Products, whether covered by insurance or not and whether litigation has resulted or not, are listed and summarized on Schedule 3.22.   Since January 1, 2017, no allegation has been asserted or threatened in writing that any Products contain a design defect or a manufacturing defect.

3.23.   Health Care Regulatory Matters.   Except as set forth in Schedule 3.23 or as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and since January 1, 2017:

(a)     The Company and its Subsidiaries, and to the Knowledge of Sellers, each of their directors, officers, management employees, agents (while acting in such capacity), contract manufacturers, suppliers, and distributors are, and at all times after January 1, 2017 were, in compliance with all Health Care Laws to the extent applicable to the Company or any of its products or activities, except, with respect to such agents, contractors, manufacturers, suppliers and distributors, as would not reasonably be expected to prevent the Company and its Subsidiaries from being in such compliance themselves.  To the Knowledge of Sellers, there are no facts or circumstances that reasonably would be expected to give rise to any failure by the Company and its Subsidiaries to be in such compliance under any Health Care Laws that would reasonably be expected to give rise to a Material Adverse Effect.

(b)     All material Governmental Authorizations required by the Health Care Laws are in full force and effect.  Neither the Company nor any of its Subsidiaries have knowledge of any facts or circumstances that would be reasonably likely to lead the revocation, suspension, limitation, or cancellation of a Governmental Authorization required under Health Care Laws or of any application for a Governmental Authorization required under Health Care Laws currently pending before the FDA, DEA, or such other Governmental Body.

(c)     All reports, documents, claims, notices, or Governmental Authorizations required under Health Care Laws to be filed, maintained or furnished to the FDA, DEA, or any Governmental Body by the Company and its Subsidiaries have been so filed, maintained or furnished, except where failure to file, maintain or furnish such reports, documents, claims, notices, or Governmental Authorizations have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  To the Knowledge of Sellers all such reports, documents, claims, notices, and other Governmental Authorizations were true and complete in all material respects on the date filed (or were corrected in or supplemented by a subsequent filing).

(d)     All preclinical and clinical trials conducted by or, to the Knowledge of Sellers, on behalf of the Company or any of its Subsidiaries, have been, and if still pending are being, conducted in compliance with research protocols and all applicable Health Care Laws, including the FDCA and its applicable implementing regulations at 21 C.F.R. Parts 50, 54, 56, 58, 312, 314, 320, 511, and 814.  No clinical trial conducted by or on behalf of the Company or its Subsidiaries has been terminated or suspended prior to completion, and no clinical investigator that has participated or is participating in, or institutional review board that has or has had jurisdiction over, a clinical trial conducted by or on behalf of the Company or its Subsidiaries has placed a clinical hold order on, or otherwise terminated, delayed or suspended, such a clinical trial at a clinical research site based on an actual or alleged lack of safety or efficacy of any Product or a failure to conduct such clinical trial in compliance with applicable Health Care Laws.

(e)     All manufacturing operations conducted by or, to the Knowledge of Sellers, for the benefit of the Company or its Subsidiaries have been and are being conducted in material compliance with all Governmental Authorizations issued by a Governmental Body under Health Care Laws and in material compliance with all applicable Health Care Laws, including the FDA's current Good Manufacturing Practice (cGMP) regulations at 21 C.F.R. Parts 210-211, Quality System (QS) regulations at 21 C.F.R. Part 820, animal drug cGMP regulations at 21 C.F.R. Part 507, and all comparable foreign regulatory requirements of any Governmental Body.

(f)     Neither the Company nor any of its Subsidiaries have received any written communication or, to the Knowledge of Sellers, any oral communication from an applicable Governmental Body that relates to an alleged violation or non-compliance with any Health Care Laws, including any notification of any pending or threatened claim, suit, proceeding, hearing, enforcement, investigation, arbitration, import detention or refusal, subpoena, civil investigative demand, FDA Warning Letter or Untitled Letter, or any action by a Governmental Body relating to any Health Care Laws, in each case, that has not been resolved to the satisfaction of the applicable Governmental Body.

(g)     Neither the Company nor any of its Subsidiaries are party to any corporate integrity agreements, monitoring agreements, consent decrees, settlement orders, or similar agreements with or imposed by any Governmental Body.

(h)     There have been no seizures, withdrawals, recalls, detentions, or suspensions of manufacturing or distribution relating to the Products required or requested by a Governmental Body, or voluntary recalls, field notifications, field corrections, product removals, market withdrawals or replacements, "dear doctor" letters, safety alerts, or other notice of action relating to an alleged lack of safety, efficacy, or regulatory compliance of the Products ("Safety Notices"), in each case that has not been resolved to the satisfaction of the applicable Governmental Body. To the Knowledge of Sellers, there are no facts or circumstances that reasonably would be expected to give rise to a Safety Notice.

(i)     Neither the Company, nor its Subsidiaries, nor, to the Knowledge of Sellers, any officer, employee, agent, or distributor of the Company or any of its Subsidiaries has made an untrue statement of a material fact or fraudulent or misleading statement to a Governmental Body, failed to disclose a material fact required to be disclosed to a Governmental Body, or committed an act, made a statement, or failed to make a statement that would reasonably be expected to provide a basis for the FDA to invoke its policy respecting "Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities" Final Policy set forth in 56 Fed. Reg. 46191 (September 10, 1991) and any amendments thereto (the "FDA Ethics Policy").  None of the aforementioned is or has been under investigation resulting from any allegedly untrue, fraudulent, misleading, or false statement or omission, including data fraud, or had any action pending or threatened relating to the FDA Ethics Policy.

(j)     Neither the Company, nor its Subsidiaries, nor, to the Knowledge of Sellers, any officer, employee, agent, or distributor acting on behalf of the Company or any of its Subsidiaries has committed any act, made any statement or failed to make any statement in connection with the business and operations of the Company and its Subsidiaries that violates the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the federal False Claims Act, 31 U.S.C. § 3729 et seq., or other Health Care Laws applicable in the jurisdictions in which the Products are sold or intended to be sold.

(k)     Neither the Company nor its Subsidiaries, nor, to the Knowledge of Sellers, any officer, employee, agent, or distributor of the Company or its Subsidiaries has been convicted of any crime or engaged in any conduct that has resulted, or would reasonably be expected to result, in debarment under 21 U.S.C. § 335a, exclusion under 42 U.S.C. § 1320a-7, or any other

Health Care Law applicable in other jurisdictions in which the Products are sold or intended to be sold.

(l)    The Company and each of its Subsidiaries (i) are and have been in compliance with all applicable statutes, regulations, rules, and regulatory guidance relating to Product pricing, price reporting, discounts, and rebates, including those relating to the Medicaid Drug Rebate Program, the 340B Drug Pricing Program, the Medicare Part B Program, the Veterans Health Care Act Drug Pricing Program, and applicable state price reporting laws, and (ii) have calculated and reported the applicable pricing metrics under the foregoing programs (including Average Manufacturer Price, Best Price, 340B Ceiling Price, Average Sales Price, and Non-Federal Average Manufacturer Price) consistent with the applicable Health Care Laws associated with the foregoing programs.

(m)    Neither the Company nor any of its Subsidiaries, nor, to the Knowledge of Sellers, any officer, employee, agent or distributor of the Company or any of its Subsidiaries, has been excluded from participation in any federal health care program or convicted of any crime or engaged in any conduct for which such Person could be excluded from participating in any federal health care program under Section 1128 of the Social Security Act of 1935, as amended, or under any other Health Care Law.

3.24.    <u>Absence of Certain Changes</u>.    Except as set forth on <u>Schedule 3.24</u>, since December 31, 2019 through the date hereof, (w) the Company and its Subsidiaries have conducted their business in the Ordinary Course in all material respects (other than the (i) marketing of the Company, and processes and negotiations with Advisors and third parties in connection therewith (including the execution of confidentiality agreements and the sharing of confidential information pursuant thereto), (ii) preparation and commencement of the Bankruptcy Case and actions related thereto, (iii) the tightening of credit and payment terms with business counterparties following public announcement of the Company's potential plans for strategic or bankruptcy transactions, and (iv) responses to the "Coronavirus" or "COVID-19" as described on <u>Schedule 3.17(d)</u>), (x) there has not been any Material Adverse Effect, (y) there is no material business interruption or similar event, change or circumstance that has occurred, or is occurring, at any of the facilities, plants, offices, laboratories, warehouses, distribution centers and other properties (including at any Owned Real Property or Leased Real Property) owned or operated by the Company or any of its Subsidiaries, and (z) the Company and its Subsidiaries have not taken any of the following actions:

(a)    (i) redeemed, purchased or otherwise acquired any of the outstanding shares of capital stock or other equity or voting interests, or any rights, warrants or options to acquire any shares of such capital stock or other equity or voting interests, other than the acceptances of shares of Company common stock as payment for the exercise price of, or any withholding Taxes incurred with the vesting or settlement of, any Company equity awards; (ii) established a record date for, declared, set aside for payment or paid any dividend on, or made any other distribution in respect of, any shares of the capital stock or other equity or voting interests, other than cash dividends and distributions by an Acquired Subsidiary to another Acquired Subsidiary, or (iii) split, combined, subdivided or reclassified any shares of the capital stock or other equity or voting interests;

(b)    issued, incurred, assumed or otherwise become liable for any material Indebtedness, including any Indebtedness for borrowed money in excess of $1,000,000;

37

(c)     sold, divested, distributed, assigned, licensed, mortgaged, pledged, encumbered, transferred, leased or subleased to any Person, or otherwise disposed of, in a single transaction or series of related transactions, any of their assets (other than any Company Owned Intellectual Property), that are (or would otherwise be) Acquired Assets, other than (i) sales of Products in the Ordinary Course, (ii) Permitted Encumbrances, and (iii) dispositions of obsolete or worn out assets;

(d)     made or authorized any capital expenditures, including for property, plant and Equipment, in excess of $1,000,000, except for those that are expressly contemplated by the Company's capital plan that has been made available to Purchaser in item 6.2.1 of the Dataroom;

(e)     made any acquisition of, or investment in, or otherwise acquired, any properties, assets, securities or business (including by merger, asset acquisition, equity purchase or other similar transaction), except for any acquisition of Inventory in the Ordinary Course;

(f)     other than as required by applicable Law or as required to comply with any Contract or Seller Plan binding on the Company and its Subsidiaries (i) granted to any current or former director, officer, employee, individual independent contractor or other individual service provider of the Company or any of its Subsidiaries any increase in compensation or benefits, (ii) granted to any current or former director, officer, employee, individual independent contractor or other individual service provider of the Company or any of its Subsidiaries any severance, retention, change in control, termination or similar compensation or benefits, (iii) granted or amended any equity, equity-based or other incentive or similar awards, (iv) established, adopted, entered into, materially amended or terminated any material Seller Plan, or (v) taken any action to accelerate or materially modify the vesting of, or payment of, any compensation or benefit under any Seller Plan; provided, however, that the foregoing clauses (i) through (v) shall not include the Company or any of its Subsidiaries entering into or making available to newly hired employees or to employees in the context of promotions based on job performance or workplace requirements, plans, agreements, benefits and compensation arrangements (including any cash-based bonus arrangements, but excluding, for the avoidance of doubt, any equity incentive grants or similar equity, or equity-linked grants or awards) that have a value that is consistent with past practice of making compensation and benefits available to newly hired or promoted employees in similar positions and otherwise consistent with the Ordinary Course; provided further, and for the avoidance of doubt, any increase in any severance, retention, change in control, termination or similar compensation or benefits shall not be deemed "Ordinary Course" or "consistent with past practice" for purposes of this Section 3.24(f);

(g)     hired or terminated (other than with cause, as determined by Sellers in good-faith), any director, officer, employee, individual independent contractor or other individual service provider, other than any employee, individual independent contractor or individual service provider whose base salary did not (and following any such action did not) exceed $250,000 per annum;

(h)     other than as required by applicable Law, entered into, amended or waived in any material respect any collective bargaining agreement (or similar agreement or arrangement);

(i)      made any material changes in financial accounting methods, principles, practices, procedures or policies, except insofar as may be required by (i) GAAP or (ii) or any applicable Law, including Regulation S-X under the Securities Act;

(j)      authorized, consented to or effected any amendment or change in (i) the Company's articles of incorporation or bylaws or (ii) the organizational documents of any Subsidiary of the Company;

(k)      waived, released, assigned, instituted, compromised, or settled, with respect to any pending or threatened Action related to the Company or any of its Subsidiaries, their respective businesses, the Acquired Assets or the Assumed Liabilities, other than involving solely money damages not in excess of $500,000 individually, or $1,000,000 in the aggregate;

(l)      (i) made any unusual or extraordinary efforts to collect any accounts receivable, intercompany obligation or Liability for Indebtedness, or given any discounts or concessions for early payment of such accounts receivable, intercompany obligation or Liability for Indebtedness or (ii) made any sales of, or, other than Permitted Encumbrances, conveyed any interest in, any such accounts receivable, intercompany obligation or Liability for Indebtedness to any third party;

(m)      licensed on-market or in-development products from third parties other than (i) in the Ordinary Course, (ii) which would not reasonably expected to result in payments, over the life of such Contract (including any purchaser order or similar agreement or binding arrangement associated therewith), of amounts in excess of $1,000,000 and (iii) those which would not impose any obligations on the Company and its Subsidiaries of the type contemplated by Section 3.9(a)(viii);

(n)      (i) abandoned, cancelled, failed to renew, or permitted to lapse (A) any Company Owned Intellectual Property that is used in the conduct of the business or held for use by the Company or any of its Subsidiaries and is material to the Company and its Subsidiaries or (B) any material Company Licensed Intellectual Property to the extent that a Seller has the right to take or cause to be taken such action pursuant to the terms of the applicable Contract under which such Intellectual Property is licensed to the applicable Seller, (ii) sold, transferred, licensed or otherwise encumbered any material Company Owned Intellectual Property, other than licenses of Company Owned Intellectual Property in the Ordinary Course, or (iii) except in the Ordinary Course, withdrawn, amended, modified or terminated any Product Registrations;

(o)      amended in any material respect, cancelled or permitted to terminate any material insurance policy naming the Company or a Subsidiary of the Company as an insured, a beneficiary or a loss payable payee without first obtaining comparable substitute insurance coverage with no lapse in coverage;

(p)      granted any waiver under or amended or modified, or surrendered, revoked, permitted to lapse or otherwise terminated any Permit, other than in the Ordinary Course and as would not reasonably be expected to be material to the Acquired Assets, the Assumed Liabilities or the operation of the business of the Company and its Subsidiaries; or

(q)     authorized any of, or committed, or agreed in writing or otherwise, to take any of, the foregoing actions.

3.25.   <u>Bank Accounts</u>.   <u>Schedule 3.25</u> sets forth a complete list of all bank accounts (including any deposit accounts, securities accounts and any sub-accounts) of Sellers and the Acquired Subsidiaries.

3.26.   <u>No Other Representations or Warranties</u>.   Except for the representations and warranties expressly contained in this <u>Article III</u> (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the officer's certificate of the Company delivered pursuant to <u>Section 2.3(f)</u> (the "<u>Express Representations</u>"), neither the Company nor any other Person on behalf of the Company makes any express or implied representation or warranty with respect to the Company or any of its Subsidiaries, the Acquired Assets or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in the Projections, the Confidential Information Memorandum prepared by PJT Partners LP) (the "<u>Information Presentation</u>") or in that certain datasite administered by Intralinks (the "<u>Dataroom</u>") or elsewhere to Purchaser or any of its Affiliates or Advisors on behalf of the Company or any of its Affiliates or Advisors.   Except with respect to the Express Representations, all other representations and warranties, whether express or implied, are hereby expressly disclaimed by the Company.   Nothing in this <u>Section 3.26</u> shall limit any rights or remedies of Purchaser with respect to a claim for Fraud.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to the Company as follows as of the date hereof and as of the Closing Date.

4.1.   <u>Organization and Qualification</u>.   Purchaser is a limited liability company, validly existing and in good standing under the laws of the State of Delaware and has all requisite limited liability company power and limited liability company authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due incorporation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement.   Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement.   Purchaser is not in violation of any of the provisions of its organizational documents, except as would not reasonably be expected to be material to Purchaser.

4.2.   <u>Authorization of Agreement</u>.   Purchaser has all necessary limited liability company power and limited liability company authority to execute and deliver this Agreement and each

Ancillary Agreement to which it is a party and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and each Ancillary Agreement to which it is a party, and the consummation by Purchaser of the transactions contemplated hereby and thereby, subject to requisite Bankruptcy Court approvals, have been, or with respect to any Ancillary Agreement to which Purchaser is a party, will be prior to the execution and delivery thereof, duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are, or will be when so executed and delivered, necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the Ancillary Agreements and the consummation by it of the transactions contemplated hereby and thereby. Subject to requisite Bankruptcy Court approvals, this Agreement has been, and at or prior to the Closing, each Ancillary Agreement to which it is a party will be, duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, this Agreement and each Ancillary Agreement to which it is a party constitutes a legal, valid and binding obligation of Purchaser when so executed, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3.    Conflicts; Consents.

(a)    Assuming that (a) requisite Bankruptcy Court approvals are obtained, (b) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 4.3 are made, given or obtained (as applicable), (c) the requirements of the HSR Act are complied with, and (d) any filings required by any applicable federal or state securities or "blue sky" Laws are made, neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the transactions contemplated hereby, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (i) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (ii) conflict with or violate any Law or Order applicable to Purchaser, (iii) conflict with, violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or result in the acceleration of or give rise to a right of termination, modification, acceleration or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of material Contract to which Purchaser is a party, or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of clauses (i) through (iv), as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement.

(b)    Except as set forth on Schedule 4.3(b), Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the transactions contemplated hereby, except (i) any filings required to be made under the HSR Act, (ii) such filings as may be required by any applicable federal or state securities or "blue sky" Laws, (iii) as otherwise set forth on Schedule 4.3 or (iv) where failure to file, seek or obtain such notice, authorization, approval, Order, permit or consent, would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the transactions contemplated hereby.

4.4.    <u>Financing</u>.  Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Wind-Down Amount (to the extent that the Wind-Down Amount is not reduced to zero by Excluded Cash), to assume the Assumed Liabilities and to consummate all of the other transactions contemplated by this Agreement.  Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5.    <u>Brokers</u>.  Except for Greenhill & Co., LLC, the fees and expenses of which will be paid solely by Purchaser, no broker, finder, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Purchaser.

4.6.    <u>Credit Bid</u>.  The Required Lenders (as defined in the Direction Letter), as holders of outstanding Loan Agreement Indebtedness, delivered to Purchaser, on or prior to the date hereof, a direction letter to fully authorize Purchaser to, among other things, enter into and perform and comply with this Agreement and consummate the transactions contemplated hereby, including the credit bid contemplated in <u>Section 2.1(a)</u>, which is attached on <u>Schedule 4.6</u> (the "<u>Direction Letter</u>").

4.7.    <u>No Litigation</u>.  There are no Actions pending or, to Purchaser's knowledge, threatened against Purchaser that will adversely affect in any material respect Purchaser's ability to consummate the transactions contemplated by this Agreement (other than with respect to any objection, adversary proceeding or other contested matter which may after the date hereof be filed or otherwise arise in connection with the Bankruptcy Case).

4.8.    <u>Certain Arrangements</u>.  As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of the Company or any of its Subsidiaries or board of directors (or applicable governing body of any Subsidiary), any holder of equity or debt securities of the Company or its Subsidiaries, or any lender or creditor of the Company or its Subsidiaries, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the transactions contemplated by this Agreement or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of the Company to entertain, negotiate or participate in any such transaction.

4.9.    <u>Investment Representation; Investigation</u>.  Purchaser is acquiring the capital stock or other equity interests of the Acquired Subsidiaries for its own account with the present intention of holding such securities for investment purposes and not with a view to, or for sale in connection with, any distribution of such securities in violation of any federal or state securities Laws. Purchaser is an "accredited investor" within the meaning of Regulation D promulgated pursuant to the Securities Act. Purchaser has knowledge and experience in financial and business matters, is capable of evaluating the merits and risks of the transactions contemplated by this Agreement, and is able to bear the substantial economic risk of such investment for an indefinite period of time.

4.10.    <u>No Additional Representations or Warranties</u>.  Except for the representations and

warranties expressly contained in this Article IV (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the officer's certificate delivered by Purchaser pursuant to Section 2.4(c), each Seller, on behalf of itself and each other Seller Party, acknowledges and agrees that neither Purchaser nor any other Person on behalf of Purchaser makes, and none of the Seller Parties have relied on the accuracy or completeness of any express or implied representation or warranty with respect to Purchaser or with respect to any other information provided by or on behalf of any Purchaser.

**ARTICLE V**

**BANKRUPTCY COURT MATTERS**

5.1.    Bankruptcy Actions.

(a)    As promptly as practicable after the date hereof (and, in any event, in accordance with the milestones set forth in the RSA), Sellers shall file with the Bankruptcy Court consistent with the consent rights set forth in the RSA (i) the Petitions and (ii) a motion seeking approval of (y) the Bidding Procedures Order and (z) the form of this Agreement and Sellers' authority to enter into this Agreement (the "Bidding Procedures Motion"); provided that the Company may modify the Bidding Procedures Motion pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or statutory committee representing a group of creditors in the Bankruptcy Case, or any other party in interest and otherwise in a manner consistent with the RSA; provided further that any and all such modifications are first approved by Purchaser in writing. The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order. Purchaser agrees and acknowledges that Sellers, including through their representatives, are and may continue soliciting inquiries, proposals or offers from third parties in connection with any Alternative Transaction.

(b)    From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII and (ii) the Closing Date, Sellers shall diligently pursue the entry of (i) the Bidding Procedures Order and (ii) the Sale Order, in each case, by the Bankruptcy Court.

(c)    Sellers and Purchaser shall reasonably cooperate with the Company to assist in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as reasonably practicable, including furnishing affidavits, non-confidential financial information, or other documents or information for filing with the Bankruptcy Court and making such Advisors of Purchaser and Sellers and their respective Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing adequate assurances of performance by Purchaser as required under Section 365 of the Bankruptcy Code, and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(d)    Each of the Company and Purchaser shall appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and keep the other reasonably apprised of the status of material matters related to this Agreement, including, upon

43

reasonable request promptly furnishing the other with copies of notices or other communications received by any Seller from the Bankruptcy Court or any third party and/or any Governmental Body with respect to the transactions contemplated by this Agreement.

(e)    If the prevailing party at the conclusion of the Auction (such prevailing party, the "Successful Bidder") fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the next highest bidder (the "Backup Bidder") will be deemed to have the new prevailing bid, and the Company shall be required to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement; provided, however, that Purchaser shall only be required to keep Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) open and irrevocable until the earlier of (i) the Outside Back-Up Date or (ii) the date of closing of an Alternative Transaction with the Successful Bidder.

(f)    The Company and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. The Company and Purchaser acknowledge that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about the Company to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

(g)    Notwithstanding any other provision of this Agreement to the contrary, Purchaser acknowledges that Sellers and their Affiliates and Advisors are and may continue soliciting and/or responding to inquiries, proposals or offers for the Acquired Assets and may furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any Person to do or seek to do any of the foregoing in connection with any Alternative Transaction.

(h)    Purchaser shall provide adequate assurance of future performance as required under Section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

5.2.    Cure Costs. Subject to entry of the Sale Order and consummation of the Closing, Purchaser shall, on the Closing, pay the Cure Costs and cure any and all other defaults and breaches under the Acquired Contracts so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement.

5.3.    Sale Order. The Sale Order shall, among other things, (a) approve, pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, (i) the execution, delivery and performance

by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Sellers of their respective obligations under this Agreement; (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts; (c) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code; (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity; (e) find that Purchaser has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts; and (f) find that Purchaser shall have no Liability for any Excluded Liability. Without limiting Sellers' obligation to take all such actions as are reasonably necessary to obtain Bankruptcy Court approval of the Sale Order, Purchaser agrees that it will promptly take reasonable actions to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code. Nothing in this Agreement shall require Purchaser or its Affiliates to give testimony to or submit any pleading, affidavit or information to the Bankruptcy Court or any Person that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

5.4.    <u>Sale Free and Clear</u>.  Sellers acknowledge and agree, and the Sale Order shall provide that, except as otherwise provided in <u>Section 1.3</u>, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances of, against or created by Sellers or their bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Acquired Assets.  On the Closing Date, the Acquired Assets shall be transferred to Purchaser free and clear of all obligations, Liabilities and Encumbrances, other than Permitted Encumbrances and the Assumed Liabilities to the fullest extent permitted by Section 363 of the Bankruptcy Code.

5.5.    <u>Approval</u>.  Sellers' obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order).  Nothing in this Agreement shall require the Company or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

# ARTICLE VI

# COVENANTS AND AGREEMENTS

6.1.    <u>Conduct of Business of Sellers</u>.

(a)    Except as (i) required by applicable Law, (ii) required by order of the Bankruptcy Court or required, authorized or restricted pursuant to the Bankruptcy Code or the Financing Order or the DIP Credit Agreement, as the case may be, (iii) expressly contemplated or required by this Agreement or (iv) expressly set forth in <u>Schedule 6.1(a),</u> during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to <u>Article VIII</u>), unless Purchaser otherwise consents in writing (<u>provided</u>, and without prejudice to <u>Section 6.2(b)</u>, in the event that Sellers request, in writing, to take any reasonable action of short term duration which, based on Sellers' good faith business judgment, is necessary to respond the "Coronavirus" or "COVID-19" (or the Effects thereof), Purchaser shall not unreasonably withhold, condition or delay its consent for such action), the Company shall, and shall cause each of its Subsidiaries to, carry on its and their business in the Ordinary Course, pay all of their respective post-petition obligations in the Ordinary Course and use its and their commercially reasonable efforts to preserve substantially intact their goodwill and relationships with employees, suppliers, vendors, licensors, licensees, distributors, consultants, customers and other Persons having material relationships with the Company and its Subsidiaries, taken as a whole (other than making any payment of any pre-petition claim).

(b)    Except as (i) required by applicable Law, (ii) required by order of the Bankruptcy Court or required, authorized or restricted pursuant to the Bankruptcy Code or the Financing Order or the DIP Credit Agreement, as the case may be, (iii) expressly contemplated or required by this Agreement, or (iv) expressly set forth in <u>Schedule 6.1(a)</u>, and without limiting the generality of the restrictions set forth in <u>Section 6.1(a)</u>, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to <u>Article VIII</u>), unless Purchaser otherwise consents in writing (<u>provided</u>, and without prejudice to <u>Section 6.2(b)</u>, in the event that Sellers request, in writing, to take any reasonable action of short term duration which, based on Sellers' good faith business judgment, is necessary to respond the "Coronavirus" or "COVID-19" (or the Effects thereof), Purchaser shall not unreasonably withhold, condition or delay its consent for such action), the Company shall not, and shall cause each of its Subsidiaries not to, do any of the following (whether by merger, operation of law or otherwise):

(i)    (A) issue, sell, encumber or grant any shares of the capital stock or other equity or voting interests, or any securities or rights convertible into, exchangeable or exercisable for, or evidencing the right to subscribe for any shares of such capital stock or other equity or voting interests, or any rights, warrants or options to purchase any shares of such capital stock or other equity or voting interests; (B) redeem, purchase or otherwise acquire any of the outstanding shares of capital stock or other equity or voting interests, or any rights, warrants or options to acquire any shares of such capital stock or other equity or voting interests, other than the acceptance of shares of Company common stock as payment for the exercise price of, or any withholding Taxes incurred with the vesting or settlement of, any Company equity awards, (C) establish a record date for, declare, set

46

aside for payment or pay any dividend on, or make any other distribution in respect of, any shares of the capital stock or other equity or voting interests, other than cash dividends and distributions by an Acquired Subsidiary to another Acquired Subsidiary, but subject to Section 6.1(a), or (D) split, combine, subdivide or reclassify any shares of the capital stock or other equity or voting interests;

(ii)      issue, incur, assume or otherwise become liable for (A) any indebtedness for borrowed money, (B) any notes, mortgages, bonds, debentures or other debt securities or warrants or other rights to acquire any notes, mortgages, bonds, debentures or other debt securities of the Company or any of its Subsidiaries, (C) any letters of credit, security or performance bonds or similar credit support instruments or overdraft facilities or cash management programs of any Person, (D) any amounts owing as deferred purchase price for property or services, including any capital leases, seller notes and "earn out" payments, or other contingent payment obligations, or (E) any guarantee of any of the foregoing obligations of another Person, or any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "Indebtedness"), except Indebtedness that will constitute Excluded Liabilities;

(iii)      sell, divest, distribute, assign, license, mortgage, pledge, encumber, transfer, lease or sublease to any Person, or otherwise dispose of, in a single transaction or series of related transactions, any of the Acquired Assets (other than Intellectual Property), except (A) Ordinary Course dispositions of Inventory, and (B) dispositions of obsolete or worn out assets; provided, however, that the Company shall not, and shall not permit its Subsidiaries to (i) take any such action, or otherwise terminate, amend, modify, extend, waive, renew or otherwise alter any of the Leases, (ii) construct, alter or destroy any material improvement on the Owned Real Property, except in connection with any capital expenditures expressly contemplated by Section 6.1(b)(iv), or (iii) take any such action with respect to any of the Owned Real Property or any portion thereof;

(iv)      make or authorize capital expenditures, including for property, plant and Equipment, except for those that are expressly contemplated by the Company's capital plan that has been made available to Purchaser in item 6.2.1 of the Dataroom;

(v)      make any acquisition of, or investment in, or otherwise acquire, any properties, assets, securities or business (including by merger, asset acquisition, equity purchase or other similar transaction), except for any acquisition of Inventory in the Ordinary Course and, in each case, otherwise in accordance with the budget contemplated by the Financing Order the DIP Credit Agreement and except in connection with any capital expenditures expressly contemplated by Section 6.1(b)(iv);

(vi)      other than as required by applicable Law, required to comply with any Contract or Seller Plan binding on the Company and its Subsidiaries as of the date of this Agreement and made available to Purchaser (if so required by this Agreement), or as set forth on Schedule 6.1(b)(vi) (1) grant to any current or former director, officer, employee, individual independent contractor or other individual service provider of the Company or any of its Subsidiaries any increase in compensation or benefits, (2) grant to any current or former director, officer, employee, individual independent contractor or

other individual service provider of the Company or any of its Subsidiaries any severance, retention, change in control, termination or similar compensation or benefits, (3) grant or amend any equity, equity-based or other incentive or similar awards, (4) establish, adopt, enter into, materially amend or terminate any material Seller Plan, or (5) take any action to accelerate or materially modify the vesting of, or payment of, any compensation or benefit under any Seller Plan; provided, however, that the foregoing clauses (1) through (5) shall not restrict the Company or any of its Subsidiaries from entering into or making available to newly hired employees or to employees in the context of promotions based on job performance or workplace requirements, plans, agreements, benefits and compensation arrangements (including any cash-based bonus arrangements, but excluding, for the avoidance of doubt, any equity incentive grants or similar equity, or equity-linked grants or awards) that have a value that is consistent with past practice of making compensation and benefits available to newly hired or promoted employees in similar positions and otherwise consistent with the Ordinary Course; provided further, and for the avoidance of doubt, any increase in any severance, retention, change in control, termination or similar compensation or benefits shall not be deemed "Ordinary Course" or "consistent with past practice" for purposes of this Section 6.1(b)(vi);

(vii)    hire or terminate (other than with cause, as determined by Sellers in good-faith), any director, officer, employee, individual independent contractor or other individual service provider, other than any employee, individual independent contractor or individual service provider whose base salary does not (and following any such action will not) exceed $250,000 per annum;

(viii)    other than as required by applicable Law, enter into, amend or waive in any material respect any collective bargaining agreement (or similar agreement or arrangement);

(ix)    make any material changes in financial accounting methods, principles, practices, procedures or policies, except insofar as may be required by (A) GAAP or (B) or any applicable Law, including Regulation S-X under the Securities Act;

(x)    authorize, consent to or effect any amendment or change in (A) the Company's articles of incorporation or bylaws or (B) the organizational documents of any Subsidiary of the Company;

(xi)    sell, lease, transfer, license, abandon or otherwise dispose of, or grant any Encumbrance (other than Permitted Encumbrances), on any Acquired Assets (other than Intellectual Property), other than (A) any Encumbrance to secure Indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms); provided that any such Encumbrance will be extinguished in connection with the Closing; or (B) sales of Inventory in the Ordinary Course;

(xii)    waive, release, assign, institute, compromise, or settle, with respect to any pending or threatened Action related to the Company or any of its Subsidiaries, their respective businesses, the Acquired Assets or the Assumed Liabilities, other than (i) the

Bankruptcy Case or (ii) involving solely money damages not in excess of $500,000 individually, or $1,000,000 in the aggregate which will constitute Excluded Liabilities;

(xiii)   (A) terminate, amend, supplement, modify or waive any provision of, or accelerate any rights, benefits or obligations under, any Material Contract, except any such action which would otherwise not be material and is in the Ordinary Course or the expiration in accordance with its term or (B) enter into any Contract that would be a Material Contract if executed prior to the date of this Agreement or which would result in an obligation of the Company or any of its Subsidiaries in excess of $3,000,000, except for any renewal of any such Contract in the Ordinary Course upon terms and conditions which are no less favorable to the Company and its Subsidiaries, in any material respect, than those in effect as of the date of this Agreement;

(xiv)   (A) make any unusual or extraordinary efforts to collect any accounts receivable, intercompany obligation or Liability for Indebtedness, or give any discounts or concessions for early payment of such accounts receivable, intercompany obligation or Liability for Indebtedness or (B) make any sales of, or, other than Permitted Encumbrances and any Encumbrances provided for in the Financing Order, convey any interest in, any accounts receivable, intercompany obligation or Liability for Indebtedness to any third party;

(xv)   license on-market or in-development products from third parties other than (A) in the Ordinary Course, (B) those that would not reasonably be expected to result in payments, over the life of such Contract (including any purchaser order or similar agreement or binding arrangement associated therewith), of amounts in excess of $3,000,000 and (C) which would not impose any obligations on the Company and its Subsidiaries of the type contemplated by Section 3.9(a)(viii);

(xvi)   (A) abandon, cancel, fail to renew, or permit to lapse, as applicable, (1) any Company Owned Intellectual Property that is used in the conduct of the business or held for use by the Company or any of its Subsidiaries and is material to the Company and its Subsidiaries or (2) any material Company Licensed Intellectual Property to the extent that a Seller has the right to take or cause to be taken such action pursuant to the terms of the applicable Contract under which such Intellectual Property is licensed to the applicable Seller, (B) sell, transfer, license or otherwise encumber any material Company Owned Intellectual Property, other than licenses of Company Owned Intellectual Property in the Ordinary Course, or (C) except in the Ordinary Course, withdraw, amend, modify or terminate any Product Registrations;

(xvii)   amend in any material respect, cancel or permit to terminate any material insurance policy naming the Company or a Subsidiary of the Company as an insured, a beneficiary or a loss payable payee without first obtaining comparable substitute insurance coverage with no lapse in coverage;

(xviii)  grant any waiver under or amend or modify, or surrender, revoke, permit to lapse or otherwise terminate any Permit, other than in the Ordinary Course and

49

as would not reasonably be expected to be material to the Acquired Assets, the Assumed Liabilities or the operation of the business of the Company and its Subsidiaries;

(xix)    except as required by applicable Law, (1) make, revoke or change any material Tax election or method of accounting with respect to Taxes, (2) file any Tax Return (other than in the Ordinary Course and consistent with past practice and applicable Law) or amend any Tax Return, (3) enter into any closing agreement, (4) commence, settle or compromise any material Tax claim or assessment, (5) consent to any extension or waiver of the limitation period applicable to any claim or assessment with respect to a material amount of Taxes, (6) grant any power of attorney with respect to material Taxes, or (7) enter into any Tax allocation, sharing, indemnity or similar agreement or arrangement (other than any customary commercial agreement or arrangement entered into in the Ordinary Course the primary purpose of which is not the allocation of Taxes); in each case to the extent such action could adversely affect Purchaser or the Acquired Assets or increase the amount of any Assumed Liabilities; or

(xx)    authorize any of, or commit, agree in writing or otherwise, to take any of, the foregoing actions.

It is understood and agreed that certain actions may be contemplated by one or more provisions of this Section 6.1(b) and, in such event, such action may only be taken (or omitted to be taken) if so permitted by each such provision of this Section 6.1(b).

(c)    Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct the Company's or its Subsidiaries' operations or business prior to the Closing, and nothing contained in this Agreement is intended to give the Company, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations.  Prior to the Closing, each of Purchaser and the Company shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations.

(d)    In furtherance of the provisions of Section 6.1(a) and Section 6.1(b), it is the intent of the Parties that, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing (such consent to be provided in Purchaser's sole discretion), other than as set forth on Schedule 6.1(d), Sellers shall not, and Sellers shall cause their Subsidiaries not to, (i) sell, divest, distribute, assign, license, mortgage, pledge, encumber, transfer, lease or sublease to any Subsidiary that is not a Seller or, at the Closing, is an Acquired Subsidiary, any property, right, privilege, interest or any other asset of Sellers or any such Acquired Subsidiary that would otherwise (A) constitute an Acquired Asset if owned immediately prior to the Closing or (B) is or would otherwise constitute a property, right, privilege, interest or any other asset of any such Acquired Subsidiary, or (ii) convey, transfer or otherwise assign to any Seller or such Acquired Subsidiary any Liability of any entity that is an Excluded Subsidiary.

6.2.    Access to Information.

50

(a)    From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to Article VIII), the Company will, and will cause its Subsidiaries and use commercially reasonable efforts to cause its Advisors and other representatives to, provide Purchaser and its Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records (including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other Documents), documents, data, files, personnel and offices and properties of the Company and its Subsidiaries, in order for Purchaser and its Advisors to access such information regarding the Company and its Subsidiaries as is reasonably necessary in order to consummate the transactions contemplated by this Agreement or otherwise as reasonably requested by Purchaser in connection with Purchaser's actions provided for in this Agreement, or as requested by Purchaser in order for Purchaser and its Advisors to conduct a Phase I or similar environmental site assessment of any of the Acquired Assets; provided that (i) such access does not unreasonably interfere with the normal and Ordinary Course operations of the Company and its Subsidiaries, (ii) all requests for access will be directed to PJT Partners LP or such other Person(s) as the Company may designate in writing from time to time, (iii) nothing herein will require the Company to provide access to any properties, plants or facilities for the purposes of conducting (A) any Phase I or similar environmental site assessment, including a Preliminary Assessment (as defined in ISRA), for any Acquired Leased Real Property in New Jersey for which a General Information Notice was submitted or (B) any subsurface or invasive environmental sampling or testing (for clarity, a Phase I environmental site assessment or similar environmental assessment shall not constitute subsurface or invasive environmental sampling or testing) and (iv) nothing herein will require the Company to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would result in the waiver of any attorney-client, work-product or other legal privilege or accountant privilege, (B) would reasonably be expected to violate any applicable Laws (including the HSR Act and Foreign Competition Laws), or (C) would violate any fiduciary duty; provided further that the Company and its Subsidiaries will use commercially reasonable efforts to provide a reasonable alternative means of accessing any such information in a manner that is not inconsistent with the foregoing; provided further that no such access shall be required in connection with a proceeding between Purchaser or any of its Affiliates, on the one hand, and any Seller or any of its Affiliates, on the other hand.

(b)    From time to time following the date hereof and prior to the Closing, upon Purchaser's reasonable request with respect to any Effects on the Company and its Subsidiaries relating to or arising from the "Coronavirus" or "COVID-19" (including any quarantine or trade restrictions or similar Effects reasonably related thereto) that would reasonably be expected to adversely impact the business and operations of the Company and its Subsidiaries in any material respect, the Sellers shall, and shall use their commercially reasonable efforts to cause their Advisors to, promptly (and, in any event, within five (5) Business Days of any written request of Purchaser) (i) provide, in a manner consistent with the provisions of Section 6.2(a), information reasonably requested by Purchaser and relating to such Effects and the Company and its Subsidiaries or, to the extent relevant to such Effects, its historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of the Company or any of its Subsidiaries related thereto, (ii) participate in meetings or teleconferences reasonably requested by Purchaser (including such members of senior management of the Company as may be reasonably requested or necessary with respect to such Effects) to discuss

such Effects and information referred to in the immediately preceding clause (i), and (iii) consider in good-faith Purchaser's requests, recommendations and advice in connection therewith.

(c)    The information provided pursuant to this Section 6.2 will be used solely for the purpose of consummating the transactions contemplated hereby or in connection with Purchaser's actions provided for in this Agreement, and will be governed by all the confidentiality terms and conditions of the Loan Documents.  Neither the Company nor any of Sellers makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, other than the Express Representations.

(d)    From and after the Closing for a period of three (3) years following the Closing Date (or, if earlier, the closing of the Bankruptcy Case), Purchaser will provide Sellers and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other Documents transferred to Purchaser pursuant to this Agreement (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities, in each case, in Purchaser's possession or control and solely to the extent concerning periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to personnel, offices and properties of Purchaser, as may be reasonably requested by the Company in connection with the Bankruptcy Cases, the wind-down and liquidation of Sellers, to comply with legal, regulatory, stock exchange and financial reporting requirements, to satisfy any audit, accounting or similar requirement; provided, in each case, that such access does not unreasonably interfere with the normal operations of Purchaser; provided further that nothing herein will require Purchaser to provide access to, or to disclose any information to, Sellers if such access or disclosure (A) would result in the waiver of any attorney-client, work-product or other legal privilege or accountant privilege, (B) would reasonably be expected to violate any applicable Laws (including the HSR Act and Foreign Competition Laws), (C) would reasonably expected to be in violation of the provisions of any agreement (including any confidentiality obligation) by which Purchaser or any of its Subsidiaries is bound, or (D) would violate any fiduciary duty; provided that Purchaser and its Subsidiaries will use commercially reasonable efforts to provide a reasonable alternative means of accessing any such information in a manner that is not inconsistent with the foregoing; provided further that no such access shall be required in connection with a proceeding between Purchaser or any of its Affiliates, on the one hand, and any Seller or any of its Affiliates, on the other hand.

(e)    Unless otherwise consented to in writing by the other Parties, no Party, for a period of three (3) years following the Closing Date, shall destroy, alter or otherwise dispose of any of the books and records relating to any period occurring on or prior to the Closing without providing reasonable advance notice to such other Party and offering to permit such other Party (at such other Party's sole cost and expense) to make copies of such books and records or any portion thereof that such Party may intend to destroy, alter or dispose of.  From and after the Closing, Purchaser will, and will cause its employees to, provide Sellers with reasonable assistance, support and cooperation, upon reasonable advance notice and during normal business hours, with Sellers' wind-down and related activities (e.g., helping to locate documents or information related to and assistance with preparation of Tax Returns or prosecution or processing of insurance/benefit claims); provided that such assistance, support and cooperation does not (x)

unreasonably interfere with Purchaser's business and operations or (y) require Purchaser to incur any out of pocket costs or expenses.

(f)       Except for contacts in the Ordinary Course unrelated to the transactions contemplated hereby, Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of the Company or its Subsidiaries prior to the Closing with respect to the Company, its Subsidiaries, their business or the transactions contemplated by this Agreement without the prior written consent of the Company for each such contact, such consent not to be unreasonably withheld, conditioned or delayed.

(g)       From and after the Closing for a period of three (3) years following the Closing Date (or, if earlier, the closing of the Bankruptcy Case), Sellers will provide Purchaser and its Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents relating to the Company or its Subsidiaries (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities, in each case, in Sellers' possession or control and solely to the extent concerning periods or occurrences prior to the Closing Date as may be reasonably requested by Purchaser (x) to comply with legal, contractual, regulatory, stock exchange and financial reporting requirements, (y) to satisfy any audit, accounting or similar requirement, or (z) to satisfy any other bona fide legal compliance, accounting or tax purpose; provided that nothing herein will require Sellers to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would result in the waiver of any attorney-client, work-product or other legal privilege or accountant privilege, (B) would reasonably be expected to violate any applicable Laws (including the HSR Act and Foreign Competition Laws), or (C) would violate any fiduciary duty; provided that Sellers will use commercially reasonable efforts to provide a reasonable alternative means of accessing any such information in a manner that is not inconsistent with the foregoing; provided further that no such access shall be required in connection with a proceeding between Purchaser or any of its Affiliates, on the one hand, and any Seller or any of its Affiliates, on the other hand.

6.3.    Employee Matters.

(a)       Purchaser shall extend to all employees of Sellers listed on Schedule 3.17(a) (or hired in compliance with Section 6.1) (the "Employees") an offer of employment in a position that is comparable to such Employee's position immediately prior to the Closing (including level of responsibility, primary location of employment, and authority) on the terms set forth in this Section 6.3 ("Transfer Offer") that, if accepted, shall become effective immediately after the Closing.  Employees who accept such Transfer Offers with Purchaser in accordance with this Section 6.3(a) shall be referred to herein as "Transferred Employees."  Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all of the Employees will accept the offer of employment from Purchaser or will continue in employment with Purchaser following the Closing.  Purchaser shall carry out all actions necessary under applicable Law to effect the transfer of employment to it of each such Transferred Employee who has accepted that offer.  Effective as of the Closing, each Transferred Employee shall cease to be an employee of Sellers or their Affiliates.

(b)     For a period of one year from and after the Closing Date, Purchaser shall provide or cause to be provided each Transferred Employee with: (i) base compensation/wage rate that is no lower than that provided to such Transferred Employees as of the date hereof; (ii) short-term cash bonus opportunities substantially similar in amounts to the portion of existing retention bonus opportunities tied to short-term incentive opportunities (i.e., excluding any portion of the retention bonus opportunities that were calculated based on long-term incentives) that is no less favorable than that provided to such Transferred Employee as of the date hereof; and (iii) other employee benefits (including severance benefits, but excluding any equity incentive or other long term incentive arrangements, defined benefit pension benefits and post-employment welfare benefits) that are substantially comparable in the aggregate to those provided by Sellers to such Transferred Employees as of the date hereof under the Seller Plans made available to Purchaser (but excluding any severance benefits under any employment agreement not assumed by Purchaser).  For purposes of eligibility and vesting (other than vesting of future equity awards) under the benefit plans and programs maintained by Purchaser or any of its Affiliates after the Closing Date in which Transferred Employees are eligible to participate (the "Purchaser Plans"), each Transferred Employee who is so eligible shall be credited with his or her years of service with Sellers or any of their respective Subsidiaries before the Closing Date to the same extent as such Transferred Employee was entitled, before the Closing Date, to credit for such service under substantially similar Seller Plans in which such Transferred Employees participated before the Closing Date, except to the extent such credit would result in a duplication of benefits.

(c)     Without limiting the generality of any other provision of this Agreement: (i) each Transferred Employee shall be immediately eligible to participate, without any waiting time, in any and all Purchaser Plans that are made available to Transferred Employees at the relevant time as required by Section 6.3(c); (ii) for purposes of each Purchaser Plan providing health or welfare benefits, Purchaser shall use commercially reasonable efforts to cause all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Plan to be waived for such Transferred Employee and his or her covered dependents (unless such exclusions or requirements were applicable under comparable Seller Plans); and (iii) Purchaser shall use commercially reasonable efforts to cause any co-payments, deductible and other eligible expenses incurred by such Transferred Employee or his or her covered dependents during the plan year in which the Closing Date occurs to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Purchaser Plan.

(d)     Purchaser shall assume and be solely responsible for paying, providing and satisfying when due the following: (a) all accrued and unused vacation, personal days, sick pay and other paid time off for Transferred Employees earned but unused as of the Closing Date, (b) all cash retention and cash long term incentive plans and similar obligations and Liabilities to the extent the payee and the time and amount of payment are specified on Schedule 6.3(d), and (c) all compensation (including salary, wages, commissions, bonuses, incentive compensation, overtime, premium pay and shift differentials), vacation, personal days, sick pay and other paid time off, benefits and benefit claims, severance and termination pay, notice, and benefits (including any employer Taxes or other payments related thereto), in each case of this clause (c), accruing, incurred or arising as a result of employment or separation from employment with Purchaser after the Closing Date with respect to Transferred Employees.

(e)    Sellers shall reasonably cooperate in providing, pursuant to <u>Section 6.2,</u> to Purchaser all information reasonably requested by Purchaser with respect to Purchaser's compliance with its obligations under this <u>Section 6.3</u>.

(f)    The provisions of this <u>Section 6.3</u> are for the sole benefit of the Parties to this Agreement and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any Employees or Transferred Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this <u>Section 6.3</u> or under or by reason of any provision of this Agreement).  Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement, (ii) shall, subject to compliance with the other provisions of this <u>Section 6.3</u>, alter or limit Purchaser's or Sellers' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement or (iii) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

(g)    Effective as of the Closing, Purchaser and Purchaser's Affiliates shall assume all obligations, Liabilities and commitments in respect of claims made by any Transferred Employee (or any other individual claiming that he or she is or should be a Transferred Employee) for severance or other termination benefits (including claims for wrongful dismissal, notice of termination of employment, pay in lieu of notice or breach of Contract) arising out of, relating to or in connection with any failure of Purchaser to offer employment to, or to continue the employment of, any such Transferred Employee (or other individual claiming that he or she is or should be a Transferred Employee) on terms and conditions consistent with Purchaser's obligations under this <u>Section 6.3(g)</u>.

(h)    Purchaser will, or will cause its Affiliates to, provide any required notice to Transferred Employees under the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar Laws ("<u>WARN Act</u>") and to otherwise comply with the WARN Act to Transferred Employees with respect to any "plant closing" or "mass layoff" or group termination or similar event under the WARN Act affecting Employees (including as a result of the consummation of transactions contemplated by this Agreement) and occurring on and after the Closing.  Purchaser will not, and will cause its Affiliates not to, take any action on or after the Closing Date that would cause any termination of employment of any Employees by Sellers or their respective Affiliates occurring prior to the Closing to constitute a "plant closing," "mass layoff" or group termination or similar event under the WARN Act that would result in any Liability for Sellers, or to create any Liability or penalty to Sellers or any of their respective Affiliates for any employment terminations under Law.

(i)    For any Transferred Employees who are principally based outside the United States, the provisions of this <u>Section 6.3</u> shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law. With respect to the employees of the Swiss Company (the "<u>Swiss Employees</u>"), no transfer of employment relationships will occur as a consequence of the Closing of the transactions contemplated hereby and the currently applicable terms and conditions of employment (including social security and pension plan scheme) of such Swiss Employees shall remain unaltered in full force and effect.  The provisions of this <u>Section</u>

6.3, in particular, without limitation, with respect to compensation and other employee benefits, shall also apply *mutatis mutandis* to the Swiss Employees.

6.4.    Regulatory Matters.

(a)    Subject to Section 6.5, the Company will (1) make or cause to be made all filings and submissions required to be made by the Company or its Subsidiaries under any applicable Laws for the consummation of the transactions contemplated by this Agreement set forth on Schedule 6.4, including filings or submissions related to Product Registrations and a General Information Notice for each Acquired Leased Real Property in New Jersey subject to ISRA, (2) reasonably cooperate with Purchaser in exchanging such information and providing reasonable assistance as Purchaser may reasonably request in connection with any filings made by the Purchaser Group pursuant to Section 6.4(b), and (3) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this Section 6.4(a) or Section 6.4(b), and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings. Prior to Closing, the Company shall engage a Licensed Site Remediation Professional ("LSRP") that is reasonably acceptable to Purchaser to commence performance of a Preliminary Assessment (as defined in ISRA) for each Acquired Leased Real Property in New Jersey for which a General Information Notice was submitted. The Company and Purchaser shall cooperate in good faith regarding the performance of the Preliminary Assessments, including the Company responding as promptly as reasonably practicable to any inquiries from Purchaser about the status of the Preliminary Assessments. Purchaser shall have the reasonable right to review and comment on the Preliminary Assessments, and the Company shall request that the LSRP consider in good faith any reasonable comments on the Preliminary Assessments received from Purchaser. At Closing, the Company shall end its engagement of the LSRP, at which time Purchaser shall directly engage the LSRP in connection with its assumption of responsibility for ISRA under Section 6.4(b)(ii). In the event the Preliminary Assessments have not been finalized at Closing, Purchaser shall be responsible, at its sole cost and expense, to complete the Preliminary Assessments.

(b)    Subject to Section 6.5, Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws and necessary to permit the consummation of the transactions contemplated by this Agreement, including any such filings or submissions related to Product Registrations, (ii) two (2) calendar days prior to Closing, submit a Remediation Certification, as defined under ISRA, to the New Jersey Department of Environmental Protection for each Acquired Leased Real Property in New Jersey subject to ISRA identifying Purchaser as the person responsible for ISRA compliance after Closing along with a Remediation Cost Review and RFS/FA Form, a Remediation Funding Source instrument and 1% annual surcharge check, as required, (iii) reasonably cooperate with the Company in exchanging such information and providing reasonable assistance as the Company may reasonably request in connection with any filings made by the Company pursuant to Section 6.4(a), and (iv) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this Section 6.4(b) or Section 6.4(a) and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances.

(c)     From and after the date hereof, the Parties will cooperate in connection with the transfer of the transferable Product Registrations to Purchaser as of the Closing Date and the obtaining by Purchaser of new Product Registrations to the extent a Product Registration is not transferable.  Promptly following the date hereof, the Parties will agree upon procedures to ensure a transition from the Sellers to Purchaser of all of the activities required to be undertaken by the holder of the Product Registrations, including adverse experience reporting, quarterly and annual reports to the FDA, handling and tracking of complaints, sample tracking, and communication with health care professionals and customers.  Subject to Section 6.4(d), after the Closing, Purchaser shall assume all responsibility for the Product Registrations, including all responsibility for communications with the FDA and any other Governmental Body concerning the Products.  The Parties shall cooperate in making and maintaining all required regulatory filings, and reporting all material communications (whether written or oral) from a Governmental Body in relation to a transfer and, to the extent one Party (Seller or Purchaser, as the case may be) requires the other Party's (Purchaser or Seller, as the case may be) participation to effectuate the transfer of the Product Registrations, it shall give the other Party reasonable notice of all meetings and telephone calls with any Governmental Body expected to have a material impact upon a transfer and give the other Party a reasonable opportunity to participate at each such meeting or telephone call.

(d)     On the Closing Date (or within such time after the Closing Date as permitted under applicable Law) or as soon as practicable after the Closing Date, Sellers shall submit to the FDA the executed Seller FDA Transfer Letters.  To the extent required, Sellers shall submit or deliver to the FDA and other appropriate Governmental Bodies within timelines as prescribed under applicable Law such documents and instruments of conveyance as necessary and sufficient to effectuate the transfer of each Permit and Governmental Authorization to Purchaser under applicable Law on the Closing Date or as soon as practicable after the Closing Date.  Unless otherwise required by applicable Law, from the Closing Date until the relevant date of transfer for each Product Registration, Sellers shall use commercially reasonable efforts to maintain or cause to be maintained in force each such Product Registration and Purchaser shall promptly reimburse Sellers for the reasonable documented and out-of-pocket costs and expenses incurred by Sellers in connection with maintaining or causing to be maintained such Product Registrations.  Unless otherwise required by applicable Law and as may be agreed between the Parties, Sellers shall use commercially reasonable efforts to progress or cause to be progressed any pending application filed prior to the Closing Date for a Product Registration.  Notwithstanding anything contained in this Agreement to the contrary (including Section 6.1), Sellers shall not, from the Closing Date until the relevant date of transfer for such Product Registration, absent the prior written consent from Purchaser, or as is required by a Governmental Body, withdraw or suspend a Product Registration that is pending as of the Closing Date.  The Sellers shall ensure that an employee or other authorized person is reasonably available to Purchaser to effectuate any transfers contemplated by this Section 6.4 and occurring after the Closing.

(e)     Prior to the Closing, the actions taken by Sellers pursuant to Section 6.4(c) shall be at the sole cost and expense of the Sellers.  All documented and out-of-pocket costs and expenses incurred by Sellers after the Closing at the request of Purchaser in connection with this Section 6.4 shall be reimbursed by Purchaser.

6.5.    Antitrust Notification.

(a)      The Company and Purchaser will, as promptly as practicable and no later than ten (10) Business Days following the date hereof, (i) file with the United States Federal Trade Commission and the United States Department of Justice, the notification form required pursuant to the HSR Act for the transactions contemplated by this Agreement, which form will specifically request early termination of the waiting period prescribed by the HSR Act and (ii) make all notifications, filings, registrations or other materials required or necessary under the Foreign Competition Laws set forth on Schedule 6.5(a).  Each of the Company and Purchaser will (and shall cause their respective Affiliates to) furnish to each other's counsel such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that is necessary under the HSR Act or such Foreign Competition Laws and will provide any supplemental information requested by any Governmental Body as promptly as practicable.  Purchaser and Sellers will use reasonable best efforts to comply as promptly as practicable with any requests made for any additional information in connection with such filings.  Whether or not the transactions contemplated by this Agreement are consummated, Sellers will be responsible for all filing fees payable in connection with such filings.

(b)      Subject to the immediately following sentence, the Company and Purchaser will use their reasonable best efforts to promptly obtain any clearance required, or any clearance that is otherwise advisable, under the HSR Act or such Foreign Competition Laws for the consummation of this Agreement and the transactions contemplated hereby and will keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from, any Governmental Body and will comply promptly with any such inquiry or request.  Purchaser will take, and will cause its Affiliates to take, any and all steps necessary to avoid or eliminate each and every impediment under any Law that may be asserted by any Governmental Body or any other Person so as to enable the Parties to expeditiously close the transactions contemplated by this Agreement, including (i) opposing any motion or action for a temporary, preliminary or permanent injunction or Order against or preventing or delaying the consummation of the transactions contemplated by this Agreement, (ii) entering into a consent decree, consent agreement or other agreement or arrangement containing Purchaser's agreement to hold separate, license, sell or divest (pursuant to such terms as may be required by any Governmental Body) such assets or businesses of Purchaser and its Affiliates after the Closing (including entering into customary ancillary agreements relating to any such sale, divestiture, licensing or disposition of such assets or businesses), and (iii) agreeing to such limitations on conduct or actions of members of Purchaser and its Affiliates after the Closing as may be required in order to obtain satisfaction of the closing conditions set forth in Section 7.1(a) prior to the Outside Date.

(c)      The Parties commit to instruct their respective counsel to cooperate with each other in good faith and use reasonable best efforts to facilitate and expedite the identification and resolution of any issues arising under the HSR Act or such Foreign Competition Laws at the earliest practicable dates.  Such efforts and cooperation shall include counsel's undertaking (i) to keep each other appropriately informed of communications from and to personnel of the reviewing Governmental Bodies and (ii) to confer with each other regarding communications with such Governmental Bodies and the content of any such communications, including any analyses, clearances, memoranda, briefs, arguments, opinions, proposals or presentations made or submitted by or on behalf of any Party in connection with the identification and resolution of any issues arising under the HSR Act, other U.S. Antitrust Laws, or such Foreign Competition Laws.  Neither

the Company nor Purchaser will participate in any meeting or discussion with any Governmental Body with respect of any such filings, applications, investigation or other inquiry without giving the other Party prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Body, the opportunity to attend and participate in such meeting or discussion (which, at the request of either Purchaser or the Company, will be limited to outside antitrust counsel only). Each Party will have the right to review (subject to appropriate redactions for confidentiality and attorney-client privilege concerns) and approve the content of any presentations, white papers or other written materials to be submitted to any Governmental Body in advance of any such submission.

6.6.    Reasonable Efforts; Cooperation.

(a)    Without prejudice to any other term or provision of this Agreement, each Party shall, and shall cause its Subsidiaries and its and their respective Advisors to, use its reasonable best efforts to perform their respective obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things reasonably necessary, proper or advisable to cause the transactions contemplated herein to be effected as soon as reasonably practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to reasonably cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder.

(b)    The obligations of Purchaser pursuant to this Agreement shall be subject to the Direction Letter. The obligations of the Company pursuant to this Agreement, including this Section 6.6(b), shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases), the obligations under Sellers' debtor-in-possession financing, and each of Sellers' obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

(c)    From and after the date hereof until the earlier of Closing or the termination of this Agreement in accordance with its terms, Sellers will use commercially reasonable efforts to seek estoppel certificates from parties to any recorded agreements materially affecting title to the Acquired Owned Real Properties and Acquired Leased Real Properties set forth on Schedule 6.6(c) in a form reasonably acceptable to the parties; provided that such efforts shall not include the payment by or on behalf of Sellers of any non-*de minimis* costs or expenses in connection therewith or the commencement of any litigation or the taking of any similar adverse action.

6.7.    Notification of Certain Matters.

(a)    The Company will promptly (and, in any event, within ten (10) days) notify Purchaser in writing of: (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (ii) any notice or other communication from any Governmental Body, or any Action by any Governmental Body, related to or in connection with the transactions contemplated by this Agreement (including that may restrain, enjoin or otherwise prohibit the consummation of the transactions contemplated by this Agreement); (iii) the discovery of any variances from, or the

existence or occurrence of any event, fact or circumstance arising after the execution of this Agreement that would reasonably be expected to cause, any of the representations and warranties contained in <u>Article III</u> to be untrue or inaccurate such that the condition set forth in <u>Section 7.2(a)</u> will not be satisfied; and (iv) any event that has had, or is reasonably expected to have, a Material Adverse Effect or would otherwise cause, or reasonably be expected to cause, the failure of any condition to Closing for the benefit of the Purchaser set forth in <u>Article VII</u>. If the subject matter of any such notification required by the previous sentence requires any change in the Schedules, the Company shall deliver to Purchaser prior to the Closing a supplement to such Schedule (the "<u>Updated Schedules</u>") with such change; <u>provided</u> that in no event will any Updated Schedule serve to amend, supplement or modify the Schedules for purposes of <u>Section 7.2(a)</u> or otherwise determining whether any condition set forth in <u>Article VII</u> was or has been satisfied or any statement set forth in the officer's certificate of the Company delivered pursuant to <u>Section 2.3(f)</u> was or is true and correct; <u>provided</u> <u>further</u> that if the Closing occurs, the Updated Schedules will (other than in respect of any claim for Fraud with respect to (x) the representations and warranties of the Sellers made as of the date hereof or (y) the officer's certificate delivered pursuant to <u>Section 2.3(f)</u>) be considered and deemed to be part of the Schedules for all purposes under this Agreement and each reference in this Agreement to a particular Schedule will mean such Schedule in, or as updated by, the Updated Schedules.

(b)    Purchaser will promptly notify the Company in writing of: (i) any notice or other communication from any Governmental Body, or any Action by any Governmental Body, related to or in connection with the transactions contemplated by this Agreement (including that may restrain, enjoin or otherwise prohibit the consummation of the transactions contemplated by this Agreement); (ii) any Actions relating to or involving or otherwise affecting Purchaser or its Affiliates that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to <u>Section 4.7</u>; and (iii) the discovery of any variances from, or the existence or occurrence of any event, fact or circumstance arising after the execution of this Agreement that would reasonably be expected to cause, any of the representations and warranties contained in <u>Article IV</u> to be untrue or inaccurate such that the condition set forth in <u>Section 7.3(a)</u> will not be satisfied; <u>provided</u> that the delivery of any notice pursuant to this <u>Section 6.7(b)</u> will not limit the remedies available to Sellers under or with respect to this Agreement.

6.8.    <u>Further Assurances</u>. Without prejudice to any other term or provision of this Agreement, from time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement and the transfer of title to the Acquired Assets to Purchaser or its designee(s) in accordance with the terms of the Agreement.

6.9.    <u>Insurance Matters</u>. Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to Sellers and the Acquired Assets that is maintained by any Seller or its Affiliates other than by the Acquired Subsidiaries themselves, if any, (whether such policies are maintained with third party insurers or with such Seller or its Affiliates (other than with the Acquired Subsidiaries)), shall cease to provide any coverage to Purchaser and the Acquired Assets with respect to post-Closing occurrences related thereto and no further coverage shall be available with respect to such post-Closing occurrences to Purchaser or the Acquired

Assets under any such policies; provided, however, that Purchaser shall have the right to make claims and the right to any proceeds with respect to any matter related to the Assumed Liabilities under any insurance policies for occurrence-based claims pertaining to, arising out of and inuring to the benefit of any Seller for all periods prior to the Closing, and Seller shall use reasonable best efforts to seek the maximum recovery or allow Purchaser to seek recovery (including by executing or delivering any document, agreement, instrument or other information as Purchaser may reasonably request to seek such recovery) under such insurance policies, in each case, at Purchaser's sole cost and expense (including, if and to the extent unpaid and otherwise payable as a result of such recovery, any deductibles, self-insured retentions or other out-of-pocket expenses required to be paid by Purchaser or to the insurer in connection therewith), and Seller shall cooperate with Purchaser's reasonable requests if it seeks recovery, with respect to such matters and shall remit (or, at Purchaser's request, direct any such insurer to pay directly to Purchaser) any insurance proceeds actually obtained therefrom (net of such Seller's reasonable and documented out-of-pocket costs and expenses of seeking such recovery, to the extent not otherwise paid or reimbursed by Purchaser) to Purchaser or its designee; provided that, subject to compliance with the terms and conditions of this Section 6.9, Sellers shall be liable for any uninsured or uncollected amounts of such claim(s).

6.10.   Receipt of Misdirected Assets.  From and after the Closing, if any Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset, the applicable Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred.  From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the Company, and such asset will be deemed the property of the Company held in trust by Purchaser for the Company until so transferred.

6.11.   Acknowledgment by Purchaser.

(a)      Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted an independent investigation and analysis of the business, including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of the Company and its Subsidiaries and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser and the Purchaser Group have, other than the Express Representations, relied on the results of the Purchaser Group's own independent investigation and analysis and have not relied on, are not relying on, and will not rely on, any Seller, any Subsidiary, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom, the Information Presentation, or the Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express

Representations).  Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made by any Seller Party to Purchaser or any member of the Purchaser Group on which Purchaser or any member of the Purchaser Group may rely in connection with the transactions contemplated by this Agreement; and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (1) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent set forth in the Express Representations) including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of the Company and its Subsidiaries, any of the Seller Parties or any other Person on behalf of the Company, its Subsidiaries or any of the Seller Parties or any of their respective Affiliates or Advisors and (2) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of the Company or any of its Subsidiaries, or the quality, quantity or condition of the Company's or its Subsidiaries' assets, are, in each case, specifically disclaimed by the Company, on its behalf and on behalf of the Seller Parties, and each Seller.  Purchaser, on its own behalf and on behalf of the Purchaser Group: (x) disclaims reliance on the items in clause (ii) in the immediately preceding sentence (which do not, for the avoidance of doubt, include Purchaser's and the Purchaser Groups' reliance on the Express Representations) and (y) together with Sellers, acknowledges and agrees that Purchaser has relied on, is relying on and will rely on only the Express Representations. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither the Company, nor any other Person (including the Seller Parties), has made, is making or is authorized by or on behalf of any Seller Party to make, and subject to <u>Section 6.11(c)</u>, Purchaser, on its own behalf and on behalf of the Purchaser Group, hereby waives all rights and claims it or they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (A) any potentially material information regarding the Company, its Subsidiaries or any of their respective assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (B) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of the Company's or its Subsidiaries' business, operations, assets, Liabilities, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.

(b)     Without limiting the generality of the foregoing (including any of the Express Representations), in connection with the investigation by the Purchaser Group of the Company and its Subsidiaries, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of the Company, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "<u>Projections</u>").  Purchaser acknowledges and agrees, without limiting any of the Express Representations, on its own behalf and on behalf of the Purchaser Group, that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of the Company and its Subsidiaries, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv)

Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)    Nothing in this Section 6.11 shall limit any rights or remedies available to Purchaser in the case of a claim for Fraud.

6.12.    Directors' and Officers' Indemnification.

(a)    Following the Closing until the six (6) year anniversary thereof, Purchaser shall cause the Acquired Subsidiaries not to amend, repeal or otherwise modify the Acquired Subsidiaries' constitutive documents as in effect as of the date of this Agreement, in any manner that would adversely affect the rights to indemnification or exculpation thereunder of individuals who are or were directors or officers of the Acquired Subsidiaries prior to the Closing.  Purchaser shall not take any action to cancel or otherwise reduce coverage under any "tail" insurance policies purchased by the Acquired Subsidiaries prior to the Closing; provided that no payments or other obligations shall be required of the Acquired Subsidiaries or the Purchaser Group with respect to such policies after the Closing.

(b)    As soon as practicable after the Closing, and no later than five (5) Business Days after the Closing (exclusive), Purchaser shall, or shall cause to, adopt the required resolutions and make the necessary applications or filings in order to ensure that (i) those directors and officers of the Swiss Company who resign as of the Closing shall no longer be directors and/or officers of the Swiss Company, (ii) the effect of such resignations shall be registered with the relevant Swiss commercial register, and (iii) shall hold an extraordinary shareholders' meeting of the Swiss Company by which the aforementioned resignations of the current board members are acknowledged and, subject to a full and unconditional release, in form and substance reasonably acceptable to Purchaser, being delivered by any such directors and officers, a full and unconditional release is granted to the resigning board members and the new board members designated by Purchaser are elected.  The granting of release is to be repeated at the next ordinary shareholders' meeting of the Swiss Company and Purchaser further covenants to procure that neither Purchaser nor any of its Affiliates makes any claim against any directors or officers of the Swiss Company relating to their mandate or activities for the Swiss Company up to and including Closing or in connection with the transactions contemplated hereby, save for gross negligence and intentional actions.

6.13.    No Successor Liability.  The Parties intend that, to the fullest extent permitted by applicable Law (including under Section 36 of the Bankruptcy Code), upon the closing, Purchaser shall not be deemed to:  (a) be the successor of any Seller, (b) have, de facto, or otherwise, merged with or into Sellers, (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers or (d) be liable or have any Liability for any acts or omissions of Sellers in the conduct of their businesses or arising under or related to the Acquired Assets other than as expressly set forth and agreed in this Agreement.  Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that Purchaser shall have no Liability for any Encumbrance (other than the Assumed Liabilities and Permitted Encumbrances on the Acquired Assets) against Sellers or any of Sellers predecessors or Affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or in connection with the transactions contemplated to occur

on the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the businesses of Sellers, the Acquired Assets or any Liability of Sellers arising prior to, or relating to any period occurring prior to, the Closing Date.  The Parties agree that the Sale Order shall contain provisions substantially in the form set forth in this <u>Section 6.13</u>.

6.14.    <u>Change of Name</u>.  Promptly (and, in any event, within thirty (30) Business Days) following the Closing, each Seller shall, and shall cause their Subsidiaries to, discontinue the use of their current name (and any other trade names or "d/b/a" names currently utilized by each Seller or their Subsidiaries) and shall not subsequently change any of their names to or otherwise use or employ any name which includes the words "Akorn" and the other names listed on <u>Schedule 6.14</u> without the prior written consent of Purchaser, and each Seller shall cause the name of Sellers in the caption of the Bankruptcy Cases to be changed to the new names of each Seller.

6.15.    <u>Excluded Subsidiaries; Cash Repatriation</u>.

(a)    Notwithstanding <u>Schedule 1.1(j)</u>, at any time following the date of this Agreement and three (3) Business Days prior to the Closing Date, Purchaser shall have the right, but the not the obligation, by delivery of a written notice to the Company, to designate WorldAkorn Pharma Mauritius as an Excluded Subsidiary, in which case, any such entity so designated by Purchaser in writing shall be deemed an Excluded Subsidiary hereunder, and notwithstanding anything contained herein to the contrary, Purchaser shall not acquire any of the equity securities of such Excluded Subsidiary (whether at the Closing, or otherwise) and, for the avoidance of doubt, none of the Liabilities of any such Excluded Subsidiary shall be assumed by Purchaser in connection with this Agreement (including any Liabilities in respect of the employees of the India Company (including any obligation contemplated by this Agreement in relation to the employees of the India Company), or otherwise as may have arisen under an Assumed Benefit Plan in connection with any current or former employees of such Excluded Subsidiary).

(b)    Notwithstanding anything contained herein to the contrary, in the event that (i) at least ten (10) Business Days prior to the Closing, (A) Purchaser delivers a written request to Sellers and (B) a sale or disposition of the India Company (whether by equity sale, asset sale, merger or otherwise) or WorldAkorn Pharma Mauritius (by asset sale) is consummated and (ii) Purchaser has designated WorldAkorn Pharma Mauritius as an excluded Subsidiary pursuant to <u>Section 6.15(a)</u>, then the Company shall, to the extent permissible under applicable Law and any other legally binding obligations of any of its Subsidiaries who are not Sellers or Acquired Subsidiaries, cause any of its Subsidiaries who are not Sellers or Acquired Subsidiaries to, immediately prior to the Closing, declare and otherwise consummate any dividend, distribution or similar transaction (as may be requested by Purchaser), or otherwise repay any intercompany Indebtedness, such that, subject to <u>Section 6.15(e)</u>, all Cash and Cash Equivalents of any such Person are held by Sellers as of immediately prior to the Closing.

(c)    In the event that (i) a sale or disposition of the India Company (whether by equity sale, asset sale, merger or otherwise) or WorldAkorn Pharma Mauritius (by asset sale) is consummated after the date that is ten (10) Business Days prior to the Closing and (ii) Purchaser has designated WorldAkorn Pharma Mauritius as an Excluded Subsidiary pursuant to <u>Section 6.15(a)</u>, then, subject to <u>Section 6.15(e)</u>, Sellers shall pay, or cause to be paid, to the extent permissible under applicable Law and any other legally binding obligations of any of its

Subsidiaries who are not Sellers or Acquired Subsidiaries, to Purchaser all Cash and Cash Equivalents of any such Person and the net cash proceeds received in consideration therefor no later than the later of the Closing and the date that is five (5) Business Days following receipt thereof.

(d)     In the event that (i) a sale or disposition of WorldAkorn Pharma Mauritius (whether by equity sale, merger or otherwise, but not by asset sale) is consummated after the Closing and (ii) Purchaser has designated WorldAkorn Pharma Mauritius as an Excluded Subsidiary pursuant to Section 6.15(a), then, subject to Section 6.15(e), Sellers shall pay, or cause to be paid, to Purchaser all Cash and Cash Equivalents of any such Person and the net cash proceeds received in consideration therefor no later than the date that is five (5) Business Days following receipt thereof; provided, however, that if such sale or disposition is not consummated within the later of three (3) months of the Closing and the "outside date" in any Contract with respect to such transaction that is entered into in accordance with this Agreement prior to such time, Sellers shall pay, or cause to be paid, to the Purchaser the Cash and Cash Equivalents of WorldAkorn Pharma Mauritius and India Company as of such time.

(e)     The Cash and Cash Equivalents contemplated by Section 6.15(b), 6.15(c) or 6.15(d) and the net cash proceeds contemplated by Section 6.15(c) or 6.15(d) shall be determined net of (i) any applicable fees, expenses, and Taxes of Sellers or any of their Subsidiaries in connection with sale or disposition of the India Company (whether by equity sale, asset sale, merger or otherwise) or WorldAkorn Pharma Mauritius or in connection with the distribution of such amounts from the applicable Subsidiary to the applicable Seller, and (ii) any holdbacks, reserves, escrows, or other similar amounts in respect of indemnification, purchase price adjustments, or other contingent obligations of Sellers or any of their Subsidiaries in connection with such sale or disposition or in connection with such distribution; provided that upon release, expiration, or other applicable termination of such contingent obligations, any such amounts, subject to the immediately preceding clause (i), shall be promptly paid to Purchaser.

6.16.   Communications with Customers and Suppliers.  Subject to Section 6.2(f), prior to the Closing, the Parties shall reasonably cooperate with each other in coordinating their communications with any customer, supplier or other contractual counterparty of Sellers in relation to this Agreement and the transactions contemplated hereby.

6.17.   Exclusive License.  With respect to each Product that is an Acquired Asset whose title is not transferred to Purchaser as of the Closing Date, Sellers hereby grant to Purchaser an irrevocable, exclusive, royalty-free, fully paid-up, sublicensable, transferrable license under Sellers' rights in the applicable Product and Product Registration to sell, distribute and otherwise commercialize or exploit such Product.  For the avoidance of doubt, following the Closing, Purchaser will have full and exclusive rights to commercialize such Products and retain all profits with respect thereto.

6.18.   Treatment of Contracts.

(a)     Notwithstanding anything contained herein to the contrary, during the pendency of the Bankruptcy Case, Sellers shall not reject or transfer any Excluded Contract without first obtaining Purchaser's prior written consent.  In the event that any of the Parties to

this Agreement discovers a Contract related to the business of the Company and its Subsidiaries, the Acquired Assets or the Assumed Liabilities (whether prior to, on or following the Closing) and such Contract (i) was not set forth on Schedule 1.5(a), (ii) is a Contract which Purchaser wishes to assume the rights and obligations of, and (iii) has not been rejected by Sellers (with Purchaser's prior written consent in compliance with the immediately preceding sentence), Purchaser and Sellers shall execute, acknowledge and deliver such other instruments and take such further actions as are reasonably practicable for Purchaser or a Designated Purchaser to assume the rights and obligations under such Contract as of the Closing (or, if applicable, as soon as reasonably practicable following the Closing), otherwise in accordance with Section 1.5.

6.19.   Retained Privileged Materials.  Following the Closing (i) in the event of a dispute between Purchaser and its Affiliates, on the one hand, and a third party (other than Sellers), on the other hand, Purchaser shall have the right to, or to require Sellers to, assert the attorney-client privilege to prevent disclosure of any Retained Privileged Materials to a third party, and (ii) without Purchaser's prior written consent, Sellers shall not, unless required by applicable Law, disclose, transfer or otherwise make available any Retained Privileged Materials to any third-party, in any manner that would reasonably be expected to result in the waiver of the attorney-client privilege with respect to such materials.  In the event that Purchaser or any of its Affiliates (including the Acquired Subsidiaries after the Closing) should discover in its possession after the Closing any Retained Privileged Materials, it will take reasonable steps to preserve the confidentiality thereof and promptly deliver the same to Sellers, keeping no copies, and will not by reason thereof assert any loss of confidentiality or privilege protection.  As to any such Retained Privileged Materials, Purchaser and each of its Subsidiaries, together with any of their respective Affiliates, successors or assigns, further agree that none of the foregoing may use or rely on any of the Retained Privileged Materials in any action against or involving any of Sellers.  The Retained Privileged Materials may be used by Sellers in connection with any dispute that relates in any way to this Agreement or the transactions contemplated hereby.

## ARTICLE VII

## CONDITIONS TO CLOSING

7.1.   Conditions Precedent to the Obligations of Purchaser and Sellers.  The respective obligations of each Party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by each of the Company and Purchaser, in their respective sole discretion) on or prior to the Closing Date, of each of the following conditions:

(a)     the waiting period (and any extension thereof), or any approval, as applicable, related to the transactions contemplated by this Agreement under the HSR Act or under the Foreign Competition Laws or other regulations set forth in Schedule 7.1 shall have been received or terminated, or shall have expired, as applicable;

(b)     no court or other Governmental Body has issued, enacted, entered, promulgated or enforced any Law or Order (that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; and

(c)      the Bankruptcy Court shall have entered the Bidding Procedures Order, the Sale Order and the Financing Order, and such orders shall not have been reversed, modified, amended or stayed.

7.2.    <u>Conditions Precedent to the Obligations of Purchaser</u>.  The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)      (i) the representations and warranties made by Sellers in <u>Article III</u> (other than the Seller Sufficiency Representations and the Seller Fundamental Representations) shall be true and correct, in each case as of the date hereof and the Closing Date with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality", "material adverse effect", "Material Adverse Effect" or similar qualifiers contained therein (other than "material weaknesses" in <u>Section 3.5(b)</u> and the word "Material" when used in the instances of the defined terms "Material Contract", "Material Customer" and "Material Supplier")) has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (ii) the representations and warranties set forth in <u>Sections 3.1</u> (other than the last sentence of <u>Section 3.1(a)</u>, the last sentence of <u>Section 3.1(b)</u> and <u>Section 3.1(c)</u>), <u>3.2</u>, <u>3.3</u> (solely with respect to clause (i) thereof), <u>3.4</u> and <u>3.19</u> (collectively, the "<u>Seller Fundamental Representations</u>") shall be true and correct in all respects, other than for *de minimis* inaccuracies, in each case as of the date hereof and the Closing Date with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date) and (iii) the representations and warranties set forth in <u>Section 3.7(b)</u> (the "<u>Seller Sufficiency Representations</u>") shall be true and correct in all respects, in each case as of the date hereof and the Closing Date with the same force and effect as though such representations and warranties had been made as of the Closing Date;

(b)      Sellers shall have performed or complied with, or caused to be performed or complied with, in all material respects, all of the obligations and covenants required by this Agreement to be performed or complied with by Sellers on or prior to the Closing;

(c)      Sellers shall have delivered, or caused to be delivered, to Purchaser (i) all of the items set forth in <u>Section 2.3</u>;

(d)      The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall have become a Final Order;

(e)      each consent, approval, assignment or waiver of any Person identified on <u>Schedule 7.2(e)</u> shall, in each case, (i) have been obtained and delivered to Purchaser, (ii) be in form and substance reasonably acceptable to Purchaser, (iii) not be subject to the satisfaction of any condition that has not been satisfied or waived and (iv) be in full force and effect;

67

(f)      Purchaser shall have obtained, or there is a reasonable expectation that Purchaser will obtain within ten (10) Business Days following the Closing (or within such time as otherwise required by applicable Law), all Permits required by Purchaser to operate the business of the Company and its Subsidiaries following the Closing consistent, in all material with respects, with the operation of such business in the Ordinary Course as of the date of this Agreement; and

(g)      no Material Adverse Effect shall have occurred and then be continuing.

7.3.    Conditions Precedent to the Obligations of the Company.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by the Company in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)      the representations and warranties made by Purchaser in Article IV shall be true and correct, in each case as of the date hereof and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations or warranties to be so true and correct (without giving effect to any limitation as to "materiality", "material adverse effect", "Material Adverse Effect" or similar qualifiers contained therein) would not materially impair or prevent Purchaser's ability to consummate the transactions contemplated by this Agreement;

(b)      Purchaser shall have performed or complied with, or caused to be performed or complied with, in all material respects, all of the obligations and covenants required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing; and

(c)      Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 2.4.

## ARTICLE VIII

## TERMINATION

8.1.    Termination of Agreement.  This Agreement may be terminated only in accordance with this Section 8.1.  This Agreement may be terminated, and the transactions contemplated hereby abandoned, at any time prior to the Closing:

(a)      by the mutual written consent of the Company and Purchaser;

(b)      by written notice of either Purchaser or the Company to the other Party, upon the issuance by any Governmental Body of an Order restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final and non-appealable; provided that no termination may be made by a Party under this Section 8.1(b) if the issuance of such Order was primarily caused by the breach by such Party (including, with respect to the Company, any of its Subsidiaries) with respect to, or action or inaction of such Party

68

(including, with respect to the Company, any of its Subsidiaries) in violation of, any obligation or condition of this Agreement;

(c)     by written notice of either Purchaser or the Company to the other Party, if the Closing shall not have occurred on or before the date that is one hundred three (103) days after the date hereof (the "Outside Date"); provided that if on the Outside Date any of the conditions set forth in Sections 7.1(a) or 7.1(b) (solely if and to the extent relating to matters set forth in Section 7.1(a)) have not been satisfied but all other conditions set forth in Article VII shall have been satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing; provided further that such conditions shall then be capable of being satisfied if the Closing were to take place on such date), then the Outside Date shall be automatically extended to the date that is the third Business Day following receipt of all regulatory approvals and such date shall become the Outside Date for purposes of this Agreement; provided further that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if the failure of the Closing to have occurred on or prior to the Outside Date was primarily caused by the breach by such Party (including, with respect to the Company, any of its Subsidiaries) with respect to, or action or inaction of such Party (including, with respect to the Company, any of its Subsidiaries) in violation of, any obligation or condition of this Agreement;

(d)     by written notice from Purchaser to the Company, if (i) the Company or any of its Subsidiaries seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by Sellers under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Cases, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Company is appointed in the Bankruptcy Case or (ii) an Order or dismissal, conversion or appointment is entered for any reason and not reversed or vacated within fourteen (14) days after entry thereof;

(e)     automatically, and without any requirement of any Party to deliver any notice of such termination to any other Party, if Sellers announce any stand-alone plan of reorganization or liquidation (or support any such plan filed by any other party), (other than a wind-down plan of Sellers' estates post-Closing, including pursuant to a plan of liquidation consistent with the RSA);

(f)     by written notice from the Company to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser set forth in this Agreement, or if any representation or warranty of Purchaser set forth herein will have become untrue or incorrect, in each case, such that any condition set forth in Section 7.3(a) or 7.3(b) would not be satisfied at the Closing; provided that (i) Sellers shall have provided notice to Purchaser of such breach at least five (5) Business Days prior to the effectiveness of such termination and, if such breach is curable, then the Company may not terminate this Agreement under this Section 8.1(f) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) twenty (20) days after such notice is delivered in accordance with Section 10.3, and (ii) the right to terminate this Agreement pursuant to this Section 8.1(f) will not be available to the Company at any time that the Company or any of its Subsidiaries is in material breach of, any covenant, representation or warranty hereunder such that the satisfaction of any condition set forth in Section 7.2(a) or 7.2(b) at the Closing would then be prevented;

(g)    by written notice from Purchaser to the Company, upon a breach of any covenant or agreement on the part of any Seller or Acquired Subsidiary set forth in this Agreement, or if any representation or warranty of any Seller set forth herein will have become untrue or incorrect, in each case, such that any condition set forth in Section 7.2(a) or 7.2(b) would not be satisfied at the Closing; provided that (i) Purchaser shall have provided notice to Sellers of such breach at least five (5) Business Days prior to the effectiveness of such termination and, if such breach is curable by such Seller, then Purchaser may not terminate this Agreement under this Section 8.1(g) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) twenty (20) days after such notice is delivered in accordance with Section 10.3, and (ii) the right to terminate this Agreement pursuant to this Section 8.1(g) will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder such that the satisfaction of any condition set forth in Section 7.3(a) or 7.3(b) at the Closing would then be prevented;

(h)    by written notice from Purchaser or the Company to the other Party, if (i) (A) Purchaser is not the Successful Bidder and (B) the Bankruptcy Court approves an Alternative Transaction with the Successful Bidder; or (ii) the Bankruptcy Court approves an Alternative Transaction other than (A) in connection with the Auction or (B) pursuant to a plan of reorganization that is in form and substance reasonably acceptable to Purchaser in writing; provided that if Purchaser is the Backup Bidder at the Auction, the right of Purchaser or the Company to terminate this Agreement pursuant to this Section 8.1(h) shall not be available to Purchaser or the Company until the Outside Back-Up Date;

(i)    by written notice from Purchaser to the Company following the termination of the RSA;

(j)    by written notice from Purchaser to the Company if, under Section 363(k) of the Bankruptcy Code, Purchaser is disallowed from providing a credit bid (or otherwise bidding on such other terms as may be agreed by Purchaser, in its sole discretion) as contemplated by this Agreement in connection with the payment of the Purchase Price;

(k)    by written notice from either Purchaser or the Company to the other Party, if an Order of the Bankruptcy Court is entered denying approval of the Bidding Procedures Order or the Sale Order and such Order becomes final and non-appealable; or

(l)    by written notice from Purchaser to the Company upon the occurrence of any "Event of Default" under the DIP Credit Agreement that has not been cured (if susceptible to cure) or waived by the applicable percentage of DIP Lenders in accordance with the terms of the DIP Credit Agreement.

For the avoidance of doubt, each condition permitting termination of this Agreement set forth in this Section 8.1 shall be considered separate and distinct from each other such condition and, if more than one termination condition set forth in this Section 8.1 is applicable, the Party exercising any such termination right shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

8.2.    Effect of Termination.  In the event of termination of this Agreement pursuant to

Section 8.1, this Agreement shall forthwith become void and there shall be no Liability on the part of any Party or any of its partners, officers, directors or shareholders; provided that this Section 8.2 and Article X shall survive any such termination; provided further that no termination will relieve any Party from any Liability from any Willful Breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder).

## ARTICLE IX

## TAXES

9.1.    Transfer Taxes.  Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, value added, motor vehicle registration, excise, documentary, stamp, or other similar Taxes and all filing and recording charges (and any interest, penalties and additions with respect to such Taxes and fees) payable by reason of the consummation of the transactions contemplated by this Agreement, including the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby in any U.S. or foreign jurisdiction (the "Transfer Taxes") shall be borne by Purchaser, regardless of the party on whom liability is imposed under the provisions of the Laws relating to such Transfer Taxes.  For the avoidance of doubt, Transfer Taxes shall not include any income or similar taxes.  The party customarily responsible under applicable Law shall file all necessary Tax Returns with respect to Transfer Taxes.  Sellers and Purchaser shall cooperate to ensure that all such Transfer Taxes are timely paid and all Tax Returns related to the Transfer Taxes are timely filed.  Sellers and Purchaser shall use commercially reasonable efforts and cooperate in good faith to exempt all such transactions from any Transfer Taxes.  Sellers shall, and shall cause their Subsidiaries (as applicable), or Purchaser (or its subsidiaries) shall, as applicable, as soon as practicable after any payment of any Transfer Taxes to the relevant Governmental Body, deliver to the non-paying party the original or a certified copy of a receipt issued by the relevant Governmental Body evidencing such payment and any tax certificates or forms in respect of such Transfer Taxes and any other form or other information that could aid in the recovery of any such Transfer Taxes in a form reasonably satisfactory to the non-paying party.

9.2.    Allocation of Purchase Price.  Unless Purchaser elects to structure the transactions contemplated hereby as a G Reorganization pursuant to Section 9.5:

(a)    For U.S. federal and applicable state and local income Tax purposes, Purchaser, Sellers, and their respective Affiliates shall, consistent with the requirements of Section 1060 of the Code and the regulations promulgated thereunder and any similar provision of applicable Law, allocate the Purchase Price (and any Assumed Liabilities treated as part of the Purchase Price for applicable income Tax purposes) among the Acquired Assets in accordance with a methodology to be mutually agreed upon by the parties (the "Allocation Methodology").

(b)    As soon as commercially practicable, but no later than forty-five (45) days following the determination of the final Purchase Price, Purchaser shall provide a proposed allocation to Sellers setting forth the allocation of the Purchase Price (and other amounts treated as Purchase Price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the Allocation Methodology (the "Allocation").  If Sellers fail to deliver a written objection

in accordance with this Section 9.2, the Allocation will be conclusive and binding on all Parties. If Sellers deliver a written objection on the grounds that the draft Allocation is inconsistent with the Allocation Methodology, which objection sets forth in reasonable detail their objections within twenty (20) days after receipt of the draft Allocation proposed by Purchaser, then Purchaser and Sellers shall negotiate in good faith to resolve any such objection, and, if Sellers and Purchaser cannot resolve such dispute within thirty (30) days of Purchaser's receipt of Sellers' objection, then a nationally recognized accounting firm mutually acceptable to Purchaser and Sellers shall resolve such dispute and the resolution of such dispute shall be final and binding on the Parties, with costs being borne by the Party whose position was not sustained.

(c)    The Parties and their respective Affiliates shall file all Tax Returns in accordance with such Allocation (as finally determined under this Section 9.2) and not take any Tax related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code.

9.3.    Cooperation.  Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

9.4.    Preparation of Tax Returns and Payment of Taxes.

(a)    Except as otherwise provided by Section 9.1, Sellers shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets, including of the Acquired Subsidiaries, for any Tax period ending on or before the Closing Date and (ii) all Tax Returns of Sellers.  Except to the extent any Tax reflected on a return required to be prepared and filed by Sellers pursuant to this Section 9.4 is otherwise reflected as an adjustment to Purchase Price or constitutes an Assumed Liability, Sellers shall be liable and responsible for, and pay any Taxes relating to periods covered by such Tax Returns.

(b)    Purchaser shall prepare and timely file all other Tax Returns with respect to the Acquired Assets for any Pre-Closing Tax Period or Straddle Period, including of any Acquired Subsidiaries, that are not addressed by Section 9.4(a).  With respect to any Straddle Period, Purchaser shall prepare such Tax Returns consistent with past practice, except as otherwise required by applicable Law.  Purchaser shall provide Company with a draft of such Tax Returns with respect to the Acquired Assets for any Pre-Closing Tax Period or Straddle Period, along with a calculation of the amount of the Taxes consistent with Section 9.4(c) that relate to the portion of the period ending on the Closing Date and are the responsibility of Sellers at least thirty (30) days prior to the filing of any such Tax Return; provided that if such Tax Return is due less than forty five (45) days after Closing, then Purchaser shall deliver a draft of such Tax Return as soon as practicable after the Closing.  Purchaser shall incorporate any changes reasonably requested by Sellers with respect to such Tax Returns.

(c)    All real property taxes, personal property taxes, ad valorem and similar periodic Taxes and obligations levied on or with respect to the Acquired Assets for any Straddle Period (collectively, the "Apportioned Obligations") shall be apportioned between Sellers, on the one hand, and Purchaser, on the other hand, based on the number of days of such taxable period included in the Pre-Closing Tax Period and the number of days included in the Post-Closing Tax

72

Period.  Sellers shall be liable for the proportionate amount of such Taxes that is attributable to the Pre-Closing Tax Period ("Straddle Period Taxes") and Purchaser shall be liable for the proportionate amount of such Taxes that is attributable to the Post-Closing Tax Period.  The Apportioned Obligations shall be prorated (based on the most recent available Tax statement, latest Tax valuation and latest bills) as of the Closing.  If the Closing occurs before the Tax rate is fixed for the then current fiscal or calendar year, whichever is applicable, the proration of the corresponding Taxes shall be on the basis of the tax rate for the last preceding year applied to the latest assessed valuation.

(d)    Except as expressly provided in Section 9.4(e) or Section 9.5, Purchaser shall not file any Tax Return, file an amendment to any previously-filed Tax Return, or otherwise take any Tax position that has the effect of increasing any Tax due for a Pre-Closing Tax Period or portion of a Straddle Period ending on the Closing Date, unless required to do so by applicable Law, and shall provide no less than five (5) days' notice of its position to the Company before filing any such Tax Return.

(e)    At Purchaser's request, Sellers shall join with Purchaser in making (or Purchaser shall be permitted to unilaterally make) an election pursuant to Section 336(e), Section 338(g) and/or Section 338(h)(10) of the Code and any similar provisions of state Tax Law with respect to the purchase of the Acquired Subsidiaries hereunder (collectively, the "Tax Elections") to the extent that such Tax Elections do not materially increase the cash Tax liability of Sellers from the transactions contemplated in this Agreement as reasonably determined by Sellers.  Purchaser shall be responsible for the preparation of all forms and documents required in connection with the Tax Elections (the "Tax Forms").  Upon receipt of the Tax Forms prepared by Purchaser, and Sellers shall promptly execute and deliver such Tax Forms back to Purchaser (and, to the extent instructed to do so by Purchaser, promptly file such Tax Forms) and take such actions as may be reasonably requested by Purchaser thereafter in connection with making or perfecting the Tax Elections.  The parties shall cooperate fully with each other and make available to each other such Tax data and other information as may be reasonably required in order to prepare and file the Tax Elections.

9.5.    "G" Reorganization.

(a)    Purchaser and Sellers have the right to jointly elect at any time prior to the Closing to structure or restructure the transactions contemplated by this Agreement as a reorganization under Section 368(a)(1)(G) of the Code, with any actual or deemed distribution by the Company (or, if applicable, any of its Subsidiaries) qualifying solely under Sections 354 and 356 of the Code but not under Section 355 of the Code ("G Reorganization" and such election, the "G Reorganization Election").

(b)    In the event that a G Reorganization Election is made, Purchaser and Sellers shall (i) implement the G Reorganization in a manner that is otherwise consistent with the rights and obligations of Purchaser and Sellers under this Agreement, (ii) treat the G Reorganization as a corporate acquisition of assets by Purchaser to which Section 381 of the Code applies, (iii) agree that this Agreement constitutes a "plan of reorganization" within the meaning of Treasury Regulations Section 1.368-2(g) with neither Purchaser nor any Seller taking any action or failing to take an action that will preclude the transactions contemplated by this Agreement from

73

qualifying as a G Reorganization, (iv) take (or not take) any other actions to secure and preserve the qualification of any of the transactions set forth in this Agreement as a G Reorganization, including, without limitation, with respect to (A) repayment, cancellation or settlement of, or other actions with respect to, any intercompany accounts on or before the Closing Date, (B) the merger of one member of the Company or its Subsidiaries with another member of the Company or its Subsidiaries on or before the Closing Date or conversion (or liquidation) of any such member into a limited liability company on or before the Closing Date, (C) the filing of any Tax elections to treat any such entity as a disregarded entity for U.S. federal income Tax purposes on or before the Closing Date, and (D) satisfaction of the ownership requirements set forth in Section 382(l)(5)(A) of the Code ("L5") to the extent that Purchaser and Sellers agree that Purchaser is potentially eligible to make an L5 election and Purchaser agrees that the preservation of the ability to make such election is in the best interests of Purchaser; provided that Sellers shall not be limited in respect of disposing of any of its assets if and to the extent permitted under the other provisions of this Agreement and taking or refraining from taking any action required by law, including if such actions would be inconsistent with its obligations under the Bankruptcy Code.

(c)     To the extent not addressed by the foregoing, Purchaser and each Seller shall also furnish or cause to be furnished to each other all documentation and information of Sellers or any of their Affiliates as reasonably requested in connection with (i) the treatment of the transactions contemplated by this Agreement as one or more reorganizations under Section 368 of the Code and/or in connection with qualifying for the application of Section 382(l)(5) of the Code and (ii) the Tax basis, losses, and credits (including carryovers), income, gains, deductions and other attributes or Tax items of Sellers or any of their Affiliates.

## ARTICLE X

## MISCELLANEOUS

10.1.   <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>.  Each of the representations and warranties and the covenants and agreements (to the extent (and solely to the extent) such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in Contract, in tort or at law or in equity) may be brought with respect thereto after the Closing.  Each covenant and agreement that contemplates performance following the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then until the earlier of the time such covenant is fully performed and the seven (7) year anniversary of the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Party for breach of any such surviving covenant or agreement.  Purchaser and Sellers Parties acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) requiring performance after the Closing will survive the Closing until the earlier of the date that such covenant or agreement, as applicable, is fully performed and the seven (7) year anniversary of the Closing Date; (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this <u>Section 10.1</u>, none of the Parties would

enter into this Agreement and (c) for the avoidance of doubt, the Parties (i) intend the time periods contemplated by this Section 10.1 to shorten, replace and supersede (as may be applicable) any statute of limitations that may otherwise be applicable and (ii) acknowledge and agree that such shortening, replacing or supersession of any such statute of limitations is reasonable and appropriate. Purchaser Group hereby waives all rights and remedies under Environmental Laws, including ISRA and the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, with respect to any environmental, health or safety matters relating to this Agreement or the transactions contemplated hereby; for clarity, the foregoing shall not in any way waive any of the rights and remedies that this Agreement affords to the Purchaser. Notwithstanding anything contained in this Agreement to the contrary (including in this Section 10.1 and Section 10.7), nothing set forth herein shall limit any right or remedies available to Purchaser in respect of any claim for Fraud.

10.2. Expenses. Whether or not the Closing takes place, except as otherwise provided in Sections 1.5, 6.2(e), 6.4(d), 6.4(e), 6.8, 6.9 and 8.2, all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the Ancillary Agreements, the performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby, will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all fees and expenses in connection with any filing or submission that is necessary under the HSR Act and any Foreign Competition Laws will be allocated pursuant to Section 6.5, (b) all Transfer Taxes will be allocated pursuant to Section 9.1 and (c) all Cure Costs will be allocated pursuant to Section 5.2.

10.3. Notices. All notices, requests, permissions, waivers, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) if transmitted by electronic mail with confirmation of delivery (which confirmation may be electronic) prior to 5:00 p.m. New York time on a Business Day, then on such Business Day, and if such confirmation of delivery is on a day which is not a Business Day or after 5:00 p.m. New York time on a Business Day, then the next proceeding Business Day, (c) one (1) Business Day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party from time to time.

Notices to Purchaser:

Wilmington Savings Fund Society, FSB
500 Delaware Ave.
Wilmington, DE 19801
Attention:     Geoffrey J. Lewis
Email:         glewis@wsfsbank.com

with a copy to (which shall not constitute notice):

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
Attention:      Scott J. Greenberg
                Steven Domanowski
                Steven R. Shoemate
Email:          SGreenberg@gibsondunn.com
                SDomanowski@gibsondunn.com
                SShoemate@gibsondunn.com

and:

Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Attention:      Andrew N. Goldman
Email:          andrew.goldman@wilmerhale.com

<u>Notices to Sellers</u>:

Akorn, Inc.
1925 W. Field Court, Suite 300
Lake Forest, Illinois 60045
Attention:      Joseph Bonaccorsi
Email:          joe.bonaccorsi@akorn.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attention:      Richard J. Campbell, P.C.
                Patrick J. Nash Jr., P.C.
                Steve Toth
                Gregory F. Pesce
Email:          richard.campbell@kirkland.com
                patrick.nash@kirkland.com
                steve.toth@kirkland.com
                gregory.pesce@kirkland.com

10.4.   <u>Assignment</u>.

(a)    This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Sellers, and shall inure to the benefit of and be so binding on the Parties

and their respective successors and permitted assigns; provided that, subject to Section 10.4(b), neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and the Company, and any attempted assignment or delegation without such prior written consent shall be null and void; provided further that Purchaser (subject to Purchaser remaining liable for its obligations hereunder in the event such obligations are not performed in accordance with their terms) may assign any of its rights or obligations hereunder to any of its Affiliates without the consent of any Person.

(b)     At any time prior to the Closing, and notwithstanding anything contained herein to the contrary, Purchaser shall be entitled to designate, by written notice to Sellers, one or more Persons to (i) purchase the Acquired Assets (including specified Assigned Contracts) and pay the corresponding Purchase Price amount and require payment of the Cure Costs as contemplated by Section 5.2, as applicable and/or (ii) assume the Assumed Liabilities (any such Person that shall be designated in accordance with this clause, a "Designated Purchaser").  In addition, and for the avoidance of doubt, a Designated Purchaser shall be entitled to employ any of the Transferred Employees on and after the Closing Date (otherwise in accordance with Section 6.3) and to perform any other covenants or agreements of Purchaser under this Agreement. Notwithstanding the foregoing, Purchaser's designation of any Designated Purchaser pursuant to this Section 10.4 shall not relieve Purchaser of its obligations under this Agreement in the event such obligations are not performed by any such Designated Purchaser in accordance with their terms.

10.5.    Amendment and Waiver.  Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and the Company or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought or asserted.  No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6.    Third Party Beneficiaries.  Except for Sections 6.12 and 10.7, this Agreement is for the sole benefit of the Parties (and their permitted successors and assigns) and nothing expressed or referred to in this Agreement shall give or be construed to give any Person other than the Parties (and their permitted successors and assigns) any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7.    Non-Recourse.  This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement.  Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party or any Subsidiary of Sellers will have any Liability (whether in Contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8.    Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective, valid and enforceable under applicable Law, but if any provision of this Agreement is held by a court or other tribunal of competent jurisdiction to be

prohibited by, invalid or unenforceable under applicable Law in any jurisdiction, such provision will be limited or ineffective only to the extent of such prohibition, invalidity or unenforceability in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9.    <u>Construction</u>.    The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party.    The table of contents and headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify or affect the meaning or interpretation of any of the terms or provisions hereof.

10.10.    <u>Schedules</u>.    The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; <u>however</u>, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement, in each case, to the extent (and solely to the extent) the relevance of such disclosure to such other section of the Schedules or such other representation or warranty set forth in this Agreement is reasonably apparent on the face of such disclosure (without review or other examination of the underlying documents listed therein).    Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement.    The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not material or threatened, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules, Updated Schedules, or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not material or threatened for purposes of this Agreement.    In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules and such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature.    Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement, in each case, solely to the extent made available to Purchaser in accordance with <u>Section 11.3(j)</u>.    The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any breach or violation of, or default in, Law or any provision of any Contract.

10.11.    <u>Complete Agreement</u>.    This Agreement, together with the Confidentiality Agreement, the Ancillary Agreements and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement. In the event an ambiguity or question of intent or interpretation arises with respect to this

Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12.  Specific Performance.   The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement.   It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 10.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Sellers nor Purchaser would have entered into this Agreement.   The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 10.12 will not be required to provide any bond or other security in connection with any such Order.   The remedies available to the Parties pursuant to this Section 10.12 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Party from seeking to collect or collecting damages.  If, prior to the Outside Date, any Party brings any action, in each case in accordance with Section 10.12, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (y) for the period during which such action is pending, plus five (5) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be.

10.13.  Jurisdiction and Exclusive Venue.   Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the transactions contemplated hereby brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) ((a) and (b), the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby.  Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or

venue-related grounds, including the doctrine of *forum non-conveniens*.  The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action.  Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3.  Nothing in this Agreement will affect the right of any Party to this agreement to serve process in any other manner permitted by Law.

10.14.  Governing Law; Waiver of Jury Trial.

(a)     Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.  EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.  EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER (WHETHER BEFORE, ON OR FOLLOWING THE CLOSING) AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.  FOR THE AVOIDANCE OF DOUBT, THIS SECTION 10.14(b) SHALL NOT APPLY TO ANY CLAIMS THAT PURCHASER OR ITS AFFILIATES MAY HAVE AGAINST ANY THIRD PARTY FOLLOWING THE CLOSING.

10.15.  Counterparts and PDF.  This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument.  Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding

legal effects as if it were the original signed version thereof delivered in person.  Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature.  At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of .PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.16.  <u>Publicity</u>.  The Company shall not and shall cause its Subsidiaries not to, and Purchaser shall not, issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld, conditioned or delayed, unless, in the reasonable judgment of Purchaser or the Company, disclosure is required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or the Company lists securities; <u>provided</u> that the Party intending to make such release shall use its reasonable best efforts to consult in advance with the other Parties with respect to the form and text thereof (and will consider in good faith all reasonable comments of the other Parties thereto).

10.17.  <u>Bulk Sales Laws</u>.  The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances (other than Permitted Encumbrances) in the Acquired Assets including any liens or claims arising out of the bulk transfer laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.  Each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement and any other agreement contemplated hereby; provided that nothing in this <u>Section 10.17</u> shall be deemed to expand, transfer, shift or otherwise alter any Party's obligations with respect to Assumed Liabilities and/or Excluded Liabilities.

10.18.  <u>No Solicitation</u>.  This Agreement and the transactions contemplated herein and therein are the product of negotiations among the Parties.  Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (a) a solicitation of votes for the acceptance of any plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act or the Exchange Act and none of the Company, the other Sellers, nor their Subsidiaries will solicit acceptances of a plan from any party until such party has been provided with copies of a disclosure statement containing adequate information as required by section 1125 of the Bankruptcy Code.

# ARTICLE XI

# ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1.   Certain Definitions.

(a)     "Action" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, grievance, summons, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which Liability, if any, or obligation may be sought to be imposed, whether sounding in Contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

(b)     "Advisors" means, with respect to any Person, any directors, officers, employees, investment bankers, financial or other professional advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(c)     "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d)     "Akorn Luxembourg" means Akorn International S.à r.l, a limited liability company, organized under the laws of Luxembourg, with registered office and business address at 15, Rue Edward Steichen, 4th Floor, L-2540 Luxembourg, company registration number B188609.

(e)     "Alternative Transaction" means any transaction (or series of transaction), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of any Seller or any portion of the equity interests or any material portion of the assets thereof (in any form of transaction, whether by merger, sale of assets or equity or otherwise).

(f)     "Anti-Corruption Laws" means all anti-corruption Laws applicable to the Company, including the United States Foreign Corrupt Practices Act of 1977 (15 U.S.C. §§ 78dd-1, et seq.), and any other applicable anti-bribery or anti-corruption Law (including any Laws relating to the making of any unlawful payment to any foreign or domestic government official), including any rules, regulations and guidance promulgated under any of the foregoing that prohibit bribery, corruption, or substantially similar conduct.

(g)     "Anti-Money Laundering Laws" means all anti-money laundering laws applicable to the Company, including 18 U.S.C. §§ 1956 and 1957.

(h)     "Assumed Taxes" means (i) Purchaser's share of Transfer Taxes, as determined in accordance with Section 9.1, (ii) Purchaser's share of Apportioned Obligations, as

determined in accordance with <u>Section 9.4(b)</u>, and (iii) Taxes relating to any Tax period beginning after the Closing Date.

(i)     "<u>Auction</u>" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(j)     "<u>Avoidance Actions</u>" means any and all avoidance, recovery, subordination or other claims, actions, or remedies which any of the "Debtors" under the Bankruptcy Case, the debtors in possession, the "Estates" under the Bankruptcy Case, or other appropriate parties in interest have asserted or may assert under Sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

(k)     "<u>Bidding Procedures Order</u>" means an Order substantially in the form attached hereto as <u>Exhibit D</u>.

(l)     "<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(m)     "<u>Cash and Cash Equivalents</u>" means all of the Company's cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(n)     "<u>Code</u>" means the United States Internal Revenue Code of 1986, as amended.

(o)     "<u>Company Exclusively Licensed Intellectual Property</u>" means all Intellectual Property exclusively licensed or purported to be exclusively licensed to the Company or any of its Subsidiaries.

(p)     "<u>Company Licensed Intellectual Property</u>" means all Company Exclusively Licensed Intellectual Property and all Intellectual Property that is non-exclusively licensed or purported to be non-exclusively licensed to the Company or any of its Subsidiaries.

(q)     "<u>Company Owned Intellectual Property</u>" means all Intellectual Property owned or purported to be owned by the Company or any of its Subsidiaries.

(r)     "<u>Company SEC Documents</u>" means Company's Annual Report on Forms 10-K or 10-K/A and the Company's Quarterly Report on Form 10-Q, in each case, filed by the Company with the SEC pursuant to the Securities Act since January 1, 2019.

(s)     "<u>Consent</u>" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(t)     "<u>Contract</u>" means any written or oral contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, license or other agreement, arrangement, instrument or commitment, in each case that is binding upon a Person.

(u)     "<u>DEA</u>" means the United States Drug Enforcement Administration.

(v)     "<u>DIP Credit Agreement</u>" means the Senior Secured Super-Priority Term Loan Debtor-In-Possession Loan Agreement, dated as of the date hereof, among the Company, the other Loan Parties party thereto, the Lenders party thereto, and Wilmington Savings Fund Society, FSB, as Administrative Agent.

(w)     "<u>DIP Lenders</u>" means the parties identified as Lenders under the DIP Credit Agreement.

(x)     "<u>Documents</u>" means all of the Company's and its Subsidiaries' current or historical written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), consulting materials, opinions and other documents commissioned by or on behalf of the Company or its Subsidiaries, development, quality control, quality assurance, regulatory, pharmacovigilance records and other regulatory documents, all personnel and employment records for the Transferred Employees or any individual independent contractors of the Company or its Subsidiaries, and other books and records of Sellers, in each case whether or not in electronic form.

(y)     "<u>Encumbrance</u>" means any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in Section 101(5) of the Bankruptcy Code), license, charge, mortgage, deed of trust, option, pledge, security interest, restriction or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use or other encumbrance of any kind.

(z)     "<u>Environmental Laws</u>" means all applicable Laws concerning pollution or protection of the environment or concerning public or worker health or safety (with respect to exposure to Hazardous Substances), including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, Release, control, or cleanup of any Hazardous Substances.  For the avoidance of doubt, Environmental Laws shall not cover communicable diseases, such as the "Coronavirus" or "COVID-19".

(aa)    "<u>Equipment</u>" means any and all equipment, computers, machinery, furniture, spare parts, furnishings, fixtures, office supplies, supply inventory, vehicles and all other fixed assets.

(bb)    "ERISA" means the Employee Retirement Income Security Act of 1974.

(cc)    "Exchange Act" means the Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

(dd)    "Excluded Bank Accounts" means those certain bank accounts of Sellers that are set forth on Schedule 1.1(t).

(ee)    "Excluded Cash" means any Cash and Cash Equivalents expressly set forth on Schedule 1.1(a) or designated pursuant to Section 2.1(a).

(ff)    "Excluded Confidentiality Arrangements" means those certain non-disclosure, confidentiality, and similar arrangements with (or for the benefit of) employees and agents of Sellers or with third parties that are set forth on Schedule 1.1(q).

(gg)    "FDA" means the United States Food and Drug Administration.

(hh)    "Final Order" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, reargument or rehearing shall then be pending or (ii) if an appeal, writ of *certiorari* new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Code, may be filed relating to such order, shall not cause an order not to be a Final Order.

(ii)    "Financing Order" means, as applicable, the interim and final Orders of the Bankruptcy Court, "(I) Authorizing the Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling A Final Hearing, and (V) Granting Related Relief," in the Bankruptcy Case, setting forth the terms of Sellers' debtor-in-possession financing, which shall be consistent with the DIP Credit Agreement.

(jj)    "Fraud" means a (i) a false representation of material fact, (A) in the making of any representation or warranty by Sellers in Article III or any certificate delivered by Sellers pursuant to Section 2.3(f) or (B) with respect to the making of any representation or warranty of Purchaser in Article IV; (ii) made with knowledge or belief that such representation is false; (iii) with an intention to deceive or mislead the party to whom such representation is made to act or refrain from acting; and (iv) causing that party, in reliance upon such false representation, to take or refrain from taking action, that if taken together satisfy the requirements for establishing

85

common law fraud under Delaware Law (and does not include any fraud claim based on constructive knowledge, negligent misrepresentation, recklessness or a similar theory).

(kk)    "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(ll)    "Governmental Authorization" means any permit, license, franchise, certificate, approval, application, registration, drug listing, consent, permission, clearance, waiver, notification, designation, registration, certification, making, exemption, variance, order, tariff, rate schedule, qualification authorization or Product Registration issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law, including any Health Care Law.

(mm)    "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory or self-regulatory body, board, bureau, authority agency or political subdivision thereof of any nature, whether supranational, international, foreign, federal, state, local, provincial, territorial, county or municipal, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court, arbitrator, judicial body or tribunal (whether public or private).

(nn)    "Hazardous Substance" means any substance, material or waste defined, listed, regulated or characterized as "toxic," "hazardous," a "pollutant" or a "contaminant" under or pursuant to any Environmental Laws or which could form the basis of any liability under Environmental Laws because of its dangerous or deleterious properties or characteristics, including petroleum and its by-products, asbestos, polychlorinated biphenyls, per- and polyfluoroalkyl substances, explosives, radioactive materials, and solid wastes that pose imminent and substantial endangerment to health or the environment.  For the avoidance of doubt, Hazardous Substances shall not cover communicable diseases, such as the "Coronavirus" or "COVID-19".

(oo)    "Health Care Laws" include, but are not limited to the following: the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.) ("FDCA"); the Prescription Drug Marketing Act, as amended by the Prescription Drug Amendments of 1992 (21 U.S.C. § 331 et seq.); the Public Health Service Act (42 U.S.C. § 201 et seq.), including the Clinical Laboratory Improvement Amendments of 1988 (42 U.S.C. § 263a); the Federal Trade Commission Act (15 U.S.C. § 41 et seq.); the Controlled Substances Act (21 U.S.C. § 801 et seq.); the Criminal Health Care Fraud Statute (18 U.S.C. § 1347); the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)); the civil monetary penalties law (42 U.S.C. § 1320a-7a); the criminal False Claims Act (18 U.S.C. § 287); the civil False Claims Act (31 U.S.C. § 3729 et seq.); the administrative False Claims Law (42 U.S.C. § 1320a-7b(a)); the Stark law (42 U.S.C. § 1395nn); the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d et seq.) as amended by the Health Information Technology for Economic and Clinical Health Act (42 U.S.C. § 17921 et seq.); the exclusion laws (42 U.S.C. § 1320a-7); the Medicare statutes (Title XVIII of the Social Security Act); the Medicaid statutes (Title XIX of the Social Security Act); and the Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010 (42 U.S.C. § 18001 et seq.); any regulations or guidance promulgated or issued pursuant to such laws; and any other state, federal or ex-U.S. laws, accreditation standards, or regulations governing the classification, design, research, investigation, development, approval,

manufacturing, safety surveillance, testing, packaging, labeling, advertising, marketing, storage, import, export, promotion, distribution, or sale of Products, kickbacks, patient or program charges, recordkeeping, claims process, documentation requirements, medical necessity, referrals, the hiring of employees or acquisition of services or supplies from those who have been excluded from government health care programs, quality, safety, privacy, security, licensure, accreditation or any other aspect of providing health care, clinical laboratory or diagnostic products or services, to the extent applicable to the Company or its Subsidiaries.

(pp)    "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations promulgated thereunder.

(qq)    "India Company" means Akorn India Private Limited.

(rr)    "Intellectual Property" means any and all intellectual property of every kind, arising under the Laws of the United States or any other jurisdiction, including all of the following: (i) patents, patent applications and patent disclosures; (ii) trademarks and service marks (registered and unregistered), trade dress, trade names, corporate names and Internet domain names, together with all goodwill associated with each of the foregoing; (iii) copyrights (registered and unregistered); (iv) registrations and applications for any of the foregoing; (v) trade secrets, know-how, inventions, methods, processes, formulae, research and development information, technology, product roadmaps, customer lists and any other information or any kind or nature, in each case to the extent any of the foregoing derives economic value (actual or potential) from not being generally known to other Persons who can obtain economic value from its disclosure; (vi) computer software; (vii) drawings, schematics and other technical plans; and (viii) all other intellectual property, proprietary or industrial property rights of any kind or nature.

(ss)    "International Trade Laws"   means all applicable United States laws, regulations, and orders pertaining to trade and economic sanctions and export controls, including, such laws, regulations, and orders administered and enforced by the U.S. Department of the Treasury, the U.S. Department of Commerce, the U.S. Department of State including the sanctions administered and enforced by the Office of Foreign Assets Control, the United States Export Administration Act of 1979, as amended, and the Export Control Reform Act of 2018, and implementing Export Administration Regulations; the Arms Export Control Act and implementing International Traffic in Arms Regulations; the anti-boycott regulations, guidelines and reporting requirements under the Export Administration Regulations and Section 999 of the Code; and all comparable applicable economic sanctions and export laws outside the United States for each country where the Company and its Subsidiaries, or their agents and representatives on behalf of the Company and its Subsidiaries, conduct business.

(tt)    "Inventory" means all inventory (including active pharmaceutical ingredients, finished goods, supplies, raw materials, work in progress, spare, replacement and component parts) maintained or held by, stored by or on behalf of, or in transit to, any of Sellers or Acquired Subsidiaries, whether for sale or non-commercial use (e.g., validation) or otherwise, together with any interests therein, including (x) being held by customers pursuant to consignment arrangements or (y) being held by suppliers or vendors under tolling or similar arrangements.

(uu)    "ISRA" means the New Jersey Industrial Site Recovery Act, N.J.S.A. 13:1K-6 et seq., as amended, and the rules and regulations promulgated thereunder.

(vv)    "Knowledge of Sellers" means the actual knowledge of Duane Portwood, Joseph Bonaccorsi, and Jennifer Bowles, after reasonable investigation of their direct reports with respect to the applicable subject matter.

(ww)    "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body anywhere in the world.

(xx)    "Leasehold Improvements" means all buildings, structures, improvements and fixtures which are owned by a Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the lease for such Leased Real Property.

(yy)    "Lenders" has the meaning set forth in the Loan Agreement.

(zz)    "Liability" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(aaa)    "Loan Agreement" means that certain Loan Agreement, dated as of April 17, 2014, between the Company, the other loan parties, the lenders and Wilmington Savings Fund Society, FSB as administrative agent, as amended by the Standstill Agreement, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time.

(bbb)    "Loan Agreement Indebtedness" means all Prepetition Obligations outstanding as of the date hereof under the Loan Agreement and the other Loan Documents, including all interest due and owing thereunder and all accrued and unpaid fees and expenses.

(ccc)    "Loan Documents" has the meaning set forth in the Loan Agreement.

(ddd)    "Material Adverse Effect" means any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") that, individually or in the aggregate (a) has, or would reasonably be expected to have, a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as a whole, or on the results of operations or condition (financial or otherwise) of the business of the Company and its Subsidiaries or (b) would reasonably be expected to impair, in any material respect, the ability of the Company and its Subsidiaries to consummate the transactions contemplated by this Agreement or the Ancillary Agreements;

provided that, for purposes of clause (a), none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: any Effect arising from or relating (and solely to the extent arising from or relating) to (i) general business or economic conditions affecting the industry in which the Company and its Subsidiaries operate, (ii) general national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices, (iii) any fire, flood, hurricane, earthquake, tornado, windstorm, or other similar calamity or similar act of God, (iv) any global or national health concern, epidemic, disease outbreak, pandemic (whether or not declared as such by any Governmental Body and including the "Coronavirus" or "COVID-19") or any Law issued by a Governmental Body requiring business closures, quarantine or "sheltering-in-place" or similar restrictions that arise out of such health concern, epidemic, disease outbreak or pandemic (including the "Coronavirus" or "COVID-19") or any change in such Law following the date of this Agreement, (v) general financial, banking, or securities market conditions, (vi) the announcement or pendency of this Agreement or the transactions contemplated hereby or the identity, nature or ownership of Purchaser, (vii) changes after the date hereof in GAAP, (viii) changes after the date hereof in Laws, (ix) any failure, in and of itself, of Sellers to achieve any budgets, projections, forecasts, estimates, predictions, or guidance; provided that the Effects giving rise to or contributing to such failure may be deemed to constitute, or be taken into account in determining whether there has been a Material Adverse Effect, (x) the matters set forth on Schedule 11.1(ddd), or (xi) (A) the commencement or pendency of the Bankruptcy Case; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby or thereby, (2) the reorganization of Sellers, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract otherwise in compliance with this Agreement; (C) any Order of the Bankruptcy Court or any actions or omissions of Sellers or their Subsidiaries required to be taken (or not to be taken) to comply therewith; provided, however, in the case of the immediately preceding clauses (i), (ii), (iii), (iv), (v), (vii) or (viii), to the extent that the impact of any such Effect is disproportionately adverse to Sellers, the Acquired Subsidiaries, their respective business, the Acquired Assets or the Assumed Liabilities, taken as a whole, relative to other similarly situated businesses in the industry in which Sellers and the Acquired Subsidiaries operate occur or arise, then such matter, event, change, development, occurrence, circumstance or effect may be taken into account in determining whether there has been or will be, a Material Adverse Effect.

(eee)    "Order" means any award, order, injunction, order, decree, ruling, writ, assessment, judgment, decision, subpoena, mandate, precept, command, directive, consent, approval, award (including any arbitration award) or similar determination or finding entered, issued, made or rendered by any Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

(fff)    "Ordinary Course" means the ordinary and usual course of operations of the business of the Company and its Subsidiaries consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Case; provided that any action described in Schedule 3.17(d) and taken, whether before, on or after the date of this Agreement in Sellers' good faith business judgment, to respond to the "Coronavirus" or "COVID-19" (or the Effects thereof) shall be deemed "Ordinary Course" hereunder.

89

(ggg)    "Outside Back-Up Date" means the date that is forty-five (45) days after the date of the Sale Hearing.

(hhh)    "Permitted Encumbrances" means (i) statutory Encumbrances for Taxes (A) not yet due or payable or (B) that are being contested in good faith by appropriate Actions and for which adequate reserves have been established in accordance with GAAP; (ii) with respect to Owned Real Property or Leased Real Property, easements, rights of way and similar non-monetary Encumbrances (that would be disclosed by an accurate survey of the real property and otherwise affecting title to real property) which do not, individually or in the aggregate, adversely affect the use or occupancy of such Owned Real Property or Leased Real Property as it relates to the Acquired Assets; (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated by the current use or occupancy, or the current or previous use or occupancy in the Ordinary Course, of such Owned Real Property or Leased Real Property, as applicable; (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course and securing obligations incurred prior to the Closing Date for amounts not yet due or payable; (v) non-exclusive licenses of Intellectual Property granted in the Ordinary Course; (vi) such other Encumbrances or title exceptions as Purchaser may approve in writing in its sole discretion; (vii) any Encumbrances set forth on Schedule 11.1(hhh); and (viii) any Encumbrances that will be removed or released by operation of the Sale Order with no Liability to Purchaser or any of its Affiliates.

(iii)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group, whether or not a legal entity.

(jjj)    "Personal Information" means any information that can be used directly or indirectly, alone or in combination with other information, to identify an individual, including name, Social Security Number or other government identifier, or credit card account information and any information defined as "personal data", "personally identifiable information" or "personal information" under any Law relating to privacy, data security, data protection, and collection, storing, use, security, processing and transferring of Personal Information, as applicable.

(kkk)    "Post-Closing Tax Period" means all taxable periods beginning after the Closing Date and the portion beginning on the day after the Closing Date of any tax period that includes but does not end on the Closing Date.

(lll)    "Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date and with respect to any taxable period that includes but does not end on the Closing Date, the portion thereof ending on the Closing Date.

(mmm)"Prepetition Obligations" shall have the meaning assigned to it in the Financing Order.

(nnn)    "Product" means each product manufactured, commercialized, developed, packaged, labeled, stored, used, marketed, imported, exported, distributed or sold by or on behalf of the business of the Company, or which the process has taken substantial steps

towards manufacturing, commercializing, developing, packaging, labeling, storing, using, marketing, importing, exporting, distributing or selling, including all products that are regulated as human or animal drugs, medical devices, or other health care products under Health Care Laws, including drug and biological candidates, compounds or products being researched, tested, stored, developed, labeled, manufactured, packed, marketed, sold and/or distributed by the Company or any of its Subsidiaries.

(ooo)    "Product Registrations" means (i) any investigational new drug application, new drug application, abbreviated new drug application, premarket approval, 510(k) clearance, or similar regulatory application of Sellers for any Product that has been submitted to or approved by the FDA in the United States (other than withdrawn submissions or approvals) and (ii) all marketing approvals, clearances, registrations, certifications, markings, consents or other authorizations used to market the Products and granted or pending with any Governmental Body, including establishment registrations and Product listings.

(ppp)    "Purchaser Group" means Purchaser, any Affiliate of Purchaser and each of their respective Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns; provided, however, that the definition of "Purchaser Group" shall not include Wilmington Savings Fund Society, FSB, in its capacity as Administrative Agent under the Loan Agreement or Administrative Agent under the DIP Credit Agreement or any of their respective officers, directors, employees, partners, members, managers, agents, or Advisors in their capacities as such.

(qqq)    "Registration Information" means any and all original Product Registrations, together with all Regulatory Documentation.

(rrr)    "Regulatory Documentation" means (i) all regulatory filings, underlying material data, datasets and supporting documents (including copies of all material correspondence between any of Sellers or their Affiliates and the applicable Governmental Body), material CMC data and documentation, preclinical and clinical studies and tests, (ii) any premarket approval or 510(k) clearance application or foreign equivalent, and all regulatory files related thereto, current approved packaging and any other existing files and dossiers, including the underlying data, datasets or information used to support, maintain or obtain marketing authorization, (iii) all records maintained under record keeping or reporting Laws of the FDA or any other Governmental Body, including all marketing applications, annual and safety reports, master files, FDA warning letters, FDA notices of adverse finding letters, FDA audit reports (including any responses to such reports), periodic safety update reports, complaint files, and annual product quality reviews, and (iv) the complete complaint, adverse event and medical inquiry filings with respect to any product line as required by applicable Health Care Laws, including the Product Registrations.

(sss)    "Release" means any actual or threatened spilling, leaking, pumping, pouring, releasing, emitting, emptying, discharging, injecting, escaping, dumping, disposing, depositing, dispersing, leaching or migrating of any Hazardous Substance into or through the indoor or outdoor environment.

(ttt)    "RSA" means that certain Restructuring Support Agreement, dated as of the date hereof, by and among the Sellers and the other parties thereto, as may be amended, modified, or supplemented from time to time, in accordance with its terms.

(uuu)    "Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions pursuant to the Sale Order.

(vvv)    "Sale Order" means an order of the Bankruptcy Court approving and authorizing the sale of the Acquired Assets to Purchaser substantially in the form attached as Exhibit H hereto, with such changes as may be required by the Bankruptcy Court that are in form and substance satisfactory to Purchaser and Sellers.

(www) "Sanctioned Person" means an individual or entity that is identified on (or owned, 50% or more, individually or in the aggregate by, controlled by, or acting on behalf of an individual or entity identified on), the United States' Specially Designated Nationals and Blocked Persons List, the United States' Denied Persons or Entity lists, the United Nations Security Council Sanctions List, as applicable, the European Union's List of Persons, Groups and Entities Subject to Financial Sanctions, as applicable, the U.K. Consolidated List of Financial Targets, as applicable, and any other applicable list of sanctioned persons maintained by any other Governmental Body of any country where the Company and its Subsidiaries conduct business.

(xxx)    "SEC" means the U.S. Securities and Exchange Commission.

(yyy)    "Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(zzz)    "Seller FDA Transfer Letters" means the letters from the applicable holders of a New Drug Application or Abbreviated New Drug Application for human or animal drug products, premarket approval, or 510(k) clearance (each as defined by the FDA), duly executed, notifying the FDA of the transfer of the rights to the applicable Governmental Body New Drug Application, Abbreviated New Drug Application, premarket approval, or 510(k) clearance (each as defined by the FDA) to Purchaser.  In the case of a premarket approval or 510(k) clearances, a "Seller FDA Transfer Letter" notification shall include the submission of electronic information to the FDA pursuant to 21 CFR §807.

(aaaa)    "Seller Parties" means Sellers and the Company's Subsidiaries and each of their respective former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(bbbb)    "Seller Plan" means each (i) employee benefit plan within the meaning of Section 3(3) of ERISA (whether or not subject to ERISA), (ii) stock option, stock purchase, stock appreciation right or other equity or equity-based plan, program, policy, Contract, agreement or other arrangement, (iii) employment, individual consulting, severance, retention, change in control or other similar plan, program, policy, Contract, agreement or other arrangement or (iv) bonus, incentive, deferred compensation, profit-sharing, retirement, post- termination health or welfare, vacation, severance or termination pay, fringe or other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored,

maintained or contributed to by the Company or any of its Subsidiaries or to which the Company or any of its Subsidiaries contributes or is obligated to contribute to or has any Liability.

(cccc)    "Standstill Agreement" means that certain Standstill Agreement, dated as May 6, 2019, by and among the Company, certain loan parties under the Loan Agreement, certain other lenders party thereto, and JPMorgan Chase Bank, N.A., as administrative agent, as amended by the First Amendment, dated as of December 13, 2019, and the Second Amendment, dated as of February 12, 2020, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time.

(dddd)    "Straddle Period" means any Tax period beginning before, and ending after, the Closing.

(eeee)    "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(ffff)    "Swiss Company" means Akorn AG, a Swiss share corporation (Aktiengesellschaft), organized under the laws of Switzerland, with registered office in and business address at Riethofstrasse 1, 8842 Hettlingen, Switzerland, Swiss company registration number CHE-110.060.866.

(gggg)    "Tax" or "Taxes" means any federal, state, local, or foreign tax or other duty, fee, assessment or other charge in the nature of taxes of any kind whatsoever (whether imposed directly or through withholding and whether or not disputed) including income, gross receipts, capital, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, inventory, license, payroll, employment, social security, severance, intangibles, environmental, customs duties, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty, additions to tax or additional amounts with respect thereto (or attributable to the nonpayment thereof).

(hhhh)    "Tax Return" means any return, declaration, estimate, claim for refund, report, statement or information return relating to Taxes filed or required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(iiii)    "U.S. Antitrust Laws" means any of the HSR Act, the Sherman Antitrust Act, as amended, the Clayton Antitrust Act, as amended, and any other United States federal or state Law, Orders, or administrative or judicial doctrines that are designed to prohibit, restrict or regulate mergers and acquisitions and/or actions having the purpose or effect of lessening competition, monopolization or restraining trade.

(jjjj)    "<u>United States Seller Plan</u>" means each Seller Plan maintained with respect to the Company and its Subsidiaries other than any Non-Debtor Subsidiary.

(kkkk)    "<u>Willful Breach</u>" means a material breach of this Agreement that is a consequence of an act or failure to act with the actual knowledge that the taking of the act or failure to act would result in a material breach of this Agreement.

(llll)    "<u>Wind-Down Budget</u>" means the wind-down budget, substantially in the form attached hereto as <u>Exhibit G</u> and otherwise in form and substance satisfactory to Purchaser.

11.2.    <u>Index of Defined Terms</u>.

Acquired Assets ........................................... 1
Acquired Avoidance Actions ...................... 4
Acquired Leased Real Property ................. 2
Acquired Leases ........................................ 13
Acquired Owned Real Property ................. 2
Acquired Subsidiaries ................................ 3
Action ........................................................ 82
Advisors .................................................... 82
Affiliate .................................................... 82
Agreement .................................................. 1
Akorn Luxembourg .................................... 82
Allocation .................................................. 71
Allocation Methodology ........................... 71
Alternative Transaction ............................. 82
Ancillary Agreement ................................. 16
Anti-Corruption Laws ............................... 82
Anti-Money Laundering Laws .................. 82
Apportioned Obligations ........................... 72
Assigned Contracts ..................................... 2
Assignment and Assumption Agreement .. 13
Assignment and Assumption of Lease ...... 13
Assumed Benefit Plans .............................. 7
Assumed Liabilities .................................... 6
Assumed Taxes .......................................... 82
Auction ...................................................... 83
Avoidance Actions .................................... 83
Backup Bidder .......................................... 44
Bankruptcy Case ......................................... 1
Bankruptcy Code ........................................ 1
Bankruptcy Court ........................................ 1
Bidding Procedures Motion ...................... 43
Bidding Procedures Order ......................... 83
Business Day .............................................. 83
Cash and Cash Equivalents ....................... 83
Chosen Courts ........................................... 79

Closing ...................................................... 13
Closing Date .............................................. 13
Code .......................................................... 83
Company ..................................................... 1
Company Exclusively Licensed
   Intellectual Property ............................ 83
Company Licensed Intellectual Property .. 83
Company Owned Intellectual Property ..... 83
Company SEC Documents ........................ 83
Consent ...................................................... 83
Contract ..................................................... 84
Credit Bid Amount .................................... 12
Credit Bid Portion ..................................... 12
Cure Costs ................................................... 6
Dataroom ................................................... 40
DEA .......................................................... 84
Designated Purchaser ................................ 77
DIP Credit Agreement .............................. 84
Direction Letter ......................................... 42
Documents ................................................. 84
Effect ......................................................... 88
Employees ................................................. 53
Encumbrance ............................................. 84
Enforceability Exceptions ........................ 16
Environmental Laws .................................. 84
Environmental Permits .............................. 26
Equipment ................................................. 84
ERISA ....................................................... 85
Exchange Act ............................................ 85
Excluded Assets .......................................... 4
Excluded Bank Accounts .......................... 85
Excluded Cash ........................................... 85
Excluded Confidentiality Arrangements ... 85
Excluded Contracts ..................................... 4
Excluded Liabilities .................................... 7

Excluded Subsidiaries ................................... 5
Express Representations ........................... 40
FDA ............................................................. 85
FDA Ethics Policy .................................... 36
FDCA .......................................................... 86
Filed SEC Documents ............................... 15
Final Order ................................................ 85
Financing Order ........................................ 85
Foreign Competition Laws ...................... 16
Fraud .......................................................... 85
G Reorganization ...................................... 73
G Reorganization Election ....................... 73
GAAP .......................................................... 86
Governmental Authorization ................... 86
Governmental Body .................................. 86
Hazardous Substance ................................ 86
Health Care Laws ...................................... 86
HSR Act ...................................................... 87
Indebtedness .............................................. 47
India Company ........................................... 87
Information Presentation .......................... 40
Intellectual Property ................................. 87
International Trade Laws .......................... 87
Inventory ................................................... 87
ISRA ............................................................ 88
Knowledge of Sellers ............................... 88
L5 ................................................................ 74
Law .............................................................. 88
Leased Real Property ................................ 20
Leasehold Improvements .......................... 88
Leases ......................................................... 20
Lenders ....................................................... 88
Liability ...................................................... 88
Loan Agreement ........................................ 88
Loan Agreement Indebtedness ................. 88
Loan Documents ....................................... 88
LSRP ........................................................... 56
Material Adverse Effect ............................ 88
Material Contract ...................................... 22
Material Customers ................................... 34
Material Suppliers ..................................... 34
Non-Debtor Subsidiaries .......................... 17
Order ........................................................... 89
Ordinary Course ........................................ 89
Outside Back-Up Date .............................. 90
Outside Date ............................................... 69

Owned Real Property ................................ 19
Parties ........................................................... 1
Party ............................................................. 1
Permits ...................................................... 24
Permitted Encumbrances .......................... 90
Person ......................................................... 90
Personal Information ................................. 90
Petitions ....................................................... 1
Post-Closing Tax Period ........................... 90
Pre-Closing Tax Period ............................. 90
Prepetition Obligations ............................ 90
Product ....................................................... 90
Product Registrations ............................... 91
Projections ................................................. 62
Purchase Price ........................................... 12
Purchaser ..................................................... 1
Purchaser Group ....................................... 91
Purchaser Plans ......................................... 54
Registration Information .......................... 91
Regulatory Documentation ...................... 91
Release ........................................................ 91
Retained Privileged Materials ................... 5
RSA ............................................................. 92
Safety Notices ........................................... 36
Sale Hearing .............................................. 92
Sale Order .................................................. 92
Sanctioned Person ..................................... 92
Schedules ................................................... 15
SEC ............................................................. 92
Securities Act ............................................ 92
Seller ............................................................ 1
Seller FDA Transfer Letters ..................... 92
Seller Fundamental Representations ........ 67
Seller Parties ............................................. 92
Seller Plan .................................................. 92
Seller Sufficiency Representations .......... 67
Sellers ........................................................... 1
Standstill Agreement ................................ 93
Straddle Period .......................................... 93
Straddle Period Taxes ............................... 73
Subsidiaries ............................................... 93
Subsidiary .................................................. 93
Successful Bidder ...................................... 44
Swiss Company .......................................... 93
Swiss Employees ....................................... 55
Systems ...................................................... 28

| | | | |
|---|---|---|---|
| Tax | 93 | U.S. Antitrust Laws | 93 |
| Tax Elections | 73 | United States Seller Plan | 94 |
| Tax Forms | 73 | Updated Schedules | 60 |
| Tax Return | 93 | WARN Act | 55 |
| Taxes | 93 | Willful Breach | 94 |
| Transfer Offer | 53 | Wind-Down Adjustment Amount | 13 |
| Transfer Taxes | 71 | Wind-Down Amount | 12 |
| Transferred Employees | 53 | Wind-Down Budget | 94 |

11.3.    <u>Rules of Interpretation</u>.  Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied.  To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation."  Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)    The words "to the extent" shall mean "the degree by which" and not "if."

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded.  If the last day of such period is a day other than a Business Day, the period in question will end at 11:59 p.m. New York time on the next succeeding Business Day.

(f)    Words denoting any gender will include all genders, including the neutral gender.  Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)    The word "will" will be construed to have the same meaning and effect as the word "shall".  The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)    All references to "$" and dollars will be deemed to refer to United States currency.

(i)      All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable.

(j)      Any document or item will be deemed "delivered," "provided" or "made available" by the Company, within the meaning of this Agreement if such document or item is included in the Dataroom and accessible by Purchaser and all of its representatives with access to the Dataroom by 5:00 p.m. New York time on the date that is two (2) Business Days prior to the date of this Agreement.

(k)      Any reference to any agreement, Contract or instrument will be a reference to such agreement, Contract or instrument, as amended, modified, supplemented or waived in accordance with its terms and, if applicable, the terms hereof.

(l)      Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of determining whether such violation or non-compliance or alleged violation or non-compliance has occurred.

(m)      A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

(n)      References to "written" or "in writing" include in electronic form.

*[Signature page(s) follow.]*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**[PURCHASER]**


By: _____
Name:
Title:

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**AKORN, INC.**


By: _____
Name:
Title:


**VPI HOLDINGS CORP.**


By: _____
Name:
Title:


**VPI HOLDINGS SUB, LLC**


By: _____
Name:
Title:


**AKORN ANIMAL HEALTH, INC.**


By: _____
Name:
Title:


**AKORN OPHTHALMICS, INC.**


By: _____
Name:
Title:


**ADVANCED VISION RESEARCH, INC.**


By: _____
Name:
Title:

*Signature Page to Asset Purchase Agreement*

**AKORN SALES, INC.**


By: _____
Name:
Title:


**HI-TECH PHARMACAL CO., INC.**


By: _____
Name:
Title:


**INSPIRE PHARMACEUTICALS, INC.**


By: _____
Name:
Title:


**AKORN (NEW JERSEY), INC.**


By: _____
Name:
Title:


**OAK PHARMACEUTICALS, INC.**


By: _____
Name:
Title:


**VERSAPHARM INCORPORATED**


By: _____
Name:
Title:

**OLTA PHARMACEUTICALS CORP.**


By: _____
Name:
Title:


**COVENANT PHARMA, INC.**


By: _____
Name:
Title:


**CLOVER PHARMACEUTICALS CORP.**


By: _____
Name:
Title:


**10 EDISON STREET LLC**


By: _____
Name:
Title:


**13 EDISON STREET LLC**


By: _____
Name:
Title:

## EXHIBIT A

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

**<u>EXHIBIT B</u>**

**FORM OF PATENT ASSIGNMENT AGREEMENT**

**<u>EXHIBIT C</u>**

**FORM OF TRADEMARK ASSIGNMENT AGREEMENT**

## EXHIBIT D

**FORM OF BIDDING PROCEDURES ORDER**

**<u>EXHIBIT E</u>**

**FORM OF SPECIAL WARRANTY DEED**

**EXHIBIT F**

**FORM OF ASSIGNMENT AND ASSUMPTION OF LEASE**

**<u>EXHIBIT G</u>**

**WIND-DOWN BUDGET**

## **EXHIBIT H**

## **FORM OF SALE ORDER**

# EXHIBIT C

**Buchsmann Declaration**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AKORN, INC., *et al.*,[1] | ) Case No. 20-11177 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DECLARATION
## OF MARK BUSCHMANN
## IN SUPPORT OF THE DEBTORS' MOTION
## FOR ENTRY OF AN ORDER (A) AUTHORIZING AND
## APPROVING BIDDING PROCEDURES, (B) SCHEDULING AN
## AUCTION AND SALE HEARING, (C) APPROVING THE FORM
## AND MANNER OF NOTICE THEREOF, (D) ESTABLISHING NOTICE
## AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
## EXECUTORY CONTRACTS AND LEASES, AND (E) GRANTING RELATED RELIEF

I, Mark Buschmann, declare under penalty of perjury:

1.      I am a Partner of PJT Partners LP ("PJT"), an investment banking firm with principal offices located at 280 Park Avenue, New York, New York 10017.  The debtors and debtors in possession (collectively, the "Debtors") are proposing to retain PJT as their investment banker in these chapter 11 cases.[2]

2.      I am authorized to submit this declaration (this "Declaration") on the Debtors' behalf in support of the relief requested in the *Debtors' Motion for Entry of an Order*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are:  Akorn, Inc. (7400); 10 Edison Street LLC (7890); 13 Edison Street LLC; Advanced Vision Research, Inc. (9046); Akorn (New Jersey), Inc. (1474); Akorn Animal Health, Inc. (6645); Akorn Ophthalmics, Inc. (6266); Akorn Sales, Inc. (7866); Clover Pharmaceuticals Corp. (3735); Covenant Pharma, Inc. (0115); Hi-Tech Pharmacal Co., Inc. (8720); Inspire Pharmaceuticals, Inc. (9022); Oak Pharmaceuticals, Inc. (6647); Olta Pharmaceuticals Corp. (3621); VersaPharm Incorporated (6739); VPI Holdings Corp. (6716); and VPI Holdings Sub, LLC.  The location of the Debtors' service address is:  1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.

[2]     The Debtors intend to file in the near term their application to retain and employ PJT as their investment banker.

*(I)(A) Approving Bidding Procedures, (B) Approving Bidding Protections, (C) Scheduling an Auction and Sale Hearing, (D) Approving the Form and Manner of Notice Thereof, and (E) Establishing Procedures for the Assumption and Assignment of Contracts and Leases, (II) (A) Approving the Asset Purchase Agreement, (B) Authorizing the Sale of Assets, and (III) Granting Related Relief* (the "Sale Motion").[3]

3.        The statements in this Declaration are, except where specifically noted, based on (a) my personal knowledge, (b) information regarding the Debtors' operations and finances that I obtained from the Debtors' advisors or employees working directly with me or from other members of the PJT Partners LP ("PJT") team working under my supervision or direction, (c) the Debtors' books, records, and relevant documents, (d) information provided to me by employees of PJT working under my supervision, and/or (e) my opinions, experience, and knowledge as a restructuring professional.  Specifically, I have overseen the PJT team, which, since January 2019, has been one of the principal advisors to the Debtors.  In that capacity, I have been directly involved in the matters leading up to the Debtors' chapter 11 filings.  I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors.  If I were called upon to testify, I could and would competently testify to the facts set forth herein.

## Qualifications

4.        PJT is a full-service investment banking firm providing financial advisory services, including with respect to mergers and acquisitions, capital raising, and restructuring advice, across a broad range of industries.  PJT and its senior professionals have extensive experience with respect to the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.  I personally have over 21 years of experience advising companies in connection with

---

[3]        Capitalized terms used but not otherwise defined shall have the meaning ascribed to them in the Sale Motion.

restructuring transactions and chapter 11 cases, including with respect to financing and mergers and acquisitions.

5.     My experience includes representing companies, boards, creditors, and other stakeholders in a variety of situations across a broad range of industries.  My restructuring and financial advisory engagements have included representations of the following companies:  21st Century Oncology, Aceto, Angiotech, API Heat Transfer, Arch Coal, Cable & Wireless America, CEDC, Delta Air Lines, Homer City, Los Angeles Dodgers, Magnetation, Mattress Discounters, Noranda, Nortek, Patriot Coal, Pinnacle Airlines, Russell-Stanley, Taro Pharmaceuticals, TridentUSA, Ultra Petroleum, and Westinghouse Electric Company, among many others.

6.     Prior to joining PJT, I was a Senior Managing Director in the Restructuring and Reorganization Group at The Blackstone Group Inc., where I worked for fourteen years.  I hold a Bachelor of Arts in Economics and German Literature from Dartmouth College and a Master of Business Administration from the Kellogg Graduate School of Management at Northwestern University.

## The Retention of PJT

7.     PJT has been engaged as investment banker to the Debtors, and members of my team and I have been working closely with the Debtors since January 2019.  During that period, PJT has rendered investment banking advisory services to the Debtors in connection with their evaluation of various strategic alternatives.  Additionally, PJT has worked closely with the Debtors' management team and their other advisors with respect to these strategic alternatives and is thus acquainted with the Debtors' capital structure, liquidity needs, and business operations.

## The Prepetition Marketing Process

8.     In the months preceding the commencement of these chapter 11 cases, the Debtors worked with PJT and their other advisors to explore and develop several strategic alternatives to

maximize value for the Debtors' Assets and address their litigation overhang, including seeking both a junior capital investment to facilitate a refinancing of the Debtors' outstanding first lien term loan ("Term Loan") and a sale of the Debtors' assets (the "Assets") through an in-court process.  The Debtors thoroughly evaluated these potential alternatives to ensure that the path chosen for implementing any transaction during these chapter 11 cases was as value-maximizing and expeditious as possible.  Indeed, as described further below, the Debtors, with the assistance of PJT, have already conducted a robust prepetition marketing process, which, in the final weeks, led to several rounds of negotiations that culminated in the execution of a stalking horse asset purchase agreement with certain of the lenders under the Term Loan (collectively, the "Lenders"). The Debtors intend to further market test the proposed transaction with the Lenders in chapter 11.

9.      Specifically, beginning in August 2019, the Debtors, with the assistance of PJT, launched a financing process through which they solicited debt and equity-linked financings to either (i) fully refinance the existing Term Loan or (ii) pay down the Debtors' existing Term Loan to effectuate a refinancing.  The Debtors, with the assistance of PJT, contacted thirty-two prospective investors, of which twenty-two entered into confidentiality agreements with the Debtors and received a copy of the Debtors' investor presentation and access to a virtual data room containing certain information about the Debtors' business.  Several parties submitted non-binding indications of interest involving new debt and/or equity-linked investments, and the Debtors selected bidders to advance to the second round.  These parties had several meetings with management and conducted substantial due diligence.  After conducting such due diligence, the Debtors received second round non-binding indications of interest for junior capital only.  No investors were willing to refinance the capital structure in its entirety, despite the Debtors having significantly less net debt in Q3 2019 than today.  Further, given feedback from the remaining

junior capital investors regarding the importance of resolving outstanding litigation as part of consummating a transaction, it became clear these investors would not be able to provide binding junior financing proposals on an out-of-court basis.  As such, in December 2019, the Debtors alerted the remaining investors that they would be pivoting to a court-supervised sale process in order to maximize the value of the enterprise for all stakeholders.

10.      Accordingly, beginning in December 2019, the Debtors, with the assistance of PJT, contacted seventy-two potentially interested parties (including both strategic purchasers from the pharmaceutical industry and financial purchasers), of which thirty-seven entered into confidentiality agreements with the Debtors.  All of the equity sponsor parties who completed significant diligence in the financing process were invited to participate in the sale process.  Parties who executed a confidentiality agreement received a copy of the Debtors' investor presentation and access to a virtual data room containing approximately fifty documents with certain key information about the Debtors' business.  In addition, parties were offered phone calls with management.

11.      PJT instructed bidders to submit preliminary indications of interest by January 30, 2020, which were to include: (i) the identity and description of the bidder, (ii) the purchase price for the Debtors' business to be paid in cash, (iii) descriptions of the material assumptions informing the proposed purchase price, (iv) a description of due diligence information required to make a definitive proposal, (v) a transaction structure and proposed source of funds, (vi) prospective plans for the Debtors' business following consummation of a transaction, (vii) any conditions precedent required to be satisfied to consummate a transaction, (viii) estimates of time required to execute and close a transaction, (ix) the bidder's contact information and a list of any

5

external advisors retained to assist in due diligence, and (x) any other matters material to a proposal.

12.     Several parties submitted non-binding indications of interest that contemplated a going-concern sale of the Debtors' business.  Based on the overall quality of the bid, value, and certainty of execution, the Debtors selected seven bidders to advance to the second round of the sale process.  These parties were invited to participate in a second round of bidding with access to further diligence, including site visits and discussions with the Debtors' management team. Additionally, bidders received access to a second round virtual data room containing additional critical information about the Debtors' business. During the second round, the Debtors and PJT held in-person management meetings, responded to over 500 diligence inquiries, conducted numerous follow-up calls, and hosted site visits at the Debtors' manufacturing sites.

13.     On February 28, 2020, the Debtors uploaded a form of asset purchase agreement to the virtual data room. Moreover, PJT instructed bidders to submit updated indications of interest by March 9, 2020, including, in addition to substantially the same information as required in the first round, (i) confirmation that due diligence had been substantially completed and (ii) a mark-up of the asset purchase agreement.

14.     Based on the overall quality of the bid, value, and certainty of execution of the updated indications of interest, the Debtors ultimately selected two bidders to advance to the final binding round of the sale process.  In total, final bidders received access to over 2,600 documents that were uploaded to the data room, and conducted numerous follow up diligence calls with management and its advisors at AlixPartners, Kirkland & Ellis LLP, PJT Partners, and Grant Thornton.

15.     On the March 27, 2020, deadline for binding bids, however, the Debtors received no bids at a level sufficient to pay the aggregate outstanding amount of the Term Loan claims in full.  The Debtors swiftly pivoted to negotiating the terms of a comprehensive restructuring transaction with the Ad Hoc Group.

16.     Subsequently, the Term Loan lenders notified the Debtors of their intention to credit bid their loans and act as the "stalking horse" (such bid, the "<u>Stalking Horse</u>" and such bidder, the "<u>Stalking Horse Bidder</u>").  After several rounds of negotiation and given the lack of interest from third parties to bid at a level sufficient to pay the aggregate outstanding amount of the Term Loan claims in full, the Debtors and the Lenders executed the asset purchase agreement (including all exhibits and schedules related thereto, the "<u>Stalking Horse APA</u>").

## **The Bidding Procedures**

17.     The Debtors, with the assistance of PJT, intend to continue their efforts to market their Assets and market test the Stalking Horse Bid and, in connection therewith, have filed the Motion seeking approval of the Bidding Procedures.  As set forth in the Motion, the Debtors are seeking approval of the Bidding Procedures to establish a clear and transparent process for the solicitation, receipt, and evaluation of bids on a court-approved timeline that allows the Debtors to timely consummate a sale of their Assets.

18.     I have reviewed the Bidding Procedures.   Generally speaking, the Bidding Procedures establish, among other things:

- the availability of and access to conduct due diligence by Acceptable Bidders;

- the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be "Qualified Bids" sufficient to trigger the Auction, including the terms and conditions that must be satisfied and the deadline that must be met by any bidder to be considered a "Qualified Bidder" and to participate in the Auction;

- the manner in which Qualified Bids will be evaluated by the Debtors;

- the conditions for having the Auction and procedures for conducting the Auction, if any;

- the bid protections (if any) provided to the Stalking Horse Bidder pursuant to the terms and conditions of the Stalking Horse APA; and

- various other matters relating to the sale process generally, including the designation of the Back-Up Bid, return of any good faith deposits, and certain reservations of rights

19.     In addition, the Bidding Procedures propose the following key dates and deadlines:

| Event | Date |
|---|---|
| Bid Deadline | August 3, 2020 |
| Auction | August 10, 2020 |
| Contract Objection Deadline | August 15, 2020 |
| Sale Objection Deadline | August 15, 2020 |
| Sale Hearing | August 20, 2020 |

20.     Based on my experience, I believe that the Bidding Procedures are designed to maximize the value received for the Assets by facilitating a fair and competitive bidding process where potential bidders are encouraged to participate and submit competing bids within the specified time frame.  As described in the Motion, the proposed Bid Deadline requires bids for the purchase of the Assets to be delivered no later than August 3, 2020.  The Bid Deadline thus provides parties with approximately ten (10) weeks from the filing of the Motion to obtain information and formulate and submit a timely and informed competing bid to purchase some or all of the Assets.  Moreover, these ten (10) weeks are *in addition* to the approximately four (4) months that certain interested parties have already invested in due diligence prior to the commencement of these chapter 11 cases.

21.     As described above, the Debtors' Assets have been marketed over the approximately last four (4) months to a group of strategic and financial buyers, with some buyers having been involved for up to 9 months, and substantial information regarding the Debtors' businesses have been made available to many of these parties to date.  These marketing efforts,

moreover, are continuing and are expected to continue following approval of the Bidding Procedures. Accordingly, numerous parties that may have an interest in bidding at the Auction may already have an existing base of knowledge in and familiarity with the Assets, and in many cases have already conducted due diligence in connection therewith.

22.     Given the duration and scope of the Debtors' prepetition marketing process, the due diligence conducted to date by potential interested parties, the proposed postpetition marketing process, and the timeline proposed by the Debtors, it is my view, based on my experience and in light of the circumstances, including the robust prepetition marketing process, that the proposed postpetition sale process set forth in the Bidding Procedures is reasonable and appropriate under the circumstances. The Bidding Procedures seek to balance the Debtors' interests in consummating the Sale on an expedited timeline while simultaneously preserving the opportunity to attract the highest or otherwise best offer: at the Auction, as set forth in the proposed Bidding Procedures, the Debtors will have an opportunity to consider all competing offers and select the offer that they deem to be the highest or otherwise best offer for the Assets.

## Conclusion

23.     Accordingly, for all the foregoing reasons, I believe that the Bidding Procedures and the timeline set forth therein: (a) will encourage bidding for the Debtors' assets; (b) are generally consistent with other procedures previously approved in chapter 11 cases of similar size and complexity; and (c) are appropriate under the circumstances. Given the robust prepetition marketing process described in this Declaration and based on my experience as a restructuring professional, I believe that the Bidding Procedures are appropriate and should be approved.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing declaration are true and correct to the best of my knowledge, information, and belief.

Dated:  May 21, 2020                               /s/ *Mark Buschmann*
                                                    Mark Buschmann
                                                    Partner
                                                    PJT Partners LP