**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THE DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AKORN, INC., *et al.*,[1] | ) | Case No. 20-11177 (KBO) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DISCLOSURE STATEMENT FOR JOINT CHAPTER 11
## PLAN OF AKORN, INC. AND ITS DEBTOR AFFILIATES

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
Christopher M. Hayes (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
               gregory.pesce@kirkland.com
               christopher.hayes@kirkland.com

- and -

Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:          nicole.greenblatt@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

Paul N. Heath (No. 3704)
Amanda R. Steele (No. 5530)
Zachary I. Shapiro (No. 5103)
Brett M. Haywood (No. 6166)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email:          heath@rlf.com
               steele@rlf.com
               shapiro@rlf.com
               haywood@rlf.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are:  Akorn, Inc. (7400); 10 Edison Street LLC (7890); 13 Edison Street LLC; Advanced Vision Research, Inc. (9046); Akorn (New Jersey), Inc. (1474); Akorn Animal Health, Inc. (6645); Akorn Ophthalmics, Inc. (6266); Akorn Sales, Inc. (7866); Clover Pharmaceuticals Corp. (3735); Covenant Pharma, Inc. (0115); Hi-Tech Pharmacal Co., Inc. (8720); Inspire Pharmaceuticals, Inc. (9022); Oak Pharmaceuticals, Inc. (6647); Olta Pharmaceuticals Corp. (3621); VersaPharm Incorporated (6739); VPI Holdings Corp. (6716); and VPI Holdings Sub, LLC.  The location of the Debtors' service address is:  1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.

| IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT |
| --- |

**THE DEADLINE TO VOTE ON THE PLAN IS**
**[August 15], 2020, at 5:00 p.m. (prevailing Eastern Time)**

**THE DEADLINE TO OBJECT TO THE PLAN IS**
**[August 15], 2020, at 4:00 p.m. (prevailing Eastern Time)**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY KURTZMAN CARSON CONSULTANTS LLC ON OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN**

**THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF AKORN, INC. AND ITS DEBTOR AFFILIATES.**[2]

**<u>THE PLAN IS SUPPORTED BY THE DEBTORS AND CERTAIN PARTIES IN INTEREST THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT, INCLUDING HOLDERS OF APPROXIMATELY 80 PERCENT IN PRINCIPAL AMOUNT OF TERM LOAN CLAIMS.  THE DEBTORS URGE HOLDERS OF CLAIMS AND INTERESTS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN.</u>**

**NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED HEREIN.**

**THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, BUSINESS, OR OTHER ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.**

**THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS IN THESE CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.**

---

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Joint Chapter 11 Plan of Akorn, Inc. and Its Debtor Affiliates* (as may be amended, supplemented or modified from time to time, the "<u>Plan</u>"), attached hereto as **<u>Exhibit A</u>**.

IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT OR THIRD-PARTY ADVISORS EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.  WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  THE DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  ANY ANALYSES, ESTIMATES, OR

RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS PRECEDENT TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED.

IF CONFIRMATION OR EFFECTIVENESS OF THE PLAN DOES NOT OCCUR, THE PLAN SHALL ACT AS A MOTION SEEKING A DISMISSAL OF THE CHAPTER 11 CASES IN ACCORDANCE WITH THE BANKRUPTCY CODE.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

# TABLE OF CONTENTS

Page

**ARTICLE I. INTRODUCTION** ........................................................................................... 1
    A.    Preliminary Statement ....................................................................................... 1

**ARTICLE II. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE
STATEMENT** ...................................................................................................... 4
    A.    What is Chapter 11? ........................................................................................... 4
    B.    Why are the Debtors sending me this Disclosure Statement? .......................... 4
    C.    Am I entitled to vote on the Plan? ..................................................................... 4
    D.    What will I receive from the Debtors if the Plan is Consummated? .................. 5
    E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim
        or an Allowed Priority Tax Claim? .................................................................... 8
    F.    If the Plan provides that I get a distribution, do I get it upon Confirmation or
        when the Plan becomes effective, and what is meant by "Confirmation,"
        "Effective Date," and "Consummation?" ......................................................... 10
    G.    What are the sources of cash and other consideration required to fund the Plan? ........... 10
    H.    Who supports the Plan? ..................................................................................... 10
    I.    Will there be releases and exculpation granted to parties in interest as part of the
        Plan? ................................................................................................................. 11
    J.    What is the deadline to vote on the Plan? ........................................................ 12
    K.    How do I vote for or against the Plan? ............................................................. 12
    L.    Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the
        Confirmation Hearing set to occur? ................................................................. 12
    M.    What is the purpose of the Confirmation Hearing? ......................................... 13
    N.    Who do I contact if I have additional questions with respect to this Disclosure
        Statement or the Plan? ...................................................................................... 13
    O.    Do the Debtors recommend voting in favor of the Plan? ................................ 14

**ARTICLE III. BUSINESS DESCRIPTION AND BACKGROUND TO THE CHAPTER 11
CASES** ................................................................................................................ 14
    A.    Akorn's Corporate History. .............................................................................. 14
    B.    Business Operations. ......................................................................................... 14
    C.    Prepetition Capital Structure. ........................................................................... 20

**ARTICLE IV. EVENTS LEADING UP TO THE CHAPTER 11 CASES** .......................... 20
    A.    The Fresenius Merger Agreement and Related Litigation. .............................. 20
    B.    Akorn Securities Class Action and Opt-Out Litigation. .................................. 23
    C.    Negotiations with the Ad Hoc Group. .............................................................. 26
    D.    Akorn's Current Operational and Financial Position. ...................................... 27
    E.    Akorn's Prepetition Marketing Process. ........................................................... 28

**ARTICLE V. ADMINISTRATION OF THE CHAPTER 11 CASES** ................................. 30
    A.    First Day Pleadings and Other Case Matters. .................................................. 30
    B.    Summary of Claims Process, Bar Date and Claims Filed. ............................... 31
    C.    Exclusivity. ....................................................................................................... 32
    D.    The Sale Motion and Sale Process. .................................................................. 32

**ARTICLE VI. SUMMARY OF THE PLAN**..................................................................................**33**
    A.    General Settlement of Claims. ...............................................................33
    B.    Sources of Plan Consideration. ..............................................................34
    C.    Restructuring Transactions. ...................................................................34
    D.    Vesting of Assets. ..................................................................................35
    E.    Plan Administrator. ................................................................................35
    F.    Wind-Down. ...........................................................................................37
    G.    Wind-Down Amount. .............................................................................37
    H.    Plan Administrator Exculpation, Indemnification, Insurance, and Liability
               Limitation..............................................................................................37
    I.    Tax Returns.............................................................................................38
    J.    Cancellation of Notes, Instruments, Certificates, and Other Documents. .......38
    K.    Corporate Action.....................................................................................38
    L.    Dissolution of the Board of the Debtors. ...............................................39
    M.    Release of Liens. ....................................................................................39
    N.    Effectuating Documents; Further Transactions. ....................................39
    O.    Exemption from Certain Taxes and Fees...............................................40
    P.    Causes of Action.....................................................................................40
    Q.    Closing the Chapter 11 Cases. ...............................................................40
    R.    Release, Injunction, and Related Provisions..........................................41
    S.    Applicability of Insurance Policies. .......................................................47

**ARTICLE VII. VOTING AND CONFIRMATION** ...........................................................**47**
    A.    *Classes Entitled to Vote on the Plan.* ....................................................47
    B.    *Votes Required for Acceptance by a Class.* ..........................................47
    C.    *Certain Factors to Be Considered Prior to Voting.*................................48
    D.    *Classes Not Entitled to Vote on the Plan.* .............................................48
    E.    *Solicitation Procedures.*........................................................................49
    F.    *Voting Procedures.* ...............................................................................50
    G.    *Confirmation Objection Deadline.*........................................................52
    H.    Confirmation Hearing. ...........................................................................52
    I.    Confirmation Standards. .........................................................................52
    J.    Acceptance by Impaired Classes. ...........................................................55
    K.    Confirmation Without Acceptance by All Impaired Classes...................56

**ARTICLE VIII. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING** ...........**58**
    A.    Risk Factors that May Affect the Recovery Available to Holders of Allowed
               Claims under the Plan. ...........................................................................58
    B.    Certain Bankruptcy Law Considerations. ..............................................60
    C.    Disclosure Statement Disclaimer. ..........................................................63
    D.    Risks Related to the Debtors' Business. .................................................65
    E.    Risks Related to the Debtors' Industry. ..................................................71
    F.    Risks Related to Regulations. .................................................................72
    G.    Risks Related to the Debtors' Intellectual Property................................76
    H.    Risks Related to the Debtors' Liquidity.................................................77

**ARTICLE IX. MATERIAL UNITED STATES FEDERAL  INCOME TAX
CONSEQUENCES OF THE PLAN.**.................................................................................**78**
    A.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and
               the Purchaser..........................................................................................79

B.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of Class 3 Term Loan Claims, Class 4 General Unsecured Claims, Class 7 Section 510(b) Claims, and Class 8 Akorn Interests. ............................................................................................ 84

C.      Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims and Interests. ................................................................................................................. 89

D.      Information Reporting and Withholding. ........................................................................ 93

**ARTICLE X. RECOMMENDATIONS OF THE DEBTORS.............................................................. 94**

## **<u>EXHIBITS</u>**

**EXHIBIT A**   Joint Chapter 11 Plan of Akorn, Inc. and Its Debtor Affiliates

**EXHIBIT B**   Wind-Down Budget

**EXHIBIT C**   Restructuring Support Agreement

# ARTICLE I.
# INTRODUCTION

The Debtors submit this disclosure statement (this "<u>Disclosure Statement</u>") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes to accept or reject the Plan.[3]  A copy of the Plan is attached hereto as **<u>Exhibit A</u>** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.  The rules of interpretation set forth in Article I.B of the Plan govern the interpretation of this Disclosure Statement.

**THE DEBTORS BELIEVE THAT THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO HOLDERS OF CLAIMS AND INTERESTS UNDER THE CIRCUMSTANCES.  EACH OF THE DEBTORS AND THE PARTIES IN INTEREST THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT, INCLUDING HOLDERS OF APPROXIMATELY 80 PERCENT IN PRINCIPAL AMOUNT OF TERM LOAN CLAIMS, SUPPORT CONFIRMATION OF THE PLAN.  ACCORDINGLY, THE DEBTORS BELIEVE THAT THE PLAN IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.[4]**

A.    *Preliminary Statement.*

Akorn, Inc. (together with its Debtor and non-Debtor affiliates, "<u>Akorn</u>") is a specialty generic pharmaceutical company that develops, manufactures, and markets generic and branded prescription pharmaceuticals, branded and private-label over-the-counter consumer health products, and animal health pharmaceuticals.  Akorn focuses on difficult-to-manufacture sterile and non-sterile dosage forms including, but not limited to, ophthalmics, injectables, oral liquids, otics, topicals, inhalants, and nasal sprays.  Akorn was founded in 1971 in Abita Springs, Louisiana.  In 1997, Akorn relocated its corporate offices to the Chicago, Illinois area; today, Akorn maintains its principal corporate offices in Lake Forest, Illinois.

Historically, Akorn explored and executed strategic mergers and acquisitions to, among other things, expand its product portfolio and pharmaceutical research and development and manufacturing capabilities.  In April of 2017, Akorn and Fresenius Kabi AG ("<u>Fresenius</u>") announced a proposed merger that, if consummated, would have resulted in in Akorn shareholders receiving $34 per common share and Akorn becoming a wholly-owned subsidiary of Fresenius.

---

[3]    The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

[4]    If the Plan is not confirmed or the Effective Date does not occur, the Debtors reserve all of their rights regarding the Disclosure Statement and the Plan and any statement set forth in the Disclosure Statement and the Plan, as applicable.  Furthermore, if the Plan is not confirmed or the Effective Date does not occur, nothing in the Disclosure Statement or the Plan shall be deemed an admission by the Debtors, and the Debtors reserve all such rights regarding the Disclosure Statement and the Plan and any statement set forth in the Disclosure Statement and the Plan.

1

As discussed further herein, following approval of the merger by Akorn shareholders, Akorn's business entered into a period of decline, leading Fresenius to seek to terminate the merger. Ensuing litigation in the Court of Chancery for the State of Delaware (the "Delaware Chancery Court") resulted in a decision finding that Akorn's business had suffered a "material adverse effect" that permitted Fresenius to terminate the merger.

Fresenius's initial announcement that the merger was at risk and the ensuing Delaware Chancery Court opinion prompted federal securities class action litigation against Akorn and certain of its former directors and officers, as well as federal and state law derivative litigation, relating to regulatory compliance issues. On March 13, 2020, the United States District Court for the Northern District of Illinois (the "Illinois District Court") granted final approval to a settlement of the securities class action litigation resolving the securities claims of a class of investors who acquired Akorn common stock from November 3, 2016 through January 8, 2019. However, four groups of hedge funds have "opted out" of the settlement class, filed separate securities law claims, and made clear they intend to continue to litigate their claims against Akorn and the other defendants.

Following the terminated merger and related shareholder litigation, a group of Term Loan Lenders (the "Ad Hoc Group") organized and asserted certain purported defaults under the Debtors' Term Loan Credit Agreement. After significant arm's-length negotiations with the Ad Hoc Group, the Debtors ultimately entered into the Standstill Agreement with certain of the Term Loan Lenders, pursuant to which the Term Loan Lenders party thereto agreed, among other things, not to declare an event of default under the Term Loan Credit Agreement for the duration of an agreed-upon standstill period. The standstill period expired prior to commencement of the Chapter 11 Cases.

Notwithstanding these challenging nonoperational headwinds, Akorn's business is in the midst of a significant financial and operational turnaround. Thanks in part to Akorn's ongoing operational turnaround and in part to company-specific and industrywide tailwinds—including savings to the U.S. healthcare system from generics that continue to drive substitution, loss of exclusivity of brand-name pharmaceuticals driving generic opportunities, and the attractiveness of alternative dosage forms that comprise the substantial majority of Akorn's product portfolio—Akorn is poised for sustainable near-term business success. Yet the overhang of the Fresenius Litigation, the related shareholder litigation with the remaining opt-outs, and ongoing debt service obligations have deterred new financing sources from investing in and/or acquiring Akorn's business outside of the chapter 11 context, obstructing out-of-court solutions to Akorn's current capital structure. These headwinds continue to undermine Akorn's performance.

In response, the Debtors and their advisors worked tirelessly in the months leading up to the Petition Date to find alternatives to a chapter 11 filing, but ultimately determined that the only viable course of action was to commence the Chapter 11 Cases to pursue and facilitate a sale of the Debtors through an in-court process, as more fully described below. In the months leading up to commencement of the Chapter 11 Cases, the Debtors, with the assistance of their advisors, robustly marketed a potential going-concern transaction of the Debtors' business, which included outreach to dozens of financial and strategic partners, substantial due diligence conducted by multiple parties, and initial indications of interest at valuations sufficient to fully pay the outstanding balance of the Debtors' Term Loans. As the Debtors' nearly four-month marketing

process drew to a close in late March, a confluence of factors adversely impacted interested parties' valuation levels, including perceived operational risks associated with Akorn's ongoing FDA remediation efforts, perceived risks around obtaining approvals for new products in their pipeline, and the impact of the COVID-19 pandemic on capital markets and the availability of financing. As a result, the Debtors did not receive any binding bids sufficient to fully repay the Term Loans. Consequently, on March 28, 2020, an immediate event of default under the Term Loan Credit Agreement occurred, and, as discussed further herein, the Debtors and the Ad Hoc Group pivoted to a prenegotiated set of alternative milestones that contemplated a credit bid by their Term Loan Lenders that will serve as the "stalking horse" for a further marketing process to be conducted inside the Debtors' Chapter 11 Cases.

After pivoting to the new timeline, the Debtors, their advisors, and the Ad Hoc Group and its advisors worked tirelessly to negotiate the definitive documentation for a value-maximizing credit bid from the Term Loan Lenders that enticed further bidding as markets began to stabilize in the wake of the COVID-19 crisis. The stalking horse bid set the floor for a further market test and a potential sale to a third-party Purchaser, only if such Purchaser submits an actionable bid that is higher or otherwise better than the stalking horse bid. The Term Lenders' support for the sale process is also memorialized in the Restructuring Support Agreement executed by holders of approximately 80% in principal amount of the term loans. To execute the value-maximizing restructuring contemplated by the Restructuring Support Agreement, certain of the Restructuring Support Agreement parties also have agreed to provide $30 million of debtor-in-possession ("DIP") financing to fund the chapter 11 cases and sale process. The DIP financing commitment sends a strong signal to the Debtors' employees, customers, and trade partners of the confidence the Term Lenders have in the value of their business and to ensure there is adequate funding to ensure operational stability through closing of the Sale Transaction. Together, the Restructuring Support Agreement and DIP financing provide a framework for the postpetition marketing process for the Debtors' business and a wind-down plan for the Debtors' Estates that will finally resolve these Chapter 11 Cases on substantially the same timeline as contemplated by the sale process. To that end, the Debtors filed a motion to approve the Bidding Procedure and sale of the Debtors, and expect to move swiftly through the Chapter 11 Cases.

In parallel, the Debtors have filed the Plan. The terms of the Plan are more fully described herein, but, in general, the Plan contemplates that a Plan Administrator will be appointed on the Effective Date to wind down the Debtors' Estates, monetize any remaining assets, and make distributions to creditors in accordance with the priorities established by the Bankruptcy Code. Significantly, the Stalking Horse APA includes the Purchaser's agreement to fund a $35 million wind-down budget, pursuant to which the Debtors intend to satisfy their post-closing obligations under the Sale Transaction Documentation and otherwise bring these Chapter 11 Cases to conclusion.

The Debtors believe that the Plan is in the best interest of the Debtors' Estates, and therefore the Debtors seek to confirm the Plan. The Plan provides the best available alternative for the Debtors' Estates and recoveries following consummation of the Sale Transaction. If the Debtors' business were liquidated in a chapter 7 process, creditors would receive lower recoveries because the Debtors' Estates would necessarily bear additional costs associated with transitioning to chapter 7, retaining a chapter 7 trustee, counsel, and advisors, and administering a chapter 7

process.  The Debtors believe that Confirmation of the Plan will avoid the lengthy delay and significant cost of liquidation under chapter 7 of the Bankruptcy Code.

If Confirmation or effectiveness of the Plan does not occur, the Plan shall act as a motion seeking a dismissal of the Chapter 11 Cases in accordance with the Bankruptcy Code.

The Debtors urge Holders of Claims and Interests in Class 3 (Term Loan Claims), Class 4 (General Unsecured Claims), Class 7 (Section 510(b) Claims), and Class 8 (Akorn Interests) to vote to accept the Plan.

## ARTICLE II.
## QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT

A.     *What is Chapter 11?*

Chapter 11 is the principal business restructuring chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.     *Why are the Debtors sending me this Disclosure Statement?*

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  The Plan provides for the wind-down and dissolution of the Debtors' Estates and for the making of distributions to Holders of Claims and Interests, and this Disclosure Statement is being submitted to provide information about the transactions contemplated under the Plan and related information concerning the Debtors, all in accordance with the requirements of the Bankruptcy Code.

C.     *Am I entitled to vote on the Plan?*

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold (if any).  Each category of Holders of Claims or Interests in Article III

of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Term Loan Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / (Deemed to Reject) |
| Class 6 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 7 | Section 510(b) Claims | Impaired | Entitled to Vote |
| Class 8 | Akorn Interests | Impaired | Entitled to Vote |

D.   *What will I receive from the Debtors if the Plan is Consummated?*

The following table provides a summary of the anticipated recovery to Holders of Allowed Claims and Interests under the Plan. Any estimates of Claims in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

| SUMMARY OF EXPECTED RECOVERIES[5] | | | | |
|-------|----------------------|------------------------------------|----------------------------|---------------------|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims | Projected Recovery |
| 1 | Other Priority Claims | Except to the extent that a Holder of an Allowed Priority Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired, in each case on the Effective Date. | $[●] | 100% |

---

[5]   The Plan contemplates distributions being made pursuant to a waterfall priority scheme in accordance with the Bankruptcy Code. Thus, the recoveries for each class listed in this chart depend entirely on the extent to which classes senior to them are satisfied.

| SUMMARY OF EXPECTED RECOVERIES[5] | | | | |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims | Projected Recovery |
| 2 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the election of the Debtors, in consultation with the Required Consenting Term Loan Lenders, and in each case, on the Effective Date:<br><br>(i) payment in full in Cash of such Allowed Other Secured Claim;<br>(ii) the Collateral securing such Allowed Other Secured Claim;<br>(iii) Reinstatement of such Allowed Other Secured Claim, notwithstanding any contractual provision or applicable non-bankruptcy Law that entitles the holder of such claim to demand or to receive payment prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of default; or<br>(iv) such other treatment rendering such Allowed Other Secured Claim Unimpaired. | $[●] | 100% |
| 3 | Term Loan Claims | In full and final satisfaction, compromise, settlement, release, and discharge of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of an Allowed Term Loan Claim shall receive on the Effective Date either:<br><br>(i) In the event the Sale Transaction is not a Term Loan Credit Bid Transaction, its Pro Rata share of the Distributable Proceeds pursuant to the Waterfall Recovery; or<br>(ii) In the event the Sale Transaction is a Term Loan Credit Bid Transaction, on account of the Allowed Term Loan Claims *less* the Term Loan Credit Bid Amount, its Pro Rata share of the | $861,686,192 | 100% |

| | | SUMMARY OF EXPECTED RECOVERIES[5] | | |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims | Projected Recovery |
| | | Distributable Proceeds, if any, pursuant to the Waterfall Recovery.<br><br>For the avoidance of doubt, in the event the Sale Transaction is a Term Loan Credit Bid Transaction, the Term Loan Lenders shall be entitled to immediate possession of the Purchased Assets as and solely to the extent set forth in the Sale Order, with no further order of the Bankruptcy Court required. | | |
| 4 | General Unsecured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of an Allowed General Unsecured Claim that is not assumed by the Purchaser shall receive its Pro Rata share of the Distributable Proceeds, if any, pursuant to the Waterfall Recovery.<br><br>For the avoidance of doubt, all General Unsecured Claims that are assumed by the Purchaser pursuant to the Sale Transaction Documentation shall be satisfied by the Purchaser in full in Cash following the Effective Date in the ordinary course of business; *provided* that any Allowed General Unsecured Claim that has been expressly assumed by the Purchaser under the Sale Transaction shall not be an obligation of the Debtors as of or after the Effective Date. | $[●] | [●]% |
| 5 | Intercompany Claims | In full and final satisfaction of each Allowed Intercompany Claim, each Allowed Intercompany Claim, unless otherwise provided for under the Plan and subject to the Description of Transaction Steps, will either be Reinstated, distributed, contributed, set off, settled, cancelled and released or otherwise addressed at the option of the Debtors, in consultation with the Required Consenting Term Loan Lenders; provided, that no distributions shall be made on account of any such | $[●] | 100% or 0% |

| SUMMARY OF EXPECTED RECOVERIES[5] | | | | |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims | Projected Recovery |
| | | Intercompany Claims. | | |
| 6 | Intercompany Interests | In full and final satisfaction of each Allowed Intercompany Interest, subject to the Description of Transaction Steps, each Intercompany Interest shall be Reinstated solely to maintain the Debtors' corporate structure. | N/A | 100% |
| 7 | Section 510(b) Claims | On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of its Claim, each Holder of an Allowed Class 7 Section 510(b) Claim shall receive its Pro Rata share of the Distributable Proceeds, if any, pursuant to the Waterfall Recovery; *provided that* for purposes of receiving the treatment provided herein, each Holder of an Allowed Section 510(b) Claim shall be treated as if such Holder held a number of Allowed Class 8 Akorn Interests equal in value to the amount of its Allowed Section 510(b) Claim. | $[●] | [●]% |
| 8 | Akorn Interests | On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of its Interests, each Holder of Allowed Class 8 Akorn Interests shall receive its Pro Rata share of the Distributable Proceeds, if any, pursuant to the Waterfall Recovery. | N/A | [●]% |

E.    *What will I receive from the Debtors if I hold an Allowed Administrative Claim or an Allowed Priority Tax Claim?*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Facility Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan. Administrative Claims, DIP Facility Claims, and Priority Tax Claims will be satisfied as set forth in Article II of the Plan as described below.

1.    *Administrative Claims.*

Except with respect to Professional Fee Claims and DIP Facility Claims, or as otherwise set forth in the Plan, subject to the provisions of sections 327, 330(a), and 331 of the Bankruptcy Code, and except to the extent that a Holder of an Allowed Administrative Claim and, as applicable, the Debtors or the Plan Administrator, agree to less favorable treatment or such Holder has been paid by any applicable Debtor prior to the Effective Date, the Debtors or the Plan Administrator shall, in consultation with the Required Consenting Term Loan Lenders, pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash, which payment shall be made (x) in the ordinary course of business, or (y) on the later of (i) the Effective Date and (ii) the date on which such Administrative Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter) with a Cash distribution; *provided* that any Allowed Administrative Claim that has been expressly assumed by the Purchaser under the Sale Transaction Documentation shall not be an obligation of the Debtors as of or after the Effective Date.

2.    *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim and, as applicable, the Debtors or the Plan Administrator, agree to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Priority Tax Claim, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, each Holder of such Allowed Priority Tax Claim shall receive, at the option of the Debtors or the Plan Administrator, as applicable, in consultation with the Required Consenting Term Loan Lenders, either (i) the full unpaid amount of such Allowed Priority Tax Claim in Cash on the later of the Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter), or (ii) equal annual installment payments in Cash, of a total value equal to the Allowed amount of such Priority Tax Claim, over a period ending not later than five (5) years after the Petition Date; *provided* that any Allowed Priority Tax Claim that has been expressly assumed by the Purchaser under the Sale Transaction Documentation shall not be an obligation of the Debtors. In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full. On the Effective Date, any Liens securing any Allowed Priority Tax Claim shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order or rule, or the vote, consent, authorization, or approval of any Person.

3.    *DIP Facility Claims.*

All DIP Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to the full amount due and owing under the DIP Credit Agreement, including, for the avoidance of doubt, (i) the principal amount outstanding under the DIP Facility on such date, (ii) all interest accrued and unpaid thereon through and including the date of payment, and (iii) all accrued and unpaid fees, expenses and noncontingent indemnification obligations payable under the DIP Facility and the Final DIP Order. On the Effective Date, in full and final satisfaction,

settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, each DIP Facility Claim shall be paid in full in Cash, except to the extent such DIP Facility Claims were credit bid pursuant to the terms of the Sale Transaction Documentation. All Liens and security interests granted by the Debtors to secure the obligations under the DIP Facility shall be of no further force or effect. For the avoidance of doubt, the DIP Facility Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection, or any challenges under applicable law or regulation.

F.      *If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan becomes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"*

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan may become effective. Initial distributions to Holders of Allowed Claims and Interests will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. "Consummation" means the occurrence of the Effective Date.

G.      *What are the sources of cash and other consideration required to fund the Plan?*

The following sources shall be used to fund the distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided in the Plan: Cash on hand, borrowings under the DIP Facility, the Distributable Proceeds, if any, the Wind-Down Amount, the Debtors' rights under the Sale Transaction Documentation, payments made directly by the Purchaser on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of Cure Costs made by the Purchaser pursuant to sections 365 or 1123 of the Bankruptcy Code, the return of any utility deposits as set forth in the Utilities Orders, and all Causes of Action not previously settled, released, or exculpated under the Plan, if any, shall be used to fund the distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided in the Plan. Unless otherwise agreed in writing by the Debtors and the Purchaser, distributions required by the Plan on account of Allowed Claims that are Assumed Liabilities shall be the sole responsibility of the Purchaser to the extent such Claim is Allowed against the Debtors.

H.      *Who supports the Plan?*

The Plan is supported by the Debtors and certain parties in interest that have executed the Restructuring Support Agreement, including Holders of approximately 80 percent in principal amount of Term Loan Claims.

I.     *Will there be releases and exculpation granted to parties in interest as part of the Plan?*

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties as set forth in Article VIII of the Plan.[6]  The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts.  In addition to the releases the Released Parties and the exculpation of the Exculpated Parties, there is an injunction against bringing claims and causes of action from which the Released Parties were released or the Exculpated Parties exculpated.

Under the Plan, "Released Parties" means, collectively, and in each case, in their respective capacities as such: (a) the Debtors; (b) the Consenting Term Loan Lenders; (c) the Term Loan Agent; (d) the DIP Lenders; (e) the DIP Agent; (f) all Releasing Parties; (g) the Acquired Entities; and (h) with respect to each Entity in clause (a) through (g), each such Entity's current and former subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (unless any such Entity or related party has opted out of being a Releasing Party, in which case such Entity or related party, as applicable, shall not be a Released Party).

"Releasing Parties," under the Plan, means, collectively, and in each case, in their respective capacities as such:  (a) the Debtors; (b) the Consenting Term Loan Lenders; (c) the Term Loan Agent; (d) the DIP Lenders; (e) the DIP Agent; (f) the Acquired Entities; (g) all Holders of Claims or Interests that are presumed to accept the Plan *and* who do not opt out of the releases in the Plan; (h) all Holders of Claims or Interests who vote to accept the Plan; (i) all Holders of Claims or Interests that (x) abstain from voting on the Plan *and* who do not opt out of the releases in the Plan, (y) vote to reject the Plan *and* who do not opt out of the releases in the Plan, or (z) are deemed to reject the Plan *and* who do not opt out of the releases in the Plan; (j) with respect to each Entity in clause (a) through (i), each such Entity's current and former  subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (unless any such Entity or related party has opted out of being a Releasing Party, in which case such Entity or related party, as applicable, shall not be a Releasing Party).

Importantly, as of the Effective Date, except as otherwise provided in the Plan, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Standstill Agreement, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the DIP Loan Documents, the Disclosure Statement, the Plan, the Sale Transaction, or

---

[6]    Notwithstanding anything to the contrary in the Plan, no Person or Entity shall be exculpated from any liability resulting from any act or omission constituting actual fraud, willful misconduct, or gross negligence.

any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, the Chapter 11 Cases, the DIP Loan Documents, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon the business or contractual arrangements between any Debtor and any Released Party, and any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, fraud, or gross negligence.

The Debtors believe that the Plan's release, exculpation, and injunction provisions are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are reproduced in Article VI.R of this Disclosure Statement, entitled "Release, Injunction, and Related Provisions."

J.      *What is the deadline to vote on the Plan?*

The Voting Deadline is [**August 15], 2020, at 5:00 p.m., prevailing Eastern Time**.

K.      *How do I vote for or against the Plan?*

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims and Interests that are entitled to vote on the Plan.  For your vote to be counted, you must submit your Ballot in accordance with the instructions provided in Article VII.F.2 of this Disclosure Statement.  **BALLOTS SENT BY FACSIMILE TRANSMISSION ARE NOT PERMITTED AND WILL NOT BE COUNTED.**

L.      *Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the Confirmation Hearing set to occur?*

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for **[●], 2020, at [●] [a.m./p.m.], prevailing Eastern Time**.  The Confirmation Hearing may be adjourned from time to time without further notice.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New*

*York Times* (National edition) and *PM360* to provide notification to those persons who may not receive notice by mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

M.    *What is the purpose of the Confirmation Hearing?*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Disclosure Statement contains adequate information under section 1125(a) of the Bankruptcy Code and the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed and subject to satisfaction or waiver of each condition precedent in Article IX of the Plan. For a more detailed discussion of the Confirmation Hearing, *see* Article VII of this Disclosure Statement.

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under the chapter 11 plan, any person acquiring property under the chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose prior to the effective date of the plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

The deadline by which all objections to the Plan must be filed with the Bankruptcy Court and served so as to be actually received by the appropriate notice parties is [**August 15], 2020, at 4:00 p.m., prevailing Eastern Time**.

N.    *Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?*

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice and Claims Agent, Kurtzman Carson Consultants LLC:

> *By Hand Delivery or Overnight Mail at*:
>
> Akorn Ballot Processing Center
> c/o Kurtzman Carson Consultants LLC
> 222 N Pacific Coast Highway, Suite 300
> El Segundo, CA 90245
>
> *By electronic mail at*:
>
> AkornInfo@kccllc.com
>
> *By telephone (U.S. and Canada) at*:
>
> (877) 725-7539

*By telephone (International) at:*

(424) 236-7247

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' Notice and Claims Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Notice and Claims Agent at https://www.kccllc.net/akorn (free of charge) or the Bankruptcy Court's website at https://ecf.deb.uscourts.gov (for a fee).

O.    *Do the Debtors recommend voting in favor of the Plan?*

Yes. The Debtors believe the Plan provides for a greater distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe the Plan, which provides for the wind-down and dissolution of the Debtors' Estates and for distributions to Holders of Claims and Interests, is in the best interests of all Holders of Claims and Interests, and that other alternatives fail to realize or recognize the value inherent under the Plan.

## ARTICLE III.
## BUSINESS DESCRIPTION AND BACKGROUND TO THE CHAPTER 11 CASES

A.    *Akorn's Corporate History.*

Akorn was founded in 1971 in Abita Springs, Louisiana. In 1997, Akorn relocated its corporate headquarters to the Chicago, Illinois area; today, Akorn maintains its principal corporate offices in Lake Forest, Illinois. The Debtors have historically evaluated and, in some instances, executed opportunities to expand through the acquisition of products and companies in areas that the Debtors believed offered attractive opportunities for growth.

B.    *Business Operations.*

1.    *Research and Development Expertise in Alternative Dosage Forms.*

The Debtors' R&D efforts are primarily focused on the development of generic prescription products that are in "alternative dosage forms," *i.e.*, dosage forms other than oral solid dose. These products typically have fewer competitors in mature markets, are more difficult to develop and manufacture, and can carry higher profitability over time than oral solid dose products. The alternative dosage forms that the Debtors focus on are primarily those for which the Debtors have manufacturing capability: ophthalmics, injectables, oral liquids, otics, topicals, inhalants, and nasal sprays.

2.    *Alternative Dosage Form Manufacturing Expertise.*

The Debtors' manufacturing network specializes in alternative dosage form products. Through their manufacturing facilities, the Debtors manufacture a diverse assortment of sterile and non-sterile pharmaceutical products, including oral liquids, otics, nasal sprays, liquid injectables, lyophilized injectables, topical gels, creams and ointments, and ophthalmic solutions and

14

ointments.    The Debtors represent one of only a limited number of scaled manufacturers for injectables and ophthalmics.  Akorn's four manufacturing facilities, which are U.S. Food and Drug Administration ("FDA") approved,[7] specialize in different of the Debtors' products:

- the Decatur, Illinois facility specializes in sterile injectables and ophthalmics;

- the Somerset, New Jersey facility specializes in sterile ophthalmic solutions, ointments, and topical gels;

- the Amityville, New York facility specializes in sterile ophthalmic solutions and suspensions and non-sterile nasal sprays, topical creams, ointments, and gels, oral liquids, and unit dose oral liquid products; and

- the Hettlingen, Switzerland facility specializes in sterile ophthalmic solutions, suspensions, ointments, and gels.[8]



_____

[7]    Akorn's Paonta Sahib, Himachal Pradesh, India manufacturing facility is not FDA approved.  The Paonta Sahib facility is a sterile injectable facility with separate areas dedicated to general injectable products, carbapenem injectable products, cephalosporin injectable products and hormonal injectable products.  Akorn is exploring strategic alternatives for exiting the Paonta Sahib, Himachal Pradesh, India manufacturing facility.

[8]    On January 4 and June 13, 2019, respectively, Akorn received warning letters from the FDA regarding the Decatur Facility and the Somerset Facility and has worked diligently over the last year to address the issues raised in those warning letters and bring the facilities substantially into compliance.

3.      *Product Portfolio and Sales and Marketing Infrastructure.*

The Debtors market a diverse portfolio of generic prescription pharmaceutical products, branded prescription pharmaceutical products, over-the-counter ("OTC") brands, various private-label OTC pharmaceutical products, and a number of prescription animal health products. For the Debtors' human prescription products, the Debtors' diverse portfolio of alternative dosage forms sets the Debtors apart from their larger competitors and allows them to provide a single source of such products to the Debtors' customers. The Debtors' OTC and animal health products are largely complementary to their human prescription products, which allows them to further leverage their manufacturing and marketing expertise.

The Debtors' flagship OTC brand is TheraTears® Therapy for Your Eyes®, a family of therapeutic eye care products that includes dry eye therapy lubricating eye drops, eyelid and eyelash cleanser, and eye nutrition supplements. The Debtors also market several specialty OTC products including Zostrix®, MagOx®, Maginex®, Multi-betic®, and Diabetic Tussin®.

The Debtors' portfolio of branded and generic companion animal prescription pharmaceutical products include Anased® and VetaKet® veterinary sedatives, Tolazine® and Yobine® sedative reversing agents, and Butorphic® pain reliever.

The Debtors maintain a targeted sales and marketing infrastructure to promote their branded, generic, OTC, and animal health products. They leverage this sales and marketing infrastructure to promote their branded portfolio and sell their multisource generic products directly into physician offices, hospital systems, and group purchasing organizations ("GPOs").

The Debtors rely on their sales and marketing teams to help maintain and, where possible, increase market share for the Debtors' products. The Debtors' sales organization is structured as follows:

- field sales teams focused on branded ophthalmology products;

- field sales teams focused on institutional markets;

- inside sales team focused on customers in smaller markets; and

- national accounts sales team focused on wholesalers, distributors, retail pharmacy chains and GPOs.

Field sales representatives promote ophthalmic products directly to glaucoma specialists, retinal surgeons, and ophthalmologists and other pharmaceutical products directly to local hospitals in order to support compliance and pull-through against existing contracts. The inside sales team augments the Debtors' outside sales teams to sell products in markets where field sales would not be cost effective. The national accounts sales team seeks to establish and maintain contracts with wholesalers, distributors, retail pharmacy chains, and GPOs. The Debtors utilize a sales force of approximately seventy field and inside sales representatives to promote Akorn's product portfolio. To support their sales efforts, the Debtors also have a customer service team and a marketing department focused on promoting and raising awareness about the Debtors' product offerings.

4.       *The Debtors' Employees.*

As of the Petition Date, Akorn employed approximately 2,180 employees worldwide, and the Debtors employed approximately 1,680 individuals in the United States, including approximately 1,676 full-time and four part-time employees, and retained approximately seventy contractors and temporary workers to fulfill certain duties on a short- and long-term bases. The Debtors' employment relationships with full-time and part-time employees are not subject to collective bargaining agreements.

The Debtors' performance and operations are highly dependent on the continued service of the Debtors' key R&D personnel, other technical employees, managers, and sales personnel, and the Debtors' ability to continue to attract and retain such personnel. Competition for such personnel is intense, particularly for highly motivated and experienced R&D and other technical personnel. The Debtors face increasing competition for such personnel from companies with greater financial resources.

5.       *The Debtors' Competitors.*

Sourcing, marketing, and manufacturing pharmaceutical products and consumer health products is highly competitive, with many established manufacturers, suppliers, and distributors actively engaged in all phases of the business. With respect to pharmaceutical products, the Debtors compete principally on the quality of their products and services, reliability of their supply, their breadth of portfolio, their depth of customer relationships, and price. Within the consumer health segment, the Debtors' relatively small product portfolio means the Debtors primarily compete on product offering, price, and service. Many of the Debtors' competitors have substantially greater financial and other resources, including greater sales volume, larger sales forces, and greater manufacturing capacity.

6.       *The Debtors' Customers.*

A high percentage of the Debtors' direct sales are attributable to three large wholesale drug distributors: AmerisourceBergen Corporation; Cardinal Health, Inc.; and McKesson Corporation. On a combined basis, these three wholesale drug distributors accounted for approximately 82.6% of Akorn's gross sales and approximately 60.3% of net revenue in the year ended December 31, 2019.

7.       *The Debtors' Suppliers.*

The Debtors require raw materials and components to manufacture and package pharmaceutical products. The principal components of the Debtors' products are active and inactive pharmaceutical ingredients and certain packaging materials. Many of these materials are available from only a single source and, in the case of many of the Debtors' products, only one supplier of raw materials has been identified and qualified. Because FDA approval of drugs requires manufacturers to specify their proposed suppliers of active ingredients and certain packaging materials in their applications, FDA approval of any new supplier would be required if such active ingredients or such packaging materials were no longer available from the specified supplier. The qualification of a new supplier could delay the Debtors' development and marketing efforts and otherwise disrupt the Debtors' postpetition operations and restructuring efforts. If for

17

any reason the Debtors are unable to obtain sufficient quantities of any of the raw materials or components required to produce and package their products, the Debtors may not be able to manufacture their products as planned.  In addition, certain of the pharmaceutical products that the Debtors market are manufactured by third parties that serve as the Debtors' only supplier of those products.  Any delays or failure of a contract manufacturing partner to supply finished goods in a timely manner or in adequate volume could impede the Debtors' marketing of those products.  Further, if supply is disrupted, the Debtors may be forced to incur failure to supply penalties, as the Debtors have done in the past.  Any of the aforementioned risk factors may have a deleterious effect on the Debtors' business, financial condition, and restructuring efforts.

In addition, the COVID-19 pandemic has disrupted global supply chains and introduced additional uncertainty to the Debtors' ability to find substitute suppliers of active and inactive pharmaceutical ingredients and packaging materials.

8.      *The Debtors' Regulatory Environment.*

The Debtors are subject to extensive regulation by government agencies, including the FDA, the Drug Enforcement Administration ("DEA"), the Federal Trade Commission ("FTC"), and other federal, state, and local agencies.  The development, testing, manufacturing, processing, quality, safety, efficacy, packaging, labeling, recordkeeping, distribution, storage, and advertising of the Debtors' products, and disposal of waste products arising from such activities, are subject to regulation by FDA, DEA, FTC, the Consumer Product Safety Commission, the Occupational Safety and Health Administration, and the Environmental Protection Agency.  In addition to federal regulators, similar state and local agencies have local jurisdiction over these activities. Noncompliance with applicable United States and/or local regulatory requirements can result in fines, injunctions, penalties, mandatory recalls or seizures, suspensions of production, recommendations by FDA against governmental contracts, and, in some cases, criminal prosecution.  The Debtors are also subject to oversight from federal and state governmental benefit programs, healthcare fraud and abuse laws, and international regulations in jurisdictions in which the Debtors manufacture or sell their pharmaceutical products.

(a)      *FDA Inspection and Approval.*

The Federal Food, Drug and Cosmetic Act (the "FDC Act"), the Controlled Substance Act, and other federal statutes and regulations govern or influence the development, testing, manufacture, labeling, storage, and promotion of products that the Debtors manufacture and market.  The FDA inspects drug manufacturers and storage facilities to determine compliance with its current Good Manufacturing Practices ("cGMP") regulations.  Noncompliance with the cGMP regulations can result in fines, recall and seizure of products, total or partial suspension of production, refusal to approve New Drug Applications ("NDAs") and abbreviated New Drug Applications ("ANDAs"), and, in some instances, criminal prosecution.  cGMPs address pharmaceutical manufacturing and product development, including the integrity of manufacturing and testing data, and require having strong quality management systems, obtaining appropriate quality materials, establishing robust operating procedures, detecting and investigating product quality deviations, and maintaining reliable testing laboratories, among other things.

The FDA monitors cGMP compliance through routine inspections of manufacturing and development facilities.  As part of its oversight, the FDA inspects Akorn's manufacturing sites every one to two years.  At the conclusion of inspections, the FDA holds a close-out meeting and shares its observations.  At these meetings, the FDA may make no observations or only oral observations, or it may document objectionable observations in a "Form 483," which "does not constitute a final Agency determination."[9]    Pharmaceutical companies also are required to regularly self-assess compliance with cGMP.   Akorn's internal Global Quality Compliance ("GQC") organization regularly conducts cGMP facility audits at its manufacturing facilities and its R&D facilities.

Once the facility responds to the Form 483 observations, the FDA makes a formal determination to classify the facility as "voluntary action indicated" ("VAI"), indicating the facility's proposed corrective action plan is adequate to address FDA's observations, "official action indicated" ("OAI"), indicating the corrective action plan is inadequate, or, if no Form 483 was issued, "no action indicated" ("NAI"), indicating no action is necessary.  OAI status often results in a formal FDA "warning letter," which may mean that no new products will be approved from the facility until OAI status is resolved.

Prior to 2018, Akorn had a history of generally satisfactory FDA inspections at its operational facilities.  In 2018, Akorn's facilities in Decatur and Somerset were inspected by the FDA and received OAI status.  Akorn's facility in Amityville was inspected by the FDA in 2019 and received VAI status.  Akorn's facility in Hettlingen was inspected by the FDA in February 2020 and received VAI status.  Other recent regulatory inspections at certain of Akorn's other facilities concluded with satisfactory outcomes.  As of the Petition Date, FDA compliance-related activities have reached essentially full completion at Akorn's Decatur facility and expect FDA compliance-related activities to be substantially completed in 2020.

9.    *The Sale of Non-Debtor Akorn India Private Limited.*

(a)    *The Akorn India Private Limited Transaction.*

Non-Debtor Akorn India Private Limited ("AIPL") is a private limited company in the pharmaceutical industry with a facility for manufacturing sterile injectable products.  Akorn Inc. and Akorn Mauritius are the legal and beneficial owners of 100% of the equity interests (the "AIPL Interests") in AIPL.  Prior to the commencement of the Chapter 11 Cases, the Debtors determined that the AIPL operations will not be a part of Akorn's core, go-forward business strategy.  Accordingly, Akorn Inc. and Akorn Mauritius (the "AIPL Sellers") determined to conduct a marketing process for the AIPL Interests to identify and ultimately consummate a sale to a purchaser.

(b)    *The Akorn India Private Limited Marketing Process.*

In October of 2019, the AIPL Sellers initiated an extensive marketing process with respect to their AIPL Interests.   The AIPL Sellers worked with PricewaterhouseCoopers Corporate

---

[9]    Form 483 Frequently Asked Questions, FDA (July 2, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions.

Finance LLC ("PwC") to identify several potential purchasers. In the succeeding months, additional purchasers engaged in discussions with PwC and executed non-disclosure agreements and completed site visits. The marketing process for the AIPL Interests is remains ongoing as of the date hereof.

C.    *Prepetition Capital Structure.*

As of the Petition Date, the Debtors' funded indebtedness consisted exclusively of the Term Loans. In April 2014, to finance certain of its acquisitions, Akorn, Inc., as "Borrower," and certain of the Debtors, as "Guarantors," (the Borrower and the Guarantors together, the "Akorn Loan Parties") entered into the Term Loan Credit Agreement with the Term Loan Lenders as lenders and with the Term Loan Agent as administrative agent. As of the Petition Date, the outstanding principal, interest, and other obligations under the Term Loan Credit Agreement was approximately $861.7 million. The Term Loans are scheduled to mature on April 16, 2021.

As discussed herein, on February 12, 2020, the Debtors and their Term Loan Lenders entered into an amended Standstill Agreement (as defined below) that, among other things, further extended the terms of the standstill and established certain milestones related to the Debtors' sale process and chapter 11 filing.

As of the Petition Date, Akorn had approximately 133.4 million shares of common stock, no par value per share, issued and outstanding. Prior to the Petition Date, Akorn's common stock traded on NASDAQ under the ticker "AKRX."

## ARTICLE IV.
## EVENTS LEADING UP TO THE CHAPTER 11 CASES

A.    *The Fresenius Merger Agreement and Related Litigation.*

1.    *The Fresenius Merger Agreement.*

On April 24, 2017, Akorn entered into an Agreement and Plan of Merger (the "Merger Agreement" and the transaction contemplated thereby, the "Merger") with Fresenius, a German stock corporation, Quercus Acquisition, Inc., a Louisiana corporation and wholly-owned subsidiary of Fresenius ("Merger Sub"), and, solely for purposes of Article VIII thereof, Fresenius SE & Co. KGaA, a German partnership limited by shares (together with Fresenius and Merger Sub, the "Fresenius Parties"). The Merger, if consummated, would have delivered consideration of $34 per share to Akorn's common shareholders, which at the time represented a 35% premium over the unaffected market price of Akorn common shares.

The Merger Agreement contained customary representations and warranties and operating covenants, including a representation and warranty that Akorn was in compliance with regulatory obligations (except to the extent that any non-compliance would not arise to the level of a "material adverse effect") and an operating covenant requiring Akorn to use commercially reasonable efforts to operate in the ordinary course.

Fresenius had the right to terminate the Merger Agreement if Akorn experienced a "material adverse effect" on its business, breached its representations and warranties and such

breaches resulted or could reasonably be expected to result in a "material adverse effect," or failed to comply with its covenants in all material respects.

On July 19, 2017, Akorn's shareholders voted to approve the Merger Agreement.

2.      *Decline in Akorn's Financial Performance.*

From 2012 through 2016, Akorn grew consistently year over year when measured by revenue, EBITDA, EBIT, and EPS.[10]  Beginning in 2017, Akorn began to experience a steep and sustained drop-off in financial performance driven by a variety of factors, including, among other things:  consolidation of customer buying power leading to price reductions; the FDA's expedition of its review and approval process for generic drugs, leading to increased competition and resultant additional price and volume erosion; and legislative attempts to reduce drug prices.

These dynamics contributed to a downturn across the generics pharmaceutical industry as a whole.  In Akorn's case, the impact was particularly severe due to a steep decline in sales of three of Akorn's largest products—ephedrine, lidocaine ointment, and clobetasol—resulting from new entrants in the markets for each of these products beginning in 2017.

On July 31, 2017, Akorn publicly announced net revenue for the quarter ended June 30, 2017 was $199 million, representing a 29.1% year-over-year decline.  These results were attributed to, among other things, customer consortiums accelerating price erosion across the industry, limited bid/RFP opportunities and increasing competitive responses, and new competitive entrants into higher value products.

Akorn's financial performance continued to decline in the third quarter of 2017.  On November 1, 2017, Akorn reported net revenue of $202.4 million for the quarter ended September 30, 2017, representing a year-over-year decline of 28.7%.  Akorn's operating income came in at only $9 million, representing a year-over-year decline of 89%.  Akorn reported a loss of $0.02 per share, a year-over-year decline of 105%.

3.      *The Anonymous Letters and Investigations.*

On November 16, 2017, Fresenius informed Akorn that Fresenius had received two anonymous letters alleging data integrity and regulatory deficiencies at Akorn facilities.  Over the next several months, Akorn granted Fresenius broad access to its facilities, documents, employees, and equipment.  Akorn also briefed Fresenius on the findings of its own investigation undertaken following the receipt of the anonymous letters (the "<u>Akorn Investigation</u>"), including an incident that it had uncovered involving the submission of likely false data to the FDA in connection with an ANDA.

On February 26, 2018, Fresenius announced in a press release that it was investigating Akorn's data integrity compliance and that "[t]he consummation of the transaction may be affected if the closing conditions under the merger agreement are not met."  Akorn released a statement

---

[10]   "Earnings before interest, taxes, depreciation and amortization," "earnings before interest and taxes," and "earnings per share," respectively.

disclosing its own investigation and stating that its "investigation has not found any facts that would result in a material impact on Akorn's operations and Akorn does not believe this investigation should affect the closing of the transaction with Fresenius." Following these announcements, Akorn's share price declined 38% from $30.28 to $18.65.

Akorn informed the FDA in March 2018 of its findings concerning the instance of likely data falsification and withdrew the underlying ANDA. Akorn also retained a third-party inspection and certification organization, NSF International ("NSF"), to conduct a thorough review of Akorn's data integrity practices and FDA submissions. Over the course of this review, NSF found certain data integrity deficiencies at Akorn's facilities and corporate offices. Since completion of NSF's review, Akorn has been working to remediate these deficiencies.

4. *Fresenius Purports to Terminate the Merger Agreement; Litigation Ensues.*

On April 22, 2018, Fresenius gave notice to Akorn that it was terminating the Merger Agreement.

On April 23, 2018, Akorn filed a verified complaint in the Delaware Chancery Court seeking to force the Fresenius Parties to perform their contractual obligations under the Merger Agreement and consummate the Merger.[11] The complaint alleged, among other things, that (a) Fresenius anticipatorily breached its obligations under the Merger Agreement by repudiating its obligation to close the Merger, (b) Fresenius knowingly and intentionally breached its obligations under the Merger Agreement by working to slow the antitrust approval process and by engaging in a series of actions designed to hamper and ultimately block the Merger, and (c) Akorn had performed its obligations under the Merger Agreement and was ready, willing, and able to close the Merger. The complaint sought a declaration that Fresenius's termination was invalid, an order enjoining Fresenius from terminating the Merger Agreement, and an order compelling Fresenius to specifically perform its obligations under the Merger Agreement and to use reasonable best efforts to consummate the Merger. On April 30, 2018, the Fresenius Parties filed a verified counterclaim alleging that, due primarily to purported data integrity deficiencies discovered during the investigations, Akorn had breached representations, warranties, and covenants in the Merger Agreement and that Akorn had allegedly experienced a "material adverse effect." The verified counterclaim sought damages and a declaration that Fresenius's purported termination of the Merger Agreement was valid and that Fresenius was not obligated to consummate the Merger.

Following expedited discovery, the Delaware Chancery Court held a five-day trial in July 2018. At the conclusion of the trial, the Delaware Chancery Court ordered post-trial briefing, which was completed on August 20, 2018, and a post-trial hearing, which was held on August 23, 2018.

On October 1, 2018, the Delaware Chancery Court issued a 246-page post-trial opinion (the "Chancery Opinion")[12] denying Akorn's claims for relief and concluding that Fresenius had

---

[11] *Akorn, Inc. v. Fresenius Kabi AG*, C.A. No. 2018-0300-JTL (Del Ch.).

[12] *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347 (Del. Ch. Oct. 1, 2018).

validly terminated the Merger Agreement. The Delaware Chancery Court concluded that Akorn had experienced a "material adverse effect" due to its financial performance following the signing of the Merger Agreement, that Akorn had breached representations and warranties in the Merger Agreement and that those breaches would reasonably be expected to give rise to a "material adverse effect," that Akorn had materially breached a covenant in the Merger Agreement, and that Fresenius was materially in compliance with its own contractual obligations. On October 17, 2018, the Delaware Chancery Court entered partial final judgment against Akorn on its claims and in favor of the Fresenius Parties on their claims for declaratory judgment. The Delaware Chancery Court also entered an order holding proceedings on the Fresenius Parties' damages claims in abeyance pending the resolution of any appeal from the partial final judgment.

On October 18, 2018, Akorn filed a notice of appeal from the partial final judgment and a motion seeking expedited treatment of Akorn's appeal. On October 23, 2018, the Delaware Supreme Court granted Akorn's motion for expedited treatment and set a hearing on Akorn's appeal for December 5, 2018.

On December 7, 2018, the Delaware Supreme Court affirmed the Delaware Chancery Court's ruling denying Akorn's claims for declaratory and injunctive relief and granting the Fresenius Parties' counterclaim for a declaration that the termination was valid. On December 27, 2018, the Delaware Supreme Court issued a mandate returning the case to the Delaware Chancery Court for consideration of all remaining issues, including the Fresenius Parties' damages claims.

On August 16, 2019, the Fresenius Parties filed a motion for summary judgment seeking damages of approximately $123 million, plus statutory interest, which claim was ultimately reduced to approximately $117 million, plus statutory interest. On September 30, 2019, Akorn filed a combined cross-motion for summary judgment and opposition to the Fresenius Parties' motion. Briefing on the motions for summary judgment was completed on December 9, 2019.

On April 22, 2020, the Delaware Chancery Court heard oral argument on the cross-motions for summary judgment. At the conclusion of the hearing, the Delaware Chancery Court denied the Fresenius Parties' request for approximately $43 million in alleged damages attributable to the Fresenius Parties' litigation fees and expenses, and reserved judgment on the remaining components of the Fresenius Parties' damages claim, which total approximately $74 million, plus interest. To date, no ruling has been issued on the remaining components of the Fresenius Parties' damages claim.

B.    *Akorn Securities Class Action and Opt-Out Litigation.*

In addition to Fresenius's claims for damages, Akorn faces several private actions brought by purported shareholders in the wake of the Fresenius litigation alleging that Akorn and its management misstated or omitted material information about its data integrity controls and compliance with FDA regulations in the Akorn's statements to shareholders. As discussed more fully below, Akorn has obtained final approval of a class settlement that resolves all of the claims brought by shareholders who acquired Akorn common stock from November 3, 2016 through January 8, 2019 (the "Class Members"). However, four groups of "opt-out" litigants who requested exclusion from the class settlement commenced separate actions in the Illinois District

Court against Akorn and certain other named defendants, including current and former Akorn officers and directors, alleging violations of federal securities laws. As of the Petition Date, those four actions remained unresolved.

On March 8, 2018, less than two weeks after Fresenius disclosed its investigation into Akorn's data integrity compliance, a purported Akorn shareholder filed a putative class action complaint captioned *Joshi Living Trust v. Akorn, Inc., et al.* in the Illinois District Court alleging violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934. The complaint named as defendants Akorn, then-Chief Executive Officer Rajat Rai, Chief Financial Officer Duane Portwood, and Chief Accounting Officer Randall Pollard, and sought, among other things, an award of damages resulting from alleged false statements and omissions concerning Akorn's data integrity compliance. Akorn and the other named defendants dispute these claims.

On May 31, 2018, the Illinois District Court issued an order in that class action matter appointing Gabelli & Co. Investment Advisors, Inc. and Gabelli Funds, LLC as lead plaintiffs (the "Lead Plaintiffs") pursuant to the Private Securities Litigation Reform Act, approving their selection of lead counsel and liaison counsel, and amending the case caption to *In re Akorn, Inc. Data Integrity Securities Litigation* (the "Shareholder Litigation"). Several later-filed securities lawsuits were consolidated into the Shareholder Litigation.

On September 5, 2018, the Lead Plaintiffs filed an amended complaint naming additional defendants, asserting additional claims, and alleging that, during a class period from November 3, 2016 to April 20, 2018, the defendants knew or recklessly disregarded widespread institutional data integrity problems at Akorn's manufacturing and research and development facilities while making or causing Akorn to make contrary misleading statements and omissions of material fact concerning Akorn's data integrity at its facilities. The amended complaint alleged that corrective information was provided to the market on two separate dates, causing non-insider shareholders to lose over $1.07 billion and $613 million in value, respectively.

On October 29, 2018, the parties filed a stipulation and joint motion for dismissal of certain claims and defendants, which was granted on October 30, 2018. On December 19, 2018, the remaining defendants filed an answer to the amended complaint, disputing the plaintiffs' remaining allegations. On April 22, 2019, the Lead Plaintiffs filed a second amended complaint extending the class period through January 8, 2019.

On May 3, 2019, Akorn and the Lead Plaintiffs commenced mediation. Following several months of extensive arm's-length negotiations, the parties reached a nonbinding agreement in principle to settle the Shareholder Litigation on July 25, 2019, and executed a definitive stipulation of settlement on August 9, 2019. The stipulation of settlement was subject to numerous terms and conditions including, among other things, (a) the unilateral right of Akorn to terminate the definitive settlement agreement if persons who purchased a number of shares exceeding an agreed-upon threshold (the "Termination Threshold") opted out of and elected not to participate in or be bound by the proposed settlement and (b) final approval by the court.

Pursuant to the terms of the settlement, which was granted final approval by the Illinois District Court on March 13, 2020 (the "Shareholder Settlement"), all Class Members that did not timely submit notices of exclusion released all claims arising from or relating to the facts and

circumstances alleged in the Shareholder Litigation in exchange for a combination of (a) up to $30 million in insurance proceeds from Akorn's directors and officers liability insurance policies ("D&O Insurance"), (b) the issuance by Akorn of approximately 6.5 million shares of Akorn's common stock and any additional shares of Akorn common stock that are released as a result of expiration of out of the money options through December 31, 2024, and (c) the issuance by Akorn of contingent value rights ("CVRs") with a five-year term, subject to an extension of up to two years under certain circumstances.  Under the terms of the Shareholder Settlement, holders of the CVR would be entitled to receive an annual cash payment from Akorn of 33.3% of "Excess EBITDA" (*i.e.*, EBITDA in excess of the amount required meet a 3.0x net leverage ratio, assuming a $100 million minimum cash cushion, before any such CVR payment is triggered).  To the extent any such annual payments would be triggered under the CVRs, they would be capped at an aggregate $12 million per year and $60 million in the aggregate during the term of the CVRs.

Upon certain change of control transactions during the term of the CVRs, if the Term Loan Lenders and holders of Akorn's other debt are repaid in full, the CVRs would entitle holders thereof to a cash payment in the aggregate amount of $30 million (the "CVR Change of Control Payment").  In the event of a voluntary or involuntary bankruptcy filing during the term of the CVRs, the CVR agreement would provide that holders of the CVRs would receive in the aggregate a $30 million unsecured claim (which unsecured claim would be contractually subordinated to any deficiency claim of the Term Loan Lenders and holders of Akorn's other secured debt in any such bankruptcy case) (the "CVR Bankruptcy Claim").  The $60 million aggregate cap on annual payments would not apply to the CVR Change of Control Payment or the CVR Bankruptcy Claim, if any.  No further amounts would be payable under the CVRs following such a change of control transaction or bankruptcy event.

Between October 21 and November 12, 2019, Akorn received requests for exclusion totaling approximately $250 million in recognized losses, as calculated in accordance with the Shareholder Settlement plan of allocation, on behalf of six entities or groups of affiliated entities (the "Opt-Outs") who purchased a number of shares substantially exceeding the Termination Threshold.  Five of those Opt-Outs either filed or had previously filed lawsuits in the Illinois District Court against certain defendants in the Shareholder Litigation, including Akorn (the "Opt-Out Cases").  The complaints in the Opt-Out Cases variously alleged violations of sections 10(b), 18, and 20(a) of the Securities Exchange Act of 1934 and common law fraud.

Throughout November, 2019, Akorn and counsel for the Lead Plaintiffs were in contact with counsel for the Opt-Outs in an effort to persuade them to withdraw their requests for exclusion and participate in the Shareholder Settlement.

Ultimately, two of the six entities, including the plaintiff in one of the Opt-Out Cases, that originally submitted requests for exclusion withdrew their requests and participated in the Shareholder Settlement.  The remaining Opt-Outs did not withdraw their requests for exclusion, and those entities have continued to pursue the claims asserted in four Opt-Out Cases, captioned *Twin Master Fund, Ltd., et al. v. Akorn, Inc., et al.*, C.A. No. 19-cv-3648 (N.D. Ill.) (the "*Twin* Action"), *Manikay Master Fund, LP, et al. v. Akorn, Inc., et al.*, C.A. No. 19-cv-4651 (N.D. Ill.) (the "*Manikay* Action"), *Magnetar Constellation Fund II-PRA LP, et al. v. Akorn, Inc., et al.*, C.A. No. 19-cv-8418 (N.D. Ill.) (the "*Magnetar* Action"), and *AQR Funds – AQR Multi-Strategy Alternative Fund, et al. v. Akorn, Inc., et al.*, C.A. No. 20-cv-0434 (N.D. Ill.) (the "*AQR* Fund").

The Opt-Out Cases are stayed as against Akorn by virtue of the filing of the Chapter 11 Cases.  On or around the Petition Date, Akorn filed a motion seeking to stay the Opt-Out Cases as against the non-Debtor defendants in the Opt-Out Cases.

In accordance with the terms of the Shareholder Settlement, between April 1, 2020 and April 7, 2020, a total of $27.5 million in insurance proceeds from Akorn's applicable directors & officers insurance policies was deposited into a cash escrow account, and a total of 6,713,905 shares of Akorn common stock and a total of 6,713,905 CVRs were issued into separate securities escrow accounts.  The Settlement Shares and the CVRs were issued pursuant to the exemption from registration provided by section 3(a)(10) of the Securities Act of 1933, as amended.[13]  As of the Petition Date, Akorn believes it has substantially complied with its obligations under the Shareholder Settlement.[14]

C.      *Negotiations with the Ad Hoc Group.*

On November 7, 2018, Akorn received a letter from the legal representatives of the Ad Hoc Group asserting that the Delaware Chancery Court's finding that Akorn had suffered a "material adverse effect" and had failed to operate in the ordinary course of business may have significant implications under the Term Loan Credit Agreement.  The letter further stated that the Ad Hoc Group wanted to engage in a dialogue with Akorn.  Following the Delaware Supreme Court's affirmance of the Delaware Chancery Court's judgment, the legal representatives of the Ad Hoc Group sent a second letter, reiterating the Ad Hoc Group's desire to start a dialogue and stating that the Ad Hoc Group now represented a sufficient number of Term Loan Lenders to declare a default and accelerate Akorn's debt obligations under the Term Loan Credit Agreement.

Akorn and the Ad Hoc Group subsequently began discussions regarding the Term Loan Credit Agreement.  After months of hard-fought, arm's-length negotiations, on May 6, 2019, the Akorn Loan Parties entered into the Standstill Agreement and First Amendment with respect to the Term Loan Credit Agreement with the Ad Hoc Group, certain other Term Loan Lenders (together with the Ad Hoc Group, the "Standstill Lenders"), and the Term Loan Agent (together with the Akorn Loan Parties and the Standstill Lenders, the "Standstill Parties").  On December 15, 2019, the Akorn Loan Parties and certain of the Standstill Lenders entered into a First Amendment to Standstill Agreement and Second Amendment to Credit Agreement that, among other things, extended the date of expiry of the Standstill Period (as defined in the Standstill Agreement) from December 13, 2019 to and including February 7, 2020.

In exchange for the agreement of the Standstill Lenders to standstill during the Standstill Period, the Standstill Agreement required the Debtors to abide by certain milestones and covenants and to negotiate in good faith with the Ad Hoc Group regarding a comprehensive amendment of the Term Loan Credit Agreement.

---

[13]    Once the settlement consideration is issued into escrow, the Lead Plaintiffs are responsible for distributing it to members of the settlement class.

[14]    The Debtors expect to file a motion seeking authorization for the Debtors and other parties to perform any remaining postpetition obligations under the settlement out of an abundance of caution.

With the initial Standstill Agreement in place, beginning in August 2019, the Debtors, with the assistance of PJT, Partners, LP ("PJT"), who was hired as financial advisor in January 2019, launched a financing process through which they solicited debt and equity-linked financings to either (i) fully refinance the existing Term Loan or (ii) pay down the Debtors' existing Term Loan to effectuate a refinancing.   The Debtors, with the assistance of PJT, contacted thirty-two prospective investors, of which twenty-two entered into confidentiality agreements with the Debtors and received a copy of the Debtors' investor presentation and access to a virtual data room containing certain information about the Debtors' business.   Several parties submitted nonbinding indications of interest involving new debt and/or equity-linked investments, and the Debtors selected bidders to advance to the second round.   The parties had several meetings with management and conducted substantial due diligence.  After conducting due diligence, the Debtors received second-round nonbinding indications of interest for junior capital only.   No investors were willing to refinance the capital structure in its entirety, despite the Debtors having significantly less net debt in Q3 2019 than today.   Further, given feedback from the remaining junior capital investors regarding the importance of resolving outstanding litigation as part of consummating a transaction, it became clear these investors would not be able to provide binding junior financing proposals on an out-of-court basis.

Akorn and its advisors ultimately determined that these financing proposals were not actionable and a further extension of the Standstill Agreement was needed.   In October and November of 2019, Akorn and the Ad Hoc Group entered into discussions concerning an extension of the Standstill Agreement to afford Akorn time to resolve the then-pending Shareholder Litigation settlement and complete its refinancing process.  Unfortunately, Akorn and the Ad Hoc Group were unable to reach terms on either an extension to the Standstill Agreement or a Comprehensive Amendment at that time.

The failure to enter into a Comprehensive Amendment on or prior to November 15, 2019, resulted in payment by Akorn of a one-time in-kind fee in an amount equal to 0.625% of the Term Loans outstanding on such date and required the Akorn Loan Parties to pledge for the benefit of the Term Loan Lenders all unpledged equity interests in foreign subsidiaries.

Moreover, under the Standstill Agreement, the failure to enter into a Comprehensive Amendment or otherwise address the Term Loans on or prior to expiry of the Standstill Period (*i.e.*, February 7, 2020) would have constituted an immediate event of default under the Term Loan Credit Agreement.  On February 12, 2020, and without the Term Loan Lenders having declared an event of default, Akorn and the Standstill Parties reached agreement on a further extension of the Standstill Period for Akorn to continue its prepetition marketing process, with the goal of filing the Chapter 11 Cases with a stalking horse bid in hand.  Unfortunately, as discussed further herein, the Debtors did not secure any binding bids sufficient to fully pay the Term Loans.

D.    *Akorn's Current Operational and Financial Position.*

Since April 2017, Akorn's market capitalization has declined by more than 99%—from roughly $4 billion following announcement of the Merger Agreement to less than $37 million as of the Petition Date.  Akorn has not made an annual profit in two years and generated $310 million in negative EBITDA in 2018.

During the worst of this downturn, Akorn was party to the Merger Agreement, which imposed restrictive operating covenants that prevented the Debtors from taking strategic actions to shore up their business.  For example, Akorn was precluded from engaging in acquisitions, which had previously been a key driver of growth.  Akorn suffered a further loss when Fresenius successfully terminated the Merger Agreement, depriving Akorn shareholders of the Merger consideration of $34 per share, and the Delaware Chancery Court issued a public ruling criticizing Akorn's FDA regulatory compliance.

The Standstill Agreement with the Term Loan Lenders provided Akorn with much-needed time to improve their regulatory status and turn around their business.  Since entering the Standstill Agreement, Akorn has increased net revenue and adjusted EBITDA.  From the first quarter to the second quarter of 2019, Akorn increased its net revenue from $166 million to $178 million; in the third and fourth quarters, Akorn achieved net revenue of $176 million and $162 million, representing increases of $11 million and $9 million, or 6% and 5.8%, respectively, from the prior year quarters.  Akorn also increased adjusted EBITDA in three consecutive quarters of 2019:  after suffering a loss of $20 million in the fourth quarter of 2018, Akorn has achieved adjusted EBITDA of $23 million, $36 million, and $37 million for the first three quarters of 2019, respectively.  In the fourth quarter of 2019, the Debtors achieved adjusted EBITDA of $28 million.  In the first quarter of 2020, the Debtors achieved adjusted EBITDA of $59 million.

The Debtors' business stabilization has been driven by executing operational improvement, quality systems, and compliance initiatives focused on measuring and driving improvement in key performance metrics.  Through these initiatives, the Debtors have improved product availability, lowered backorders, and reduced failure to supply penalties.  As a result of their ongoing operational turnaround, the Debtors are poised to achieve significant growth.

While the Debtors' underlying business is sound today and improving with each passing quarter, the Debtors continue to face significant nonoperational headwinds, including, first and foremost, the Debtors' significant lingering litigation overhang as a result of the Opt-Out Cases and the Fresenius litigation, which have deterred new financing sources from investing in and/or acquiring the Debtors' business outside of the chapter 11 context.

E.      *Akorn's Prepetition Marketing Process.*

Beginning in December 2019, the Debtors, with the assistance of PJT, contacted seventy-two potentially interested parties (including both strategic purchasers from the pharmaceutical industry and financial purchasers) regarding a potential going-concern transaction of the Debtors' business, of which thirty-seven entered into confidentiality agreements with the Debtors.  All of the equity sponsor parties who completed significant diligence in the financing process were invited to participate in the sale process.  Parties who executed a confidentiality agreement received a copy of the Debtors' investor presentation and access to a virtual data room containing approximately fifty documents with certain key information about the Debtors' business.  In addition, parties were offered phone calls with management.

PJT instructed bidders to submit preliminary indications of interest by January 30, 2020, which were to include: (i) the identity and description of the bidder, (ii) the purchase price for the Debtors' business to be paid in cash, (iii) descriptions of the material assumptions informing the

proposed purchase price, (iv) a description of due diligence information required to make a definitive proposal, (v) a transaction structure and proposed source of funds, (vi) prospective plans for the Debtors' business following consummation of a transaction, (vii) any conditions precedent required to be satisfied to consummate a transaction, (viii) estimates of time required to execute and close a transaction, (ix) the bidder's contact information and a list of any external advisors retained to assist in due diligence, and (x) any other matters material to a proposal.

Several parties submitted nonbinding indications of interest that contemplated a going-concern sale of the Debtors' business. Based on the overall quality of the bid, value, and certainty of execution, the Debtors selected seven bidders to advance to the second round of the process. These parties were invited to participate in the second round of bidding with access to further diligence, including site visits and discussions with the Debtors' management team. Additionally, these bidders received access to a second round virtual data room containing additional critical information about the Debtors' business. During the second round, the Debtors and PJT held in-person management meetings, responded to over 500 diligence inquiries, conducted numerous follow-up calls, and hosted site visits at the Debtors' manufacturing sites.

On February 28, 2020, the Debtors uploaded a form of asset purchase agreement to the virtual data room, and PJT instructed bidders to submit updated indications of interest by March 9, 2020 including, in addition to substantially the same information as required in the first round, (i) confirmation that due diligence had been substantially completed and (ii) a markup of the asset purchase agreement.

Based on the overall quality of the bid, value, and certainty of execution of the updated indications of interest, the Debtors ultimately selected two bidders to advance to the final round of the sale process. In total, final bidders received access to over 2,600 documents that were uploaded to the data room and conducted numerous follow-up diligence calls with management and its advisors at AlixPartners LLP, Kirkland & Ellis LLP, PJT, and Grant Thornton LLP.

On the March 27, 2020 deadline for binding bids, however, the Debtors received no bids at a level sufficient to pay the aggregate outstanding amount of the Term Loans in full. The Debtors swiftly pivoted to negotiating the terms of a comprehensive restructuring transaction with the Ad Hoc Group.

Subsequently, the Term Loan Lenders notified the Debtors of their intention to credit bid the outstanding amount of the Term Loans and act as the "stalking horse" bidder in an in-court sale process. After several rounds of negotiation and given the lack of interest from third parties to bid at a level sufficient to pay the aggregate outstanding amount of the Term Loans in full, the Debtors and the Term Loan Lenders agreed on an asset purchase agreement (including all exhibits and schedules related thereto, the "Stalking Horse APA").

The Debtors filed these Chapter 11 Cases to take the next step in marketing a going-concern sale of their business—specifically, a value-maximizing, in-Court sale process that will publicly "market test" the value of their business—to address the Debtors' capital structure needs and litigation liabilities in a single forum. To that end, prior to the Petition Date, the Debtors and certain of their Term Loan Lenders entered into the Restructuring Support Agreement, which solidifies their support for the Sale Transaction (whether to the Term Loan Lenders or a third party)

and provides for the orderly wind-down of the Debtors' estates and sufficient capital to fund the Debtors' operations until consummation of the Sale Transaction.  In addition, certain of the Restructuring Support Agreement parties have agreed to fund the costs of these Chapter 11 Cases via $30 million of DIP financing, which will send a clear signal to the market that the Debtors' operations can and will continue on a business-as-usual basis while they continue their marketing process.

To that end, the Debtors filed a motion requesting Court approval of the Bidding Procedures, with an auction (if any) to be scheduled for August 10, 2020.  In light of their fulsome pre and postpetition marketing process, the Debtors remain confident that sufficient interest exists to maximize the value of their business and expect to move expeditiously to select a winning bidder and consummate the contemplated sale of their assets.

**ARTICLE V.**
**ADMINISTRATION OF THE CHAPTER 11 CASES**

A.     *First Day Pleadings and Other Case Matters.*

On the Petition Date, the Debtors Filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court, various first day motions, and an application to employ Kurtzman Carson Consultants LLC ("KCC") as Notice and Claims Agent (collectively, the "First Day Pleadings") with the Bankruptcy Court.  On May 22, 2020, the Bankruptcy Court entered orders granting the First Day Pleadings on an interim or final basis, as applicable.  On [●], 2020, the Bankruptcy Court granted certain of the relief requested in the First Day Pleadings on a final basis.

1.     *Administrative Motions.*

To facilitate a smooth and efficient administration of the Chapter 11 Cases, the Debtors Filed First Day Pleadings seeking orders authorizing the joint administration of the Debtors' Chapter 11 Cases and establishing certain notice and administrative procedures.

2.     *Operational Relief.*

The Debtors Filed certain motions and applications requesting various types of "first day" and "second day" relief.  The relief granted enabled the Debtors to preserve value and efficiently administer the Chapter 11 Cases, including, among other things, orders authorizing the Debtors to:

- continue using their existing cash management system, honor certain prepetition obligations related thereto, maintain existing business forms, and continue to perform intercompany transactions;

- pay certain prepetition taxes and fees;

- obtain postpetition financing and use cash collateral with the consent of certain Term Loan Lenders;

30

- fulfill and honor all customer obligations the Debtors deemed appropriate in the ordinary course of business and continue, renew, replace, implement new, and/or terminate any customer practices and incur customer obligations as the Debtors deem appropriate;

- pay their obligations under insurance policies entered into prepetition, continue paying brokerage fees, renew, supplement, modify, and purchase insurance coverage in the ordinary course of business, maintain the customs surety bonds, honor the terms of the financing agreements and pay premiums thereunder ;

- pay prepetition employee wages, salaries, other compensation, and reimbursable employee expenses in the ordinary course of business, and continue certain employee benefits programs;

- make payment on account of prepetition Claims of certain critical domestic and foreign vendors, lienholders, and 503(b)(9) claimants; and

- determine adequate assurance of payment for future utility services, establish procedures for utilities to request adequate assurance, pursuant to which the utility companies were prohibited from altering, refusing, or discontinuing utility services except in certain circumstances, and require utility providers to return deposits for utility services no longer in use.

3.     *Automatic Stay.*

The Filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, stayed all collection efforts and actions against the Debtors' and their Estates, the enforcement of Liens, Claims, encumbrances, and interests against property of the Debtors, and both the commencement and continuation of prepetition litigation against the Debtors. With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay remains in effect until the Effective Date of the Plan. On May 22, 2020, the Bankruptcy Court entered an order granting the Debtors' request for an order restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and *ipso facto* provisions of the Bankruptcy Code and approving the form and manner of notice thereof [Docket No. 72].

B.     *Summary of Claims Process, Bar Date and Claims Filed.*

On May 22, 2020, the Debtors Filed a motion [Docket No. 95] seeking entry of an order granting an extension of time through and including June 30, 2020, to File their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") and their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Federal Rule of Bankruptcy Procedure 2015.3 (the "2015.3 Reports"). On [●], 2020, the Bankruptcy Court entered an order approving this

extension motion [Docket No. [●]].  On [●], 2020, the Debtors Filed their Schedules and Statements and Rule 2015.3 Reports [Docket Nos. [●]–[●]].

C.    *Exclusivity.*

Section 1121(b) of the Bankruptcy Code establishes an initial period of 120 days after the Bankruptcy Court enters an order for relief under chapter 11 of the Bankruptcy Code, during which only the debtor may file a chapter 11 plan.  If the debtor files a chapter 11 plan within such 120-day period, section 1121(c)(3) of the Bankruptcy Code extends the exclusivity period by an additional sixty (60) days to permit the debtor to seek acceptances of such plan.  Section 1121(d) of the Bankruptcy Code also permits the Bankruptcy Court to extend these exclusivity periods "for cause."  Absent further order of the Bankruptcy Court, the Debtors' exclusivity period to File a chapter 11 plan will expire on September 17, 2020, which is 120 days after the Debtors petitioned for relief under chapter 11 of the Bankruptcy Code.

D.    *The Sale Motion and Sale Process.*

On the Petition Date, the Debtors Filed a motion [Docket No. 18] (the "Sale Motion") seeking authority to conduct a postpetition process to market test the transaction contemplated by the Ad Hoc Group's bid, and to consummate the sale to the Ad Hoc Group or a successful topping bidder.  More specifically, the Debtors are seeking:  (i) authorization and approval of the Bidding Procedures in connection with the sale of substantially all of the Debtors' assets; (ii) establishment of certain dates and deadlines, including the bid deadline and the date of the auction, and the scheduling of a hearing to approve the sale of substantially all of the Debtors' assets to the Stalking Horse Bidder or otherwise Successful Bidder (as defined in the Bidding Procedures) (the "Sale Hearing"); (iii) approval of the form and manner of notice of the Sale Hearing; and (iv) approval of procedures for the assumption and assignment of executory contracts and leases, including notice of proposed cure amounts.

The Bidding Procedures Order contemplates the following dates and deadlines in connection with the Sale Transaction.

| Event | Date |
| --- | --- |
| Bid Deadline | August 3, 2020 |
| Auction | August 10, 2020 |
| Contract Objection Deadline | August 15, 2020 |
| Sale Objection Deadline | August 15, 2020 |
| Sale Hearing | August 20, 2020 |

The Sale Transaction shall be consummated in accordance with the terms and conditions set forth in the Sale Transaction Documentation, the Bidding Procedures Order, and the Sale Order. Generally, the Sale Transaction contemplates that:

(a)    on the Sale Closing (as defined in the Restructuring Support Agreement), the Debtors shall consummate the Sale Transaction by, among other things,

32

transferring the Transferred Assets to the Purchaser free and clear of all Liens, Claims, Interests, charges, and other encumbrances (other than the Assumed Liabilities) pursuant to sections 363 and 365 of the Bankruptcy Code and the Sale Order;

(b)     the Purchaser shall assume certain obligations owed by the Debtors to their customers and trade vendors. Following such assumption by the Purchaser, the Purchaser shall satisfy such obligations in Cash, and for the avoidance of doubt, any obligations that were assumed by the Purchaser shall cease to be Claims against the Debtors following such assumption;

(c)     Distributable Proceeds will be used to make payments or distributions pursuant to the Plan; and

(d)     on the Effective Date, the Debtors shall pay all Cure Costs that are required to be paid (if any) pursuant to and in accordance with sections 365 or 1123 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases that are assumed by the Debtors pursuant to the Plan. For the avoidance of doubt, the Debtors shall have no obligations to pay any Cure Costs for any contract or lease that was assumed by the Purchaser pursuant to the Sale Order.

# ARTICLE VI.
# SUMMARY OF THE PLAN

**THIS ARTICLE VI IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS THERETO. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL SUCH TERMS AND PROVISIONS, AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS. THE PLAN ITSELF (INCLUDING ATTACHMENTS) WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS ARTICLE VI AND THE PLAN (INCLUDING ATTACHMENTS), THE PLAN SHALL GOVERN.**

The Plan provides for the wind-down and dissolution of the Debtors' Estates and for distributions to Holders of Claims and Interests. The key terms of the Plan are as follows:

A.     *General Settlement of Claims.*

Except as otherwise expressly provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to

the Plan. The Plan shall be deemed a motion, proposed by the Debtors, to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Distributions made to Holders of Allowed Claims in any Class are intended to be final.

B.      *Sources of Plan Consideration.*

Cash on hand, borrowings under the DIP Facility, the Distributable Proceeds, if any, the Wind-Down Amount, the Debtors' rights under the Sale Transaction Documentation, payments made directly by the Purchaser on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of Cure Costs made by the Purchaser pursuant to sections 365 or 1123 of the Bankruptcy Code, the return of any utility deposits as set forth in the Utility Orders, and all Causes of Action not previously settled, released, or exculpated under the Plan, if any, shall be used to fund the distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided herein. Unless otherwise agreed in writing by the Debtors and the Purchaser, distributions required by the Plan on account of Allowed Claims that are Assumed Liabilities shall be the sole responsibility of the Purchaser to the extent such Claim is Allowed against the Debtors.

C.      *Restructuring Transactions.*

Upon the entry of the Confirmation Order, the Debtors, the Plan Administrator, and the Purchaser are authorized, without further order of the Bankruptcy Court, subject to the terms of the Restructuring Support Agreement, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under or in connection with the Plan that are consistent with and pursuant to the terms and conditions of the Plan and the Restructuring Support Agreement, including: (a) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (c) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (d) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state Law; and (e) any transaction described in the Description of Transactions Steps, if applicable.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

1.     *The Purchaser Assumed Claims.*

The Sale Transaction Documentation provides that as part of the Sale Transaction, the Purchaser assumed certain obligations owed by the Debtors to their customers and trade vendors. Following such assumption by the Purchaser, the Purchaser is required to satisfy such obligations in Cash, and for the avoidance of doubt, any obligations that were assumed by the Purchaser ceased to be Claims against the Debtors following such assumption.

2.     *Payment of Cure Costs and Other Amounts.*

On the Effective Date, the Debtors shall pay all Cure Costs that are required to be paid (if any) pursuant to and in accordance with sections 365 or 1123 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases that are assumed by the Debtors pursuant to the Plan. For the avoidance of doubt, the Debtors shall have no obligations to pay any Cure Costs for any contract or lease that was assumed by the Purchaser pursuant to the Sale Order.

D.     *Vesting of Assets.*

Except as otherwise provided in the Plan, the Sale Transaction Documentation, or any agreement, instrument, or other document incorporated herein or therein, on the Effective Date the Retained Assets shall vest in the Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, and other encumbrances. For the avoidance of doubt, all Transferred Causes of Action have been or will be transferred to the Purchaser in connection with the Sale Transaction and shall vest in the Purchaser as of the effective date thereof, and all Retained Causes of Action shall vest in the Debtors on the Effective Date for prosecution, settlement, or other action as determined by the Plan Administrator.

On and after the Effective Date, except as otherwise provided in the Plan, the Plan Administrator may operate the Debtors' businesses and use, acquire, or dispose of property and, as applicable, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

E.     *Plan Administrator.*

The Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers and officers of the Debtors shall be deemed to have resigned, solely in their capacities as such, and a representative of the Plan Administrator shall be appointed as the sole manager and sole officer of the Debtors and shall succeed to the powers of the Debtors' managers and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Debtors. For the avoidance of doubt, the foregoing shall not limit the authority of the Debtors or the Plan Administrator, as applicable, to continue the employment any former manager or officer.

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to make distributions thereunder and wind down the businesses and affairs of the Debtors, including: (i) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Debtors remaining after consummation of the Sale Transaction; (ii) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (iii) making distributions as contemplated under the Plan; (iv) establishing and maintaining bank accounts in the name of the Debtors; (v) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (vi) paying all reasonable fees, expenses, debts, charges, and liabilities of the Debtors; (vii) administering and paying taxes of the Debtors, including filing tax returns; (viii) representing the interests of the Debtors before any taxing authority in all matters, including any action, suit, proceeding or audit; and (ix) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator.  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Debtors shall be terminated.

1. *Appointment of the Plan Administrator.*

The Plan Administrator shall be appointed by the Debtors, in consultation with the Purchaser.  The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out its responsibilities under the Plan, and as otherwise provided in the Confirmation Order.

2. *Retention of Professionals.*

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  The reasonable fees and expenses of such professionals shall be paid by the Debtors, upon the monthly submission of statements to the Plan Administrator.  The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

3. *Compensation of the Plan Administrator.*

The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement.

F.    *Wind-Down.*

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall:  (i) cause the Debtors to comply with, and abide by, the terms of the Plan and any other documents contemplated thereby; (ii) take any actions necessary to wind down the Debtors' Estates; and (iii) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  From and after the Effective Date, except as set forth herein, the Debtors (x) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, and (y) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The Filing of the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly operating reports shall be the responsibility of the Plan Administrator.

G.    *Wind-Down Amount.*

On or prior to the Effective Date, the Debtors shall retain the Wind-Down Amount in accordance with the terms of the Sale Transaction Documentation.  The Wind-Down Amount shall be used by the Plan Administrator solely to satisfy the distributions set forth herein, the expenses of the Debtors and the Plan Administrator as set forth in the Plan; *provided* that all costs and expenses associated with the winding down of the Debtors and the storage of records and documents shall constitute expenses of the Debtors and shall be paid from the Wind-Down Amount.  In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes.

H.    *Plan Administrator Exculpation, Indemnification, Insurance, and Liability Limitation.*

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for actual fraud, willful misconduct, or gross negligence, in all respects by the Debtors.  The Plan Administrator may obtain, at the expense of the Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Debtors.  The Plan Administrator may rely upon written information previously generated by the Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator, in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

I.     *Tax Returns.*

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

J.     *Cancellation of Notes, Instruments, Certificates, and Other Documents.*

On the Effective Date, except as otherwise specifically provided for in the Plan or to the extent otherwise assumed by the Purchaser:  (i) the obligations of any Debtor under any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of giving rise to any Claim shall be cancelled and deemed surrendered as to the Debtors, and the Debtors shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised; *provided*, *however*, that notwithstanding anything to the contrary contained herein, any indenture or agreement that governs the rights of the DIP Agent and the Term Loan Agent shall continue in effect to allow the DIP Agent or the Term Loan Agent, as applicable, to (A) enforce its rights, Claims, and interests (and those of any predecessor or successor thereto) vis-à-vis any parties other than the Debtors, (B) receive distributions under the Plan and to distribute them to Holders of Allowed DIP Facility Claims and Term Loan Claims, as applicable, in accordance with the terms of such agreements, (C) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of Allowed DIP Facility Claims and Term Loan Claims, as applicable, including any rights to priority of payment and/or to exercise charging liens, and (D) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the DIP Agent, the Term Loan Agent, or Holders of DIP Facility Claims and Term Loan Claims under the Plan, as applicable.

K.     *Corporate Action.*

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Debtors or the Plan Administrator, as applicable) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, the Plan Administrator, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

Upon the Effective Date or as soon as reasonably practicable thereafter, after making all distributions provided for under the Plan, the Debtors shall be deemed to have been dissolved and

terminated, except as necessary to satisfy their obligations under the Plan.  The directors, managers, and officers of the Debtors shall be authorized to execute, deliver, File, or record such contracts, instruments, and other agreements or documents and take such other actions as they may deem necessary or appropriate to implement the provisions of Article IV.K of the Plan.

The authorizations and approvals contemplated by Article IV.K of the Plan shall be effective notwithstanding any requirements under applicable nonbankruptcy Law.

L.    *Dissolution of the Board of the Debtors.*

As of the Effective Date, the existing boards of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the Debtors with respect to their affairs other than matters substantially related to the transactions described in Article IV.C.1 of the Plan.  Subject in all respects to the terms of the Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall:  (i) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable Laws of the applicable state(s) of formation; and (ii) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any of the Debtors' certificates of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of any of the Debtors or any of their affiliates.

M.    *Release of Liens.*

Except as otherwise expressly provided herein, on the Effective Date, all Liens on any property of any Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtors shall automatically be discharged and released.

N.    *Effectuating Documents; Further Transactions.*

The Debtors and the officers and members thereof are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Restructuring Support Agreement,

without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

O.    *Exemption from Certain Taxes and Fees.*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan, the Sale Transaction, or the Sale Transaction Documentation or pursuant to:  (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

P.    *Causes of Action.*

Pursuant to the Sale Transaction Documentation, the Debtors assigned and transferred to the Purchaser all of the Transferred Causes of Action pursuant to the Sale Transaction Documentation in connection with the Sale Transaction.  For the avoidance of doubt, the Debtors or the Plan Administrator, as applicable, will retain the right to enforce the terms of the Sale Transaction Documentation.  Any Retained Causes of Action shall remain with the Debtors and shall vest with the Plan Administrator as of the Effective Date.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any such Cause of Action against them as any indication that the Debtors will not pursue any and all available Causes of Actions against them.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

Q.    *Closing the Chapter 11 Cases.*

For the avoidance of doubt, upon the occurrence of the Effective Date, the Debtors or Plan Administrator, as applicable, shall be permitted to close all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Akorn, and any other Debtor identified in the Description of Transaction Steps, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Akorn, irrespective of whether such Claim(s) were filed against a Debtor whose Chapter 11 Case was closed.

When all Disputed Claims have become Allowed or disallowed and all remaining Cash has been distributed in accordance with the Plan, the Debtors or Plan Administrator, as applicable,

shall seek authority from the Bankruptcy Court to close any remaining Chapter 11 Cases of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules.

R.      *Release, Injunction, and Related Provisions.*

The Plan contains certain releases, as described in Article II.I of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"

**Importantly, all Holders of Claims and Interests that are not in voting Classes (*i.e.*, are presumed to accept or deemed to reject the Plan) and that do not opt out to the inclusion of such Holder as a Releasing Party under the provisions contained in Article VIII.F of the Plan, will be deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Standstill Agreement, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the DIP Loan Documents, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, the Chapter 11 Cases, the DIP Loan Documents, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon the business or contractual arrangements between any Debtor and any Released Party, and any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, fraud or gross negligence.  By opting out of the releases set forth in Article VIII.F of the Plan you will forgo the benefit of obtaining the releases set forth in Article VIII.E and F of the Plan if you would otherwise be a Released Party thereunder.  The releases are an integral element of the Plan.**

**It is the Debtors' position that the consideration for the third-party releases set forth in Article VIII of the Plan and the mechanism by which Holders of Claims and Interests who are impaired under the Plan to consent to such releases meet the requirements for third party releases and are consistent with recent Chapter 11 Cases.  First, the consideration for the third party releases is the mutual releases provided by Released Parties to all other Released Parties.  For example, public investors or shareholders who consent to the third party releases would be released from any potential claims or causes of action that arose in connection with the events leading up to the Debtors' Chapter 11 Cases.  The Debtors do not currently believe that the claims being released against or by investors or shareholders have**

**any value.  Second, all impaired Holders of Claims and Interests, irrespective of whether they are entitled to vote on the Plan, will receive a Solicitation Package which will include materials allowing such holders to affirmatively consent to the third party releases by choosing not to opt out via a form that can either be mailed, emailed, or hand-delivered to the Debtors' Notice and Claims Agent.  In addition, the Debtors believe the third party release is entirely consensual under the established case law in the United States Bankruptcy Court for the District of Delaware.  *See, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. 286, 304–06 (Bankr. D. Del. 2013).  The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each of the Released Parties and each Exculpated Party as part of Confirmation of the Plan.**

The release, exculpation, injunction, and discharge provisions that are contained in Article VIII of the Plan are reproduced in pertinent part below.

1.    *Release of Liens.*

**Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtors and their successors and assigns without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.  In addition, the Term Loan Agent and the DIP Agent shall be authorized to execute and deliver all documents reasonably requested by the Debtors or the Plan Administrator to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

2.    *Releases by the Debtors.*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, their Estates, the Plan Administrator, and the Acquired Entities from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, or their Estates, or the Plan Administrator, or the Acquired Entities would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in a Debtor, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Standstill Agreement, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the DIP Loan Documents, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release,**

42

or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Chapter 11 Cases, the DIP Loan Documents, the Sale Transaction Documentation, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon the business or contractual arrangements between and Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, fraud or gross negligence. Notwithstanding the inclusion of any Released Parties as a potential party to any Transferred Causes of Action or Retained Causes of Action, such parties shall remain Released Parties.

Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan, the releases contained in the Plan do not (i) release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) affect the rights of Holders of Allowed Claims and Interests to receive distributions under the Plan, or (iii) release any Claims or Causes of Action against any non-Released Party.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases herein, which includes by reference each of the related provisions and definitions contained herein, *and further*, shall constitute the Bankruptcy Court's finding that the releases herein are:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the claims released by the releases herein; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (vi) a bar to any of the Debtors asserting any claim released by the releases herein against any of the Released Parties.

3.    *Releases by Holders of Claims and Interests.*

As of the Effective Date, except as otherwise provided herein, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Standstill Agreement, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the DIP Loan Documents, the Disclosure Statement, the

**Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, the Chapter 11 Cases, the DIP Loan Documents, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon the business or contractual arrangements between any Debtor and any Released Party, and any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, fraud or gross negligence.**

**Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan, the releases contained in the Plan do not (i) release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) affect the rights of Holders of Allowed Claims and Interests to receive distributions under the Plan, or (iii) release any Claims or Causes of Action against any non-Released Party.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the claims released by the Releasing Parties; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after notice and opportunity for hearing; and (vi) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.**

4.    *Exculpation.*

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the DIP Loan Documents, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created**

**or entered into in connection with the Restructuring Support Agreement, the DIP Loan Documents, the Disclosure Statement or the Plan, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that constitutes actual fraud, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

5.    *Injunction.*

**Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan shall be discharged pursuant to the Plan, or are subject to Exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Released Parties, or the Exculpated Parties (to the extent of the Exculpation provided pursuant to the Plan with respect to the Exculpated Parties):  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.  Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, the automatic stay pursuant to section 362 of the Bankruptcy Code shall remain in full force and effect with respect to the Debtors until the closing of these Chapter 11 Cases.**

6.    *The Definitions of "Released Parties" and "Releasing Parties."*

Under the Plan, "<u>Released Parties</u>" means, collectively, and in each case, in their respective capacities as such: (a) the Debtors; (b) the Consenting Term Loan Lenders; (c) the Term Loan Agent; (d) the DIP Lenders; (e) the DIP Agent; (f) the Purchaser; (g) all Releasing Parties; (h) the Acquired Entities; and (i) with respect to each Entity in clause (a) through (h), each such Entity's current and former subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (unless any such Entity or related party has opted out of being a Releasing Party, in which case such Entity or related party, as applicable, shall not be a Released Party).

Under the Plan, "<u>Releasing Parties</u>" means, collectively, and in each case, in their respective capacities as such:  (a) the Debtors; (b) the Consenting Term Loan Lenders; (c) the Term Loan Agent; (d) the DIP Lenders; (e) the DIP Agent; (f) the Purchaser; (g) the Acquired Entities; (h) all Holders of Claims or Interests that are presumed to accept the Plan *and* who do not opt out of the releases in the Plan; (i) all Holders of Claims or Interests who vote to accept the Plan; (j) all Holders of Claims or Interests that (x) abstain from voting on the Plan *and* who do not opt out of the releases in the Plan, (y) vote to reject the Plan *and* who do not opt out of the releases in the Plan, or (z) are deemed to reject the Plan *and* who do not opt out of the releases in the Plan; (k) with respect to each Entity in clause (a) through (j), each such Entity's current and former  subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (unless any such Entity or related party has opted out of being a Releasing Party, in which case such Entity or related party, as applicable, shall not be a Releasing Party).

7.    *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Plan Administrator), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the

Holder of such a Claim or Interest has voted to accept the Plan. Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is Unimpaired by the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

S.      *Applicability of Insurance Policies.*

Notwithstanding anything to the contrary in the Plan or Confirmation Order, Confirmation and Consummation of the Plan shall not limit or affect the rights of any third-party beneficiary or other covered party of any of the Debtor's insurance policies with respect to such policies (including the D&O Policies), nor shall anything contained herein (i) constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under any insurance policy, applicable law, equity, or otherwise, or (ii) establish, determine, or otherwise imply any liability or obligation, including any coverage obligation, of any insurer.

## ARTICLE VII.
## VOTING AND CONFIRMATION

On [●], 2020, the Bankruptcy Court entered an order approving the adequacy of this Disclosure Statement and the solicitation procedures and deadlines contemplated herein.

A.      *Classes Entitled to Vote on the Plan.*

The following Classes are the only Classes entitled to vote to accept or reject the Plan (the "Voting Classes"):

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| Class 3 | Term Loan Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 7 | Section 510(b) Claims | Impaired | Entitled to Vote |
| Class 8 | Akorn Interests | Impaired | Entitled to Vote |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined herein) or a Ballot. If your Claim is included in the Voting Classes, you should read your Ballot and carefully follow the instructions set forth therein. Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors, or the Notice and Claims Agent on behalf of the Debtors, otherwise provide to you.

B.      *Votes Required for Acceptance by a Class.*

The Bankruptcy Code requires, as a condition to confirmation of a plan, except as described herein, that each class of claims or interests impaired under a plan accept the plan. A class that is

not "impaired" under a plan is deemed to have accepted the plan and, solicitation of acceptances with respect to such class is not required.  Each Class of Claims or Interests entitled to vote on the Plan will have accepted the Plan if:  (a) the Holders of at least two-thirds in dollar amount of the Claims *actually* voting in each Class vote to accept the Plan; and (b) the Holders of more than one-half in number of the Allowed Claims *actually* voting in each Class vote to accept the Plan.  Each Class of Interests entitled to vote on the Plan will have accepted the Plan if the Holders of at least two-thirds in the amount of the Allowed Interests *actually* voting in each Class vote to accept the Plan.

C.      *Certain Factors to Be Considered Prior to Voting.*

There are a variety of factors that all Holders of Claims and Interests entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan, including that:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims or Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims or Interests under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of Holders within the Voting Classes or necessarily require a resolicitation of the votes of Holders of Claims and Interests in such Voting Classes.

For a further discussion of risk factors, please refer to <u>Article VIII</u> hereof, entitled "Certain Risk Factors to be Considered Before Voting."

D.      *Classes Not Entitled to Vote on the Plan.*

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan, in which case they are conclusively presumed to accept the proposed plan, or if they will receive no property under the plan, in which case they are deemed to reject the proposed plan.  Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / (Deemed to Reject) |
| Class 6 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

E.      *Solicitation Procedures.*

1.      *Notice and Claims Agent.*

The Debtors have retained KCC to act, among other things, as the Notice and Claims Agent in connection with the solicitation of votes to accept or reject the Plan.

2.      *Solicitation Package.*

Pursuant to the Disclosure Statement Order, Holders of Claims and Interests who are entitled to vote to accept or reject the Plan as of **[July 1], 2020** (the "Voting Record Date"), will receive appropriate solicitation materials (the "Solicitation Package"), which will include, in part, the following:

- the appropriate Ballot(s) and applicable voting instructions, or appropriate notices and applicable release forms for those parties who are not entitled to vote on the Plan, together with a pre-addressed, postage prepaid return envelope;  and

- this Disclosure Statement, including the Plan attached as an exhibit thereto.

3.      *Distribution of the Solicitation Package and Plan Supplement.*

The Debtors will cause the Notice and Claims Agent to distribute the Solicitation Packages to Holders of Claims and Interests in the Voting Classes on or before **[●], 2020**.

The Solicitation Package (except for the Ballots) may also be obtained:  (a) from KCC by (i) visiting the website maintained in these Chapter 11 Cases at https://www.kccllc.net/akorn or (ii) writing to Akorn Ballot Processing Center, c/o KCC, 222 North Pacific Coast Highway, Suite 300, El Segundo, California 90245; or (b) for a fee via PACER at https://ecf.deb.uscourts.gov.

At least five days prior to the Voting Deadline (or such later date as may be approved by the Bankruptcy Court), the Debtors intend to file the Plan Supplement.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available at https://www.kccllc.net/akorn.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement (a) free of charge upon request to KCC (the notice and claims agent retained in these Chapter 11 Cases) by calling (877) 725-7539 (U.S. and Canada) or (424) 236-7247 (International); (b) by visiting the website maintained in these Chapter 11 Cases at https://www.kccllc.net/akorn; or (c) for a fee via PACER at https://ecf.deb.uscourts.gov.

As described above, certain Holders of Claims and Interests may not be entitled to vote because they are Unimpaired or are otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code.  In addition, certain Holders of Claims and Interests may be Impaired but are receiving no distribution under the Plan, and are therefore deemed to reject the Plan and are not entitled to vote.  Such Holders will receive only notice of the Confirmation Hearing and a Nonvoting Status Notice.  The Debtors are only distributing a Solicitation Package, including this Disclosure Statement and a Ballot to be used for voting to accept or reject the Plan, to the Holders of Claims and Interests entitled to vote to accept or reject the Plan as of the Voting Record Date.

F.      *Voting Procedures.*

If, as of the Voting Record Date, you are a Holder of a Claim or Interest in Class 3, Class 4, Class 7, or Class 8—the Voting Classes—you may vote to accept or reject the Plan in accordance with the Solicitation Procedures by completing the Ballot and returning it in the envelope provided. If your Claim or Interest is not included in the Voting Classes you are not entitled to vote and you will not receive a Solicitation Package.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

1.      *Voting Deadline.*

The Voting Deadline is [**August 15], 2020, at 5:00 p.m., prevailing Eastern Time**.  To be counted as a vote to accept or reject the Plan, a Ballot must be properly executed, completed, and delivered, whether by first class mail, overnight delivery, or personal delivery, so that the Ballot is **actually received** by the Notice and Claims Agent no later than the Voting Deadline.

2.      *Voting Instructions.*

As described above, the Debtors have retained KCC to serve as the Notice and Claims Agent for purposes of the Plan.  KCC is available to answer questions, provide additional copies of all materials, oversee the voting process, and process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

| **BALLOTS** |
| --- |
| To be counted, all Ballots must be **actually received** by KCC by the Voting Deadline, which is [**August 15], 2020, at 5:00 p.m., prevailing Eastern Time**, at the following address: |
| **If by First Class Mail, Hand Delivery or Overnight Mail, Ballots must be sent to:**<br><br>Akorn Ballot Processing Center<br>c/o Kurtzman Carson Consultants LLC<br>222 N Pacific Coast Highway, Suite 300<br>El Segundo, CA 90245 |
| **If by Email, scanned Ballots must be sent to:** |
| AkornInfo@kccllc.com |
| If you have any questions on the procedure for voting on the Plan, please call the Debtors' restructuring hotline maintained by KCC at:<br>(877) 725-7539 (U.S. and Canada) or (424) 236-7247 (International). |

More detailed instructions regarding the procedures for voting on the Plan are contained in the Ballots distributed to Holders of Claims and Interests that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate Ballot. All Ballots must be properly executed, completed, and delivered according to their applicable voting instructions by: (a) first class mail, in the return envelope provided with each Ballot; (b) overnight courier; or (c) hand-delivery, so that the Ballots are **actually received** by KCC no later than the Voting Deadline at the return address set forth in the applicable Ballot. Any Ballot that is properly executed by the Holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim in a Voting Class held by such Holder. By signing and returning a Ballot, each Holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtors that no other Ballots with respect to such Claim have been cast or, if any other Ballots have been cast with respect to such Claim, such earlier Ballots are superseded and revoked. It is important to follow the specific instructions provided on each Ballot, as failing to do so may result in your Ballot not being counted.

3.    *Ballots Not Counted.*

No Ballot will be counted if, among other things: (a) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest; (b) it was transmitted

by means other than as specifically set forth in the ballots; (c) it was cast by an entity that is not entitled to vote on the Plan; (d) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed, and for which the applicable Claims Bar Date has passed and no Proof of Claim was timely filed; (e) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (f) it was sent to the Debtors, the Debtors' agents/representatives (other than the Notice and Claims Agent), or the Debtors' financial or legal advisors instead of the Notice and Claims Agent; (g) it is unsigned; or (h) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan**.

G.      *Confirmation Objection Deadline.*

Parties must object to Confirmation of the Plan by [**August 15], 2020, at 4:00 p.m., prevailing Eastern Time** (the "Confirmation Objection Deadline").  All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest so that they are **actually received** on or before the Confirmation Objection Deadline.

H.      *Confirmation Hearing.*

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  The Bankruptcy Court has scheduled the Confirmation Hearing for [●], 2020, at [●] [a.m./p.m.], prevailing Eastern Time.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and solicitation procedures.  Any objection to the Plan must:  (i) be in writing; (ii) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (iii) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served no later than the Confirmation Objection Deadline.  Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court.

I.      *Confirmation Standards.*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and such payment:  (i) made before the confirmation of the Plan is reasonable; or (ii) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after confirmation of the Plan.

- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.  With respect to Akorn Interests, Holders of such Interests will have accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan will have either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to different treatment of its Claim, the Plan provides that:  (i) Holders of Claims specified in section 507(a)(2) of the Bankruptcy Code will receive payment in full, in Cash; (ii) Holders of Claims specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code will receive on account of such Claims payment in full, in Cash; and (iii) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim payment in full, in Cash.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial restructuring of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or restructuring.

- The Debtors have paid, or the Plan provides for the payment of, the required fees pursuant to 28 U.S.C. § 1930.

1.     *Best Interests of Creditors Test—Liquidation Analysis.*

Notwithstanding acceptance of the Plan by a voting Impaired Class, to confirm the Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of each holder of a Claim or Interest in any such Impaired Class that has not voted to accept the Plan, meaning that the Plan provides each such Holder with a recovery that has a value at least equal to the value of the recovery that each such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, beginning on what would have been the Effective Date.  Accordingly, if an Impaired Class does not unanimously vote to accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code beginning on the Effective Date.

The Debtors believe that the Plan will satisfy the best interests test because, among other things, the recoveries expected to be available to holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation, as discussed more fully below.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code.  Generally, secured creditors are paid first from the proceeds of sales of their collateral.  If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid.  After accounting for administrative expenses, unsecured creditors (including any secured creditor deficiency claims) are paid from the sale proceeds of any unencumbered assets and any remaining sale proceeds of encumbered assets in excess of any secured claims, according to their respective priorities.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will be liquidated through the Sale Transaction, and the Plan effects a liquidation of the Debtors' remaining assets.  Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to holders of Allowed Term Loan Claims, Allowed General Unsecured Claims, and Allowed Akorn Interests than would a chapter 7 liquidation and a larger, more timely recovery primarily due to the expectation of materially lower realized sale proceeds in chapter 7.

A chapter 7 liquidation beginning on what would have been the Effective Date would provide less recovery for creditors than the Plan.  The delay of the chapter 7 trustee becoming familiar with the assets could easily cause bids already obtained to be lost, and the chapter 7 trustee would not have the technical expertise or knowledge of the Debtors' business (or Akorn) that the Debtors had when they proposed to sell their assets pursuant to the Plan.  Moreover, the distributable proceeds under a chapter 7 liquidation would be lower because of the chapter 7 trustee's fees and expenses.

Sale proceeds in chapter 7 would likely be significantly lower, particularly in light of the highly regulated nature of the Debtors' business and the time delay associated with the chapter 7 trustee's learning curve in connection therewith. In addition to the expected material reduction in sale proceeds, recoveries would be further reduced (in comparison with those provided for under the Plan) due to the expenses that would be incurred in a chapter 7 liquidation, including added expenses for wind-down costs and costs incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors' technical assets, and these specific Chapter 11 Cases, in order to complete the administration of the Debtors' Estates. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).

In a chapter 7 liquidation, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case. Moreover, the conversion to chapter 7 would also require entry of a new bar date for filing claims that would be more than ninety (90) days following conversion of the case to chapter 7. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the number and dollar amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries relative to those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in materially reduced sale proceeds, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

2.    *Financial Feasibility.*

Section 1129(a)(11) of the Bankruptcy Code requires that a bankruptcy court find that confirmation is not likely to be followed by the liquidation or the need for further financial restructuring, unless the plan contemplates such liquidation or restructuring. The Plan provides for the sale of the Debtors' business. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

J.    *Acceptance by Impaired Classes.*

The Bankruptcy Code requires that, as a condition to confirmation, and except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not impaired under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Pursuant to section 1124 of the Bankruptcy Code, a class is impaired unless the plan either: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to

be cured; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan. Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in dollar amount of those interests who actually vote to accept or to reject a plan. Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of creditors or interests.

Claims in Classes 1, 2, and 6 are Unimpaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan. Holders of Claims in Class 5 will be deemed either Impaired or Unimpaired, but in any event are not receiving any distribution under the Plan.

Claims and Interests in Classes 3, 4, 7, and 8 are Impaired under the Plan, and as a result, the Holders of Claims and Interests in such Classes are entitled to vote on the Plan. Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims and Interests in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described directly below. As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan, and Classes of Interests will have accepted the Plan if the Plan is accepted by at least two-thirds in amount of the Interests of each such Class (other than any Interests of entities designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

K.    *Confirmation Without Acceptance by All Impaired Classes.*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if impaired classes entitled to vote on the plan have not accepted it or if an impaired class is deemed to reject the plan; *provided* that the plan is accepted by at least one impaired class (without regard to the votes of insiders). Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

1.     *No Unfair Discrimination.*

The test for unfair discrimination applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent but that such treatment be "fair."  In general, courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for nonconsensual Confirmation.

2.     *Fair and Equitable Test.*

The fair and equitable test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class.  As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement because there is no Class receiving more than 100 percent of the amount of the Allowed Claims in such Class, and no Class that is junior to a dissenting Class that will receive or retain any property on account of the Claims or Interests in such junior Class.

(a)     *Secured Claims.*

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied by demonstrating that, among other things:  (i) holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

(b)     *Unsecured Claims.*

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that the plan provides either: (i) that each holder of a claim of such class receives or retains on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) no holder of any claim or any interest that is junior to the claims of such class will receive or retain any property under the plan on account of such junior claim or junior interest.

57

(c)    *Interests.*

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that the plan provides that either:  (i) each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of: (A) the allowed amount of any fixed liquidation preference to which such holder is entitled; (B) any fixed redemption price to which such holder is entitled; or (C) the value of such interest; or (ii) that no holder of any interest that is junior to the interests of such class will receive  or retain any property under the plan on account of such junior interest.

## ARTICLE VIII.
## CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING

Holders of Claims and Interests entitled to vote should carefully read and consider the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

A.    *Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims under the Plan.*

1.    *Actual Amounts of Allowed Claims May Differ from Estimated Amounts of Allowed Claims, Thereby Adversely Affecting the Recovery of Some Holders of Allowed Claims.*

The estimate of Allowed Claims and recoveries for Holders of Allowed Claims set forth in this Disclosure Statement are based on various assumptions.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may significantly vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims or Interests that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims under the Plan.

2.    *Employee Attrition.*

There can be no guarantee that the Debtors will be able to retain their leadership through the pendency of these Chapter 11 Cases, which in turn could negatively affect the Debtors' business operations.

As a result of the Chapter 11 Cases, the Debtors may experience increased levels of employee attrition, and their employees likely will face considerable distraction and uncertainty. A loss of key personnel or material erosion of employee morale could adversely affect the Debtors' business and results of operations. The Debtors' ability to attract, engage, motivate, and retain key employees or take other measures intended to motivate and incent key employees to remain with them through the pendency of the Chapter 11 Cases is limited by restrictions on implementation of incentive programs under the Bankruptcy Code. The loss, incapacity, or unavailability for any

reason of key members of the Debtors' senior management team could impair the Debtors' ability to execute their strategy and implement operational initiatives, which would likely have a material adverse effect on their financial condition, liquidity, and results of operations. In addition, the Debtors' financial results and ability to compete may suffer if they are unable to attract or retain qualified personnel with comparable skills and experience in the future.

3.     *The Debtors May Not Be Able to Satisfy the Conditions Precedent to Consummation of the Plan.*

To the extent that the Debtors are unable to satisfy the conditions precedent to Consummation of the Plan, the Debtors may be unable to consummate the Plan and parties may terminate their support, financial or otherwise, for the Plan prior to the Confirmation or Consummation of the Plan. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

4.     *The Debtors Cannot State with Certainty What Recovery Will Be Available to Holders of Allowed Claims in the Voting Classes.*

The Debtors cannot know with certainty, at this time, the number or amount of Claims in the Voting Classes that will ultimately be Allowed and how the amount of Allowed Claims will compare to the estimates provided herein. For example, a number of Proofs of Claim may allege Claims in an unliquidated amount that will require future resolution, making the amount of any Allowed Claim based on such Proof of Claim entirely speculative as of the date of this Disclosure Statement. In addition, the Debtors are continuing to review the Proofs of Claim filed in their Chapter 11 Cases. As such, the estimated amount of Claims may materially change due to the Debtors' ongoing review. Accordingly, because certain Claims under the Plan will be paid on a *pro rata* basis, the Debtors cannot state with certainty what recoveries will be available to Holders of Allowed Claims in the Voting Classes.

5.     *The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries.*

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims, including Administrative Claims, Priority Tax Claims, and Other Priority Claims, it is possible that the actual amount of such Allowed Claims is materially higher than the Debtors' estimates. Creditor recoveries could be materially reduced or eliminated in this instance. In addition, the timing of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guaranty the timing of any recovery on an Allowed Claim.

6.     *Certain Tax Implications of the Debtors' Bankruptcy.*

Holders of Allowed Claims or Allowed Interests should carefully review Article IX of this Disclosure Statement, entitled "Material United States Federal Income Tax Consequences," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of certain Claims or Interests.

B.      *Certain Bankruptcy Law Considerations.*

Although the Debtors believe that these Chapter 11 Cases will be of short duration and will not be materially disruptive to their business, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of these Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.

The occurrence or nonoccurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims or Allowed Interests under the Plan, but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a resolicitation of the votes of Holders of Claims or Interests in such Impaired Classes.

1.      *Parties in Interest May Object to the Plan's Classification of Claims.*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Furthermore, certain parties in interest, including the Debtors, reserve the right, under the Plan, to object to the amount or classification of any Claim. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim when such Claim is or may be subject to an objection or is not yet Allowed. Any Holder of a Claim that is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

2.      *The Debtors May Fail to Satisfy Vote Requirements.*

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or transaction would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

3.      *The Debtors May Not Be Able to Secure Confirmation of the Plan.*

The Debtors must satisfy the requirements of section 1129 of the Bankruptcy Code, which requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further

financial restructuring unless such liquidation or restructuring is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims and Interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. If the requisite acceptances are not received, the Debtors may seek to accomplish an alternative restructuring and obtain acceptances to an alternative plan of reorganization for the Debtors that may not have the support of the Holders of Allowed Claims and Allowed Interests and/or may be required to liquidate these Estates under chapter 7 or 11 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan. Even if the requisite acceptances are received, and although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the Debtors' proposed procedures for the solicitation of Ballots from Holders of Allowed Claims or Allowed Interests, and the voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes. If the Plan is not Confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what distributions, if any, Holders of Allowed Claims or Allowed Interests will receive with respect to their Claims or Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class of Claims or Interests, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan. Changes to the Plan may also delay the confirmation of the Plan and the Debtors' emergence from bankruptcy.

4.      *Failure to Consummate the Plan.*

As of the date of this Disclosure Statement, there can be no assurance that the conditions to Consummation of the Plan will be satisfied or waived. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the Restructuring Transactions completed.

5.      *Nonconsensual Confirmation.*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with

such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses relating to professional compensation and the expiration of any commitment to provide support for the Plan, financially or otherwise.

6.    *Liquidation under Chapter 7.*

If the Bankruptcy Court finds that it would be in the best interests of creditors and/or the debtors in a chapter 11 case, or if no chapter 11 plan can be confirmed, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation could have on the recoveries of Holders of Claims and Interests and the Debtors' liquidation analysis is set forth in Article VII.I.1 of this Disclosure Statement entitled "Best Interests of Creditors Test—Liquidation Analysis."

7.    *The Debtors May Object to the Amount or Classification of a Claim.*

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement. Further, the Committee or other parties in interest may object to the amount and/or classification of any Claim under the Plan in accordance with the Bankruptcy Code.

8.    *Risk of Nonoccurrence of the Effective Date.*

Although the Debtors believe that the Effective Date may quickly occur after the Confirmation Date, there can be no assurance as to such timing or as to whether such an Effective Date will, in fact, occur.

9.    *Risk of Termination of the Restructuring Support Agreement.*

The Restructuring Support Agreement contains certain provisions that give the parties the ability to terminate the Restructuring Support Agreement upon the occurrence of certain events. Termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact Akorn's relationships with regulators, government agencies, vendors, suppliers, employees, and customers. If the Restructuring Support Agreement is terminated, each vote or any consent given by any Consenting Term Lenders (as defined in the Restructuring Support Agreement) prior to such termination will be deemed null and void from the first instance.

10.    *Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.*

The distributions available to Holders of Allowed Claims or Allowed Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims and Allowed Interests to be subordinated to other Allowed Claims and Allowed Interests.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims or Allowed Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

11.    *The Debtors May Lack Sufficient Liquidity to Satisfy Certain Priority and Administrative Claims in Full in Cash.*

It is possible that Allowed Administrative Claims, Priority Tax Claims, DIP Facility Claims, Other Priority Claims, Professional Fee Claims, and the costs of the Wind-Down may exceed the funding available with respect to such Claims, in which case the Plan will not become effective.

12.    *Releases, Injunctions, and Exculpations Provisions May Not Be Approved.*

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases of claims and causes of action that may otherwise be asserted against the Debtors or Released Parties, as applicable.  The Debtors believe that the releases, injunctions, and exculpations set forth in the Plan comply with the requirements for approval of such provisions under applicable law and are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts.  The Plan's release and exculpation provisions are an inextricable component of the Plan and the significant deleveraging and financial benefits that it embodies.  Nevertheless, all of the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

13.    *The Closing Conditions of the Sale Transaction May Not Be Satisfied.*

It is possible that the Debtors may not satisfy the closing conditions of the Sale Transaction, which would prevent the Debtors from consummating the Plan.  A failure to satisfy any of the closing conditions of the Sale Transaction could prevent the Sale Transaction from being consummated, which could lead to the Chapter 11 Cases being converted to cases under chapter 7 or dismissed.

C.    *Disclosure Statement Disclaimer.*

1.    *The Financial Information Contained in this Disclosure Statement Has Not Been Audited.*

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information

provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to represent or warrant that the financial information contained in this Disclosure Statement and attached hereto is without inaccuracies.

2.      *Information Contained in this Disclosure Statement Is Only for Soliciting Votes.*

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3.      *This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission.*

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

4.      *This Disclosure Statement May Contain Forward Looking Statements.*

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein is an estimate only, based upon information currently available to the Debtors.

5.      *No Admissions Made.*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

6.      *Failure to Identify Litigation Claims or Projected Objections.*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

7.      *No Waiver of Right to Object or Right to Recover Transfers and Assets.*

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective estates are specifically or generally identified in this Disclosure Statement.

8.      *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.*

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained in this Disclosure Statement.

9.      *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update this Disclosure Statement.*

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified herein, and the delivery of this Disclosure Statement after the date hereof does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of the information provided in this Disclosure Statement and the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10.     *No Representations Outside this Disclosure Statement Are Authorized.*

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors.

D.      *Risks Related to the Debtors' Business.*

Additional discussion of the risks associated with the Debtors' business operations and historical financial performance is set forth in Akorn's Annual Report on Form 10-K for the fiscal year ended December 31, 2019, filed with the Securities and Exchange Commission on February 26, 2020, and on Akorn's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2020, filed with the Securities and Exchange Commission on May 11, 2020.

1.      *The Debtors' Growth Depends on Their Ability to Timely and Efficiently Develop and Successfully Launch and Market New Pharmaceutical Products.*

The Debtors' strategy for growth is dependent upon their ability to develop products that can be promoted through current marketing and distribution channels and, when appropriate, the enhancement of such marketing and distribution channels. The Debtors may fail to meet their anticipated time schedule for the filing of new applications or may decide not to pursue applications that they have already submitted or had anticipated submitting. Their failure to develop new products or to receive regulatory approval of applications could have a material adverse effect on their business, financial condition, and results of operations. Even if approved, technical challenges or capacity constraints may prevent successful launch and marketing of new products. Even if successfully launched, no assurance can be given as to the actual size of the market for any product or the level of profitability and sales of the product.

2.      *Business Interruptions at the Debtors' Manufacturing Facilities Can Have A Material Adverse Effect on Their Business, Financial Position, and Results of Operations.*

The Debtors manufacture drug products at four (three domestic and one international) manufacturing facilities, and they have contracted with a number of third parties to provide other manufacturing, finishing, and packaging services. They face a substantial risk to their business when any one or more of these facilities is shut down or unable to operate at full capacity as a result of business interruptions, governmental or regulatory actions, or natural or man-made catastrophic events.

3.      *A Significant Portion of the Debtors' Revenues Are Generated Through the Sale of Products Manufactured by Third Parties, the Loss or Failure of Any of Which May Have A Material Adverse Effect on the Debtors' Business, Financial Position, and Results of Operations.*

Certain of the pharmaceutical products that the Debtors market, representing a significant portion of their net revenue, are manufactured by third parties that serve as their only supplier of those products. Certain delays or failure of a contract manufacturing partner to supply finished goods timely or in adequate volume have impeded the Debtors' marketing of those products. The Debtors expect this risk to become more significant as they receive approvals for new products to be manufactured through their strategic partnerships and to the extent they seek additional growth opportunities beyond the capacity and capabilities of their current manufacturing facilities. If they are unable to obtain or retain third-party manufacturers for these products on commercially acceptable terms, they may not be able to distribute such products as planned. Any additional material delays or difficulties with third-party manufacturers could adversely affect the marketing and distribution of certain of the Debtors' products, which could have a material adverse effect on their business, financial condition, and results of operations.

4.      *The Debtors Depend on A Small Number of Wholesalers to Distribute Their Products, the Loss of Any of Which Could Have A Material Adverse Effect on Their Business.*

A small number of large wholesale drug distributors account for a significant portion of the Debtors' gross sales, net revenue, and accounts receivable. The following three wholesalers—Amerisource, Cardinal and McKesson—accounted for approximately 82.6% of total gross sales

and 60.3% of total net revenue in 2019 and constituted 83.4% of gross trade receivables as of December 31, 2019.  In addition to acting as distributors of the Debtors' products, these three companies also distribute a broad range of healthcare products on behalf of many other companies. The loss of the Debtors' relationship with one or more of these wholesalers, together with a delay or inability to secure an alternative distribution source for their hospital, retail, and other customers, could have a material adverse impact on the Debtors' revenue and results of operations. A change in purchasing patterns or inventory levels, an increase in returns of the Debtors' products, delays in purchasing products, and delays in payment for products by one or more of these wholesale drug distributors also could have a material adverse impact on the Debtors' revenue, results of operations, and cash flows.

     5.     *The Debtors' Operations or Ability to Emerge from Bankruptcy May Be Impacted by the Continuing COVID-19 Pandemic.*

The continued spread of COVID-19 could have a significant impact on the Debtors' business. On a macro level, this pandemic could dampen global growth and ultimately lead to an economic recession.  Given the unprecedented and evolving nature of the pandemic and the swift-moving response from multiple levels of government, the impact of these changes and other potential changes on the Debtors are uncertain at this time.

     (a)     *The COVID-19 pandemic could adversely affect the Debtors' business, financial condition, and results of operations.*

While the COVID-19 pandemic did not materially adversely affect the Debtors' financial results and business operations in the quarter ended March 31, 2020, the pandemic had a negative effect on the capital markets and availability of funds for potential bidders in the Debtors' sale process, and economic and health conditions in the United States and across most of the globe have changed rapidly since the end of the quarter.  Demand for the Debtors' products has not been significantly altered by the impact of COVID-19 during the three month period ended March 31, 2020, but that could change depending on the duration and severity of the COVID-19 pandemic, the length of time it takes for normal economic and operating conditions to resume, additional governmental actions that may be taken and/or extensions of time for restrictions that have been imposed to date, and numerous other uncertainties.  Such events may result in disruption to the sale process and interest of potential bidders as well as business and manufacturing disruption, interruptions to the Debtors' research and development efforts, inventory shortages, delivery delays, and reduced demand and sales of the Debtors' products, any of which could materially affect the Debtors' business, financial condition, and results of operations.

     (b)     *The ability of the Debtors' employees to work may be significantly impacted by the COVID-19 pandemic.*

The ability of the Debtors' employees to work may be significantly impacted by the COVID-19 pandemic.  The Debtors have adopted a series of precautionary measures in an effort to protect their employees and mitigate the potential spread of COVID-19.  The majority of the Debtors'office and management personnel are working remotely, and some of their employees engaged in manufacturing, production, and distribution facilities have been restricted by the Debtors and/or by governmental order from coming to work.  At the same time, the Debtors have

worked to continue their critical business functions and support uninterrupted access to their medicines. For example, the Debtors have instituted additional safety precautions, including increased sanitization of their facilities, to help protect the health and safety of their employees who work in their manufacturing facilities and laboratories, as they continue to manufacture and deliver important medicines for patients. The health of the Debtors' workforce is of primary concern and the Debtors may need to enact further precautionary measures to help minimize the risk of their employees being exposed to the coronavirus. Further, the Debtors' management team is focused on mitigating the adverse effects of the COVID-19 pandemic, which has required and will continue to require a large investment of time and resources across the entire company, thereby diverting their attention from other priorities that existed prior to the outbreak of the pandemic. If these conditions worsen, or last for an extended period of time, the Debtors' ability to manage their business may be impaired, and operational risks, cybersecurity risks, and other risks facing the Debtors prior to the pandemic may be elevated.

(c)    *The Debtors cannot predict the impact of the COVID-19 pandemic on their customers, suppliers, vendors, and other business partners.*

The Debtors cannot predict the impact of the COVID-19 pandemic on their customers, suppliers, vendors, and other business partners. The Debtors rely upon third parties for many aspects of our business, including the provision of goods and services related to the development, manufacture, and distribution of their products. The COVID-19 pandemic's potential effects on the third parties on which the Debtors rely could have a material and adverse effect on their business, financial condition, and results of operations. For example, if the Debtors' sales channels are substantially impaired for an extended period of time because of the COVID-19 pandemic, the Debtors' sales may be materially reduced.

(d)    *The full effects of the COVID-19 pandemic are highly uncertain and cannot be predicted.*

The COVID-19 pandemic could significantly affect the Debtors' operations. The Debtors are continuously monitoring their own operations and intend to take appropriate actions to mitigate the risks arising from the COVID-19 pandemic to the best of their abilities, but there can be no assurances that the Debtors will be successful in doing so. The Debtors will seek to minimize disruptions to their supply chain and distribution channels, but many circumstances will be beyond the Debtors' control. Governmental action may further cause the Debtors to temporarily close their facilities and/or regional quarantines may result in labor shortages and work stoppages. The COVID-19 pandemic may continue to make it difficult or impossible for patients to visit their physicians' offices to determine whether the Debtors' medicines may be appropriate. As a result, the Debtors may experience a decline in the number of new patients starting their medicines, which could cause a negative impact on their revenues. All of these factors may have far reaching direct and indirect impacts on the Debtors' business, operations, and financial results and condition. The ultimate extent of the effects of the COVID-19 pandemic on the Debtors is highly uncertain and will depend on future developments which cannot be predicted. Although the Debtors did not experience a material impact to their business operations during the quarter ended March 31, 2020 due to the COVID-19 pandemic, the pandemic had a negative effect on the capital markets and availability of funds for potential bidders in the Debtors' sale process. The Debtors cannot predict the duration or magnitude of the pandemic or the full impact that it may have on the Debtors' sale

68

process and any interest of potential bidders or future financial condition, operations, suppliers, and workforce.

6.      *The Debtors May Be Subject to Significant Disruptions or Failures in Their Information Technology Systems and Network Infrastructures That Could Have A Material Adverse Effect on Their Business.*

The Debtors rely on the efficient and uninterrupted operation of complex information technology systems and network infrastructures to operate their business. They also hold data in various data center facilities upon which their business depends. The Debtors have experienced occasional, actual, and attempted breaches of their cybersecurity, and at least one of such breaches the Debtors believe had a material effect on their business, operations, or reputation. Any significant disruption, infiltration, or failure of their information technology systems or any of their data centers, as a result of software or hardware malfunctions, system implementations or upgrades, computer viruses, third-party security breaches, employee error, theft, misuse, or malfeasance, could cause breaches of data security, loss of intellectual property and critical data, and the release and misappropriation of sensitive competitive information, as has happened on at least one significant occurrence of data deletion. As the Debtors on at least the one occasion mentioned, any another such event could result in the loss of key information, impair the Debtors' production and supply chain processes, damage their reputation in the marketplace, deter people from purchasing their products, cause the Debtors to incur significant costs to remedy any damages, subject them to significant civil and criminal liability, and require them to incur significant technical, legal, and other expenses, and ultimately materially and adversely affect the Debtors' business, results of operations, financial condition, and price of their common stock.

7.      *The Debtors Depend on Their Employees and Must Continue to Attract and Retain Key Personnel in Order to Be Successful, and Failure to Do so May Hinder Successful Execution of Their Business and Development Plans.*

The Debtors' performance depends, to a large extent, on the continued service of their key personnel, including in R&D and regulatory compliance functions, other technical employees, managers and sales personnel, and the Debtors' ability to continue to attract and retain such personnel. Competition for such personnel is intense, particularly for highly motivated and experienced R&D and other technical personnel, including those involved in ensuring regulatory compliance for pharmaceuticals and controlled substances. The Debtors face competition from companies with greater financial resources for such personnel. Additionally, given the Debtors' current financial position, attracting and retaining highly skilled personnel may become more difficult and may adversely affect their business operations.

8.      *The Debtors Are Involved in Legal Proceedings and Governmental Investigations from Time to Time, Any of Which May Result in Substantial Losses, Government Enforcement Actions, Damage to Their Business and Reputation, and Place A Strain on Their Internal Resources.*

In the ordinary course of their business, the Debtors become involved in legal proceedings, as a party or non-party witness, with both private parties and certain government agencies, including the FDA, DEA, and SEC. The Debtors incur substantial time and expense participating

in these types of lawsuits and investigations, which also divert management's attention from ongoing business concerns and normal operations.  In addition, these matters and any other substantial litigation may result in verdicts against the Debtors or government enforcement actions, which may include significant monetary awards, judgments invalidating certain of their intellectual property rights, and preventing the manufacture, marketing, and sale of their products.  When such disputes are resolved unfavorably, the Debtors' business, financial condition, and results of operations are adversely affected.  Any litigation, whether or not successful, may also damage the Debtors' reputation.

9.      *Charges to Earnings Resulting from Acquisitions Could Have A Material Adverse Effect on the Debtors' Business, Financial Position, and Results of Operations.*

Under accounting principles generally accepted in the United States of America business acquisition accounting standards, the Debtors recognize the identifiable assets acquired, the liabilities assumed, and any non-controlling interests in acquired companies generally at their acquisition date fair values and, in each case, separately from goodwill.  Goodwill as of the acquisition date is measured as the excess amount of consideration transferred, which is also generally measured at fair value, and the net of the acquisition date amounts of the identifiable assets acquired and the liabilities assumed.  The Debtors' estimates of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain.  After the Debtors complete an acquisition, the following factors could result in material charges and adversely affect their operating results and may adversely affect their cash flow:

- costs incurred to combine the operations of companies they acquire, such as transitional employee expenses and employee retention, redeployment, or relocation expenses;

- impairment of goodwill or intangible assets;

- amortization of intangible assets acquired;

- a reduction in the useful lives of intangible assets acquired;

- identification of or changes to assumed contingent liabilities, including, but not limited to, contingent purchase price consideration, income tax contingencies, and other non-income tax contingencies, after their final determination of the amounts for these contingencies or the conclusion of the measurement period (generally up to one year from the acquisition date), whichever comes first;

- charges to their operating results to eliminate certain duplicative pre-acquisition activities, to restructure their operations, or to reduce their cost structure;

- charges to their operating results resulting from expenses incurred to effect the acquisition;

- changes to contingent consideration liabilities, including accretion and fair value adjustments.  A significant portion of these adjustments could be accounted for as

expenses that will decrease the Debtors' net income and earnings per share for the periods in which those costs are incurred.

Such charges could cause a material adverse effect on the Debtors' business, financial position, results of operations, and/or cash flow, and could cause the price of their common stock to decline.

E.      *Risks Related to the Debtors' Industry.*

1.      *Sales of the Debtors' Products May Be Adversely Affected by Further Increases in Competition.*

Competition in the pharmaceutical industry is significant, and trends related to the volume and pace of new applications and approvals of products have increased the level of competition the Debtors face.  Given the FDA mandate to continue to reduce the cost of prescription drugs by increasing the number of generic drug approvals, the Debtors anticipate that this trend will continue.  As a result, this may continue to adversely impact the profitability of their current portfolio and will magnify the need for them to develop and launch new products in order to grow their business.

Additionally, trends toward increased substitution and reimbursement of generics for cost-containment purposes may reduce and limit the sales of the Debtors' off-patent branded products. Increased focus by the FDA on approval of generics may accelerate this trend.

2.      *Many of the Raw Materials and Components Used in the Debtors' Products Come from A Single Source, the Loss of Any of Which Could Have A Material Adverse Effect on the Debtors' Business.*

The Debtors require raw materials and components to manufacture and package pharmaceutical products.  The principal components of their products are active and inactive pharmaceutical ingredients and certain packaging materials.  Many of these materials are available from only a single source and, in the case of many of the Debtors' products, only one supplier of raw materials has been identified and qualified.  Because FDA approval of drugs requires manufacturers to specify their proposed suppliers of active ingredients and certain packaging materials in their applications, FDA approval of any new supplier would be required if such active ingredients or such packaging materials were no longer available from the specified supplier.  The qualification of a new supplier could delay the Debtors' development and marketing efforts.  If for any reason the Debtors are unable to obtain sufficient quantities of any of the raw materials or components required to produce and package their products, they may not be able to manufacture their products as planned.

3.      *Sales of the Debtors' Products May Be Adversely Affected by Further Consolidation of Their Customer Base, Which May Have A Material Adverse Effect on the Debtors' Business, Financial Position, and Results of Operations.*

Drug wholesalers, drug retailers, and group purchasing organizations have undergone significant consolidation, which has provided and may continue to provide them with additional purchasing leverage, and consequently may increase the pricing pressures that the Debtors face.

In addition, since such a significant portion of the Debtors' revenue is derived from relatively few customers, any financial difficulties experienced by a single customer, or any delay in receiving payments from a single customer could have a material adverse effect on the Debtors' business, results of operations, and financial condition.

4.      *International Trade Complications Could Have an Adverse Impact.*

Product constraints from suppliers could have an adverse impact on the Debtors' business, as there continues to be uncertainty regarding the impact of the Coronavirus outbreak.  Moreover, changes to the law, including that of the law regarding the application of country of origin requirements for drug products, could adversely impact the Debtors' business.

5.      *Changes in Technology Could Render the Debtors' Products Obsolete.*

The pharmaceutical industry is characterized by rapid technological change.  The products that the Debtors sell today and their drug delivery methods may be replaced by more effective methods to deliver the same care, rendering the Debtors' current products obsolete.  Further, the technologies that the Debtors invest in for future use may not become the preferred method of delivery.

F.      *Risks Related to Regulations.*

1.      *The Debtors Are Subject to Extensive Government Regulations.  When Regulations Change or the Debtors Fall out of Compliance, the Debtors Can Face Increased Costs, Additional Obligations, Fines, or Halts to Their Operations.*

New, modified, and additional regulations, statutes, or legal interpretations, which occur from time to time, among other things, require changes to manufacturing methods, expanded or different labeling, recall, replacement or discontinuation of certain products, additional record keeping procedures, expanded documentation of the properties of certain products, and additional scientific substantiation.  Such changes or new legislation can have a material adverse effect on the Debtors' business, financial condition, and results of operations.  Certain of the regulatory risks that the Debtors are subject to are outlined below:

The Debtors, their third-party manufacturers, and their suppliers are subject to periodic inspection by the FDA to assure regulatory compliance regarding the manufacturing, distribution, and promotion of pharmaceutical products.  The FDA imposes stringent mandatory requirements on the manufacture and distribution of pharmaceutical products to ensure their safety and efficacy. The FDA also regulates drug labeling and the advertising of prescription drugs.  A finding by a governmental agency or court that the Debtors are not in compliance with FDA requirements could have a material adverse effect on the Debtors' business, financial condition, and results of operations.

As previously disclosed in various reports filed with the SEC, the Debtors, with the assistance of outside consultants, have been investigating alleged breaches of FDA data integrity requirements relating to development of the Debtors' products.  The Debtors have informed the FDA regarding the investigation and will continue to update the FDA as it proceeds.  During 2018, the Debtors had FDA inspections at their Decatur and Somerset facilities that resulted in Official

Action Indicated ("OAI") facility status, and the Debtors received warning letters in January and June of 2019 related to the 2018 inspections at these facilities, respectively. Significant costs were incurred to address the FDA observations from the inspections of their Decatur and Somerset facilities in 2019 and 2018. If the Debtors are unable to adequately address the FDA's concerns in a timely manner, the FDA may take further actions and the Debtors' pipeline product approvals may be further delayed.

The Debtors must obtain approval from the FDA for each prescription pharmaceutical product that they market, and the timing of such approval process is unknown and uncertain. The FDA approval process is typically lengthy, and approval is never certain. The Debtors' new products could take a significantly longer time than the Debtors expect to gain regulatory approval and may never gain approval. Even if the FDA or another regulatory agency approves a product, the approval may limit the indicated uses for a product, may otherwise limit the Debtors' ability to promote, sell, and distribute a product, or may require post-marketing studies or impose other post-marketing obligations, which could have a material adverse effect on the marketability and profitability of the new products.

The Debtors are subject to recalls and other enforcement actions by the FDA and other regulatory bodies. The FDA or other government agencies having regulatory authority over pharmaceutical products may request the Debtors to voluntarily or involuntarily conduct product recalls due to disputed labeling claims, manufacturing issues, quality defects, or for other reasons. Restriction or prohibition on sales, halting of manufacturing operations, recalls of the Debtors' pharmaceutical products, or other enforcement actions could have a material adverse effect on the Debtors' business, financial condition, and results of operations. Further, such actions, in certain circumstances, may constitute an event of default under the terms of the Debtors' various financing arrangements.

If the FDA changes its regulatory policies, it could force the Debtors to delay or suspend their manufacturing, distribution, or sales of certain products. FDA interpretations of existing or pending regulations and standards may change over time with the advancement of associated technologies, industry trends, or prevailing scientific rationale. If the FDA changes its regulatory policies due to such factors, it could result in delay or suspension of the manufacturing, distribution, or sales of certain of the Debtors' products. In addition, modifications or enhancements of approved products are in many circumstances subject to additional FDA approvals that may or may not be granted and that may be subject to a lengthy application process. Any change in the FDA's enforcement policy, or any decision by the FDA to require an approved application for one of the Debtors' products not currently subject to the approved application requirements, or any delay in the FDA approving an application for one of the Debtors' products could have a material adverse effect on the Debtors' business, financial condition, and results of operations.

The Debtors are subject to extensive DEA regulation, which could result in their being fined or otherwise penalized if they are not in compliance. The DEA could limit or reduce the amount of controlled substances that the Debtors are permitted to manufacture and market, or issue fines and penalties against the Debtors for non-compliance with DEA regulations, which could have a material adverse effect on our business, financial condition, and results of operations.

2.     *The Debtors' Inability to Timely and Adequately Address FDA Warning Letters Status May Adversely Affect Their Business.*

The Debtors received warning letters in January and June of 2019 related to the 2018 FDA inspections at their Decatur and Somerset facilities, respectively. In addition, the Debtors received a Form 483 related to the February 2020 FDA inspection at their Hettlingen facility. The Debtors responded to this Form 483 in March 2020. While the Debtors have already completed a substantial majority of outstanding FDA compliance-related items, if the Debtors are unable to adequately address the FDA's remaining or potential future concerns in a timely manner, the FDA may take further actions, and the Debtors' pipeline product approvals may be further delayed.

3.     *Changes in Healthcare Law and Policy May Adversely Affect the Debtors' Business and Results of Operations.*

The sales of the Debtors' products depend in part on the availability of reimbursements from third-party payers such as government health administration authorities, private health insurers, health maintenance organizations, including pharmacy benefit managers ("PBMs"), and other healthcare-related organizations. The Debtors expect both federal and state governments in the United States and foreign governments to continue to propose and pass new legislation, rules, and regulations designed to contain or reduce the cost of healthcare. Existing regulations that affect the price of pharmaceutical and other medical products may also change. Cost control initiatives could decrease the price that the Debtors receive for any product they develop in the future. In addition, PBMs and other third-party payers are increasingly challenging the price and cost-effectiveness of medical products and services. Significant uncertainty exists as to the reimbursement status of newly approved pharmaceutical products. The Debtors' products may not be considered cost effective, or adequate third-party reimbursement may not be available to enable the Debtors to maintain price levels sufficient to realize a return on their investments. Any such changes in healthcare law or policy may harm the Debtors' ability to market their products and generate profits.

4.     *The FDA May Require the Debtors to Stop Marketing Certain Unapproved Drugs, Which Could Have A Material Adverse Effect on the Debtors' Business, Financial Position, and Results of Operations.*

The Debtors market several generic prescription products that do not have formal FDA approvals. These products are non-application drugs that are manufactured and marketed without formal FDA approval on the basis of their having been marketed by the pharmaceutical industry prior to the 1962 Amendments of the FDC Act. The FDA has increased its efforts to require companies to file and seek FDA approval for unapproved products, and when a product is approved, the FDA has typically increased its effort to remove unapproved products from the market by issuing notices to companies currently manufacturing these products to cease its distribution of said products. The Debtors have discontinued marketing of previously unapproved products after receipt such notices from the FDA. During 2019, the Debtors marketed six such unapproved products, generating net revenue of approximately $30.4 million. At the FDA's request, the Debtors discontinued marketing one unapproved product in early 2020.

5.      *Any Failure to Comply with the Complex Reporting and Payment Obligations Under Medicare, Medicaid, and Other Government Programs May Result in Litigation or Sanctions.*

The Debtors are subject to various federal and state laws pertaining to healthcare fraud and abuse, including anti-kickback, false claims, marketing, and pricing laws. The Debtors are also subject to Medicaid and other government reporting and payment obligations that are highly complex and, at times, ambiguous. Violations of these laws and reporting obligations are punishable by criminal or civil sanctions and exclusion from participation in federal and state healthcare programs such as Medicare and Medicaid. If the Debtors' past, present or future operations are found to be in violation of any of the laws described above or other similar governmental regulations, the Debtors may be subject to the applicable penalty associated with the violation, which could adversely affect their ability to operate their business and negatively impact their financial results. Further, if there is a change in laws, regulations, or administrative or judicial interpretations, the Debtors may have to change their business practices or their existing business practices could be challenged as unlawful, which could materially adversely affect their business, financial position, and results of operations.

6.      *Failure to Comply with the U.S. Foreign Corrupt Practices Act Could Subject the Debtors To, Among Other Things, Penalties and Legal Expenses That Could Harm Their Reputation and Have A Material Adverse Effect on Their Business, Financial Condition, and Operating Results.*

The Debtors and their employees are subject to the FCPA, which generally prohibits covered entities and their intermediaries from engaging in bribery or making other prohibited payments to foreign officials for the purpose of obtaining or retaining business or other benefits. In addition, the FCPA imposes record keeping standards and requirements on publicly traded U.S. corporations and their foreign affiliates, which are intended to prevent the diversion of corporate funds to the payment of bribes and other improper payments, and to prevent the establishment of "off books" slush funds from which such improper payments can be made. If the Debtors' employees, third-party sales representatives, or other agents are found to have engaged in such practices, the Debtors could suffer severe penalties, including criminal and civil penalties, disgorgement, and other remedial measures, including further changes or enhancements to their procedures, policies, and controls, as well as potential personnel changes and disciplinary actions.

7.      *The FDA May Authorize Sales of Some Prescription Pharmaceuticals on A Non-Prescription Basis, Which May Reduce the Profitability of the Debtors' Prescription Products.*

The FDA may change the designation of some prescription pharmaceuticals that the Debtors currently sell to non-prescription. If the Debtors are unable to gain approval of their product(s) on a non-prescription designation, they may experience an adverse effect on their business.

8.     *State Legislatures Are Increasingly Active in Regulating the Sale and Distribution of Pharmaceuticals Which May Have an Adverse Effect on the Debtors' Business.*

New laws and regulations are imposing fees and reporting obligations on the sale and distribution of the Debtors' products.  Identifying, interpreting, and complying with such new laws requires significant time and resources.  Enforcement actions at the state level could impact the Debtors' operations.

G.     *Risks Related to the Debtors' Intellectual Property.*

1.     *Third Parties May Claim That the Debtors Infringe Their Proprietary Rights and May Prevent or Delay the Debtors from Manufacturing and Selling Some of Their New Products.*

The manufacture, use, and sale of new products that are the subject of conflicting patent rights have been the subject of substantial litigation in the pharmaceutical industry.  Pharmaceutical companies with patented brand products frequently sue companies that file applications to produce generic equivalents of their patented brand products for alleged patent infringement or other violations of intellectual property rights, which may delay or prevent the entry of such generic products into the market.  Generally, a generic drug may not be marketed until the applicable patent(s) on the brand name drug expire or are held to be not infringed, invalid, or unenforceable.  When the Debtors or their development partners submit a filing to the FDA for approval of a generic drug, the Debtors or their development partners must certify:  (a) that there is no patent listed by the FDA as covering the relevant brand product, (b) that any patent listed as covering the brand product has expired, (c) that the patent listed as covering the brand product will expire prior to the marketing of the generic product, in which case the filing will not be finally approved by the FDA until the expiration of such patent, or (d) that any patent listed as covering the brand drug is invalid or will not be infringed by the manufacture, sale, or use of the generic product for which the filing is submitted.

Under any circumstance in which an act of infringement is alleged to occur, there is a risk that a brand pharmaceutical company may sue the Debtors for alleged patent infringement or other violations of intellectual property rights.  Also, competing pharmaceutical companies may file lawsuits against the Debtors or their strategic partners alleging patent infringement or may file declaratory judgment actions of non-infringement, invalidity, or unenforceability against the Debtors relating to the Debtors' own patents.  The Debtors have been sued for patent infringement related to several of their filings, and they anticipate that they may be sued once they file for other products in their pipeline.  Such litigation is often costly and time-consuming and could result in a substantial delay in, or prevent the introduction and/or marketing of, our products, and allow for damages for any at-risk launches, which could have a material adverse effect on the Debtors' business, financial condition, and results of operations.

Even if the parties settle their intellectual property disputes through licensing or similar arrangements, the costs associated with these arrangements may be substantial and could include ongoing royalties, and the necessary licenses might not be available to the Debtors on terms they believe to be acceptable.

2.      *The Debtors' Patents and Proprietary Rights May Be Challenged, Circumvented, or Otherwise Compromised by Competitors, Which May Result in the Debtors' Protected Products Losing Their Market Exclusivity and Becoming Subject to Generic Competition Before Their Patents Expire.*

The patent and proprietary rights position of competitors in the pharmaceutical industry generally is highly uncertain, involves complex legal and factual questions, and is the subject of much litigation.  There can be no assurance that any patent applications or other proprietary rights, including licensed rights, relating to the Debtors' potential products or processes will result in patents being issued or other proprietary rights secured, or that the resulting patents or proprietary rights, if any, will provide protection against competitors who:  (a) successfully challenge the Debtors' patents or proprietary rights; (b) obtain patents or proprietary rights that may have an adverse effect on the Debtors' ability to conduct business; or (c) are able to circumvent the Debtors' patent or proprietary rights position.  It is possible that other parties have conducted or are conducting research and could make discoveries of pharmaceutical formulations or processes that would precede any discoveries made by the Debtors, which could prevent the Debtors from obtaining patent or other protection for these discoveries or marketing products developed therefrom.  Consequently, others could independently develop pharmaceutical products similar to or rendering obsolete those that the Debtors are planning to develop, or duplicate any of the Debtors' products.  The Debtors' inability to obtain patents for, or other proprietary rights in, their products and processes or the ability of competitors to circumvent or cause to be obsolete the Debtors' patents or proprietary rights could have a material adverse effect on the Debtors' business, financial condition, and results of operations.  Additionally, the Debtors' inability to successfully defend the existing patents on their products against challenges by competing drug companies could have a material adverse effect on the Debtors' business, financial condition, and results of operations.

Further, the majority of the drug products that the Debtors market are generics, with essentially no patent or proprietary rights attached.  While this fact has allowed the Debtors the opportunity to obtain FDA approval to market their generic products, it also allows competing drug companies to do the same.  Should multiple additional drug companies choose to develop and market the same generic products that the Debtors actively market, the Debtors' profit margins could decline, which would have a material adverse effect on the Debtors' business, financial condition, and results of operations.

H.      *Risks Related to the Debtors' Liquidity.*

1.      *The Debtors' Limited Liquidity Could Materially and Adversely Affect Their Business Operations.*

The Debtors require certain capital resources in order to operate their business and their limited liquidity could materially and adversely affect their business operations.  Without sufficient additional capital funding, the Debtors may be required to delay, scale back, or abandon some or all of their capital projects, product development, manufacturing, acquisition, licensing and marketing initiatives, or operations.

2.      *The Debtors' Suppliers, Manufacturers, and Other Business Partners' Unwillingness to Do Business with Them or to Provide Acceptable Payment Terms Could Negatively Impact the Debtors' Liquidity or Reduce the Availability of Products or Services They Seek to Procure.*

The Debtors have ongoing discussions concerning their liquidity and financial position with their third-party suppliers, manufacturers, and other business partners. The topics discussed have included such areas as pricing, payment terms, and ongoing business arrangements. Third parties requiring or conditioning manufacture and supply of goods or services on new payment terms or other assurances could significantly disrupt the Debtors' access to materials or services and have a negative effect on the Debtors' business, financial condition, and results of operations.

## ARTICLE IX.
## MATERIAL UNITED STATES FEDERAL
## INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain United States ("U.S.") federal income tax consequences of the consummation of the Plan to the Debtors, the Purchaser, and to certain Holders of Claims and Interests. The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims or Interests in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders of Claims or Interests subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax exempt organizations, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims or Interests, or the equity in the Purchaser or any other consideration to be received under the Plan, as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that Holders of Claims hold only Claims in a single Class and holds Claims or Interests as "capital assets" (within the meaning of section 1221 of the IRC). This summary does not address any special arrangements or contractual

rights that are not being received or entered into in respect of an underlying Claim, including the tax treatment of any backstop fees or similar arrangements (including any ramifications such arrangements may have on the treatment of a Holder under the Plan). This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors and Holders of Claims or Interests described below also may vary depending on the nature of any Restructuring Transactions that the Debtors engage in.

For purposes of this discussion, a "U.S. Holder" is a Holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons has authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims or Interests should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

A.    *Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Purchaser.*

1.    *In General.*

The Plan provides that the Sale Transaction may be structured as either (a) a taxable disposition of the Transferred Assets (a "Taxable Transaction") or (b) a disposition of the Transferred Assets in a tax-free reorganization pursuant to sections 368(a)(1)(G) and 354 of the IRC (a "Tax-Free Reorganization"). The Sale Transaction can only be structured as a Tax-Free Reorganization if a Credit Bid Transaction (as defined below occurs).

As will be described in further detail in the Description of Transaction Steps, either structure provides that (a) relevant assets are transferred by the Debtors to Purchaser; (b) any of the Debtors' remaining assets that were not transferred to Purchaser will be transferred to one or more liquidating entities or otherwise disposed of; (c) any Debtors that are not transferred to Purchaser shall be wound-down; and (d) (i) if Purchaser is acquiring assets pursuant to a credit bid (a "Taxable Credit Bid Transaction"), the equity of Purchaser will be distributed to Holders of Claims; and (ii) if Purchaser is a third party buyer (a "Third-Party Sale"), the sale consideration will be distributed to Holders of Claims (and, if there are sufficient proceeds, Holders of Interests).

The tax consequences of the implementation of the Plan to the Debtors, the Purchaser, and Holders of Claims will differ depending on whether the Sale Transaction is structured as a Taxable Transaction or Tax-Free Reorganization. The Debtors have not yet determined how the Sale Transaction will be structured, whether in whole or in part.

2.    *Taxable Sale.*

(a)    *Recognition of Gain or Loss and Tax Basis of Assets Acquired by Purchaser.*

(i)    *Taxable Transaction.*

If the transactions undertaken pursuant to the Plan are structured as a Taxable Transaction, the Debtors would recognize gain or loss upon a transfer of all or a portion of their assets in an amount equal to the difference between the aggregate fair market value of the assets transferred by the Debtors and the Debtors' aggregate tax basis in such assets. Such gain or loss would be reduced by the amount of such Debtors' available tax attributes, and the reduced amount of gain or loss would be recognized by the Debtors (and the liability for which will constitute an Administrative Claim).

In a Taxable Transaction, Purchaser will take a fair market value basis in the acquired assets. As a general matter, the Debtors currently anticipate that in a Taxable Transaction, Purchaser will not acquire any stock of any material U.S. subsidiary of the Debtors (however, stock of non-U.S. subsidiaries are expected to be acquired) and, as a result, the tax basis of the assets of the Debtor's subsidiaries (except, potentially, for the assets of non-U.S. subsidiaries) would not be expected to transfer to Purchaser in a Taxable Transaction.

(ii)    *Tax-Free Reorganization.*

If the transactions undertaken pursuant to the Plan are structured as a Tax-Free Reorganization, the Debtors are not expected to recognize any gain or loss for federal income tax purposes, but this expectation assumes that the Debtors do not have any "deferred intercompany gains" or "excess loss accounts," which is not known with certainty. In the event any federal income tax liability arises in connection with a Tax-Free Reorganization, Purchaser would be jointly liable for such federal income tax liability pursuant to section 1.1502-6 of the Treasury Regulations.

Purchaser should have carryover tax basis in any assets acquired pursuant to such transaction, subject to reduction due to COD Income, as described below.

(b)      *Preservation of Tax Attributes and Cancellation of Indebtedness Income.*

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (x) the amount of Cash paid, (y) the issue price of any new indebtedness of the debtor issued, and (z) the fair market value of any new consideration given in satisfaction of such indebtedness at the time of the satisfaction.

Pursuant to section 108 of the IRC, a debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of indebtedness occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. In general, tax attributes of a debtor will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets ( subject to the Asset Tax Basis Floor, as described below); (f) passive activity loss and credit carryovers; and (g) foreign tax credits.  A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC, prior to effecting any other reductions in tax attributes set forth above, though it has not been determined whether the Debtor will make this election. The reduction in tax attributes occurs only after the taxable income (or loss) for the taxable year of the debt discharge has been determined and any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations. Pursuant thereto, the tax attributes of each debtor member of an affiliated group of corporations that is excluding COD Income are first subject to reduction. To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

The aggregate tax basis of the Debtors in their assets (determined on an entity-by-entity basis, and in the case of an affiliated group of corporations, subject to the look-through rule described above) is not required to be reduced below the amount of indebtedness (determined on an entity-by-entity basis) that the Debtors will be subject to immediately after the cancellation of debt giving rise to COD Income (the "Asset Tax Basis Floor"). Generally, all of an entity's obligations that are treated as debt under general U.S. federal income tax principles (including intercompany debt treated as debt for U.S. federal income tax purposes) are taken into account in determining an entity's Asset Tax Basis Floor.

The Debtors expect to realize significant COD Income as a result of the consummation of the Plan. The exact amount of any COD Income that will be realized by the Debtors will not be determinable until after the consummation of the Plan.

The implications of these rules, and the more general question of whether Purchaser will succeed to any of the Debtors' tax attributes, depends on whether the Sale Transaction is consummated as a Taxable Transaction or a Tax-Free Reorganization.

(i)    *Taxable Transaction.*

In the event the transactions undertaken pursuant to the Plan are consummated as a Taxable Transaction and Purchaser is not treated as acquiring the stock of any entity that is taxed as a corporation for U.S. federal income tax purposes, the rules related to COD Income, worthless stock deductions and section 382 of the IRC (as described below) will generally be irrelevant, Purchaser will acquire all such assets with an aggregate tax basis equal to their aggregate fair market value (as determined under applicable tax rules), and Purchaser will not inherit any of the NOLs or other tax attributes of the Debtors.

(ii)    *Tax-Free Reorganization.*

If the transactions undertaken pursuant to the Plan are structured as a Tax-Free Reorganization, Purchaser will succeed to some or all of the tax attributes of the Debtors, depending upon, among other things; (a) whether certain tax attributes attributable to the subsidiaries of Akorn, Inc. ("Parent Debtor") can be transferred to the Parent Debtor prior to the consummation of the Plan; and (b) whether the equity of any of the Parent Debtor's subsidiaries are transferred to Purchaser. However, such tax attributes will be subject to reduction for COD Income according to the rules described above.

(c)    *Limitation of Surviving Tax Attributes Under Sections 382 and 383 of the IRC.*

After giving effect to the reduction in tax attributes from excluded COD Income, if any, to the extent that the transactions undertaken pursuant to the Plan are structured as a Tax-Free Reorganization, Purchaser's ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

(i)    *General Sections 382 and 383 Annual Limitations.*

Under section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs, certain recognized built-in losses if the corporation has an overall "net unrealized built in loss" as determined pursuant to IRS Notice 2003-65 and other tax attributes (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) and deductions recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.

In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change. The rules of sections 382 and 383 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of Purchaser Equity pursuant to the Plan will result in an "ownership change" for these purposes, and that Purchaser's use of any Pre-Change Losses will be subject to limitation unless an exception to the general rules of sections 382 and 383 of the IRC applies.

(ii)  <em>General Section 382 Annual Limitation.</em>

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject (the "382 Limitation") is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs: 1.47% percent for May 2020). The 382 Limitation may be increased, up to the amount of any net unrealized built-in gain (if any) at the time of the ownership change, to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.[15] Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

Notwithstanding the rules described above, if subsequent to an ownership change, a debtor corporation and its subsidiaries do not continue the debtor corporation's historic business or use a significant portion of its historic business assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero.

(iii)  <em>Special Bankruptcy Exceptions.</em>

An exception to the foregoing annual limitation rules generally applies when so called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, together with existing shareholders with respect to their stock, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the Plan Effective Date of the plan of reorganization, and during the part of the taxable year prior to and including the Plan

---

[15] Regulations have been proposed that would significantly change the application of the rules relating to built-in gains and losses for purposes of computing the 382 Limitation. However, proposed regulations have also been released that would "grandfather" companies that undergo an "ownership change" pursuant to an order entered in a bankruptcy case that was commenced prior to, or within 30 days of, the publication of the finalized new rules in this area. Accordingly, the Debtors do not expect the proposed regulations to apply to them or to Purchaser with respect to the "ownership change" that will occur pursuant to the Plan.

Effective Date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses are eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy, along with certain integrated transactions. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

The Debtors do not currently know whether Purchaser will be eligible for the 382(l)(5) Exception, and regardless of whether the 382(l)(5) Exception is available, Purchaser may decide to affirmatively elect out of the 382(l)(5) Exception so that the 382(l)(6) Exception instead applies. Whether the Purchaser take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, though, the Purchaser's use of Pre-Change Losses after the Effective Date may be adversely affected if a subsequent "ownership change" within the meaning of section 382 of the IRC were to occur after the Effective Date.

B.      *Certain U.S. Federal Income Tax Consequences to U.S. Holders of Class 3 Term Loan Claims, Class 4 General Unsecured Claims, Class 7 Section 510(b) Claims, and Class 8 Akorn Interests.*

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

1.      *General Considerations.*

In general, the U.S. federal income tax treatment of Holders of Claims will depend, in part, on whether the transactions undertaken pursuant to the Plan constitute, for U.S. federal income tax purposes, (a) a Taxable Transaction or (b) a Tax-Free Reorganization. In a Tax-Free Reorganization, the U.S. federal income tax consequences to certain Holders of such Claims will further depend on whether the Claims surrendered constitute "securities" for U.S. federal income tax purposes.

Neither the IRC nor the Treasury Regulations define the term "security." Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for

U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.  The discussion below assumes that Class 3 Term Loan Claims constitute "securities" for U.S. federal income tax purposes; in the event that determination is not sustained, the tax consequences described below would be significantly different.

       2.    *Consequences to Holders of Class 3 Term Loan Claims.*

The form of recovery to be received by Holders of Class 3 Term Loan Claims will depend on the form of the Sale Transaction.

       (a)    *Taxable Transaction.*

If the Sale Transaction is structured as a Taxable Transaction, then, regardless of whether the Taxable Transaction is a Taxable Credit Bid Transaction or a Third-Party Sale, the receipt of consideration in satisfaction of Class 3 Term Loan Claims pursuant to the Plan will constitute a taxable exchange under section 1001 of the IRC.  Accordingly, other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID), and subject to the rules relating to market discount, each U.S. Holder of such Claims would recognize gain or loss equal to the difference between (1) the amount of cash and the fair market value (or issue price, in the case of any debt received) of the non-cash consideration received pursuant to the Plan, and (2) such U.S. Holder's adjusted basis, if any, in such Claims.  A U.S. holder's tax basis in the non-cash consideration received should equal the fair market value (or issue price, in the case of any debt received) of such consideration as of the Effective Date.  A U.S. Holder's holding period for the non-cash consideration received should begin on the day following the Effective Date.

       (b)    *Tax-Free Reorganization.*

If the Sale Transaction is structured as a Tax-Free Reorganization, assuming the Class 3 Term Loan Claims constitute "securities" for U.S. federal income tax purposes, the receipt of consideration pursuant to the Plan should be at least partially tax-free under sections 354 and 356 of the IRC.

Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount ("OID")), and subject to the rules relating to market discount, a U.S. Holder of such a Claim should recognize gain (but not loss), to the extent of the lesser of (a) the amount of gain realized from the exchange, which should be equal to (i) the sum of (A) any Cash received and (B) the fair market value (or issue price, in the case of debt instruments) of any non-Cash consideration, minus (ii) the U.S. Holder's adjusted basis, if any, in the Claim; and (b) the sum of (i) any Cash received and (ii) the fair market value (or issue price, in the case of debt

instruments) of any non-Cash consideration that constitutes "other property" that is not permitted to be received under sections 354 and 356 of the IRC without recognition of gain.

With respect to non-Cash consideration that is treated as a "stock or security" of Purchaser, such U.S. Holder should obtain a tax basis in such property, other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or OID), and subject to the rules relating to market discount, equal to (a) the tax basis of the Claim surrendered, less (b) the Cash and "other property" received plus (c) gain recognized (if any). The holding period for such non-Cash consideration should include the holding period for the exchanged Claims.

With respect to non-Cash consideration that is not treated as a "stock or security" of Purchaser, U.S. Holders should obtain a tax basis in such property, other than any amounts treated as received in satisfaction of accrued but untaxed interest (or OID), and subject to the rules relating to market discount, equal to the property's fair market value (or issue price, in the case of debt instruments) as of the date such property is distributed to the U.S. Holder. The holding period for any such property should begin on the day following the receipt of such property.

3.      *Consequences to Holders of Class 4 General Unsecured Claims.*

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of the Class 4 General Unsecured Claims, each Holder of an Allowed General Unsecured Claim, each Holder thereof will receive its pro rata share of cash (if any is available as Distributable Proceeds).

The receipt of consideration in satisfaction of such Claims pursuant to the Plan will constitute a taxable exchange under section 1001 of the IRC. Accordingly, other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID), and subject to the rules relating to market discount, each U.S. Holder of such Claims would recognize gain or loss equal to the difference between (1) the amount of cash consideration received pursuant to the Plan, and (2) such U.S. Holder's adjusted basis, if any, in such Claims.

4.      *U.S. Federal Income Tax Consequences to U.S. Holders of Class 8 Akorn Interests and Class 7 Section 510(b) Claims.*

Pursuant to the Plan, holders of Akorn Interests may receive proceeds from the Sale Transaction in final satisfaction of such Akorn Interests. An Akorn Interest holder should recognize gain or loss equal to (a) the sum of the cash received minus (b) the holder's tax basis in the Akorn Interest.

While not free from doubt, under "relation back" principles, recoveries with respect to Class 7 Section 510(b) Claims are likely to be treated as if a Holder of such Claim received additional consideration in respect of such Holder's Akorn Interests (even if such Holder does not receive any recovery under the Plan in respect of its Akorn Interests and even if such Holder no longer owns any Akorn Interests. Holders of Class 7 Section 510(b) Claims should consult their own advisors regarding the treatment of any recoveries in respect of such Claims.

5.   *Character of Gain or Loss.*

The character of any gain or loss recognized by a U.S. Holder as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim or Interest in such Holder's hands, whether the Claim or Interest constitutes a capital asset in the hands of the Holder, whether a Claim was purchased at a discount, and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long term capital gain if the Holder held its Claim or Interest for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations as discussed below.

6.   *Accrued Interest (and OID).*

To the extent that any amount received by a U.S. Holder of a surrendered Claim under the Plan is attributable to accrued but untaxed interest (or OID) on the debt instruments constituting the surrendered Claim, such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already included in income by the U.S. Holder).  Conversely, a U.S. Holder of a surrendered Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.  The tax basis of any non-Cash consideration treated as received in satisfaction of accrued but untaxed interest (or OID) should equal the amount of such accrued but untaxed interest (or OID).  The holding period for such non-cash consideration should begin on the day following the receipt of such property.

The extent to which the consideration received by a U.S. Holder of a surrendered Claim will be attributable to accrued interest on the debt constituting the surrendered Claim is unclear.  Certain legislative history and case law indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest.  The Plan provides that amounts paid to Holders of Claims will be allocated first to unpaid principal and then to unpaid interest.  The IRS could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.  Holders of Claims are urged to consult their tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

7.   *Market Discount.*

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Claim.

Subject to potential arguments that the market discount rules should not apply to market discount in respect of distressed debt that does not represent the economic equivalent of additional interest on OID, which the Debtors express no view on, any gain recognized by a U.S. Holder on

the taxable disposition (determined as described above) of a Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debt instruments were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the surrendered Claims that were acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debt instruments but was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

8.    *Consequences of Holding Equity in the Purchaser.*

Any distributions made on account of the equity in the Purchaser will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Purchaser as determined under U.S. federal income tax principles. Certain qualified dividends received by a non-corporate taxpayer are taxed at preferential rates. To the extent that a Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Holder's basis in its shares. Any such distributions in excess of the Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

9.    *Sale, Redemption, or Repurchase of Non-Cash Consideration.*

Unless a non-recognition provision applies, and subject to the market discount rules discussed above, Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of non-Cash consideration received pursuant to the Plan. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the Holder held the applicable non-Cash consideration for more than one year. Long-term capital gains of a non-corporate taxpayer generally are taxed at preferential rates. Under the recapture rules of section 108(e)(7) of the Code, a U.S. Holder may be required to treat gain recognized on such dispositions of the equity in the Purchaser of Interests as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Claim or recognized an ordinary loss on the exchange of its Claim for equity in the Purchaser or Interests.

For a description of certain limitations on the deductibility of capital losses, see the section entitled "Limitation on Use of Capital Losses" below.

10.     *Limitations on Use of Capital Losses.*

A U.S. Holder of a Claim or Interest who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (1) $3,000 annually ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate Holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

11.     *Medicare Tax.*

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, dividends and gains from the sale or other disposition of capital assets. U.S. holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of stock.

C.     *Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims and Interests.*

The following discussion includes only certain U.S. federal income tax consequences to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences to such Non-U.S. Holder and the ownership and disposition of non-Cash consideration.

1.     *Gain Recognition.*

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

Any gain realized by a Non-U.S. Holder on the exchange of Claims or Interests[16] generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who is present in the United States for 183 days or more during the taxable year in which the Sale Transaction occurs and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an

---

[16]   Non-U.S. Holders of Interests and Section 510(b) Claims could also be subject to tax in the event the Interests constitute an interest other than solely as a creditor and Akorn, Inc. is a USRPHC (as defined below). The Debtors do not believe that Akorn, Inc. is or has been a USRPHC.

income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

2.      *If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder.  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide properly executed original copies of IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments. Interest Payments; Accrued but Untaxed Interest.*

Payments to a Non-U.S. Holder that are attributable to either (a) interest on (or OID accruals with respect to) debt received under the Plan, or (b) accrued but untaxed interest on their Allowed Claim generally will not be subject to U.S. federal income or withholding tax, *provided* that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

- the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of (a) the Debtor obligor on a Claim (in the case of consideration received in respect of accrued but unpaid interest), or (b) Purchaser (in the case of debt received under the Plan);

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtors (each, within the meaning of the IRC);

- the Non-U.S. Holder is a bank receiving interested described in section 881(c)(3)(A) of the IRC; or

- such interest (or OID) is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent), the Non-U.S. Holder (i) generally will not be subject to withholding tax, but (ii) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on (a) interest on debt received under the Plan and (b) payments that are attributable to accrued but untaxed interest on such Non-U.S. Holder's Allowed Claim.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

      3.     *Sale, Redemption, or Repurchase of Non-Cash Consideration.*

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other disposition (including a cash redemption) of its *pro rata* share of the non-Cash consideration received under the Plan unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

- in the case of the sale of equity in the Purchaser, Purchaser is or has been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its equity in the Purchaser under the Foreign Investment in Real Property Tax Act ("FIRPTA").  Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income.  Further, the buyer of the equity in the Purchaser will be required to withhold a tax equal to 15 percent of the amount realized on the sale.  The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's federal income tax liability and may

91

entitle the Non-U.S. Holder to a refund, *provided* that the Non-U.S. Holder properly and timely files a tax return with the IRS. In general, the FIRPTA provisions will not apply if (a) the Non-U.S. Holder does not directly or indirectly own more than 5 percent of the value of such interest during a specified testing period and (b) such interest is regularly traded on an established securities market. In the event equity in the Purchaser is regularly traded on an established securities market, the withholding obligation described above would not apply, even if a Non-U.S. Holder is subject to the substantive FIRPTA tax.

In general, a corporation is a USRPHC as to a Non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective date of the applicable disposition or the period of time the Non-U.S. Holder held such interest. The Debtors do not anticipate that Purchaser will be a USRPHC for U.S. federal income tax purposes on the Effective Date. However, the Debtors cannot provide a guarantee of that result, nor can the Debtors guarantee that Purchaser will not become a USRPHC in the future.

4.    *Consequences of Holding Equity in the Purchaser.*

Any distributions made with respect to equity in the Purchaser will constitute dividends for U.S. federal income tax purposes to the extent of the issuer's current or accumulated earnings and profits as determined under U.S. federal income tax principles. To the extent that a Non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Non-U.S. Holder's basis in its shares. Any such distributions in excess of a Non-U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange (and the respective excess distributions as proceeds from a sale or exchange).

Except as described below, dividends paid with respect to equity in the Purchaser held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to withholding at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to equity in the Purchaser held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are

attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

In the event Purchaser were, contrary to the Debtors' expectations, a USRPHC, distributions and dividends would both be subject to additional rules under FIRPTA.

5.      *FATCA.*

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on shares of equity in the Purchaser), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include equity in the Purchaser and the Claims). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed Treasury Regulations, which can be relied on until final regulations become effective.

D.      *Information Reporting and Withholding.*

The Debtors, Purchaser, and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the  form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of

transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders of Claims subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE X.
## RECOMMENDATIONS OF THE DEBTORS

**In the opinion of the Debtors, the Plan is extremely preferable to any potential alternatives described in this Disclosure Statement because the Plan provides for a greater distribution to the Holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.**  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan.  **Accordingly, the Debtors recommend that Holders of Claims and Interests entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.**

*[Remainder of page intentionally left blank]*

Respectfully submitted,

Dated: May 26, 2020

Akorn, Inc.
on behalf of itself and all other Debtors

*/s/ Joseph Bonaccorsi*

Name: Joseph Bonaccorsi
Title: Executive Vice President and General
Counsel
Company: Akorn, Inc.

## EXHIBIT A

**Joint Chapter 11 Plan of Akorn, Inc. and Its Debtor Affiliates**

[*Plan filed separately on the docket.*]

**EXHIBIT B**

**Wind-Down Budget**

**Key Assumptions:**
- Plan Effective Date: 8/31/2020
- Post-emergence wind down time frame: 3 months
- No proceeds remain from the transaction for distribution to unsecured creditors
- Post-emergence wind down activities primarily consist of filing final tax return, dissolving entities and other administrative tasks
- No wind down cost for India. Transaction closes on or before 8/31/2020

| WIND DOWN BUDGET | ($ 000s) | |
|---|---:|---|
| **(i) Administrative and Priority claims not assumed by the Buyer** | | |
| | | |
| Unpaid 503(b)(9) Claims as of Close Date | - | **(A)** |
| Other unpaid Secured, Administrative and Priority claims not assumed by the Buyer | 5,000 | **(B)** |
| **Total Taxes** | **5,000** | |
| **(ii) Taxes** | | |
| | | |
| Income Taxes - Sale of Business | 600 | **(C)** |
| Other Taxes | 4,100 | **(D)** |
| **Total Taxes** | **4,700** | |
| **(iii) Fees and expenses of professionals engaged by sellers** | | |
| | | |
| **Ch. 11 Professionals** | | |
| | | |
| Accrued Unpaid Professional Fees | 10,653 | |
| Transaction Fees | 13,097 | |
| UST Fees | 250 | |
| **Total Ch. 11 Professionals** | **24,000** | **(E)** |
| | | |
| **Post-Emergence Liquidating Professionals & Wind Down Costs** | | |
| | | |
| Legal Counsel | 300 | **(F)** |
| Liquidating Director | 90 | **(G)** |
| Accounting Firm (Final Tax Return) | 500 | **(H)** |
| Accounting Firm (Final Accounting ) | 200 | **(I)** |
| Admin Expenses / Records Retention | 100 | **(J)** |
| Akorn Personnel / Contractor | 75 | **(K)** |
| Liability Insurance | 50 | **(L)** |
| India Sale Costs | - | **(M)** |
| **Total Liquidating Professionals** | **1,315** | |
| **Total Wind Down Budget** | **35,015** | |

**Supporting Details:**
**(A)** All 503(b)(9) claims are assumed to be paid during the pendency of the bankruptcy.
**(B)** Placeholder value for other secured, administrative or priority claims accrued/unpaid at emergence and not assumed by buyer.
**(C)** Assumes a tax free exchange under a G reorganization.
**(D)** Based on estimate of outstanding tax liability for various taxes as of 8/31/2020.
**(E)** Total accrued unpaid professional fees.
**(F)** Legal counsel to oversee entity dissolution and any remaining legal issues.
**(G)** Minimum of $30,000 per month based upon $750 per hour and 40 hours per month; monthly fees may be higher based on actual volume of work. Liquidating director engaged to oversee activities to wind down estate.
**(H)** Accounting firm engaged to file final tax return ($500,000 for 3 month engagement)
**(I)** Accounting firm engaged to prepare final accounting as required ($200,000 for 3 month engagement)
**(J)** $100,000 for other administrative expenses and records retention
**(K)** $25,000 per month for contract with Akorn personnel to support wind down activities as required
**(L)** $50,000 liability insurance premium for 3 months of coverage during the wind down
**(M)** Assumes India sale closes on or before 8/31/2020. If sale does not close prior to effective date, an amount would need to be set aside to fund professionals associated with the sale and operations until close.

## **EXHIBIT C**

**Restructuring Support Agreement**

EXECUTION VERSION

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT A THIRD-PARTY OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS, IN EACH CASE, SUBJECT TO THE TERMS HEREOF.

## *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 16.02, this "**Agreement**") is made and entered into as of May 20, 2020 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (ii) of this preamble, collectively, the "**Parties**"):[1]

    i.    Akorn, Inc., a company incorporated under the Laws of Louisiana ("**Akorn**"), and each of its direct and indirect subsidiaries listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Term Lenders (the Entities in this clause (i), collectively, the "**Company Parties**"); and

    ii.    the undersigned holders of Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (collectively, the "**Consenting Term Lenders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Term Lenders, including those Consenting Term Lenders that are members of an ad hoc group represented by Gibson, Dunn &

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

Crutcher LLP (the "**Ad Hoc Group**") have negotiated certain transactions in pursuit of a sale of some or all of the Company Parties' assets on the terms set forth in this Agreement and as specified in the following documents (such transactions, the "**Transactions**"):

      i.      the bidding procedures attached hereto as **Exhibit B** (as amended, modified, waived or supplemented in accordance herewith, the "**Bidding Procedures**");

      ii.      in the event that the Stalking Horse Bidder is the Successful Bidder, the Stalking Horse APA, substantially in the form attached hereto as **Exhibit C**, pursuant to which up to the full amount of indebtedness under the Term Loan Credit Agreement shall be credit bid or, in the event that a Qualified Bidder other than the Stalking Horse Bidder is the Successful Bidder, the purchase agreement for the Successful Bidder as approved by the Bankruptcy Court;

      iii.      the debtor-in-possession credit agreement by and among certain Company Parties, the DIP Agent, and the Consenting Term Lenders party thereto setting forth the terms and conditions of a $30 million debtor-in-possession financing facility, substantially in the form attached as **Exhibit D** to this Agreement (the "**DIP Credit Agreement**"); and

      iv.      the term sheet setting forth the Transactions, substantially in the form attached hereto as **Exhibit E** (including any exhibits and schedules thereto "**Plan Term Sheet**").

**WHEREAS**, the Company Parties intend to implement the Transactions, including through the commencement of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Transactions on the terms and conditions set forth in this Agreement, the Stalking Horse APA, the DIP Credit Agreement, the DIP Order, the Plan Term Sheet, and the Bidding Procedures.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**    *Definitions and Interpretation.*

    1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**Ad Hoc Group**" has the meaning set forth in the recitals to the Agreement.

"**Ad Hoc Group Advisors**" means Gibson, Dunn & Crutcher LLP, Greenhill & Co., LLC, and Young Conaway Stargatt & Taylor, LLP.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 16.02.

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**AIPL Assets**" means the Company Parties' Interests in Akorn India Private Limited, including, for the avoidance of doubt, any Interests held by WorldAkorn Pharma Mauritius.

"**Alternative Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Transactions and not contemplated by the Plan or Bidding Procedures.

"**Auction**" has the meaning given to such term in the Bidding Procedures.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Bid Deadline**" has the meaning given to such term in the Bidding Procedures.

"**Bidding Procedures**" has the meaning set forth in the recitals to this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting Term Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means, collectively, the Company Parties that commence the Chapter 11 Cases.

"**DIP Agent**" means, Wilmington Savings Fund Society, FSB, as the administrative agent under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

"**DIP Credit Agreement**" has the meaning set forth in the recitals to this Agreement.

"**DIP Facility Claims**" means any Claim on account of the DIP Facility Documents.

"**DIP Facility**" means the new superpriority secured term loans to be made by certain holders of Term Loan Claims in accordance with the DIP Facility Credit Agreement.

"**DIP Facility Documents**" means the DIP Facility Credit Agreement and any other documentation necessary to effectuate the incurrence of the DIP Facility.

"**DIP Order**" means, as applicable, the interim and final orders of the Bankruptcy Court setting forth the terms of the debtor-in-possession financing, which shall be consistent with the DIP Credit Agreement.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Disclosure Statement Motion**" means the motion filed with the Bankruptcy Court seeking approval of the adequacy of the Disclosure Statement.

"**Disclosure Statement Order**" means the order entered by the Bankruptcy Court approving the adequacy of information in the Disclosure Statement and authorizing the Debtors to solicit votes in connection with the Plan.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file.

"**Interest**" means common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests, and options, warrants, rights, or other securities

or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Term Loan Claims who meets the requirements of Section 10.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" the proposed plan of reorganization, as contemplated by the Plan Term Sheet.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Plan Term Sheet**" has the meaning given to such term sheet in the recitals of this Agreement.

"**Qualified Bid**" has the meaning given to such term in the Bidding Procedures.

"**Qualified Bidder**" has the meaning given to such term in the Bidding Procedures.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Term Loan Claims (or enter with customers into long and short positions in Term Loan Claims), in its capacity as a dealer or market maker in Term Loan Claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Release Price**" means a Qualified Bid for a going-concern Sale Transaction sufficient to pay in full, in cash, all allowed Term Loan Claims or such other amount as may be agreed by the Required Consenting Term Lenders.

"**Required Consenting Term Lenders**" means, as of the relevant date, Consenting Term Lenders holding more than 60.00% of the aggregate outstanding principal amount of Term Loans that are held by Consenting Term Lenders.

"**Restructuring Effective Date**" means the Plan Effective Date and Sale Closing.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Sale Closing**" means the date of closing of the Sale Transaction.

"**Sale Transaction**" means a sale of some or all of the Company Parties' assets in accordance with (a) the Stalking Horse APA, pursuant to which the full amount of indebtedness under the Term Loan Credit Agreement shall be credit bid, or (b) in the event that a Qualified Bidder other than the Stalking Horse Bidder is the Successful Bidder, pursuant to the Required Consenting Term Lenders' election to pursue a transaction for consideration greater than the Release Price, the purchase agreement for the Successful Bidder as approved by the Bankruptcy Court.

"**Shareholder Settlement**" means the full and final settlement and resolution of any and all claims related to that certain litigation, captioned *In re Akorn, Inc. Data Integrity Securities Litigation*, Civ. A. No. 1:18-cv-01713 (N.D. Ill. Mar. 8, 2018), that did not "opt out" of such settlement pursuant to that certain *Order and Final Judgment Approving Class Action Settlement* [Document No. 190].

"**Stalking Horse APA**" has the meaning given to such term in the Bidding Procedures.

"**Stalking Horse Bidder**" has the meaning given to such term in the Bidding Procedures.

"**Standstill Agreement**" means that certain standstill agreement, dated as of May 6, 2019, by and among Akorn, Inc., certain Term Loan Lenders under the Term Loan Credit Agreement, and the Term Loan Agent (as may be amended, restated, or otherwise modified from time to time).

"**Successful Bidder**" has the meaning given to such term in the Bidding Procedures.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Term Loan**" means loans outstanding under the Term Loan Credit Agreement.

"**Term Loan Agent**" means any administrative agent, collateral agent, or similar Entity under the Term Loan, including any successors thereto.

"**Term Loan Claims**" means any Claim on account of the Term Loan, including but not limited to any exit fees, call protection, or other fees provided for thereunder.

"**Term Loan Credit Agreement**" means that certain Term Loan Credit Agreement, dated as of April 17, 2014, by and among Akorn, Inc., as borrower, and certain of the Company Parties as guarantors party thereto, Wilmington Savings Fund Society, FSB, in its capacity as successor administrative agent, and the other lender parties thereto, as may be amended, restated, or otherwise supplemented from time to time (including by the Standstill Agreement).

"**Term Loan Credit Documentation**" means collectively, the Term Loan Credit Agreement and the other documents and instruments related thereto (including, without limitation, the notes, guarantees, collateral documents, amendments, and fee letters entered into in connection therewith).

"**Term Loan Lenders**" means the lenders under the Term Loan Credit Agreement, each in their capacities as such.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 13.01, 13.02, 13.03, or 13.04.

"**Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit F**.

1.02.   Interpretation.  For purposes of this Agreement:

This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof shall not be effective in regard to the interpretation hereof.

(a)      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)      the use of "include" or "including" is without limitation, whether stated or not;

(j)      the phrase "counsel to the Consenting Term Lenders" refers in this Agreement to each counsel specified in Section 16.12 other than counsel to the Company Parties; and

(k)      unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

**Section 2.**      ***Effectiveness of this Agreement.***   This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)      each of the Consenting Term Lenders consisting of holders of Term Loans together holding at least two-thirds (2/3) of the principal amount of the Term Loans in the aggregate shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company; provided, that signature pages executed by Consenting Term Lenders shall be delivered to (x) other Consenting Term Lenders in a redacted form that removes such Consenting Term Lenders' holdings of Term Loans, and (y) the Company, the advisors to the Company and (solely with respect to members of the Ad Hoc Group) the Ad Hoc Group Advisors in an unredacted form; provided, further, that such recipients shall not disclose the unredacted signature pages and shall keep such unredacted signature pages in strict confidence, except as required by law;

(c)      the Company shall have paid all reasonable and documented fees and out of pocket expenses and all agreed and unpaid professional retainer amounts of the Ad Hoc Group Advisors in accordance with their respective fee letters or engagement letters for which an invoice has been received by the Company on or before the date that is one (1) Business Day prior to the Agreement Effective Date; and

(d)      counsel to the Company Parties shall have given notice to counsel to the Consenting Term Lenders in the manner set forth in Section 16.12 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2 have occurred.

This Agreement shall be effective from the Agreement Effective Date until validly terminated pursuant to the terms set forth in Section 13 (such period, the "**Effective Period**").  To the extent that a signatory to this Agreement holds, as of the date hereof or thereafter, multiple claims or interests in the Company, such Party shall be deemed to have executed this Agreement in its

capacity as a holder of all such claims and interests, and this Agreement shall apply severally to such Party with respect to each such claim held by such Party.

**Section 3.**    *Definitive Documents.*

3.01.    The Definitive Documents governing the Transactions shall include the following: (a) this Agreement; (b) documents implementing and achieving the Transactions, including any substantive "first day" or "second day" motions; (c) the Stalking Horse APA, or, in the event that a Qualified Bidder other than the Stalking Horse Bidder is the Successful Bidder, the purchase agreement for the Successful Bidder; (d) the Plan; (e) the Confirmation Order; (f) the Disclosure Statement; (g) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (h) the Plan Supplement; (i) the DIP Order; (j) the DIP Facility Documents; (j) any motion seeking approval of the Bidding Procedures and/or a sale of some or all of the Company Parties' assets and all agreements, documents, orders, and/or amendments in connection therewith (collectively, the "**Sale Documents**"); and (k) any exit financing agreements (as applicable).

3.02.    The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Transactions, or any amendments thereto, shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 15.  The Definitive Document shall be, to the extent permitted by law, consistent with this Agreement in all respects and otherwise reasonably acceptable in form and substance to (i) the Company, (ii) the Consenting Term Lenders that hold, in aggregate on the relevant date, at least sixty (60) percent in principal amount outstanding of Term Loans held by the Consenting Term Lenders (the "**Required Consenting Term Lenders**"); provided that, notwithstanding anything herein to the contrary, (1) the DIP Facility Documents (including the DIP Credit Agreement, any agreement documenting the DIP Facility, and the DIP Order) shall be acceptable in form and substance in all material respects to the DIP Lenders (it being understood that DIP Credit Agreement attached hereto as **Exhibit D** shall be deemed to be acceptable to the DIP Lenders); provided further, that any exit facility that replaces the DIP Facility Claims (in lieu of payment in full in cash) shall be acceptable in form and substance in all respects to the DIP Lenders.

**Section 4.**    *Milestones*

On and after the Agreement Effective Date, the Company Parties shall use commercially reasonable efforts to implement the Transaction in accordance with the following milestones (the "**Milestones**"), as applicable, unless extended or waived in writing (which may be by electronic mail between applicable counsel) by the Company Parties and the Required Consenting Term Lenders; provided that, with respect to the Milestones in subsections (a), (d), (f) and (h) herein, such Milestones may be extended by the Company Parties and the Ad Hoc Group Advisors.

For the avoidance of doubt, nothing in these Milestones shall prevent the Debtors from exercising their respective fiduciary duties under applicable law:[2]

(a)        no later than 5:00 p.m. (prevailing Eastern time) on May 15, 2020, provide the Ad Hoc Group Advisors with an ABL contact log, process letter, and CIM;

(b)        no later than 11:59 p.m. (prevailing Eastern time) on May 20, 2020, the Company Parties shall have commenced the Chapter 11 Cases in the Bankruptcy Court (the "**Petition Date**");

(c)        no later than three (3) days after the Petition Date, the Bankruptcy Court shall have entered the DIP Order on an interim basis, which DIP Order shall be in the form and substance acceptable to the DIP Lenders;

(d)        no later than three (3) days after the Petition Date, the Company shall initiate outreach to contact log for ABL;

(e)        no later than 11:59 p.m. (prevailing Eastern time) the date that is five (5) days after the Petition Date, the Company Parties shall have filed the Plan, Disclosure Statement, and Disclosure Statement Motion;

(f)        no later than 11:59 p.m. (prevailing Eastern time) on the date that is thirty (30) days after the Petition Date, the Bankruptcy Court shall have entered (i) an order approving the Bidding Procedures (which Bidding Procedures shall be in form and substance acceptable to the Required Consenting Term Lenders) and (ii) the DIP Order on a final basis (which DIP Order shall be in form and substance acceptable to the DIP Lenders);

(g)        no later than 5:00 p.m. (prevailing Eastern time) on the date that is thirty-three (33) days after the Petition Date, non-binding term sheets for a new asset-based lending facility (the "**Exit ABL**") shall be due;

(h)        no later than forty-eight (48) days after the Petition Date (or such later date as may be required to accommodate the Bankruptcy Court's schedule), (i) the hearing to approve the Disclosure Statement shall have occurred and (ii) the Disclosure Statement Order shall have been entered;

(i)        no later than sixty-three (63) days after the Petition Date, commitment letters with respect to the Exit ABL shall be due;

(j)        no later than 11:59 p.m. (prevailing Eastern time) on the date that is seventy-five (75) days after the Petition Date, the Company Parties shall have received any and all Qualified Bids;

---

[2]    The date of each Milestone provided for in this <u>Section 4</u> shall be calculated in accordance with Rule 9006 of the Federal Rules of Bankruptcy Procedure.

(k)     if applicable, as soon as reasonably practicable, but in no event later than eighty-two (82) days after the Petition Date, the Auction shall have occurred;

(l)     no later than eighty-nine (89) days (or such later date as may be required to accommodate the Bankruptcy Court's schedule) after the Petition Date, (i) the Bankruptcy Court shall have approved the Sale Transaction and entered into the order approving the Sale Transaction and (ii) the confirmation hearing shall have occurred and, within two (2) Business Days thereafter, the Bankruptcy Court shall have entered the Confirmation Order; and

(m)     no later than one hundred and three (103) days after the Petition Date, (i) the Sale Transaction shall have closed and (ii) the Plan Effective Date shall have occurred, provided that, if regulatory approvals associated with a Sale Transaction remain pending as of such date, this date shall automatically be extended to the date that is the third Business Day following receipt of all regulatory approvals.[3]

**Section 5.     *Commitments of the Consenting Term Lenders.***

5.01.   General Commitments, Forbearances, and Waivers.

(a)     During the Agreement Effective Period, each Consenting Term Lender agrees (severally and not jointly), in respect of all of its Term Loan Claims, to:

(i)     use its commercially reasonable efforts to support the Transaction and to act in good faith and take all reasonable actions necessary to implement and consummate the Transaction in accordance with the terms, conditions, and applicable deadlines set forth in this Agreement, the Plan, and the Bidding Procedures, as applicable;

(ii)     direct the Term Loan Agent (or any designated subagent) to credit bid up to the full amount of the indebtedness under the Term Loan Credit Agreement and otherwise facilitate the transactions contemplated by this Agreement and the Stalking Horse APA, including, without limitation, by causing the Stalking Horse Bidder to execute the Stalking Horse APA;

(iii)     take, and direct the Term Loan Agent to take, all actions reasonably necessary in furtherance of the Company Parties' sale of the AIPL Assets;

(iv)     negotiate in good faith the applicable Definitive Documents and use its commercially reasonable efforts to agree to the form and substance of such Definitive Documents consistent with the terms of this Agreement;

(v)     support the Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process

---

[3]     As soon as reasonably practicable after closing the Auction, the Debtors shall finalize definitive documentation to implement the terms of the Successful Bid, and, as applicable, cause such definitive documentation to be filed with the Bankruptcy Court.

requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Transactions;

(vi)    direct the Term Loan Agent to take all actions in furtherance of such Consenting Term Lender's respective obligations under this Agreement, and if the Term Loan Agent takes any action inconsistent with a Party's obligations under this Agreement, such Party shall promptly direct such Term Loan Agent to cease and refrain from taking any such action;

(vii)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(viii)    use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Transactions from the Company Parties' other stakeholders;

(ix)    use commercially reasonable efforts to oppose any party or person from taking any actions contemplated in Section 5.01(b);

(x)    give any notice, order, instruction, or direction to the Term Loan Agent necessary to give effect to the Transactions; and

(xi)    negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it or the Stalking Horse Bidder is required to be a party.

(b)    During the Agreement Effective Period, each Consenting Term Lender agrees (severally and not jointly), in respect of all of its Term Loan Claims, that it shall not directly or indirectly:

(i)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Transactions;

(ii)    direct the Term Loan Agent to take any action inconsistent with such Consenting Term Lender's respective obligations under this Agreement;

(iii)    propose, file, support, or vote for any Alternative Proposal;

(iv)    object to, delay, impede, or take any other action to terminate, shorten, or interfere with the Company Parties' exclusivity rights under section 1121 of the Bankruptcy Code;

(v)    object to, the Company Parties' (A) retention of professionals in connection with the Transactions, if applicable, and (B) allowance and/or payment of the reasonable and documented fees and expenses incurred by such professionals in connection with the Transactions, provided that such fees and expenses are incurred pursuant to and in accordance with the terms of the engagement letters between such professionals and the Company Parties in effect as of the Agreement Effective Date;

(vi)    object to or challenge, in any way, any payments made by the Company Parties prior to or during the pendency of the Agreement Effective Period pursuant to any employee compensation or benefit programs; provided that any employee compensation or benefit programs instituted during the Agreement Effective Period shall be in form and substance acceptable to the Required Consenting Term Lenders;

(vii)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(viii)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(ix)    object to, delay, impede, or take any other action to interfere with the enforcement or implementation of the Shareholder Settlement;

(x)    exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims against or Interests in the Company Parties; or

(xi)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

5.02.    Commitments with Respect to Chapter 11 Cases.

(a)    During the Agreement Effective Period, each Consenting Term Lender that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Term Lender, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)    vote each of its Term Loan Claims to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)    support all of the debtor and third-party releases, injunctions, discharge, and exculpation provisions provided in the Plan, substantially consistent with those set forth in Exhibit 1 to the Plan Term Sheet;

(iii)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iv)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) through (iii) above.

(b)    During the Agreement Effective Period, each Consenting Term Lender, in respect of each of its Term Loan Claims, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

(c)    During the Agreement Effective Period, each Consenting Term Lender (severally, and not jointly) agrees to support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any action in furtherance of any key employee retention, pre-paid retention programs, and/or other retention and incentive programs, nor will any Consenting Term Lender directly or indirectly object to, delay, impede, or take any other action to interfere with any additional compensation programs implemented by any Company Party during the Chapter 11 Cases (if applicable); provided that any such programs identified in this Section 5.02(c) shall be in form and substance acceptable to the Required Consenting Term Lenders.

(d)    During the Agreement Effective Period, each Consenting Term Lender will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with, nor will any Consenting Term Lender direct the Term Loan Agent to object to, delay, impede, or take any action to interfere with, any DIP Facility Document filed by any Company Party in the Bankruptcy Court.

(e) During the Agreement Effective Period, the Consenting Term Lenders agree:

(i)    If the Successful Bidder is the Stalking Horse Bidder, then the Consenting Term Lenders agree (severally and not jointly), and direct the Term Loan Agent (as applicable), to (a) with respect to any and all liens, encumbrances, and interests in the assets of the Company Parties, including all Collateral (as defined in the Term Loan Credit Agreement), including on account of the Term Loan Credit Documentation automatically release and discharge such liens, encumbrances, and interests without any further action of such Consenting Term Lender, (b) consent to the Sale Transaction pursuant to the Auction and Plan, and (c) otherwise support, negotiate in good-faith, and implement such Sale Transaction.  The Consenting Lenders hereby authorize and instruct the Term Loan Agent to promptly execute and deliver any instruments, documentation and agreement necessary or desirable or reasonably requested by the Company Parties to evidence and confirm the release of all such liens, encumbrances, interests and claims pursuant to the forgoing Section 5.02(e)(i).

(ii)    If the Successful Bidder is a Qualified Bidder other than the Stalking Horse Bidder, the Consenting Term Lenders agree (severally and not jointly), and direct the Term Loan Agent (as applicable), to:  (a) with respect to any and all liens, claims, encumbrances, and interests in the assets of the Company Parties, including all Collateral (as defined in the Term Loan Credit Agreement), including on account of the Term Loan Credit Documentation, automatically release and discharge such liens, claims, encumbrances, and interests without any further action of such Consenting Term Lender, provided that the Successful Bidder is not the Term Loan Lenders; (b) consent to the Sale Transaction pursuant to the Auction and Plan; and (c) otherwise support, negotiate in good-faith, and implement such Sale Transaction.  The Consenting Lenders hereby authorize and instruct the Term Loan Agent to promptly execute and deliver any instruments, documentation and agreement necessary or desirable or reasonably requested by the Company

Parties to evidence and confirm the release of all such liens, encumbrances, interests and claims pursuant to the forgoing Section 5.02(e)(ii).

(iii)    Each Consenting Term Lender will support, and will direct the Term Loan Agent to support, the Company Parties' Transactions and will not object to, delay, impede, or take any other action to interfere with entry of any Sale Document and/or consummation of any Sale Transaction, provided that such Sale Transaction complies with the Plan and the Bidding Procedures.

**Section 6.**    *Additional Provisions Regarding the Consenting Term Lenders' Commitments.*

6.01.    Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:  (a) affect the ability of any Consenting Term Lender to consult with any other Consenting Term Lender, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), subject to all applicable Confidentiality Agreements; (b) impair or waive the rights of any Consenting Term Lender to assert or raise any objection permitted under this Agreement in connection with the Transactions; and (c) prevent any Consenting Term Lender from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 7.**    *Commitments of the Company Parties.*

7.01.    Affirmative Commitments.  Except as set forth in Section 8, during the Agreement Effective Period, the Company Parties agree to:

(a)    use commercially reasonable efforts (i) to pursue the Transactions on the terms and in accordance with the Milestones set forth in this Agreement, including by negotiating the Definitive Documents in good faith, and (ii) cooperate with the Consenting Term Lenders to obtain necessary Bankruptcy Court approval of the Definitive Documents to consummate the Transactions;

(b)    not take any action, and not encourage any other person or entity to, take any action, directly or indirectly, that would reasonably be expected to, breach or be inconsistent with this Agreement, or take any other action, directly or indirectly, that would reasonably be expected to interfere with the acceptance or implementation of the Transactions, this Agreement, the Sale Transaction, or the Plan;

(c)    negotiate in good faith and use commercially reasonable efforts to execute and deliver any appropriate additional or alternative agreements to address any legal, financial, or structural impediment to the Transactions that are necessary to effectuate the Transactions in accordance with the terms hereof;

(d)    use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Transactions;

(e)    negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Transactions as contemplated by this Agreement;

(f)        use commercially reasonable efforts to seek additional support for the Transactions from their other material stakeholders to the extent reasonably prudent;

(g)        to the extent reasonably practicable, provide counsel for the Ad Hoc Group a review period of (i) at least three (3) calendar days (or such shorter review period as is necessary or appropriate under the circumstances) prior to the date when the Company intends to file any Definitive Document with the Bankruptcy Court and (ii) at least one (1) calendar day (or such shorter review period as necessary or appropriate) prior to the date when the Company intends to file any other material pleading with the Bankruptcy Court (but excluding retention applications, fee applications, and any declarations in support thereof or related thereto) with the Bankruptcy Court; and

(h)        provide the Consenting Term Lenders with a schedule of all the Company's existing employee bonus obligations, employee retention plans, employee incentive plans, or other similar obligations on the Agreement Effective Date.

7.02.    <u>Negative Commitments</u>.  Except as set forth in Section 8, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)        object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Transactions;

(b)        take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Transactions described in, this Agreement or the Plan;

(c)        modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects; or

(d)        file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan.

**Section 8.        *Additional Provisions Regarding Company Parties' Commitments.***

8.01.    Notwithstanding anything to the contrary herein, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 8.01 shall not, and shall not be deemed to, constitute a breach of this Agreement.  Notwithstanding anything to the contrary herein, each Consenting Term Lender reserves its rights to challenge any action taken in the exercise of such fiduciary duties.

8.02.    Notwithstanding anything to the contrary in this Agreement, but subject to the terms of Section 8.01, each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider and respond to Alternative Proposals; (b) provide access to

non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Proposals; (d) otherwise cooperate with, assist or participate in any inquiries, proposals, discussions, or negotiation of Alternative Proposals in good faith and consistent with applicable fiduciary obligations; and (e) enter into or continue discussions or negotiations with holders of Term Loan Claims (including any Consenting Term Lender), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Transactions or Alternative Proposals.  If any Company Party receives a written or oral proposal or expression of interest regarding any Alternative Proposal that a majority of the Company Parties' applicable Board of Directors, Board of Managers, or similar governing body determines in good faith and following consultation with counsel is a bona fide committed proposal that represents higher or otherwise better economic recovery to the Company Parties' stakeholders than the Transactions taken as a whole, within two (2) Business Days, the Company Party shall notify (with email being sufficient) the Ad Hoc Group Advisors of any such proposal or expression of interest, with such notice to include a copy of such proposal, if it is in writing, or otherwise a summary of the material terms thereof.  If the board of directors of the Company Parties decides (i) that proceeding with any of the Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Proposal (a "**Fiduciary Out**"), the Company Parties shall notify counsel to the Consenting Term Lenders within two (2) Business Days of such decision.  Upon any determination by any Company Party to exercise a Fiduciary Out, the other Parties to this Agreement shall be immediately and automatically relieved of any obligation to comply with their respective covenants and agreements herein in accordance with Section 13.02 hereof.

8.03.    Notwithstanding anything to the contrary herein, nothing in this Agreement shall create or impose any additional fiduciary obligations upon any Company entity or any of the Consenting Term Lenders, or any members, partners, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents or other representatives of the same or their respective affiliated entities, in such person's capacity as a member, partner, manager, managing member, officer, director, employee, advisor, principal, attorney, professional, accountant, investment banker, consultant, agent or other representative of such Party, that such entities did not have prior to the Agreement Effective Date.

8.04.    Nothing in this Agreement shall:  (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

## Section 9.    *Cooperation and Support*

Each Party hereby covenants and agrees to cooperate with the other Parties in good faith and shall coordinate their activities (to the extent practicable and subject to the terms hereof) with respect to: (a) all matters relating to their rights hereunder; (b) all matters concerning the implementation of the Plan and the Transactions; and (c) the pursuit, approval and support of the Transactions (including confirmation of the Plan).  Furthermore, subject to the terms hereof, each of the Parties

shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, or to effectuate the solicitation of the Plan and/or the Transactions, including making and filing any required regulatory filings, executing and delivering any other necessary agreements or instruments, and voting any claims against or interests in the Company Parties in favor of the Plan, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

**Section 10.    *Transfer of Interests and Securities.***

10.01.  During the Agreement Effective Period, no Consenting Term Lender shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Term Loan Claims to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless either (a) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (b) the transferee is a Consenting Term Lender and the transferee provides notice of such Transfer (including the amount and type of Term Loan Claim Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer.

10.02.  Upon compliance with the requirements of Section 10.01, (a) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Term Loan Claims and (b) the transferee shall be deemed to be a Consenting Term Lender under this Agreement with respect to such transferred Term Loan Claims.  Any Transfer in violation of Section 10.01 shall be deemed null and void *ab initio* and of no force or effect until such a Transfer Agreement is executed and effective.

10.03.  This Agreement shall in no way be construed to preclude the Consenting Term Lenders from acquiring additional Term Loan Claims; provided, however, that (a) such additional Term Loan Claims shall automatically and immediately upon acquisition by a Consenting Term Lender be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Term Lenders) and (b) such Consenting Term Lender must provide notice of such acquisition (including the amount and type of Term Loan Claim acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition.

10.04.  This Section 10 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Term Lender to Transfer any of its Term Loan Claims.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

10.05.  Notwithstanding Section 10.01, a Qualified Marketmaker that acquires any Term Loan Claims with the purpose and intent of acting as a Qualified Marketmaker for such Term Loan Claims shall not be required to execute and deliver a Transfer Agreement in respect of such Term

Loan Claims if (a) such Qualified Marketmaker subsequently transfers such Term Loan Claims (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 10.01; and (c) the Transfer otherwise is permitted under Section 10.01.  To the extent that a Consenting Term Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Term Loan Claims that the Qualified Marketmaker acquires from a holder of the Term Loan Claims who is not a Consenting Term Lender without the requirement that the transferee be a Permitted Transferee.

10.06.  The Company understands that the Consenting Term Lenders are engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the Company acknowledges and agrees that the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of the Consenting Term Lender that principally manage and/or supervise the Consenting Term Lender's investment in the Company, and shall not apply to any other trading desk or business group of the Consenting Term Lender, so long as they are not acting at the direction or for the benefit of such Consenting Term Lender or in connection with such Consenting Term Lender's investment in the Company.

10.07.  Further, notwithstanding anything in this Agreement to the contrary, the Parties agree that, in connection with the delivery of signature pages to this Agreement by a Consenting Term Lender that is a Qualified Marketmaker before the occurrence of conditions giving rise to the effective date for the obligations and the support hereunder, such Consenting Term Lender shall be a Consenting Term Lender hereunder solely with respect to the Term Loan Claims listed on such signature pages and shall not be required to comply with this Agreement for any other Term Loan Claims it may hold from time to time in its role as a Qualified Marketmaker.

10.08.  Notwithstanding anything to the contrary in this Section 10, the restrictions on Transfer set forth in this Section 10 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 11.** *Representations and Warranties of Consenting Term Lenders.*  Each Consenting Term Lender severally, and not jointly, represents and warrants that, as of the date such Consenting Term Lender executes and delivers its signature page to this Agreement and as of the Plan Effective Date:

(a)      it is the beneficial or record owner of the face amount of the Term Loan Claims or is the nominee, investment manager, or advisor for beneficial holders of the Term Loan Claims reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Term Loan Claims or is the nominee, investment manager, or advisor for beneficial holders of the Term Loan Claims other than those reflected in, such Consenting Term Lender's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 10);

(b)      it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Term Loan Claims;

(c)      such Term Loan Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, right of participation, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Term Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      it has the full power to vote, approve changes to, and transfer all of its Term Loan Claims referable to it as contemplated by this Agreement subject to applicable Law; and

(e)      solely with respect to holders of Term Loan Claims, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Term Lender in connection with the Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 12.** *Mutual Representations, Warranties, and Covenants*. Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on the Restructuring Effective Date:

(a)      it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Stalking Horse APA, the Confirmation Order, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 13.**     *Termination Events*.

13.01.   <u>Consenting Term Lender Termination Events</u>.   This Agreement may be terminated with respect to the Consenting Term Lenders, by the Required Consenting Term Lenders, in each case, by the delivery to the Company Parties of a written notice in accordance with Section 16.12 hereof upon the occurrence of the following events:

(a)     the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is materially adverse to the Consenting Term Lenders seeking termination pursuant to this provision and (ii) remains uncured for a period of five (5) Business Days after the receipt by the Company Parties of notice of such breach;

(b)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Consenting Term Lenders transmit a written notice in accordance with Section 16.12 hereof detailing any such issuance; <u>provided</u> that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)     the Milestones set forth in Section 4 have not been achieved, extended, or waived within three (3) business days after the date identified for completion of such Milestone (as such date may be extended or waived);

(d)     the Bankruptcy Court enters an order denying confirmation of the Plan;

(e)     entry of a DIP Order that is not acceptable to the DIP Lenders or Required Consenting Term Lenders, as applicable;

(f)     entry of a final order that grants relief terminating, annulling, or materially modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset that, to the extent such relief were granted, would have a material adverse effect on the consummation of the Transactions;

(g)     if the Company withdraws the Plan or files any plan of reorganization or liquidation or disclosure statement that is not consistent in any material respect with this Agreement, the Plan Term Sheet, or the Plan;

(h)     if the Company files any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Consenting Lenders' Term Loan Claims;

(i)     the occurrence of any Event of Default under the DIP Facility that has not been cured (if susceptible to cure) or waived by the applicable percentage of DIP Lenders in accordance with the terms of the DIP Facility;

(j)        the Company files a motion, application, or adversary proceeding (or the Company supports any such motion, application, or adversary proceeding filed or commenced by any third party) (A) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Term Loan Claims or asserting any other cause of action against the Consenting Term Lenders or with respect or relating to such Term Loan Claim, the Term Loan Credit Agreement or any Loan Document (as such term is defined in the Term Loan Credit Agreement) or the prepetition liens securing the Term Loan Claims or (B) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Term Loan Claims or asserting any other cause of action against the Consenting Term Lenders or with respect or relating to such Term Loan Claims or the prepetition liens securing the Term Loan Claims;

(k)        the Company loses the exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(l)        the commencement of an involuntary case against the Company or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief in respect of the Company, or their debts, or of a substantial part of their assets, under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect (provided that such involuntary proceeding is not dismissed within a period of thirty (30) days after the filing thereof) or if any court grants the relief sought in such involuntary proceeding;

(m)        without the prior consent of the Required Consenting Term Lenders, the Company (A) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect except consistent with this Agreement, (B) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described above, (C) files an answer admitting the material allegations of a petition filed against it in any proceeding, (D) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official, trustee or an examiner pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases, (E) makes a general assignment or arrangement for the benefit of creditors or (F) takes any corporate action for the purpose of authorizing any of the foregoing;

(n)        the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Term Lenders, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement; or

(o)        the occurrence of a termination event in Section 13.02 of this Agreement.

13.02.  <u>Company Party Termination Events</u>.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 16.12 hereof upon the occurrence of any of the following events:

(a)    the breach in any material respect by one or more of the Consenting Term Lenders of any provision set forth in this Agreement that remains uncured for a period of five (5) Business Days after the receipt by the Consenting Term Lenders of notice of such breach, including:

(i)    Any direct or indirect objection, delay, impediment, or other action taken by a Consenting Term Lender against any action in furtherance of any key employee retention, pre-paid retention programs, and/or other retention and incentive programs that otherwise complies with the terms of this Agreement;

(ii)    Any direct or indirect objection, delay, impediment, or other action taken by a Consenting Term Lender or Term Loan Agent against any DIP Facility Document filed by any Company Party in the Bankruptcy Court; <u>provided</u> that such DIP Facility Document is materially consistent with this Agreement and the Plan;

(iii)    Any direct or indirect objection, delay, impediment, or other action taken by a Consenting Term Lender or Term Loan Agent opposing entry of any Sale Document and/or consummation of any Sale Transaction; <u>provided</u> that such Sale Transaction is materially consistent with this Agreement, the Plan, and the Bidding Procedures; or

(iv)    The failure of the Consenting Term Lenders to negotiate in good faith, support, and implement a Sale Transaction.

(b)    the Milestones set forth in Section 4 have not been achieved, extended, or waived within three (3) business days after the date identified for completion of such Milestone (as such date may be extended or waived);

(c)    the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, to exercise a Fiduciary Out;

(d)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 16.12 hereof detailing any such issuance; <u>provided</u> that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(e)    the Bankruptcy Court enters an order denying (i) confirmation of the Plan or (ii) approval of the Sale Transaction.

13.03.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Term Lenders; and (b) each Company Party.

13.04.   Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

13.05.   Effect of Termination.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Transactions and this Agreement or otherwise; provided, however, that any Consenting Term Lender withdrawing or changing its vote pursuant to this Section 13.05 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Term Lenders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Term Lender, and (b) any right of any Consenting Term Lender, or the ability of any Consenting Term Lender, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Term Lender.  No purported termination of this Agreement shall be effective under this Section 13.05 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 13.02(c) or Section 13.02(e).  Nothing in this Section 13.05 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 13.02(c).

13.06.   The Company acknowledges that after the Petition Date, the giving of notice of termination by any Party pursuant to this Agreement shall not be considered a violation of the automatic stay of section 362 of the Bankruptcy Code; provided, that nothing herein shall prejudice any Party's right to argue that the giving of notice of termination was not proper under the terms of this Agreement.

**Section 14.   *Fees and Expenses*.**  The Company shall pay or reimburse all reasonable and documented fees and expenses of the Ad Hoc Group Advisors, including the fees and expenses of

Gibson, Dunn & Crutcher LLP, as legal counsel to the Ad Hoc Group, and Greenhill & Co., as financial advisor to the Ad Hoc Group, within five (5) Business Days of receipt.

**Section 15.**    *Amendments and Waivers***.**

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 15.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing (email being sufficient) signed by (i) each Company Party and (ii) the Required Consenting Term Lenders, solely with respect to any modification, amendment, waiver or supplement that materially and adversely affects the rights of such Parties and unless otherwise specified in this Agreement.

(c)    Any proposed modification, amendment, waiver or supplement that does not comply with this Section 15 shall be ineffective and void *ab initio*.

(d)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 16.**    *Miscellaneous.*

16.01.    <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

16.02.    <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include all such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

16.03.    <u>Further Assurances</u>.  Each Party hereby covenants and agrees to cooperate with each other in good faith with respect to the pursuit, approval, implementation, and consummation of the Transactions, the Sale Transaction, and the Plan, as well as the negotiation, drafting, execution, and delivery of documents (including any related orders, agreements, instruments, schedules, or exhibits) described in this Agreement or the Definitive Documents or otherwise

necessary or desirable to facilitate the Transactions in accordance with this Agreement and the Definitive Documents.  Furthermore, subject to the terms hereof, each Party shall take such action as may be reasonably necessary or reasonably requested by another Party to carry out the purpose and intent of this Agreement, including facilitating any necessary regulatory filings, and shall refrain from taking any action that would frustrate the purpose and intent of this Agreement.

16.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

16.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:   (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

16.06.  <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

16.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Term Lenders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Term Lenders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

16.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.   There are no third party beneficiaries under this Agreement, and the rights or

26

obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

16.10. <u>Survival</u>.  Notwithstanding the termination of this Agreement, the agreements and obligations of the Parties in Section 14 shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

16.11. <u>Relationship Among the Parties</u>.  It is understood and agreed that no Party to this Agreement has any duty of trust or confidence in any form with any other Party, and, except as provided in this Agreement, there are no agreements, commitments, or undertakings between or among them.  In this regard, it is understood and agreed that any Party to this Agreement may trade in the loans and/or commitments under the Term Loan or other debt or equity securities of the Company without the consent of the Company, as the case may be, or any other Party, subject to applicable securities laws, the terms of any applicable non-disclosure agreement, and the terms of this Agreement; <u>provided</u>, further, that neither any Party to this Agreement nor the Company shall have any responsibility for any such trading by any other entity by virtue of this Agreement.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement.

16.12. <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:

Akorn, Inc.
1925 W. Field Court, Suite 300
Lake Forest, Illinois 60045
Attention:      Duane Portwood
E-mail:          duane.portwood@akorn.com

with copies to:

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attention:      Patrick J. Nash, Jr., P.C.
                     Gregory F. Pesce
                     Christopher M. Hayes
E-mail:          patrick.nash@kirkland.com
                     gregory.pesce@kirkland.com
                     christopher.hayes@kirkland.com

and

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York 10022
> Attention:    Nicole L. Greenblatt, P.C.
> E-mail:    nicole.greenblatt@kirkland.com

    (b)    if to a Consenting Term Lender, to:

> Gibson, Dunn & Crutcher LLP
> 200 Park Avenue
> New York, NY 10166
> Attention:    Scott J. Greenberg
>            Steven A. Domanowski
>            Jeremy D. Evans
> E-mail:    sgreenberg@gibsondunn.com
>            sdomanowski@gibsondunn.com
>            jevans@gibsondunn.com

Any notice given by delivery, mail, or courier shall be effective when received.

    16.13.    <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Term Lender hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

    16.14.    <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

    16.15.    <u>Waiver</u>.  If the Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

    16.16.    <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy

thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Party.

16.17.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

16.18.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

16.19.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

16.20.  <u>Capacities of Consenting Term Lenders</u>.  Each Consenting Term Lender has entered into this agreement on account of all Term Loan Claims that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Term Loan Claims.

16.21.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 15, or otherwise, including a written approval by the Company Parties or the Required Consenting Term Lenders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

16.22.  <u>Other Interpretive Matters</u>.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:  (i) when calculating the period of time before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day; (ii) all exhibits attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein; (iii) words imparting the singular number only shall include the plural and vice versa; (iv) the words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires; (v) the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; (vi) the division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting

this Agreement; (vii) all references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified; and (viii) "Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

(b)      The Company and Consenting Term Lenders have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

[*Signature Pages to Follow*]

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**AKORN, INC.**
**10 EDISON STREET LLC**
**13 EDISON STREET LLC**
**ADVANCED VISION RESEARCH, INC.**
**AKORN (NEW JERSEY), INC.**
**AKORN ANIMAL HEALTH, INC.**
**AKORN OPHTHALMICS, INC.**
**AKORN SALES, INC.**
**CLOVER PHARMACEUTICALS CORP.**
**COVENANT PHARMA, INC.**
**HI-TECH PHARMACAL CO., INC.**
**INSPIRE PHARMACEUTICALS, INC.**
**OAK PHARMACEUTICALS, INC.**
**OLTA PHARMACEUTICALS CORP.**
**VERSAPHARM INCORPORATED**
**VPI HOLDINGS CORP.**
**VPI HOLDINGS SUB, LLC**

By: _____

Name:  Duane Portwood

Authorized Signatory

**Consenting Term Lender Signature Page to
the Restructuring Support Agreement**

**[CONSENTING TERM LENDER]**

Signature: _____

Name:

Title:


Address:


E-mail address(es):


| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| Term Loan Claims | |
| Equity in Akorn | |

## Exhibit A

**Company Parties**

**Akorn, Inc.**

**10 Edison Street LLC**

**13 Edison Street LLC**

**Advanced Vision Research, Inc.**

**Akorn (New Jersey), Inc.**

**Akorn Animal Health, Inc.**

**Akorn Ophthalmics, Inc.**

**Akorn Sales, Inc.**

**Clover Pharmaceuticals Corp.**

**Covenant Pharma, Inc.**

**Hi-Tech Pharmacal Co., Inc.**

**Inspire Pharmaceuticals, Inc.**

**Oak Pharmaceuticals, Inc.**

**Olta Pharmaceuticals Corp.**

**VersaPharm Incorporated**

**VPI Holdings Corp.**

**VPI Holdings Sub, LLC**

## Exhibit B

**Bidding Procedures**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) )  Chapter 11 |
| AKORN, INC., *et al.*,[1] | )  Case No. 20-[_____] (___) )  |
|                   Debtors. | )  (Joint Administration Requested) ) |

## BIDDING PROCEDURES

On May 20, 2020, Akorn, Inc. (the "<u>Selling Debtor</u>"), entered into an asset purchase agreement (the "<u>Stalking Horse APA</u>") with [●] ("<u>Purchaser</u>" or the "<u>Stalking Horse Bidder</u>") pursuant to which Purchaser proposes to, among other things, purchase, acquire, and take assignment and delivery of certain assets (the "<u>Acquired Assets</u>") and assume certain liabilities (the "<u>Assumed Liabilities</u>") of the Selling Debtor, and the other Debtors, identified in Section 1.1 of the Stalking Horse APA.

On [●], 2020, the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") entered an order [Docket No. [●]] (the "<u>Bidding Procedures Order</u>"),[2] by which the Court authorized the Debtors to solicit bids for and conduct an auction (the "<u>Auction</u>") for a sale or disposition (collectively, the "<u>Sale</u>," and each, a "<u>Sale Transaction</u>") of all or substantially all of the Debtors' assets or sub-groups thereof free and clear of all liens, claims, encumbrances, and other interests (other than those permitted by an applicable Stalking Horse Agreement) and in accordance with the following procedures (the "<u>Bidding Procedures</u>").

Set forth below are the Bidding Procedures that will be employed in connection with the Sale of substantially all of the Debtors' assets or sub-groups thereof.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are:  Akorn, Inc. (7400); 10 Edison Street LLC (7890); 13 Edison Street LLC; Advanced Vision Research, Inc. (9046); Akorn (New Jersey), Inc. (1474); Akorn Animal Health, Inc. (6645); Akorn Ophthalmics, Inc. (6266); Akorn Sales, Inc. (7866); Clover Pharmaceuticals Corp. (3735); Covenant Pharma, Inc. (0115); Hi-Tech Pharmacal Co., Inc. (8720); Inspire Pharmaceuticals, Inc. (9022); Oak Pharmaceuticals, Inc. (6647); Olta Pharmaceuticals Corp. (3621); VersaPharm Incorporated (6739); VPI Holdings Corp. (6716); and VPI Holdings Sub, LLC.  The location of the Debtors' service address is:  1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.

[2]    Terms utilized but not otherwise defined herein shall have the meanings ascribed to them in the Stalking Horse APA or the Bidding Procedures Order, as applicable.

**ANY PARTY INTERESTED IN BIDDING ON THE ACQUIRED ASSETS SHOULD CONTACT THE DEBTORS' PROPOSED ADVISORS, AS FOLLOWS:**

| | | |
|---|---|---|
| PJT Partners, Inc.<br>280 Park Ave<br>New York, New York 10017<br>Attn: Tom Davidson,<br>Mark Buschmann<br>Michael O'Hara,<br>Tarek Aguizy, and<br>Harold Kim | Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attn.: Richard J. Campbell,<br>P.C. and<br>Steve Toth | Richards, Layton, & Finger,<br>P.A.<br>920 N. King Street<br>Wilmington, Delaware 19801<br>Attn.: Paul N. Heath<br>Paul N. Heath<br>Amanda R. Steele<br>Zachary I. Shapiro<br>Brett M. Haywood |

## I.      DESCRIPTION OF THE ACQUIRED ASSETS.

The Debtors are seeking to sell the Acquired Assets, which include the Debtors' owned real property, unexpired leases, executory contracts, and certain equipment, inventory, supplies, intellectual property, insurance proceeds, receivables, prepaid expenses and deposits, and books and records, in each case, free and clear of all liens, claims, interests, or other encumbrances. The Acquired Assets are specifically identified in the Stalking Horse APA and the Sale Hearing Notice.

## II.      PARTICIPATION REQUIREMENTS.

### A.      Potential Bidders.

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity interested in the Acquired Assets or part of the Acquired Assets (other than the Stalking Horse Bidder) (a "Potential Bidder") must deliver to each of the Debtors' advisors the following documents and information (collectively, the "Preliminary Bid Documents"):

1.      an executed confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement");

2.      proof by the Potential Bidder of its financial capacity to close a proposed Sale Transaction(s), which may include audited financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the desired Acquired Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors and their advisors; and

3.      a non-binding preliminary indication of the amount of the cash purchase price in U.S. Dollars or other consideration that the Potential Bidder is prepared to pay or deliver in exchange for the acquisition of some or all of the Acquired Assets.

With respect to items 2 and 3 above, such information shared with the Debtors' advisors shall be shared with the Consultation Parties' advisors no later than 48 hours after such receipt.

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors and their advisors regarding the ability of such Potential Bidder, as applicable, to consummate its contemplated transaction; *provided* that the Consultation Parties and their respective advisors shall be permitted to submit reasonable requests for information from Potential Bidders only through the Debtors and their advisors and, for the avoidance of doubt, shall not be permitted to directly contact any Potential Bidder and/or its respective advisor(s).

**B.     Obtaining Due Diligence.**

The Debtors (in consultation with the Consultation Parties), with their advisors will determine and notify each Potential Bidder whether such Potential Bidder has submitted adequate Preliminary Bid Documents so that such Potential Bidder may submit a Bid (each, an "Acceptable Bidder", and each such bid, an "Acceptable Bid").  Notwithstanding anything herein to the contrary, the Debtors reserve the right to work with Potential Bidders (in consultation with the Consultation Parties) to aggregate bids into a consolidated Acceptable Bid, or otherwise improve bids to be Acceptable Bids, prior to the Bid Deadline (defined herein).  The Stalking Horse Bidder shall be deemed an Acceptable Bidder, and the bid as set forth in the Stalking Horse APA (the "Stalking Horse Bid") an Acceptable Bid.  For the avoidance of doubt, the Prepetition Secured Parties shall be deemed an Acceptable Bidder.

Only Acceptable Bidders shall be eligible to receive due diligence information and access to the Debtors' electronic data room and to additional non-public information regarding the Debtors and the Acquired Assets.

The Debtors and their advisors shall coordinate all reasonable requests from Acceptable Bidders for additional information and due diligence access; *provided* that (i) the Debtors shall have the right (in consultation with the Consultation Parties) to limit the information and due diligence provided to competitors and (ii) the Debtors may (in consultation with the Consultation Parties) decline to provide such information, after prior notice to Acceptable Bidders who, at such time and in the Debtors' reasonable business judgment, have not established, or who have raised doubt, that such Acceptable Bidders intends in good faith to, or has the capacity to, consummate a proposed Sale Transaction.  The due diligence period will end on the Bid Deadline and, subsequent to the Bid Deadline, the Debtors shall have no obligation to furnish any due diligence information.  Additional due diligence will not be provided after the Bid Deadline, unless otherwise deemed reasonably appropriate by the Debtors (in consultation with the Consultation Parties). The Debtors and the Consultation Parties, and each of their representatives and advisors, are not responsible for, and will bear no liability with respect to, any information obtained by any Acceptable Bidder in connection with any Sale or Sale Transaction.

### III.    REQUIREMENTS FOR QUALIFIED BIDS.

Any binding proposal, solicitation, or offer (each, a "Bid") will be considered a qualified bid only if the Bid is submitted in writing by an Acceptable Bidder, by the Bid Deadline, and is deemed to comply with all of the following in the Debtors' business judgment (in consultation with the Consultation Parties) (a "Qualified Bid" and such bidder a "Qualified Bidder"); *provided* that the Prepetition Secured Parties shall be deemed a Qualified Bidder (and any bid submitted by them, a Qualified Bid) without the need to satisfy any of the other requirements placed on Acceptable Bidders hereunder:

1. *Purpose*.  Each Qualified Bidder must state that the Bid includes an irrevocable and binding offer by the Qualified Bidder to purchase some or all of the Acquired Assets (identified with specificity) and specify the Debtors' liabilities that the Qualified Bidder seeks to assume.

2. *Assets and Liabilities*.  The Bid must clearly identify the following:  (a) the Acquired Assets, or the portion thereof, to be purchased; and (b) the liabilities and obligations to be assumed, including any indebtedness to be assumed; if any.

3. *Purchase Price.*  The Bid must clearly set forth the cash purchase price, and any other non-cash consideration (with the form of such consideration specified), to be paid.  If the Bid proposes an acquisition of only certain of the Acquired Assets, the purchase price must be applied to each Acquired Asset or package of Acquired Assets in that Bid.

4. *Deposit*.  Each Bid must be accompanied by a good faith deposit in the form of cash (or other form acceptable to the Debtors in their reasonable discretion, subject to consultation with the Consultation Parties) in an amount equal to not less than ten (10) percent of the aggregate purchase price of the Bid to be held in an escrow account to be identified and established by the Debtors (the "Deposit").

5. *Marked Agreement.*  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents").  The Bid Documents shall include a schedule of Assigned Contracts (as defined in the Stalking Horse APA) to the extent applicable to the Bid, and a clearly marked version of the Stalking Horse APA and the Sale Order showing all changes requested by the Acceptable Bidder, as well as all other material documents integral to such Bid.

6. *Committed Financing*.  To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the proposed transactions set forth in its Bid with cash on hand, each Bid must include committed financing documented to the satisfaction of the Debtors (in consultation with the Consultation Parties) that demonstrates that the Acceptable Bidder has received sufficient unconditional debt and/or equity funding commitments to satisfy the Acceptable Bidder's Purchase Price and other obligations under its Bid, including providing adequate assurance of future performance under all contracts proposed

4

to be Assigned Contracts by such Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors (in consultation with the Consultation Parties).

7. ***Contingencies; No Financing or Diligence Outs.***  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence.

8. ***Identity.***  The Bid must fully disclose the identity of each person or entity that (a) will directly or indirectly own and/or control five percent or more (individually or collectively) of the equity and/or voting securities of the Qualified Bidder, including its full legal name, jurisdiction of incorporation or formation and its location in the Qualified Bidder's corporate structure, that will be bidding for some or all of the Acquired Assets or otherwise participating in connection with such Bid, (b) will directly or indirectly own and/or control any amount of equity and/or voting securities of the Potential Bidder, (c) for trusts and similar legal arrangements that meet the criteria for subparts (a) and (b) above, (w) each trust's settlor (the provider of funds), (x) each trustee or person or entity exercising control over each trust, (y) any person with the power to remove any trustee and (z) the beneficiaries of such trust(s) or similar legal arrangement, (d) for foundations that meet the criteria for subparts (a) and (b) above, (x) the founders of such foundation, (y) the key individuals who control such foundation and (x) such foundation's source of funds and (e) has a connection or agreement with any Debtor or with any other prospective bidder for some or all of the Acquired Assets or any officer, director or equity security holder of any Debtor.

9. ***Irrevocable.***  An Acceptable Bidder's Bid must be irrevocable and binding; *provided* that if the Bid is not selected as the Successful Bid or Backup Bid (defined below), the Bid may be revoked after consummation of the Successful Bid or Backup Bid.

10. ***Backup Bidder.***  Each Bid must contain an agreement for the Acceptable Bidder to be a Backup Bidder (as defined below) if such bidder's Qualified Bid is selected as the next highest or next best bid after the Successful Bid.

11. ***As-Is, Where-Is.***  The Bid must include the following representations and warranties:  (a) expressly state that the Acceptable Bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' businesses and the Acquired Assets prior to submitting its bid; and (b) a statement that the Acceptable Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Acquired Assets in making its Bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the Acquired Assets or the completeness of any information provided in

connection therewith, except as expressly stated in the representations and warranties contained in the Acceptable Bidder's proposed asset sale agreement ultimately accepted and executed by the Debtors.

12.     ***Authorization.***  The Bid must include evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Debtors with respect to the submission, execution, and delivery of its Bid and Bid Documents, participation in the Auction, and closing of the proposed transaction(s) contemplated in such Bid. The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Acceptable Bidder.

13.     ***Disclaimer of Fees.***  Each Bid (other than the Stalking Horse Bid) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, "topping" or termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

14.     ***Time Frame for Closing.***  A Bid by an Acceptable Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations in the Debtors' business judgment) to be consummated, if selected as the Successful Bid (as defined herein), within a time frame reasonably acceptable to the Debtors (in consultation with the Consultation Parties).  The Acceptable Bidder must commit to closing the proposed Sale(s) contemplated by the Bid as soon as practicable and provide perspective on any potential regulatory issues that may arise in connection with such Acceptable Bidder's acquisition of the Acquired Assets including timing for resolution thereof; *provided* that the closing of the transaction shall not be later than the milestones set forth in the Standstill Agreement.

15.     ***Adherence to Bid Procedures.***  Each Bid must include (a) a statement that the Acceptable Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code; and (b) that the Bid constitutes a *bona fide* offer to consummate the proposed transactions, and agrees to be bound by these Bidding Procedures.

16.     ***Postpetition Financing Order.***  All Bids must be in accordance with the terms and conditions of any order authorizing the use of cash collateral and providing postpetition financing.

17.     ***Joint Bids.***  The Debtors will be authorized to approve joint Bids in their discretion (in consultation with the Consultation Parties) on a case-by-case basis.

18.     ***Cooperation.***  The Acceptable Bidder must provide a covenant to cooperate with the Debtors to provide pertinent factual information regarding such Bidder's operations reasonably required to analyze issues arising with respect to any applicable laws or regulatory requirements.

19.     ***No Collusion.***  The Acceptable Bidder must acknowledge in writing that (a) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids or the Sale, specifying that it did not agree with any Potential Bidders, Acceptable Bidders or Qualified Bidders to control price; and (b) it agrees not to engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids, the Auction, or the Sale.

20.     ***Other Information.***  The Bid contains such other information as may be reasonably requested by the Debtors and the Consultation Parties with such requests made through the Debtors.

## IV.    BID DEADLINE.

An Acceptable Bidder that desires to make a bid must transmit via email (in .pdf or similar format) or deliver written copies of its bid to the following parties so as to be received not later than **5:00 p.m. (prevailing Eastern Time) on August 3, 2020** (the "<u>Bid Deadline</u>"): (i) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Nicole L. Greenblatt, email: ngreenblatt@kirkland.com, and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn:  Patrick J. Nash, email: patrick.nash@kirkland.com, Richard J. Campbell, email: rcampbell@kirkland.com, Steve Toth, email:  steve.toth@kirkland.com, Gregory F. Pesce, email:  gregory.pesce@kirkland.com, Christopher M. Hayes, email: christopher.hayes@kirkland.com  (ii) proposed Delaware counsel to the Debtors, Richards, Layton & Finger, P.A., 920 N. King Street, Wilmington, Delaware 19801, Attn:  Paul Heath, email: heath@rlf.com; and (iii) the Debtors' proposed investment banker, PJT Partners, Inc., 280 Park Ave, New York, New York 10017, Attn: Tom Davidson, email: davidson@pjtpartners.com, Mark Buschmann, email:  buschmann@pjtpartners.com, Michael O'Hara, email: ohara@pjtpartners.com, Tarek Aguizy, email: aguizy@pjtpartners.com, Harold Kim, email kimh@pjtpartners.com.

The Debtors will provide copies of all Bids via electronic mail within 24 hours of receiving any Final Bid to the Consultation Parties and to the Office of the United States Trustee.

## V.    QUALIFIED BIDDERS.

No later than 24 hours prior to the commencement of the Auction, the Debtors (in consultation with the Consultation Parties) shall notify each Acceptable Bidder whether such party is a Qualified Bidder.  Promptly upon designating the Qualified Bidders, the Debtors shall provide the adequate  assurance information received from the applicable Qualified Bidder to the Consultation Parties pursuant to such Qualified Bidder's proposed transaction.

If any Bid is determined by the Debtors (in consultation with the Consultation Parties) not to be a Qualified Bid, the Debtors will refund such Acceptable Bidder's Deposit on or before the date that is five (5) Business Days after the Bid Deadline.

The Debtors may accept (in consultation with the Consultation Parties), as a single Qualified Bid, multiple bids for non-overlapping material portions of the Acquired Assets such that, when taken together in the aggregate, such bids would otherwise meet the standards for a single Qualified Bid. The Debtors may permit (in consultation with the Consultation Parties) otherwise Qualified Bidders who submitted bids by the Bid Deadline for less than a substantial (but nevertheless a material) portion of the Acquired Assets but who are not identified as a component of a single Qualified Bid consisting of such multiple bids, to participate in the Auction and to submit *higher or otherwise better* bids that in subsequent rounds of bidding may be considered, together with other bids for non-overlapping material portions of the Acquired Assets, as part of such a single Qualified Bid for overbid purposes. The Debtors (in consultation with the Consultation Parties) may conduct the Auction in any manner to facilitate a sale of all or different subgroupings of the Debtors' assets, including conducting multiple Auctions for different subgroupings of the Debtors' Acquired Assets (each, a "Sub-Auction").

Between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent of the Debtors (in consultation with the Consultation Parties), a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors (in consultation with the Consultation Parties) regarding the ability of such Qualified Bidder to consummate its contemplated transaction. Failure by a Qualified Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors (in consultation with the Consultation Parties) to determine that such bidder is no longer a Qualified Bidder or that a bid made by such bidder is not a Qualified Bid.

Notwithstanding anything to the contrary herein, the Stalking Horse Bidder is deemed to be a Qualified Bidder, and the Stalking Horse Bid shall be deemed to be a Qualified Bid, such that the Stalking Horse Bidder shall not be required to submit an additional Qualified Bid.

## VI.    RIGHT TO CREDIT BID.

Any Qualified Bidder who has a valid and perfected lien on any Acquired Assets of the Debtors' estates (a "Secured Creditor") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy

Code; provided that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured.

Notwithstanding anything to the contrary contained herein, the Prepetition Secured Creditors shall have the right to credit bid all or any portion of the aggregate amount of their applicable outstanding secured obligations pursuant to section 363(k) of the Bankruptcy Code, and any such credit bid will be considered a Qualified Bid to the extent such bid is received by the Bid Deadline and complies with section 363(k) of the Bankruptcy Code; *provided that* a credit bid shall not constitute a Qualified Bid if the bid does not (a) include a cash component sufficient to pay in full, in cash, all claims for which there are valid, perfected, and unavoidable liens on any assets included in such Bid that are senior in priority to those of the party seeking to credit bid (unless such Secured Creditor consents to alternative treatment) or (b) comply with the terms of the priority scheme contained in the Credit Agreement and the Bidding Procedures Order.

## VII.    THE AUCTION.

If the Debtors receive a Qualified Bid (other than the Stalking Horse Bid), the Debtors shall conduct the Auction to determine the Successful Bidder with respect to the Acquired Assets or portion of the Acquired Assets.  If one or more Qualified Bid(s) exist for acquiring specific sub-groups of the Debtors' Acquired Assets, then the Debtors may, in the exercise of their reasonable business judgment (in consultation with the Consultation Parties), first conduct a Sub-Auction for each of the businesses or Acquired Assets that has at least one Qualified Bid pursuant to the Bid Procedures.  If the Debtors do not receive a Qualified Bid (other than the Stalking Horse Bid), the Debtors will not conduct the Auction and will designate the Stalking Horse's Qualified Bid as the Successful Bid.

No later than 24 hours prior to the commencement of the Auction or specific Sub-Auction, the Debtors will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, as determined in the Debtors' reasonable business judgment (in consultation with the Consultation Parties) (the "<u>Baseline Bid</u>"), and provide copies of the Bid Documents supporting the Baseline Bid to all Qualified Bidders.  The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors (in consultation with the Consultation Parties) reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things:  (a) the number, type, and nature of any changes to the Stalking Horse APA requested by the Qualified Bidder, including the type and portion of the Acquired Assets sought and Assumed Liabilities to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Bidder's ability to close the proposed Sale Transaction(s), the conditions thereto, and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transactions contemplated by the Bid Documents; and (e) the tax consequences of such Qualified Bid (collectively, the "<u>Bid Assessment Criteria</u>").

The Auction shall take place at **[●] (prevailing Eastern Time) on August 10, 2020**, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or such later date, time and location as designated by the Debtors (in consultation with the

Consultation Parties), after providing notice to the Notice Parties. In the event that the Auction cannot be held at a physical location, the Auction will be conducted via a virtual meeting. The Debtors shall have the right to conduct any number of Auctions on that date, if the Debtors determine, in their reasonable business judgment (in consultation with the Consultation Parties), that conducting such Auctions would be in the best interests of the Debtors' estates.

## A.    Participants and Attendees.

The Debtors and their advisors shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a written transcript of the Auction and of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid (defined below).

Only Qualified Bidders that have submitted Qualified Bids by the Bid Deadline are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors (in consultation with the Consultation Parties) in accordance with these Bidding Procedures. Qualified Bidders participating in the Auction must appear in person (or through a duly authorized representative), telephonically, or through a video teleconference. The Auction will be conducted openly and all creditors may be permitted to attend; *provided* that the Debtors may (in consultation with the Consultation Parties) establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany each Qualified Bidder or creditor at the Auction. Any creditor and its advisors wishing to attend the Auction may do so by contacting, no later than three (3) Business Days prior to the start of the Auction, the Debtors' advisors; *provided that* the Ad Hoc Group Advisors shall be permitted to attend the Auction without any prior notice to the Debtors' advisors.

Each Qualified Bidder participating in the Auction will be required to confirm in writing and on the record at the Auction that (i) it has not engaged in any collusion with respect to the submission of any bid or the Auction and (ii) each Qualified Bid it submits at the Auction is a binding, good faith and bona fide offer to purchase the Acquired Assets identified in such bid.

## B.    Auction Procedures.

The Auction or Sub-Auction shall be governed by the following procedures, subject to the Debtors' right to modify such procedures in their reasonable business judgment (in consultation with the Consultation Parties), and upon approval by the Purchaser pursuant to the Stalking Horse APA:

1.    ***Baseline Bids.*** Bidding shall commence at the amount of the Baseline Bid.

2.    ***Minimum Overbid.*** Qualified Bidders may submit successive bids higher than the previous bid, based on and increased from the Baseline Bid for the relevant Acquired Assets (each such bid, an "Overbid"). Any Qualified Bidder's initial Overbid shall be made in increments of at least $5,000,000 in cash, cash equivalents, or such other consideration that the Debtors deem equivalent (in

consultation with the Consultation Parties).  The Debtors may, in their reasonable business judgment (in consultation with the Consultation Parties), announce increases or reductions to initial or subsequent Overbids at any time during the Auction or specific Sub-Auction.

3.   **Highest or Best Offer.**  After the first round of bidding and between each subsequent round of bidding, the Debtors (in consultation with the Consultation Parties) shall announce the bid that they believe in their reasonable business judgment to be the highest or otherwise best offer for the relevant Acquired Assets (the "Leading Bid") and describe the material terms thereof.  Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge of the Leading Bid. To the extent not previously provided (which is determined by the Debtors), a Qualified Bidder submitting a subsequent bid must submit, as part of its subsequent bid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) demonstrating such Qualified Bidder's ability to close the transaction at the Purchase Price contemplated by such subsequent bid.

4.   **Rejection of Bids.**  The Debtors may, in their reasonable business judgment (in consultation with the Consultation Parties) reject, at any time before entry of an order of the Court approving a Qualified Bid, any bid that the Debtors determine is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders.

5.   **No Round-Skipping**.   Round-skipping, as described herein, is explicitly prohibited.  To remain eligible to participate in the Auction or specific Sub-Auction for a particular Acquired Assets, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtors in their reasonable business judgment (in consultation with the Consultation Parties), such Qualified Bidder shall be disqualified from continuing to participate in the Auction for such Acquired Assets; *provided* that with the consent of the Consultation Parties, the Debtors may adopt and utilize the Auction procedures other than the foregoing procedure for any round of bidding.

6.   **Additional Information**.   The Debtors (in consultation with the Consultation Parties) shall have the right to request any additional financial information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors

believe is reasonably necessary to clarify and evaluate any bid made by a Qualified Bidder during the Auction or Sub-Auction.

7.  ***Modification of Procedures.*** The Debtors may announce, at the Auction, modified or additional procedures for conducting the Auction or otherwise modify these Bidding Procedures *provided*, that at no point may the form of currency be in a form other than cash unless a hybrid offer is made that provides for sufficient cash to pay the term loans off in cash at par plus any accrued interest and any applicable fees. All such modifications and additional rules will be communicated in advance to each of the Consultation Parties, Prospective Bidders, and Qualified Bidders; *provided*, that, to the extent such modifications occur at the Auction, disclosure of such modifications shall be limited to those in attendance at the Auction.

The Auction or specific Sub-Auction shall include open bidding in the presence of all other Qualified Bidders. All Qualified Bidders shall have the right to submit additional bids and make modifications to any prior Qualified Bid or Overbid at the Auction to improve their bids; *provided* that any Overbid made by a Qualified Bidder (including with respect to any Backup Bid (defined below)) must remain open and binding on the Qualified Bidder until the earlier of (a) the closing of a Sale Transaction for the applicable Acquired Assets pursuant to the Successful Bid and (b) 45 days after the date of the Sale Hearing, unless otherwise decided (in consultation with the Consultation Parties). The Debtors may, in their reasonable business judgment (in consultation with the Consultation Parties), negotiate with any and all Qualified Bidders participating in the Auction or specific Sub-Auction.

## C.    Adjournment of the Auction.

The Debtors reserve the right, in their reasonable business judgment (in consultation with the Consultation Parties), to adjourn the Auction one or more times to, among other things, (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt or equity funding commitments to consummate the proposed Sale Transaction(s) at the prevailing bid amount.

## D.    Successful Bidder.

Immediately prior to the conclusion of the Auction or specific Sub-Auction, the Debtors shall (i) determine (in consultation with the Consultation Parties) consistent with these Bidding Procedures, which bid constitutes the highest or otherwise best bid(s) for the applicable Acquired Assets (each such bid, a "Successful Bid"); and (ii) notify all Qualified Bidders at the Auction for the applicable Acquired Assets of the identity of the bidder that submitted the Successful Bid (each such bidder, the "Successful Bidder") and the amount of the purchase price and other material terms of the Successful Bid.

The Debtors shall file a notice identifying the Successful Bidder and Backup Bidder (if selected) by 5:00 p.m. (prevailing Eastern Time) as soon as reasonably practicable after closing the Auction, if any, and in any event not less than 24 hours following closing the Auction.

## VIII.    BACKUP BIDDER.

Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction or Sub-Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid as compared to the Successful Bid at the Auction or Sub-Auction for the Acquired Assets or sub-group thereof, as determined by the Debtors in the exercise of their reasonable business judgment (in consultation with the Consultation Parties) (the "Backup Bid"), shall be required to serve as a backup bidder (the "Backup Bidder"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated.  In the case of the Stalking Horse Bidder, it shall agree to serve as the Backup Bidder only to the extent provided in Sections 5.1(e) and 8.1(h) of the Stalking Horse APA.

The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors at the conclusion of the Auction or relevant Sub-Auction at the same time the Debtors announce the identity of the Successful Bidder.

The Backup Bid shall remain binding on the Backup Bidder until the earlier of (a) the closing of a Sale Transaction for the applicable Acquired Assets pursuant to the Successful Bid and (b) 45 days after the date of the Sale Hearing, unless otherwise decided.  If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.

The Debtors will be authorized, but not required, to consummate (in consultation with the Consultation Parties) all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.

## IX.    ACCEPTANCE OF SUCCESSFUL BID

The Debtors' presentation of a particular Qualified Bid to the Court for approval does not constitute the Debtors' acceptance of such Qualified Bid.  The Debtors will be deemed to have accepted a Bid only when the Bid has been approved by the Court at the Sale Hearing (defined below).  The Debtors shall seek approval by the Court to consummate the Backup Bid, solely in the event the Successful Bidder fails to close the transaction as provided in the Successful Bid and with all rights reserved against the Successful Bidder.

## X.    FREE AND CLEAR OF ANY AND ALL ENCUMBRANCES

All rights, titles and interests in and to the Acquired Assets subject thereto shall be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the "Encumbrances"), subject only to the Assumed Liabilities and Permitted Encumbrances (each as defined in the Stalking Horse APA or in another Successful Bidder's purchase agreement), if any, in accordance with Bankruptcy Code section 363(f), with such Encumbrances to attach to the net proceeds (if any) received by the Debtors from the Sale of the Acquired Assets in accordance with the Bankruptcy Code, applicable non-bankruptcy law and any prior orders of the Court.

## XI.    NOTICE PARTIES.

The term "Notice Parties" as used in these Bidding Procedures shall mean (i) Wilmer Cutler Pickering Hale and Dorr LLP, as counsel to Wilmington Savings Fund Society, FSB (in its capacity as successor administrative agent under the Term Loan Credit Agreement, or any of its predecessors or successors (the "Term Loan Agent") to the Debtors' term loan lenders' party to that certain Term Loan Agreement, dated as of April 17, 2014 (as the same shall have been amended, supplemented, or otherwise modified from time to time), among Akorn Inc., the Loan Parties (as defined in the Term Loan Agreement) and the lenders from time to time party thereto (the "Term Loan Lenders"), (ii) Gibson, Dunn & Crutcher, LLP, as counsel to the ad hoc group of the Debtors' Term Loan Lenders (the "Ad Hoc Group"), Young Conaway Stargatt & Taylor as co-counsel to the Ad Hoc Group, and Greenhill & Co. LP, as financial advisor to the Ad Hoc Group (collectively, the "Ad Hoc Group Advisors"), (iii) the U.S. Trustee for the District of Delaware, and (iv) counsel to any official committee appointed in these Chapter 11 Cases.

## XII.    CONSULTATION BY THE DEBTORS

The Debtors shall consult with the Consultation Parties (as defined below) as explicitly provided for in these Bidding Procedures.  Each reference in these Bidding Procedures to "consultation" (or similar phrase) with the consultation Parties shall mean consultation in good faith.  The following parties will constitute the "Consultation Parties":  (a) the Ad Hoc Group (including the Ad Hoc Group Advisors); and (b) counsel to any official committee appointed in these Chapter 11 Cases.  Notwithstanding anything to the contrary herein, during any period in which a Consultation Party (i) has submitted a Qualified Bid and has become a Qualified Bidder hereunder, or (ii) submits (or indicates its intent to submit) a Credit Bid, such Consultation Party shall no longer be considered a Consultation Party for purposes of these Bidding Procedures unless and until such party unequivocally revokes its bid and waives its right to continue in the Auction process.

## XIII.    RESERVATION OF RIGHTS.

**The Debtors reserve the right to, in their reasonable business judgment (in consultation with the Consultation Parties) to modify these Bidding Procedures in good faith, to further the goal of attaining the highest or otherwise best offer for the Acquired Assets, or impose, at or prior to selection of the Successful Bidder, additional customary terms and conditions on the Sale of the Acquired Assets, including, without limitation:**

**(a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction (if held) without further notice; (c) adding or modifying procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction and/or adjourning the Sale Hearing (as defined below) in open court (if held); (d) canceling the Auction or electing not to hold an Auction; (e) rejecting any or all Bids or Qualified Bids; (f) adjusting the applicable minimum Overbid increment, including by requesting that Qualified Bidders submit last or final bids on a "blind basis"; and (g) selecting a draft purchase agreement agreed to by a Qualified Bidder in connection with a Qualified Bid to serve as the purchase agreement that will be executed by the Successful Bidder or Successful Bidders, as applicable and with any necessary adjustments for the assets and liabilities being purchased and assumed, upon conclusion of the Auction, if held; *provided*, however, that that any changes to the dates and deadlines set forth herein shall: (i) comply with the milestones agreed upon in the Standstill Agreement or (ii) shall be made only with the consent of the Ad Hoc Group; *provided*, further, that any modification to the form of currency used for payment, prior to the fulfillment of any obligations owed to each of the Term Loan Lenders, shall be made only with the consent of the Ad Hoc Group and not until the Term Loan Lenders are paid off fully in cash.  The Debtors shall provide reasonable notice of any such modification to any Qualified Bidder, including any Stalking Horse Bidders**.

## XIV.    CONSENT TO JURISDICTION.

All Potential Bidders, Acceptable Bidders and Qualified Bidders shall be deemed to have consented to the exclusive jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures, and/or the Bid Documents, as applicable.

## XV.    SALE HEARING.

A hearing to consider approval of the sale of the Debtors' Acquired Assets to the Successful Bidder, Backup Bidder (if applicable), or to approve the Stalking Horse APA if no Auction is held (the "Sale Hearing"), is currently scheduled to take place on **August 20, 2020**, at [●], (prevailing Eastern Time), before the Honorable [●], at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, [●]th Floor, Courtroom No. [●], Wilmington, Delaware 19801.

**The Sale Hearing may be continued to a later date by the Debtors (in consultation with the Consultation Parties) by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder).**

At the Sale Hearing, the Successful Bidder and the Backup Bidder must acknowledge on the record at the start of the hearing that in connection with submitting their Bids, they did not engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids, the Auction or the Sale, specifying that they did not agree with any Potential Bidders, Acceptable Bidders or Qualified Bidders to control the price or any other terms of the Sale.

Objections to the sale of any Acquired Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code to the Successful Bidder(s) and/or a Backup Bidder, as applicable, any of the relief requested in the motion, and entry of any order approving the sale (the "Sale Order") must (i) be in writing and specify the nature of such objection; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and all orders of the Court; and (iii) be filed with the Court and served on the Notice Parties by August 15, 2020 at 4:00 p.m. (prevailing Eastern Time).

## XVI.   FIDUCIARY OUT.

Nothing in these Bidding Procedures will require the board of directors, board of managers, or such similar governing body of a Debtor or non-debtor affiliate to take any action, or to refrain from taking any action, with respect to the Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body reasonably determines in good faith that taking such action, or refraining from taking such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

## XVII.   RETURN OF DEPOSIT.

The Deposit of the Successful Bidder shall be applied to the purchase price of such transaction at closing.  The Deposits for each Qualified Bidder shall be held in one or more accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Stalking Horse Bidder, the Successful Bidder, and the Backup Bidder) on or before the date that is five (5) Business Days after the Auction.  The Stalking Horse Bidder's Deposit shall be returned in accordance with the terms of the Stalking Horse APA.  The Backup Bidder's Deposit shall be held in escrow until the closing of the Sale with the Successful Bidder.  In the event the Successful Bidder fails to close and the Debtors opt to close on the Sale Transaction(s) set forth in the Backup Bid, the Backup Bidder's Deposit shall be applied to the purchase price of such transaction(s) at closing.  In the event of a breach or failure to consummate a Sale by the Successful Bidder or the Backup Bidder, as applicable, the defaulting Successful Bidder's Deposit or Backup Bidder's Deposit, as applicable, shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder or Backup Bidder, as applicable, subject to the terms of the Stalking Horse APA.  For the avoidance of doubt, any forfeited Successful Bidder's Deposit or Backup Bidder's Deposit shall become Collateral of the Term Loan Lenders under the Term Loan Agreement.

*        *        *        *        *

**<u>Exhibit C</u>**

**Stalking Horse APA**

EXECUTION VERSION

---

**ASSET PURCHASE AGREEMENT**

**DATED AS OF MAY 20, 2020**

**BY AND BETWEEN**

**[_____], AS PURCHASER,**

**AND**

**AKORN, INC., AS THE COMPANY,**

**AND**

**THE OTHER SELLERS NAMED HEREIN**

---

# **TABLE OF CONTENTS**

**Page**

ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION
OF ASSUMED LIABILITIES ....................................................................... 1

| | | |
|---|---|---|
| 1.1. | Purchase and Sale of the Acquired Assets | 1 |
| 1.2. | Excluded Assets | 4 |
| 1.3. | Assumption of Certain Liabilities | 6 |
| 1.4. | Excluded Liabilities | 7 |
| 1.5. | Assumption/Rejection of Certain Contracts | 9 |

ARTICLE II CONSIDERATION; PAYMENT; CLOSING ................................... 12

| | | |
|---|---|---|
| 2.1. | Consideration; Payment | 12 |
| 2.2. | Closing | 13 |
| 2.3. | Closing Deliveries by Sellers | 13 |
| 2.4. | Closing Deliveries by Purchaser | 14 |
| 2.5. | Withholding | 15 |

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS ............. 15

| | | |
|---|---|---|
| 3.1. | Organization and Qualification | 15 |
| 3.2. | Authorization of Agreement | 16 |
| 3.3. | Conflicts; Consents | 16 |
| 3.4. | Equity Interests of Non-Debtor Subsidiaries | 17 |
| 3.5. | Financial Statements; Internal Controls; SEC Reports | 18 |
| 3.6. | Real Property. | 19 |
| 3.7. | Title to Property; Sufficiency of Assets. | 21 |
| 3.8. | Insurance | 21 |
| 3.9. | Contracts. | 22 |
| 3.10. | Litigation | 24 |
| 3.11. | Permits; Compliance with Laws | 24 |
| 3.12. | Anti-Corruption and International Trade Compliance | 25 |
| 3.13. | Environmental Matters | 25 |
| 3.14. | Intellectual Property | 26 |
| 3.15. | Tax Matters | 29 |
| 3.16. | Seller Plans | 30 |
| 3.17. | Employees | 32 |
| 3.18. | Affiliate Transactions | 33 |
| 3.19. | Brokers | 33 |
| 3.20. | Inventory | 33 |
| 3.21. | Customers and Suppliers | 34 |
| 3.22. | Product Liability | 34 |
| 3.23. | Health Care Regulatory Matters | 34 |
| 3.24. | Absence of Certain Changes | 37 |

3.25.   Bank Accounts ................................................................................. 40
3.26.   No Other Representations or Warranties .......................................... 40

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER ...................... 40

4.1.    Organization and Qualification ........................................................ 40
4.2.    Authorization of Agreement ............................................................. 40
4.3.    Conflicts; Consents ......................................................................... 41
4.4.    Financing ........................................................................................ 42
4.5.    Brokers ........................................................................................... 42
4.6.    Credit Bid ....................................................................................... 42
4.7.    No Litigation .................................................................................. 42
4.8.    Certain Arrangements ..................................................................... 42
4.9.    Investment Representation; Investigation ........................................ 42
4.10.   No Additional Representations or Warranties .................................. 42

ARTICLE V BANKRUPTCY COURT MATTERS .................................................... 43

5.1.    Bankruptcy Actions. ........................................................................ 43
5.2.    Cure Costs ...................................................................................... 44
5.3.    Sale Order ...................................................................................... 44
5.4.    Sale Free and Clear ......................................................................... 45
5.5.    Approval ......................................................................................... 45

ARTICLE VI COVENANTS AND AGREEMENTS ................................................... 46

6.1.    Conduct of Business of Sellers ........................................................ 46
6.2.    Access to Information ...................................................................... 50
6.3.    Employee Matters ........................................................................... 53
6.4.    Regulatory Matters .......................................................................... 56
6.5.    Antitrust Notification. ..................................................................... 57
6.6.    Reasonable Efforts; Cooperation ..................................................... 59
6.7.    Notification of Certain Matters ........................................................ 59
6.8.    Further Assurances .......................................................................... 60
6.9.    Insurance Matters ........................................................................... 60
6.10.   Receipt of Misdirected Assets ......................................................... 61
6.11.   Acknowledgment by Purchaser ....................................................... 61
6.12.   Directors' and Officers' Indemnification .......................................... 63
6.13.   No Successor Liability ..................................................................... 63
6.14.   Change of Name ............................................................................. 64
6.15.   Excluded Subsidiaries; Cash Repatriation ....................................... 64
6.16.   Communications with Customers and Suppliers .............................. 65
6.17.   Exclusive License ........................................................................... 65
6.18.   Treatment of Contracts ................................................................... 65
6.19.   Retained Privileged Materials ......................................................... 66

ARTICLE VII CONDITIONS TO CLOSING ........................................................... 66

7.1.    Conditions Precedent to the Obligations of Purchaser and Sellers ...................... 66
7.2.    Conditions Precedent to the Obligations of Purchaser ......................................... 67
7.3.    Conditions Precedent to the Obligations of the Company ................................... 68

## ARTICLE VIII TERMINATION ............................................................................................. 68

8.1.    Termination of Agreement ................................................................................... 68
8.2.    Effect of Termination .......................................................................................... 70

## ARTICLE IX TAXES ............................................................................................................... 71

9.1.    Transfer Taxes ..................................................................................................... 71
9.2.    Allocation of Purchase Price ............................................................................... 71
9.3.    Cooperation ......................................................................................................... 72
9.4.    Preparation of Tax Returns and Payment of Taxes ............................................. 72
9.5.    "G" Reorganization ............................................................................................. 73

## ARTICLE X MISCELLANEOUS ............................................................................................ 74

10.1.    Non-Survival of Representations and Warranties and Certain Covenants;
         Certain Waivers ................................................................................................... 74
10.2.    Expenses .............................................................................................................. 75
10.3.    Notices ................................................................................................................. 75
10.4.    Assignment .......................................................................................................... 76
10.5.    Amendment and Waiver ...................................................................................... 77
10.6.    Third Party Beneficiaries .................................................................................... 77
10.7.    Non-Recourse ...................................................................................................... 77
10.8.    Severability ......................................................................................................... 77
10.9.    Construction ........................................................................................................ 78
10.10.   Schedules ............................................................................................................. 78
10.11.   Complete Agreement ........................................................................................... 78
10.12.   Specific Performance ........................................................................................... 79
10.13.   Jurisdiction and Exclusive Venue ....................................................................... 79
10.14.   Governing Law; Waiver of Jury Trial ................................................................. 80
10.15.   Counterparts and PDF ......................................................................................... 80
10.16.   Publicity .............................................................................................................. 81
10.17.   Bulk Sales Laws .................................................................................................. 81
10.18.   No Solicitation ..................................................................................................... 81

## ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS ................. 82

11.1.    Certain Definitions .............................................................................................. 82
11.2.    Index of Defined Terms ....................................................................................... 94
11.3.    Rules of Interpretation ......................................................................................... 96

**INDEX OF EXHIBITS**

EXHIBIT A   FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
            AGREEMENT

EXHIBIT B   FORM OF PATENT ASSIGNMENT AGREEMENT

EXHIBIT C   FORM OF TRADEMARK ASSIGNMENT AGREEMENT

EXHIBIT D   FORM OF BIDDING PROCEDURES ORDER

EXHIBIT E   FORM OF SPECIAL WARRANTY DEED

EXHIBIT F   FORM OF ASSIGNMENT AND ASSUMPTION OF LEASE

EXHIBIT G   WIND-DOWN BUDGET

EXHIBIT H   FORM OF SALE ORDER

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of May 20, 2020, by and among [_____], a Delaware limited liability company ("Purchaser"), Akorn, Inc., a Louisiana corporation (the "Company"), and the Subsidiaries of the Company that are indicated on the signature pages attached hereto (together with the Company, each a "Seller" and collectively "Sellers").  Purchaser and Sellers are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, the Company and the other Sellers intend to file voluntary petitions for relief (collectively, the "Petitions") under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), to be jointly administered for procedural purposes (collectively, the "Bankruptcy Case");

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, Sections 105, 363 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to entry of the Sale Order; and

WHEREAS, the board of directors (or similar governing body) of each Seller has determined that it is advisable and in the best interests of such Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and each has approved the same.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, and intending to be legally bound hereby, Purchaser and Sellers hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES

1.1.    Purchase and Sale of the Acquired Assets.  On the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser or a Designated Purchaser, and Purchaser or a Designated Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to the Acquired Assets as of the Closing, free and clear of all Encumbrances other than Permitted Encumbrances.  "Acquired Assets" means all of the properties, rights, interests and other assets of Sellers as of the Closing of every kind and nature, whether tangible or intangible (including goodwill), real, personal, or mixed, known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, wherever located and whether or not required to be reflected on

1

a balance sheet prepared in accordance with GAAP or specifically referred to in this Agreement, including any such properties, rights, interests, and other assets acquired by Sellers after the date hereof and prior to the Closing in accordance with <u>Section 6.1</u>, including the following properties, rights, interests and other assets of Sellers, but excluding in all cases, the Excluded Assets:

(a)     other than any Excluded Cash, (i) all Cash and Cash Equivalents and (ii) all deposits (including maintenance deposits, customer deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments that have been prepaid by any Seller and are not referenced in <u>Section 1.1(f)</u> or <u>Section 1.1(p)</u>;

(b)     subject to <u>Section 1.5</u>, all Contracts to which any Seller is a party, including the Contracts listed on <u>Schedule 1.1(b)</u>, and all purchase orders (the "<u>Assigned Contracts</u>"), and which schedule may be modified from time to time after the date hereof in accordance with <u>Section 1.5</u>, and, in each case, all rights under any such Assigned Contracts;

(c)     all trade and non-trade accounts receivable, notes receivable, negotiable instruments and chattel paper owned or held, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto, but, in each case, for purposes of this <u>Section 1.1(c)</u>, excluding any intercompany Indebtedness among Sellers and any amounts owing from any Excluded Subsidiary; provided, however, that Acquired Assets shall include the intercompany receivable described on <u>Schedule 1.1(c)</u>;

(d)     other than any Documents whose transfer to Purchaser is prohibited by applicable Law, and subject to <u>Section 1.2(c)</u>, all Documents, including (i) all Regulatory Documentation and Tax Returns (subject to <u>Section 6.2(c)</u> and Sellers' right to retain copies of such Tax Returns) (and any related work papers) relating to the other Acquired Assets or Assumed Liabilities, and (ii) subject to <u>Section 6.2(c)</u> and Sellers' right to retain copies thereof, those prepared or received by or on behalf of any Seller in connection with the sale of the Acquired Assets, this Agreement, or the transactions contemplated hereby, including (A) all records and reports prepared or received by Sellers, any of their respective Affiliates or Advisors in connection with the sale of the Acquired Assets and the transactions contemplated hereby, and (B) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets;

(e)     the Owned Real Property listed on <u>Schedule 1.1(e)</u> (the "<u>Acquired Owned Real Property</u>");

(f)     the Leased Real Property listed on <u>Schedule 1.1(f)</u> (the "<u>Acquired Leased Real Property</u>"), including any Leasehold Improvements and all permanent fixtures, improvements, and appurtenances thereto and including any security deposits or other deposits delivered in connection therewith;

(g)     other than the assets set forth on <u>Schedule 1.1(g)(i)</u>, all tangible assets (including Equipment, accessories, materials, machinery and all other similar items of tangible personal property or capital assets) of Sellers, including any tangible assets of Sellers located at

2

any Acquired Leased Real Property or Acquired Owned Real Property or any location set forth on Schedule 1.1(g)(ii) and any other tangible assets on order to be delivered to any Seller;

(h)    all rights against third parties (including suppliers, vendors, merchants, manufacturers and counterparties to leases, licensees, licensors or of the Company or any of its Subsidiaries arising under or related to any Assigned Contract, other Acquired Asset or Assumed Liability), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (including Tax refunds (i) with respect to the Acquired Assets, except to the extent any anticipated Tax refund is taken into account in reducing the Wind-Down Amount, and/or (ii) arising from the carryback of any net operating loss to a prior taxable year, whenever received, or the amount of any cash with respect to such Tax refund, including any amount received in respect of the federal income Tax refund filings described on Schedule 1.1(h)), Actions, rights of set off, rights of recovery, rights of subrogation, rights of recoupment, rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties or other similar rights, in each case with respect to Assumed Liabilities or arising from the use, ownership, possession, operation, business integration operation, sale or lease of any Acquired Assets;

(i)    to the extent transferrable under applicable Law, all of the rights, interests and benefits accruing under all Permits and Governmental Authorizations, and all pending applications therefor;

(j)    subject to Section 6.15, all shares of capital stock or other equity interests that any Seller owns, directly or indirectly, in the Subsidiaries set forth on Schedule 1.1(j) (the "Acquired Subsidiaries"), including any securities convertible into, or exchangeable or exercisable for, any such shares of capital stock or other equity interests, investments or contributions in the Acquired Subsidiaries;

(k)    the sponsorship of each Assumed Benefit Plan and all right, title and interest in any assets thereof or relating thereto;

(l)    all Company Owned Intellectual Property, all rights to collect royalties and proceeds in connection therewith, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Company Owned Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world;

(m)    all goodwill, payment intangibles and general intangible assets and rights of Sellers;

(n)    all Inventory of Sellers whether or not obsolete or carried on Sellers' books of account, in each case, with any transferable warranty and service rights related thereto;

(o)    all Product Registrations, Registration Information, and all other data and information regarding the development and commercialization of the Products, including all safety and efficacy databases, clinical data, non-clinical data and related books and records;

3

(p)      all credits, prepaid expenses, deferred charges, advance payments, refunds, rights of set-off, rights of recovery, security deposits, prepaid items and duties to the extent related to the other Acquired Assets (including Assigned Contracts) or the Assumed Liabilities;

(q)      except with respect to any Excluded Confidentiality Arrangements, all rights and obligations under non-disclosure, confidentiality, and similar arrangements with (or for the benefit of) employees and agents of Sellers or with third parties (including any non-disclosure, confidentiality agreements or similar arrangements entered into in connection with or in contemplation of the filing of the Bankruptcy Case and the Auction contemplated by the Bidding Procedures Order);

(r)      (i) all Avoidance Actions relating to the Acquired Assets and/or Assumed Liabilities, including actions relating to vendors and service providers that are counterparties to Assigned Contracts or relating to Assumed Liabilities (collectively, the "Acquired Avoidance Actions") and (ii) all rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment existing as of the Closing of any Seller against any Transferred Employee or any employee of any Acquired Subsidiary;

(s)      all insurance benefits, including rights and proceeds, to the extent arising from or relating to any of the Acquired Assets or Assumed Liabilities (including returns and refunds of any premiums paid, or other amounts due back to Sellers, with respect to cancelled policies); and

(t)      except for the Excluded Bank Accounts, all of Sellers' bank accounts.

At any time at least one (1) Business Day prior to the Closing, Purchaser may, in its sole discretion and by written notice to the Company, designate any of the Acquired Assets (other than (A) any purchase orders (except a purchase order entered into in connection with, or otherwise governed by, any Excluded Contract) and any Assumed Benefit Plans, and (B) any Contracts, the treatment of which are the subject of Section 1.5(b)) as additional Excluded Assets, which notice shall set forth in reasonable detail the Acquired Assets so designated.  Purchaser acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to designate any Acquired Assets as Excluded Assets pursuant to the operation of this paragraph.  Notwithstanding any other provision hereof to the contrary, the Liabilities of Sellers under or related to any Acquired Asset designated as an Excluded Asset pursuant to this paragraph will constitute Excluded Liabilities.

1.2.   Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, or convey, and Sellers shall retain all right, title and interest to, in and under the following assets, properties, interests and other interests of such Seller (collectively, the "Excluded Assets"):

(a)      any Excluded Cash, if applicable, and any retainers or similar amounts paid to Advisors or other professional service providers (which amounts shall be taken into account in the Wind-Down Budget and determining the Wind-Down Adjustment Amount);

(b)      each Contract of any Seller that is listed on Schedule 1.2(b), which schedule may be modified from time to time after the date hereof in accordance with Section 1.5 (the "Excluded Contracts");

4

(c)       all Documents (i) to the extent (and solely to the extent) exclusively related to any of the Excluded Assets or Excluded Liabilities; (ii) minute books, organizational documents, stock registers and such other similar books and records of any Seller (excluding, for the avoidance of doubt, the Acquired Subsidiaries) as pertaining to ownership, organization or existence of such Seller (other than Tax Returns described in Section 1.1(d)), or any corporate seal of any Seller (other than an Acquired Subsidiary); or (iii) that any Seller is required by applicable Law to retain; provided that, to the extent not prohibited by applicable Law, Purchaser shall have the right to make copies of such Documents (or any portions thereof);

(d)       all materials, Documents, reports and records of a Seller or any of its Affiliates that are subject to any attorney-client privilege and the transfer of which to Purchaser would result in the waiver of any such privilege ("Retained Privileged Materials");

(e)       without prejudice to Section 6.9, all current and prior director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries under such insurance policies;

(f)       all membership interests or other equity interests of any Seller or any of their respective Subsidiaries (excluding the Acquired Subsidiaries) (the "Excluded Subsidiaries"), or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests of such Excluded Subsidiaries but excluding, for the avoidance of doubt, any investment or contribution described on Schedule 1.2(f);

(g)       other than the Acquired Avoidance Actions, all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment existing as of the Closing of any Seller, in each case, solely to the extent (y) related to any other Excluded Assets or any Excluded Liabilities and (z) not against any Transferred Employee or employee of any Acquired Subsidiary;

(h)       Sellers' claims or other rights under this Agreement, including the right to be paid the Purchase Price hereunder at the Closing in accordance with the terms hereof, or Sellers' rights under any agreement, certificate, instrument, or other document executed and delivered between any Seller and Purchaser in connection with the transactions contemplated hereby entered into on or after the date hereof;

(i)       subject to Section 1.1(h), all Tax attributes that are not transferred by the operation of applicable Tax Law;

(j)       all real estate and all interests in real estate (including any Leasehold Improvements thereon), other than the Acquired Owned Real Property and the Acquired Leased Real Property (including, for the avoidance of doubt, any Leasehold improvements thereon);

(k)       every asset of Sellers that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) in compliance with the terms and conditions of this Agreement (including Section 6.1) or (ii) if Purchaser otherwise agrees, in writing after the date hereof, to such conveyance or other disposition;

5

(l)    the tangible assets (including Equipment, accessories, materials, machinery and all other similar items of tangible personal property or capital assets) of Sellers expressly set forth on Schedule 1.1(g)(i);

(m)    any Excluded Confidentiality Arrangements, if applicable;

(n)    the Excluded Bank Accounts (but not, for the avoidance of doubt, any Cash and Cash Equivalents, or any other property or assets, held or deposited in such Excluded Bank Accounts other than Excluded Cash, if any);

(o)    any asset, property, interest or other interest of a Seller which is an Excluded Asset by operation of Section 6.15; and

(p)    the properties and assets set forth on Schedule 1.2(p).

1.3.    Assumption of Certain Liabilities.  On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, Purchaser or a Designated Purchaser shall assume from Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall convey, transfer, and assign to Purchaser or a Designated Purchaser, only the following Liabilities (and no other Liabilities, which other Liabilities shall be retained by Sellers), without duplication and only to the extent not paid, performed, discharged or otherwise satisfied prior to the Closing (collectively, the "Assumed Liabilities"):

(a)    all Liabilities of Sellers arising from the Assigned Contracts, solely to the extent arising from periods occurring after the Closing and excluding, for the avoidance of doubt, any Liabilities contemplated by Section 1.4(e);

(b)    all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs");

(c)    all Liabilities arising out of the ownership or operation of the Acquired Assets, in each case, by Purchaser solely to the extent arising from periods occurring after the Closing and excluding, for the avoidance of doubt, any Liabilities contemplated by Section 1.4(e);

(d)    all (i) accrued trade and non-trade payables, (ii) open purchase orders (except a purchase order entered into in connection with, or otherwise governed by, any Excluded Contract), (iii) Liabilities arising under drafts or checks outstanding at Closing, (iv) accrued royalties, (v) accrued compensation, employee expenses and benefits in each case for Transferred Employees, but excluding workers' compensation claims for injuries occurring prior to the Closing, and (vi) all Liabilities arising from rebates, returns, recalls, chargebacks, coupons, discounts, failure to supply claims and similar obligations, in each case, to the extent (and solely to the extent) (x) incurred in the Ordinary Course and otherwise in compliance with the terms and conditions of this Agreement (including Section 6.1) and (y) not arising under or otherwise relating to any Excluded Asset;

(e)    Assumed Taxes;

6

(f)    subject to Section 6.15, the sponsorship of, and all Liabilities at any time arising under, pursuant to or in connection with, the Seller Plans (the "Assumed Benefit Plans"), and all Liabilities for compliance with the requirements of Section 4980B of the Code with respect to all individuals who are "M&A qualified beneficiaries" as such term is defined in Treasury Regulations §54.4980B-9;

(g)    to the extent, and solely to the extent, arising from Purchaser's failure to comply with Section 6.3, all Liabilities related to Purchaser's selection of employees, including any failure to extend offers of employment, pursuant to Section 6.3 and any Liabilities for severance or under the WARN Act, in each case, that (i) constitute bankruptcy administrative expenses of Sellers and (ii) result from or arise out of Purchaser's failure to make an offer of employment to any employees or any Sellers' subsequent termination of such employee's employment in connection with or following the Closing;

(h)    all Liabilities owing to any Subsidiary of the Company, other than to an Excluded Subsidiary;

(i)    Liabilities arising under Section 503(b)(9) of the Bankruptcy Code;

(j)    all Liabilities and obligations of Sellers for compliance with ISRA at the Acquired Leased Real Property in New Jersey; and

(k)    all Liabilities, if any, set forth on Schedule 1.3(k).

The assumption by Purchaser (or a Designated Purchaser) of any Assumed Liability shall not, in any way, expand the rights of any third party relating thereto.

1.4.    Excluded Liabilities.  Purchaser and the Designated Purchaser(s) (if any) shall not assume and shall not be deemed to have assumed, nor shall be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Sellers or relating to the Acquired Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing prior to or on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities, and Sellers shall be solely and exclusively liable for any and all such Liabilities, including those Liabilities set forth below (collectively, the "Excluded Liabilities"):

(a)    except to the extent of any Liabilities expressly assumed pursuant to Section 1.3, all Liabilities arising out of, relating to or otherwise in respect of the Acquired Assets or the operation of the business of Sellers arising on or prior to the Closing;

(b)    all Liabilities to the extent relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(c)    except to the extent of any Liabilities expressly assumed pursuant to Sections 1.3(d)(v), 1.3(g), and 1.3(i) and without prejudice to Section 6.3, any and all Liabilities

in respect of the Excluded Contracts and any other Contracts to which any Seller is party or is otherwise bound that are not Assigned Contracts;

(d)    except to the extent of any Liabilities expressly assumed pursuant to Sections 1.3(d) or 1.3(h), any and all Liabilities of Sellers for Indebtedness;

(e)    all Liabilities arising from or related to any Action (whether civil, criminal, administrative, investigative, or informal) against the Company or any of its Subsidiaries (including, for the avoidance of doubt, any Action related to fraud, breach of fiduciary duty, misfeasance or under any other theory relating to conduct, performance or non-performance of the Company or any of its Subsidiaries, or any of their respective directors, officers, or employees), or related to the Acquired Assets or the Assumed Liabilities, pending or threatened or having any other status or with respect to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing Date (including any breach, default, failure to perform, torts related to performance, violations of Law, infringements or indemnities, guaranties and overcharges, underpayments or penalties, whether in respect of any Contract, agreement, arrangement, promise or understanding of any kind), including any successor liability claims or that may be owed to or assessed by, any Governmental Body or other Person, and whether commenced, filed, initiated, or threatened prior to, on or following the Closing;

(f)    except to the extent of any Liabilities expressly assumed pursuant to Section 1.3(g) and without prejudice to Sections 10.2, 6.3 or 1.3(b), all costs and expenses incurred or to be incurred by Sellers in connection with the drafting, preparation, negotiation, diligence, execution, and performance of this Agreement and the consummation of the transactions contemplated hereby;

(g)    except to the extent of any Liabilities expressly assumed pursuant to Sections 1.3(d), 1.3(f), or 1.3(g) and without prejudice to Section 6.3, all Liabilities related to any current or former employee of the Company or of any Subsidiary of the Company (other than all Liabilities related to the Transferred Employees arising on or after the date such applicable Employee becomes a Transferred Employee, including under the WARN Act);

(h)    all Liabilities for any Taxes (including Taxes payable by reason of contract, assumption, transferee or successor Liability, operation of Law, pursuant to Treasury Regulations Section 1.1502-6 (or any similar provision of any state or local law) or otherwise: (i) arising or relating to any Pre-Closing Tax Period (including any Straddle Period Taxes), (ii) owed by any of Sellers (whether or not relating to a Pre-Closing Tax Period), including pursuant to any Tax sharing, Tax indemnity or similar agreement or arrangement to which any Seller (or any Affiliate thereof) is obligated under or a party to, (iii) arising in connection with the consummation of the transactions contemplated by this Agreement, and (iv) Taxes arising from or in connection with an Excluded Asset), in each case, other than to the extent such Tax is an Assumed Tax;

(i)    except to the extent of any Liabilities expressly assumed pursuant to Sections 1.3(d) or 1.3(f) and without prejudice to Section 6.3, all Liabilities arising out of, relating to, or with respect to any and all Employees and contractors of the Company or any of its Subsidiaries arising at any time on or prior to the Closing;

8

(j)        except to the extent of any Liabilities expressly assumed pursuant to <u>Section 1.3(f)</u> and without prejudice to <u>Sections 1.5</u> or <u>6.3</u>, all Liabilities of Sellers arising out of any Contract, agreement, Permit, franchise or claim that is not transferred to Purchaser as part of the Acquired Assets or, is not transferred to Purchaser because of any failure to obtain any Consent or Governmental Authorization required for such transfer;

(k)        subject to <u>Section 1.3(j)</u>, all Liabilities of Sellers arising under or pursuant to Environmental Laws, including with respect to any real property owned, operated, leased or otherwise used by Sellers, whether or not used in the Ordinary Course, including any Liabilities for noncompliance with Environmental Laws or the Release of Hazardous Substances, to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the Closing, whether known or unknown as of the Closing;

(l)        drafts or checks outstanding as of the Closing (except to the extent expressly stated as an Assumed Liability in <u>Section 1.3(d)</u>); and

(m)        all Liabilities set forth on <u>Schedule 1.4(m)</u>.

Purchaser hereby acknowledges and agrees that no Liability of any Non-Debtor Subsidiary shall be an Excluded Liability and that all Liabilities of any Non-Debtor Subsidiary as of the Closing shall continue to be the Liabilities of such Non-Debtor Subsidiary following the Closing; <u>provided</u>, and notwithstanding the foregoing provisions of this sentence to the contrary, Sellers hereby acknowledge and agree that any Liability of an Excluded Subsidiary (other than Sellers) shall, at and following the Closing, not be an Assumed Liability.

1.5.    <u>Assumption/Rejection of Certain Contracts</u>.

(a)        <u>Assumption and Assignment of Executory Contracts</u>.  <u>Schedule 1.5(a)</u> sets forth a list of all executory Contracts (including all Leases with respect to Leased Real Property) to which, to the Knowledge of Sellers, one or more Sellers are party or to which any of their assets are bound and which are to be included in the Assigned Contracts.  From time to time, and as reasonably requested by Purchaser, Sellers shall update <u>Schedule 1.5(a)</u>.  Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired leases that are Assigned Contracts and take all other actions necessary or otherwise required to cause such Contracts to be assumed by Sellers and assigned to Purchaser or any other Designated Purchaser pursuant to Section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts as of the Closing (including (x) serving on all non-Seller counterparties to all of their Contracts a notice specifically stating that Sellers are or may be seeking the assumption and assignment of such Contract(s) and of the deadline for objecting to the Cure Costs or any other aspect of the proposing assumption and assignment of their Contracts to Purchaser and (y) taking, as promptly as practicable, all other actions reasonably requested by Purchaser to facilitate any negotiations with the counterparties to such Assigned Contracts and to obtain an Order, including a finding that the proposed assumption and assignment of the Assigned Contracts to Purchaser satisfies all applicable requirements of Section 365 of the Bankruptcy Code).  The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, Sellers shall assign or cause to be assigned to Purchaser or a Designated Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate

description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, a notice filed in connection with the motion for approval of the Sale Order or a separate motion for authority to assume and assign such Assigned Contracts.  Such exhibit shall also set forth Sellers' good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Sellers based on Sellers' books and records or as otherwise determined by the Bankruptcy Court.  At the Closing and subject to the last paragraph of <u>Section 1.1</u> and <u>Section 1.5(b)</u>, Sellers shall, pursuant to the Sale Order, and the Assignment and Assumption Agreement(s), assume and assign to Purchaser or a Designated Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by any such Seller to Purchaser or a Designated Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code.  At the Closing, Purchaser (i) shall pay all Cure Costs and (ii) shall, assume or cause to be assumed, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform (or cause to be fully satisfied, discharged and performed) all of the obligations (other than any Excluded Liabilities) that are Assumed Liabilities under each Assigned Contract pursuant to Section 365 of the Bankruptcy Code and the Assignment and Assumption Agreements, as applicable.

(b)      <u>Excluding or Adding Assigned Contracts Prior to Closing</u>.   Without prejudice to <u>Section 6.18(a)</u>, Purchaser shall have the right to notify Sellers in writing of any Assigned Contract (other than any purchase order, unless such purchase order was (x) entered into in connection with, or is otherwise governed by, any Excluded Contract, or (y) entered into in breach of this Agreement after the date hereof) that it does not wish to assume or a Contract to which any Seller is a party that Purchaser wishes to add as an Assigned Contract up to one (1) Business Day prior to the Closing and (i) any such previously considered Assigned Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed added to the Schedules related to Excluded Contracts, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by Sellers to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price.  Purchaser may request, in its reasonable business judgment, certain modifications and amendments to any Contract as a condition to such Contract becoming an Assigned Contract, and Sellers shall use their reasonable best efforts to obtain such modifications or amendments; <u>provided</u>, <u>however</u>, that, for so long as Sellers use their reasonable best efforts to obtain such modifications or amendments, the failure to obtain any such modifications or amendments shall, in and of itself, not be a condition to Purchaser's obligation to consummate the transactions contemplated by this Agreement on the Closing Date.  All reasonable and documented costs and expenses payable prior to Closing in connection with transferring any Assigned Contracts as contemplated by this Agreement (other than the Cure Costs) shall be borne by Sellers.

(c)      <u>Non-Assignment</u>.  Notwithstanding the foregoing, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract (1) expires by its terms on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder or (2) requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the

sale or transfer to Purchaser of the applicable Seller's rights under such Contract in accordance with applicable Law, and such Consent or Governmental Authorization has not been obtained. In the event that any Contract that would otherwise have been assigned to Purchaser or a Designated Purchaser is deemed not to be assigned pursuant to clause (ii) of the first sentence of this Section 1.5(c), the Closing shall, subject to the satisfaction of the conditions set forth in Article VII, nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earliest of (w) such time as such Consent or Governmental Authorization is obtained, (x) the expiration of the term of such Contract in accordance with its current term, (y) the execution of a replacement Contract by Purchaser or a Designated Purchaser and (z) the closing of the Bankruptcy Case, Sellers and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to any such Assigned Contract, under which (1) Purchaser shall receive the claims, rights, remedies and benefits under, or arising pursuant to, the terms of such Assigned Contract with respect to which the Consent and/or Governmental Authorization has not been obtained and (2) subject to receiving any such claims, rights, remedies and benefits, Purchaser shall thereafter assume and bear all Assumed Liabilities with respect to such Assigned Contract from and after the Closing (as if such Assigned Contract had been transferred to Purchaser as of the Closing) in accordance with this Agreement (including by means of any subcontracting, sublicensing or subleasing arrangement). Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Assigned Contract after the Closing, such Assigned Contract shall promptly be transferred and assigned to Purchaser or a Designated Purchaser in accordance with the terms of this Agreement, the Sale Order and the Bankruptcy Code, and otherwise without any further additional consideration. Without limitation of the foregoing, prior to the Closing, Sellers shall cooperate with Purchaser in connection with obtaining any Consent, including by providing Purchaser reasonable access to and facilitating discussions with the applicable counterparties (provided Purchaser shall provide Sellers a reasonable opportunity to consult with Purchaser, and, if reasonably practicable, an opportunity to be present (but not participate) at any meeting) in respect of such Consents, and shall use reasonable best efforts to assist Purchaser with obtaining such Consents as promptly as practicable after the date hereof and prior to the Closing.

(d)     With respect to any Permit(s) reasonably required to operate the business of Sellers, Sellers shall, and shall cause their Subsidiaries to, use reasonable best efforts to obtain or cause to be obtained or made any Consent or Governmental Authorization required to sell, assign, transfer or convey such Permits at the Closing, and Purchaser shall provide reasonable cooperation to Sellers and their Subsidiaries in connection therewith as reasonably requested by Sellers, in each case to the extent obtaining or making any such Consent or Governmental Authorization is allowed to occur prior to the Closing pursuant to applicable Law. If any such Consent or Governmental Authorization is not obtained prior to the Closing, then, until the earlier of such time as (i) such Consent or Governmental Authorization is obtained by Sellers, (ii) Purchaser separately obtains any such Permit (sufficient to conduct the business of the Company and its Subsidiaries in the Ordinary Course) and (iii) the closing of the Bankruptcy Case, Sellers shall, and shall cause their respective Subsidiaries to continue to, use reasonable best efforts to obtain, or cause to be obtained, such Consent or Governmental Authorization, and Purchaser shall provide reasonable cooperation to Sellers, subject to any approval of the Bankruptcy Court that may be required, and Sellers shall,

11

and shall cause their Subsidiaries to enter into an arrangement reasonably acceptable to Purchaser intended to both (x) provide Purchaser, to the fullest extent not prohibited by applicable Law, the claims, rights, remedies and benefits under, and pursuant to, such Permit(s) and (y) cause Purchaser, subject to Purchaser receiving such claims, rights, remedies and benefits, to assume and bear all Assumed Liabilities with respect to such Permits from and after the Closing (as if such Permit had been transferred to Purchaser as of the Closing) in accordance with this Agreement (including by means of any subcontracting, sublicensing or subleasing arrangement).  Upon obtaining the relevant Consent or Governmental Authorization, each Seller shall, and shall cause any of its applicable Subsidiaries to, promptly sell, convey, assign, transfer and deliver to Purchaser such Permit for no additional consideration.  All reasonable and documented costs and expenses payable prior to Closing in connection with transferring any Permits as contemplated by this Agreement shall be borne by Sellers.

## ARTICLE II

## CONSIDERATION; PAYMENT; CLOSING

2.1.    <u>Consideration; Payment</u>.

(a)    The aggregate consideration (collectively, the "<u>Purchase Price</u>") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities, (ii) the credit bid of 100% of the Loan Agreement Indebtedness (the "<u>Credit Bid Amount</u>") (such portion of the Purchase Price, the "<u>Credit Bid Portion</u>") which amount shall be satisfied by discharging all Loan Agreement Indebtedness pursuant to section 363(k) of the Bankruptcy Code and (iii) an amount in cash equal to the amount set forth opposite "Total Wind-Down Budget Amount" in the Wind-Down Budget (the "<u>Wind-Down Amount</u>").  At the Closing, in lieu of paying all or any portion of the Wind-Down Amount, Purchaser may, by delivery of a written notice to Sellers at least two (2) Business Days prior to the Closing Date, instruct Sellers to retain a portion of, and not to exceed, the cash expected to be actually held at Closing by Sellers (net of written but uncashed checks) in an amount set forth in such notice and such cash shall constitute "Excluded Cash" hereunder and reduce, on a dollar for dollar basis, the Wind-Down Amount to be paid by Purchaser at the Closing.

(b)    In accordance with <u>Section 2.1(a)</u>, Purchaser shall satisfy the Purchase Price at the Closing as to the Credit Bid Portion by discharging Sellers, and Sellers shall be deemed to be discharged, from the Loan Agreement Indebtedness in an aggregate amount equal to the Credit Bid Amount (for the avoidance of doubt, any Encumbrance and security interest of Purchaser on any asset of Sellers that is not an asset being purchased by Purchaser pursuant to this Agreement shall not be released and will continue to secure the remaining outstanding amount of the Loan Agreement Indebtedness).

(c)    Notwithstanding anything to the contrary in this Agreement, to the extent that the actual amount paid by Sellers to wind down the bankruptcy estate of Sellers for the aggregate amount of any (i) claims asserted pursuant to Section 503(b)(9) of the Bankruptcy Code, (ii) Taxes, (iii) fees and expenses of professionals engaged by Sellers, or (iv) other amounts contemplated by the Wind-Down Budget (including administrative and priority claims not assumed by Purchaser), in each case, to the extent set forth therein and, in each case, whether due

to settlement or otherwise is less than the Wind-Down Amount (the amount of such difference, the "Wind-Down Adjustment Amount"), the Purchaser shall be entitled to receive the Wind-Down Adjustment Amount, and, promptly following the determination of such amount (and in no event later than two (2) Business Days following such determination), Sellers shall deliver, or cause to be delivered, to Purchaser an aggregate amount equal to the Wind-Down Adjustment Amount in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Purchaser.

2.2.    Closing.  The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 300 North LaSalle, Chicago, Illinois 60654) at 8:00 a.m. Chicago time on the third (3rd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree in writing.  The date on which the Closing actually occurs is referred to herein as the "Closing Date."

2.3.    Closing Deliveries by Sellers.  At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)    a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by Sellers;

(b)    a short-form patent assignment agreement substantially in the form of Exhibit B, duly executed by Sellers;

(c)    a short-form trademark assignment agreement substantially in the form of Exhibit C, duly executed by Sellers;

(d)    an assignment and assumption of lease for the leases related to the Acquired Leased Real Property (the "Acquired Leases") substantially in the form of Exhibit F (the "Assignment and Assumption of Lease"), duly executed by Sellers;

(e)    each Seller (or, if a Seller is a disregarded entity within the meaning of Treasury Regulations Section 1.1445-2(b)(2)(iii) the entity that is treated as the transferor of the relevant Acquired Assets) shall deliver a certificate to Purchaser satisfying the requirements of Treasury Regulations Section 1.1445-2(b);

(f)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the Company certifying that the conditions set forth in Sections 7.2(a), 7.2(b) and 7.2(c) have been satisfied;

(g)    a special warranty deed (or general warranty deed if it is customary for a commercial seller to deliver a general warranty deed in any jurisdiction in which Acquired Owned Real Property is located) without any covenants by Sellers substantially in the form of Exhibit E

for each Acquired Owned Real Property, in each case (i) in proper form for recordation or equivalent in accordance with applicable Law, (ii) sufficient to vest in Purchaser good and marketable title in, and fee simple ownership of, each Acquired Owned Real Property, subject only to the Permitted Encumbrances, together with (iii) any certificates, affidavits, forms and such other documents reasonably requested by Purchaser that are customary for presentation or submission when transferring real property or recording deeds in jurisdictions where the Acquired Owned Real Property is located (without expanding or supplementing any of the representations and warranties hereunder or Purchaser's remedies with respect thereto, except as customarily required by title insurance companies in connection with the transfer of and insuring title to, in each applicable jurisdiction, commercial real estate or interests therein);

(h)     such customary affidavits and indemnities as Purchaser's title insurance company may reasonably require (including a so-called gap indemnity) in order to issue at the Closing owner's (and lender's, if applicable) title insurance policy (or policies) insuring Purchaser's (and lender's, if applicable) fee simple title to (or in the case of a lender, security interest in) the Acquired Owned Real Property, subject to no exceptions other than Permitted Encumbrances (without expanding or supplementing any of the representations and warranties hereunder or Purchaser's remedies with respect thereto, except as customarily required by title insurance companies in connection with the transfer of and insuring title to, in each applicable jurisdiction, commercial real estate or interests therein); and

(i)     the Seller FDA Transfer Letters, dated as of the Closing Date.

2.4.    <u>Closing Deliveries by Purchaser</u>.  At the Closing, Purchaser shall deliver or cause to be delivered to (or at the direction of) the Company:

(a)     the Assignment and Assumption Agreement, duly executed by Purchaser;

(b)     an Assignment and Assumption of Lease for each Acquired Lease, duly executed by Purchaser;

(c)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in <u>Sections 7.3(a)</u> and <u>7.3(b)</u> have been satisfied;

(d)     documentation establishing that a Remediation Certification, Remediation Funding Source/Cost Review Form and Remediation Funding Source have been submitted to the New Jersey Department of Environmental Protection for the Acquired Leased Real Property in New Jersey as set forth in <u>Section 6.4(b)</u>;

(e)     a notice concerning the beneficial owners of the Swiss Company pursuant to art. 697j of the Swiss Code of Obligations, duly signed for and behalf of Akorn Luxembourg (the sole shareholder of the Swiss Company), reflecting the status of the ownership of the Swiss Company immediately after Closing; and

(f)     satisfaction of the Purchase Price as to the Credit Bid Portion by discharging Sellers, and Sellers shall be deemed to be discharged, from the Loan Agreement Indebtedness in an aggregate amount equal to the Credit Bid Amount.

14

2.5.    Withholding.    Purchaser shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any Seller such amounts as Purchaser is required to deduct and withhold under the Code, or any Tax law, with respect to the making of such payment; provided, however, that at least ten (10) Business Days prior to the Closing, except with respect to compensatory payments or to the extent a Seller fails to provide the documentation described in Section 2.3(e), Purchaser must notify such Seller of any potentially applicable withholding requirement and, in the event such Seller informs Purchaser that it believes such deduction or withholding is inapplicable, the Parties shall use commercially reasonable efforts to cooperate to eliminate or reduce any such withholding obligation.  To the extent that amounts are properly withheld and paid to the applicable Governmental Body, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as (i) disclosed in the forms, reports, schedules, statements, exhibits and other documents filed with the SEC by the Company to the extent publicly available on the SEC's Electronic Data Gathering Analysis and Retrieval System during the twelve (12) months preceding the date hereof (other than any disclosures set forth in any risk factor section, in any section relating to forward looking statements and any other disclosures included therein to the extent they are predictive, cautionary or forward-looking in nature) (the "Filed SEC Documents") or (ii) set forth in the disclosure schedules delivered by the Company concurrently herewith (the "Schedules") and subject to Sections 6.7 and 10.10, Sellers, jointly and severally, represent and warrant to Purchaser as follows as of the date hereof and as of the Closing Date:

3.1.    Organization and Qualification.

(a)    The Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Louisiana and has all requisite corporate power and corporate authority necessary to carry on the its business as it is now being conducted, subject to the provisions of the Bankruptcy Code. The Company is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law), in each case, as a "foreign" entity by the applicable Secretary of State of such jurisdiction, in each jurisdiction in which the nature of its business or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified, or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  True and complete copies of the Company's articles of incorporation and bylaws are included in the Filed SEC Documents, each of which are in full force and effect, and the Company is not in violation of any of the provisions thereof, except as would not reasonably be expected to be material to the Company.

(b)    Each of the Company's Subsidiaries is duly organized, validly existing and in good standing (where such concept is recognized under applicable Law) under the Laws of the jurisdiction of its organization, has all requisite corporate or similar organizational power and authority necessary to carry on its business as it is now being conducted, subject to the provisions

15

of the Bankruptcy Code. Each of the Company's Subsidiaries organized in the United States is duly licensed or qualified, in each case, as a "foreign" entity by the applicable Secretary of State of such jurisdiction, to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except where the failure to be so qualified, licensed, and in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. True and complete copies of each such Subsidiary's organizational documents have been made available by the Company to Purchaser prior to the date of this Agreement, each of which are in full force and effect, and each such Subsidiary is not in violation of any of the provisions of its organizational documents, except as would not reasonably be expected to be material to such Subsidiary.

(c)    Schedule 3.1(c) sets forth a true, complete and correct list of each jurisdiction in which the Company and each of the Company's Subsidiaries is duly licensed or qualified to do business, in each case, as a "foreign" entity by the applicable Secretary of State of such jurisdiction.

3.2.    Authorization of Agreement. Each Seller has all necessary corporate or similar organizational power and authority to execute and deliver this Agreement and each of the other agreements contemplated hereby (each such agreement, an "Ancillary Agreement") to which it is a party and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby or thereby. The execution, delivery and performance by each Seller of this Agreement and each of the Ancillary Agreements to which it is a party, and the consummation by such Seller of the transactions contemplated hereby or thereby, subject to requisite Bankruptcy Court approvals as described in this Agreement, have been, or with respect to any Ancillary Agreement to which such Seller is a party, will be prior to the execution and delivery thereof, duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part or on the part of any of its stockholders or other equityholders are, or will be when so executed and delivered, necessary to authorize the execution, delivery and performance by such Seller of this Agreement or any Ancillary Agreement to which it is a party and the consummation by it of the transactions contemplated hereby or thereby. Subject to requisite Bankruptcy Court approvals, this Agreement has been, and at or prior to Closing, each Ancillary Agreement to which it is a party will be, duly executed and delivered by such Seller and, assuming due authorization, execution and delivery hereof by the other parties hereto or thereto, constitutes a legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, except that such enforceability (i) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity (clauses (i) and (ii), collectively, the "Enforceability Exceptions").

3.3.    Conflicts; Consents. Assuming that (a) requisite Bankruptcy Court approvals are obtained, (b) the notices, authorizations, registrations, approvals, Orders, permits or consents set forth on Schedule 3.3 are made, given or obtained (as applicable), (c) the requirements of the HSR Act and any other applicable antitrust, competition or merger control Laws promulgated by any Governmental Body ("Foreign Competition Laws") are complied with, and (d) any filings required

16

by any applicable federal or state securities or "blue sky" Laws are made, the execution and delivery by Sellers of this Agreement and each Ancillary Agreement, and the consummation by Sellers of the transactions contemplated hereby or thereby, and the performance and compliance by Sellers with any of the terms or provisions hereof or thereof, do not and will not (i) conflict with or violate any provision (1) of the Company's articles of incorporation or bylaws or (2) of the similar organizational documents of any of the Company's Subsidiaries, (ii) conflict with or violate any Law or Order applicable to the Company, any of its Subsidiaries or any of the Acquired Assets or by which the Company, any of its Subsidiaries or any of the Acquired Assets may be bound or affected, (iii) require consent from any party in connection with the transfer of any Acquired Owned Real Property or Acquired Leased Real Property, (iv) conflict with, violate or constitute a breach of or default (with or without notice or lapse of time, or both) under, or result in the acceleration of any obligation under or give rise to a right of termination, modification, acceleration or cancelation of any obligation or to the loss of any benefit under, any of the terms or provisions of any Material Contract, Permit, loan or credit agreement or other Contract to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or to which any of the Acquired Assets is subject, or (v) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of the Company or any of its Subsidiaries, except, in the case of clauses (iii), (iv) and (v), as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets or the Assumed Liabilities, taken as a whole.

3.4.    <u>Equity Interests of Non-Debtor Subsidiaries</u>.

(a)    The authorized and outstanding capital stock or other equity interests of each of the Subsidiaries of the Company, other than Sellers (such Subsidiaries, the "<u>Non-Debtor Subsidiaries</u>"), are as set forth on <u>Schedule 3.4(a)</u>.  All of the outstanding capital stock or other equity interests of the Non-Debtor Subsidiaries have been duly authorized, validly issued, fully paid and are non-assessable (where such concepts are legally recognized in the jurisdictions of organization of such Non-Debtor Subsidiaries).  Except as set forth on <u>Schedule 3.4(a)</u>, there are no outstanding options, warrants, convertible, exercisable or exchangeable securities, "phantom" stock rights, stock appreciation rights, stock-based performance units, rights to subscribe to, purchase rights, calls or commitments relating to the issuance, purchase, sale or repurchase of any capital stock or other equity interests issued by the Non-Debtor Subsidiaries containing any equity features, or Contracts, commitments, understandings, arrangements or other obligations by which any of the Non-Debtor Subsidiaries is bound to issue, deliver or sell, or cause to be issued, delivered or sold, additional capital stock or other equity interests, or options, warrants, convertible, exercisable or exchangeable securities, "phantom" stock rights, stock appreciation rights, stock-based performance units, rights to subscribe to, purchase rights, calls or commitments relating to any capital stock or other equity interests of the Non-Debtor Subsidiaries, or that otherwise give any Person the right to receive any benefits or rights similar to any rights enjoyed by or accruing to the holders of shares of capital stock or other equity securities of any Non-Debtor Subsidiary (including any rights to receive any payment in respect, or based on the price or value, thereof).  None of the Company or any Subsidiary of the Company is a party to any shareholders' agreement, voting trust agreement, registration rights agreement or other similar agreement or understanding relating to any such securities or any other agreement relating to the disposition, voting or dividends with respect to any such securities.  Except as set forth on <u>Schedule 3.4(a)</u>, the Company or one or more of the other Sellers own all of the outstanding capital stock or other

17

equity interests of the Non-Debtor Subsidiaries, free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)     Except as set forth on Schedule 3.4(b), there are no other corporations, limited liability companies, partnerships, joint ventures, associations or other entities or Persons in which the Company or any of the Company's Subsidiaries own as of the date of this Agreement, of record or beneficially, any direct or indirect equity or other interest or any right (contingent or otherwise) to acquire the same.

3.5.    Financial Statements; Internal Controls; SEC Reports.

(a)     The consolidated financial statements of the Company (including all related notes or schedules) included or incorporated by reference in the Company SEC Documents, as of their respective dates of filing with the SEC (or, if such Company SEC Documents were amended prior to the date hereof, the date of the filing of such amendment, with respect to the consolidated financial statements that are amended or restated therein), (i) complied as to form in all material respects with the published rules and regulations of the SEC with respect thereto, (ii) are consistent in all material respects with the books and records of the Company and its Subsidiaries, (iii) have been prepared in all material respects in accordance with GAAP (except, in the case of unaudited quarterly statements, as permitted by Form 10-Q of the SEC or other rules and regulations of the SEC) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto or as permitted by Regulation S-X), and (iv) fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods shown.  The books and records of the Company and its Subsidiaries have been, and are being, maintained in all material respects in accordance with GAAP (to the extent applicable) and reflect only actual transactions.

(b)     The Company has established and maintains disclosure controls and procedures and a system of internal controls over financial reporting (as such terms are defined in paragraphs (e) and (f), respectively, of Rule 13a-15 under the Exchange Act) as required by Rule 13a-15 under the Exchange Act.  The accounting controls of the Company have been and are sufficient to provide reasonable assurances that (i) all transactions are executed in accordance with management's general or specific authorization, (ii) all transactions are recorded as necessary to permit the accurate preparation of financial statements in accordance with GAAP (except, in the case of unaudited quarterly statements, as permitted by Form 10-Q of the SEC or other rules and regulations of the SEC) and to maintain proper accountability for such items, (iii) access to assets is permitted only in accordance with management's general or specific authorization, (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences, (v) violations of the applicable Anti-Corruption Laws will be prevented and detected, and (vi) the Company does not maintain any off-the-books accounts or more than one set of books and financial records.  Neither the Company nor, to the Knowledge of Sellers, the Company's independent registered public accounting firm, has identified or been made aware of "significant deficiencies" or "material weaknesses" (as defined by the Public Company Accounting Oversight Board) in the design or operation of the Company's internal controls over financial reporting which would reasonably be expected to adversely affect in any material respect the Company's ability to record, process, summarize and

report financial data, in each case which has not been subsequently remediated. The Company has disclosed, based on its most recent evaluation of the Company's internal control over financial reporting prior to the date hereof, to the Company's auditors and audit committee any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting. A true, correct and complete summary of any such disclosures made by management to the Company's auditors and audit committee is set forth on Schedule 3.5(b).

(c)     Schedule 3.5(c) lists all Indebtedness for borrowed money of any Non-Debtor Subsidiaries.

(d)     None of the Acquired Subsidiaries has any Liabilities of any nature, whether accrued, absolute, contingent or otherwise, known or unknown, whether due or to become due and whether or not required to be recorded or reflected on a balance sheet under GAAP, except (i) to the extent accrued or reserved against in the audited consolidated balance sheet of the Company and its Subsidiaries as of the date of the most recent audited balance sheet included in the Annual Report on Form 10-K filed by the Company with the SEC on February 26, 2020 (without giving effect to any amendment thereto filed on or after the date hereof), (ii) for liabilities and obligations incurred in the Ordinary Course since December 31, 2019, (iii) as will be paid off or discharged prior to or at the Closing without any Liability to Purchaser and its Affiliates, (iv) as arise under this Agreement or the Ancillary Agreements or (v) as are not, and would not reasonably be expected to be, material to the Company and its Subsidiaries, taken as a whole.

3.6.    Real Property.

(a)     The Company or one of its Subsidiaries, as applicable, has good and marketable fee simple title to the real estate owned by the Company or any of its Subsidiaries (together with all buildings and other structures, facilities or improvements located thereon and all easements, licenses, rights and appurtenances of the Company or such Subsidiary, as applicable, relating to the foregoing) (the "Owned Real Property") free and clear of all Encumbrances, including any leases, subleases, licenses, concessions or other agreements by or pursuant to which the Company or its Subsidiaries, as applicable, grants to any party or parties the right of use or occupancy of any portion of the Owned Real Property (other than Permitted Encumbrances). Schedule 3.6(a) sets forth the address and owner of all such Owned Real Property. All buildings, structures, improvements and fixtures located on, under or within the Owned Real Property, and all other material aspects of each parcel of Owned Real Property (including heating, cooling and ventilation, electrical, plumbing, drainage, sprinkler and other mechanical or other systems or improvements) are in good operating condition and repair, reasonable wear and tear excepted and taking into account the relative ages and/or service period of such assets, and are structurally sound and free of any material defects that would reasonably be expected to be materially adverse to the Company and its Subsidiaries, taken as a whole. Except as set forth on Schedule 3.6(a), the Company and its Subsidiaries do not own any real property. The Company has delivered or made available to Purchaser complete and correct copies of the following, if any, in the possession of the Company or any Subsidiary: title insurance policies and land survey documents with respect to current title to the Owned Real Property.

(b)     Except as set forth on Schedule 3.6(b): (i) there are no outstanding options, repurchase rights or rights of first refusal to purchase or lease any Owned Real Property, or any portion thereof or interest therein, or any other real property, to which the Company or its Subsidiaries are a party; (ii) except as would not reasonably be expected to be material to the ownership, use or operation thereof, the buildings and improvements on the Owned Real Property are located within the boundary lines of the Owned Real Property, are not encroached upon, are not in violation in any material respect of any applicable setback requirements, Law, restriction or similar agreement and do not encroach in any material way on any other property or any easement that may burden the Owned Real Property; (iii) the Owned Real Property has reasonable direct vehicular access to at least one public roadway and the Company and its Subsidiaries have not received any written notice of any fact or condition that will result in the termination of any existing access to or from any of the Owned Real Property and any public right of ways and roads; (iv) neither the Company nor any of its Subsidiaries is a lessor under, or otherwise a party to, any lease, sublease, license, concession or other agreement pursuant to which the Company or any of its Subsidiaries has granted to any Person the right to use or occupy all or any portion of the Owned Real Property; (v) there is no, and neither the Company nor its Subsidiaries has received written notice from any Governmental Body regarding, presently pending or threatened condemnation or eminent domain proceedings or their local equivalent affecting or relating to any of the Owned Real Property; and (vi) it is not the case that, and neither the Company nor its Subsidiaries has received written notice from any Governmental Body or other Person that, the use and occupancy of any of the Owned Real Property, as currently used and occupied, and the conduct of the business thereon, as currently conducted, violates in any material respect any deed restrictions, contractual obligation (including requirements of any Encumbrances), or applicable Law consisting of building codes, zoning, subdivision or other land use or similar Laws.

(c)     The Company or one of its Subsidiaries, as applicable, has a good and valid leasehold interest to all real property leased by the Company (the "Leased Real Property"), free and clear of all Encumbrances (other than Permitted Encumbrances).  Schedule 3.6(c) sets forth a true, correct and complete list of all leases, licenses, subleases and other use agreements with respect to such Leased Real Property, and all amendment, supplements, addendums and guarantees thereto (collectively, the "Leases") along with the address of each such Leased Real Property and all parties to each Lease.  Except pursuant to the Leases, neither the Company nor any of its Subsidiaries lease, sublease, license or, except with respect to the Owned Real Property, use or occupy any real property.  The Company has made available to Purchaser true, correct and complete copies (in all material respects) of the Leases and any estoppels or subordination, non-disturbance and attornment agreements relating thereto.

(d)     With respect to the Leased Real Property, except as set forth on Schedule 3.6(d): (i) the Company or a Subsidiary of the Company is in exclusive possession thereof; (ii) the Leases are valid, binding and in full force and effect and there are no unwritten or oral modifications by the Company or any of its Subsidiaries to the Leases or any course of dealing or business operations involving the Company or its Subsidiaries that could reasonably be construed as a modification to the Leases that would reasonably be expected to be material to the Company and its Subsidiaries; (iii) neither the Company nor any of its Subsidiaries is a lessor under, or otherwise a party to, any lease, sublease, license, concession or other agreement pursuant to which the Company or any of its Subsidiaries has granted to any Person the right to use or occupy all or any portion of the Leased Real Property; (iv) except as a result of the commencement

of the Bankruptcy Case, neither the Company nor its Subsidiaries nor, to the Knowledge of Sellers, any landlords are in default under any of the Leases in any material respect, nor does any event or circumstances exist which, with the passage of time or the giving of notice would constitute such a default under any of the Leases, nor has the Company or any of its Subsidiaries received or provided written notice from or to any Person that any such default exists under any of the Leases; (v) there is no, and neither the Company nor its Subsidiaries has received written notice from any Governmental Body regarding, presently pending or threatened condemnation or eminent domain proceedings or their local equivalent affecting or relating to such Leased Real Property; and (vi) it is not the case that, and neither the Company nor its Subsidiaries has received written notice from any Governmental Body or other Person, that the use and occupancy of any of the Leased Real Property, as currently used and occupied, and the conduct of the business thereon, in the Ordinary Course, violates in any material respect any deed restrictions, contractual obligation (including requirements of any Encumbrances), or applicable Law consisting of building codes, zoning, subdivision or other land use or similar Laws.

3.7.    Title to Property; Sufficiency of Assets.

(a)    Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, (i) the Company and its Subsidiaries own good and valid title to, or hold a valid leasehold interest in, all of the Acquired Assets, whether tangible or intangible (other than Inventory sold in the Ordinary Course on or after January 1, 2020 and otherwise in accordance with this Agreement), free and clear of all Encumbrances (other than Permitted Encumbrances), and (ii) at the Closing, Sellers will transfer, convey and assign good and valid title to, or a valid leasehold interest in, all of the Acquired Assets (including record and beneficial ownership of all equity securities, or securities convertible, exchangeable or exercisable into such securities, of the Acquired Subsidiaries) free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)    Other than the Excluded Assets and any Permits, the Acquired Assets constitute all of the material assets, properties and rights held for use or necessary to operate and conduct the business of the Company and its Subsidiaries as conducted in the Ordinary Course as of the date of this Agreement.

3.8.    Insurance.    Schedule 3.8 lists each material insurance policy maintained by the Company and each of its Subsidiaries as of the date hereof.  To the Knowledge of Sellers, (a) the Company and its Subsidiaries own or hold policies of insurance, or are self-insured, of the types and in amounts providing reasonably adequate coverage against all risks customarily insured against by companies in similar lines of business as the Company and its Subsidiaries or as may otherwise be required by applicable Law and (b) all such insurance policies are in full force and effect except for any expiration thereof in accordance with the terms thereof occurring after the date of this Agreement.  The Company and its Subsidiaries have not received written notice of cancelation or modification with respect to such insurance policies other than in connection with ordinary renewals, and there is no existing default or event which, with the giving of notice or lapse of time or both, would constitute a default by any insured thereunder.  All premiums in respect of each insurance policy maintained by the Company or any of the Company's Subsidiaries have been paid when due.

3.9.    Contracts.

(a)    Schedule 3.9(a) sets forth a list of all Material Contracts as of the date of this Agreement.  For purposes of this Agreement, "Material Contract" means any Contract to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries or any of their respective properties or assets is bound (in each case, excluding any Seller Plan) that:

(i)    is or would be required to be filed as an exhibit to the Company's Annual Report on Form 10-K pursuant to Item 601(b)(10) of Regulation S-K under the Securities Act;

(ii)    relates to the formation, creation, governance, economics or control of any joint venture, partnership or other similar arrangement (including any Contract involving a sharing of revenues, profits, losses, costs or liabilities), other than (A) with respect to any partnership that is wholly owned by the Company or any of its wholly owned Subsidiaries and (B) for the avoidance of doubt, marketing, licensing, manufacturing, development and distribution Contracts entered into in the Ordinary Course;

(iii)    (A) is for Indebtedness of the Company or any of its Subsidiaries; (B) relates to the mortgaging or pledging of, or otherwise placing an Encumbrance (other than a Permitted Encumbrance) on, any of the Acquired Assets; or (C) is in the nature of a capital or direct financing lease that is required by GAAP to be treated as a long-term liability involving payments above $1,000,000 annually, in each case other than (x) Indebtedness solely between or among any of the Company and its wholly-owned Subsidiaries or (y) Liabilities which will be fully discharged under the Bankruptcy Code;

(iv)    relates to the acquisition or disposition of any business, assets or properties (whether by merger, sale of stock, sale of assets or otherwise) for aggregate consideration under such Contract in excess of $5,000,000 (A) that was entered into after January 1, 2017 or (B) pursuant to which any material earn-out, indemnification or deferred or contingent payment obligations remain outstanding (in each case, excluding for the avoidance of doubt, acquisitions of Inventory in the Ordinary Course);

(v)    under which the Company or any of its Subsidiaries is lessee of (i) any real property or (ii) material personal property with annual lease payments in excess of $500,000, in each case, owned by any other party (including the Leased Real Property);

(vi)    is a Contract (A) (other than purchase orders), with any Material Supplier or (B) for the purchase of materials, supplies, goods, services, Equipment or other assets pursuant to which the Company or any of its Subsidiaries would reasonably be expected to make payments of more than $3,000,000 during any fiscal year (other than a Contract with any Material Supplier that is otherwise disclosed in subsection (A) above);

(vii)    is a Contract (other than purchase orders) (A) with any Material Customer or (B) with a direct or indirect customer of the Company or any of its Subsidiaries (other than a Material Customer) pursuant to which the Company or any of its Subsidiaries

22

received aggregate net payments of more than $5,000,000, during the fiscal year ended December 31, 2019;

(viii)    contains any provision (A) limiting, in any material respect, the right of the Company or any of its Subsidiaries to engage in any business (including developing or commercializing any pharmaceutical products), compete with any Person, or operate anywhere in the world (other than provisions in any license agreements for Intellectual Property limiting the Company's and its Subsidiaries' use of applicable Intellectual Property of a third party to specified fields of use or specified territories), (B) granting any exclusivity right to any third party, or containing a "most favored nation" provision or any option, right of first refusal or preferential or similar right in favor of any third party or that is a "take or pay" or similar provision requiring the business to make a minimum payment for goods or services from third party suppliers irrespective of usage, in each case, other than a Contract that can be terminated by the Company or one of its Subsidiaries on ninety (90) days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any money under, such Contract;

(ix)    is a Contract (x) that contains an exclusive license of Intellectual Property to the Company or any of its Subsidiaries that is material to the business of the Company and its Subsidiaries as currently conducted or (y) pursuant to which the Company or any of its Subsidiaries has a right to use any Intellectual Property of any other Person, which Intellectual Property is material to the business of the Company and its Subsidiaries as currently conducted, excluding in each case (A) licenses that are ancillary or incidental to the sale of goods or provision of services and (B) standard licenses for computer software that is readily commercially available on a "click wrap" or other similar basis;

(x)    is a Contract with a Governmental Body;

(xi)    is a surety or guarantee agreement or other similar undertaking with respect to contractual performance;

(xii)    is a license, sublicense, development, collaboration or royalty agreement or other Contract relating to the use of any Company Owned Intellectual Property by any third party (other than licenses granted to customers, resellers and distributors in the Ordinary Course) pursuant to which the Company or any of its Subsidiaries received payments above $1,000,000 during the fiscal year ended December 31, 2019;

(xiii)    is a Contract for any interest rate, currency or commodity derivatives or hedging transaction; or

(xiv)    is a binding commitment or agreement to enter into any of the foregoing.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except with respect to any Contract that has previously expired in accordance with its terms (or, after the date of this Agreement, is

23

terminated, restated or replaced in compliance with this Agreement), subject to the Enforceability Exceptions, (i) each Material Contract is valid and binding on the Company and/or any of its Subsidiaries to the extent such Person is a party thereto, as applicable, and to the Knowledge of Sellers, each other party thereto, and is in full force and effect; (ii) the Company and each of its Subsidiaries, and, to the Knowledge of Sellers, any other party thereto, have performed all obligations required to be performed by it under each Material Contract; (iii) except as a result of the commencement of the Bankruptcy Case, neither the Company nor any of its Subsidiaries have given or received written notice of the existence of any breach or default on the part of the Company or any of its Subsidiaries under any Material Contract; (iv) except as a result of the Bankruptcy Case, there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of the Company or any of its Subsidiaries, or to the Knowledge of Sellers, any counterparty under such Material Contract; and (v) to the Knowledge of Sellers, the Company has not received any notice from any Person that such Person currently intends to terminate, or not renew, any Material Contract, in each instance of (ii), (iii), (iv) and (v), except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets and the Assumed Liabilities, taken as a whole.

(c)     There are no Material Contracts that cannot be readily fulfilled or performed by the Company and its Subsidiaries without undue or unusual expenditure of money or effort or any preparation, action or arrangement outside of the Ordinary Course (including, as may be a result of any pandemic (including the "Coronavirus" or "COVID-19") or any quarantine or trade restrictions related, or which would reasonably be expected to be related, thereto).

3.10.   Litigation.  Except as set forth on Schedule 3.10, there is no Action pending, or to the Knowledge of Sellers threatened, against or relating to the Company or any of its Subsidiaries, the Acquired Assets or the Assumed Liabilities that (a) if adversely determined against the Company and its Subsidiaries would reasonably be expected to result in fines or damages of more than $1,000,000 or would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (b) (i) relates to a criminal matter or (ii) calls for injunctive relief or other restriction that, if adversely determined against the Company and its Subsidiaries, would reasonably be expected to be material to the Acquired Assets and the Assumed Liabilities, taken as a whole.  Except as set forth on Schedule 3.10, since January 1, 2017, there has been no (x) such Action pending, or to the Knowledge of Sellers threatened, against the Company or any of its Subsidiaries, or (y) Order imposed (or otherwise pending or the Knowledge of Sellers threatened) upon the Company or any of its Subsidiaries, in each case, by or before any Governmental Body.

3.11.   Permits; Compliance with Laws.  Except as set forth on Schedule 3.11, the Company and each of its Subsidiaries are, and have been since January 1, 2017, in compliance in all material respects with all Laws or Orders applicable to the Company or any of its Subsidiaries or the ownership and operation of the Acquired Assets.  The Company and each of its Subsidiaries hold, and, to the extent applicable, have filed timely applications to renew, all licenses, notifications, franchises, permits, certificates, registrations, approvals, consents, waivers, clearances, exemptions, classifications and other authorizations from Governmental Bodies necessary for the lawful conduct of their respective businesses (collectively, "Permits"), except where the failure to hold the same would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets and the Assumed Liabilities, taken as a whole.  Since January 1, 2017, neither the Company nor any of its Subsidiaries has received written

24

notice from any Governmental Body (i) claiming or alleging that it is not in compliance with any applicable Law or Order applicable to any of them, or the operation of their respective businesses, in any material respect or (ii) requesting or requiring the Company or any of its Subsidiaries to take, or refrain from taking, any action in connection with the "Coronavirus" or "COVID-19" except for publicly announced notices and Orders of general applicability, in each case of (i) and (ii) except as would not, individually or in the aggregate, reasonably be expected to be material to the operation of their business in the Ordinary Course or material to the Acquired Assets and the Assumed Liabilities, taken as a whole.

3.12. <u>Anti-Corruption and International Trade Compliance</u>.

(a)     In the last five years, neither Sellers, nor the Company and its Subsidiaries or their employees, or to the Knowledge of Sellers, any other Person acting on behalf of any of the foregoing, has directly or knowingly indirectly in connection with the business and operations of the Company and its Subsidiaries (i) made, offered, promised to make or authorized any unlawful payment, gift, or any other thing of value or advantage in violation of Anti-Corruption Laws, (ii) requested or received any payment, gift, or other thing of value or advantage in violation of Anti-Corruption Laws or (iii) otherwise violated any provision of the Anti-Corruption Laws, Anti-Money Laundering Laws, and International Trade Laws.

(b)     The Company and its Subsidiaries have implemented policies and procedures reasonably designed to prevent, detect, and deter violations of any Anti-Corruption Laws and International Trade Laws.

(c)     In the last five years, neither Sellers nor the Company and its Subsidiaries have received any notice from any Governmental Body or any other Person regarding any actual, alleged, or investigated violation of, or failure to comply with or Liability under, any Anti-Corruption Laws, Anti-Money Laundering Laws, and International Trade Laws, and to the Knowledge of Sellers there are no conditions or circumstances that would reasonably be expected to give rise to any material future Action against, or voluntary disclosure by, the Company and its Subsidiaries with respect to any Anti-Corruption Laws and International Trade Laws.

(d)     In the last five years, neither Sellers nor the Company and its Subsidiaries have: (i) acted, directly or knowingly indirectly, on behalf of a Sanctioned Person, nor are Sellers, the Company, and its Subsidiaries Sanctioned Persons; (ii) conducted any business, directly or knowingly indirectly, or engaged in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person in violation of International Trade Laws; or (iii) unlawfully directly or knowingly indirectly dealt in, or otherwise directly or knowingly indirectly engaged in, any transaction relating to, any property or interests of Sanctioned Persons in violation of International Trade Laws.

(e)     The Company and its Subsidiaries are and in the last five years have been in compliance with the customs and import Laws of Canada, India, Luxembourg, Switzerland, the United States, and of each country where the Company and its Subsidiaries conduct business.

3.13. <u>Environmental Matters</u>.  Except as set forth on <u>Schedule 3.13</u>, (a) the Company, each of its Subsidiaries and their respective businesses are, and have been since January 1, 2017,

in compliance with all applicable Environmental Laws, except as would not, individually or in the aggregate, reasonably be expected to be material to any of the respective businesses of the Company or its Subsidiaries (to the extent such businesses are included as Acquired Assets or Assumed Liabilities), taken as a whole, (b) neither the Company nor any of its Subsidiaries have received any written notice alleging that the Company is or was in material violation of or has material liability under, or any other written request for information pursuant to, any Environmental Law, in each case to the extent the subject matter of such notice or request is still unresolved or otherwise pending, (c) the Company and its Subsidiaries possess and are in compliance with all Permits required under Environmental Laws for the operation of their respective businesses ("Environmental Permits"), except where the failure to possess or comply with such Permits would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets and the Assumed Liabilities, taken as a whole, (d) neither the execution, delivery or performance of this Agreement will result in the material modification or termination of any Environmental Permit that would, individually or in the aggregate, reasonably be expected to be material to any of the respective businesses of the Company or its Subsidiaries (to the extent such businesses are included as Acquired Assets or Assumed Liabilities), taken as a whole, and neither the Company nor any of its Subsidiaries has received any written notice regarding the revocation, suspension or material amendment of any Environmental Permit that would, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets and the Assumed Liabilities, taken as a whole, (e) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or threatened in writing or, to the Knowledge of Sellers, orally, against the Company or any of its Subsidiaries that would, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets and the Assumed Liabilities, taken as a whole, (f) neither the Company nor any of its Subsidiaries are subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved material obligations on the part of the Company or its Subsidiaries, (g) no Hazardous Substances have been Released by the Company or any of its Subsidiaries at any location or are present at the Owned Real Property or Leased Real Property, in each case that are reasonably likely to result in any material Liability to the Company or any of its Subsidiaries under Environmental Laws, (h) to the Knowledge of Sellers, no Hazardous Substances present at any real properties to which the Company or any of its Subsidiaries has sent Hazardous Substances for treatment or disposal would reasonably be expected to result in material Liability to the Company or any of its Subsidiaries under Environmental Laws, (i) neither the Company nor any of its Subsidiaries has assumed or retained by contract or operation of law or indemnified any third party against any material liability or obligation under Environmental Laws which is unresolved and of which the Company or its Subsidiaries have received written notice, and (j) the Company has provided to Purchaser copies of all final third party reports prepared at the request, or on behalf of, the Company or any of its Subsidiaries in the last three (3) years or, to the Knowledge of Sellers, earlier with respect to any material environmental or health and safety assessments, investigations, studies, audits, tests, reviews or other similar documents, in each case with respect to any environmental conditions or violation of Environmental Laws at any properties that are Acquired Assets or are owned, leased, or operated by any of the Acquired Subsidiaries that are in the possession or reasonable control of the Company or any of its Subsidiaries.

      3.14.   Intellectual Property.

(a)     The Company and its Subsidiaries exclusively own all of the rights, title and interest in and to the Company Owned Intellectual Property, free and clear of all Encumbrances (other than Permitted Encumbrances).  All of the Company Owned Intellectual Property is presumed valid, subsisting, and, to the Knowledge of Sellers, enforceable.  None of the Company Owned Intellectual Property is involved in any filed interference, reissue, reexamination, opposition, cancellation or similar proceeding and, to the Knowledge of Sellers, no such Action is or has been threatened with respect to any of the Company Owned Intellectual Property.  A true and complete list of all registered Company Owned Intellectual Property (including country, application number, registration number, filing date, title, owner and status) is set forth in Schedule 3.14(a).  The Company Owned Intellectual Property and the Company Licensed Intellectual Property are sufficient for the conduct of the business of the Company and its Subsidiaries in the Ordinary Course as currently conducted, in all material respects.

(b)     (i) The Company and its Subsidiaries own or have legally enforceable and sufficient rights to use all Intellectual Property that is used in and material to or otherwise necessary for the conduct of the business of the Company and its Subsidiaries in the Ordinary Course, as currently conducted, free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) the Company and its Subsidiaries have taken commercially reasonable steps in accordance with industry practice to (x) protect their rights in the Company Owned Intellectual Property that is material to the business of the Company and its Subsidiaries as currently conducted and (y) to maintain the confidentiality of non-public Intellectual Property (including trade secrets) owned by or exclusively licensed to the Company or any of its Subsidiaries that is material to the business of the Company and its Subsidiaries in the Ordinary Course, and all other non-public Intellectual Property that the Company or any of its Subsidiaries is required by the provisions of any Contract to protect as confidential; provided that nothing in this Section 3.14(b) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.14(c) and Section 3.14(d).

(c)     As of the date hereof, no Actions are pending or threatened in writing or, to the Knowledge of Sellers, orally, against the Company or its Subsidiaries, and since January 1, 2017, neither the Company nor any of its Subsidiaries has received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by the Company or any of its Subsidiaries of any Intellectual Property owned by the Company or any of its Subsidiaries or (ii) alleging that the Company or any of its Subsidiaries infringed, misappropriated or otherwise violated, or are infringing, misappropriating or otherwise violating, the Intellectual Property of any Person.  None of the Company Owned Intellectual Property that is material to the business of the Company and its Subsidiaries in the Ordinary Course is subject to any outstanding Order restricting or limiting in any material respect the use or licensing thereof by the Company or any of its Subsidiaries.

(d)     As of the date hereof, (i) to the Knowledge of Sellers, no Person has infringed, misappropriated or otherwise violated the rights of the Company or any of its Subsidiaries with respect to any Intellectual Property owned by or exclusively licensed to the Company or a Subsidiary of the Company and (ii) except as would not be material, the operation of the business of the Company and its Subsidiaries has not violated, misappropriated or infringed the Intellectual Property of any other Person and the operation of the business of the Company and

27

its Subsidiaries in the Ordinary Course as of the date of this Agreement does not violate, misappropriate or infringe the Intellectual Property of any other Person.

(e)    No present or former employee, officer or director of the Company or any of its Subsidiaries, or agent, outside contractor or consultant of the Company or any of its Subsidiaries, holds any right, title or interest, directly or indirectly, in whole or in part, in or to any Company Owned Intellectual Property that is material to the business of the Company and its Subsidiaries as currently conducted.

(f)    The Company's and its Subsidiaries' technology systems and infrastructure, including middleware, servers, workstations, routers, and all other information technology software or equipment used by the Company and its Subsidiaries are adequate for the current conduct of the business of the Company and its Subsidiaries in the Ordinary Course, in all material respects.  Each of the Company and its Subsidiaries has taken reasonable steps and implemented reasonable procedures designed to ensure that its internal computer systems used in connection with its business (consisting of hardware, software, databases or embedded control systems, "Systems") are free from disabling codes and contaminants and are sufficient in all material respects for the current needs of the business of the Company and its Subsidiaries in the Ordinary Course.  Each of the Company and its Subsidiaries has taken reasonable steps to protect the integrity and security of its respective Systems and the information stored therein from unauthorized use, access or modification.  The Company and its Subsidiaries provide for the back-up and recovery of material data and have implemented commercially reasonable disaster recovery plans, procedures and facilities and, as applicable, have taken commercially reasonable steps to implement such plans and procedures.  Since January 1, 2017, to the Knowledge of Sellers, there have been no breaches of or unauthorized intrusions into the security of any Systems, and the Company and its Subsidiaries have not experienced any incident in which Personal Information was or may have been stolen, lost, destroyed, altered or improperly accessed, disclosed or used without authorization.

(g)    Since January 1, 2017, the Company and its Subsidiaries have complied in all material respects with all applicable Laws relating to privacy, data security, data protection, and collection, storing, use, security, processing and transferring of Personal Information.

(h)    No government funding or facilities of a university, college, other educational institution or research center was used in the development of any Company Owned Intellectual Property.  No employee of the Company or any of its Subsidiaries who was involved in, or who contributed to, the creation or development of any Company Owned Intellectual Property, has performed services for the government, university, college, or other educational institution or research center with respect to technology or inventions that have been or may be incorporated into any Products or related to Company Owned Intellectual Property during a period of time during which such employee was also performing services for the Company or any of its Subsidiaries.

(i)    Except as set forth in Schedule 3.14(i), since January 1, 2017, neither the Company nor any of its Subsidiaries has transferred ownership of any Company Owned Intellectual Property that was used in the conduct of the business of the Company or any of its Subsidiaries.

28

(j)       Assuming that (A) requisite Bankruptcy Court approvals are obtained and (B) the notices, authorizations, registrations, approvals, Orders, permits or consents set forth on Schedule 3.3 are made, given or obtained (as applicable), the consummation of the transactions contemplated hereby will not result in (i) the grant of any right or license to any third party of any Intellectual Property that is owned by or exclusively licensed to the Company or any of its Subsidiaries or (ii) the loss of the Company's or any of its Subsidiaries' rights or obligations under any Contract under which Intellectual Property is licensed to the Company or any of its Subsidiaries, in each case of the immediately clauses (i) and (ii), that is material to the business of the Company and its Subsidiaries.

3.15.   Tax Matters.  Other than with respect to any Excluded Subsidiary:

(a)       The Company and each of its Subsidiaries has prepared (or caused to be prepared) and duly and timely filed (taking into account valid extensions of time within which to file) all material Tax Returns required to be filed by (or on behalf of) any of them, and all such filed Tax Returns (taking into account all amendments thereto) are true, complete and accurate in all material respects.  Neither the Company nor any of its Subsidiaries is currently the beneficiary of any extension of time within which to file any Tax Return required to be filed by either the Company or any of its Subsidiaries with respect to, or that relate to a material amount of Taxes (individually or in the aggregate) that (if unpaid) could give rise to an Encumbrance on, the Acquired Assets.

(b)       All income and other material Taxes owed by the Company and each of its Subsidiaries that are due (whether or not shown on any Tax Return) have, in all material respects, been timely paid in full or have been adequately reserved against in accordance with GAAP.

(c)       There are no Encumbrances for Taxes on any of the assets of the Company or any of its Subsidiaries, other than statutory Encumbrances for current Taxes not yet due or payable or that are being contested in good faith by appropriate Actions and for which adequate reserves have been established in the Current Financial Statements in accordance with GAAP, and no written claim for unpaid Taxes has been made by any Governmental Body that could give rise to any such Encumbrance.

(d)       (i) Neither the Company nor any of its Subsidiaries (other than any Subsidiaries identified on Schedule 3.15(d)), is, or has ever been, and (ii) none of the Subsidiaries identified on Schedule 3.15(d) is, or has been within the past five years, a member of an affiliated group of corporations filing a consolidated federal income Tax Return (other than a group the common parent of which is the Company or one of its Subsidiaries) or has any material Liability for the Taxes of any Person (other than the Company or any of its Subsidiaries) under Treasury Regulations Section 1.1502-6 (or any similar provision of any state, local or non-U.S. Law), as a transferee or successor.

(e)       No written notice from any Governmental Body of proposed adjustment, deficiency or underpayment of Taxes with respect to any Seller or the Acquired Assets has been received by any Seller that has not since been fully satisfied by payment or been finally withdrawn, and no written notification has been provided by any Governmental Body of a current intent to raise such issues.  Neither the Company nor any of its Subsidiaries has waived any statute of

limitations in respect of a material amount of Taxes (individually or in the aggregate) or agreed to any extension of time with respect to an assessment or deficiency for any such Taxes (other than pursuant to automatic extensions of time to file Tax Returns duly obtained in the Ordinary Course).

(f)    Neither the Company nor any of its Subsidiaries has participated in any "listed transaction" within the meaning of Treasury Regulations Section 1.6011-4(b)(2).

(g)    There are no pending or threatened in writing audits, investigations, disputes, notices of deficiency, assessments or other Actions or proceedings for or relating to any Liability for Taxes of the Company or any of its Subsidiaries or for Taxes relating to the Acquired Assets.

(h)    No claim has ever been made by an authority in a jurisdiction where a Seller does not file Tax Returns that such Seller is subject to taxation by that jurisdiction.

(i)    Sellers have collected or withheld all amounts required to be collected or withheld by Sellers for all material Taxes or assessments, and all such amounts have been fully and timely paid to the appropriate Governmental Body.  The Company and its Subsidiaries have complied with in all material respects all applicable Laws relating to information reporting and record retention (including to the extent necessary to claim any exemption from sales Tax collection and maintaining adequate and current resale certificates to support any such claimed exemptions) with respect to the Acquired Assets.

(j)    No Seller is a "foreign person" as that term is used in Treasury Regulations Section 1.445-2.

(k)    None of the Acquired Assets includes any stock, partnership interests, limited liability company interests, legal, or beneficial interests or any other equity interests in or of any Person, and there is no joint venture, co-tenancy, contract, or other similar arrangement involving the Acquired Assets for which an election is in effect under Section 761(a) of the Code or that could be treated as a partnership under Subchapter K of Chapter 1 of Subtitle A of the Code if no such election has been made.

(l)    None of the Assumed Liabilities includes any obligation to any Person under any Tax allocation, sharing, indemnity obligation, or similar agreement or arrangement with respect to Taxes (other than any customary commercial agreement or arrangement entered into the ordinary course of business the primary purpose of which is not the allocation of Taxes).

Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this Section 3.15 and Section 3.16 (insofar as they relate to Taxes) shall constitute the sole representation and warranties with respect to Taxes.  No representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute, in each case, for any Tax period (or any portion thereof) following the Closing.

3.16.    Seller Plans.

(a)    Schedule 3.16(a) contains a true and complete list, as of the date of this Agreement, of each material Seller Plan. With respect to each material Seller Plan (but for non-

30

United States material Seller Plans, only to the extent reasonably available to the Company), the Company has made available to Purchaser true and complete copies (to the extent applicable) of (i) the current plan document (or, if the Seller Plan is unwritten, a written description of the material terms thereof), including any amendments thereto other than any document that the Company or any of its Subsidiaries are prohibited from making available to Purchaser as the result of applicable Law relating to the safeguarding of data privacy, (ii) the most recent annual report on Form 5500 filed with the Department of Labor, (iii) the most recent IRS determination or opinion letter received by the Company, (iv) the most recent summary plan description, (v) each current material related insurance Contract or trust agreement, (vi) the most recent actuarial report, financial statement and trustee report, and (vii) all non-routine correspondence with the IRS or United States Department of Labor since January 1, 2017 for which a Liability remains outstanding.

(b)     Each United States Seller Plan intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination letter from the IRS or is entitled to rely upon a favorable opinion letter issued by the IRS. There are no existing circumstances or any events that have occurred that would reasonably be expected to cause the loss of any such qualification status of any such United States Seller Plan. There are no pending or, to the Knowledge of Sellers, anticipated or threatened Actions or other claims (other than routine claims for benefits) by, on behalf of, against or with respect to any Seller Plan (or, to the Knowledge of Sellers, any fiduciary thereof or service provider thereto) and no audit or other Action by a Governmental Body is pending, or, to the Knowledge of Sellers, anticipated or threatened with respect to such Seller Plan. Since January 1, 2017, the Seller Plans have complied in form and in operation in all material respects with their terms and applicable Laws, including the applicable requirements of the Code and ERISA. Except as could not reasonably be expected to result in any liability for Purchaser or its Affiliates, all contributions or premiums required to be made under the terms of each Seller Plan or by applicable Laws have been timely made in all material respects in accordance with applicable Laws and the terms of the Seller Plans.

(c)     Neither the Company nor any Subsidiary has, in the past six years, sponsored, maintained, contributed to or has been required to maintain or contribute to, or has any Liability with respect to any (i) plan that is subject to Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code, (ii) "multiemployer plan" (as defined in Sections 3(37) or 4001(a)(3) of ERISA) or (iii) "multiple employer welfare arrangement" (within the meaning of Section 3(40) of ERISA).

(d)     No Seller Plan provides or has (in the last 24 months) provided benefits or coverage in the nature of health or life insurance following retirement or other termination of employment, other than coverage or benefits required to be provided under Part 6 of Subtitle B of Title I of ERISA or Section 4980B of the Code, or any other applicable Law.

(e)     The consummation of the transactions contemplated hereby will not, either alone or in combination with another event, (i) accelerate the time of payment or vesting, or increase the amount of compensation or benefits due to any director, officer, employee or other individual service provider of the Company or any of its Subsidiaries under any United States Seller Plan, (ii) subject to Purchaser's compliance with Section 6.3, cause the payment of any

severance benefits to any individual, or (iii) cause the Company to transfer or set aside any assets to fund any benefits under any United States Seller Plan.

(f)    The consummation of the transactions contemplated hereby will not, either alone or in combination with another event result in any "disqualified individual" receiving any payment that would be characterized as an "excess parachute payment" (each such term as defined in Section 280G of the Code).  No director, officer, employee or other individual service provider of the Company or any of its Subsidiaries has any "gross up" agreements or other assurance of reimbursement for any Taxes resulting from any such "excess parachute payments" or with respect to any violation of Section 409A of the Code.

(g)    With respect to the Swiss Company, Sections 3.16(a) through 3.16(f) shall not apply to any pension plan maintained by the Swiss Company.  All accrued pension claims of the Swiss Company's employees are either covered by funds of a special foundation, by insurance contracts or provisions the Swiss Company has specifically established for such purpose, all pursuant to applicable laws and actuarial principles consistently applied in the past two (2) financial years.  The Swiss Company has and will have complied up to the Closing Date with all relevant social security regulations and have and will have made up to the Closing Date all deductions and payments required to be made and/or due under such regulations for all social security, employment related insurance premiums and pension plan contributions in respect of its employees.  There is no funding deficit (Unterdeckung) under any of the occupational pension plans, funds, contracts, schemes or arrangements relating to the Swiss Company or its employees.

(h)    Each Seller Plan that constitutes a "non-qualified deferred compensation plan" within the meaning of Section 409A of the Code has at all times complied in both form and operation with the requirements of Section 409A of the Code.

3.17.    Employees.

(a)    Schedule 3.17(a) lists each employee of Sellers as of the date hereof and as of the date that is three (3) Business days prior to the Closing Date (provided that Sellers shall be permitted to deliver Schedule 3.17(a) as of three (3) Business Days prior to the Closing Date until the date that is two (2) Business Days prior to the Closing Date), along with his or her (i) base salary, (ii) title/position, (iii) Fair Labor Standards Act classification, (iv) leave status, (v) date of hire and (vi) accrued paid time-off.

(b)    Neither the Company nor any of its Subsidiaries is party to any collective bargaining agreements or similar Contracts with any labor union applicable to any employees of the Company or any of its Subsidiaries.  Since January 1, 2017, no demand for recognition as the exclusive bargaining representative of any employees has been made to the Company or any of its Subsidiaries by or on behalf of any labor union and, since January 1, 2017, there have been no union organizing activities.  There is no pending or, to the Knowledge of Sellers, threatened strike, lockout, slowdown, or work stoppage by or with respect to the employees of the Company or any of its Subsidiaries and there has been no such event since January 1, 2017.  Since January 1, 2017, each of the Company and its Subsidiaries has complied in all material respects with all applicable Laws respecting employment and employment practices, including Laws concerning terms and conditions of employment, wages and hours, immigration, classification and occupational safety

and health.  Each of the Company and its Subsidiaries is not, and since January 1, 2017 has not been, involved in any material litigation, audit, governmental investigation, administrative agency proceeding, private dispute resolution procedure, or investigation of alleged employee misconduct, in each case with respect to employment or labor matters (including allegations of employment discrimination, retaliation, noncompliance with wage and hour Laws, the misclassification of independent contractors, violation of restrictive covenants, sexual harassment, other unlawful harassment or unfair labor practices).  The Company and its Subsidiaries have not experienced a "plant closing" or "mass layoff" or similar group employment loss as defined in the WARN Act with respect to which there is any unsatisfied liability.  During the 90-day period preceding the date hereof, no more than 10 employees at any "single site of employment" have suffered an "employment loss" as defined in the WARN Act with respect to the Company and its Subsidiaries. Since January 1, 2017, there have been no sexual harassment allegations against any officer or other key employee of the Company or its Subsidiaries.

(c)    To the Knowledge of Sellers, there are no facts that would reasonably be expected to give rise to a claim or claims of sexual harassment, other unlawful harassment or unlawful discrimination against or involving the Company or its Subsidiaries or any employee, director or independent contractor of the Company or its Subsidiaries.

(d)    Sellers have taken actions reasonably designed to protect their employees from the effects of the "Coronavirus" or "COVID-19", as described on Schedule 3.17(d).

3.18.    Affiliate Transactions.    Except as set forth on Schedule 3.18, or in the "Compensation Discussion and Analysis" or "Related Party Transactions" disclosures in the Filed SEC Documents, to the Knowledge of Sellers, no Affiliate of the Company (other than any Seller or any of their Subsidiaries), or any officer or director of the Company or any of its Subsidiaries (a) is a party to any agreement or transaction with the Company or its Subsidiaries having a potential or actual value or a contingent or actual Liability exceeding $50,000, other than (i) employment arrangements in the Ordinary Course and (ii) the Seller Plans, (b) has any material interest in any material property (whether tangible or intangible) used by the Company or its Subsidiaries or (c) owns any material interest in, or is an officer, director, employee or consultant of, any Person which is, or is engaged in business as a Material Supplier (or other professional Advisor) or Material Customer of the Company or any of its Subsidiaries.

3.19.    Brokers.    Except for PJT Partners LP and Greenhill & Co., LLC, the fees and expenses of which will be paid by the Company on or prior to the Closing Date, no broker, finder, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Company or any of its Subsidiaries.

3.20.    Inventory.    Except for those items the value of which has been reduced or written off the books and records of the Company in the Ordinary Course, all Inventory consists of a quality usable and salable in the Ordinary Course, none of which (a) is materially damaged in any significant way, except for any such damage that would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets or the Assumed Liabilities, taken as a whole or (b) is held on a consignment basis.  The Inventory conforms in all material respects to

33

Case 20-11177-KBO    Doc 102    Filed 05/26/20    Page 197 of 410

all standards and Laws applicable to each item of Inventory or its use or sale imposed by any Governmental Body, and is not part of a current or past recall except for those items the value of which have been reduced or written off the books of the Company in the Ordinary Course.

3.21.    Customers and Suppliers.

(a)    Schedule 3.21(a) sets forth a true, complete and correct list of (i) the five (5) largest customers of the Company and its Subsidiaries (measured by dollar volume of sales to such customers) for the fiscal year ended December 31, 2019 (such customers collectively referred to as the "Material Customers"); and (ii) the ten (10) largest suppliers (excluding any professional Advisors) from which the Company and its Subsidiaries purchased materials, supplies, services or other goods (measured by dollar volume of purchases from such suppliers) for the fiscal year ended December 31, 2019 (such suppliers collectively referred to as "Material Suppliers"), and the amount each such Material Supplier was paid by the Company and its Subsidiaries during such period.

(b)    Except as set forth on Schedule 3.21(b), neither the Company nor any of its Subsidiaries has received any written notice that any Material Customer or Material Supplier (i) has terminated its relationship with the Company or any of its Subsidiaries, or (ii) intends to terminate its relationship with the Company or any of the Company's Subsidiaries.

(c)    As of May 18, 2020, the aggregate value of backorders is as set forth on Schedule 3.21(c).

3.22.    Product Liability.  Except as set forth on Schedule 3.22 and excluding voluntary recalls and field alerts, all products sold by the Company and its Subsidiaries since January 1, 2017, or provided, manufactured or delivered by the Company and its Subsidiaries since January 1, 2017, were designed, manufactured, prepared, assembled, packaged, labeled, sterilized, stored, serviced and processed in compliance, in all material respects, with applicable Law, applicable contractual commitments and the Company's specifications and quality standards.  Except as set forth on Schedule 3.22, there are no pending or, to the Knowledge of Sellers, threatened Actions arising out of any injury to a Person or property as a result of the ownership, design, manufacture, possession, provision, clinical development, distribution, marketing, promotion, sale, implanting, or other use of the Products sold, provided, manufactured or delivered by the Company and its Subsidiaries after January 1, 2017 and prior to the Closing Date.  All Actions (including those relating to clinical trials) against or, to the Knowledge of Sellers, involving or threatened against the Company and its Subsidiaries that are pending or were asserted since January 1, 2017 and that relate in any way to the Products, whether covered by insurance or not and whether litigation has resulted or not, are listed and summarized on Schedule 3.22.  Since January 1, 2017, no allegation has been asserted or threatened in writing that any Products contain a design defect or a manufacturing defect.

3.23.    Health Care Regulatory Matters.  Except as set forth in Schedule 3.23 or as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and since January 1, 2017:

(a)    The Company and its Subsidiaries, and to the Knowledge of Sellers, each of their directors, officers, management employees, agents (while acting in such capacity), contract manufacturers, suppliers, and distributors are, and at all times after January 1, 2017 were, in compliance with all Health Care Laws to the extent applicable to the Company or any of its products or activities, except, with respect to such agents, contractors, manufacturers, suppliers and distributors, as would not reasonably be expected to prevent the Company and its Subsidiaries from being in such compliance themselves.  To the Knowledge of Sellers, there are no facts or circumstances that reasonably would be expected to give rise to any failure by the Company and its Subsidiaries to be in such compliance under any Health Care Laws that would reasonably be expected to give rise to a Material Adverse Effect.

(b)    All material Governmental Authorizations required by the Health Care Laws are in full force and effect.  Neither the Company nor any of its Subsidiaries have knowledge of any facts or circumstances that would be reasonably likely to lead the revocation, suspension, limitation, or cancellation of a Governmental Authorization required under Health Care Laws or of any application for a Governmental Authorization required under Health Care Laws currently pending before the FDA, DEA, or such other Governmental Body.

(c)    All reports, documents, claims, notices, or Governmental Authorizations required under Health Care Laws to be filed, maintained or furnished to the FDA, DEA, or any Governmental Body by the Company and its Subsidiaries have been so filed, maintained or furnished, except where failure to file, maintain or furnish such reports, documents, claims, notices, or Governmental Authorizations have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  To the Knowledge of Sellers all such reports, documents, claims, notices, and other Governmental Authorizations were true and complete in all material respects on the date filed (or were corrected in or supplemented by a subsequent filing).

(d)    All preclinical and clinical trials conducted by or, to the Knowledge of Sellers, on behalf of the Company or any of its Subsidiaries, have been, and if still pending are being, conducted in compliance with research protocols and all applicable Health Care Laws, including the FDCA and its applicable implementing regulations at 21 C.F.R. Parts 50, 54, 56, 58, 312, 314, 320, 511, and 814.  No clinical trial conducted by or on behalf of the Company or its Subsidiaries has been terminated or suspended prior to completion, and no clinical investigator that has participated or is participating in, or institutional review board that has or has had jurisdiction over, a clinical trial conducted by or on behalf of the Company or its Subsidiaries has placed a clinical hold order on, or otherwise terminated, delayed or suspended, such a clinical trial at a clinical research site based on an actual or alleged lack of safety or efficacy of any Product or a failure to conduct such clinical trial in compliance with applicable Health Care Laws.

(e)    All manufacturing operations conducted by or, to the Knowledge of Sellers, for the benefit of the Company or its Subsidiaries have been and are being conducted in material compliance with all Governmental Authorizations issued by a Governmental Body under Health Care Laws and in material compliance with all applicable Health Care Laws, including the FDA's current Good Manufacturing Practice (cGMP) regulations at 21 C.F.R. Parts 210-211, Quality System (QS) regulations at 21 C.F.R. Part 820, animal drug cGMP regulations at 21 C.F.R. Part 507, and all comparable foreign regulatory requirements of any Governmental Body.

(f)    Neither the Company nor any of its Subsidiaries have received any written communication or, to the Knowledge of Sellers, any oral communication from an applicable Governmental Body that relates to an alleged violation or non-compliance with any Health Care Laws, including any notification of any pending or threatened claim, suit, proceeding, hearing, enforcement, investigation, arbitration, import detention or refusal, subpoena, civil investigative demand, FDA Warning Letter or Untitled Letter, or any action by a Governmental Body relating to any Health Care Laws, in each case, that has not been resolved to the satisfaction of the applicable Governmental Body.

(g)    Neither the Company nor any of its Subsidiaries are party to any corporate integrity agreements, monitoring agreements, consent decrees, settlement orders, or similar agreements with or imposed by any Governmental Body.

(h)    There have been no seizures, withdrawals, recalls, detentions, or suspensions of manufacturing or distribution relating to the Products required or requested by a Governmental Body, or voluntary recalls, field notifications, field corrections, product removals, market withdrawals or replacements, "dear doctor" letters, safety alerts, or other notice of action relating to an alleged lack of safety, efficacy, or regulatory compliance of the Products ("Safety Notices"), in each case that has not been resolved to the satisfaction of the applicable Governmental Body. To the Knowledge of Sellers, there are no facts or circumstances that reasonably would be expected to give rise to a Safety Notice.

(i)    Neither the Company, nor its Subsidiaries, nor, to the Knowledge of Sellers, any officer, employee, agent, or distributor of the Company or any of its Subsidiaries has made an untrue statement of a material fact or fraudulent or misleading statement to a Governmental Body, failed to disclose a material fact required to be disclosed to a Governmental Body, or committed an act, made a statement, or failed to make a statement that would reasonably be expected to provide a basis for the FDA to invoke its policy respecting "Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities" Final Policy set forth in 56 Fed. Reg. 46191 (September 10, 1991) and any amendments thereto (the "FDA Ethics Policy").  None of the aforementioned is or has been under investigation resulting from any allegedly untrue, fraudulent, misleading, or false statement or omission, including data fraud, or had any action pending or threatened relating to the FDA Ethics Policy.

(j)    Neither the Company, nor its Subsidiaries, nor, to the Knowledge of Sellers, any officer, employee, agent, or distributor acting on behalf of the Company or any of its Subsidiaries has committed any act, made any statement or failed to make any statement in connection with the business and operations of the Company and its Subsidiaries that violates the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the federal False Claims Act, 31 U.S.C. § 3729 et seq., or other Health Care Laws applicable in the jurisdictions in which the Products are sold or intended to be sold.

(k)    Neither the Company nor its Subsidiaries, nor, to the Knowledge of Sellers, any officer, employee, agent, or distributor of the Company or its Subsidiaries has been convicted of any crime or engaged in any conduct that has resulted, or would reasonably be expected to result, in debarment under 21 U.S.C. § 335a, exclusion under 42 U.S.C. § 1320a-7, or any other

Health Care Law applicable in other jurisdictions in which the Products are sold or intended to be sold.

(l)     The Company and each of its Subsidiaries (i) are and have been in compliance with all applicable statutes, regulations, rules, and regulatory guidance relating to Product pricing, price reporting, discounts, and rebates, including those relating to the Medicaid Drug Rebate Program, the 340B Drug Pricing Program, the Medicare Part B Program, the Veterans Health Care Act Drug Pricing Program, and applicable state price reporting laws, and (ii) have calculated and reported the applicable pricing metrics under the foregoing programs (including Average Manufacturer Price, Best Price, 340B Ceiling Price, Average Sales Price, and Non-Federal Average Manufacturer Price) consistent with the applicable Health Care Laws associated with the foregoing programs.

(m)     Neither the Company nor any of its Subsidiaries, nor, to the Knowledge of Sellers, any officer, employee, agent or distributor of the Company or any of its Subsidiaries, has been excluded from participation in any federal health care program or convicted of any crime or engaged in any conduct for which such Person could be excluded from participating in any federal health care program under Section 1128 of the Social Security Act of 1935, as amended, or under any other Health Care Law.

3.24.   <u>Absence of Certain Changes</u>.   Except as set forth on <u>Schedule 3.24</u>, since December 31, 2019 through the date hereof, (w) the Company and its Subsidiaries have conducted their business in the Ordinary Course in all material respects (other than the (i) marketing of the Company, and processes and negotiations with Advisors and third parties in connection therewith (including the execution of confidentiality agreements and the sharing of confidential information pursuant thereto), (ii) preparation and commencement of the Bankruptcy Case and actions related thereto, (iii) the tightening of credit and payment terms with business counterparties following public announcement of the Company's potential plans for strategic or bankruptcy transactions, and (iv) responses to the "Coronavirus" or "COVID-19" as described on <u>Schedule 3.17(d))</u>, (x) there has not been any Material Adverse Effect, (y) there is no material business interruption or similar event, change or circumstance that has occurred, or is occurring, at any of the facilities, plants, offices, laboratories, warehouses, distribution centers and other properties (including at any Owned Real Property or Leased Real Property) owned or operated by the Company or any of its Subsidiaries, and (z) the Company and its Subsidiaries have not taken any of the following actions:

(a)     (i) redeemed, purchased or otherwise acquired any of the outstanding shares of capital stock or other equity or voting interests, or any rights, warrants or options to acquire any shares of such capital stock or other equity or voting interests, other than the acceptances of shares of Company common stock as payment for the exercise price of, or any withholding Taxes incurred with the vesting or settlement of, any Company equity awards; (ii) established a record date for, declared, set aside for payment or paid any dividend on, or made any other distribution in respect of, any shares of the capital stock or other equity or voting interests, other than cash dividends and distributions by an Acquired Subsidiary to another Acquired Subsidiary, or (iii) split, combined, subdivided or reclassified any shares of the capital stock or other equity or voting interests;

(b)     issued, incurred, assumed or otherwise become liable for any material Indebtedness, including any Indebtedness for borrowed money in excess of $1,000,000;

(c)    sold, divested, distributed, assigned, licensed, mortgaged, pledged, encumbered, transferred, leased or subleased to any Person, or otherwise disposed of, in a single transaction or series of related transactions, any of their assets (other than any Company Owned Intellectual Property), that are (or would otherwise be) Acquired Assets, other than (i) sales of Products in the Ordinary Course, (ii) Permitted Encumbrances, and (iii) dispositions of obsolete or worn out assets;

(d)    made or authorized any capital expenditures, including for property, plant and Equipment, in excess of $1,000,000, except for those that are expressly contemplated by the Company's capital plan that has been made available to Purchaser in item 6.2.1 of the Dataroom;

(e)    made any acquisition of, or investment in, or otherwise acquired, any properties, assets, securities or business (including by merger, asset acquisition, equity purchase or other similar transaction), except for any acquisition of Inventory in the Ordinary Course;

(f)    other than as required by applicable Law or as required to comply with any Contract or Seller Plan binding on the Company and its Subsidiaries (i) granted to any current or former director, officer, employee, individual independent contractor or other individual service provider of the Company or any of its Subsidiaries any increase in compensation or benefits, (ii) granted to any current or former director, officer, employee, individual independent contractor or other individual service provider of the Company or any of its Subsidiaries any severance, retention, change in control, termination or similar compensation or benefits, (iii) granted or amended any equity, equity-based or other incentive or similar awards, (iv) established, adopted, entered into, materially amended or terminated any material Seller Plan, or (v) taken any action to accelerate or materially modify the vesting of, or payment of, any compensation or benefit under any Seller Plan; provided, however, that the foregoing clauses (i) through (v) shall not include the Company or any of its Subsidiaries entering into or making available to newly hired employees or to employees in the context of promotions based on job performance or workplace requirements, plans, agreements, benefits and compensation arrangements (including any cash-based bonus arrangements, but excluding, for the avoidance of doubt, any equity incentive grants or similar equity, or equity-linked grants or awards) that have a value that is consistent with past practice of making compensation and benefits available to newly hired or promoted employees in similar positions and otherwise consistent with the Ordinary Course; provided further, and for the avoidance of doubt, any increase in any severance, retention, change in control, termination or similar compensation or benefits shall not be deemed "Ordinary Course" or "consistent with past practice" for purposes of this Section 3.24(f);

(g)    hired or terminated (other than with cause, as determined by Sellers in good-faith), any director, officer, employee, individual independent contractor or other individual service provider, other than any employee, individual independent contractor or individual service provider whose base salary did not (and following any such action did not) exceed $250,000 per annum;

(h)    other than as required by applicable Law, entered into, amended or waived in any material respect any collective bargaining agreement (or similar agreement or arrangement);

(i)     made any material changes in financial accounting methods, principles, practices, procedures or policies, except insofar as may be required by (i) GAAP or (ii) or any applicable Law, including Regulation S-X under the Securities Act;

(j)     authorized, consented to or effected any amendment or change in (i) the Company's articles of incorporation or bylaws or (ii) the organizational documents of any Subsidiary of the Company;

(k)     waived, released, assigned, instituted, compromised, or settled, with respect to any pending or threatened Action related to the Company or any of its Subsidiaries, their respective businesses, the Acquired Assets or the Assumed Liabilities, other than involving solely money damages not in excess of $500,000 individually, or $1,000,000 in the aggregate;

(l)     (i) made any unusual or extraordinary efforts to collect any accounts receivable, intercompany obligation or Liability for Indebtedness, or given any discounts or concessions for early payment of such accounts receivable, intercompany obligation or Liability for Indebtedness or (ii) made any sales of, or, other than Permitted Encumbrances, conveyed any interest in, any such accounts receivable, intercompany obligation or Liability for Indebtedness to any third party;

(m)     licensed on-market or in-development products from third parties other than (i) in the Ordinary Course, (ii) which would not reasonably expected to result in payments, over the life of such Contract (including any purchaser order or similar agreement or binding arrangement associated therewith), of amounts in excess of $1,000,000 and (iii) those which would not impose any obligations on the Company and its Subsidiaries of the type contemplated by Section 3.9(a)(viii);

(n)     (i) abandoned, cancelled, failed to renew, or permitted to lapse (A) any Company Owned Intellectual Property that is used in the conduct of the business or held for use by the Company or any of its Subsidiaries and is material to the Company and its Subsidiaries or (B) any material Company Licensed Intellectual Property to the extent that a Seller has the right to take or cause to be taken such action pursuant to the terms of the applicable Contract under which such Intellectual Property is licensed to the applicable Seller, (ii) sold, transferred, licensed or otherwise encumbered any material Company Owned Intellectual Property, other than licenses of Company Owned Intellectual Property in the Ordinary Course, or (iii) except in the Ordinary Course, withdrawn, amended, modified or terminated any Product Registrations;

(o)     amended in any material respect, cancelled or permitted to terminate any material insurance policy naming the Company or a Subsidiary of the Company as an insured, a beneficiary or a loss payable payee without first obtaining comparable substitute insurance coverage with no lapse in coverage;

(p)     granted any waiver under or amended or modified, or surrendered, revoked, permitted to lapse or otherwise terminated any Permit, other than in the Ordinary Course and as would not reasonably be expected to be material to the Acquired Assets, the Assumed Liabilities or the operation of the business of the Company and its Subsidiaries; or

(q)      authorized any of, or committed, or agreed in writing or otherwise, to take any of, the foregoing actions.

3.25.   Bank Accounts.   Schedule 3.25 sets forth a complete list of all bank accounts (including any deposit accounts, securities accounts and any sub-accounts) of Sellers and the Acquired Subsidiaries.

3.26.   No Other Representations or Warranties.   Except for the representations and warranties expressly contained in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the officer's certificate of the Company delivered pursuant to Section 2.3(f) (the "Express Representations"), neither the Company nor any other Person on behalf of the Company makes any express or implied representation or warranty with respect to the Company or any of its Subsidiaries, the Acquired Assets or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in the Projections, the Confidential Information Memorandum prepared by PJT Partners LP) (the "Information Presentation") or in that certain datasite administered by Intralinks (the "Dataroom") or elsewhere to Purchaser or any of its Affiliates or Advisors on behalf of the Company or any of its Affiliates or Advisors.  Except with respect to the Express Representations, all other representations and warranties, whether express or implied, are hereby expressly disclaimed by the Company.  Nothing in this Section 3.26 shall limit any rights or remedies of Purchaser with respect to a claim for Fraud.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to the Company as follows as of the date hereof and as of the Closing Date.

4.1.   Organization and Qualification.   Purchaser is a limited liability company, validly existing and in good standing under the laws of the State of Delaware and has all requisite limited liability company power and limited liability company authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due incorporation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement.  Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement.  Purchaser is not in violation of any of the provisions of its organizational documents, except as would not reasonably be expected to be material to Purchaser.

4.2.   Authorization of Agreement.   Purchaser has all necessary limited liability company power and limited liability company authority to execute and deliver this Agreement and each

Ancillary Agreement to which it is a party and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement and each Ancillary Agreement to which it is a party, and the consummation by Purchaser of the transactions contemplated hereby and thereby, subject to requisite Bankruptcy Court approvals, have been, or with respect to any Ancillary Agreement to which Purchaser is a party, will be prior to the execution and delivery thereof, duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are, or will be when so executed and delivered, necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the Ancillary Agreements and the consummation by it of the transactions contemplated hereby and thereby.  Subject to requisite Bankruptcy Court approvals, this Agreement has been, and at or prior to the Closing, each Ancillary Agreement to which it is a party will be, duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, this Agreement and each Ancillary Agreement to which it is a party constitutes a legal, valid and binding obligation of Purchaser when so executed, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3.    Conflicts; Consents.

(a)    Assuming that (a) requisite Bankruptcy Court approvals are obtained, (b) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 4.3 are made, given or obtained (as applicable), (c) the requirements of the HSR Act are complied with, and (d) any filings required by any applicable federal or state securities or "blue sky" Laws are made, neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the transactions contemplated hereby, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (i) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (ii) conflict with or violate any Law or Order applicable to Purchaser, (iii) conflict with, violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or result in the acceleration of or give rise to a right of termination, modification, acceleration or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of material Contract to which Purchaser is a party, or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of clauses (i) through (iv), as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement.

(b)    Except as set forth on Schedule 4.3(b), Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the transactions contemplated hereby, except (i) any filings required to be made under the HSR Act, (ii) such filings as may be required by any applicable federal or state securities or "blue sky" Laws, (iii) as otherwise set forth on Schedule 4.3 or (iv) where failure to file, seek or obtain such notice, authorization, approval, Order, permit or consent, would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the transactions contemplated hereby.

4.4.    <u>Financing</u>.  Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Wind-Down Amount (to the extent that the Wind-Down Amount is not reduced to zero by Excluded Cash), to assume the Assumed Liabilities and to consummate all of the other transactions contemplated by this Agreement.  Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5.    <u>Brokers</u>.  Except for Greenhill & Co., LLC, the fees and expenses of which will be paid solely by Purchaser, no broker, finder, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Purchaser.

4.6.    <u>Credit Bid</u>.  The Required Lenders (as defined in the Direction Letter), as holders of outstanding Loan Agreement Indebtedness, delivered to Purchaser, on or prior to the date hereof, a direction letter to fully authorize Purchaser to, among other things, enter into and perform and comply with this Agreement and consummate the transactions contemplated hereby, including the credit bid contemplated in <u>Section 2.1(a)</u>, which is attached on <u>Schedule 4.6</u> (the "<u>Direction Letter</u>").

4.7.    <u>No Litigation</u>.    There are no Actions pending or, to Purchaser's knowledge, threatened against Purchaser that will adversely affect in any material respect Purchaser's ability to consummate the transactions contemplated by this Agreement (other than with respect to any objection, adversary proceeding or other contested matter which may after the date hereof be filed or otherwise arise in connection with the Bankruptcy Case).

4.8.    <u>Certain Arrangements</u>.  As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of the Company or any of its Subsidiaries or board of directors (or applicable governing body of any Subsidiary), any holder of equity or debt securities of the Company or its Subsidiaries, or any lender or creditor of the Company or its Subsidiaries, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the transactions contemplated by this Agreement or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of the Company to entertain, negotiate or participate in any such transaction.

4.9.    <u>Investment Representation; Investigation</u>.  Purchaser is acquiring the capital stock or other equity interests of the Acquired Subsidiaries for its own account with the present intention of holding such securities for investment purposes and not with a view to, or for sale in connection with, any distribution of such securities in violation of any federal or state securities Laws.  Purchaser is an "accredited investor" within the meaning of Regulation D promulgated pursuant to the Securities Act. Purchaser has knowledge and experience in financial and business matters, is capable of evaluating the merits and risks of the transactions contemplated by this Agreement, and is able to bear the substantial economic risk of such investment for an indefinite period of time.

4.10.    <u>No Additional Representations or Warranties</u>.  Except for the representations and

warranties expressly contained in this <u>Article IV</u> (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the officer's certificate delivered by Purchaser pursuant to <u>Section 2.4(c)</u>, each Seller, on behalf of itself and each other Seller Party, acknowledges and agrees that neither Purchaser nor any other Person on behalf of Purchaser makes, and none of the Seller Parties have relied on the accuracy or completeness of any express or implied representation or warranty with respect to Purchaser or with respect to any other information provided by or on behalf of any Purchaser.

## ARTICLE V

## BANKRUPTCY COURT MATTERS

5.1.    <u>Bankruptcy Actions.</u>

(a)    As promptly as practicable after the date hereof (and, in any event, in accordance with the milestones set forth in the RSA), Sellers shall file with the Bankruptcy Court consistent with the consent rights set forth in the RSA (i) the Petitions and (ii) a motion seeking approval of (y) the Bidding Procedures Order and (z) the form of this Agreement and Sellers' authority to enter into this Agreement (the "<u>Bidding Procedures Motion</u>"); <u>provided</u> that the Company may modify the Bidding Procedures Motion pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or statutory committee representing a group of creditors in the Bankruptcy Case, or any other party in interest and otherwise in a manner consistent with the RSA; <u>provided</u> <u>further</u> that any and all such modifications are first approved by Purchaser in writing.  The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order.  Purchaser agrees and acknowledges that Sellers, including through their representatives, are and may continue soliciting inquiries, proposals or offers from third parties in connection with any Alternative Transaction.

(b)    From the date hereof until the earlier of (i) the termination of this Agreement in accordance with <u>Article VIII</u> and (ii) the Closing Date, Sellers shall diligently pursue the entry of (i) the Bidding Procedures Order and (ii) the Sale Order, in each case, by the Bankruptcy Court.

(c)    Sellers and Purchaser shall reasonably cooperate with the Company to assist in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as reasonably practicable, including furnishing affidavits, non-confidential financial information, or other documents or information for filing with the Bankruptcy Court and making such Advisors of Purchaser and Sellers and their respective Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing adequate assurances of performance by Purchaser as required under Section 365 of the Bankruptcy Code, and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(d)    Each of the Company and Purchaser shall appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and keep the other reasonably apprised of the status of material matters related to this Agreement, including, upon

reasonable request promptly furnishing the other with copies of notices or other communications received by any Seller from the Bankruptcy Court or any third party and/or any Governmental Body with respect to the transactions contemplated by this Agreement.

(e)     If the prevailing party at the conclusion of the Auction (such prevailing party, the "Successful Bidder") fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the next highest bidder (the "Backup Bidder") will be deemed to have the new prevailing bid, and the Company shall be required to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement; provided, however, that Purchaser shall only be required to keep Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) open and irrevocable until the earlier of (i) the Outside Back-Up Date or (ii) the date of closing of an Alternative Transaction with the Successful Bidder.

(f)     The Company and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval.  The Company and Purchaser acknowledge that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about the Company to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

(g)     Notwithstanding any other provision of this Agreement to the contrary, Purchaser acknowledges that Sellers and their Affiliates and Advisors are and may continue soliciting and/or responding to inquiries, proposals or offers for the Acquired Assets and may furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any Person to do or seek to do any of the foregoing in connection with any Alternative Transaction.

(h)     Purchaser shall provide adequate assurance of future performance as required under Section 365 of the Bankruptcy Code for the Assigned Contracts.  Purchaser agrees that it will take actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

5.2.    Cure Costs. Subject to entry of the Sale Order and consummation of the Closing, Purchaser shall, on the Closing, pay the Cure Costs and cure any and all other defaults and breaches under the Acquired Contracts so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement.

5.3.    Sale Order.  The Sale Order shall, among other things, (a) approve, pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, (i) the execution, delivery and performance

by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Sellers of their respective obligations under this Agreement; (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts; (c) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code; (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity; (e) find that Purchaser has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts; and (f) find that Purchaser shall have no Liability for any Excluded Liability. Without limiting Sellers' obligation to take all such actions as are reasonably necessary to obtain Bankruptcy Court approval of the Sale Order, Purchaser agrees that it will promptly take reasonable actions to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code. Nothing in this Agreement shall require Purchaser or its Affiliates to give testimony to or submit any pleading, affidavit or information to the Bankruptcy Court or any Person that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

5.4.    Sale Free and Clear.  Sellers acknowledge and agree, and the Sale Order shall provide that, except as otherwise provided in Section 1.3, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances of, against or created by Sellers or their bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Acquired Assets. On the Closing Date, the Acquired Assets shall be transferred to Purchaser free and clear of all obligations, Liabilities and Encumbrances, other than Permitted Encumbrances and the Assumed Liabilities to the fullest extent permitted by Section 363 of the Bankruptcy Code.

5.5.    Approval.  Sellers' obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order).  Nothing in this Agreement shall require the Company or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

## ARTICLE VI

## COVENANTS AND AGREEMENTS

6.1.    <u>Conduct of Business of Sellers</u>.

(a)    Except as (i) required by applicable Law, (ii) required by order of the Bankruptcy Court or required, authorized or restricted pursuant to the Bankruptcy Code or the Financing Order or the DIP Credit Agreement, as the case may be, (iii) expressly contemplated or required by this Agreement or (iv) expressly set forth in <u>Schedule 6.1(a),</u> during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to <u>Article VIII</u>), unless Purchaser otherwise consents in writing (<u>provided</u>, and without prejudice to <u>Section 6.2(b)</u>, in the event that Sellers request, in writing, to take any reasonable action of short term duration which, based on Sellers' good faith business judgment, is necessary to respond the "Coronavirus" or "COVID-19" (or the Effects thereof), Purchaser shall not unreasonably withhold, condition or delay its consent for such action), the Company shall, and shall cause each of its Subsidiaries to, carry on its and their business in the Ordinary Course, pay all of their respective post-petition obligations in the Ordinary Course and use its and their commercially reasonable efforts to preserve substantially intact their goodwill and relationships with employees, suppliers, vendors, licensors, licensees, distributors, consultants, customers and other Persons having material relationships with the Company and its Subsidiaries, taken as a whole (other than making any payment of any pre-petition claim).

(b)    Except as (i) required by applicable Law, (ii) required by order of the Bankruptcy Court or required, authorized or restricted pursuant to the Bankruptcy Code or the Financing Order or the DIP Credit Agreement, as the case may be, (iii) expressly contemplated or required by this Agreement, or (iv) expressly set forth in <u>Schedule 6.1(a)</u>, and without limiting the generality of the restrictions set forth in <u>Section 6.1(a)</u>, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to <u>Article VIII</u>), unless Purchaser otherwise consents in writing (<u>provided</u>, and without prejudice to <u>Section 6.2(b)</u>, in the event that Sellers request, in writing, to take any reasonable action of short term duration which, based on Sellers' good faith business judgment, is necessary to respond the "Coronavirus" or "COVID-19" (or the Effects thereof), Purchaser shall not unreasonably withhold, condition or delay its consent for such action), the Company shall not, and shall cause each of its Subsidiaries not to, do any of the following (whether by merger, operation of law or otherwise):

(i)    (A) issue, sell, encumber or grant any shares of the capital stock or other equity or voting interests, or any securities or rights convertible into, exchangeable or exercisable for, or evidencing the right to subscribe for any shares of such capital stock or other equity or voting interests, or any rights, warrants or options to purchase any shares of such capital stock or other equity or voting interests; (B) redeem, purchase or otherwise acquire any of the outstanding shares of capital stock or other equity or voting interests, or any rights, warrants or options to acquire any shares of such capital stock or other equity or voting interests, other than the acceptance of shares of Company common stock as payment for the exercise price of, or any withholding Taxes incurred with the vesting or settlement of, any Company equity awards, (C) establish a record date for, declare, set

46

aside for payment or pay any dividend on, or make any other distribution in respect of, any shares of the capital stock or other equity or voting interests, other than cash dividends and distributions by an Acquired Subsidiary to another Acquired Subsidiary, but subject to Section 6.1(a), or (D) split, combine, subdivide or reclassify any shares of the capital stock or other equity or voting interests;

(ii)    issue, incur, assume or otherwise become liable for (A) any indebtedness for borrowed money, (B) any notes, mortgages, bonds, debentures or other debt securities or warrants or other rights to acquire any notes, mortgages, bonds, debentures or other debt securities of the Company or any of its Subsidiaries, (C) any letters of credit, security or performance bonds or similar credit support instruments or overdraft facilities or cash management programs of any Person, (D) any amounts owing as deferred purchase price for property or services, including any capital leases, seller notes and "earn out" payments, or other contingent payment obligations, or (E) any guarantee of any of the foregoing obligations of another Person, or any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "Indebtedness"), except Indebtedness that will constitute Excluded Liabilities;

(iii)    sell, divest, distribute, assign, license, mortgage, pledge, encumber, transfer, lease or sublease to any Person, or otherwise dispose of, in a single transaction or series of related transactions, any of the Acquired Assets (other than Intellectual Property), except (A) Ordinary Course dispositions of Inventory, and (B) dispositions of obsolete or worn out assets; provided, however, that the Company shall not, and shall not permit its Subsidiaries to (i) take any such action, or otherwise terminate, amend, modify, extend, waive, renew or otherwise alter any of the Leases, (ii) construct, alter or destroy any material improvement on the Owned Real Property, except in connection with any capital expenditures expressly contemplated by Section 6.1(b)(iv), or (iii) take any such action with respect to any of the Owned Real Property or any portion thereof;

(iv)    make or authorize capital expenditures, including for property, plant and Equipment, except for those that are expressly contemplated by the Company's capital plan that has been made available to Purchaser in item 6.2.1 of the Dataroom;

(v)    make any acquisition of, or investment in, or otherwise acquire, any properties, assets, securities or business (including by merger, asset acquisition, equity purchase or other similar transaction), except for any acquisition of Inventory in the Ordinary Course and, in each case, otherwise in accordance with the budget contemplated by the Financing Order the DIP Credit Agreement and except in connection with any capital expenditures expressly contemplated by Section 6.1(b)(iv);

(vi)    other than as required by applicable Law, required to comply with any Contract or Seller Plan binding on the Company and its Subsidiaries as of the date of this Agreement and made available to Purchaser (if so required by this Agreement), or as set forth on Schedule 6.1(b)(vi) (1) grant to any current or former director, officer, employee, individual independent contractor or other individual service provider of the Company or any of its Subsidiaries any increase in compensation or benefits, (2) grant to any current or former director, officer, employee, individual independent contractor or

47

other individual service provider of the Company or any of its Subsidiaries any severance, retention, change in control, termination or similar compensation or benefits, (3) grant or amend any equity, equity-based or other incentive or similar awards, (4) establish, adopt, enter into, materially amend or terminate any material Seller Plan, or (5) take any action to accelerate or materially modify the vesting of, or payment of, any compensation or benefit under any Seller Plan; provided, however, that the foregoing clauses (1) through (5) shall not restrict the Company or any of its Subsidiaries from entering into or making available to newly hired employees or to employees in the context of promotions based on job performance or workplace requirements, plans, agreements, benefits and compensation arrangements (including any cash-based bonus arrangements, but excluding, for the avoidance of doubt, any equity incentive grants or similar equity, or equity-linked grants or awards) that have a value that is consistent with past practice of making compensation and benefits available to newly hired or promoted employees in similar positions and otherwise consistent with the Ordinary Course; provided further, and for the avoidance of doubt, any increase in any severance, retention, change in control, termination or similar compensation or benefits shall not be deemed "Ordinary Course" or "consistent with past practice" for purposes of this Section 6.1(b)(vi);

(vii)    hire or terminate (other than with cause, as determined by Sellers in good-faith), any director, officer, employee, individual independent contractor or other individual service provider, other than any employee, individual independent contractor or individual service provider whose base salary does not (and following any such action will not) exceed $250,000 per annum;

(viii)    other than as required by applicable Law, enter into, amend or waive in any material respect any collective bargaining agreement (or similar agreement or arrangement);

(ix)    make any material changes in financial accounting methods, principles, practices, procedures or policies, except insofar as may be required by (A) GAAP or (B) or any applicable Law, including Regulation S-X under the Securities Act;

(x)    authorize, consent to or effect any amendment or change in (A) the Company's articles of incorporation or bylaws or (B) the organizational documents of any Subsidiary of the Company;

(xi)    sell, lease, transfer, license, abandon or otherwise dispose of, or grant any Encumbrance (other than Permitted Encumbrances), on any Acquired Assets (other than Intellectual Property), other than (A) any Encumbrance to secure Indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms); provided that any such Encumbrance will be extinguished in connection with the Closing; or (B) sales of Inventory in the Ordinary Course;

(xii)    waive, release, assign, institute, compromise, or settle, with respect to any pending or threatened Action related to the Company or any of its Subsidiaries, their respective businesses, the Acquired Assets or the Assumed Liabilities, other than (i) the

48

Bankruptcy Case or (ii) involving solely money damages not in excess of $500,000 individually, or $1,000,000 in the aggregate which will constitute Excluded Liabilities;

(xiii)   (A) terminate, amend, supplement, modify or waive any provision of, or accelerate any rights, benefits or obligations under, any Material Contract, except any such action which would otherwise not be material and is in the Ordinary Course or the expiration in accordance with its term or (B) enter into any Contract that would be a Material Contract if executed prior to the date of this Agreement or which would result in an obligation of the Company or any of its Subsidiaries in excess of $3,000,000, except for any renewal of any such Contract in the Ordinary Course upon terms and conditions which are no less favorable to the Company and its Subsidiaries, in any material respect, than those in effect as of the date of this Agreement;

(xiv)   (A) make any unusual or extraordinary efforts to collect any accounts receivable, intercompany obligation or Liability for Indebtedness, or give any discounts or concessions for early payment of such accounts receivable, intercompany obligation or Liability for Indebtedness or (B) make any sales of, or, other than Permitted Encumbrances and any Encumbrances provided for in the Financing Order, convey any interest in, any accounts receivable, intercompany obligation or Liability for Indebtedness to any third party;

(xv)   license on-market or in-development products from third parties other than (A) in the Ordinary Course, (B) those that would not reasonably be expected to result in payments, over the life of such Contract (including any purchaser order or similar agreement or binding arrangement associated therewith), of amounts in excess of $3,000,000 and (C) which would not impose any obligations on the Company and its Subsidiaries of the type contemplated by Section 3.9(a)(viii);

(xvi)   (A) abandon, cancel, fail to renew, or permit to lapse, as applicable, (1) any Company Owned Intellectual Property that is used in the conduct of the business or held for use by the Company or any of its Subsidiaries and is material to the Company and its Subsidiaries or (2) any material Company Licensed Intellectual Property to the extent that a Seller has the right to take or cause to be taken such action pursuant to the terms of the applicable Contract under which such Intellectual Property is licensed to the applicable Seller, (B) sell, transfer, license or otherwise encumber any material Company Owned Intellectual Property, other than licenses of Company Owned Intellectual Property in the Ordinary Course, or (C) except in the Ordinary Course, withdraw, amend, modify or terminate any Product Registrations;

(xvii)   amend in any material respect, cancel or permit to terminate any material insurance policy naming the Company or a Subsidiary of the Company as an insured, a beneficiary or a loss payable payee without first obtaining comparable substitute insurance coverage with no lapse in coverage;

(xviii)  grant any waiver under or amend or modify, or surrender, revoke, permit to lapse or otherwise terminate any Permit, other than in the Ordinary Course and

49

as would not reasonably be expected to be material to the Acquired Assets, the Assumed Liabilities or the operation of the business of the Company and its Subsidiaries;

(xix)    except as required by applicable Law, (1) make, revoke or change any material Tax election or method of accounting with respect to Taxes, (2) file any Tax Return (other than in the Ordinary Course and consistent with past practice and applicable Law) or amend any Tax Return, (3) enter into any closing agreement, (4) commence, settle or compromise any material Tax claim or assessment, (5) consent to any extension or waiver of the limitation period applicable to any claim or assessment with respect to a material amount of Taxes, (6) grant any power of attorney with respect to material Taxes, or (7) enter into any Tax allocation, sharing, indemnity or similar agreement or arrangement (other than any customary commercial agreement or arrangement entered into in the Ordinary Course the primary purpose of which is not the allocation of Taxes); in each case to the extent such action could adversely affect Purchaser or the Acquired Assets or increase the amount of any Assumed Liabilities; or

(xx)    authorize any of, or commit, agree in writing or otherwise, to take any of, the foregoing actions.

It is understood and agreed that certain actions may be contemplated by one or more provisions of this Section 6.1(b) and, in such event, such action may only be taken (or omitted to be taken) if so permitted by each such provision of this Section 6.1(b).

(c)    Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct the Company's or its Subsidiaries' operations or business prior to the Closing, and nothing contained in this Agreement is intended to give the Company, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations.  Prior to the Closing, each of Purchaser and the Company shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations.

(d)    In furtherance of the provisions of Section 6.1(a) and Section 6.1(b), it is the intent of the Parties that, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing (such consent to be provided in Purchaser's sole discretion), other than as set forth on Schedule 6.1(d), Sellers shall not, and Sellers shall cause their Subsidiaries not to, (i) sell, divest, distribute, assign, license, mortgage, pledge, encumber, transfer, lease or sublease to any Subsidiary that is not a Seller or, at the Closing, is an Acquired Subsidiary, any property, right, privilege, interest or any other asset of Sellers or any such Acquired Subsidiary that would otherwise (A) constitute an Acquired Asset if owned immediately prior to the Closing or (B) is or would otherwise constitute a property, right, privilege, interest or any other asset of any such Acquired Subsidiary, or (ii) convey, transfer or otherwise assign to any Seller or such Acquired Subsidiary any Liability of any entity that is an Excluded Subsidiary.

6.2.    Access to Information.

50

(a)    From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to Article VIII), the Company will, and will cause its Subsidiaries and use commercially reasonable efforts to cause its Advisors and other representatives to, provide Purchaser and its Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records (including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other Documents), documents, data, files, personnel and offices and properties of the Company and its Subsidiaries, in order for Purchaser and its Advisors to access such information regarding the Company and its Subsidiaries as is reasonably necessary in order to consummate the transactions contemplated by this Agreement or otherwise as reasonably requested by Purchaser in connection with Purchaser's actions provided for in this Agreement, or as requested by Purchaser in order for Purchaser and its Advisors to conduct a Phase I or similar environmental site assessment of any of the Acquired Assets; provided that (i) such access does not unreasonably interfere with the normal and Ordinary Course operations of the Company and its Subsidiaries, (ii) all requests for access will be directed to PJT Partners LP or such other Person(s) as the Company may designate in writing from time to time, (iii) nothing herein will require the Company to provide access to any properties, plants or facilities for the purposes of conducting (A) any Phase I or similar environmental site assessment, including a Preliminary Assessment (as defined in ISRA), for any Acquired Leased Real Property in New Jersey for which a General Information Notice was submitted or (B) any subsurface or invasive environmental sampling or testing (for clarity, a Phase I environmental site assessment or similar environmental assessment shall not constitute subsurface or invasive environmental sampling or testing) and (iv) nothing herein will require the Company to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would result in the waiver of any attorney-client, work-product or other legal privilege or accountant privilege, (B) would reasonably be expected to violate any applicable Laws (including the HSR Act and Foreign Competition Laws), or (C) would violate any fiduciary duty; provided further that the Company and its Subsidiaries will use commercially reasonable efforts to provide a reasonable alternative means of accessing any such information in a manner that is not inconsistent with the foregoing; provided further that no such access shall be required in connection with a proceeding between Purchaser or any of its Affiliates, on the one hand, and any Seller or any of its Affiliates, on the other hand.

(b)    From time to time following the date hereof and prior to the Closing, upon Purchaser's reasonable request with respect to any Effects on the Company and its Subsidiaries relating to or arising from the "Coronavirus" or "COVID-19" (including any quarantine or trade restrictions or similar Effects reasonably related thereto) that would reasonably be expected to adversely impact the business and operations of the Company and its Subsidiaries in any material respect, the Sellers shall, and shall use their commercially reasonable efforts to cause their Advisors to, promptly (and, in any event, within five (5) Business Days of any written request of Purchaser) (i) provide, in a manner consistent with the provisions of Section 6.2(a), information reasonably requested by Purchaser and relating to such Effects and the Company and its Subsidiaries or, to the extent relevant to such Effects, its historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of the Company or any of its Subsidiaries related thereto, (ii) participate in meetings or teleconferences reasonably requested by Purchaser (including such members of senior management of the Company as may be reasonably requested or necessary with respect to such Effects) to discuss

such Effects and information referred to in the immediately preceding clause (i), and (iii) consider in good-faith Purchaser's requests, recommendations and advice in connection therewith.

(c)    The information provided pursuant to this <u>Section 6.2</u> will be used solely for the purpose of consummating the transactions contemplated hereby or in connection with Purchaser's actions provided for in this Agreement, and will be governed by all the confidentiality terms and conditions of the Loan Documents.  Neither the Company nor any of Sellers makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this <u>Section 6.2</u>, other than the Express Representations.

(d)    From and after the Closing for a period of three (3) years following the Closing Date (or, if earlier, the closing of the Bankruptcy Case), Purchaser will provide Sellers and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other Documents transferred to Purchaser pursuant to this Agreement (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities, in each case, in Purchaser's possession or control and solely to the extent concerning periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to personnel, offices and properties of Purchaser, as may be reasonably requested by the Company in connection with the Bankruptcy Cases, the wind-down and liquidation of Sellers, to comply with legal, regulatory, stock exchange and financial reporting requirements, to satisfy any audit, accounting or similar requirement; <u>provided</u>, in each case, that such access does not unreasonably interfere with the normal operations of Purchaser; <u>provided</u> <u>further</u> that nothing herein will require Purchaser to provide access to, or to disclose any information to, Sellers if such access or disclosure (A) would result in the waiver of any attorney-client, work-product or other legal privilege or accountant privilege, (B) would reasonably be expected to violate any applicable Laws (including the HSR Act and Foreign Competition Laws), (C) would reasonably expected to be in violation of the provisions of any agreement (including any confidentiality obligation) by which Purchaser or any of its Subsidiaries is bound, or (D) would violate any fiduciary duty; <u>provided</u> that Purchaser and its Subsidiaries will use commercially reasonable efforts to provide a reasonable alternative means of accessing any such information in a manner that is not inconsistent with the foregoing; <u>provided</u> <u>further</u> that no such access shall be required in connection with a proceeding between Purchaser or any of its Affiliates, on the one hand, and any Seller or any of its Affiliates, on the other hand.

(e)    Unless otherwise consented to in writing by the other Parties, no Party, for a period of three (3) years following the Closing Date, shall destroy, alter or otherwise dispose of any of the books and records relating to any period occurring on or prior to the Closing without providing reasonable advance notice to such other Party and offering to permit such other Party (at such other Party's sole cost and expense) to make copies of such books and records or any portion thereof that such Party may intend to destroy, alter or dispose of.  From and after the Closing, Purchaser will, and will cause its employees to, provide Sellers with reasonable assistance, support and cooperation, upon reasonable advance notice and during normal business hours, with Sellers' wind-down and related activities (*e.g.*, helping to locate documents or information related to and assistance with preparation of Tax Returns or prosecution or processing of insurance/benefit claims); <u>provided</u> that such assistance, support and cooperation does not (x)

unreasonably interfere with Purchaser's business and operations or (y) require Purchaser to incur any out of pocket costs or expenses.

(f)     Except for contacts in the Ordinary Course unrelated to the transactions contemplated hereby, Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of the Company or its Subsidiaries prior to the Closing with respect to the Company, its Subsidiaries, their business or the transactions contemplated by this Agreement without the prior written consent of the Company for each such contact, such consent not to be unreasonably withheld, conditioned or delayed.

(g)     From and after the Closing for a period of three (3) years following the Closing Date (or, if earlier, the closing of the Bankruptcy Case), Sellers will provide Purchaser and its Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents relating to the Company or its Subsidiaries (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities, in each case, in Sellers' possession or control and solely to the extent concerning periods or occurrences prior to the Closing Date as may be reasonably requested by Purchaser (x) to comply with legal, contractual, regulatory, stock exchange and financial reporting requirements, (y) to satisfy any audit, accounting or similar requirement, or (z) to satisfy any other bona fide legal compliance, accounting or tax purpose; provided that nothing herein will require Sellers to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would result in the waiver of any attorney-client, work-product or other legal privilege or accountant privilege, (B) would reasonably be expected to violate any applicable Laws (including the HSR Act and Foreign Competition Laws), or (C) would violate any fiduciary duty; provided that Sellers will use commercially reasonable efforts to provide a reasonable alternative means of accessing any such information in a manner that is not inconsistent with the foregoing; provided further that no such access shall be required in connection with a proceeding between Purchaser or any of its Affiliates, on the one hand, and any Seller or any of its Affiliates, on the other hand.

6.3.    Employee Matters.

(a)     Purchaser shall extend to all employees of Sellers listed on Schedule 3.17(a) (or hired in compliance with Section 6.1) (the "Employees") an offer of employment in a position that is comparable to such Employee's position immediately prior to the Closing (including level of responsibility, primary location of employment, and authority) on the terms set forth in this Section 6.3 ("Transfer Offer") that, if accepted, shall become effective immediately after the Closing.  Employees who accept such Transfer Offers with Purchaser in accordance with this Section 6.3(a) shall be referred to herein as "Transferred Employees."  Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all of the Employees will accept the offer of employment from Purchaser or will continue in employment with Purchaser following the Closing.  Purchaser shall carry out all actions necessary under applicable Law to effect the transfer of employment to it of each such Transferred Employee who has accepted that offer.  Effective as of the Closing, each Transferred Employee shall cease to be an employee of Sellers or their Affiliates.

(b)      For a period of one year from and after the Closing Date, Purchaser shall provide or cause to be provided each Transferred Employee with: (i) base compensation/wage rate that is no lower than that provided to such Transferred Employees as of the date hereof; (ii) short-term cash bonus opportunities substantially similar in amounts to the portion of existing retention bonus opportunities tied to short-term incentive opportunities (i.e., excluding any portion of the retention bonus opportunities that were calculated based on long-term incentives) that is no less favorable than that provided to such Transferred Employee as of the date hereof; and (iii) other employee benefits (including severance benefits, but excluding any equity incentive or other long term incentive arrangements, defined benefit pension benefits and post-employment welfare benefits) that are substantially comparable in the aggregate to those provided by Sellers to such Transferred Employees as of the date hereof under the Seller Plans made available to Purchaser (but excluding any severance benefits under any employment agreement not assumed by Purchaser).  For purposes of eligibility and vesting (other than vesting of future equity awards) under the benefit plans and programs maintained by Purchaser or any of its Affiliates after the Closing Date in which Transferred Employees are eligible to participate (the "Purchaser Plans"), each Transferred Employee who is so eligible shall be credited with his or her years of service with Sellers or any of their respective Subsidiaries before the Closing Date to the same extent as such Transferred Employee was entitled, before the Closing Date, to credit for such service under substantially similar Seller Plans in which such Transferred Employees participated before the Closing Date, except to the extent such credit would result in a duplication of benefits.

(c)      Without limiting the generality of any other provision of this Agreement: (i) each Transferred Employee shall be immediately eligible to participate, without any waiting time, in any and all Purchaser Plans that are made available to Transferred Employees at the relevant time as required by Section 6.3(c); (ii) for purposes of each Purchaser Plan providing health or welfare benefits, Purchaser shall use commercially reasonable efforts to cause all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Plan to be waived for such Transferred Employee and his or her covered dependents (unless such exclusions or requirements were applicable under comparable Seller Plans); and (iii) Purchaser shall use commercially reasonable efforts to cause any co-payments, deductible and other eligible expenses incurred by such Transferred Employee or his or her covered dependents during the plan year in which the Closing Date occurs to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Purchaser Plan.

(d)      Purchaser shall assume and be solely responsible for paying, providing and satisfying when due the following: (a) all accrued and unused vacation, personal days, sick pay and other paid time off for Transferred Employees earned but unused as of the Closing Date, (b) all cash retention and cash long term incentive plans and similar obligations and Liabilities to the extent the payee and the time and amount of payment are specified on Schedule 6.3(d), and (c) all compensation (including salary, wages, commissions, bonuses, incentive compensation, overtime, premium pay and shift differentials), vacation, personal days, sick pay and other paid time off, benefits and benefit claims, severance and termination pay, notice, and benefits (including any employer Taxes or other payments related thereto), in each case of this clause (c), accruing, incurred or arising as a result of employment or separation from employment with Purchaser after the Closing Date with respect to Transferred Employees.

54

(e)     Sellers shall reasonably cooperate in providing, pursuant to Section 6.2, to Purchaser all information reasonably requested by Purchaser with respect to Purchaser's compliance with its obligations under this Section 6.3.

(f)     The provisions of this Section 6.3 are for the sole benefit of the Parties to this Agreement and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any Employees or Transferred Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement, (ii) shall, subject to compliance with the other provisions of this Section 6.3, alter or limit Purchaser's or Sellers' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement or (iii) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

(g)     Effective as of the Closing, Purchaser and Purchaser's Affiliates shall assume all obligations, Liabilities and commitments in respect of claims made by any Transferred Employee (or any other individual claiming that he or she is or should be a Transferred Employee) for severance or other termination benefits (including claims for wrongful dismissal, notice of termination of employment, pay in lieu of notice or breach of Contract) arising out of, relating to or in connection with any failure of Purchaser to offer employment to, or to continue the employment of, any such Transferred Employee (or other individual claiming that he or she is or should be a Transferred Employee) on terms and conditions consistent with Purchaser's obligations under this Section 6.3(g).

(h)     Purchaser will, or will cause its Affiliates to, provide any required notice to Transferred Employees under the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar Laws ("WARN Act") and to otherwise comply with the WARN Act to Transferred Employees with respect to any "plant closing" or "mass layoff" or group termination or similar event under the WARN Act affecting Employees (including as a result of the consummation of transactions contemplated by this Agreement) and occurring on and after the Closing.  Purchaser will not, and will cause its Affiliates not to, take any action on or after the Closing Date that would cause any termination of employment of any Employees by Sellers or their respective Affiliates occurring prior to the Closing to constitute a "plant closing," "mass layoff" or group termination or similar event under the WARN Act that would result in any Liability for Sellers, or to create any Liability or penalty to Sellers or any of their respective Affiliates for any employment terminations under Law.

(i)     For any Transferred Employees who are principally based outside the United States, the provisions of this Section 6.3 shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law. With respect to the employees of the Swiss Company (the "Swiss Employees"), no transfer of employment relationships will occur as a consequence of the Closing of the transactions contemplated hereby and the currently applicable terms and conditions of employment (including social security and pension plan scheme) of such Swiss Employees shall remain unaltered in full force and effect.  The provisions of this Section

6.3, in particular, without limitation, with respect to compensation and other employee benefits, shall also apply *mutatis mutandis* to the Swiss Employees.

    6.4.   <u>Regulatory Matters.</u>

        (a)    Subject to <u>Section 6.5</u>, the Company will (1) make or cause to be made all filings and submissions required to be made by the Company or its Subsidiaries under any applicable Laws for the consummation of the transactions contemplated by this Agreement set forth on <u>Schedule 6.4</u>, including filings or submissions related to Product Registrations and a General Information Notice for each Acquired Leased Real Property in New Jersey subject to ISRA, (2) reasonably cooperate with Purchaser in exchanging such information and providing reasonable assistance as Purchaser may reasonably request in connection with any filings made by the Purchaser Group pursuant to <u>Section 6.4(b)</u>, and (3) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this <u>Section 6.4(a)</u> or <u>Section 6.4(b),</u> and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings. Prior to Closing, the Company shall engage a Licensed Site Remediation Professional ("<u>LSRP</u>") that is reasonably acceptable to Purchaser to commence performance of a Preliminary Assessment (as defined in ISRA) for each Acquired Leased Real Property in New Jersey for which a General Information Notice was submitted. The Company and Purchaser shall cooperate in good faith regarding the performance of the Preliminary Assessments, including the Company responding as promptly as reasonably practicable to any inquiries from Purchaser about the status of the Preliminary Assessments. Purchaser shall have the reasonable right to review and comment on the Preliminary Assessments, and the Company shall request that the LSRP consider in good faith any reasonable comments on the Preliminary Assessments received from Purchaser. At Closing, the Company shall end its engagement of the LSRP, at which time Purchaser shall directly engage the LSRP in connection with its assumption of responsibility for ISRA under <u>Section 6.4(b)(ii)</u>. In the event the Preliminary Assessments have not been finalized at Closing, Purchaser shall be responsible, at its sole cost and expense, to complete the Preliminary Assessments.

        (b)    Subject to <u>Section 6.5</u>, Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws and necessary to permit the consummation of the transactions contemplated by this Agreement, including any such filings or submissions related to Product Registrations, (ii) two (2) calendar days prior to Closing, submit a Remediation Certification, as defined under ISRA, to the New Jersey Department of Environmental Protection for each Acquired Leased Real Property in New Jersey subject to ISRA identifying Purchaser as the person responsible for ISRA compliance after Closing along with a Remediation Cost Review and RFS/FA Form, a Remediation Funding Source instrument and 1% annual surcharge check, as required, (iii) reasonably cooperate with the Company in exchanging such information and providing reasonable assistance as the Company may reasonably request in connection with any filings made by the Company pursuant to <u>Section 6.4(a)</u>, and (iv) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this <u>Section 6.4(b)</u> or <u>Section 6.4(a)</u> and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances.

(c)     From and after the date hereof, the Parties will cooperate in connection with the transfer of the transferable Product Registrations to Purchaser as of the Closing Date and the obtaining by Purchaser of new Product Registrations to the extent a Product Registration is not transferable.  Promptly following the date hereof, the Parties will agree upon procedures to ensure a transition from the Sellers to Purchaser of all of the activities required to be undertaken by the holder of the Product Registrations, including adverse experience reporting, quarterly and annual reports to the FDA, handling and tracking of complaints, sample tracking, and communication with health care professionals and customers.  Subject to Section 6.4(d), after the Closing, Purchaser shall assume all responsibility for the Product Registrations, including all responsibility for communications with the FDA and any other Governmental Body concerning the Products.  The Parties shall cooperate in making and maintaining all required regulatory filings, and reporting all material communications (whether written or oral) from a Governmental Body in relation to a transfer and, to the extent one Party (Seller or Purchaser, as the case may be) requires the other Party's (Purchaser or Seller, as the case may be) participation to effectuate the transfer of the Product Registrations, it shall give the other Party reasonable notice of all meetings and telephone calls with any Governmental Body expected to have a material impact upon a transfer and give the other Party a reasonable opportunity to participate at each such meeting or telephone call.

(d)     On the Closing Date (or within such time after the Closing Date as permitted under applicable Law) or as soon as practicable after the Closing Date, Sellers shall submit to the FDA the executed Seller FDA Transfer Letters.  To the extent required, Sellers shall submit or deliver to the FDA and other appropriate Governmental Bodies within timelines as prescribed under applicable Law such documents and instruments of conveyance as necessary and sufficient to effectuate the transfer of each Permit and Governmental Authorization to Purchaser under applicable Law on the Closing Date or as soon as practicable after the Closing Date.  Unless otherwise required by applicable Law, from the Closing Date until the relevant date of transfer for each Product Registration, Sellers shall use commercially reasonable efforts to maintain or cause to be maintained in force each such Product Registration and Purchaser shall promptly reimburse Sellers for the reasonable documented and out-of-pocket costs and expenses incurred by Sellers in connection with maintaining or causing to be maintained such Product Registrations.  Unless otherwise required by applicable Law and as may be agreed between the Parties, Sellers shall use commercially reasonable efforts to progress or cause to be progressed any pending application filed prior to the Closing Date for a Product Registration.  Notwithstanding anything contained in this Agreement to the contrary (including Section 6.1), Sellers shall not, from the Closing Date until the relevant date of transfer for such Product Registration, absent the prior written consent from Purchaser, or as is required by a Governmental Body, withdraw or suspend a Product Registration that is pending as of the Closing Date.  The Sellers shall ensure that an employee or other authorized person is reasonably available to Purchaser to effectuate any transfers contemplated by this Section 6.4 and occurring after the Closing.

(e)     Prior to the Closing, the actions taken by Sellers pursuant to Section 6.4(c) shall be at the sole cost and expense of the Sellers.  All documented and out-of-pocket costs and expenses incurred by Sellers after the Closing at the request of Purchaser in connection with this Section 6.4 shall be reimbursed by Purchaser.

6.5.    Antitrust Notification.

(a)    The Company and Purchaser will, as promptly as practicable and no later than ten (10) Business Days following the date hereof, (i) file with the United States Federal Trade Commission and the United States Department of Justice, the notification form required pursuant to the HSR Act for the transactions contemplated by this Agreement, which form will specifically request early termination of the waiting period prescribed by the HSR Act and (ii) make all notifications, filings, registrations or other materials required or necessary under the Foreign Competition Laws set forth on Schedule 6.5(a). Each of the Company and Purchaser will (and shall cause their respective Affiliates to) furnish to each other's counsel such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that is necessary under the HSR Act or such Foreign Competition Laws and will provide any supplemental information requested by any Governmental Body as promptly as practicable. Purchaser and Sellers will use reasonable best efforts to comply as promptly as practicable with any requests made for any additional information in connection with such filings. Whether or not the transactions contemplated by this Agreement are consummated, Sellers will be responsible for all filing fees payable in connection with such filings.

(b)    Subject to the immediately following sentence, the Company and Purchaser will use their reasonable best efforts to promptly obtain any clearance required, or any clearance that is otherwise advisable, under the HSR Act or such Foreign Competition Laws for the consummation of this Agreement and the transactions contemplated hereby and will keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from, any Governmental Body and will comply promptly with any such inquiry or request. Purchaser will take, and will cause its Affiliates to take, any and all steps necessary to avoid or eliminate each and every impediment under any Law that may be asserted by any Governmental Body or any other Person so as to enable the Parties to expeditiously close the transactions contemplated by this Agreement, including (i) opposing any motion or action for a temporary, preliminary or permanent injunction or Order against or preventing or delaying the consummation of the transactions contemplated by this Agreement, (ii) entering into a consent decree, consent agreement or other agreement or arrangement containing Purchaser's agreement to hold separate, license, sell or divest (pursuant to such terms as may be required by any Governmental Body) such assets or businesses of Purchaser and its Affiliates after the Closing (including entering into customary ancillary agreements relating to any such sale, divestiture, licensing or disposition of such assets or businesses), and (iii) agreeing to such limitations on conduct or actions of members of Purchaser and its Affiliates after the Closing as may be required in order to obtain satisfaction of the closing conditions set forth in Section 7.1(a) prior to the Outside Date.

(c)    The Parties commit to instruct their respective counsel to cooperate with each other in good faith and use reasonable best efforts to facilitate and expedite the identification and resolution of any issues arising under the HSR Act or such Foreign Competition Laws at the earliest practicable dates. Such efforts and cooperation shall include counsel's undertaking (i) to keep each other appropriately informed of communications from and to personnel of the reviewing Governmental Bodies and (ii) to confer with each other regarding communications with such Governmental Bodies and the content of any such communications, including any analyses, clearances, memoranda, briefs, arguments, opinions, proposals or presentations made or submitted by or on behalf of any Party in connection with the identification and resolution of any issues arising under the HSR Act, other U.S. Antitrust Laws, or such Foreign Competition Laws. Neither

58

the Company nor Purchaser will participate in any meeting or discussion with any Governmental Body with respect of any such filings, applications, investigation or other inquiry without giving the other Party prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Body, the opportunity to attend and participate in such meeting or discussion (which, at the request of either Purchaser or the Company, will be limited to outside antitrust counsel only). Each Party will have the right to review (subject to appropriate redactions for confidentiality and attorney-client privilege concerns) and approve the content of any presentations, white papers or other written materials to be submitted to any Governmental Body in advance of any such submission.

6.6.    Reasonable Efforts; Cooperation.

(a)    Without prejudice to any other term or provision of this Agreement, each Party shall, and shall cause its Subsidiaries and its and their respective Advisors to, use its reasonable best efforts to perform their respective obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things reasonably necessary, proper or advisable to cause the transactions contemplated herein to be effected as soon as reasonably practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to reasonably cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder.

(b)    The obligations of Purchaser pursuant to this Agreement shall be subject to the Direction Letter.  The obligations of the Company pursuant to this Agreement, including this Section 6.6(b), shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases), the obligations under Sellers' debtor-in-possession financing, and each of Sellers' obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

(c)    From and after the date hereof until the earlier of Closing or the termination of this Agreement in accordance with its terms, Sellers will use commercially reasonable efforts to seek estoppel certificates from parties to any recorded agreements materially affecting title to the Acquired Owned Real Properties and Acquired Leased Real Properties set forth on Schedule 6.6(c) in a form reasonably acceptable to the parties; provided that such efforts shall not include the payment by or on behalf of Sellers of any non-*de minimis* costs or expenses in connection therewith or the commencement of any litigation or the taking of any similar adverse action.

6.7.    Notification of Certain Matters.

(a)    The Company will promptly (and, in any event, within ten (10) days) notify Purchaser in writing of: (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (ii) any notice or other communication from any Governmental Body, or any Action by any Governmental Body, related to or in connection with the transactions contemplated by this Agreement (including that may restrain, enjoin or otherwise prohibit the consummation of the transactions contemplated by this Agreement); (iii) the discovery of any variances from, or the

existence or occurrence of any event, fact or circumstance arising after the execution of this Agreement that would reasonably be expected to cause, any of the representations and warranties contained in <u>Article III</u> to be untrue or inaccurate such that the condition set forth in <u>Section 7.2(a)</u> will not be satisfied; and (iv) any event that has had, or is reasonably expected to have, a Material Adverse Effect or would otherwise cause, or reasonably be expected to cause, the failure of any condition to Closing for the benefit of the Purchaser set forth in <u>Article VII</u>. If the subject matter of any such notification required by the previous sentence requires any change in the Schedules, the Company shall deliver to Purchaser prior to the Closing a supplement to such Schedule (the "<u>Updated Schedules</u>") with such change; <u>provided</u> that in no event will any Updated Schedule serve to amend, supplement or modify the Schedules for purposes of <u>Section 7.2(a)</u> or otherwise determining whether any condition set forth in <u>Article VII</u> was or has been satisfied or any statement set forth in the officer's certificate of the Company delivered pursuant to <u>Section 2.3(f)</u> was or is true and correct; <u>provided</u> <u>further</u> that if the Closing occurs, the Updated Schedules will (other than in respect of any claim for Fraud with respect to (x) the representations and warranties of the Sellers made as of the date hereof or (y) the officer's certificate delivered pursuant to <u>Section 2.3(f)</u>) be considered and deemed to be part of the Schedules for all purposes under this Agreement and each reference in this Agreement to a particular Schedule will mean such Schedule in, or as updated by, the Updated Schedules.

(b)    Purchaser will promptly notify the Company in writing of: (i) any notice or other communication from any Governmental Body, or any Action by any Governmental Body, related to or in connection with the transactions contemplated by this Agreement (including that may restrain, enjoin or otherwise prohibit the consummation of the transactions contemplated by this Agreement); (ii) any Actions relating to or involving or otherwise affecting Purchaser or its Affiliates that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to <u>Section 4.7</u>; and (iii) the discovery of any variances from, or the existence or occurrence of any event, fact or circumstance arising after the execution of this Agreement that would reasonably be expected to cause, any of the representations and warranties contained in <u>Article IV</u> to be untrue or inaccurate such that the condition set forth in <u>Section 7.3(a)</u> will not be satisfied; <u>provided</u> that the delivery of any notice pursuant to this <u>Section 6.7(b)</u> will not limit the remedies available to Sellers under or with respect to this Agreement.

6.8.    <u>Further Assurances</u>.  Without prejudice to any other term or provision of this Agreement, from time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement and the transfer of title to the Acquired Assets to Purchaser or its designee(s) in accordance with the terms of the Agreement.

6.9.    <u>Insurance Matters</u>.  Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to Sellers and the Acquired Assets that is maintained by any Seller or its Affiliates other than by the Acquired Subsidiaries themselves, if any, (whether such policies are maintained with third party insurers or with such Seller or its Affiliates (other than with the Acquired Subsidiaries)), shall cease to provide any coverage to Purchaser and the Acquired Assets with respect to post-Closing occurrences related thereto and no further coverage shall be available with respect to such post-Closing occurrences to Purchaser or the Acquired

Assets under any such policies; provided, however, that Purchaser shall have the right to make claims and the right to any proceeds with respect to any matter related to the Assumed Liabilities under any insurance policies for occurrence-based claims pertaining to, arising out of and inuring to the benefit of any Seller for all periods prior to the Closing, and Seller shall use reasonable best efforts to seek the maximum recovery or allow Purchaser to seek recovery (including by executing or delivering any document, agreement, instrument or other information as Purchaser may reasonably request to seek such recovery) under such insurance policies, in each case, at Purchaser's sole cost and expense (including, if and to the extent unpaid and otherwise payable as a result of such recovery, any deductibles, self-insured retentions or other out-of-pocket expenses required to be paid by Purchaser or to the insurer in connection therewith), and Seller shall cooperate with Purchaser's reasonable requests if it seeks recovery, with respect to such matters and shall remit (or, at Purchaser's request, direct any such insurer to pay directly to Purchaser) any insurance proceeds actually obtained therefrom (net of such Seller's reasonable and documented out-of-pocket costs and expenses of seeking such recovery, to the extent not otherwise paid or reimbursed by Purchaser) to Purchaser or its designee; provided that, subject to compliance with the terms and conditions of this Section 6.9, Sellers shall be liable for any uninsured or uncollected amounts of such claim(s).

6.10.    Receipt of Misdirected Assets.  From and after the Closing, if any Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset, the applicable Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred.  From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the Company, and such asset will be deemed the property of the Company held in trust by Purchaser for the Company until so transferred.

6.11.    Acknowledgment by Purchaser.

(a)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted an independent investigation and analysis of the business, including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of the Company and its Subsidiaries and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser and the Purchaser Group have, other than the Express Representations, relied on the results of the Purchaser Group's own independent investigation and analysis and have not relied on, are not relying on, and will not rely on, any Seller, any Subsidiary, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom, the Information Presentation, or the Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express

Representations).  Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made by any Seller Party to Purchaser or any member of the Purchaser Group on which Purchaser or any member of the Purchaser Group may rely in connection with the transactions contemplated by this Agreement; and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (1) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent set forth in the Express Representations) including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of the Company and its Subsidiaries, any of the Seller Parties or any other Person on behalf of the Company, its Subsidiaries or any of the Seller Parties or any of their respective Affiliates or Advisors and (2) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of the Company or any of its Subsidiaries, or the quality, quantity or condition of the Company's or its Subsidiaries' assets, are, in each case, specifically disclaimed by the Company, on its behalf and on behalf of the Seller Parties, and each Seller.  Purchaser, on its own behalf and on behalf of the Purchaser Group: (x) disclaims reliance on the items in clause (ii) in the immediately preceding sentence (which do not, for the avoidance of doubt, include Purchaser's and the Purchaser Groups' reliance on the Express Representations) and (y) together with Sellers, acknowledges and agrees that Purchaser has relied on, is relying on and will rely on only the Express Representations. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither the Company, nor any other Person (including the Seller Parties), has made, is making or is authorized by or on behalf of any Seller Party to make, and subject to <u>Section 6.11(c)</u>, Purchaser, on its own behalf and on behalf of the Purchaser Group, hereby waives all rights and claims it or they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (A) any potentially material information regarding the Company, its Subsidiaries or any of their respective assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (B) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of the Company's or its Subsidiaries' business, operations, assets, Liabilities, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.

(b)    Without limiting the generality of the foregoing (including any of the Express Representations), in connection with the investigation by the Purchaser Group of the Company and its Subsidiaries, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of the Company, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "<u>Projections</u>").  Purchaser acknowledges and agrees, without limiting any of the Express Representations, on its own behalf and on behalf of the Purchaser Group, that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of the Company and its Subsidiaries, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv)

Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)     Nothing in this <u>Section 6.11</u> shall limit any rights or remedies available to Purchaser in the case of a claim for Fraud.

6.12.     <u>Directors' and Officers' Indemnification</u>.

(a)     Following the Closing until the six (6) year anniversary thereof, Purchaser shall cause the Acquired Subsidiaries not to amend, repeal or otherwise modify the Acquired Subsidiaries' constitutive documents as in effect as of the date of this Agreement, in any manner that would adversely affect the rights to indemnification or exculpation thereunder of individuals who are or were directors or officers of the Acquired Subsidiaries prior to the Closing. Purchaser shall not take any action to cancel or otherwise reduce coverage under any "tail" insurance policies purchased by the Acquired Subsidiaries prior to the Closing; <u>provided</u> that no payments or other obligations shall be required of the Acquired Subsidiaries or the Purchaser Group with respect to such policies after the Closing.

(b)     As soon as practicable after the Closing, and no later than five (5) Business Days after the Closing (exclusive), Purchaser shall, or shall cause to, adopt the required resolutions and make the necessary applications or filings in order to ensure that (i) those directors and officers of the Swiss Company who resign as of the Closing shall no longer be directors and/or officers of the Swiss Company, (ii) the effect of such resignations shall be registered with the relevant Swiss commercial register, and (iii) shall hold an extraordinary shareholders' meeting of the Swiss Company by which the aforementioned resignations of the current board members are acknowledged and, subject to a full and unconditional release, in form and substance reasonably acceptable to Purchaser, being delivered by any such directors and officers, a full and unconditional release is granted to the resigning board members and the new board members designated by Purchaser are elected. The granting of release is to be repeated at the next ordinary shareholders' meeting of the Swiss Company and Purchaser further covenants to procure that neither Purchaser nor any of its Affiliates makes any claim against any directors or officers of the Swiss Company relating to their mandate or activities for the Swiss Company up to and including Closing or in connection with the transactions contemplated hereby, save for gross negligence and intentional actions.

6.13.     <u>No Successor Liability</u>. The Parties intend that, to the fullest extent permitted by applicable Law (including under Section 36 of the Bankruptcy Code), upon the closing, Purchaser shall not be deemed to: (a) be the successor of any Seller, (b) have, <em>de facto</em>, or otherwise, merged with or into Sellers, (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers or (d) be liable or have any Liability for any acts or omissions of Sellers in the conduct of their businesses or arising under or related to the Acquired Assets other than as expressly set forth and agreed in this Agreement. Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that Purchaser shall have no Liability for any Encumbrance (other than the Assumed Liabilities and Permitted Encumbrances on the Acquired Assets) against Sellers or any of Sellers predecessors or Affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or in connection with the transactions contemplated to occur

on the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the businesses of Sellers, the Acquired Assets or any Liability of Sellers arising prior to, or relating to any period occurring prior to, the Closing Date.  The Parties agree that the Sale Order shall contain provisions substantially in the form set forth in this Section 6.13.

6.14.    Change of Name.  Promptly (and, in any event, within thirty (30) Business Days) following the Closing, each Seller shall, and shall cause their Subsidiaries to, discontinue the use of their current name (and any other trade names or "d/b/a" names currently utilized by each Seller or their Subsidiaries) and shall not subsequently change any of their names to or otherwise use or employ any name which includes the words "Akorn" and the other names listed on Schedule 6.14 without the prior written consent of Purchaser, and each Seller shall cause the name of Sellers in the caption of the Bankruptcy Cases to be changed to the new names of each Seller.

6.15.    Excluded Subsidiaries; Cash Repatriation.

(a)    Notwithstanding Schedule 1.1(j), at any time following the date of this Agreement and three (3) Business Days prior to the Closing Date, Purchaser shall have the right, but the not the obligation, by delivery of a written notice to the Company, to designate WorldAkorn Pharma Mauritius as an Excluded Subsidiary, in which case, any such entity so designated by Purchaser in writing shall be deemed an Excluded Subsidiary hereunder, and notwithstanding anything contained herein to the contrary, Purchaser shall not acquire any of the equity securities of such Excluded Subsidiary (whether at the Closing, or otherwise) and, for the avoidance of doubt, none of the Liabilities of any such Excluded Subsidiary shall be assumed by Purchaser in connection with this Agreement (including any Liabilities in respect of the employees of the India Company (including any obligation contemplated by this Agreement in relation to the employees of the India Company), or otherwise as may have arisen under an Assumed Benefit Plan in connection with any current or former employees of such Excluded Subsidiary).

(b)    Notwithstanding anything contained herein to the contrary, in the event that (i) at least ten (10) Business Days prior to the Closing, (A) Purchaser delivers a written request to Sellers and (B) a sale or disposition of the India Company (whether by equity sale, asset sale, merger or otherwise) or WorldAkorn Pharma Mauritius (by asset sale) is consummated and (ii) Purchaser has designated WorldAkorn Pharma Mauritius as an excluded Subsidiary pursuant to Section 6.15(a), then the Company shall, to the extent permissible under applicable Law and any other legally binding obligations of any of its Subsidiaries who are not Sellers or Acquired Subsidiaries, cause any of its Subsidiaries who are not Sellers or Acquired Subsidiaries to, immediately prior to the Closing, declare and otherwise consummate any dividend, distribution or similar transaction (as may be requested by Purchaser), or otherwise repay any intercompany Indebtedness, such that, subject to Section 6.15(e), all Cash and Cash Equivalents of any such Person are held by Sellers as of immediately prior to the Closing.

(c)    In the event that (i) a sale or disposition of the India Company (whether by equity sale, asset sale, merger or otherwise) or WorldAkorn Pharma Mauritius (by asset sale) is consummated after the date that is ten (10) Business Days prior to the Closing and (ii) Purchaser has designated WorldAkorn Pharma Mauritius as an Excluded Subsidiary pursuant to Section 6.15(a), then, subject to Section 6.15(e), Sellers shall pay, or cause to be paid, to the extent permissible under applicable Law and any other legally binding obligations of any of its

Subsidiaries who are not Sellers or Acquired Subsidiaries, to Purchaser all Cash and Cash Equivalents of any such Person and the net cash proceeds received in consideration therefor no later than the later of the Closing and the date that is five (5) Business Days following receipt thereof.

(d)     In the event that (i) a sale or disposition of WorldAkorn Pharma Mauritius (whether by equity sale, merger or otherwise, but not by asset sale) is consummated after the Closing and (ii) Purchaser has designated WorldAkorn Pharma Mauritius as an Excluded Subsidiary pursuant to Section 6.15(a), then, subject to Section 6.15(e), Sellers shall pay, or cause to be paid, to Purchaser all Cash and Cash Equivalents of any such Person and the net cash proceeds received in consideration therefor no later than the date that is five (5) Business Days following receipt thereof; provided, however, that if such sale or disposition is not consummated within the later of three (3) months of the Closing and the "outside date" in any Contract with respect to such transaction that is entered into in accordance with this Agreement prior to such time, Sellers shall pay, or cause to be paid, to the Purchaser the Cash and Cash Equivalents of WorldAkorn Pharma Mauritius and India Company as of such time.

(e)     The Cash and Cash Equivalents contemplated by Section 6.15(b), 6.15(c) or 6.15(d) and the net cash proceeds contemplated by Section 6.15(c) or 6.15(d) shall be determined net of (i) any applicable fees, expenses, and Taxes of Sellers or any of their Subsidiaries in connection with sale or disposition of the India Company (whether by equity sale, asset sale, merger or otherwise) or WorldAkorn Pharma Mauritius or in connection with the distribution of such amounts from the applicable Subsidiary to the applicable Seller, and (ii) any holdbacks, reserves, escrows, or other similar amounts in respect of indemnification, purchase price adjustments, or other contingent obligations of Sellers or any of their Subsidiaries in connection with such sale or disposition or in connection with such distribution; provided that upon release, expiration, or other applicable termination of such contingent obligations, any such amounts, subject to the immediately preceding clause (i), shall be promptly paid to Purchaser.

6.16.     Communications with Customers and Suppliers.  Subject to Section 6.2(f), prior to the Closing, the Parties shall reasonably cooperate with each other in coordinating their communications with any customer, supplier or other contractual counterparty of Sellers in relation to this Agreement and the transactions contemplated hereby.

6.17.     Exclusive License.  With respect to each Product that is an Acquired Asset whose title is not transferred to Purchaser as of the Closing Date, Sellers hereby grant to Purchaser an irrevocable, exclusive, royalty-free, fully paid-up, sublicensable, transferrable license under Sellers' rights in the applicable Product and Product Registration to sell, distribute and otherwise commercialize or exploit such Product.  For the avoidance of doubt, following the Closing, Purchaser will have full and exclusive rights to commercialize such Products and retain all profits with respect thereto.

6.18.     Treatment of Contracts.

(a)     Notwithstanding anything contained herein to the contrary, during the pendency of the Bankruptcy Case, Sellers shall not reject or transfer any Excluded Contract without first obtaining Purchaser's prior written consent.  In the event that any of the Parties to

this Agreement discovers a Contract related to the business of the Company and its Subsidiaries, the Acquired Assets or the Assumed Liabilities (whether prior to, on or following the Closing) and such Contract (i) was not set forth on <u>Schedule 1.5(a)</u>, (ii) is a Contract which Purchaser wishes to assume the rights and obligations of, and (iii) has not been rejected by Sellers (with Purchaser's prior written consent in compliance with the immediately preceding sentence), Purchaser and Sellers shall execute, acknowledge and deliver such other instruments and take such further actions as are reasonably practicable for Purchaser or a Designated Purchaser to assume the rights and obligations under such Contract as of the Closing (or, if applicable, as soon as reasonably practicable following the Closing), otherwise in accordance with <u>Section 1.5</u>.

6.19.    <u>Retained Privileged Materials</u>.  Following the Closing (i) in the event of a dispute between Purchaser and its Affiliates, on the one hand, and a third party (other than Sellers), on the other hand, Purchaser shall have the right to, or to require Sellers to, assert the attorney-client privilege to prevent disclosure of any Retained Privileged Materials to a third party, and (ii) without Purchaser's prior written consent, Sellers shall not, unless required by applicable Law, disclose, transfer or otherwise make available any Retained Privileged Materials to any third-party, in any manner that would reasonably be expected to result in the waiver of the attorney-client privilege with respect to such materials.  In the event that Purchaser or any of its Affiliates (including the Acquired Subsidiaries after the Closing) should discover in its possession after the Closing any Retained Privileged Materials, it will take reasonable steps to preserve the confidentiality thereof and promptly deliver the same to Sellers, keeping no copies, and will not by reason thereof assert any loss of confidentiality or privilege protection.  As to any such Retained Privileged Materials, Purchaser and each of its Subsidiaries, together with any of their respective Affiliates, successors or assigns, further agree that none of the foregoing may use or rely on any of the Retained Privileged Materials in any action against or involving any of Sellers.  The Retained Privileged Materials may be used by Sellers in connection with any dispute that relates in any way to this Agreement or the transactions contemplated hereby.

## ARTICLE VII

## CONDITIONS TO CLOSING

7.1.    <u>Conditions Precedent to the Obligations of Purchaser and Sellers</u>.  The respective obligations of each Party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by each of the Company and Purchaser, in their respective sole discretion) on or prior to the Closing Date, of each of the following conditions:

(a)    the waiting period (and any extension thereof), or any approval, as applicable, related to the transactions contemplated by this Agreement under the HSR Act or under the Foreign Competition Laws or other regulations set forth in <u>Schedule 7.1</u> shall have been received or terminated, or shall have expired, as applicable;

(b)    no court or other Governmental Body has issued, enacted, entered, promulgated or enforced any Law or Order (that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; and

(c)        the Bankruptcy Court shall have entered the Bidding Procedures Order, the Sale Order and the Financing Order, and such orders shall not have been reversed, modified, amended or stayed.

7.2.    <u>Conditions Precedent to the Obligations of Purchaser</u>.  The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)        (i) the representations and warranties made by Sellers in <u>Article III</u> (other than the Seller Sufficiency Representations and the Seller Fundamental Representations) shall be true and correct, in each case as of the date hereof and the Closing Date with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality", "material adverse effect", "Material Adverse Effect" or similar qualifiers contained therein (other than "material weaknesses" in <u>Section 3.5(b)</u> and the word "Material" when used in the instances of the defined terms "Material Contract", "Material Customer" and "Material Supplier")) has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (ii) the representations and warranties set forth in <u>Sections 3.1</u> (other than the last sentence of <u>Section 3.1(a)</u>, the last sentence of <u>Section 3.1(b)</u> and <u>Section 3.1(c)</u>), <u>3.2</u>, <u>3.3</u> (solely with respect to clause (i) thereof), <u>3.4</u> and <u>3.19</u> (collectively, the "<u>Seller Fundamental Representations</u>") shall be true and correct in all respects, other than for *de minimis* inaccuracies, in each case as of the date hereof and the Closing Date with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date) and (iii) the representations and warranties set forth in <u>Section 3.7(b)</u> (the "<u>Seller Sufficiency Representations</u>") shall be true and correct in all respects, in each case as of the date hereof and the Closing Date with the same force and effect as though such representations and warranties had been made as of the Closing Date;

(b)        Sellers shall have performed or complied with, or caused to be performed or complied with, in all material respects, all of the obligations and covenants required by this Agreement to be performed or complied with by Sellers on or prior to the Closing;

(c)        Sellers shall have delivered, or caused to be delivered, to Purchaser (i) all of the items set forth in <u>Section 2.3</u>;

(d)        The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall have become a Final Order;

(e)        each consent, approval, assignment or waiver of any Person identified on <u>Schedule 7.2(e)</u> shall, in each case, (i) have been obtained and delivered to Purchaser, (ii) be in form and substance reasonably acceptable to Purchaser, (iii) not be subject to the satisfaction of any condition that has not been satisfied or waived and (iv) be in full force and effect;

(f)     Purchaser shall have obtained, or there is a reasonable expectation that Purchaser will obtain within ten (10) Business Days following the Closing (or within such time as otherwise required by applicable Law), all Permits required by Purchaser to operate the business of the Company and its Subsidiaries following the Closing consistent, in all material with respects, with the operation of such business in the Ordinary Course as of the date of this Agreement; and

(g)     no Material Adverse Effect shall have occurred and then be continuing.

7.3.    <u>Conditions Precedent to the Obligations of the Company</u>.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by the Company in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     the representations and warranties made by Purchaser in <u>Article IV</u> shall be true and correct, in each case as of the date hereof and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations or warranties to be so true and correct (without giving effect to any limitation as to "materiality", "material adverse effect", "Material Adverse Effect" or similar qualifiers contained therein) would not materially impair or prevent Purchaser's ability to consummate the transactions contemplated by this Agreement;

(b)     Purchaser shall have performed or complied with, or caused to be performed or complied with, in all material respects, all of the obligations and covenants required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing; and

(c)     Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in <u>Section 2.4</u>.

## ARTICLE VIII

## TERMINATION

8.1.    <u>Termination of Agreement</u>.  This Agreement may be terminated only in accordance with this <u>Section 8.1</u>.  This Agreement may be terminated, and the transactions contemplated hereby abandoned, at any time prior to the Closing:

(a)     by the mutual written consent of the Company and Purchaser;

(b)     by written notice of either Purchaser or the Company to the other Party, upon the issuance by any Governmental Body of an Order restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final and non-appealable; <u>provided</u> that no termination may be made by a Party under this <u>Section 8.1(b)</u> if the issuance of such Order was primarily caused by the breach by such Party (including, with respect to the Company, any of its Subsidiaries) with respect to, or action or inaction of such Party

68

(including, with respect to the Company, any of its Subsidiaries) in violation of, any obligation or condition of this Agreement;

(c)     by written notice of either Purchaser or the Company to the other Party, if the Closing shall not have occurred on or before the date that is one hundred three (103) days after the date hereof (the "Outside Date"); provided that if on the Outside Date any of the conditions set forth in Sections 7.1(a) or 7.1(b) (solely if and to the extent relating to matters set forth in Section 7.1(a)) have not been satisfied but all other conditions set forth in Article VII shall have been satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing; provided further that such conditions shall then be capable of being satisfied if the Closing were to take place on such date), then the Outside Date shall be automatically extended to the date that is the third Business Day following receipt of all regulatory approvals and such date shall become the Outside Date for purposes of this Agreement; provided further that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if the failure of the Closing to have occurred on or prior to the Outside Date was primarily caused by the breach by such Party (including, with respect to the Company, any of its Subsidiaries) with respect to, or action or inaction of such Party (including, with respect to the Company, any of its Subsidiaries) in violation of, any obligation or condition of this Agreement;

(d)     by written notice from Purchaser to the Company, if (i) the Company or any of its Subsidiaries seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by Sellers under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Cases, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Company is appointed in the Bankruptcy Case or (ii) an Order or dismissal, conversion or appointment is entered for any reason and not reversed or vacated within fourteen (14) days after entry thereof;

(e)     automatically, and without any requirement of any Party to deliver any notice of such termination to any other Party, if Sellers announce any stand-alone plan of reorganization or liquidation (or support any such plan filed by any other party), (other than a wind-down plan of Sellers' estates post-Closing, including pursuant to a plan of liquidation consistent with the RSA);

(f)     by written notice from the Company to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser set forth in this Agreement, or if any representation or warranty of Purchaser set forth herein will have become untrue or incorrect, in each case, such that any condition set forth in Section 7.3(a) or 7.3(b) would not be satisfied at the Closing; provided that (i) Sellers shall have provided notice to Purchaser of such breach at least five (5) Business Days prior to the effectiveness of such termination and, if such breach is curable, then the Company may not terminate this Agreement under this Section 8.1(f) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) twenty (20) days after such notice is delivered in accordance with Section 10.3, and (ii) the right to terminate this Agreement pursuant to this Section 8.1(f) will not be available to the Company at any time that the Company or any of its Subsidiaries is in material breach of, any covenant, representation or warranty hereunder such that the satisfaction of any condition set forth in Section 7.2(a) or 7.2(b) at the Closing would then be prevented;

(g)    by written notice from Purchaser to the Company, upon a breach of any covenant or agreement on the part of any Seller or Acquired Subsidiary set forth in this Agreement, or if any representation or warranty of any Seller set forth herein will have become untrue or incorrect, in each case, such that any condition set forth in Section 7.2(a) or 7.2(b) would not be satisfied at the Closing; provided that (i) Purchaser shall have provided notice to Sellers of such breach at least five (5) Business Days prior to the effectiveness of such termination and, if such breach is curable by such Seller, then Purchaser may not terminate this Agreement under this Section 8.1(g) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) twenty (20) days after such notice is delivered in accordance with Section 10.3, and (ii) the right to terminate this Agreement pursuant to this Section 8.1(g) will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder such that the satisfaction of any condition set forth in Section 7.3(a) or 7.3(b) at the Closing would then be prevented;

(h)    by written notice from Purchaser or the Company to the other Party, if (i) (A) Purchaser is not the Successful Bidder and (B) the Bankruptcy Court approves an Alternative Transaction with the Successful Bidder; or (ii) the Bankruptcy Court approves an Alternative Transaction other than (A) in connection with the Auction or (B) pursuant to a plan of reorganization that is in form and substance reasonably acceptable to Purchaser in writing; provided that if Purchaser is the Backup Bidder at the Auction, the right of Purchaser or the Company to terminate this Agreement pursuant to this Section 8.1(h) shall not be available to Purchaser or the Company until the Outside Back-Up Date;

(i)    by written notice from Purchaser to the Company following the termination of the RSA;

(j)    by written notice from Purchaser to the Company if, under Section 363(k) of the Bankruptcy Code, Purchaser is disallowed from providing a credit bid (or otherwise bidding on such other terms as may be agreed by Purchaser, in its sole discretion) as contemplated by this Agreement in connection with the payment of the Purchase Price;

(k)    by written notice from either Purchaser or the Company to the other Party, if an Order of the Bankruptcy Court is entered denying approval of the Bidding Procedures Order or the Sale Order and such Order becomes final and non-appealable; or

(l)    by written notice from Purchaser to the Company upon the occurrence of any "Event of Default" under the DIP Credit Agreement that has not been cured (if susceptible to cure) or waived by the applicable percentage of DIP Lenders in accordance with the terms of the DIP Credit Agreement.

For the avoidance of doubt, each condition permitting termination of this Agreement set forth in this Section 8.1 shall be considered separate and distinct from each other such condition and, if more than one termination condition set forth in this Section 8.1 is applicable, the Party exercising any such termination right shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

8.2.    Effect of Termination.  In the event of termination of this Agreement pursuant to

Section 8.1, this Agreement shall forthwith become void and there shall be no Liability on the part of any Party or any of its partners, officers, directors or shareholders; provided that this Section 8.2 and Article X shall survive any such termination; provided further that no termination will relieve any Party from any Liability from any Willful Breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder).

## ARTICLE IX

## TAXES

9.1.    Transfer Taxes.  Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, value added, motor vehicle registration, excise, documentary, stamp, or other similar Taxes and all filing and recording charges (and any interest, penalties and additions with respect to such Taxes and fees) payable by reason of the consummation of the transactions contemplated by this Agreement, including the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby in any U.S. or foreign jurisdiction (the "Transfer Taxes") shall be borne by Purchaser, regardless of the party on whom liability is imposed under the provisions of the Laws relating to such Transfer Taxes.  For the avoidance of doubt, Transfer Taxes shall not include any income or similar taxes.  The party customarily responsible under applicable Law shall file all necessary Tax Returns with respect to Transfer Taxes.  Sellers and Purchaser shall cooperate to ensure that all such Transfer Taxes are timely paid and all Tax Returns related to the Transfer Taxes are timely filed.  Sellers and Purchaser shall use commercially reasonable efforts and cooperate in good faith to exempt all such transactions from any Transfer Taxes.  Sellers shall, and shall cause their Subsidiaries (as applicable), or Purchaser (or its subsidiaries) shall, as applicable, as soon as practicable after any payment of any Transfer Taxes to the relevant Governmental Body, deliver to the non-paying party the original or a certified copy of a receipt issued by the relevant Governmental Body evidencing such payment and any tax certificates or forms in respect of such Transfer Taxes and any other form or other information that could aid in the recovery of any such Transfer Taxes in a form reasonably satisfactory to the non-paying party.

9.2.    Allocation of Purchase Price.  Unless Purchaser elects to structure the transactions contemplated hereby as a G Reorganization pursuant to Section 9.5:

(a)    For U.S. federal and applicable state and local income Tax purposes, Purchaser, Sellers, and their respective Affiliates shall, consistent with the requirements of Section 1060 of the Code and the regulations promulgated thereunder and any similar provision of applicable Law, allocate the Purchase Price (and any Assumed Liabilities treated as part of the Purchase Price for applicable income Tax purposes) among the Acquired Assets in accordance with a methodology to be mutually agreed upon by the parties (the "Allocation Methodology").

(b)    As soon as commercially practicable, but no later than forty-five (45) days following the determination of the final Purchase Price, Purchaser shall provide a proposed allocation to Sellers setting forth the allocation of the Purchase Price (and other amounts treated as Purchase Price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the Allocation Methodology (the "Allocation").  If Sellers fail to deliver a written objection

in accordance with this Section 9.2, the Allocation will be conclusive and binding on all Parties. If Sellers deliver a written objection on the grounds that the draft Allocation is inconsistent with the Allocation Methodology, which objection sets forth in reasonable detail their objections within twenty (20) days after receipt of the draft Allocation proposed by Purchaser, then Purchaser and Sellers shall negotiate in good faith to resolve any such objection, and, if Sellers and Purchaser cannot resolve such dispute within thirty (30) days of Purchaser's receipt of Sellers' objection, then a nationally recognized accounting firm mutually acceptable to Purchaser and Sellers shall resolve such dispute and the resolution of such dispute shall be final and binding on the Parties, with costs being borne by the Party whose position was not sustained.

(c)     The Parties and their respective Affiliates shall file all Tax Returns in accordance with such Allocation (as finally determined under this Section 9.2) and not take any Tax related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code.

9.3.    Cooperation.  Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

9.4.    Preparation of Tax Returns and Payment of Taxes.

(a)     Except as otherwise provided by Section 9.1, Sellers shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets, including of the Acquired Subsidiaries, for any Tax period ending on or before the Closing Date and (ii) all Tax Returns of Sellers.  Except to the extent any Tax reflected on a return required to be prepared and filed by Sellers pursuant to this Section 9.4 is otherwise reflected as an adjustment to Purchase Price or constitutes an Assumed Liability, Sellers shall be liable and responsible for, and pay any Taxes relating to periods covered by such Tax Returns.

(b)     Purchaser shall prepare and timely file all other Tax Returns with respect to the Acquired Assets for any Pre-Closing Tax Period or Straddle Period, including of any Acquired Subsidiaries, that are not addressed by Section 9.4(a).  With respect to any Straddle Period, Purchaser shall prepare such Tax Returns consistent with past practice, except as otherwise required by applicable Law.  Purchaser shall provide Company with a draft of such Tax Returns with respect to the Acquired Assets for any Pre-Closing Tax Period or Straddle Period, along with a calculation of the amount of the Taxes consistent with Section 9.4(c) that relate to the portion of the period ending on the Closing Date and are the responsibility of Sellers at least thirty (30) days prior to the filing of any such Tax Return; provided that if such Tax Return is due less than forty five (45) days after Closing, then Purchaser shall deliver a draft of such Tax Return as soon as practicable after the Closing.  Purchaser shall incorporate any changes reasonably requested by Sellers with respect to such Tax Returns.

(c)     All real property taxes, personal property taxes, ad valorem and similar periodic Taxes and obligations levied on or with respect to the Acquired Assets for any Straddle Period (collectively, the "Apportioned Obligations") shall be apportioned between Sellers, on the one hand, and Purchaser, on the other hand, based on the number of days of such taxable period included in the Pre-Closing Tax Period and the number of days included in the Post-Closing Tax

Period.  Sellers shall be liable for the proportionate amount of such Taxes that is attributable to the Pre-Closing Tax Period ("Straddle Period Taxes") and Purchaser shall be liable for the proportionate amount of such Taxes that is attributable to the Post-Closing Tax Period.  The Apportioned Obligations shall be prorated (based on the most recent available Tax statement, latest Tax valuation and latest bills) as of the Closing.  If the Closing occurs before the Tax rate is fixed for the then current fiscal or calendar year, whichever is applicable, the proration of the corresponding Taxes shall be on the basis of the tax rate for the last preceding year applied to the latest assessed valuation.

(d)    Except as expressly provided in Section 9.4(e) or Section 9.5, Purchaser shall not file any Tax Return, file an amendment to any previously-filed Tax Return, or otherwise take any Tax position that has the effect of increasing any Tax due for a Pre-Closing Tax Period or portion of a Straddle Period ending on the Closing Date, unless required to do so by applicable Law, and shall provide no less than five (5) days' notice of its position to the Company before filing any such Tax Return.

(e)    At Purchaser's request, Sellers shall join with Purchaser in making (or Purchaser shall be permitted to unilaterally make) an election pursuant to Section 336(e), Section 338(g) and/or Section 338(h)(10) of the Code and any similar provisions of state Tax Law with respect to the purchase of the Acquired Subsidiaries hereunder (collectively, the "Tax Elections") to the extent that such Tax Elections do not materially increase the cash Tax liability of Sellers from the transactions contemplated in this Agreement as reasonably determined by Sellers.  Purchaser shall be responsible for the preparation of all forms and documents required in connection with the Tax Elections (the "Tax Forms").  Upon receipt of the Tax Forms prepared by Purchaser, and Sellers shall promptly execute and deliver such Tax Forms back to Purchaser (and, to the extent instructed to do so by Purchaser, promptly file such Tax Forms) and take such actions as may be reasonably requested by Purchaser thereafter in connection with making or perfecting the Tax Elections.  The parties shall cooperate fully with each other and make available to each other such Tax data and other information as may be reasonably required in order to prepare and file the Tax Elections.

9.5.    "G" Reorganization.

(a)    Purchaser and Sellers have the right to jointly elect at any time prior to the Closing to structure or restructure the transactions contemplated by this Agreement as a reorganization under Section 368(a)(1)(G) of the Code, with any actual or deemed distribution by the Company (or, if applicable, any of its Subsidiaries) qualifying solely under Sections 354 and 356 of the Code but not under Section 355 of the Code ("G Reorganization" and such election, the "G Reorganization Election").

(b)    In the event that a G Reorganization Election is made, Purchaser and Sellers shall (i) implement the G Reorganization in a manner that is otherwise consistent with the rights and obligations of Purchaser and Sellers under this Agreement, (ii) treat the G Reorganization as a corporate acquisition of assets by Purchaser to which Section 381 of the Code applies, (iii) agree that this Agreement constitutes a "plan of reorganization" within the meaning of Treasury Regulations Section 1.368-2(g) with neither Purchaser nor any Seller taking any action or failing to take an action that will preclude the transactions contemplated by this Agreement from

qualifying as a G Reorganization, (iv) take (or not take) any other actions to secure and preserve the qualification of any of the transactions set forth in this Agreement as a G Reorganization, including, without limitation, with respect to (A) repayment, cancellation or settlement of, or other actions with respect to, any intercompany accounts on or before the Closing Date, (B) the merger of one member of the Company or its Subsidiaries with another member of the Company or its Subsidiaries on or before the Closing Date or conversion (or liquidation) of any such member into a limited liability company on or before the Closing Date, (C) the filing of any Tax elections to treat any such entity as a disregarded entity for U.S. federal income Tax purposes on or before the Closing Date, and (D) satisfaction of the ownership requirements set forth in Section 382(l)(5)(A) of the Code ("L5") to the extent that Purchaser and Sellers agree that Purchaser is potentially eligible to make an L5 election and Purchaser agrees that the preservation of the ability to make such election is in the best interests of Purchaser; provided that Sellers shall not be limited in respect of disposing of any of its assets if and to the extent permitted under the other provisions of this Agreement and taking or refraining from taking any action required by law, including if such actions would be inconsistent with its obligations under the Bankruptcy Code.

(c)     To the extent not addressed by the foregoing, Purchaser and each Seller shall also furnish or cause to be furnished to each other all documentation and information of Sellers or any of their Affiliates as reasonably requested in connection with (i) the treatment of the transactions contemplated by this Agreement as one or more reorganizations under Section 368 of the Code and/or in connection with qualifying for the application of Section 382(l)(5) of the Code and (ii) the Tax basis, losses, and credits (including carryovers), income, gains, deductions and other attributes or Tax items of Sellers or any of their Affiliates.

## ARTICLE X

## MISCELLANEOUS

10.1.    <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>.  Each of the representations and warranties and the covenants and agreements (to the extent (and solely to the extent) such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in Contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that contemplates performance following the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then until the earlier of the time such covenant is fully performed and the seven (7) year anniversary of the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Party for breach of any such surviving covenant or agreement. Purchaser and Sellers Parties acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) requiring performance after the Closing will survive the Closing until the earlier of the date that such covenant or agreement, as applicable, is fully performed and the seven (7) year anniversary of the Closing Date; (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this <u>Section 10.1</u>, none of the Parties would

enter into this Agreement and (c) for the avoidance of doubt, the Parties (i) intend the time periods contemplated by this <u>Section 10.1</u> to shorten, replace and supersede (as may be applicable) any statute of limitations that may otherwise be applicable and (ii) acknowledge and agree that such shortening, replacing or supersession of any such statute of limitations is reasonable and appropriate.    `Purchaser Group hereby waives all rights and remedies under Environmental Laws, including ISRA and the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, with respect to any environmental, health or safety matters relating to this Agreement or the transactions contemplated hereby; for clarity, the foregoing shall not in any way waive any of the rights and remedies that this Agreement affords to the Purchaser.`    Notwithstanding anything contained in this Agreement to the contrary (including in this <u>Section 10.1</u> and <u>Section 10.7</u>), nothing set forth herein shall limit any right or remedies available to Purchaser in respect of any claim for Fraud.

10.2.    <u>Expenses</u>.    Whether or not the Closing takes place, except as otherwise provided in <u>Sections 1.5</u>, <u>6.2(e)</u>, <u>6.4(d)</u>, <u>6.4(e)</u>, <u>6.8</u>, <u>6.9</u> and <u>8.2</u>, all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the Ancillary Agreements, the performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby, will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all fees and expenses in connection with any filing or submission that is necessary under the HSR Act and any Foreign Competition Laws will be allocated pursuant to <u>Section 6.5</u>, (b) all Transfer Taxes will be allocated pursuant to <u>Section 9.1</u> and (c) all Cure Costs will be allocated pursuant to <u>Section 5.2</u>.

10.3.    <u>Notices</u>.    All notices, requests, permissions, waivers, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) if transmitted by electronic mail with confirmation of delivery (which confirmation may be electronic) prior to 5:00 p.m. New York time on a Business Day, then on such Business Day, and if such confirmation of delivery is on a day which is not a Business Day or after 5:00 p.m. New York time on a Business Day, then the next proceeding Business Day, (c) one (1) Business Day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party from time to time.

Notices to Purchaser:

Wilmington Savings Fund Society, FSB
500 Delaware Ave.
Wilmington, DE 19801
Attention:    Geoffrey J. Lewis
Email:       glewis@wsfsbank.com

with a copy to (which shall not constitute notice):

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
Attention:      Scott J. Greenberg
                Steven Domanowski
                Steven R. Shoemate
Email:          SGreenberg@gibsondunn.com
                SDomanowski@gibsondunn.com
                SShoemate@gibsondunn.com

and:

Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Attention:      Andrew N. Goldman
Email:          andrew.goldman@wilmerhale.com

Notices to Sellers:

Akorn, Inc.
1925 W. Field Court, Suite 300
Lake Forest, Illinois 60045
Attention:      Joseph Bonaccorsi
Email:          joe.bonaccorsi@akorn.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attention:      Richard J. Campbell, P.C.
                Patrick J. Nash Jr., P.C.
                Steve Toth
                Gregory F. Pesce
Email:          richard.campbell@kirkland.com
                patrick.nash@kirkland.com
                steve.toth@kirkland.com
                gregory.pesce@kirkland.com

    10.4.   Assignment.

        (a)    This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Sellers, and shall inure to the benefit of and be so binding on the Parties

and their respective successors and permitted assigns; provided that, subject to Section 10.4(b), neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and the Company, and any attempted assignment or delegation without such prior written consent shall be null and void; provided further that Purchaser (subject to Purchaser remaining liable for its obligations hereunder in the event such obligations are not performed in accordance with their terms) may assign any of its rights or obligations hereunder to any of its Affiliates without the consent of any Person.

(b)    At any time prior to the Closing, and notwithstanding anything contained herein to the contrary, Purchaser shall be entitled to designate, by written notice to Sellers, one or more Persons to (i) purchase the Acquired Assets (including specified Assigned Contracts) and pay the corresponding Purchase Price amount and require payment of the Cure Costs as contemplated by Section 5.2, as applicable and/or (ii) assume the Assumed Liabilities (any such Person that shall be designated in accordance with this clause, a "Designated Purchaser").  In addition, and for the avoidance of doubt, a Designated Purchaser shall be entitled to employ any of the Transferred Employees on and after the Closing Date (otherwise in accordance with Section 6.3) and to perform any other covenants or agreements of Purchaser under this Agreement. Notwithstanding the foregoing, Purchaser's designation of any Designated Purchaser pursuant to this Section 10.4 shall not relieve Purchaser of its obligations under this Agreement in the event such obligations are not performed by any such Designated Purchaser in accordance with their terms.

10.5.    Amendment and Waiver.  Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and the Company or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought or asserted.  No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6.    Third Party Beneficiaries.  Except for Sections 6.12 and 10.7, this Agreement is for the sole benefit of the Parties (and their permitted successors and assigns) and nothing expressed or referred to in this Agreement shall give or be construed to give any Person other than the Parties (and their permitted successors and assigns) any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7.    Non-Recourse.  This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement.  Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party or any Subsidiary of Sellers will have any Liability (whether in Contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8.    Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective, valid and enforceable under applicable Law, but if any provision of this Agreement is held by a court or other tribunal of competent jurisdiction to be

prohibited by, invalid or unenforceable under applicable Law in any jurisdiction, such provision will be limited or ineffective only to the extent of such prohibition, invalidity or unenforceability in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9.    Construction.    The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party.  The table of contents and headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify or affect the meaning or interpretation of any of the terms or provisions hereof.

10.10.    Schedules.    The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; however, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement, in each case, to the extent (and solely to the extent) the relevance of such disclosure to such other section of the Schedules or such other representation or warranty set forth in this Agreement is reasonably apparent on the face of such disclosure (without review or other examination of the underlying documents listed therein).  Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement.  The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not material or threatened, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules, Updated Schedules, or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not material or threatened for purposes of this Agreement.  In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules and such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature.  Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement, in each case, solely to the extent made available to Purchaser in accordance with Section 11.3(j).  The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any breach or violation of, or default in, Law or any provision of any Contract.

10.11.    Complete Agreement.    This Agreement, together with the Confidentiality Agreement, the Ancillary Agreements and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement.  In the event an ambiguity or question of intent or interpretation arises with respect to this

Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12.  <u>Specific Performance</u>.   The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement.   It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Sellers nor Purchaser would have entered into this Agreement.   The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order.   The remedies available to the Parties pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Party from seeking to collect or collecting damages.   If, prior to the Outside Date, any Party brings any action, in each case in accordance with <u>Section 10.12</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (y) for the period during which such action is pending, <u>plus</u> five (5) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be.

10.13.  <u>Jurisdiction and Exclusive Venue</u>.   Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the transactions contemplated hereby brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) ((a) and (b), the "<u>Chosen Courts</u>")), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby.   Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or

venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to this agreement to serve process in any other manner permitted by Law.

10.14.   Governing Law; Waiver of Jury Trial.

(a)   Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)   EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER (WHETHER BEFORE, ON OR FOLLOWING THE CLOSING) AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION. FOR THE AVOIDANCE OF DOUBT, THIS SECTION 10.14(b) SHALL NOT APPLY TO ANY CLAIMS THAT PURCHASER OR ITS AFFILIATES MAY HAVE AGAINST ANY THIRD PARTY FOLLOWING THE CLOSING.

10.15.   Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding

legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of .PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.16. <u>Publicity</u>. The Company shall not and shall cause its Subsidiaries not to, and Purchaser shall not, issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld, conditioned or delayed, unless, in the reasonable judgment of Purchaser or the Company, disclosure is required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or the Company lists securities; <u>provided</u> that the Party intending to make such release shall use its reasonable best efforts to consult in advance with the other Parties with respect to the form and text thereof (and will consider in good faith all reasonable comments of the other Parties thereto).

10.17. <u>Bulk Sales Laws</u>. The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances (other than Permitted Encumbrances) in the Acquired Assets including any liens or claims arising out of the bulk transfer laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. Each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement and any other agreement contemplated hereby; provided that nothing in this <u>Section 10.17</u> shall be deemed to expand, transfer, shift or otherwise alter any Party's obligations with respect to Assumed Liabilities and/or Excluded Liabilities.

10.18. <u>No Solicitation</u>. This Agreement and the transactions contemplated herein and therein are the product of negotiations among the Parties. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (a) a solicitation of votes for the acceptance of any plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act or the Exchange Act and none of the Company, the other Sellers, nor their Subsidiaries will solicit acceptances of a plan from any party until such party has been provided with copies of a disclosure statement containing adequate information as required by section 1125 of the Bankruptcy Code.

# ARTICLE XI

# ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1.    Certain Definitions.

(a)    "Action" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, grievance, summons, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which Liability, if any, or obligation may be sought to be imposed, whether sounding in Contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

(b)    "Advisors" means, with respect to any Person, any directors, officers, employees, investment bankers, financial or other professional advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(c)    "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d)    "Akorn Luxembourg" means Akorn International S.à r.l, a limited liability company, organized under the laws of Luxembourg, with registered office and business address at 15, Rue Edward Steichen, 4th Floor, L-2540 Luxembourg, company registration number B188609.

(e)    "Alternative Transaction" means any transaction (or series of transaction), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of any Seller or any portion of the equity interests or any material portion of the assets thereof (in any form of transaction, whether by merger, sale of assets or equity or otherwise).

(f)    "Anti-Corruption Laws" means all anti-corruption Laws applicable to the Company, including the United States Foreign Corrupt Practices Act of 1977 (15 U.S.C. §§ 78dd-1, et seq.), and any other applicable anti-bribery or anti-corruption Law (including any Laws relating to the making of any unlawful payment to any foreign or domestic government official), including any rules, regulations and guidance promulgated under any of the foregoing that prohibit bribery, corruption, or substantially similar conduct.

(g)    "Anti-Money Laundering Laws" means all anti-money laundering laws applicable to the Company, including 18 U.S.C. §§ 1956 and 1957.

(h)    "Assumed Taxes" means (i) Purchaser's share of Transfer Taxes, as determined in accordance with Section 9.1, (ii) Purchaser's share of Apportioned Obligations, as

determined in accordance with Section 9.4(b), and (iii) Taxes relating to any Tax period beginning after the Closing Date.

(i)     "Auction" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(j)     "Avoidance Actions" means any and all avoidance, recovery, subordination or other claims, actions, or remedies which any of the "Debtors" under the Bankruptcy Case, the debtors in possession, the "Estates" under the Bankruptcy Case, or other appropriate parties in interest have asserted or may assert under Sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

(k)     "Bidding Procedures Order" means an Order substantially in the form attached hereto as Exhibit D.

(l)     "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(m)     "Cash and Cash Equivalents" means all of the Company's cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(n)     "Code" means the United States Internal Revenue Code of 1986, as amended.

(o)     "Company Exclusively Licensed Intellectual Property" means all Intellectual Property exclusively licensed or purported to be exclusively licensed to the Company or any of its Subsidiaries.

(p)     "Company Licensed Intellectual Property" means all Company Exclusively Licensed Intellectual Property and all Intellectual Property that is non-exclusively licensed or purported to be non-exclusively licensed to the Company or any of its Subsidiaries.

(q)     "Company Owned Intellectual Property" means all Intellectual Property owned or purported to be owned by the Company or any of its Subsidiaries.

(r)     "Company SEC Documents" means Company's Annual Report on Forms 10-K or 10-K/A and the Company's Quarterly Report on Form 10-Q, in each case, filed by the Company with the SEC pursuant to the Securities Act since January 1, 2019.

(s)     "Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(t)      "Contract" means any written or oral contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, license or other agreement, arrangement, instrument or commitment, in each case that is binding upon a Person.

(u)      "DEA" means the United States Drug Enforcement Administration.

(v)      "DIP Credit Agreement" means the Senior Secured Super-Priority Term Loan Debtor-In-Possession Loan Agreement, dated as of the date hereof, among the Company, the other Loan Parties party thereto, the Lenders party thereto, and Wilmington Savings Fund Society, FSB, as Administrative Agent.

(w)      "DIP Lenders" means the parties identified as Lenders under the DIP Credit Agreement.

(x)      "Documents" means all of the Company's and its Subsidiaries' current or historical written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), consulting materials, opinions and other documents commissioned by or on behalf of the Company or its Subsidiaries, development, quality control, quality assurance, regulatory, pharmacovigilance records and other regulatory documents, all personnel and employment records for the Transferred Employees or any individual independent contractors of the Company or its Subsidiaries, and other books and records of Sellers, in each case whether or not in electronic form.

(y)      "Encumbrance" means any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in Section 101(5) of the Bankruptcy Code), license, charge, mortgage, deed of trust, option, pledge, security interest, restriction or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use or other encumbrance of any kind.

(z)      "Environmental Laws" means all applicable Laws concerning pollution or protection of the environment or concerning public or worker health or safety (with respect to exposure to Hazardous Substances), including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, Release, control, or cleanup of any Hazardous Substances.  For the avoidance of doubt, Environmental Laws shall not cover communicable diseases, such as the "Coronavirus" or "COVID-19".

(aa)      "Equipment" means any and all equipment, computers, machinery, furniture, spare parts, furnishings, fixtures, office supplies, supply inventory, vehicles and all other fixed assets.

84

(bb)    "ERISA" means the Employee Retirement Income Security Act of 1974.

(cc)    "Exchange Act" means the Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

(dd)    "Excluded Bank Accounts" means those certain bank accounts of Sellers that are set forth on Schedule 1.1(t).

(ee)    "Excluded Cash" means any Cash and Cash Equivalents expressly set forth on Schedule 1.1(a) or designated pursuant to Section 2.1(a).

(ff)    "Excluded Confidentiality Arrangements" means those certain non-disclosure, confidentiality, and similar arrangements with (or for the benefit of) employees and agents of Sellers or with third parties that are set forth on Schedule 1.1(q).

(gg)    "FDA" means the United States Food and Drug Administration.

(hh)    "Final Order" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, reargument or rehearing shall then be pending or (ii) if an appeal, writ of *certiorari* new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Code, may be filed relating to such order, shall not cause an order not to be a Final Order.

(ii)    "Financing Order" means, as applicable, the interim and final Orders of the Bankruptcy Court, "(I) Authorizing the Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling A Final Hearing, and (V) Granting Related Relief," in the Bankruptcy Case, setting forth the terms of Sellers' debtor-in-possession financing, which shall be consistent with the DIP Credit Agreement.

(jj)    "Fraud" means a (i) a false representation of material fact, (A) in the making of any representation or warranty by Sellers in Article III or any certificate delivered by Sellers pursuant to Section 2.3(f) or (B) with respect to the making of any representation or warranty of Purchaser in Article IV; (ii) made with knowledge or belief that such representation is false; (iii) with an intention to deceive or mislead the party to whom such representation is made to act or refrain from acting; and (iv) causing that party, in reliance upon such false representation, to take or refrain from taking action, that if taken together satisfy the requirements for establishing

85

common law fraud under Delaware Law (and does not include any fraud claim based on constructive knowledge, negligent misrepresentation, recklessness or a similar theory).

(kk)    "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(ll)    "Governmental Authorization" means any permit, license, franchise, certificate, approval, application, registration, drug listing, consent, permission, clearance, waiver, notification, designation, registration, certification, making, exemption, variance, order, tariff, rate schedule, qualification authorization or Product Registration issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law, including any Health Care Law.

(mm)    "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory or self-regulatory body, board, bureau, authority agency or political subdivision thereof of any nature, whether supranational, international, foreign, federal, state, local, provincial, territorial, county or municipal, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court, arbitrator, judicial body or tribunal (whether public or private).

(nn)    "Hazardous Substance" means any substance, material or waste defined, listed, regulated or characterized as "toxic," "hazardous," a "pollutant" or a "contaminant" under or pursuant to any Environmental Laws or which could form the basis of any liability under Environmental Laws because of its dangerous or deleterious properties or characteristics, including petroleum and its by-products, asbestos, polychlorinated biphenyls, per- and polyfluoroalkyl substances, explosives, radioactive materials, and solid wastes that pose imminent and substantial endangerment to health or the environment.  For the avoidance of doubt, Hazardous Substances shall not cover communicable diseases, such as the "Coronavirus" or "COVID-19".

(oo)    "Health Care Laws" include, but are not limited to the following: the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.) ("FDCA"); the Prescription Drug Marketing Act, as amended by the Prescription Drug Amendments of 1992 (21 U.S.C. § 331 et seq.); the Public Health Service Act (42 U.S.C. § 201 et seq.), including the Clinical Laboratory Improvement Amendments of 1988 (42 U.S.C. § 263a); the Federal Trade Commission Act (15 U.S.C. § 41 et seq.); the Controlled Substances Act (21 U.S.C. § 801 et seq.); the Criminal Health Care Fraud Statute (18 U.S.C. § 1347); the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)); the civil monetary penalties law (42 U.S.C. § 1320a-7a); the criminal False Claims Act (18 U.S.C. § 287); the civil False Claims Act (31 U.S.C. § 3729 et seq.); the administrative False Claims Law (42 U.S.C. § 1320a-7b(a)); the Stark law (42 U.S.C. § 1395nn); the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d et seq.) as amended by the Health Information Technology for Economic and Clinical Health Act (42 U.S.C. § 17921 et seq.); the exclusion laws (42 U.S.C. § 1320a-7); the Medicare statutes (Title XVIII of the Social Security Act); the Medicaid statutes (Title XIX of the Social Security Act); and the Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010 (42 U.S.C. § 18001 et seq.); any regulations or guidance promulgated or issued pursuant to such laws; and any other state, federal or ex-U.S. laws, accreditation standards, or regulations governing the classification, design, research, investigation, development, approval,

manufacturing, safety surveillance, testing, packaging, labeling, advertising, marketing, storage, import, export, promotion, distribution, or sale of Products, kickbacks, patient or program charges, recordkeeping, claims process, documentation requirements, medical necessity, referrals, the hiring of employees or acquisition of services or supplies from those who have been excluded from government health care programs, quality, safety, privacy, security, licensure, accreditation or any other aspect of providing health care, clinical laboratory or diagnostic products or services, to the extent applicable to the Company or its Subsidiaries.

(pp)    "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations promulgated thereunder.

(qq)    "India Company" means Akorn India Private Limited.

(rr)    "Intellectual Property" means any and all intellectual property of every kind, arising under the Laws of the United States or any other jurisdiction, including all of the following: (i) patents, patent applications and patent disclosures; (ii) trademarks and service marks (registered and unregistered), trade dress, trade names, corporate names and Internet domain names, together with all goodwill associated with each of the foregoing; (iii) copyrights (registered and unregistered); (iv) registrations and applications for any of the foregoing; (v) trade secrets, know-how, inventions, methods, processes, formulae, research and development information, technology, product roadmaps, customer lists and any other information or any kind or nature, in each case to the extent any of the foregoing derives economic value (actual or potential) from not being generally known to other Persons who can obtain economic value from its disclosure; (vi) computer software; (vii) drawings, schematics and other technical plans; and (viii) all other intellectual property, proprietary or industrial property rights of any kind or nature.

(ss)    "International Trade Laws"  means all applicable United States laws, regulations, and orders pertaining to trade and economic sanctions and export controls, including, such laws, regulations, and orders administered and enforced by the U.S. Department of the Treasury, the U.S. Department of Commerce, the U.S. Department of State including the sanctions administered and enforced by the Office of Foreign Assets Control, the United States Export Administration Act of 1979, as amended, and the Export Control Reform Act of 2018, and implementing Export Administration Regulations; the Arms Export Control Act and implementing International Traffic in Arms Regulations; the anti-boycott regulations, guidelines and reporting requirements under the Export Administration Regulations and Section 999 of the Code; and all comparable applicable economic sanctions and export laws outside the United States for each country where the Company and its Subsidiaries, or their agents and representatives on behalf of the Company and its Subsidiaries, conduct business.

(tt)    "Inventory" means all inventory (including active pharmaceutical ingredients, finished goods, supplies, raw materials, work in progress, spare, replacement and component parts) maintained or held by, stored by or on behalf of, or in transit to, any of Sellers or Acquired Subsidiaries, whether for sale or non-commercial use (e.g., validation) or otherwise, together with any interests therein, including (x) being held by customers pursuant to consignment arrangements or (y) being held by suppliers or vendors under tolling or similar arrangements.

(uu)    "ISRA" means the New Jersey Industrial Site Recovery Act, N.J.S.A. 13:1K-6 et seq., as amended, and the rules and regulations promulgated thereunder.

(vv)    "Knowledge of Sellers" means the actual knowledge of Duane Portwood, Joseph Bonaccorsi, and Jennifer Bowles, after reasonable investigation of their direct reports with respect to the applicable subject matter.

(ww)    "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body anywhere in the world.

(xx)    "Leasehold Improvements" means all buildings, structures, improvements and fixtures which are owned by a Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the lease for such Leased Real Property.

(yy)    "Lenders" has the meaning set forth in the Loan Agreement.

(zz)    "Liability" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(aaa)    "Loan Agreement" means that certain Loan Agreement, dated as of April 17, 2014, between the Company, the other loan parties, the lenders and Wilmington Savings Fund Society, FSB as administrative agent, as amended by the Standstill Agreement, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time.

(bbb)    "Loan Agreement Indebtedness" means all Prepetition Obligations outstanding as of the date hereof under the Loan Agreement and the other Loan Documents, including all interest due and owing thereunder and all accrued and unpaid fees and expenses.

(ccc)    "Loan Documents" has the meaning set forth in the Loan Agreement.

(ddd)    "Material Adverse Effect" means any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") that, individually or in the aggregate (a) has, or would reasonably be expected to have, a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as a whole, or on the results of operations or condition (financial or otherwise) of the business of the Company and its Subsidiaries or (b) would reasonably be expected to impair, in any material respect, the ability of the Company and its Subsidiaries to consummate the transactions contemplated by this Agreement or the Ancillary Agreements;

provided that, for purposes of clause (a), none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: any Effect arising from or relating (and solely to the extent arising from or relating) to (i) general business or economic conditions affecting the industry in which the Company and its Subsidiaries operate, (ii) general national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices, (iii) any fire, flood, hurricane, earthquake, tornado, windstorm, or other similar calamity or similar act of God, (iv) any global or national health concern, epidemic, disease outbreak, pandemic (whether or not declared as such by any Governmental Body and including the "Coronavirus" or "COVID-19") or any Law issued by a Governmental Body requiring business closures, quarantine or "sheltering-in-place" or similar restrictions that arise out of such health concern, epidemic, disease outbreak or pandemic (including the "Coronavirus" or "COVID-19") or any change in such Law following the date of this Agreement, (v) general financial, banking, or securities market conditions, (vi) the announcement or pendency of this Agreement or the transactions contemplated hereby or the identity, nature or ownership of Purchaser, (vii) changes after the date hereof in GAAP, (viii) changes after the date hereof in Laws, (ix) any failure, in and of itself, of Sellers to achieve any budgets, projections, forecasts, estimates, predictions, or guidance; provided that the Effects giving rise to or contributing to such failure may be deemed to constitute, or be taken into account in determining whether there has been a Material Adverse Effect, (x) the matters set forth on Schedule 11.1(ddd), or (xi) (A) the commencement or pendency of the Bankruptcy Case; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby or thereby, (2) the reorganization of Sellers, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract otherwise in compliance with this Agreement; (C) any Order of the Bankruptcy Court or any actions or omissions of Sellers or their Subsidiaries required to be taken (or not to be taken) to comply therewith; provided, however, in the case of the immediately preceding clauses (i), (ii), (iii), (iv), (v), (vii) or (viii), to the extent that the impact of any such Effect is disproportionately adverse to Sellers, the Acquired Subsidiaries, their respective business, the Acquired Assets or the Assumed Liabilities, taken as a whole, relative to other similarly situated businesses in the industry in which Sellers and the Acquired Subsidiaries operate occur or arise, then such matter, event, change, development, occurrence, circumstance or effect may be taken into account in determining whether there has been or will be, a Material Adverse Effect.

(eee)    "Order" means any award, order, injunction, order, decree, ruling, writ, assessment, judgment, decision, subpoena, mandate, precept, command, directive, consent, approval, award (including any arbitration award) or similar determination or finding entered, issued, made or rendered by any Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

(fff)    "Ordinary Course" means the ordinary and usual course of operations of the business of the Company and its Subsidiaries consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Case; provided that any action described in Schedule 3.17(d) and taken, whether before, on or after the date of this Agreement in Sellers' good faith business judgment, to respond to the "Coronavirus" or "COVID-19" (or the Effects thereof) shall be deemed "Ordinary Course" hereunder.

89

(ggg)    "Outside Back-Up Date" means the date that is forty-five (45) days after the date of the Sale Hearing.

(hhh)    "Permitted Encumbrances" means (i) statutory Encumbrances for Taxes (A) not yet due or payable or (B) that are being contested in good faith by appropriate Actions and for which adequate reserves have been established in accordance with GAAP; (ii) with respect to Owned Real Property or Leased Real Property, easements, rights of way and similar non-monetary Encumbrances (that would be disclosed by an accurate survey of the real property and otherwise affecting title to real property) which do not, individually or in the aggregate, adversely affect the use or occupancy of such Owned Real Property or Leased Real Property as it relates to the Acquired Assets; (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated by the current use or occupancy, or the current or previous use or occupancy in the Ordinary Course, of such Owned Real Property or Leased Real Property, as applicable; (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course and securing obligations incurred prior to the Closing Date for amounts not yet due or payable; (v) non-exclusive licenses of Intellectual Property granted in the Ordinary Course; (vi) such other Encumbrances or title exceptions as Purchaser may approve in writing in its sole discretion; (vii) any Encumbrances set forth on Schedule 11.1(hhh); and (viii) any Encumbrances that will be removed or released by operation of the Sale Order with no Liability to Purchaser or any of its Affiliates.

(iii)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group, whether or not a legal entity.

(jjj)    "Personal Information" means any information that can be used directly or indirectly, alone or in combination with other information, to identify an individual, including name, Social Security Number or other government identifier, or credit card account information and any information defined as "personal data", "personally identifiable information" or "personal information" under any Law relating to privacy, data security, data protection, and collection, storing, use, security, processing and transferring of Personal Information, as applicable.

(kkk)    "Post-Closing Tax Period" means all taxable periods beginning after the Closing Date and the portion beginning on the day after the Closing Date of any tax period that includes but does not end on the Closing Date.

(lll)    "Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date and with respect to any taxable period that includes but does not end on the Closing Date, the portion thereof ending on the Closing Date.

(mmm)"Prepetition Obligations" shall have the meaning assigned to it in the Financing Order.

(nnn)    "Product" means each product manufactured, commercialized, developed, packaged, labeled, stored, used, marketed, imported, exported, distributed or sold by or on behalf of the business of the Company, or which the process has taken substantial steps

90

towards manufacturing, commercializing, developing, packaging, labeling, storing, using, marketing, importing, exporting, distributing or selling, including all products that are regulated as human or animal drugs, medical devices, or other health care products under Health Care Laws, including drug and biological candidates, compounds or products being researched, tested, stored, developed, labeled, manufactured, packed, marketed, sold and/or distributed by the Company or any of its Subsidiaries.

(ooo)   "<u>Product Registrations</u>" means (i) any investigational new drug application, new drug application, abbreviated new drug application, premarket approval, 510(k) clearance, or similar regulatory application of Sellers for any Product that has been submitted to or approved by the FDA in the United States (other than withdrawn submissions or approvals) and (ii) all marketing approvals, clearances, registrations, certifications, markings, consents or other authorizations used to market the Products and granted or pending with any Governmental Body, including establishment registrations and Product listings.

(ppp)   "<u>Purchaser Group</u>" means Purchaser, any Affiliate of Purchaser and each of their respective Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns; provided, however, that the definition of "Purchaser Group" shall not include Wilmington Savings Fund Society, FSB, in its capacity as Administrative Agent under the Loan Agreement or Administrative Agent under the DIP Credit Agreement or any of their respective officers, directors, employees, partners, members, managers, agents, or Advisors in their capacities as such.

(qqq)   "<u>Registration Information</u>" means any and all original Product Registrations, together with all Regulatory Documentation.

(rrr)   "<u>Regulatory Documentation</u>" means (i) all regulatory filings, underlying material data, datasets and supporting documents (including copies of all material correspondence between any of Sellers or their Affiliates and the applicable Governmental Body), material CMC data and documentation, preclinical and clinical studies and tests, (ii) any premarket approval or 510(k) clearance application or foreign equivalent, and all regulatory files related thereto, current approved packaging and any other existing files and dossiers, including the underlying data, datasets or information used to support, maintain or obtain marketing authorization, (iii) all records maintained under record keeping or reporting Laws of the FDA or any other Governmental Body, including all marketing applications, annual and safety reports, master files, FDA warning letters, FDA notices of adverse finding letters, FDA audit reports (including any responses to such reports), periodic safety update reports, complaint files, and annual product quality reviews, and (iv) the complete complaint, adverse event and medical inquiry filings with respect to any product line as required by applicable Health Care Laws, including the Product Registrations.

(sss)   "<u>Release</u>" means any actual or threatened spilling, leaking, pumping, pouring, releasing, emitting, emptying, discharging, injecting, escaping, dumping, disposing, depositing, dispersing, leaching or migrating of any Hazardous Substance into or through the indoor or outdoor environment.

(ttt)    "RSA" means that certain Restructuring Support Agreement, dated as of the date hereof, by and among the Sellers and the other parties thereto, as may be amended, modified, or supplemented from time to time, in accordance with its terms.

(uuu)    "Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions pursuant to the Sale Order.

(vvv)    "Sale Order" means an order of the Bankruptcy Court approving and authorizing the sale of the Acquired Assets to Purchaser substantially in the form attached as Exhibit H hereto, with such changes as may be required by the Bankruptcy Court that are in form and substance satisfactory to Purchaser and Sellers.

(www) "Sanctioned Person" means an individual or entity that is identified on (or owned, 50% or more, individually or in the aggregate by, controlled by, or acting on behalf of an individual or entity identified on), the United States' Specially Designated Nationals and Blocked Persons List, the United States' Denied Persons or Entity lists, the United Nations Security Council Sanctions List, as applicable, the European Union's List of Persons, Groups and Entities Subject to Financial Sanctions, as applicable, the U.K. Consolidated List of Financial Targets, as applicable, and any other applicable list of sanctioned persons maintained by any other Governmental Body of any country where the Company and its Subsidiaries conduct business.

(xxx)    "SEC" means the U.S. Securities and Exchange Commission.

(yyy)    "Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(zzz)    "Seller FDA Transfer Letters" means the letters from the applicable holders of a New Drug Application or Abbreviated New Drug Application for human or animal drug products, premarket approval, or 510(k) clearance (each as defined by the FDA), duly executed, notifying the FDA of the transfer of the rights to the applicable Governmental Body New Drug Application, Abbreviated New Drug Application, premarket approval, or 510(k) clearance (each as defined by the FDA) to Purchaser.  In the case of a premarket approval or 510(k) clearances, a "Seller FDA Transfer Letter" notification shall include the submission of electronic information to the FDA pursuant to 21 CFR §807.

(aaaa)    "Seller Parties" means Sellers and the Company's Subsidiaries and each of their respective former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(bbbb)    "Seller Plan" means each (i) employee benefit plan within the meaning of Section 3(3) of ERISA (whether or not subject to ERISA), (ii) stock option, stock purchase, stock appreciation right or other equity or equity-based plan, program, policy, Contract, agreement or other arrangement, (iii) employment, individual consulting, severance, retention, change in control or other similar plan, program, policy, Contract, agreement or other arrangement or (iv) bonus, incentive, deferred compensation, profit-sharing, retirement, post- termination health or welfare, vacation, severance or termination pay, fringe or other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored,

maintained or contributed to by the Company or any of its Subsidiaries or to which the Company or any of its Subsidiaries contributes or is obligated to contribute to or has any Liability.

(cccc)    "Standstill Agreement" means that certain Standstill Agreement, dated as May 6, 2019, by and among the Company, certain loan parties under the Loan Agreement, certain other lenders party thereto, and JPMorgan Chase Bank, N.A., as administrative agent, as amended by the First Amendment, dated as of December 13, 2019, and the Second Amendment, dated as of February 12, 2020, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time.

(dddd)    "Straddle Period" means any Tax period beginning before, and ending after, the Closing.

(eeee)    "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(ffff)    "Swiss Company" means Akorn AG, a Swiss share corporation (Aktiengesellschaft), organized under the laws of Switzerland, with registered office in and business address at Riethofstrasse 1, 8842 Hettlingen, Switzerland, Swiss company registration number CHE-110.060.866.

(gggg)    "Tax" or "Taxes" means any federal, state, local, or foreign tax or other duty, fee, assessment or other charge in the nature of taxes of any kind whatsoever (whether imposed directly or through withholding and whether or not disputed) including income, gross receipts, capital, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, inventory, license, payroll, employment, social security, severance, intangibles, environmental, customs duties, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty, additions to tax or additional amounts with respect thereto (or attributable to the nonpayment thereof).

(hhhh)    "Tax Return" means any return, declaration, estimate, claim for refund, report, statement or information return relating to Taxes filed or required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(iiii)    "U.S. Antitrust Laws" means any of the HSR Act, the Sherman Antitrust Act, as amended, the Clayton Antitrust Act, as amended, and any other United States federal or state Law, Orders, or administrative or judicial doctrines that are designed to prohibit, restrict or regulate mergers and acquisitions and/or actions having the purpose or effect of lessening competition, monopolization or restraining trade.

(jjjj)    "<u>United States Seller Plan</u>" means each Seller Plan maintained with respect to the Company and its Subsidiaries other than any Non-Debtor Subsidiary.

(kkkk)    "<u>Willful Breach</u>" means a material breach of this Agreement that is a consequence of an act or failure to act with the actual knowledge that the taking of the act or failure to act would result in a material breach of this Agreement.

(llll)    "<u>Wind-Down Budget</u>" means the wind-down budget, substantially in the form attached hereto as <u>Exhibit G</u> and otherwise in form and substance satisfactory to Purchaser.

11.2.    <u>Index of Defined Terms</u>.

Acquired Assets ........................................ 1
Acquired Avoidance Actions ..................... 4
Acquired Leased Real Property ................. 2
Acquired Leases ....................................... 13
Acquired Owned Real Property ................. 2
Acquired Subsidiaries ............................... 3
Action ...................................................... 82
Advisors .................................................. 82
Affiliate ................................................... 82
Agreement ................................................. 1
Akorn Luxembourg .................................. 82
Allocation ................................................ 71
Allocation Methodology .......................... 71
Alternative Transaction ........................... 82
Ancillary Agreement ................................ 16
Anti-Corruption Laws .............................. 82
Anti-Money Laundering Laws ................. 82
Apportioned Obligations .......................... 72
Assigned Contracts .................................... 2
Assignment and Assumption Agreement .. 13
Assignment and Assumption of Lease ...... 13
Assumed Benefit Plans ............................. 7
Assumed Liabilities ................................... 6
Assumed Taxes ........................................ 82
Auction .................................................... 83
Avoidance Actions ................................... 83
Backup Bidder ......................................... 44
Bankruptcy Case ........................................ 1
Bankruptcy Code ....................................... 1
Bankruptcy Court ...................................... 1
Bidding Procedures Motion ..................... 43
Bidding Procedures Order ........................ 83
Business Day ............................................ 83
Cash and Cash Equivalents ...................... 83
Chosen Courts .......................................... 79

Closing .................................................... 13
Closing Date ............................................ 13
Code ........................................................ 83
Company .................................................... 1
Company Exclusively Licensed
    Intellectual Property ........................... 83
Company Licensed Intellectual Property .. 83
Company Owned Intellectual Property ..... 83
Company SEC Documents ....................... 83
Consent .................................................... 83
Contract ................................................... 84
Credit Bid Amount ................................... 12
Credit Bid Portion ................................... 12
Cure Costs ................................................. 6
Dataroom ................................................. 40
DEA ........................................................ 84
Designated Purchaser ............................... 77
DIP Credit Agreement ............................. 84
Direction Letter ....................................... 42
Documents ............................................... 84
Effect ....................................................... 88
Employees ............................................... 53
Encumbrance ........................................... 84
Enforceability Exceptions ........................ 16
Environmental Laws ................................ 84
Environmental Permits ............................. 26
Equipment ............................................... 84
ERISA ..................................................... 85
Exchange Act .......................................... 85
Excluded Assets ........................................ 4
Excluded Bank Accounts ......................... 85
Excluded Cash ......................................... 85
Excluded Confidentiality Arrangements ... 85
Excluded Contracts .................................... 4
Excluded Liabilities ................................... 7

Excluded Subsidiaries .................................. 5
Express Representations ........................... 40
FDA............................................................ 85
FDA Ethics Policy .................................... 36
FDCA ........................................................ 86
Filed SEC Documents .............................. 15
Final Order ............................................... 85
Financing Order ....................................... 85
Foreign Competition Laws ...................... 16
Fraud ........................................................ 85
G Reorganization ..................................... 73
G Reorganization Election ....................... 73
GAAP........................................................ 86
Governmental Authorization ................... 86
Governmental Body ................................. 86
Hazardous Substance ............................... 86
Health Care Laws ..................................... 86
HSR Act .................................................... 87
Indebtedness ............................................ 47
India Company ......................................... 87
Information Presentation.......................... 40
Intellectual Property ................................ 87
International Trade Laws .......................... 87
Inventory .................................................. 87
ISRA ......................................................... 88
Knowledge of Sellers ............................... 88
L5 ............................................................. 74
Law ........................................................... 88
Leased Real Property ............................... 20
Leasehold Improvements ......................... 88
Leases....................................................... 20
Lenders..................................................... 88
Liability.................................................... 88
Loan Agreement....................................... 88
Loan Agreement Indebtedness................. 88
Loan Documents ...................................... 88
LSRP......................................................... 56
Material Adverse Effect ........................... 88
Material Contract ..................................... 22
Material Customers .................................. 34
Material Suppliers .................................... 34
Non-Debtor Subsidiaries.......................... 17
Order ........................................................ 89
Ordinary Course....................................... 89
Outside Back-Up Date ............................. 90
Outside Date............................................. 69

Owned Real Property................................ 19
Parties ........................................................ 1
Party ........................................................... 1
Permits ..................................................... 24
Permitted Encumbrances .......................... 90
Person........................................................ 90
Personal Information................................. 90
Petitions...................................................... 1
Post-Closing Tax Period ........................... 90
Pre-Closing Tax Period............................. 90
Prepetition Obligations ............................. 90
Product ...................................................... 90
Product Registrations ................................ 91
Projections................................................. 62
Purchase Price ........................................... 12
Purchaser .................................................... 1
Purchaser Group........................................ 91
Purchaser Plans ......................................... 54
Registration Information............................ 91
Regulatory Documentation ....................... 91
Release ...................................................... 91
Retained Privileged Materials.................... 5
RSA............................................................ 92
Safety Notices ........................................... 36
Sale Hearing.............................................. 92
Sale Order ................................................. 92
Sanctioned Person..................................... 92
Schedules .................................................. 15
SEC ........................................................... 92
Securities Act ............................................ 92
Seller ........................................................... 1
Seller FDA Transfer Letters...................... 92
Seller Fundamental Representations......... 67
Seller Parties ............................................. 92
Seller Plan ................................................. 92
Seller Sufficiency Representations ........... 67
Sellers.......................................................... 1
Standstill Agreement................................. 93
Straddle Period.......................................... 93
Straddle Period Taxes ............................... 73
Subsidiaries ............................................... 93
Subsidiary ................................................. 93
Successful Bidder...................................... 44
Swiss Company......................................... 93
Swiss Employees ...................................... 55
Systems ..................................................... 28

| | | | |
|---|---|---|---|
| Tax | 93 | U.S. Antitrust Laws | 93 |
| Tax Elections | 73 | United States Seller Plan | 94 |
| Tax Forms | 73 | Updated Schedules | 60 |
| Tax Return | 93 | WARN Act | 55 |
| Taxes | 93 | Willful Breach | 94 |
| Transfer Offer | 53 | Wind-Down Adjustment Amount | 13 |
| Transfer Taxes | 71 | Wind-Down Amount | 12 |
| Transferred Employees | 53 | Wind-Down Budget | 94 |

11.3.  <u>Rules of Interpretation</u>.  Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)  Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied.  To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)  The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement.  Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)  Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation."  Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)  The words "to the extent" shall mean "the degree by which" and not "if."

(e)  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded.  If the last day of such period is a day other than a Business Day, the period in question will end at 11:59 p.m. New York time on the next succeeding Business Day.

(f)  Words denoting any gender will include all genders, including the neutral gender.  Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)  The word "will" will be construed to have the same meaning and effect as the word "shall".  The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)  All references to "$" and dollars will be deemed to refer to United States currency.

        (i)      All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable.

        (j)      Any document or item will be deemed "delivered," "provided" or "made available" by the Company, within the meaning of this Agreement if such document or item is included in the Dataroom and accessible by Purchaser and all of its representatives with access to the Dataroom by 5:00 p.m. New York time on the date that is two (2) Business Days prior to the date of this Agreement.

        (k)      Any reference to any agreement, Contract or instrument will be a reference to such agreement, Contract or instrument, as amended, modified, supplemented or waived in accordance with its terms and, if applicable, the terms hereof.

        (l)      Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; <u>provided</u> that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of determining whether such violation or non-compliance or alleged violation or non-compliance has occurred.

        (m)      A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

        (n)      References to "written" or "in writing" include in electronic form.

*[Signature page(s) follow.]*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**[PURCHASER]**


By: _____
Name:
Title:

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

### AKORN, INC.

By: _____
Name:
Title:

### [VPI HOLDINGS CORP]

By: _____
Name:
Title:

### [AKORN ANIMAL HEALTH, INC.]

By: _____
Name:
Title:

### [AKORN OPHTHALMICS, INC.]

By: _____
Name:
Title:

### [ADVANCED VISION RESEARCH, INC.]

By: _____
Name:
Title:

### [AKORN SALES, INC.]

By: _____
Name:
Title:

**[HI-TECH PHARMACAL CO., INC.]**


By: _____
Name:
Title:


**[AKORN (NEW JERSEY), INC.]**


By: _____
Name:
Title:


**[OAK PHARMACEUTICALS, INC.]**


By: _____
Name:
Title:



**[10 EDISON STREET LLC]**


By: _____
Name:
Title:


**[13 EDISON STREET LLC]**


By: _____
Name:
Title:

**[VPI HOLDINGS SUB, LLC]**

By: _____
Name:
Title:

**[VERSAPHARM INCORPORATED]**

By: _____
Name:
Title:

**[INSPIRE PHARMACEUTICALS INC.]**

By: _____
Name:
Title:

**[OLTA PHARMACEUTICALS CORP]**

By: _____
Name:
Title:

**[COVENANT PHARMA, INC.]**

By: _____
Name:
Title:

**[CLOVER PHARMACEUTICALS CORP]**

By: _____
Name:
Title:

**<u>Exhibit D</u>**

**DIP Credit Agreement**

EXECUTION VERSION

SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION LOAN AGREEMENT

dated as of

May [__], 2020

among

AKORN, INC.,
a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code

The Other Loan Parties Party Hereto,
each as a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code

The Lenders Party Hereto,

and

WILMINGTON SAVINGS FUND SOCIETY, FSB,
as Administrative Agent

_____

# TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ................................................................. **2**

Section 1.01        Defined Terms ................................................................. 2
Section 1.02        Classification of Loans and Borrowings ................................... 33
Section 1.03        Terms Generally .............................................................. 33
Section 1.04        Accounting Terms; GAAP .................................................. 33

**ARTICLE II THE CREDITS** .............................................................. **34**

Section 2.01        Commitments .................................................................. 34
Section 2.02        Loans and Borrowings ....................................................... 34
Section 2.03        Procedure for Borrowings .................................................. 34
Section 2.04        [Reserved ..................................................................... 35
Section 2.05        [Reserved ..................................................................... 35
Section 2.06        [Reserved ..................................................................... 35
Section 2.07        [Reserved ..................................................................... 35
Section 2.08        Conversion and Continuation Options .................................... 35
Section 2.09        [Reserved] .................................................................... 37
Section 2.10        Repayment of Loans; Evidence of Debt ................................... 37
Section 2.11        Prepayment of Loans ........................................................ 37
Section 2.12        Fees ............................................................................ 38
Section 2.13        Interest ........................................................................ 38
Section 2.14        Alternate Rate of Interest .................................................. 39
Section 2.15        Increased Costs .............................................................. 39
Section 2.16        Break Funding Payments ................................................... 41
Section 2.17        Withholding of Taxes; Gross-Up .......................................... 41
Section 2.18        Payments Generally; Allocation of Proceeds; Sharing of Set-offs ........... 46
Section 2.19        Mitigation Obligations; Replacement of Lenders ....................... 49
Section 2.20        Defaulting Lenders .......................................................... 50
Section 2.21        Returned Payments .......................................................... 50
Section 2.22        Super Priority Nature of Obligations and Administrative Agent's
                    Liens; Payment of Obligations ............................................. 50

**ARTICLE III REPRESENTATIONS AND WARRANTIES** .............................. **51**

Section 3.01        Organization; Powers ........................................................ 51
Section 3.02        Authorization; Enforceability .............................................. 51
Section 3.03        Governmental Approvals; No Conflicts ................................... 51
Section 3.04        Financial Condition; No Material Adverse Change ...................... 52
Section 3.05        Properties ..................................................................... 52
Section 3.06        Litigation and Environmental Matters .................................... 52
Section 3.07        Compliance with Laws and Agreements; No Default ................... 53
Section 3.08        Investment Company Status ................................................ 53
Section 3.09        Taxes .......................................................................... 53
Section 3.10        ERISA ......................................................................... 53
Section 3.11        Disclosure .................................................................... 53

**TABLE OF CONTENTS** *(continued)*

Page

Section 3.12    No EEA Financial Institution.................................................. 54
Section 3.13    Insurance ............................................................................... 54
Section 3.14    Capitalization and Subsidiaries.............................................. 54
Section 3.15    Security Interest in Collateral ............................................... 54
Section 3.16    Employment Matters.............................................................. 55
Section 3.17    Federal Reserve Regulations.................................................. 55
Section 3.18    Use of Proceeds..................................................................... 55
Section 3.19    Anti-Corruption Laws and Sanctions..................................... 55
Section 3.20    Reorganization Matters ......................................................... 55

**ARTICLE IV CONDITIONS OF EFFECTIVENESS, LENDING AND
WITHDRAWALS**................................................................................................ **56**

Section 4.01    Closing Date Effectiveness .................................................... 56
Section 4.02    Conditions Precedent to each Withdrawal .............................. 59

**ARTICLE V AFFIRMATIVE COVENANTS** .......................................................... **60**

Section 5.01    Financial Statements; Other Information................................. 61
Section 5.02    Notices of Material Events...................................................... 63
Section 5.03    Existence; Conduct of Business............................................... 64
Section 5.04    Payment of Obligations.......................................................... 65
Section 5.05    Maintenance of Properties ...................................................... 65
Section 5.06    Books and Records; Inspection Rights ..................................... 65
Section 5.07    Compliance with Laws and Material Contractual Obligations.... 65
Section 5.08    Use of Proceeds..................................................................... 65
Section 5.09    Insurance ............................................................................... 66
Section 5.10    Maintenance of Ratings .......................................................... 66
Section 5.11    Additional Collateral; Further Assurances............................... 66
Section 5.12    Post-Closing Obligations ........................................................ 67
Section 5.13    Approved Budget .................................................................... 68
Section 5.14    Cash Flow Forecast................................................................ 70
Section 5.15    Monthly Calls and Status Update Calls ................................... 70
Section 5.16    Required Milestones ............................................................... 71
Section 5.17    Specified Lender Advisors....................................................... 72
Section 5.18    Additional Bankruptcy Matters................................................ 73
Section 5.19    Debtor-in-Possession Obligations............................................ 73
Section 5.20    Liquidation of WorldAkorn Pharma Mauritius ......................... 73

**ARTICLE VI NEGATIVE COVENANTS** ............................................................... **74**

Section 6.01    Indebtedness........................................................................... 74
Section 6.02    Liens...................................................................................... 75
Section 6.03    Fundamental Changes ............................................................. 76
Section 6.04    Investments, Loans, Advances, Guarantees and Acquisitions.... 76
Section 6.05    Asset Sales ............................................................................ 77
Section 6.06    Sale and Leaseback Transactions............................................. 78
Section 6.07    Swap Agreements ................................................................... 78

## TABLE OF CONTENTS *(continued)*

| | | |
|---|---|---|
| Section 6.08 | Restricted Payments; Pre-Petition Indebtedness | 78 |
| Section 6.09 | Transactions with Affiliates | 79 |
| Section 6.10 | Restrictive Agreements | 79 |
| Section 6.11 | Amendment of Organizational Documents | 80 |
| Section 6.12 | Minimum Actual Liquidity | 80 |
| Section 6.13 | Orders | 80 |
| Section 6.14 | Reclamation Claims | 80 |
| Section 6.15 | Insolvency Proceeding Claims | 80 |
| Section 6.16 | Bankruptcy Actions | 80 |

**ARTICLE VII EVENTS OF DEFAULT** ........................................................... **81**

| | | |
|---|---|---|
| Section 7.01 | Events of Default | 81 |
| Section 7.02 | Remedies Upon an Event of Default | 87 |
| Section 7.03 | License; Access; Cooperation | 87 |

**ARTICLE VIII THE AGENTS** ..................................................................... **88**

| | | |
|---|---|---|
| Section 8.01 | Appointment | 88 |
| Section 8.02 | Rights as a Lender | 89 |
| Section 8.03 | Duties and Obligations | 89 |
| Section 8.04 | Reliance | 89 |
| Section 8.05 | Actions through Sub-Agents | 90 |
| Section 8.06 | Resignation | 90 |
| Section 8.07 | Non-Reliance | 91 |
| Section 8.08 | [Reserved] | 91 |
| Section 8.09 | Not Partners or Co-Venturers; Administrative Agent as Representative of the Secured Parties | 91 |
| Section 8.10 | Lender Action | 92 |
| Section 8.11 | Collateral Documents and Loan Guaranties | 92 |
| Section 8.12 | Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim | 94 |

**ARTICLE IX MISCELLANEOUS** .................................................................. **95**

| | | |
|---|---|---|
| Section 9.01 | Notices | 95 |
| Section 9.02 | Waivers; Amendments | 96 |
| Section 9.03 | Expenses; Indemnity; Damage Waiver | 98 |
| Section 9.04 | Successors and Assigns | 101 |
| Section 9.05 | Survival | 105 |
| Section 9.06 | Counterparts; Integration; Effectiveness; Electronic Execution | 106 |
| Section 9.07 | Severability | 106 |
| Section 9.08 | Right of Setoff | 106 |
| Section 9.09 | Governing Law; Jurisdiction; Waiver of Jury Trial; Consent to Service of Process | 107 |
| Section 9.10 | [Reserved] | 107 |
| Section 9.11 | Headings | 108 |
| Section 9.12 | Confidentiality | 108 |

## TABLE OF CONTENTS *(continued)*

Page

Section 9.13    Several Obligations; Nonreliance; Violation of Law............................. 109
Section 9.14    USA PATRIOT Act ................................................................... 109
Section 9.15    Disclosure .............................................................................. 109
Section 9.16    Appointment for Perfection ....................................................... 109
Section 9.17    Interest Rate Limitation ............................................................ 109
Section 9.18    No Advisory or Fiduciary Responsibility ...................................... 110
Section 9.19    Authorization to Distribute Certain Materials to Public-Siders............. 110
Section 9.20    [Reserved] ............................................................................. 110
Section 9.21    Acknowledgement and Consent to Bail-In of EEA Financial
                Institutions............................................................................. 110

**ARTICLE X LOAN GUARANTY** ........................................................... **111**

Section 10.01    Guaranty................................................................................ 111
Section 10.02    Guaranty of Payment ............................................................... 112
Section 10.03    No Discharge or Diminishment of Loan Guaranty.............................. 112
Section 10.04    Defenses Waived ..................................................................... 112
Section 10.05    Rights of Subrogation .............................................................. 113
Section 10.06    Reinstatement; Stay of Acceleration............................................ 113
Section 10.07    Information ............................................................................ 113
Section 10.08    [Reserved] ............................................................................. 113
Section 10.09    Taxes ................................................................................... 114
Section 10.10    Maximum Liability ................................................................... 114
Section 10.11    Contribution .......................................................................... 114
Section 10.12    Liability Cumulative ................................................................ 115

## TABLE OF CONTENTS *(continued)*

Page

### SCHEDULES:

Commitment Schedule
Schedule 3.05          Properties
Schedule 3.06          Disclosed Matters
Schedule 3.13          Insurance
Schedule 3.14          Capitalization and Subsidiaries
Schedule 6.01          Existing Indebtedness
Schedule 6.02          Existing Liens
Schedule 6.04          Existing Investments


### EXHIBITS:

Exhibit A             Form of Assignment and Assumption
Exhibit B             Form of Withdrawal Notice
Exhibit C             Approved Budget
Exhibit D             Form of Compliance Certificate
Exhibit E             Joinder Agreement
Exhibit F-1           U.S. Tax Certificate (For Foreign Lenders that are not Partnerships for
                      U.S. Federal Income Tax Purposes)
Exhibit F-2           U.S. Tax Certificate (For Foreign Participants that are not Partnerships for
                      U.S. Federal Income Tax Purposes)
Exhibit F-3           U.S. Tax Certificate (For Foreign Participants that are Partnerships for
                      U.S. Federal Income Tax Purposes)
Exhibit F-4           U.S. Tax Certificate (For Foreign that are Partnerships for U.S. Federal
                      Income Tax Purposes)

SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION LOAN AGREEMENT dated as of May [  ], 2020 (as it may be amended, supplemented or otherwise modified from time to time, this "**Agreement**") among AKORN, INC., as the Borrower, a debtor and a debtor-in-possession, the other Loan Parties party hereto, each as a debtor and a debtor-in-possession, the Lenders party hereto, and WILMINGTON SAVINGS FUND SOCIETY, FSB, as Administrative Agent.

## RECITALS

WHEREAS, on [  ], 2020 (the "**Petition Date**"), the Borrower and certain Loan Guarantors (together with any of their Subsidiaries and Affiliates that are or become debtors under the Chapter 11 Cases, collectively, the "**Debtors**", and each individually, a "**Debtor**") commenced Chapter 11 Case Nos. [     ] through [     ], as administratively consolidated at Chapter 11 Case No. [     ] (collectively, the "**Chapter 11 Cases**" and each individually, a "**Chapter 11 Case**") in the United States Bankruptcy Court for the District of Delaware.  The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested, and, upon the terms set forth in this Agreement, the Lenders have agreed to make available to the Borrower, a senior secured term loan credit facility of up to of up to $30,000,000 (the "**DIP Facility**"), subject to the conditions set forth herein, pursuant to the DIP Order, to fund the costs and expenses relating to the Chapter 11 Cases, the general corporate purposes and working capital requirements of the Borrower during the pendency of the Chapter 11 Cases pursuant to and in accordance with the Approved Budget;

WHEREAS, subject to the terms hereof and the DIP Order, the Borrower and the Loan Guarantors have agreed to secure all of their Obligations under the Loan Documents by granting to the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, a security interest in and lien upon substantially all of their existing and after-acquired property;

WHEREAS, the Borrower and the Loan Guarantors' business is a mutual and collective enterprise and the Borrower and the Loan Guarantors believe that the loans and other financial accommodations to the Borrower under this Agreement will enhance the aggregate borrowing powers of the Borrower and facilitate the administration of the Chapter 11 Cases and their loan relationship with the Administrative Agent and the Lenders, all to the mutual advantage of the Borrower and the Loan Guarantors;

WHEREAS, the Borrower and each Loan Guarantor acknowledges that it will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrower as provided in the Agreement;

WHEREAS, the Administrative Agent's and the Lenders' willingness to extend financial accommodations to the Borrower, and to administer the Borrower's and the Loan Guarantors' collateral security therefor, on a combined basis as more fully set forth in this Agreement and the other Loan Documents, is done solely as an accommodation to the Borrower and the Loan

Guarantors and at the Borrower's and the Loan Guarantors' request and in furtherance of the Borrower's and the Loan Guarantors' mutual and collective enterprise; and

WHEREAS, all capitalized terms used in this Agreement, including in these Recitals, shall have the meanings ascribed to them in Section 1.01, and, for purposes of this Agreement and the other Loan Documents, the rules of construction set forth in Section 1.03 shall govern. All Schedules, Exhibits, Annexes, and other attachments hereto, or expressly identified in this Agreement, are incorporated by reference, and taken together with this Agreement, shall constitute a single agreement. These Recitals shall be construed as part of this Agreement.

NOW, THEREFORE, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01    Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"**ABR**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Alternate Base Rate.

"**Account**" has the meaning assigned to such term in the Security Agreement.

"**Account Debtor**" means any Person obligated on an Account.

"**Actual Cash Receipts**" means with respect to any period, as the context requires, (x) the amount of actual receipts during such period of the Loan Parties (excluding any borrowings under this Agreement) under the heading "Total Receipts" in the Approved Budget and/or (y) the sum, for such period, of all such receipts for all such line items which comprise "Total Receipts" (as set forth in the Approved Budget), on a cumulative basis, in each case, as determined by reference to the Approved Budget as then in effect.

"**Actual Operating Disbursement Amounts**" means with respect to any period, as the context requires, (x) the amount of actual operating disbursements made by the Loan Parties during such period that correspond to each line item (on a line item by line item basis) under the headings "Operating Disbursements" in the Approved Budget and/or (y) the sum, for such period, of all such disbursements for all such line items which comprise "Total Operating Disbursements" (as set forth in the Approved Budget), on a cumulative basis (consistent with the Variance Testing Period), in each case, as determined by reference to the Approved Budget as then in effect, which amounts do not include Actual Restructuring Related Amounts.

"**Actual Liquidity**" means as of any date of determination, as the context requires, for the Loan Parties, the actual amounts of US Bank Cash and the amount of any outstanding Withdrawal Notice (which, except in connection with any calculation of minimum Actual Liquidity pursuant to Section 6.12 shall include any amounts deposited in the Loan Proceeds Account).

"**Actual Restructuring Related Amounts**" means with respect to any period, (a) the amount of financing, restructuring and professional fees during such period (including as reimbursement to any Secured Parties or the Specified Lender Advisors), (b) interest, fees and other amounts paid in respect of the Loans and (c) adequate protection payments in respect of loans issued under the Pre-Petition Term Loan Agreement (including interest, fees and other amounts).

"**Ad Hoc Group of Lenders**" means those certain Lenders represented by the Specified Lender Advisors (as specified by the Specified Lender Advisors).

"**Adjusted LIBO Rate**" means, with respect to any Eurodollar Borrowing for any Interest Period or for any ABR Borrowing, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"**Administrative Agent**" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent for the Lenders hereunder and as collateral agent for the Secured Parties.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Advisors**" means legal counsel (including local, regulatory, foreign and in-house counsel), auditors, accountants, consultants, appraisers, engineers or other advisors.

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Agents**" means (i) the Administrative Agent and (ii) the Escrow Agent.

"**Agent Advisors**" means (x) Wilmer Cutler Pickering Hale and Dorr LLP, as legal counsel, (y) Young Conaway Stargatt & Taylor, LLP, as local bankruptcy counsel, and (z) in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents or in connection with the Loans made hereunder, one counsel in each relevant jurisdiction, in each case retained by the Agents.

"**Aggregate Credit Exposure**" means, at any time, the aggregate Credit Exposure of all of the Lenders.

"**Alternate Base Rate**" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1%, (c) the Eurodollar Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1% (without any rounding) and (d) 2.0% per annum.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively.  If the Alternate Base Rate is being used as an alternate

rate of interest pursuant to Section 2.14 hereof, then the Alternate Base Rate shall be the greater of clauses (a), (b) and (d) above and shall be determined without reference to clause (c) above.

"**Anti-Corruption Laws**" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or its Subsidiaries from time to time concerning or relating to bribery or corruption.

"**Applicable Percentage**" means, as to any Lender, the percentage which such Lender's Commitment then constitutes of the aggregate Commitments (or, at any time after the Closing Date, the percentage which the aggregate principal amount of such Lender's Loans then outstanding constitutes of the aggregate principal amount of the Loans then outstanding); provided that, in accordance with Section 2.20, so long as any Lender shall be a Defaulting Lender, such Defaulting Lender's Commitment shall be disregarded in the foregoing calculations.

"**Applicable Rate**" means, (i) 8.50% per annum for any ABR Loan, and (ii) 9.50% per annum for any Eurodollar Loan.

"**Approved Budget**" means the then most current budget prepared by the Borrower and approved by the Required Lenders in accordance with Section 5.13.  As of the Closing Date, the Approved Budget is attached hereto as Exhibit C.

"**Approved Budget Variance Report**" means a report provided by the Borrower to the Administrative Agent and the Lenders (a) showing, in each case, on a line item by line item and cumulative basis, the Actual Cash Receipts, the Actual Operating Disbursement Amounts, actual US Bank Cash and Actual Restructuring Related Amounts as of the last day of the Prior Week, and the Variance Testing Period then most recently ended, noting therein (i) all variances, on a line item by line item basis and a cumulative basis, from the Budgeted Cash Receipts, the Budgeted Operating Disbursement Amounts, the Budgeted Liquidity and the Budgeted Restructuring Related Amounts for such period as set forth in the Approved Budget as in effect for such period and (ii) containing an indication as to whether each material variance is temporary or permanent, (iii) certifying compliance or non-compliance with such maximum permitted variances set forth therein for such Variance Testing Period, and (iv) including explanations for all material variances and violations, if any, of such covenant and if any such violation exists, setting forth the actions which the Borrower has taken or intends to take with respect thereto and (b) which such reports shall be certified by a Responsible Officer of the Borrower and shall be in a form, and shall contain supporting information, satisfactory to the Required Lenders in their sole discretion (which satisfaction may be communicated via an email from either of the Specified Lender Advisors).

"**Approved Fund**" has the meaning assigned to such term in Section 9.04.

"**Asset Purchase Agreement**" means that certain Asset Purchase Agreement, dated as of May 20, 2020, by and among [__], as Purchaser (as defined therein), the Borrower and the other Sellers as defined and named therein, as may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Required Lenders (which approval may be communicated via an email from either of the Specified Lender Advisors) and the Administrative Agent.

"**Attorney Costs**" means all reasonable and documented fees, expenses and disbursements of any law firm or other external legal counsel.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, or such other court having jurisdiction over the Chapter 11 Cases.

"**Bankruptcy Event**" means, with respect to any Person, when such Person becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business, appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the U.S. or from the enforcement of judgments or writs of attachment on its assets or permits such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as the same may be amended from time to time be in effect and applicable to the Chapter 11 Cases.

"**Beneficial Owner**" means, with respect to any U.S. Federal withholding Tax, the beneficial owner, for U.S. Federal income tax purposes, to whom such Tax relates.

"**Board**" means the Board of Governors of the Federal Reserve System of the U.S.

"**Borrower**" means Akorn, Inc., a Louisiana corporation.

"**Borrowing**" means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"**Borrowing Request**" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"**Budgeted Cash Receipts**" means with respect to any period, as the context requires, (x) the amount that corresponds to the applicable line item under the heading "Total Receipts" in the Approved Budget and/or (y) the sum, for such period, of all the amounts for all such line items which comprise "Total Receipts" (as set forth in the Approved Budget), on a cumulative basis (consistent with the Variance Testing Period), in each case, as determined by reference to the Approved Budget as then in effect.

"**Budgeted Liquidity**" means as of any date of determination, as the context requires, for the Loan Parties, the amounts set forth as of such date of US Bank Cash in the Approved Budget, as determined by reference to the Approved Budget as then in effect (which, except in connection with any calculation of minimum Actual Liquidity pursuant to Section 6.12, shall include any amounts deposited in the Loan Proceeds Account).

"**Budgeted Operating Disbursement Amounts**" means with respect to any period, as the context requires, (x) the amount that corresponds to the applicable line item under the heading "Total Operating Disbursements" in the Approved Budget and/or (y) the sum, for such period, of all such line items which comprise "Total Operating Disbursements" (as set forth in the Approved Budget), on a cumulative basis (consistent with the Variance Testing Period), in each case, as determined by reference to the Approved Budget as then in effect, which amounts do not include Budgeted Restructuring Related Amounts.

"**Budgeted Restructuring Related Amounts**" means with respect to any period, (a) the amount of financing, restructuring and professional fees during such period (including as reimbursement to any Secured Parties or the Specified Lender Advisors), (b) interest paid, fees and other amounts in respect of the Loans and (c) adequate protection payments in respect of loans issued under the Pre-Petition Term Loan Agreement (including interest, fees and other amounts).

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan, the term "**Business Day**" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"**Business Plan**" means the business plan delivered to the Specified Lender Advisors on January 7, 2020.

"**Capital Lease Obligations**" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Carve-Out**" has the meaning assigned to such term in the DIP Order.

"**Carve-Out Trigger Notice**" has the meaning assigned to such term in the DIP Order.

"**Cash Management Order**" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after the "first day" hearing, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Required Lenders (which satisfaction may be communicated via an email from either of the Specified Lender Advisors), which among other matters authorizes the Debtors to maintain their existing cash management and treasury arrangements (as set forth in the Pre-Petition Term Loan Agreement) or such other arrangements as shall be acceptable to the Required Lenders in all material respects (which acceptance may be communicated via an email from either of the Specified Lender Advisors).

"**Cash Receipts Cumulative Testing Period**" means each cumulative period, with respect to Actual Cash Receipts and Budgeted Cash Receipts, commencing on the Permitted Variance Commencement Date and ending on the last day of the most recently ended Prior Week ending after the First Testing Period; provided that in the event that a Permitted Variance Reset occurs, the Cash Receipts Cumulative Testing Period shall mean each cumulative period commencing on the Reset Permitted Variance Commencement Date and ending on the last day of the most recently ended Prior Week ending after the Reset First Testing Period.

"**Change in Control**" means

(a)     any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934 (the "**Exchange Act**"), but excluding any employee benefit plan of such person or group or its respective subsidiaries, and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), is or becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that for purposes of this clause such person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of Equity Interests of the Borrower representing more than 35.0% of the voting power of the total outstanding Equity Interests of the Borrower (and taking into account all such securities that such person or group has the right to acquire (whether pursuant to an option right or otherwise));

(b)     during any period of twelve (12) consecutive months, a majority of the members of the Board of Directors of the Borrower cease to be composed of individuals (i) who were members of that Board of Directors at the commencement of such period, (ii) whose election or nomination to that Board of Directors was approved by individuals referred to in preceding clause (i) constituting at the time of such election or nomination at least a majority of that Board of Directors or (iii) whose election or nomination to that Board of Directors was approved by individuals referred to in preceding clauses (i) and (ii) constituting at the time of such election or nomination at least a majority of that Board of Directors; or

(c)     any Person or two or more Persons acting in concert shall have acquired by contract or otherwise, or shall have entered into a contract (other than the Asset Purchase Agreement or in the event that a Qualified Bidder (as defined in the RSA) other than the Stalking Horse Bidder (as defined in the RSA) is the Successful Bidder (as defined in the RSA), the

7

purchase agreement for the Successful Bidder) that, upon consummation thereof, will result in its or their acquisition of the power to exercise, directly or indirectly, a controlling influence over the management or policies of the Borrower, or control over the equity securities of the Borrower entitled to vote for members of the Board of Directors of the Borrower on a fully-diluted basis (and taking into account all such securities that such Person or Persons have the right to acquire (whether pursuant to an option right or otherwise)) representing 35.0% or more of the combined voting power of such securities.

Notwithstanding the foregoing, the commencement of the Chapter 11 Cases shall not constitute a "Change of Control" hereunder.

"**Change in Law**" means the occurrence after the Closing Date or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement) of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) compliance by any Lender (or, for purposes of Section 2.15(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline, requirement or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date; provided that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in the implementation thereof, and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "**Change in Law**", regardless of the date enacted, adopted, issued or implemented.

"**Chapter 11 Cases**" shall have the meaning assigned to such term in the Recitals.

"**Chapter 11 Plan**" means a chapter 11 plan of liquidation or reorganization in the Chapter 11 Cases in form and substance satisfactory to the Administrative Agent and the Required Lenders in all respects and consented to by the Administrative Agent and the Required Lenders, confirmed by an order (in form and substance satisfactory to the Administrative Agent and the Required Lenders) of the Bankruptcy Court under the Chapter 11 Cases (which consent or satisfaction in each case of the Required Lenders may be communicated via an email from either of the Specified Lender Advisors), containing, among other things, (i) a release in favor of the Administrative Agent and the Lenders and their respective affiliates, and (ii) provisions with respect to the settlement or discharge of all claims and other debts and liabilities, as such plan of liquidation or reorganization may be modified, altered, amended or otherwise changed or supplemented with the prior written consent of the Administrative Agent and the Required Lenders (which consent of the Required Lenders may be communicated via an email from either of the Specified Lender Advisors).

"**Chapter 11 Plan Disclosure Statement**" means a disclosure statement describing the Chapter 11 Plan.

"**Charges**" has the meaning assigned to such term in Section 9.17.

"**Closing Date**" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" means (i) any and all property owned, leased or operated by a Person covered by the Collateral Documents and any and all other property of any Loan Party, now existing or hereafter acquired, that may at any time be, become or be intended to be, subject to a security interest or Lien in favor of the Administrative Agent, on behalf of itself and the Lenders and other Secured Parties, to secure the Secured Obligations and (ii) the "DIP Collateral" referred to in the DIP Order, it being understood that "Collateral" shall include all such "DIP Collateral"; <u>provided</u> that Collateral shall in no event include Excluded Assets.

"**Collateral Documents**" means, collectively, the DIP Order, the Security Agreement, any Mortgages and any other agreements, instruments and documents executed in connection with this Agreement that are intended to create, perfect or evidence Liens to secure the Secured Obligations, including, without limitation, all other security agreements, pledge agreements, mortgages, deeds of trust, loan agreements, notes, guarantees, subordination agreements, pledges, powers of attorney, consents, assignments, contracts, fee letters, notices, leases, financing statements and all other written matter whether theretofore, now or hereafter executed by the Borrower or any of the Subsidiaries and delivered to the Administrative Agent.

"**Commitment**" means (a) as to any Lender, the aggregate commitment of such Lender to make Loans as set forth in the Commitment Schedule or in the most recent Assignment and Assumption executed by such Lender, as applicable, and (b) as to all Lenders, the aggregate commitment of all Lenders to make Loans, which aggregate commitment shall be thirty million dollars ($30,000,000) on the Closing Date.  After advancing the Loans, each reference to a Lender's Commitment shall refer to such Lender's Applicable Percentage of the Loans.

"**Commitment Schedule**" means the Schedule attached hereto identified as such.

"**Committee**" means an official committee of unsecured creditors appointed in any of the Chapter 11 Cases by the U.S. Trustee.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Communications**" has the meaning assigned to such term in Section 9.01(d).

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"**Credit Exposure**" means, as to any Lender at any time, (a) until the Closing Date, the aggregate amount of such Lender's Commitments at such time, and (b) thereafter, an amount equal to the outstanding principal amount of such Lender's Loans at such time.

"**Credit Party**" means any Agent or any Lender.

"**Debtor**" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Default**" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"**Defaulting Lender**" means any Lender that (a) has failed, within two Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans, or (ii) pay over to any Credit Party any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular Default, if any) has not been satisfied, (b) has notified the Borrower or any Credit Party in writing, or has made a public statement, to the effect that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular Default, if any) to funding a Loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after request by a Credit Party, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective Loans under this Agreement, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such Credit Party's receipt of such certification in form and substance reasonably satisfactory to it and the Administrative Agent (acting at the direction of the Required Lenders, which direction may be communicated via an email from either of the Specified Lender Advisors), (d) has become the subject of a Bankruptcy Event or (e) has become the subject of any Bail-In Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (e) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.20) upon delivery of written notice of such determination to the Borrower and each Lender.

"**DIP Collateral**" shall have the meaning assigned to such term in the DIP Order.

"**DIP Facility**" shall have the meaning assigned to such term in the recitals.

"**DIP Order**" means the Interim Order, unless the Final Order shall have been entered, in which case it means the Final Order.

"**Disclosed Matters**" means the actions, suits, proceedings and environmental matters disclosed in <u>Schedule 3.06</u>.

"**Disqualified Equity Interest**" means, with respect to any Person, any Equity Interest in such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable, either mandatorily or at the option of the holder thereof), or upon the happening of any event or condition:

        (a)     matures or is mandatorily redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), whether pursuant to a sinking fund obligation or otherwise;

        (b)     is convertible or exchangeable at the option of the holder thereof for Indebtedness or Equity Interests (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests); or

        (c)     is or may be redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests) or is or may be required to be repurchased by such Person or any of its Affiliates, in whole or in part, at the option of the holder thereof;

in each case, on or prior to the date that occurs 91 days after the Latest Maturity Date.

"**Document**" has the meaning assigned to such term in the Security Agreement.

"**dollars**" or "**$**" refers to lawful money of the U.S.

"**Domestic Subsidiary**" means a Subsidiary organized under the laws of a jurisdiction located in the U.S.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Electronic Signature**" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"**Electronic System**" means any electronic system, including e-mail, e-fax, Intralinks®, ClearPar® and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Administrative Agent and any of its respective Related Parties or any other Person, providing for access to data protected by passcodes or other security system.

"**Environmental Laws**" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, Release or threatened Release of any Hazardous Material or to health and safety matters.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) any violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) any exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Equipment**" has the meaning assigned to such term in the Security Agreement.

"**Equity Interests**" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**ERISA Event**" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30 day notice period is waived); (b) the failure to satisfy the "minimum funding standard" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or

Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal of the Borrower or any of its ERISA Affiliates from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition upon the Borrower or any of its ERISA Affiliates of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, within the meaning of Title IV of ERISA.

"**Escrow Agent**" means the Escrow Agent under the Escrow Agreement, which shall initially be Wilmington Savings Fund Society, FSB, in its capacity as Escrow Agent.

"**Escrow Agreement**" means an Escrow Agreement dated as of the Closing Date (as amended, restated, supplemented or otherwise modified from time to time) among the Borrower, the Escrow Agent and the Administrative Agent for and on behalf of the Lenders relating to the Loan Proceeds Account.

"**Eurodollar**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Adjusted LIBO Rate.

"**Eurodollar Floor**" has the meaning assigned to such term in the definition of "**Eurodollar Rate**".

"**Eurodollar Rate**" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the higher of (i) 1.00% per annum (the "**Eurodollar Floor**") and (ii) the Adjusted LIBO Rate.

"**Event of Default**" has the meaning assigned to such term in Article VII.

"**Excluded Assets**" means, after giving effect to the DIP Order, (a) governmental licenses or state or local franchises, charters and authorizations to the extent a security interest thereon is prohibited or restricted by applicable law, (b) pledges and security interests prohibited or restricted by applicable law (with no requirement to obtain the consent of any Governmental Authority or third party, including, without limitation, no requirement to comply with the Federal Assignment of Claims Act or any similar statute), (c) non-residential leases of real property, unless the applicable lease expressly permits the granting of liens on such lease, (d) any assets to the extent a security interest in such assets could result in material adverse tax consequences or material adverse regulatory consequences, in each case, as reasonably determined by the Borrower with the consent of the Administrative Agent (acting at the direction of the Required Lenders (which direction may be communicated via an email from either of the Specified Lender Advisors)), and (e) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto.

"**Excluded Subsidiary**" means (a) any Subsidiary to the extent a Guarantee hereunder by such Subsidiary is prohibited or restricted by applicable law (including any requirement to obtain Governmental Authority or regulatory authority, approval, license or authorization) on the Closing Date, and (b) any Foreign Subsidiary.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient:  (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes; (b) in the case of a Lender, U.S. Federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.19(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.17, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan or Commitment or to such Lender immediately before it changed its lending office; (c) Taxes attributable to such Recipient's failure or inability to comply with Section 2.17(f); and (d) any U.S. Federal withholding Taxes imposed under FATCA.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Credit Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities entered into in connection with the implementation of the foregoing.

"**FDA**" means the United States Food and Drug Administration.

"**Federal Funds Effective Rate**" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"**Fee Letters**" means, collectively, (i) that certain Premium Letter dated as of the Closing Date among the Borrower and Credit Suisse Loan Funding LLC, (ii) that certain Administrative Agent Fee Letter dated as of the Closing Date between the Borrower and Administrative Agent, and (iii) that certain Escrow Agent Fee Letter dated as of the Closing Date between the Borrower and the Escrow Agent.

"**Fifth Testing Period**" means (a) in respect of Actual Operating Disbursements Amounts and Budgeted Operating Disbursement Amounts, the cumulative period commencing on the Permitted Variance Commencement Date (which for the avoidance of doubt is Monday, May 25, 2020) and ending on the last day of the sixth full fiscal week after the Petition Date (which for the avoidance of doubt is Friday, July 3, 2020), and (b) in respect of Actual Cash Receipts and

Budgeted Cash Receipts, the cumulative period commencing on the Permitted Variance Commencement Date (which for the avoidance of doubt is Monday, May 25, 2020) and ending on the last day of the eighth full fiscal week after the Petition Date (which for the avoidance of doubt is Friday, July 17, 2020).

"**Final Hearing Date**" means the date on which the Final Order is entered by the Bankruptcy Court.

"**Final Order**" means an order entered by the Bankruptcy Court approving the DIP Facility on a final basis under the Bankruptcy Code, which order shall be in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole and absolute discretion (as such order may be amended, modified or extended in a manner satisfactory to the Administrative Agent and the Required Lenders) (which satisfaction of the Required Lenders in each case may be communicated via an email from either of the Specified Lender Advisors), which order has not been reversed or stayed or is otherwise subject to a timely filed motion for a stay, rehearing, reconsideration, appeal or any other review without the consent of the Administrative Agent and the Required Lenders (which consent of the Required Lenders may be communicated via an email from either of the Specified Lender Advisors).

"**Financial Officer**" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower.

"**First Testing Period**" means (a) in respect of Actual Operating Disbursements Amounts and Budgeted Operating Disbursement Amounts, the cumulative period commencing on the applicable Permitted Variance Commencement Date (which for the avoidance of doubt is Monday, May 25, 2020) and ending on the last day of the second full fiscal week after the Petition Date (which for the avoidance of doubt is Friday, June 5, 2020), and (b) in respect of Actual Cash Receipts and Budgeted Cash Receipts, the cumulative period commencing on the applicable Permitted Variance Commencement Date (which for the avoidance of doubt is Monday May 25, 2020) and ending on the last day of the fourth full fiscal week after the Petition Date (which for the avoidance of doubt is Friday, June 19, 2020).

"**Flow of Funds Statement**" means a flow of funds statement relating to payments to be made and credited by all of the parties on the Closing Date (including wire instructions therefor) as prepared by the Borrower and its financial advisor in consultation with (and approved by) the Administrative Agent and the Specified Lender Advisors.

"**Foreign Lender**" means (a) if the Borrower is a U.S. Person, a Lender, with respect to such Borrower, that is not a U.S. Person, and (b) if the Borrower is not a U.S. Person, a Lender, with respect to such Borrower, that is resident or organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes.

"**Foreign Subsidiary**" means any Subsidiary which is not a Domestic Subsidiary.

"**Fourth Testing Period**" means (a) in respect of Actual Operating Disbursements Amounts and Budgeted Operating Disbursement Amounts, the cumulative period commencing on the Permitted Variance Commencement Date (which for the avoidance of doubt is Monday, May 25, 2020) and ending on the last day of the fifth full fiscal week after the Petition Date

(which for the avoidance of doubt is Friday, June 26, 2020), and (b) in respect of Actual Cash Receipts and Budgeted Cash Receipts, the cumulative period commencing on the Permitted Variance Commencement Date (which for the avoidance of doubt is Monday, May 25, 2020) and ending on the last day of the seventh full fiscal week after the Petition Date (which for the avoidance of doubt is Friday, July 10, 2020).

"**Full Payment**" means, with respect to any Obligations, the full and complete cash payment thereof, including any interest, fees and other charges accruing during the Chapter 11 Cases.  No Loans shall be deemed to have been paid in full until all Commitments related to such Loans have expired or been terminated.

"**Funding Date**" means the First Funding Date and the Second Funding Date, as applicable.

"**GAAP**" means generally accepted accounting principles in the U.S.

"**Governmental Authority**" means the government of the U.S., any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Guarantee**" of or by any Person (the "**guarantor**") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"**Guaranteed Obligations**" has the meaning assigned to such term in Section 10.01.

"**Hazardous Materials**" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"**IFRS**" means the body of pronouncements issued by the International Accounting Standards Board (IASB), including International Financial Reporting Standards and interpretations approved by the IASB, International Accounting Standards and Standing Interpretations Committee interpretations approved by the predecessor International Accounting Standards Committee and adapted for use in the European Union.

"**Impacted Interest Period**" has the meaning assigned to such term in the definition of "**LIBO Rate**".

"**Indebtedness**" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) obligations under any liquidated earn-out, (l) any other Off-Balance Sheet Liability, (m) obligations, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (i) any and all Swap Agreements, and (ii) any and all cancellations, buy backs, reversals, terminations or assignments of any Swap Agreement transaction, and (n) all Disqualified Equity Interests.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by, or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in subsection (a), Other Taxes.

"**Indemnitee**" has the meaning assigned to such term in Section 9.03(b).

"**Information**" has the meaning assigned to such term in Section 9.12.

"**Interest Election Request**" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.08.

"**Interest Payment Date**" means (a) with respect to any ABR Loan, the last Business Day of each month, the date of any prepayment due to acceleration pursuant to Article VII, and the Maturity Date, and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part (and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period), the date of any prepayment due to acceleration pursuant to Article VII, and the Maturity Date.

"**Interest Period**" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Eurodollar Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months (or, with the consent of each relevant affected Lender, twelve months) thereafter, as the Borrower may elect; provided, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"**Interim Order**" means an order entered by the Bankruptcy Court approving the DIP Facility on an interim basis under the Bankruptcy Code, which order shall be in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole and absolute discretion (as such order may be amended, modified or extended in a manner satisfactory to the Administrative Agent and the Required Lenders) (which satisfaction of the Required Lenders may be communicated via an email from either of the Specified Lender Advisors), which order is not subject to a stay, injunction or other limitation not approved by the Administrative Agent and the Required Lenders (which satisfaction of the Required Lenders may be communicated via an email from either of the Specified Lender Advisors).

"**Interpolated Rate**" means, at any time, for any Interest Period, the rate per annum (rounded upward to four decimal places) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between:  (a) the LIBO Screen Rate for the longest period (for which the LIBO Screen Rate is available) that is shorter than the Impacted Interest Period and (b) the LIBO Screen Rate for the shortest period (for which the LIBO Screen Rate is available) that exceeds the Impacted Interest Period, in each case, at such time.  When determining the rate for a period which is less than the shortest period for which the LIBO Screen Rate is available, the LIBO Screen Rate for purposes of paragraph (a) above shall be deemed to be the overnight screen rate where "overnight screen rate" means the overnight rate determined by the Administrative Agent from such service as the Administrative Agent may select.

"**Inventory**" has the meaning assigned to such term in the Security Agreement.

"**IRS**" means the United States Internal Revenue Service.

"**Joinder Agreement**" means a Joinder Agreement in substantially the form of Exhibit E and/or such other joinder form acceptable to the Administrative Agent and the Required Lenders in their sole discretion (which acceptance of the Required Lenders may be communicated via an email from either of the Specified Lender Advisors).

"**Lender Advisors**" means (x) the Specified Lender Advisors, and (y) any other financial advisor, auditor, attorney, accountant, appraiser, auditor, business valuation expert, environmental engineer or consultant, turnaround consultant, and other consultants, professionals and experts retained by the Ad Hoc Group of Lenders and/or the Required Lenders.

"**Lenders**" means the Persons listed on the Commitment Schedule and any other Person that shall have become a Lender hereunder pursuant to an Assignment and Assumption, other than any such Person that ceases to be a Lender hereunder pursuant to an Assignment and Assumption.

"**LIBO Rate**" means, with respect to any Eurodollar Borrowing for any applicable Interest Period, the London interbank offered rate administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for Dollars) for a period equal in length to such Interest Period as displayed on page LIBOR01 or LIBOR02 of the Reuters screen or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate as shall be selected by the Administrative Agent from time to time in its reasonable discretion (the "**LIBO Screen Rate**") at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period; provided that, if the LIBO Screen Rate shall not be available at such time for a period equal in length to such Interest Period (an "**Impacted Interest Period**"), then the LIBO Rate shall be the Interpolated Rate at such time, subject to Section 2.14 in the event that the Administrative Agent shall conclude that it shall not be possible to determine such Interpolated Rate.  Notwithstanding the above, to the extent that "LIBO Rate" or "Adjusted LIBO Rate" is used in connection with an ABR Borrowing, such rate shall be determined as modified by the definition of Alternate Base Rate.

"**LIBO Screen Rate**" has the meaning assigned to such term in the definition of "LIBO Rate".

"**Lien**" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Loan Documents**" means, collectively, this Agreement, any promissory notes issued pursuant to this Agreement, the Collateral Documents, the Loan Guaranty, the Fee Letters, the Specified Advisors Fee Letters, the Approved Budget, the Escrow Agreement and all other agreements, instruments, documents and certificates identified in Sections 4.01 and 4.02 executed and delivered to, or in favor of, the Agents or any Lender and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to an Agent or any Lender in connection with this Agreement or the transactions contemplated hereby.  Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules

thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"**Loan Guarantor**" means the Borrower's Domestic Subsidiaries other than Excluded Subsidiaries.

"**Loan Guaranty**" means Article X of this Agreement.

"**Loan Parties**" means, collectively, the Borrower, the Loan Guarantors and any other Person who becomes a party to this Agreement pursuant to a Joinder Agreement and their successors and assigns.

"**Loan Proceeds Account**" means an escrow account with the Escrow Agent into which the proceeds of the Loans shall be deposited and retained subject to withdrawal thereof by the Borrower pursuant to a Withdrawal Notice for use in accordance with the terms hereof and of the Approved Budget or return thereof to the Lenders upon the occurrence of the Maturity Date for any reason whatsoever.

"**Loans**" means the loans and advances made by the Lenders pursuant to this Agreement.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets, operations, prospects or condition, financial or otherwise, of the Borrower and its Subsidiaries taken as a whole (excluding (i) any matters publicly disclosed in writing or disclosed to the Administrative Agent and the Lenders in writing prior to the filing of the Chapter 11 Cases, (ii) any matters disclosed in the schedules hereto, (iii) any matters disclosed in any first day pleadings or declarations and (iv) the filing of the Chapter 11 Cases, the events and conditions related and/or leading up thereto and the effects thereof and any action required to be taken under the Loan Documents or under the DIP Order), (b) the ability of any Loan Party to perform any of its obligations under the Loan Documents to which it is a party, (c) the Collateral or the Administrative Agent's Liens (on behalf of itself and other Secured Parties) on the Collateral or the priority of such Liens, or (d) the rights of or benefits available to the Agents or the Lenders under any of the Loan Documents.

"**Maturity Date**" means the earliest of (a) the date that is six months after the Petition Date, (b) the date on which the Obligations become due and payable pursuant to this Agreement, whether by acceleration or otherwise, (c) the effective date of a Chapter 11 Plan for the Debtors, (d) the date of consummation of a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code, including the Sale Transaction, (e) the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto, (f) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading seeking the conversion of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Required Lenders (which consent may be communicated via an email from either of the Specified Lender Advisors), (g) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the Required Lenders (which consent may be communicated via an email from either of the Specified Lender

Advisors), and (h) the Final Order is vacated, terminated, rescinded, revoked, declared null and void or otherwise ceases to be in full force and effect (unless consented to by the Required Lenders) (which consent may be communicated via an email from either of the Specified Lender Advisors).

"**Maximum Liability**" has the meaning assigned to such term in Section 10.10.

"**Maximum Rate**" has the meaning assigned to such term in Section 9.17.

"**Maximum Withdrawal Amount**" means (i) from the Closing Date until the Final Hearing Date, $10,000,000, and (ii) thereafter, all remaining amounts held in the Escrow Account.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgage**" means each mortgage, deed of trust or other agreement which conveys or evidences a Lien in favor of the Administrative Agent, for the benefit of the Administrative Agent and the Secured Parties, on real property of a Loan Party, including any amendment, restatement, modification or supplement thereto.

"**Mortgage Instruments**" means such title reports, ALTA title insurance policies (with endorsements), evidence of zoning compliance, property insurance, flood certifications and flood insurance (and, if applicable FEMA form acknowledgements of insurance), opinions of counsel, ALTA surveys, appraisals, environmental assessments and reports, mortgage tax affidavits and declarations and other similar information and related certifications as are requested by, and in form and substance reasonably acceptable to, the Required Lenders from time to time (which acceptance may be communicated via an email from either of the Specified Lender Advisors).

"**Multiemployer Plan**" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"**Net Proceeds**" means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, *minus* (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event, (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay Indebtedness (other than under or pursuant to the Pre-Petition Loan Documents or any other Indebtedness outstanding as of the Petition Date (unless senior to the Indebtedness under the Pre-Petition Loan Documents) secured by such asset or otherwise subject to mandatory prepayment as a result of such event and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by a Financial Officer).

"**Non-Consenting Lender**" has the meaning assigned to such term in Section 9.02(d).

"**Non-Paying Guarantor**" has the meaning assigned to such term in Section 10.11.

"**Non-U.S. Lender**" means a Lender that is not a U.S. Person.

"**Obligated Party**" has the meaning assigned to such term in Section 10.02.

"**Obligations**" means all unpaid principal of and accrued and unpaid interest on the Loans, all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations and indebtedness (including interest and fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), obligations and liabilities of any of the Borrower and its Subsidiaries to any of the Lenders, the Agents or any indemnified party, individually or collectively, existing on the Closing Date or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, arising or incurred under this Agreement or any of the other Loan Documents or in respect of any of the Loans made or reimbursement or other obligations incurred or other instruments at any time evidencing any thereof.

"**Off-Balance Sheet Liability**" of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any indebtedness, liability or obligation under any so-called "synthetic lease" transaction entered into by such Person, or (c) any indebtedness, liability or obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheets of such Person (other than operating leases).

"**Operating Disbursements Cumulative Testing Period**" means each cumulative period, with respect to Actual Operating Disbursement Amounts and Budgeted Operating Disbursement Amounts, commencing on the Permitted Variance Commencement Date and ending on the last day of the most recently ended Prior Week ending after the Fifth Testing Period; provided that in the event that a Permitted Variance Reset occurs, the Operating Disbursements Cumulative Testing Period shall mean each cumulative period commencing on the Reset Permitted Variance Commencement Date and ending on the last day of the most recently ended Prior Week ending after the Reset Fifth Testing Period.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Taxes (other than a connection arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan or any Loan Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are

Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.19).

"**Parent**" means, with respect to any Lender, any Person as to which such Lender is, directly or indirectly, a subsidiary.

"**Participant**" has the meaning assigned to such term in Section 9.04(c).

"**Participant Register**" has the meaning assigned to such term in Section 9.04(c).

"**Paying Guarantor**" has the meaning assigned to such term in Section 10.11.

"**PBGC**" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"**Permitted Encumbrances**" means:

(a)    Liens imposed by law for Taxes that are (1) not yet due, (2) are being contested in compliance with Section 5.04, or (3) the nonpayment of which is permitted or required under the Bankruptcy Code;

(b)    carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than thirty (30) days or are being contested in compliance with clauses (a)-(c) of Section 5.04;

(c)    pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)    deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)    judgment Liens in respect of judgments that do not constitute an Event of Default under Section 7.01(k);

(f)    easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary; and

(g)    non-exclusive licenses of intellectual property granted in the ordinary course of business.

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness, except with respect to clause (e) above.

"**Permitted Exit ABL Credit Agreement**" means a customary asset-backed revolving credit agreement, the terms and conditions of which are satisfactory to the Required Lenders (which satisfaction may be communicated via an email from either of the Specified Lender Advisors).

"**Permitted Investments**" means:

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the U.S. (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the U.S.), in each case maturing within one year from the date of acquisition thereof;

(b)    marketable direct obligations issued by any state of the U.S. or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after the date of acquisition thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's;

(c)    investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(d)    investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the U.S. or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(e)    fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(f)    money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

"**Permitted Variance**" means,

(a)    in respect of Actual Operating Disbursement Amounts, commencing with the applicable Permitted Variance Commencement Date (which, for the avoidance of doubt, is Monday, May 25, 2020, for each Variance Testing Period:

(i)    20.0% for the First Testing Period (and if applicable, the Reset First Testing Period),

(ii)    17.5% for the Second Testing Period (and if applicable, the Reset Second Testing Period),

24

    (iii) 15.0% for the Third Testing Period (and if applicable, the Reset Third Testing Period),

    (iv) 12.5% for the Fourth Testing Period (and if applicable, the Reset Fourth Testing Period),

    (v) 10.0% for the Fifth Testing Period (and if applicable, the Reset Fifth Testing Period), and

    (vi) 7.5% for each Operating Disbursements Cumulative Testing Period ending thereafter, and

  (b) in respect of Actual Cash Receipts, commencing with the applicable Permitted Variance Commencement Date (which, for the avoidance of doubt, is Monday, May 25, 2020), for all Variance Testing Periods:

    (i) 25.0% for the First Testing Period (and if applicable, the Reset First Testing Period), and

    (ii) 22.5% for each Cash Receipts Cumulative Testing Period ending thereafter, and

  (c) in respect of minimum Actual Liquidity for purposes of determining compliance with Section 6.12, the greater of 25.0% and $7,500,000.

  "**Permitted Variance Commencement Date**" means with respect to Actual Operating Disbursement Amounts and Actual Cash Receipts, the first full calendar week following the Petition Date (which, for the avoidance of doubt, is Monday, May 25, 2020) or the date of approval of the new Approved Budget, as applicable.

  "**Permitted Variance Reset**" means any approval by the Required Lenders in their sole and absolute discretion (which approval may be communicated via an email from either of the Specified Lender Advisors) of a new budget prepared by the Borrower which budget replaces the then-existing Approved Budget in its entirety (instead of merely updating, modifying or supplementing the then-existing budget in accordance with the terms of Section 5.13).

  "**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

  "**Petition Date**" means May 17, 2020.

  "**Plan**" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Prepayment Event**" means:

(a)    any sale, transfer or other disposition (including as a result of casualty or condemnation or pursuant to a Sale and Leaseback Transaction) of any property or asset of the Borrower or any Subsidiary, other than dispositions described in clauses (a), (b), (c), (d), or (h) of Section 6.05; or

(b)    the incurrence by the Borrower or any Subsidiary of any Indebtedness, other than Indebtedness permitted hereunder.

"**Pre-Petition**" means the time period ending immediately prior to the filing of the Chapter 11 Cases.

"**Pre-Petition Agent**" means Wilmington Savings Fund Society, FSB (as successor to JPMorgan Chase Bank, N.A.), in its capacity as the administrative agent and collateral agent under the Pre-Petition Term Loan Agreement.

"**Pre-Petition Collateral**" means the "Collateral" as defined in the Pre-Petition Term Loan Agreement.

"**Pre-Petition Lenders**" means the lenders party to the Pre-Petition Term Loan Agreement.

"**Pre-Petition Loan Documents**" means the "Loan Documents" as defined in the Pre-Petition Term Loan Agreement.

"**Pre-Petition Obligations**" means the "Obligations" as defined in the **Pre-Petition Term Loan Agreement**.

"**Pre-Petition Term Loan Agreement**" means the Loan Agreement, dated as of April 17, 2014, among the Borrower, the Loan Parties party thereto, Wilmington Savings Fund Society, FSB (as successor to JPMorgan Chase Bank, N.A.), as the administrative agent and collateral agent thereunder, and the lenders party thereto (as amended, amended and restated, supplemented or otherwise modified from time to time through the Petition Date).

"**Prime Rate**" means the rate of interest per annum publicly announced from time to time by Chase as its prime rate in effect at its principal offices in New York City.  Each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"**Prior Week**" means for any week, the immediately preceding calendar week (Saturday through Friday) ending on the Friday of such week.

"**Projections**" has the meaning assigned to such term in Section 5.01(e).

"**Public-Sider**" means any representative of a Lender that does not want to receive material non-public information within the meaning of federal and state securities laws.

"**Qualified Equity Interests**" means any Equity Interests of the Borrower that are not Disqualified Equity Interests.

"**Rating Agency**" means  (i) Moody's, (ii) S&P and (iii) any "nationally recognized statistical rating organization" within the meaning of Rule 15c3-1(c)(2)(vi)(F) under the Exchange Act selected by the Borrower or any direct or indirect parent of the Borrower as a replacement agency for Moody's or S&P, as the case may be.

"**Recipient**" means (a) the Agents or (b) any Lender, or either of the foregoing or any combination thereof (as the context requires).

"**Register**" has the meaning assigned to such term in Section 9.04.

"**Related Parties**" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"**Release**" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing or dumping of any substance into the environment.

"**Remedies Notice Period**" shall have the meaning assigned to such term in the DIP Order.

"**Report**" means reports prepared by the Administrative Agent or another Person showing the results of appraisals, field examinations or audits pertaining to the assets of the Loan Parties from information furnished by or on behalf of the Borrower, after the Administrative Agent has exercised its rights of inspection pursuant to this Agreement, which Reports may be distributed to the Lenders by the Administrative Agent.

"**Required Lenders**" means, at any time, Lenders (other than Defaulting Lenders) having Credit Exposures and unused Commitments representing more than 50.0% of the Aggregate Credit Exposures and unused Commitments at such time.

"**Required Milestones**" means the "Milestones" set forth in Section 5.16, and any "Milestones", "Required Milestones" or such similar term or requirements, under and as defined in the RSA or the DIP Order, as applicable.

"**Requirement of Law**" means, with respect to any Person, (a) the charter, articles or certificate of organization or incorporation and bylaws or other organizational or governing documents of such Person and (b) any statute, law (including common law), treaty, rule, regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including Environmental Laws), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Reset Permitted Variance Commencement Date**" means (i) with respect to Actual Operating Disbursement Amounts, the second full calendar week following the Permitted

27

Variance Reset, and (ii) with respect to Actual Cash Receipts, the fourth full calendar week following the Permitted Variance Reset.

"**Reset Fifth Testing Period**" means (a) in respect of Actual Operating Disbursements Amounts and Budgeted Operating Disbursement Amounts, the cumulative period commencing on the applicable Reset Permitted Variance Commencement Date and ending on the last day of the sixth full fiscal week after the Permitted Variance Reset, and (b) in respect of Actual Cash Receipts and Budgeted Cash Receipts, the cumulative period commencing on the applicable Reset Permitted Variance Commencement Date and ending on the last day of the eighth full fiscal week after the Permitted Variance Reset.

"**Reset First Testing Period**" means (a) in respect of Actual Operating Disbursements Amounts and Budgeted Operating Disbursement Amounts, the cumulative period commencing on the applicable Reset Permitted Variance Commencement Date and ending on the last day of the second full fiscal week after the Permitted Variance Reset, and (b) in respect of Actual Cash Receipts and Budgeted Cash Receipts, the cumulative period commencing on the applicable Reset Permitted Variance Commencement Date and ending on the last day of the fourth full fiscal week after the Permitted Variance Reset.

"**Reset Fourth Testing Period**" means (a) in respect of Actual Operating Disbursements Amounts and Budgeted Operating Disbursement Amounts, the cumulative period commencing on the Permitted Variance Reset and ending on the last day of the fifth full fiscal week after the Permitted Variance Reset, and (b) in respect of Actual Cash Receipts and Budgeted Cash Receipts, the cumulative period commencing on the applicable Reset Permitted Variance Commencement Date and ending on the last day of the seventh full fiscal week after the Permitted Variance Reset.

"**Reset Second Testing Period**" means (a) in respect of Actual Operating Disbursements Amounts and Budgeted Operating Disbursement Amounts, the cumulative period commencing on the applicable Reset Permitted Variance Commencement Date and ending on the last day of the third full fiscal week after the Permitted Variance Reset, and (b) in respect of Actual Cash Receipts and Budgeted Cash Receipts, the cumulative period commencing on the applicable Reset Permitted Variance Commencement Date and ending on the last day of the fifth full fiscal week after the Permitted Variance Reset.

"**Reset Third Testing Period**" means (a) in respect of Actual Operating Disbursements Amounts and Budgeted Operating Disbursement Amounts, the cumulative period commencing on the applicable Reset Permitted Variance Commencement Date and ending on the last day of the fourth full fiscal week after the Permitted Variance Reset, and (b) in respect of Actual Cash Receipts and Budgeted Cash Receipts, the cumulative period commencing on the applicable Reset Permitted Variance Commencement Date and ending on the last day of the sixth full fiscal week after the Permitted Variance Reset.

"**Responsible Officer**" of any person means any executive officer or Financial Officer of such person and any other officer or similar official thereof responsible for the administration of the obligations of such person in respect of this Agreement, or any other duly authorized employee or signatory of such person.

28

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in the Borrower or such Subsidiary or any option, warrant or other right to acquire any such Equity Interests in the Borrower or such Subsidiary.

"**RSA**" means the Restructuring Support Agreement, dated as of May 20, 2020.

"**RSA Termination Event**" means an event described under Section 13 of the RSA which with the passage of time or the taking of action thereunder would result in the termination of the RSA.

"**S&P**" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business.

"**Sale Process**" means the marketing and sale process of all or substantially all of the Borrower's consolidated assets, free and clear of liabilities (subject to customary exceptions).

"**Sale Transaction**" means the transaction to effectuate the sale of all or substantially all of the Borrower's consolidated assets, free and clear of liabilities (subject to customary exceptions) pursuant to the Chapter 11 Cases which transaction shall be consistent in all material respects with the requirements of the RSA.

"**Sanctioned Country**" means, at any time, a country or territory which is the subject or target of any Sanctions.

"**Sanctioned Person**" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or by the United Nations Security Council, the European Union or any EU member state, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person controlled by any such Person.

"**Sanctions**" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"**SEC**" means the Securities and Exchange Commission of the U.S.

"**Second Testing Period**" means (a) in respect of Actual Operating Disbursements Amounts and Budgeted Operating Disbursement Amounts, the cumulative period commencing on the applicable Permitted Variance Commencement Date (which for the avoidance of doubt is Monday, May 25, 2020) and ending on the last day of the third full fiscal week after the Petition Date (which for the avoidance of doubt is Friday, June 12, 2020), and (b) in respect of Actual Cash Receipts and Budgeted Cash Receipts, the cumulative period commencing on the Permitted

Variance Commencement Date (which for the avoidance of doubt is Monday, May 25, 2020) and ending on the last day of the fifth full fiscal week after the Petition Date (which for the avoidance of doubt is Friday, June 26, 2020).

"**Secured Obligations**" means all Obligations owing to one or more Lenders or their respective Affiliates.

"**Secured Parties**" means (a) the Agents, (b) the Lenders, (c) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, and (d) the successors and assigns of each of the foregoing.

"**Security Agreement**" means that certain Debtor-in-Possession Pledge and Security Agreement (including any and all supplements thereto), dated as of the Closing Date, among the Loan Parties and the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, and any other pledge or security agreement entered into, after the Closing Date by any other Loan Party (as required by this Agreement or any other Loan Document) or any other Person for the benefit of the Administrative Agent and the other Secured Parties, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Specified Lender Advisors**" means (x) Gibson, Dunn & Crutcher LLP, as legal counsel, and (y) Greenhill & Co., LLC, as financial advisor.

"**Specified Lender Advisors Fee Letters**" means (a) with respect to Gibson, Dunn & Crutcher LLP, the Fee and Expense Reimbursement Agreement dated November 15, 2019, and (b) with respect to Greenhill & Co, LLC, that certain engagement letter dated January 29, 2019.

"**Statutory Reserve Rate**" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentage (including any marginal, special, emergency or supplemental reserves) established by the Board to which the Administrative Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "**Eurocurrency Liabilities**" in Regulation D of the Board).  Such reserve percentages shall include those imposed pursuant to such Regulation D of the Board.  Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D of the Board or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**subsidiary**" means, with respect to any Person (the "**parent**") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b)

that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"**Subsidiary**" means any direct or indirect subsidiary of the Borrower or a Loan Party, as applicable.

"**Successor Case**" means with respect to the Chapter 11 Cases, any subsequent proceedings under Chapter 7 of the Bankruptcy Code.

"**Swap Agreement**" means any agreement with respect to any swap, forward, spot, future, credit default or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees, independent contractors, or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

"**Swap Obligation**" means, with respect to any Loan Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act or any rules or regulations promulgated thereunder.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Third Testing Period**" means (a) in respect of Actual Operating Disbursements Amounts and Budgeted Operating Disbursement Amounts, the cumulative period commencing on the applicable Permitted Variance Commencement Date (which for the avoidance of doubt is Monday, May 25, 2020) and ending on the last day of the fourth full fiscal week after the Petition Date (which for the avoidance of doubt is Friday, June 19, 2020), and (b) in respect of Actual Cash Receipts and Budgeted Cash Receipts, the cumulative period commencing on the applicable Permitted Variance Commencement Date (which for the avoidance of doubt is Monday, May 25, 2020) and ending on the last day of the sixth full fiscal week after the Petition Date (which for the avoidance of doubt is Friday, July 3, 2020).

"**Transactions**" means the execution, delivery and performance by the Borrower of this Agreement and the other Loan Documents, the borrowing of Loans and other credit extensions and the use of the proceeds thereof.

"**Type**", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Eurodollar Rate or the Alternate Base Rate.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the issue of perfection of security interests.

"**Unliquidated Obligations**" means, at any time, any Secured Obligations (or portion thereof) that are contingent in nature or unliquidated at such time, including any Secured Obligation that is: (i) any obligation (including any guarantee) that is contingent in nature at such time; or (ii) an obligation to provide collateral to secure the foregoing type of obligations.

"**U.S.**" means the United States of America.

"**U.S. Person**" means a "**United States person**" within the meaning of Section 7701(a)(30) of the Code.

"**U.S. Tax Compliance Certificate**" has the meaning assigned to such term in Section 2.17(f)(ii)(B)(3).

"**US Bank Cash**" means unrestricted cash of the Borrower and the Loan Guarantors deposited in commercial banks located in the United States.

"**USA PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

"**Variance Testing Period**" means, as applicable, each of (i) with respect to Actual Operating Disbursement Amounts and Budgeted Operating Disbursement Amounts, the First Testing Period, Second Testing Period, Third Testing Period, Fourth Testing Period and Fifth Testing Period and, thereafter, each Operating Disbursements Cumulative Testing Period and (ii) with respect to Actual Cash Receipts and Budgeted Cash Receipts, the First Testing Period and, thereafter, each Cash Receipts Cumulative Testing Period. For the avoidance of doubt, upon the approval of a new Approved Budget, the Variance Testing Periods will reset to the First Testing Period.

"**Withdrawal**" means a withdrawal from the Loan Proceeds Account made in accordance with Section 4.02.

"**Withdrawal Date**" means the date of the making of any Withdrawal.

"**Withdrawal Liability**" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"**Withdrawal Notice**" means a notice substantially in the form attached hereto as Exhibit B to be delivered by the Borrower to the Escrow Agent and the Administrative Agent from time to time to request a Withdrawal from the Loan Proceeds Account.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    Classification of Loans and Borrowings.  For purposes of this Agreement, Loans may be classified and referred to by Type (*e.g.*, a "**Eurodollar Loan**").  Borrowings also may be classified and referred to by Type (*e.g.*, a "**Eurodollar Borrowing**").

Section 1.03    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply) and all judgments, orders and decrees of all Governmental Authorities.  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignments set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (f) any reference in any definition to the phrase "at any time" or "for any period" shall refer to the same time or period for all calculations or determinations within such definition, and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.04    Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if after the Closing Date there occurs any change in GAAP or in the application thereof on the operation of any provision hereof and the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of such change in GAAP or in the application thereof (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such migration or change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (i) without giving effect to any election under Financial Accounting Standards Board Accounting Standards Codification

825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Loan Party, the Borrower or any Subsidiary at "fair value", as defined therein and (ii) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Financial Accounting Standards Board Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

## ARTICLE II

### THE CREDITS

Section 2.01    Commitments.

(a)    Subject to the terms and conditions set forth herein and in the DIP Order, each Lender with a Commitment severally (and not jointly) agrees to make a Loan in dollars to the Borrower in an amount equal to such Lender's Commitment in a single borrowing, within three (3) Business Days of the date of the entry of the Interim Order (but in accordance with the terms of the DIP Order) (such date, the "**Funding Date**").  Each Lender's Commitment shall automatically be reduced by the amount of Loans funded in respect thereof on the Funding Date; provided that, notwithstanding anything herein to the contrary, all such Commitments shall terminate automatically and be reduced to zero on June 3, 2020 to the extent that the Funding Date has not occurred on or prior to such date (or such later date as agreed to by the Borrower and the Required Lenders (which agreement of the Required Lenders may be communicated via an email from either of the Specified Lender Advisors)).

(b)    Amounts borrowed or exchanged under Section 2.01(a) and repaid or prepaid may not be reborrowed.  All Loans and all other Obligations owed under the Loan Documents or with respect to the Loans shall be paid in full not later than the Maturity Date.

Section 2.02    Loans and Borrowings.  The Loans may from time to time be Eurodollar Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.03 and 2.08.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

Section 2.03    Procedure for Borrowings.

(a)    The Borrower shall give the Administrative Agent irrevocable notice delivered electronically in .pdf or other electronic imaging format acceptable to the Administrative Agent pursuant to a Borrowing Request signed by the Borrower, not later than 11:00 a.m., New York City time, five (5) Business Days before the Funding Date, requesting that the Lenders make the Loans on the Funding Date and specifying the amount to be borrowed (and, if the Loans shall initially be Eurodollar Loans, specifying the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "**Interest**

Period"). Each Lender shall make the Loans to be made by it hereunder on the Funding Date by wire transfer of immediately available funds by 2:00 p.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. Upon receipt of all requested funds, the Administrative Agent will promptly (i) in accordance with the Flow of Funds Statement, (I) remit to the Borrower from such amounts, all fees and expenses of the Agent Advisors and the Specified Lender Advisors (which the Borrower shall immediately remit by wire transfer such amounts to such counsel and advisors in accordance with the Flow of Funds Statement) and (II) deduct and apply all fees payable to the Administrative Agent on the Funding Date for its own account and for the account of the Escrow Agent, (ii) in accordance with the Flow of Funds Statement and the Approved Budget, and subject to Section 4.01, remit to the Borrower from such amounts an amount to be agreed upon between the Borrower and the Required Lenders as the initial withdrawal amount (which agreement of the Required Lenders may be communicated via an email from either of the Specified Lender Advisors agreeing to such amount or the final draft of the Flow of Funds Statement), and (iii) remit the remaining amounts by promptly crediting such amount, in like funds, to the Loan Proceeds Account. The Loans shall be deemed made by the Lenders when so remitted and applied and so deposited to such account. The full amount of all Loans made on each Funding Date will begin to accrue interest on such Funding Date.

(b)    For the avoidance of doubt, the Agents shall have no Commitments (to make Loans) in its capacity as the Agent and the Agent's requirement to forward the Loan proceeds received from the Lenders in accordance with the provisions hereof shall be limited to the funds that it receives from the Lenders (to fund such Loans).

Section 2.04    [Reserved].

Section 2.05    [Reserved].

Section 2.06    [Reserved].

Section 2.07    [Reserved].

Section 2.08    Conversion and Continuation Options.  (a) The Loans initially shall be of the Type specified in the Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request. Thereafter, the Borrower may elect to convert each Borrowing to a different Type or to continue such Borrowing. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)    To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone by (x) 11:00 a.m., New York City time, on the Business Day preceding the proposed conversion date for any request to convert Eurodollar Loans to ABR Loans; provided that any such conversion of Eurodollar Loans may only be made on the last day of an Interest Period with respect thereto, or (y) 11:00 a.m., New York City time, on the third Business Day preceding the proposed conversion date for any request to convert

ABR Loans to Eurodollar Loans.  Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by facsimile or electronic delivery  in .pdf or other electronic imaging format acceptable to the Administrative Agent of a written Interest Election Request in a form approved by the Administrative Agent and signed by the Borrower.

(c)     Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)     whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)     if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "**Interest Period**".

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)     Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)     If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be continued as a Eurodollar Borrowing of one-month's duration. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

(f)     Notwithstanding anything to the contrary in this Agreement, all Borrowings, conversions and continuations of Eurodollar Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that, (a) after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Eurodollar Borrowing shall be equal to $5,000,000 or a whole multiple of $1,000,000 in excess

thereof and (b) no more than ten (10) Eurodollar Borrowings shall be outstanding at any one time.

Section 2.09    [Reserved].

Section 2.10    Repayment of Loans; Evidence of Debt.  (a) The Borrower shall repay to the Administrative Agent for the ratable account of the Lenders on the Maturity Date for the Loans, the aggregate principal amount of all Loans outstanding on such date.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(e)    Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Required Lenders (which approval may be communicated via an email from either of the Specified Lender Advisors). Thereafter, the Loans evidenced by such promissory note and interest thereon at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.11    Prepayment of Loans.  (a) The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to (1) prior notice in accordance with paragraph (f) of this Section and (2) if applicable, payment of any break funding expenses under Section 2.16.

(b)    [Reserved].

(c)    (i) Subject in all respects to the DIP Order, in the event and on each occasion that any Net Proceeds are received by or on behalf of the Borrower or any of its Subsidiaries in respect of any Prepayment Event, the Borrower shall, immediately after such Net Proceeds are received by it or such Subsidiary, unless approved by the Required Lenders (which

approval may be communicated via an email from either of the Specified Lender Advisors), prepay the Obligations as set forth in Section 2.18(b) or (c), as applicable, in an aggregate amount equal to 100% of such Net Proceeds (in excess of an aggregate amount of $100,000 for all such Prepayment Events under clause (a) and clause (b)) in the case of any prepayment described in clause (a) and clause (b), as applicable, of the definition thereof.  No prepayment pursuant to this clause (c) shall be required in respect of the sale or disposition of any Foreign Subsidiary's assets to the extent such prepayment would result in material adverse tax consequences (as reasonably determined by the Borrower in consultation with the Administrative Agent) or would be prohibited or restricted by applicable law.

(ii)    On each occasion that the Borrower must make a prepayment of the Loans pursuant to this Section 2.11, the Borrower shall, within one (1) Business Day after the date of realization or receipt of such Net Proceeds, notify the Administrative Agent in writing of any such mandatory prepayment, specifying the date of prepayment and providing a reasonably detailed calculation of the amount of such prepayment.

(d)    [Reserved].

(e)    [Reserved].

(f)    The Borrower shall notify the Administrative Agent by telephone (confirmed by facsimile or electronic communication as provided in Section 9.01) of any prepayment hereunder not later than 11:00 a.m., New York City time, (A) in the case of prepayment of a Eurodollar Borrowing, three (3) Business Days before the date of prepayment, or (B) in the case of prepayment of an ABR Borrowing, one (1) Business Day before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid.  Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with (except in the case of Loans that are ABR Loans) accrued interest to such date on the amount prepaid.  Partial prepayments of Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple thereof. Prepayments shall be accompanied by (i) accrued interest to the extent required by Section 2.13 and (ii) break funding payments pursuant to Section 2.16.

Section 2.12    Fees.  (a) The Borrower agrees to pay the fees and other amounts due under the terms of the Fee Letters, in accordance with the applicable terms thereof.

(b)    All fees payable under the Fee Letters shall be paid to the Persons due such amounts thereunder on the dates due thereunder, in immediately available funds.  Fees paid shall not be refundable under any circumstances.

Section 2.13    Interest.  (a) The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b)    The Loans comprising each Eurodollar Borrowing shall bear interest at the Eurodollar Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)     Notwithstanding the foregoing, unless otherwise elected by the Required Lenders (which election not to impose the default interest rate set forth in this Section 2.13(c) may be communicated via an email from either of the Specified Lender Advisors), upon the occurrence and during the continuation of an Event of Default, Loans and all other Obligations due hereunder shall bear interest, after as well as before judgment, at a rate per annum equal to 2% plus the rate otherwise applicable thereto.

(d)     Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and upon termination of the Commitments; provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)     All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate, Eurodollar Rate, Adjusted LIBO Rate or LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.14   Alternate Rate of Interest.  If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)     the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that adequate and reasonable means do not exist for ascertaining (including, without limitation, by means of an Interpolated Rate) the Eurodollar Rate, Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period; or

(b)     the Administrative Agent is advised by the Required Lenders that the Eurodollar Rate, Adjusted LIBO Rate or the LIBO Rate, as applicable, for the applicable Interest Period will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans included in such Borrowing for such Interest Period; then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by electronic communication as provided in Section 9.01 as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective and any such Eurodollar Borrowing shall be repaid on the last day of the then current Interest Period applicable thereto, and (ii) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing.

Section 2.15   Increased Costs.  (a) If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, liquidity or similar requirement (including any compulsory loan requirement, insurance charge or other assessment) against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)     impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender; or

(iii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, continuing, converting into or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender or such other Recipient hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or such other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or such other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)      If any Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)      A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)      Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the

40

270-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.16    Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default or as a result of any prepayment pursuant to Section 2.11), (b) the conversion of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.11(f) and is revoked in accordance therewith), or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.19 or 9.02(d), then, in any such event, the Borrower shall compensate each Lender for the actual loss, cost and expense attributable to such event (other than lost profits).  In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Eurodollar Loan had such event not occurred, at the Eurodollar Rate that would have been applicable to such Eurodollar Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Eurodollar Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the London interbank market.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

Section 2.17    Withholding of Taxes; Gross-Up.  (a) Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.17) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by the Borrower.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for, Other Taxes.

(c)    <u>Evidence of Payments</u>.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.17, such Loan Party shall deliver to the Administrative Agent and the Lenders the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders (which direction may be communicated via an email from either of the Specified Lender Advisors)).

(d)    <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall jointly and severally indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Loan Party by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)    <u>Indemnification by the Lenders</u>.  Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(c) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to such Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)    <u>Status of Lenders</u>.  (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set

forth in Section 2.17(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     in the case of a Foreign Lender claiming that its extension of credit will generate U.S. effectively connected income, executed copies of IRS Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit F-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a

"**U.S. Tax Compliance Certificate**") and (y) executed copies of IRS Form W-8BEN; or

(4)      to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-2 or Exhibit F-3, IRS Form W-9, and/or other certification documents from each Beneficial Owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-4 on behalf of each such direct and indirect partner;

(C)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. Federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)      if a payment made to a Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or

promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(iii)    On or before the date the Administrative Agent (or any successor thereto) becomes a party to this Agreement, such Administrative Agent shall provide to the Borrowers two duly-signed properly completed copies of the documentation prescribed in clause (A) or (B) below, as applicable (together with any required attachments): (A) IRS Form W-9 or any successor thereto, or (B)(x) IRS Form W-8ECI, or any successor thereto with respect to payments, if any, received by the Administrative Agent for its own account, and (y) with respect to payments received on account of any Lender, executed copies of IRS Form W-8IMY (or any successor form) certifying that the Administrative Agent is either (a) a "qualified intermediary" or (b) a "U.S. branch" and that payment it receives for others are not effectively connected with the conduct of a trade or business in the United States, in each case certifying that the Administrative Agent is assuming primary withholding responsibility under Chapters 3 and 4 of the Code and primary Form 1099 reporting and backup withholding responsibility for payments it receives for the accounts of others, with the effect that the Borrowers can make payments to the Administrative Agent without deduction or withholding of any Taxes imposed by the United States. At any time thereafter, the Administrative Agent shall update documentation previously provided (including, if applicable, any successor forms thereto) when any documentation previously delivered has expired or become obsolete or invalid or otherwise upon the reasonable request of the Borrowers, or shall promptly notify the Borrowers in writing of its legal inability to do so.

(g)    Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.17 (including by the payment of additional amounts pursuant to this Section 2.17), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.17 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid.  This paragraph (g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    <u>Survival</u>.  Each party's obligations under this Section 2.17 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(i)    <u>Defined Terms</u>.  For purposes of this Section 2.17, the term "applicable law" includes FATCA.

Section 2.18    <u>Payments Generally; Allocation of Proceeds; Sharing of Set-offs</u>.  (a) The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees, or of amounts payable under Section 2.15, 2.16 or 2.17, or otherwise) prior to 3:00 p.m., New York City time, on the date when due, in immediately available funds, without set off or counterclaim.  Any amounts received after such time on any date shall be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its offices at 500 Delaware Avenue, Wilmington, Delaware 19801, except that payments pursuant to Sections 2.15, 2.16, 2.17 and 9.03 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in dollars.

(b)    <u>Pre-Default Allocation of</u> Payments.  At all times when Section 2.18(c) does not apply and except as otherwise expressly provided herein, monies to be applied to the Obligations and the Prior Lender Obligations, whether arising from payments by the Loan Parties, realization on Collateral, setoff, or otherwise, shall be allocated as follows (subject, in all respects, to the Carve-Out):

(i)    *First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs and fees and expenses of Agent Advisors payable under Section 9.03 and amounts payable under Section 2.15, 2.16 or 2.17) payable to the Agents in their capacity as such, until paid in full;

(ii)    *Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including Attorney Costs and fees and expenses of Lender Advisors payable under Section 9.03 and amounts payable under Section 2.15, 2.16 or 2.17), ratably among them in proportion to the amounts described in this clause Second payable to them, until paid in full;

(iii)    *Third*, to pay interest and principal due in respect of all Loans, until paid in full;

(iv)     *Fourth*, subject to the proviso in clause (iii) above, to the payment of all other Obligations of the Loan Parties that are due and payable to the Agents and the other Secured Parties (other than any Defaulting Lenders) on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Agents and the other Secured Parties (other than any Defaulting Lenders) on such date, until paid in full;

(v)     *Fifth*, subject to the proviso in clause (iii) above, ratably to pay any Obligations that are that are due and payable to Defaulting Lenders, until paid in full;

(vi)     *Sixth*, to the payment of the Prior Lender Obligations in accordance with the Pre-Petition First Lien Credit Agreement; and

(vii)     *Last*, the balance, if any, to the Borrower or as otherwise required by Law.

Amounts shall be applied to each category of Obligations set forth above until Full Payment thereof and then to the next category. If amounts are insufficient to satisfy a category, they shall be applied on a pro rata basis among the Obligations in the category.

(c)     <u>Post-Default Allocation of Payments</u>.  Notwithstanding anything herein to the contrary, after the occurrence and during the continuation of an Event of Default, the Required Lenders may elect, in lieu of the allocation of payments set forth in Section 2.18(a), that monies to be applied to the Obligations, whether arising from payments by the Loan Parties, realization on Collateral, setoff or otherwise, shall, to the extent elected by the Required Lenders (in writing to the Administrative Agent), be allocated as follows (subject, in all respects, to the Carve-Out):

(i)     *First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs and fees and expenses of Agent Advisors payable under Section 9.03 and amounts payable under Section 2.15, 2.16 or 2.17) payable to the Agents in their capacity as such, until paid in full;

(ii)     *Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including Attorney Costs and fees and expenses of Lender Advisors payable under Section 9.03 and amounts payable under Section 2.15, 2.16 or 2.17), ratably among them in proportion to the amounts described in this clause Second payable to them, until paid in full;

(iii)     *Third*, to pay interest and principal due in respect of all Loans, until paid in full;

(iv)     *Fourth*, subject to the proviso in clause (iii) above, to the payment of all other Obligations of the Loan Parties that are due and payable to the Agents and the other Secured Parties (other than any Defaulting Lenders) on such date,

ratably based upon the respective aggregate amounts of all such Obligations owing to the Agents and the other Secured Parties (other than any Defaulting Lenders) on such date, until paid in full;

(v)    *Fifth*, subject to the proviso in clause (iii) above, ratably to pay any Obligations that are that are due and payable to Defaulting Lenders, until paid in full;

(vi)    *Sixth*, subject to the proviso in clause (iii) above, to pay any other Obligations until paid in full;

(vii)    *Seventh*, to the payment of the Prior Lender Obligations in accordance with the Pre-Petition First Lien Credit Agreement; and

(viii)    *Last*, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law.

Amounts shall be applied to each category of Obligations set forth above until Full Payment thereof and then to the next category.  If amounts are insufficient to satisfy a category, they shall be applied on a pro rata basis among the Obligations in the category.  The allocations set forth in this Section 2.18(c) are solely to determine the rights and priorities of the Agents and Lenders as among themselves, may be changed by agreement among the Agents and all of the Lenders without the consent of any Loan Party and are subject to Section 2.20 (regarding Defaulting Lenders). Appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to Obligations otherwise set forth above in this Section 2.18(c).  This Section 2.18(c) is not for the benefit of or enforceable by any Loan Party.

(d)    The Borrower hereby irrevocably authorizes the Administrative Agent to charge any deposit account of the Borrower maintained with the Administrative Agent for each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Loan Documents.

(e)    If, except as otherwise expressly provided herein (subject in all respects to the Carve-Out), any Lender shall, by exercising any right of set off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other similarly situated Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; <u>provided</u> that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or

any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(f)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(g)    If any Lender shall fail to make any payment required to be made by it hereunder, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations hereunder until all such unsatisfied obligations are fully paid and/or (ii) hold any such amounts in a segregated account as cash collateral for, and application to, any future funding obligations of such Lender hereunder; application of amounts pursuant to (i) and (ii) above shall be made in any order determined by the Administrative Agent in its discretion.

Section 2.19    Mitigation Obligations; Replacement of Lenders.

(a)    If any Lender requests compensation under Section 2.15, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.17, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    If any Lender requests compensation under Section 2.15, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, or if any Lender becomes a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate,

without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights (other than its existing rights to payments pursuant to Section 2.15 or 2.17) and obligations under this Agreement and other Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.15 or payments required to be made pursuant to Section 2.17, such assignment will result in a reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 2.20    Defaulting Lenders.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)    fees shall cease to accrue on the unfunded portion of the Commitment of such Defaulting Lender pursuant to Section 2.12(a); and

(b)    the Commitment and Credit Exposure of such Defaulting Lender shall not be included in determining whether the Required Lenders have taken or may take any action hereunder (including any consent to any amendment, waiver or other modification pursuant to Section 9.02) or under any other Loan Document; provided, that, except as otherwise provided in Section 9.02, this clause (b) shall not apply to the vote of a Defaulting Lender in the case of an amendment, waiver or other modification requiring the consent of such Lender or each Lender directly affected thereby.

Section 2.21    Returned Payments.  If after receipt of any payment which is applied to the payment of all or any part of the Obligations (including a payment effected through exercise of a right of setoff), the Administrative Agent or any Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion), then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by the Administrative Agent or such Lender.  The provisions of this Section 2.21 shall be and remain effective notwithstanding any contrary action which may have been taken by the Administrative Agent or any Lender in reliance upon such payment or application of proceeds.  The provisions of this Section 2.21 shall survive the termination of this Agreement.

Section 2.22    Super Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations.

(a)    The priority of the Administrative Agent's Liens on the Collateral, claims and other interests shall be as set forth in the DIP Order (and, for the avoidance of doubt, are subject to the Carve-Out).

(b)    Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, the Administrative Agent and the Lenders shall be entitled to immediate payment of such Obligations without application to or order of the Bankruptcy Court.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

In order to induce the Administrative Agent and Lenders to enter into this Agreement and to furnish the Loans hereunder, each Loan Party represents and warrants to the Administrative Agent and each Lender on the Closing Date, each Funding Date, and each Withdrawal Date, that the following statements are true and correct:

Section 3.01    Organization; Powers.  Each Loan Party and each of its Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business, and is in good standing, in every jurisdiction where such qualification is required.

Section 3.02    Authorization; Enforceability.  Subject to the entry of the Interim Order or Final Order, as applicable, the Transactions are within each Loan Party's organizational powers and have been duly authorized by all necessary organizational actions and, if required, actions by equity holders.  This Agreement has been duly executed and delivered by each Loan Party, and each other Loan Document to which each Loan Party is a party, when delivered hereunder, will have been duly executed and delivered by such Loan Party.  Subject to the entry of the Interim Order or Final Order, as applicable, this Agreement constitutes, and each other Loan Document when delivered hereunder shall constitute, a legal, valid and binding obligation of each Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03    Governmental Approvals; No Conflicts.  Subject to the entry of the Interim Order or the Final Order, as applicable, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except for filings necessary to perfect Liens created pursuant to the Loan Documents, (b) will not violate any Requirement of Law applicable to any Loan Party or any of its Subsidiaries, (c) will not violate or result in a default under (i) any certificate or articles of incorporation or organization, by-laws, operating, management or partnership agreement or other organizational documents of any Loan Party or (ii) any indenture, material agreement or other material instrument binding upon any Loan Party or any of its Subsidiaries or the assets of any Loan Party or any of its Subsidiaries, or

give rise to a right thereunder to require any payment to be made by any Loan Party or any of its Subsidiaries, and (d) will not result in the creation or imposition of any Lien on any asset of any Loan Party or any of its Subsidiaries, except Liens created pursuant to the Loan Documents.

Section 3.04    Financial Condition; No Material Adverse Change.  (a) The Borrower has heretofore furnished to the Lenders its consolidated balance sheet and statements of income, stockholders equity and cash flows as of and for the fiscal years ended December 31, 2019, December 31, 2018 and December 31, 2017 reported on by BDO USA, LLP, independent registered public accounting firm.  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its consolidated Subsidiaries as of such date and for such period in accordance with GAAP or IFRS, as applicable.

(b)    Other than as a result of the Chapter 11 Cases, since December 31, 2019, there has occurred no event, change or condition that has had, or could reasonably be expected to have, a Material Adverse Effect.

(c)    Except as set forth in the financial statements referred to in Section 3.04(a) and the Chapter 11 Cases, there are no liabilities of any Loan Party of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, which would reasonably be expected to result in a Material Adverse Effect.

Section 3.05    Properties.  (a) As of the Closing Date, Schedule 3.05 sets forth the address of each parcel of real property that is owned or leased by each Loan Party.  Each of such leases and subleases is valid and enforceable in accordance with its terms and is in full force and effect, and no default by any party to any such lease or sublease exists.  Each of the Loan Parties and its Subsidiaries has good and indefeasible title to, or valid leasehold interests in, all of its real and personal property that is material to the businesses of the Loan Parties, free of all Liens other than those permitted by Section 6.02.

(b)    (i) Each Loan Party and each of its Subsidiaries owns, or is licensed to use, all trademarks, trade names, copyrights, patents and other intellectual property necessary and material to its business as currently conducted, (ii) a correct and complete list of all registered or applied for patents, copyrights, and trademarks owned by the Loan Parties and their respective Subsidiaries, as of the Closing Date, is set forth on Schedule 3.05, (iii) the use thereof by each Loan Party and each of its Subsidiaries does not infringe upon the rights of any other Person , except where such infringement would not be material to the businesses of the Loan Parties and their Subsidiaries, and (iv) each Loan Party's rights thereto are not subject to any licensing agreement or similar arrangement, except for licenses entered into in the ordinary course of business.

Section 3.06    Litigation and Environmental Matters.  (a) Except for the Chapter 11 Cases, no actions, suits or proceedings by or before any arbitrator or Governmental Authority are pending or, to the knowledge of any Loan Party, threatened against or affecting any Loan Party or any of its Subsidiaries (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in

the aggregate, to result in a Material Adverse Effect (other than the Disclosed Matters) or (ii) that involve this Agreement or the Transactions.

(b)     Except for the Disclosed Matters (i) no Loan Party or any of its Subsidiaries has received notice of any claim with respect to any Environmental Liability or knows of any basis for any Environmental Liability and (ii) except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, no Loan Party or any of its Subsidiaries (A) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (B) has become subject to any Environmental Liability, (C) has received notice of any claim with respect to any Environmental Liability or (D) knows of any basis for any Environmental Liability.

(c)     Since the Closing Date, there has been no change in the status of the Disclosed Matters that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

Section 3.07    Compliance with Laws and Agreements; No Default.  Subject to the entry of the Interim Order or the Final Order, as applicable, each Loan Party and each of its Subsidiaries is in compliance with (i) all Requirements of Law applicable to it or its property and (ii) all indentures, agreements and other instruments binding upon it or its property.  No Default has occurred and is continuing.

Section 3.08    Investment Company Status.  No Loan Party or any of its Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

Section 3.09    Taxes.  Each Loan Party and each of its Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which such Loan Party or such of its Subsidiaries, as applicable, has set aside on its books adequate reserves, (b) to the extent that the failure to do so could not be expected to result in a Material Adverse Effect, or (c) the nonpayment of which is permitted or required under the Bankruptcy Code.

Section 3.10    ERISA.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.  All foreign pension schemes sponsored or maintained by the Borrower and each of its Subsidiaries is maintained in accordance with the requirements of applicable foreign law, except where noncompliance could not reasonably be expected to have a Material Adverse Effect.

Section 3.11    Disclosure.  The Loan Parties have disclosed to the Lenders all agreements, instruments and corporate or other restrictions to which any Loan Party or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information furnished in writing by or on behalf of any

Loan Party to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Closing Date, as of the Closing Date.

Section 3.12    No EEA Financial Institution.  No Loan Party is an EEA Financial Institution.

Section 3.13    Insurance.  Schedule 3.13 lists each material insurance policy maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Closing Date.  As of the Closing Date, all premiums in respect of such insurance have been paid.  The Borrower maintains, and has caused each of its Subsidiaries to maintain, with financially sound and reputable insurance companies, insurance on all their real and personal property in such amounts, subject to such deductibles and self-insurance retentions and covering such properties and risks as are adequate and customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

Section 3.14    Capitalization and Subsidiaries.  Schedule 3.14 sets forth (a) a correct and complete list of the name and relationship to the Borrower of each Subsidiary, (b) a true and complete listing of each class of each of the Borrower's authorized Equity Interests, all of which issued shares are validly issued, outstanding, fully paid and non-assessable, and owned beneficially and of record by the Persons identified on Schedule 3.14, and (c) the type of entity of the Borrower and each Subsidiary.  All of the issued and outstanding Equity Interests owned by any Loan Party have been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued and are fully paid and non-assessable.  Except as set forth on Schedule 3.14 (or, as supplemented with the consent of the Required Lenders on or prior to the Final Hearing Date, as confirmed by any Specified Lender Advisors (which approval may be communicated via an email from either of the Specified Lender Advisors)), there are no outstanding commitments or other obligations of any Loan Party to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of any Loan Party.

Section 3.15    Security Interest in Collateral.  Upon execution and delivery thereof by the parties thereto and upon the entry by the Bankruptcy Court of the Interim Order or Final Order, as applicable, the Collateral Documents are effective to create (to the extent described therein) in favor of the Administrative Agent for the benefit of the Secured Parties, a legal, valid and enforceable security interest in or liens on the Collateral described therein and the proceeds thereof, except as to enforcement, as the same may be limited by Bail-In Action, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing.  Upon the entry by the Bankruptcy Court of the Interim Order or Final Order, as applicable, and in accordance therewith, the security interests and liens granted pursuant to the Interim Order, the Final Order and the Collateral Documents shall automatically, and without further action, constitute a perfected security interest in (to the extent

intended to be created thereby and required to be perfected under the Loan Documents) all right, title and interest of each pledgor or mortgagor (as applicable) party thereto in the Collateral described therein with respect to such pledgor or mortgagor (as applicable, and subject to the Carve-Out). Notwithstanding any other provision of this Agreement, capitalized terms that are used in this Section 3.15 and not defined in this Agreement are so used as defined in the applicable Collateral Document.

Section 3.16    Employment Matters.  As of the Closing Date, there are no strikes, lockouts or slowdowns against any Loan Party or any of its Subsidiaries pending or, to the knowledge of any Loan Party, threatened.  To the knowledge of any Loan Party, the hours worked by and payments made to employees of the Loan Parties and their Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters.  All payments due from any Loan Party or any of its Subsidiaries, or for which any claim may be made against any Loan Party or any of its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Loan Party or Subsidiary, except in each case where nonpayment or a lack of accrual could not reasonably be expected to have a Material Adverse Effect.

Section 3.17    Federal Reserve Regulations.  No part of the proceeds of any Loan has been used or will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X.

Section 3.18    Use of Proceeds.  The proceeds of the Loans have been used and will be used, whether directly or indirectly as set forth in Section 5.08.

Section 3.19    Anti-Corruption Laws and Sanctions.  The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Borrower, its Subsidiaries and their respective officers and employees and to the knowledge of the Borrower its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.  None of (a) the Borrower, any Subsidiary or any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No Borrowing, use of proceeds or other Transaction will violate Anti-Corruption Laws or applicable Sanctions.

Section 3.20    Reorganization Matters.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof was given for (x) the motion seeking approval of the Interim Order and (y) the hearing for the entry of the Interim Order and (z) the hearing for the entry of the Final Order.  The Debtors shall give, on a timely basis as specified in the Orders, all notices required to be given to all parties specified in the Orders.

(b)     After entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against each Loan Party now existing or hereafter arising of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code, subject only to the Carve-Out and the priorities set forth in the Interim Order or the Final Order, as applicable.

(c)     After entry of the Interim Order (and the Final Order when applicable) and pursuant to and to the extent provided in the Interim Order and the Final Order, as applicable, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, (i) encumbered by no Liens other than Liens permitted by Section 6.02 and (ii) prior and superior to any other Person or Lien, in each case, other than the Carve-Out and subject to the priorities set forth in the Interim Order or the Final Order, as applicable.

(d)     The Interim Order (with respect to the period prior to the entry of the Final Order) or the Final Order (with respect to the period on and after the entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended without Administrative Agent and Required Lender consent (which consent of the Required Lenders may be communicated via an email from either of the Specified Lender Advisors).

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the Maturity Date (whether by acceleration or otherwise), the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations in cash and to enforce the remedies provided for hereunder or under applicable law, without further notice, motion or application to, hearing before, or order by the Bankruptcy Court.

## ARTICLE IV

### CONDITIONS OF EFFECTIVENESS, LENDING AND WITHDRAWALS

Section 4.01    Closing Date Effectiveness.  The effectiveness of this Agreement and the obligations of each Lender to make any Loan hereunder on the Closing Date is subject to the satisfaction, or waiver (by the Required Lenders in their sole discretion and, with respect to any condition affecting the rights and duties of the Administrative Agent, the Administrative Agent, any which waiver by the Required Lenders, and the satisfaction of the Required Lenders with any document described in clauses (a)-(p) below, as applicable, may be communicated via an email from either of the Specified Lender Advisors), of the following conditions:

(a)     Loan Documents.  All legal matters incident to this Agreement, the Loans hereunder and the other Loan Documents shall be satisfactory to the Required Lenders and delivered to the Administrative Agent and the Specified Lender Advisors and there shall have been delivered to the Administrative Agent and the Specified Lender Advisors a properly

executed counterpart of this Agreement and each of the other Loan Documents by the applicable parties thereto.

(b)      Closing Certificates; Certified Certificate of Incorporation; Good Standing Certificates.  The Administrative Agent shall have received (i) a certificate of each Loan Party, dated the Signing Date and executed by its Secretary or Assistant Secretary, which shall (A) certify the resolutions of its Board of Directors, members or other body authorizing the execution, delivery and performance of the Loan Documents to which it is a party, (B) identify by name and title and bear the signatures of the Financial Officers and any other officers of such Loan Party authorized to sign the Loan Documents to which it is a party, and (C) contain appropriate attachments, including the certificate or articles of incorporation or organization of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a true and correct copy of its by-laws or operating, management or partnership agreement, and (ii) a good standing certificate for each Loan Party from its jurisdiction of organization or the substantive equivalent available in the jurisdiction of organization for each Loan Party from the appropriate governmental officer in such jurisdiction, in each case satisfactory to the Required Lenders.

(c)      Officers' Certificate.  The Administrative Agent shall have received a customary certificate (satisfactory to the Required Lenders), dated the Closing Date and signed by two Officers of the Borrower, one of whom shall be a Financial Officer, confirming compliance with the conditions precedent set forth in Section 4.01(k) and (l), it being understood that any certification required hereby set forth in the Borrowing Request delivered on the Closing Date shall be satisfactory to the Required Lenders.

(d)      Orders.  (i) The Bankruptcy Court shall have entered the Interim Order, no later than three (3) Business Days after the Petition Date, and such order shall be in form and substance satisfactory to the Required Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent) in their sole discretion, be in full force and effect, and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent); (ii) the Administrative Agent and the Lenders shall have received drafts of the "first day" pleadings for the Chapter 11 Cases, in each case, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, not later than a reasonable time in advance of the Petition Date for the Administrative Agent's and Lenders' counsel to review and analyze the same; (iii) all motions, orders (including the "first day" orders) and other documents to be filed with or submitted to the Bankruptcy Court on the Petition Date shall be in form and substance reasonably satisfactory to the Administrative Agent and the Lenders; and (iv) all "first day" orders shall have been approved and entered by the Bankruptcy Court except as otherwise agreed by the Required Lenders.

(e)      Budget.  The Administrative Agent and the Specified Lender Advisors shall have received the Approved Budget.

(f)    <u>Compliance with RSA</u>.  The RSA shall be in full force and effect and no default by any of the Loan Parties shall have occurred and be continuing (with all applicable grace periods having expired) under the RSA.

(g)    [Reserved].

(h)    [Reserved].

(i)    <u>Notice</u>.  The Administrative Agent shall have received a Borrowing Request as required by <u>Section 2.03(a)</u>.

(j)    <u>Ratings</u>.  The Borrower shall use commercially reasonable efforts to obtain the ratings of the Loans by at least two Rating Agencies, which shall be Moody's and S&P, or, with the consent of the Required Lenders in the event that Moody's and/or S&P are not willing to so rate the Loans, such other Rating Agency or Rating Agencies, as applicable, in their stead as are acceptable to the Required Lenders (which acceptance may be communicated via an email from either of the Specified Lender Advisors).

(k)    <u>No Default</u>.  On the Closing Date and immediately after giving effect to any Loans made on the Closing Date and the application of the proceeds thereof, no Default or Event of Default shall have occurred and be continuing on such date.

(l)    <u>Representation and Warranties</u>.  As of the Closing Date, each of the representations and warranties relating to any Company set forth in Article III or in any other Loan Document shall be true and correct in all material respects on and as of the Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date); <u>provided</u> that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on and as of the Closing Date.

(m)    <u>Fees</u>.  All Fees (including any fees to be paid for the account of any Lender on the Closing Date that Borrower has previously agreed to in writing) and other amounts due and payable on or before the Closing Date, including, to the extent invoiced not less than one Business Day prior to the Closing Date, reimbursement or payment of all out-of-pocket expenses (including the premiums and fees and the legal fees and expenses of the Specified Lender Advisors, as counsel to the Ad Hoc Group of Lenders, and the Agent Advisors, as counsel to the Agents), and the fees and expenses of any local counsel, foreign counsel, appraisers, consultants and other advisors, shall be paid (or will be paid from the proceeds of the Loans), in each case to the extent required to be reimbursed or paid by the Loan Parties hereunder or under any other Loan Document (in each case, which may be paid with the proceeds of the Loans).

(n)    <u>USA PATRIOT Act, Etc.</u>  The Administrative Agent and the Lenders shall have received, to the extent requested by any of the Lenders at least ten (10) days prior to the Closing Date, all documentation and other information required by bank regulatory

authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, for each Loan Party.

Section 4.02    <u>Conditions Precedent to each Withdrawal</u>.  Any Withdrawal on or after the Closing Date is subject to the satisfaction or waiver of the following additional conditions precedent:

(a)    <u>No Default</u>.  At the time of and immediately after giving effect to such Withdrawal and the application of the proceeds thereof, no Default or Event of Default shall have occurred and be continuing on such date.

(b)    <u>Representations and Warranties</u>.  Each of the representations and warranties made by any Loan Party set forth in Article III or in any other Loan Document shall be true and correct in all material respects on and as of the Withdrawal Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date); <u>provided</u> that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(c)    <u>Bankruptcy Proceedings</u>.  (i) The DIP Order, shall not have been vacated, stayed, reversed, modified, or amended, in whole or in any part, without the Administrative Agent's and the Required Lenders' written consent and shall otherwise be in full force and effect; (ii) no motion for reconsideration of the Final Order shall have been timely filed by a Debtor or any of their Subsidiaries; and (iii) no appeal of the Final Order shall have been timely filed.

(d)    <u>RSA</u>.  The RSA shall be in full force and effect and no default by any of the Loan Parties shall have occurred and be continuing (with all applicable grace periods having expired) under the RSA, except as otherwise waived in accordance with the terms thereof.

(e)    <u>Fees</u>.  All reasonable and documented out-of-pocket fees and expenses required to be paid under the Loan Documents shall have been paid (or will be paid from the proceeds of such Loans).

(f)    <u>Approved Budget</u>.  The proceeds of the Loans shall be used as set forth in the Approved Budget (subject to the Permitted Variance).

(g)    <u>Withdrawal Notice</u>.  The Administrative Agent (for distribution to the Lenders and the Specified Lender Advisors) shall have received an executed Withdrawal Notice, executed by the Borrower requesting the proposed Withdrawal thereunder by no later than 1:00 p.m. (New York City time) on the Thursday of the week (excluding the week of the Closing Date) for a proposed funding of such Withdrawal on Friday of such week.

(h)    <u>Maximum Withdrawal</u>.  The maximum amount of any requested Withdrawal shall not exceed the Maximum Withdrawal Amount.

(i)    <u>Initial Withdrawal Minimum Escrow Period</u>.  Solely with respect to the initial withdrawal following the entry of the Interim Order, which withdrawal may be in an amount up to $10,000,000, such withdrawal shall be subject to all of the proceeds of the Loan (net of any fees and expenses, to the extent applicable) having been funded into the Loan Proceeds Account and such proceeds having been on deposit in such account for no less than seven (7) days following the date of the entry of Interim Order.

Upon receipt of the Withdrawal Notice and satisfaction of the conditions set forth in Article IV, the Administrative Agent shall promptly direct the Escrow Agent to disburse funds by 1:00 p.m. (New York City time) on the Friday immediately following such Withdrawal Notice.

Notwithstanding the foregoing, if the Required Lenders determine that the Borrower has failed to satisfy the conditions precedent set forth in this <u>Section 4.02</u> for a Withdrawal Notice and so advise the Administrative Agent in writing (directly or through the Specified Lender Advisors) prior to Administrative Agent funding the Withdrawal, the Administrative Agent shall decline to fund such Withdrawal and shall communicate the same to the Escrow Agent.

On any date on which the Loans shall have been accelerated, any amounts remaining in the Escrow Account, as the case may be, may be applied by the Administrative Agent to reduce the Loans then outstanding, in accordance with Section 2.18 (other than with respect to amounts to fund the Carve-Out).  None of the Loan Parties shall have (and each Loan Party hereby affirmatively waives) any right to withdraw, claim or assert any property interest in any funds on deposit in the Escrow Account upon the occurrence and continuance of any Default or Event of Default (except to fund the Carve-Out).

The acceptance by the Borrower of the Loans or proceeds of a Withdrawal shall conclusively be deemed to constitute a representation by the Borrower that each of the conditions precedent set forth in Section 4.01 and Section 4.02 shall have been satisfied in accordance with its respective terms or shall have been irrevocably waived by the applicable relevant Person; provided, <u>however</u>, that the making of any such Loan or Withdrawal (regardless of whether the lack of satisfaction was known or unknown at the time), shall not be deemed a modification or waiver by the Agents, any Lender or other Secured Party of the provisions of this Article IV on such occasion or on any future occasion or operate as a waiver of (i) the right of the Administrative Agent and Lenders to insist upon satisfaction of all conditions precedent with respect to any subsequent funding or issuance, (ii) any Default or Event of Default due to such failure of conditions or otherwise or (iii) any rights of any Agent or any Lender as a result of any such failure of the Loan Parties to comply.

## ARTICLE V

## AFFIRMATIVE COVENANTS

Until the Commitments shall have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full, each Loan

Party executing this Agreement covenants and agrees from and after the Closing Date, jointly and severally with all of the other Loan Parties, with the Lenders that:

Section 5.01    Financial Statements; Other Information.  The Borrower will furnish to the Administrative Agent and each Lender (or to the Specified Lender Advisors only, as expressly specified below):

(a)    [reserved];

(b)    as soon as available, but in any event within forty-five (45) days after the end of each fiscal quarter of each fiscal year of the Borrower, (i) its (x) consolidated balance sheet as of the end of such fiscal quarter, (y) related statements of operations for such fiscal quarter and the then elapsed portion of such fiscal year, and (z) related statements of stockholders' equity and cash flows for the then elapsed portion of such fiscal year, and (ii) (x) a consolidated balance sheet for the Borrower and its consolidated Subsidiaries as of the end of such fiscal quarter, (y) related statements of operations for the Borrower and its consolidated Subsidiaries for such fiscal quarter and the then elapsed portion of such fiscal year, and (z) related statements of stockholders' equity and cash flows for the Borrower and its consolidated Subsidiaries for the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments;

(c)    as soon as available, but in any event not later than the thirtieth (30th) day after the end of month, an unaudited financial summary of the financial performance, and unaudited consolidated balance sheet and unaudited consolidated statements of operations and comprehensive income, stockholders' equity and cash flows as of the end of and for such month and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year;

(d)    concurrently with, or on the same day as the day of, any delivery of financial statements under clause (a) or (b) above, a certificate of a Financial Officer of the Borrower in substantially the form of Exhibit D (i) certifying, in the case of the financial statements delivered under clause (b), as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, (ii) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (iii) [reserved], (iv) identifying all Material Subsidiaries, and (v) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(e)    [reserved];

(f)    [reserved];

(g)    to the Specified Lender Advisors, as soon as available, but in any event no later than thirty (30) days after the end of each month, Key Performance Indicators ("**KPI**") (which reporting shall include volume and pricing for the top 30 products);

(h)    to the Specified Lender Advisors, as soon as available, but in any event no later than thirty (30) days after the end of each month, operating statistics broken down by facility (e.g., production levels, capacity utilized, etc.) and plant KPIs on a monthly basis;

(i)    to the Specified Lender Advisors, as soon as available, but in any event no later than thirty (30) days after the end of each month, pipeline reporting for each product under development, which reports shall include information with respect to (i) manufacturing facility, (ii) product category, (iii) estimate of filing and launch dates, (iv) estimated market size, (v) estimated competitors at launch, (vi) projected research and development expenses, (vii) commentary on stage of development, with the Borrower to use reasonable efforts to provide key open workstreams and estimated milestones for FDA filing, and (viii) primary development facility, if applicable; provided that projected revenue for products under development shall be provided with the Business Plan; provided further that any molecules names appearing therein may be redacted;

(j)    to the Specified Lender Advisors, by the tenth (10th) Business Day of each month, monthly reports regarding pending Abbreviated New Drug Applications ("**ANDAs**"), which reports shall include ANDAs submitted to the FDA and the status of FDA approvals with respect thereto, estimated market size and known competitor information for each such ANDA, and a good faith estimate of the timing of the approval of each such ANDA and related competitive approvals; provided that any molecules names appearing therein may be redacted; provided further that such reports shall also include information with respect to (i) manufacturing facility, (ii) product category, (iii) estimate of filing and launch dates, and (iv) commentary on outstanding requirements for FDA approval status; provided that projected revenue for filed ANDAs shall be provided with the Business Plan;

(k)    to the Specified Lender Advisors, promptly, but in no event later than forty-eight (48) hours after receipt, copies of any material (i) correspondence received from the FDA, and (ii) cover letters to reports delivered to the FDA, in each case solely with regard to any FDA Form 483 or warning letter;

(l)    to the Specified Lender Advisors, promptly, but in no event later than forty-eight (48) hours after receipt by the Borrower or the other Loan Parties, copies of any warning letter(s), Official Action Indicated statuses, or similar regulatory actions by Swissmedic or the Central Drugs Standard Control Organization regarding those certain manufacturing facilities operated by the Borrower and its Subsidiaries in Amityville, New York, Hettlingen, Switzerland, and Paonta Sahib, Himachal Pradesh, India, and those certain research and development centers operated by the Borrower and its Subsidiaries in Vernon Hills, Illinois and Cranbury, New Jersey;

(m)    to the Specified Lender Advisors, promptly, but in no event later than forty-eight (48) hours after preparation or receipt, formal minutes for any FDA meeting or call to the extent made available to, or prepared by, the Borrower or the other Loan Parties; provided that the Borrower will be entitled to redact confidential or privileged information contained therein;

(n)    to the Specified Lender Advisors, on or before the third (3rd) Business Day of each month, monthly Quality System Corrective Action Plan update reports;

(o)    to the Specified Lender Advisors, promptly, but in no event later than forty-eight (48) hours after receipt (subject to any confidentiality obligations therein), copies of all (A) formal process or offering materials provided generally to participants in the Sale Process (which, for the avoidance of doubt, shall not be required to include individual Q&A responses to diligence requests, unless required by the following proviso), (B) written proposals, term sheets, commitment letters, and any other similar materials received in connection with the Sale Process, as applicable, and (C) all bidding materials on a redacted basis, including, but not limited to marketing materials; provided that (1) the Borrower shall share with the Specified Lender Advisors all binding bids received in connection with the Sale Process on an un-redacted basis when, and if, received, and (2) the Borrower shall otherwise communicate any material developments with respect to the Sale Process to the Specified Lender Advisors, in good faith; and

(p)    promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower or any of its Subsidiaries, or compliance with the terms of this Agreement, as the Administrative Agent, the Specified Lender Advisors or any Lender may reasonably request.

Documents required to be delivered pursuant to clauses (a) and (b) of this Section 5.01 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are (i) filed for public availability on the SEC's Electronic Data Gathering and Retrieval System, (ii) posted or the Borrower provides a link thereto on http://www.akorn.com; or (iii) posted on the Borrower's behalf on an Internet or intranet website, if any, to which the Administrative Agent has access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that the Borrower shall notify (which may be by telecopy or electronic mail) the Administrative Agent of the filing of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  The Required Lenders may waive any delivery requirements set forth in this Section 5.01 (which waiver may be communicated via e-mail by any Specified Lender Advisor).

Section 5.02    Notices of Material Events.  The Borrower will furnish to the Administrative Agent (for distribution to each Lender) prompt written notice of the following (and in any event within three (3) Business Days following the occurrence thereof):

(a)    the occurrence of any Default;

(b)      receipt of any notice of any governmental investigation or any litigation or proceeding commenced or threatened against any Loan Party that could reasonably be expected to result in a Material Adverse Effect;

(c)      to the extent reasonably practicable, (i) at least three (3) calendar days (or such shorter review period as is necessary or appropriate under the circumstances) prior to the date when the Borrower intends to file the RSA, any documents implementing and achieving the Transactions (as defined in the RSA) and the transactions contemplated by the Loan Documents, as applicable, including any substantive "first day" or "second day" motions, the Asset Purchase Agreement, or, any other the purchase agreement in connection with the Sale Transaction, the Chapter 11 Plan and any supplement thereto, the Disclosure Statement, any proposed order of the Bankruptcy Court approving the Chapter 11 Plan, any proposed order of the Bankruptcy Court approving the Disclosure Statement and the related solicitation materials, any proposed Interim Order and Final Order , in each case, with the Bankruptcy Court and (ii) at least one (1) calendar day (or such shorter review period as necessary or appropriate) prior to the date when the Borrower intends to file any other material pleading with the Bankruptcy Court (but excluding retention applications, fee applications, and any declarations in support thereof or related thereto) with the Bankruptcy Court;

(d)      the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect; and

(e)      any other development that results, or could reasonably be expected to result, in a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.  Information required to be delivered pursuant to clause (b) and (d) of this Section shall be deemed to have been delivered if such information, or one or more annual or quarterly or other periodic reports containing such information, is (i) filed for public availability on the SEC's Electronic Data Gathering and Retrieval System, (ii) posted or the Borrower provides a link thereto on http://www.akorn.com; or (iii) posted on the Borrower's behalf on an Internet or intranet website, if any, to which the Administrative Agent and the Lenders have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that the Borrower shall notify (which may be by telecopy or electronic mail) the Administrative Agent of the filing of any such documents and provide to the Administrative Agent by electronic mail electronic versions (*i.e.*, soft copies) of such documents.

Section 5.03    Existence; Conduct of Business.  Each Loan Party will, and will cause each of its Subsidiaries to, (a) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted, provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03, and

(b) carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted.

Section 5.04    Payment of Obligations.  Each Loan Party will, and will cause each of its Subsidiaries to, pay or discharge all liabilities and obligations in respect of Taxes, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party or such of its Subsidiaries has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest (i) is permitted or required under the Bankruptcy Code or (ii) could not reasonably be expected to result in a Material Adverse Effect; provided, however, each Loan Party will, and will cause each of its Subsidiaries to, remit withholding taxes and other payroll taxes to appropriate Governmental Authorities as and when claimed to be due, notwithstanding the foregoing exceptions.

Section 5.05    Maintenance of Properties.  Each Loan Party will, and will cause each of its Subsidiaries to, keep and maintain all property material to the conduct of its business in good working order and condition, casualty, condemnation and ordinary wear and tear excepted.

Section 5.06    Books and Records; Inspection Rights.  Each Loan Party will, and will cause each of its Subsidiaries to, (a) keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by the Administrative Agent, any group of Lenders holding not less than 25.0% of the aggregate principal amount of the Loans, or the Specified Lender Advisors upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, environmental assessment reports and Phase I or Phase II studies, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.  Each Loan Party acknowledges that the Administrative Agent and the Specified Lender Advisors, each after exercising its rights of inspection, may prepare and distribute to the Lenders certain Reports pertaining to each Loan Party's assets (including, without limitation, the results of such inspection) for internal use by the Administrative Agent, the Specified Lender Advisors and the Lenders.

Section 5.07    Compliance with Laws and Material Contractual Obligations.  Each Loan Party will, and will cause each of its Subsidiaries to, (i) comply with all Requirements of Law applicable to it or its property (including without limitation Environmental Laws) and (ii) perform in all material respects its obligations under material agreements to which it is a party, except, in each case, where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  The Borrower will maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

Section 5.08    Use of Proceeds.  Subject to the terms and conditions herein, the use of cash collateral and the proceeds of the Loans made hereunder shall be used by the Borrower, solely on or after the Closing Date, in accordance with the DIP Order and the Approved Budget (subject to Permitted Variances): (i) to pay related transaction costs, fees and expenses (including

attorney's fees required to be paid hereunder and to fund the Carve-Out) with respect to the DIP Facility, (ii) to make the adequate protection payments (if any) in accordance with the Approved Budget and the DIP Order, and (iii) to provide working capital, and for other general corporate purposes of the Loan Parties and their Subsidiaries, and to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court in accordance with the Approved Budget (subject to Permitted Variance). The Loan Parties shall not be permitted to use the proceeds of the Loans or any cash collateral in contravention of the provisions of the Loan Documents, the Approved Budget (subject to Permitted Variances), the DIP Order or any applicable insolvency laws, including any restrictions or limitations on the use of proceeds contained therein.

Section 5.09    Insurance.  Each Loan Party will, and will cause each of its Subsidiaries to, maintain with financially sound and reputable carriers having a financial strength rating of at least A-by A.M. Best Company (a) insurance in such amounts (with no greater risk retention) and against such risks (including, without limitation:  loss or damage by fire and loss in transit; theft, burglary, pilferage, larceny, embezzlement, and other criminal activities; business interruption; and general liability) and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required pursuant to the Collateral Documents.  The Borrower will furnish to the Lenders, upon request of the Administrative Agent or the Specified Lender Advisors, information in reasonable detail as to the insurance so maintained.

Section 5.10    Maintenance of Ratings.  The Borrower shall use commercially reasonable efforts to obtain, prior to thirty (30) days after the Closing Date, and at all times thereafter, maintain, the ratings of the Loans by at least two Rating Agencies, which shall be Moody's and S&P, or, with the consent of the Required Lenders in the event that Moody's and/or S&P are not willing to so rate the Loans, such other Rating Agency or Rating Agencies, as applicable, in their stead as are acceptable to the Required Lenders (which acceptance may be communicated via an email from either of the Specified Lender Advisors).

Section 5.11    Additional Collateral; Further Assurances.  (a) Subject to applicable Requirement of Law, the Borrower and each of its Subsidiaries that is a Loan Party will cause each of its Domestic Subsidiaries formed or acquired after the Closing Date in accordance with the terms of this Agreement to become a Loan Party by executing a Joinder Agreement.  Upon execution and delivery thereof, each such Person (i) shall automatically become a Loan Guarantor hereunder and thereupon shall have all of the rights, benefits, duties and obligations in such capacity under the Loan Documents and (ii) on and after the Closing Date, shall automatically grant Liens to the Administrative Agent, for the benefit of the Administrative Agent, the Lenders and the other Secured Parties, in any property of such Loan Party which constitutes Collateral, including any parcel of real property located in the U.S. owned by any Loan Party, or shall take action necessary to cause such Person to be included in the grant of liens and claims in the DIP Order.

(b)        [Reserved].

(c)        Without limiting the foregoing, each Loan Party will, and will cause each of its Subsidiaries to, execute and deliver, or cause to be executed and delivered, to the

66

Administrative Agent or the Specified Lender Advisors, as applicable, such documents, agreements and instruments, and take or cause to be taken such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other customary documents and such other customary actions or deliveries to perfect security interests, as applicable), which may be required by any Requirement of Law or which the Administrative Agent (acting at the direction of the Required Lenders (which direction may be communicated via an email from either of the Specified Lender Advisors)) or the Required Lenders may, from time to time, request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created by the Collateral Documents, all in form and substance reasonably satisfactory to the Required Lenders and all at the expense of the Loan Parties (which satisfaction may be communicated via an email from either of the Specified Lender Advisors).

(d)     If any real property or improvements thereto or any interest therein with a fair market value of greater than $200,000 are acquired by the Borrower or any Subsidiary that is a Loan Party after the Closing Date, the Borrower will (i) notify the Administrative Agent and the Lenders thereof and, if requested by the Administrative Agent  (acting at the direction of the Required Lenders (which direction may be communicated via an email from either of the Specified Lender Advisors)) or the Required Lenders, cause such real property or improvements to be subjected to a Lien securing the Secured Obligations and (ii) take, and cause each Subsidiary that is a Loan Party to take, such actions as shall be necessary or requested by the Administrative Agent (acting at the direction of the Required Lenders (which direction may be communicated via an email from either of the Specified Lender Advisors)) or the Required Lenders in its or their sole discretion to grant and perfect such Liens, including actions described in paragraph (c) of this Section, all at the expense of the Loan Parties.

(e)     Without limiting the generality of the foregoing, each Loan Party shall deliver Mortgages and Mortgage Instruments with respect to real property of such Loan Party that constitutes Collateral to the extent, and within such time period as is, required by the Administrative Agent (acting at the direction of the Required Lenders (which direction may be communicated via an email from either of the Specified Lender Advisors)) or the Required Lenders.

Section 5.12     Post-Closing Obligations.

(a)     On or prior to the Final Hearing Date, the Administrative Agent shall have received, on behalf of itself and the lenders, a customary written opinion of Kirkland & Ellis LLP.

(b)     With respect to the insurance certificates and applicable endorsements from the Loan Parties' insurance broker or other evidence reasonably satisfactory to the Administrative Agent that all insurance required to be maintained pursuant to Section 5.09 is in full force and effect and that such certificates and applicable endorsements comply with the requirements set forth in Section 5.09, the Borrower shall deliver such insurance certificates and applicable endorsements or such other evidence reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders (which direction may be communicated via an email from either of the Specified Lender Advisors)) within ten (10) days after the Closing

67

Date (as such time frame may be extended by the Administrative Agent (acting at the direction of the Required Lenders (which direction may be communicated via an email from either of the Specified Lender Advisors))).

(c)    Within ten (10) days following the Closing Date ((or such later date as agreed to by the Required Lenders (which agreement of the Required Lenders may be communicated via an email from either of the Specified Lender Advisors)), the Borrower shall make the Loan Proceeds Account, subject to an account control agreement that is in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders (which satisfaction may be communicated via an email from either of the Specified Lender Advisors), which account control agreement shall establish the Administrative Agent's "control" (within the meaning of Section 9-104 of the UCC) thereof.

(d)    Within twenty (20) days following the Closing Date ((or such later date as agreed to by the Required Lenders (which agreement of the Required Lenders may be communicated via an email from either of the Specified Lender Advisors)), the Borrower shall deliver (or caused to be delivered) to the Administrative Agent a stock certificate and related transfer power evidencing the Borrower's 79.0% ownership interest in WorldAkorn Pharma Mauritius.

Section 5.13    Approved Budget.

(a)    The use of proceeds of Loans by the Loan Parties under this Agreement and the other Loan Documents shall be limited solely in accordance with the Approved Budget (subject to Permitted Variances) which shall be in form and substance satisfactory to the Required Lenders (subject to the variances set forth in Section 5.13(b)) (which satisfaction may be communicated via an email from either of the Specified Lender Advisors); provided that, no proceeds of the Loans will be used in connection with (including without limitation, to fund or prefund) any executive retention plan without the express written consent of the Required Lenders (which consent may be communicated via an email from either of the Specified Lender Advisors); provided further that, for the avoidance of doubt, the initial Approved Budget does not contemplate or include the funding or prefunding of any executive retention plan.  The Approved Budget shall set forth, on a weekly basis, among other things, Budgeted Cash Receipts, Budgeted Operating Disbursement Amounts, Budgeted Liquidity and Budgeted Restructuring Related Amounts for the 13-week period commencing with the first full week after the Closing Date and such Approved Budget shall be approved in writing by, and be in form and substance reasonably satisfactory to, the Required Lenders (it being acknowledged and agreed that the initial Approved Budget attached to this Agreement is approved by and satisfactory to the Required Lenders and is and shall be the Approved Budget unless and until replaced in accordance with terms of this Section, and that with respect to any subsequent Approved Budget, such approval and satisfaction of the Required Lenders may be communicated via an email from either of the Specified Lender Advisors) and disclosed in writing to the Administrative Agent. The Approved Budget shall be updated, modified or supplemented by the Borrower from time to time in writing transmitted to the Administrative Agent and the Lenders with the written consent of and/or at the request of the Required Lenders (with a copy of such written consent or request concurrently delivered to the Administrative Agent) (which consent may be communicated via an email from either of the Specified Lender Advisors), but in any event not less than one time in

each four (4) consecutive week period, commencing with the first full week after the Closing Date, and each such updated, modified or supplemented budget shall be in form and substance satisfactory to the Required Lenders in their sole discretion, and no such updated, modified or supplemented budget shall be effective unless acceptable to the Required Lenders (which acceptance may be communicated via an email from either of the Specified Lender Advisors); and, upon delivery of any such acceptance, the updated, modified or supplemented budget shall be deemed the newly approved Budget; provided, however, that in the event the Required Lenders, on the one hand, and the Borrower, on the other hand, cannot agree as to an updated, modified or supplemented budget, after giving effect all applicable grace or cure periods, such disagreement shall constitute an immediate Event of Default once the period covered by the prior approved Approved Budget has terminated (and at all times thereafter such then current approved Approved Budget shall remain in effect unless and until a new Approved Budget is approved by the Required Lenders (which approval may be communicated via an email from either of the Specified Lender Advisors)).  Each Approved Budget delivered to the Lenders and the Administrative Agent shall be accompanied by such supporting documentation as reasonably requested by the Required Lenders.  Each Approved Budget shall be prepared in good faith based upon assumptions believed by the Borrower to be reasonable.

(b)     For each Variance Testing Period, unless otherwise agreed by the Required Lenders (which approval may be communicated via an email from either of the Specified Lender Advisors), the Borrower shall not permit: (x) the Actual Cash Receipts, for two consecutive weeks, to be less than Budgeted Cash Receipts (each calculated on a cumulative basis as opposed to on a line by line basis), in each case, for such Variance Testing Period, by more than the Permitted Variance for such Variance Testing Period, and (y) Actual Operating Disbursement Amounts, for two consecutive weeks, to exceed the Budgeted Operating Disbursement Amounts (each calculated on a cumulative basis as opposed to on a line by line basis), in each case, for such Variance Testing Period, by more than the Permitted Variance for such Variance Testing Period.

(c)     The Borrower shall deliver to the Administrative Agent and the Lenders on or before 5:00 p.m. (New York City time) on Thursday of each week (commencing on June 4, 2020) a certificate which shall include such detail as is reasonably satisfactory to the Required Lenders (which satisfaction may be communicated via an email from either of the Specified Lender Advisors), signed by a Responsible Officer of the Borrower certifying that (i) the Loan Parties are in compliance with the covenants contained in Section 5.13(a) and (b) and (ii) no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, together with an Approved Budget Variance Report, each of which shall be prepared by the Borrower as of the last day of the respective Variance Testing Period or other period then most recently ended, and shall be in a form and substance satisfactory to the Required Lenders in their sole discretion (which satisfaction may be communicated via an email from either of the Specified Lender Advisors).

(d)     The Administrative Agent and the Lenders (i) may assume that the Loan Parties will comply with the Approved Budget (subject to Permitted Variances), (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any

Approved Budget. The line items in the Approved Budget for payment of interest, expenses and other amounts to the Administrative Agent and the Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents regardless of whether such amounts exceed such estimates. Nothing in any Approved Budget shall constitute an amendment or other modification of any Loan Document or other lending limits set forth therein.

Section 5.14   Cash Flow Forecast.  The Borrower shall deliver to the Administrative Agent and the Specified Lenders Advisors (i) on Friday of every second week (commencing with the second Friday after the Petition Date), supplemental thirteen (13) week projections (the "**13-Week Cash Flow Forecast**") which shall set forth, on a weekly basis, among other things, cash receipts, operating disbursement amounts, liquidity and restructuring related amounts for the 13-week period, or (ii) on or before August 31, 2020, or such later date as may be agreed to by the Required Lenders, a 12-month post-emergence liquidity forecast (with the first three months being broken out weekly) (with any such agreement of the Required Lenders being able to be communicated via an email from either of the Specified Lender Advisors).  The projections delivered pursuant to this Section 5.14 shall not constitute the "Approved Budget" for any purpose hereunder.

Section 5.15   Monthly Calls and Status Update Calls.

(a)      on or prior to the tenth (10th) calendar day of each month (or the first Business Day thereafter), the Borrower shall conduct monthly telephone conferences with all Lenders and permit questions from such Lenders and answers, with such telephone conferences being split into (i) a Public-Siders and non-Public-Siders portion and (ii) a solely non-Public-Siders portion; provided that (I) questions from the Lenders shall be provided to the Borrower in writing no later than two (2) Business Days in advance and (II) for the avoidance of doubt, the Borrower shall not be obligated to disclose any material non-public information during the Public-Siders and non-Public-Siders portion of such telephone conferences;

(b)      on or prior to the tenth (10th) calendar day of each month (or the first Business Day thereafter), the Borrower shall conduct monthly telephone conferences solely with the Specified Lender Advisors and any Lenders which have become "restricted" and are then subject to non-disclosure agreements in customary form reasonably satisfactory to the Borrower (collectively, the "**Restricted Lenders**"), and permit questions from the Specified Lender Advisors and Restricted Lenders and provide answers; provided that, to the extent the Restricted Lenders monthly telephone conference is combined with the Public-Siders/non-Public-Siders telephone conference outlined in Section 5.15(a) hereof, such telephone conference will include a separate portion solely for Restricted Lenders; provided further that questions from the Specified Lender Advisors and Restricted Lenders shall be provided to the Borrower in writing no later than two (2) Business Days in advance;

(c)      at the request of the Specified Lender Advisors, weekly from and after the Petition Date through the Maturity Date, the Borrower shall hold a meeting (at a mutually agreeable location and time or telephonically) with management of the Borrower and the Specified Lender Advisors, which meeting, at the discretion of the Specified Lender Advisors, may include private side Lenders, public side Lenders and/or Restricted Lenders; provided, that

the Specified Lender Advisors shall (i) communicate the participants to the Borrower in advance of such call or meeting and (ii) provide an agenda in advance of such call or meeting (which exercise of discretion may be communicated via an email from either of the Specified Lender Advisors) regarding the financing results, operations, compliance of the Loan Parties and developments in the Chapter 11 Cases; provided, that any such meeting that occurs during the same week as the telephone conference outlined in Section 5.15(a) hereof may be combined with such telephone conference;

(d)     no less frequently than weekly from and after the Petition Date until the date of consummation, a representative of the investment banker engaged with respect to the Akorn India Private Ltd. sale process (the "**Akorn India Sale**") shall provide an email update every week to the Specified Lender Advisors on the status of such sale process (or email confirmation that there have been no material updates to such sale process);

(e)     the Borrower shall on or prior to the tenth (10th) calendar day of each month (or the first Business Day thereafter) arrange for monthly update calls among the Specified Lender Advisors and The Quantic Group and, to the extent then-engaged by the Borrower, NSF International and Ropes & Gray LLP; and

(f)     promptly upon any request of either Specified Lender Advisor hold a telephonic meeting with such Specified Lender Advisor regarding the financing results, operations, other business developments and developments in the Chapter 11 Cases.

The Required Lenders may waive any requirements set forth in this <u>Section 5.15</u> (which waiver may be communicated via e-mail by any Specified Lender Advisor).

Section 5.16    <u>Required Milestones</u>.   The Borrower shall, or shall cause the following to occur, by the times and dates set forth below (as any such time and date may be extended, or any of such milestone set forth below may be modified, with the consent of the Required Lenders (which consent, and any consent of the Required Lenders described below in clauses (a), (c), (d), (h) and (i), may be communicated via an email from either of the Specified Lender Advisors):

(a)     By no later than three (3) days following the Petition Date, the Bankruptcy Court shall enter the Interim Order.

(b)     By no later than three (3) days following the Petition Date, the Borrower or its financial and/or restructuring advisors shall complete initial outreach to each of the potential financing sources for the Permitted Exit ABL Credit Agreement identified to the Specified Lender Advisors in the contact log provided on May 15, 2020.

(c)     By no later than five (5) days after the Petition Date, the Borrower shall have filed the Chapter 11 Plan, Chapter 11 Plan Disclosure Statement, and the related motion seeking approval of the adequacy of the Chapter 11 Plan Disclosure Statement.

(d)     By no later than thirty (30) days following the Petition Date, the Bankruptcy Court shall enter the Final Order authorizing the DIP Facility, in form and substance reasonably acceptable to the Administrative Agent, the Required Lenders and the Borrower.

(e)    By no later than thirty (30) days following the Petition Date, the Borrower shall have obtained entry of an order from the Bankruptcy Court approving bidding procedures in respect of a Chapter 11 Sale Transaction which procedures are in form and substance acceptable to the Administrative Agent and the Required Lenders (the "**Bidding Procedures Order**");

(f)    By no later than thirty-three (33) days following the Petition Date, non-binding terms sheets to provide the Permitted Exit ABL Credit Agreement shall be due.

(g)    By no later than forty-three (48) days following the Petition Date (or such later date as may be required to accommodate the Bankruptcy Court's schedule), the Bankruptcy Court shall hold a hearing on the adequacy of the Chapter 11 Plan Disclosure Statement and enter an order approving the same, as well as solicitation of the Chapter 11 Plan within one (1) Business day thereof.

(h)    By no later than sixty-six (63) days following the Petition Date, binding commitment letters to provide the Permitted Exit ABL Credit Agreement shall be due.

(i)    By no later than seventy-five (75) days following the Petition Date, bids for the Sale Transaction shall be due.

(j)    By no later than eighty-two (82) days following the Petition Date, the Borrower shall conduct the auction, if applicable, for all or substantially all of the Borrower's consolidated assets pursuant to Section 363 of the Bankruptcy Code and the Bidding Procedures Order.

(k)    By no later than eighty-nine (89) days following the Petition Date, the Bankruptcy Court shall approve the Sale Transaction and enter an order in form and substance acceptable to the Required Lenders and the Borrower approving the Sale Transaction.

(l)    By no later than ninety-one (91) days following the Petition Date, the Bankruptcy Court shall enter an order confirming the Chapter 11 Plan in form and substance reasonably acceptable to the Required Lenders and the Borrower.

(m)    By no later than one hundred and three (103) days following the Petition Date, the Sale Transaction shall have closed and the effective date of the Chapter 11 Plan shall have occurred; provided that if regulatory approvals associated with a Sale Transaction remain pending as of such date, such date shall be automatically extended to the date that is the third Business Day following receipt of all necessary regulatory approvals.

Section 5.17    Specified Lender Advisors, Agent Advisors and Company Advisors.

(a)    The Agents, on behalf of themselves and the Lenders, the Lenders, and each of the Specified Lender Advisors, on behalf of itself and the Lenders, shall each be entitled to retain or continue to retain (either directly or through counsel) any advisor the Administrative Agent and the Ad Hoc Group of Lenders may deem necessary to provide advice, analysis and reporting for the benefit of the Administrative Agent or the Lenders, including without limitation the Agent Advisors.  The Loan Parties shall pay all fees and expenses of such advisors in

accordance with the Specified Lender Advisors Fee Letters and any other applicable fee or engagement letters, and all such fees and expenses shall constitute Obligations and be secured by the Collateral. The Loan Parties and their advisors shall grant access to, and cooperate in all respects with, the Agents, the Lenders and the Specified Lender Advisors and any other representatives of the foregoing and provide all information that such parties may request in a timely manner.

(b)     The Borrower shall continue to retain PJT Partners and AlixPartners as company advisors consistent with the terms of their respective engagement agreements as in effect on the Closing Date, or, if PJT Partners and AlixPartners are no longer retained by the Borrower, the Borrower shall retain such other financial and restructuring advisors reasonably acceptable to the Required Lenders (which acceptance may be communicated via an email from either of the Specified Lender Advisors).

Section 5.18    Additional Bankruptcy Matters.  Promptly provide the Administrative Agent, the Lenders and the Specified Lender Advisors with updates of any material developments in connection with the Loan Parties' reorganization efforts under the Chapter 11 Cases, whether in connection with the sale of all or substantially all of the Borrower's and its Subsidiaries' consolidated assets, the marketing of any Loan Parties' assets, the formulation of bidding procedures, an auction plan, and documents related thereto, or otherwise.

Section 5.19    Debtor-in-Possession Obligations.  Comply in a timely manner with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the Bankruptcy Rules, the DIP Order, and any other order of the Bankruptcy Court.

Section 5.20    Liquidation of WorldAkorn Pharma Mauritius.

(a)     In the event that, at least ten (10) Business Days prior to the closing of the Asset Purchase Agreement, the Akorn India Sale is consummated, then the Borrower shall, to the extent permissible under applicable law and any other legally binding obligations of any of its Subsidiaries who are not Loan Parties to, immediately prior to the closing of the Asset Purchase Agreement, declare and otherwise consummate any dividend, distribution or similar transaction (as may be requested by the Purchaser), or otherwise repay any intercompany Indebtedness, such that, subject to Section 5.20(d), all cash and cash equivalents of any such Person are held by a Loan Party as of immediately prior to the closing of the Asset Purchase Agreement.

(b)     In the event that the Akorn India Sale is consummated after the date that is ten (10) Business Days prior to the closing of the Asset Purchase Agreement, then subject to Section 5.20(d), the Borrower shall pay, or cause to be paid, to the Purchaser all cash and cash equivalents of any such Person and the net cash proceeds received in consideration therefor no later than the later of the closing date of the Asset Purchase Agreement and the date that is five (5) Business Days following receipt thereof.

(c)     In the event that the Akorn India Sale is consummated after the closing of the Asset Purchase Agreement, then, subject to Section 5.20(d), the Borrower shall pay or cause to be paid, to Purchaser all cash and cash equivalents of any such Person and the net cash

proceeds received in consideration therefor no later than the date that is five (5) Business Days following receipt therefor.

(d)    The cash and cash equivalents contemplated by Section 5.20(a), 5.20(b) and 5.20(c) and the net cash proceeds contemplated by Section 5.20(b) and 5.20(c) shall be determined net of (i) any applicable fees, expenses, and Taxes of the Borrower or any of its Subsidiaries in connection with consummation of the Akorn India Sale or in connection with the distribution of such amounts from the applicable Subsidiary to the applicable Loan Party, and (ii) any holdbacks, reserves, escrows, or other similar amounts in respect of indemnification, purchase price adjustments, or other contingent obligations of the Borrower or any of its Subsidiaries in connection with such sale or disposition or in connection with such distribution; provided that upon release, expiration, or other applicable termination of such contingent obligations, any such amounts, subject to the immediately preceding clause (i), shall be promptly paid to Purchaser.

## ARTICLE VI

## NEGATIVE COVENANTS

Until the Commitments shall have expired or been terminated and the principal of and interest on each Loan and all fees, expenses and other amounts payable under any Loan Document shall have been paid in full, in each case without any pending draw, each Loan Party executing this Agreement covenants and agrees from and after the Closing Date, jointly and severally with all of the other Loan Parties, with the Lenders that, unless consented to by the Required Lenders (which approval may be communicated via an email from either of the Specified Lender Advisors):

Section 6.01    Indebtedness.  No Loan Party will, nor will it permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Indebtedness, except:

(a)    the Secured Obligations;

(b)    [reserved];

(c)    Indebtedness existing on the Closing Date and set forth in Schedule 6.01;

(d)    Indebtedness of the Borrower or any Subsidiary to any Subsidiary that is a Loan Party or the Borrower or of any Subsidiary that is not a Loan Party to another Subsidiary that is not a Loan Party;

(e)    Guarantees by the Borrower of Indebtedness of any of its Subsidiaries that is a Loan Party, by any of its Subsidiaries of Indebtedness of the Borrower or any other Subsidiary that is a Loan Party and by any of its Subsidiaries that is not a Loan Party of Indebtedness of any other Subsidiary that is not a Loan Party, provided that (i) the Indebtedness so Guaranteed is permitted by this Section 6.01 and (ii) Guarantees permitted under this clause (e) shall be subordinated to the Secured Obligations of the applicable Subsidiary on the same terms as the Indebtedness so Guaranteed is subordinated to the Secured Obligations;

(f)      [reserved];

(g)      [reserved];

(h)      Indebtedness owed to any Person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business; and

(i)      Indebtedness of any Loan Party in respect of performance bonds, bid bonds, appeal bonds, surety bonds and similar obligations, in each case provided in the ordinary course of business.

Section 6.02   <u>Liens</u>.  No Loan Party will, nor will it permit any of its Subsidiaries to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(a)      Liens created pursuant to any Loan Document and the DIP Orders;

(b)      [reserved];

(c)      Liens permitted under the Cash Management Order;

(d)      Permitted Encumbrances;

(e)      the Carve-Out;

(f)      any Lien on any property or asset of the Borrower or any of its Subsidiaries existing on the Closing Date and set forth in <u>Schedule 6.02</u>; <u>provided</u> that (i) such Lien shall not apply to any other property or asset of the Borrower or such Subsidiary and (ii) such Lien shall secure only those obligations which it secures on the Closing Date;

(g)      Liens on fixed or capital assets acquired, constructed or improved by the Borrower or any of its Subsidiaries; <u>provided</u> that (i) such Liens secure Indebtedness permitted by clause (f) of Section 6.01, (ii) such Liens and the Indebtedness secured thereby are incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement, (iii) the Indebtedness secured thereby does not exceed 100% of the cost of acquiring, constructing or improving such fixed or capital assets and (iv) such Liens shall not apply to any other property or assets of the Borrower or such Subsidiary;

(h)      Liens securing the Pre-Petition First Lien Term Loan Credit Agreement and the other Pre-Petition Loan Documents;

(i)      Liens of a collecting bank arising in the ordinary course of business under Section 4-208 of the UCC in effect in the relevant jurisdiction covering only the items being collected upon;

(j)    to the extent constituting a Lien, rights of setoff, reserves and holdbacks against credit balances of a Loan Party or any of its Subsidiaries with credit card issuers or credit card processors to such Loan Party or any such Subsidiaries arising in the ordinary course of business; and

(k)    Cash Collateral and other deposits securing obligations arising after the Petition Date required under or imposed by the Bankruptcy Code.

Section 6.03    Fundamental Changes.  (a) Except in connection with the Chapter 11 Plan and the Sale Transaction, no Loan Party will, nor will it permit any of its Subsidiaries to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing (i) any Subsidiary of the Borrower may merge into the Borrower in a transaction in which the Borrower is the surviving corporation. (ii) any Loan Party (other than the Borrower) may merge into any other Loan Party in a transaction in which the surviving entity is a Loan Party, (iii) the Loan Parties and Subsidiaries may consummate transactions contemplated by the RSA and (iv) any applicable Subsidiary may consummate the Akorn India Sale and the transactions described in Section 5.20.

(b)    No Loan Party will, nor will it permit any of its Subsidiaries to, engage in any business other than businesses of the type conducted by the Borrower and its Subsidiaries on the Closing Date and businesses reasonably related thereto.

(c)    No Loan Party will change its fiscal year from the basis in effect on the Closing Date without the consent of the Administrative Agent (acting at the direction of the Required Lenders (which direction may be communicated via an email from either of the Specified Lender Advisors).

Section 6.04    Investments, Loans, Advances, Guarantees and Acquisitions.  No Loan Party will, nor will it permit any of its Subsidiaries to, (i) purchase, hold or acquire (including pursuant to any merger with any Person that was not a Loan Party and a wholly owned Subsidiary prior to such merger) any evidences of Indebtedness or Equity Interests or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, (ii) purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit, division, product line (including rights in respect of any drug or other pharmaceutical product) or line of business of such Person (whether through purchase of assets, merger or otherwise), or (iii) acquire an exclusive long-term license of rights to a drug or other product line of any Person, except:

(a)    Permitted Investments, subject to control agreements in favor of the Administrative Agent for the benefit of the Secured Parties or otherwise subject to a perfected security interest in favor of the Administrative Agent for the benefit of the Secured Parties;

(b)    investments in existence on the Closing Date and described in <u>Schedule 6.04</u>;

(c)    investments (i) by the Borrower and any of its Subsidiaries that are Loan Parties in Equity Interests in their respective Subsidiaries that are Loan Parties and (ii) by any Subsidiary of the Borrower that is not a Loan Party in Equity Interests in any of its Subsidiaries that is not a Loan Party;

(d)    loans or advances made (i) by any Loan Party to another Loan Party or (ii) made by any Subsidiary that is not a Loan Party to a Loan Party or any other Subsidiary that is not a Loan Party, <u>provided</u> that any such loans and advances made by a Subsidiary that is not a Loan Party to a Loan Party shall be subordinated to the Secured Obligations on terms acceptable to the Required Lenders (which acceptance may be communicated via an email from either of the Specified Lender Advisors);

(e)    investments necessary to effectuate the transactions contemplated by the RSA;

(f)    [reserved];

(g)    notes payable, or stock or other securities issued by Account Debtors to a Loan Party pursuant to negotiated agreements with respect to settlement of such Account Debtor's Accounts in the ordinary course of business;

(h)    investments constituting deposits described in clauses (c) and (d) of the definition of the term "**Permitted Encumbrances**"; and

(i)    Investments set forth in the Approved Budget.

Section 6.05    <u>Asset Sales</u>.  No Loan Party will, nor will it permit any of its Subsidiaries to, sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it, nor will the Borrower permit any of its Subsidiaries to issue any additional Equity Interest in such Subsidiary (other than to the Borrower or another Subsidiary in compliance with Section 6.04), except:

(a)    sales, transfers and dispositions of (i) Inventory in the ordinary course of business and (ii) used, obsolete, worn out or surplus Equipment or property in the ordinary course of business; <u>provided</u> that the fair market value of all such sales, transfers and dispositions permitted by this clause (ii) from and after the Closing Date shall not exceed $100,000;

(b)    sales, transfers and dispositions of assets to the Borrower or any of its Subsidiaries that is a Loan Party, <u>provided</u> that any such sales, transfers or dispositions involving a Subsidiary that is not a Loan Party shall be made in compliance with Section 6.09;

(c)    sales, transfers and dispositions of Accounts in connection with the compromise, settlement or collection thereof;

(d)     sales, transfers and dispositions of Permitted Investments and other investments permitted by clause (h) of Section 6.04;

(e)     other sales, transfers or dispositions pursuant to an order of the Bankruptcy Court which sale, transfer or disposition are consistent with the RSA and the Approved Budget;

(f)     dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the Borrower or any of its Subsidiaries;

(g)     sales, transfers and other dispositions consisting of divestitures required by applicable law or any Governmental Authority or other regulatory authority; and

(h)     sales, transfers and dispositions in connection with the Akorn India Sale, so long as the terms thereof are satisfactory to the Required Lenders in their sole discretion (which satisfaction may be communicated via an email from either of the Specified Lender Advisors);

provided that all sales, transfers, leases and other dispositions permitted hereby (other than those permitted by paragraphs (b) and (f) above) shall be made for fair value and for 100% cash consideration.

Section 6.06    Sale and Leaseback Transactions.  No Loan Party will, nor will it permit any Subsidiary to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred.

Section 6.07    Swap Agreements.  No Loan Party will, nor will it permit any of its Subsidiaries to, enter into any Swap Agreement.

Section 6.08    Restricted Payments; Pre-Petition Indebtedness.  (a) No Loan Party will, nor will it permit any of its Subsidiaries to, declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except (i) Restricted Payments to effectuate the transactions contemplated by the RSA, (ii) Subsidiaries may declare and pay dividends ratably with respect to their Equity Interests so long as any such recipient is a Loan Party or from a Subsidiary that is not a Loan Party to another Subsidiary that is not a Loan Party or a Subsidiary of a Loan Party, (iii) the Borrower may make Restricted Payments pursuant to and in accordance with stock option plans or other benefit plans for management or employees of the Borrower and its Subsidiaries.

(b)     No Loan Party will, nor will it permit any of its Subsidiaries to, make or agree to pay or make, directly or indirectly, (i) any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness incurred prior to the Petition Date (all such Indebtedness, including all loans under the Pre-Petition Term Loan Agreement, "**Pre-Petition Indebtedness**"), other than payment to certain creditors set forth in the Approved Budget and pursuant to an order of the Bankruptcy Court in

form and substance satisfactory to the Required Lenders (which satisfaction may be communicated via an email from either of the Specified Lender Advisors).  Furthermore, no Loan Party will, nor will it permit any of its Subsidiaries to, amend the documents evidencing any Pre-Petition Indebtedness other than as set forth in the RSA or the Chapter 11 Plan.

Section 6.09    Transactions with Affiliates.  No Loan Party will, nor will it permit any of its Subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions that (i) are in the ordinary course of business and (ii) are at prices and on terms and conditions not less favorable to such Loan Party or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among the Loan Parties not involving any other Affiliate, (c) any investment permitted by Sections 6.04(c) or 6.04(d), (d) any Indebtedness permitted under Section 6.01(d), (e) any Restricted Payment permitted by Section 6.08, (f) [reserved], (g) the payment of reasonable fees to directors of the Borrower or any of its Subsidiaries who are not employees of the Borrower or any of its Subsidiaries, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers, independent contractors, or employees of the Borrower or its Subsidiaries in the ordinary course of business and (h) any issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans approved by the Borrower's board of directors.

Section 6.10    Restrictive Agreements.  No Loan Party will, nor will it permit any of its Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of such Loan Party or any of its Subsidiaries to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary of any Loan Party to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by any Requirement of Law or by any Loan Document, (ii) the foregoing shall not apply to restrictions and conditions existing on the Closing Date identified on Schedule 6.10, (iii) [reserved], (iv) the foregoing shall not apply to restrictions and conditions imposed by Pre-Petition Indebtedness, (v) [reserved], (vi) clause (a) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof, (vii) the foregoing shall not apply to customary restrictions and conditions arising in connection with any sale, transfer, lease or disposition permitted by Section 6.05, (viii) the foregoing shall not apply to any restrictions or conditions set forth in any agreement in effect at any time any Person becomes a Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition); provided, that such agreement was not entered into in contemplation of such Person becoming a Subsidiary and the restriction or condition set forth in such agreement does not apply to the Borrower or any other Subsidiary, (ix) [reserved], (x) [reserved], (xi) the foregoing shall not apply to restrictions or conditions with respect to cash collateral so long as the Lien in respect of such cash collateral is permitted under Section 6.02, (xii) the foregoing shall not apply to customary net worth provisions contained in real property leases or licenses of intellectual property, so long as the Borrower has determined in good faith that such provisions could not reasonably be expected to impair the ability of the Borrower and the other Loan Parties

to make any payments required hereunder or otherwise satisfy the Obligations, (xiii) [reserved], (xiv) the foregoing shall not apply to customary provisions in joint venture agreements, limited liability company operating agreements, partnership agreements, stockholders agreements and other similar agreements, and (xv) the foregoing shall not apply to restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business.

Section 6.11    Amendment of Organizational Documents.  No Loan Party will, nor will it permit any of its Subsidiaries to, amend, modify or waive any of its rights under its certificate or articles of incorporation or organization, by-laws, operating, management or partnership agreement or other organizational documents, to the extent any such amendment, modification or waiver would be adverse to the Lenders.

Section 6.12    Minimum Actual Liquidity.  The Borrower shall not permit, as of the Friday of each calendar week following the Closing Date, Actual Liquidity to be less than Budgeted Liquidity (subject to Permitted Variance) for the two (2) most recently-ended consecutive weeks.

Section 6.13    Orders.  Notwithstanding anything to the contrary herein, use any portion or proceeds of the Loans or the Collateral, or disbursements set forth in the Approved Budget, for payments or purposes that would violate the terms of the DIP Order.

Section 6.14    Reclamation Claims.  Enter into any agreement to return any of its Inventory to any of its creditors for application against any Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims under Section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to Pre-Petition Indebtedness, Pre-Petition trade payables and other Pre-Petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $500,000.

Section 6.15    Insolvency Proceeding Claims.  Incur, create, assume, suffer to exist or permit any other super priority administrative claim which is pari passu with or senior to the claim of the Administrative Agent or the Lenders against the Debtors, except as set forth in the DIP Order.

Section 6.16    Bankruptcy Actions.  Seek, consent to, or permit to exist, without the prior written consent of the Required Lenders (which approval may be communicated via an email from either of the Specified Lender Advisors) (which consent shall constitute authorization under this Agreement), any order granting authority to take any action that is prohibited by the terms of this Agreement, the DIP Order or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of the DIP Order or any of the other Loan Documents.

# ARTICLE VII

# EVENTS OF DEFAULT

Section 7.01    Events of Default.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code to the extent provided in the DIP Order, with respect to the Debtors and without notice, application or motion, hearing before, or order of the Bankruptcy Court or any notice to any Loan Party, any of the following events shall constitute an "**Events of Default**":

(a)    the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement, when and as the same shall become due and payable, and such failure shall continue remedied for a period of three (3) days;

(c)    any representation or warranty made or deemed made by or on behalf of any Loan Party or any of its Subsidiaries in, or in connection with, this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been materially incorrect when made or deemed made;

(d)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section 5.01, 5.02(a), 5.02(c), 5.03 (with respect to a Loan Party's existence), clause (b) of Section 5.06, 5.08, 5.10, 5.12, 5.13, 5.14, 5.15, 5.16, 5.18, 5.19 or 5.20 or in Article VI;

(e)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Loan Document (other than those which constitute a default under another Section of this Article), and such failure shall continue unremedied for a period of five (5) days after the occurrence thereof;

(f)    [reserved];

(g)    [reserved];

(h)    [reserved];

(i)    [reserved];

(j)    [reserved];

(k)    solely with respect to pre-petition actions, (i) (i) one or more judgments for the payment of money in an aggregate amount in excess of $100,000 (after giving effect to

third-party insurance from a creditworthy insurer that has not denied coverage) shall be rendered against any Loan Party, any of its Subsidiaries or any combination thereof and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Loan Party or any of its Subsidiaries to enforce any such judgment; or (ii) any Loan Party or any of its Subsidiaries shall fail within thirty (30) days to discharge one or more non-monetary judgments or orders which, individually or in the aggregate, could reasonably be expected to result in liability in excess of $100,000, which judgments or orders, in any such case, are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued;

(l)    an ERISA Event shall have occurred that when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability to any Loan Party in excess of $100,000;

(m)    other than pursuant to the Chapter 11 Plan or the Sale Transaction, a Change in Control shall occur;

(n)    [reserved];

(o)    any Lien securing any Secured Obligation shall cease to be a perfected, first priority Lien (subject to the Carve-Out and other Liens specified in the DIP Orders) with respect to any material portion of the Collateral;

(p)    any Collateral Document shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of any Collateral Document;

(q)    any material provision of any Loan Document for any reason ceases (other than pursuant to its express terms) to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms); and

(r)    the occurrence of any of the following in any of the Chapter 11 Cases:

(i)    other than a motion in support of the DIP Order, the bringing of a motion, taking of any action or the filing of any plan of reorganization, plan of liquidation or disclosure statement attendant thereto by any of the Loan Parties or any Subsidiary in the Chapter 11 Cases: (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Liens permitted by Section 6.02; (C) except as provided in the DIP Order, to use cash collateral of the Administrative Agent and the other Secured Parties or Pre-Petition Lenders or Pre-Petition Agent under Section 363(c) of the Bankruptcy Code without the prior written consent of the Required Lenders (which approval may be communicated via an email from either of the Specified Lender Advisors); or (D) any other

action or actions adverse to the Agents and Lenders or their rights and remedies hereunder, under any other Loan Documents, or their interest in the Collateral;

(ii)    (A) other than in accordance with the RSA, (1) the filing of any plan of reorganization, plan of liquidation or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by (x) a Loan Party or (z) any other Person, in each case, that does not propose to indefeasibly repay in full in cash the Obligations under this Agreement on or before the effective date of such plan or plans and to which the Required Lenders do not consent or (2) if any of the Loan Parties or their Subsidiaries shall seek, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order that does not propose to indefeasibly repay in full in cash the Obligations under this Agreement on or before the effective date of such plan or plans, (B) the entry of any order terminating any Loan Party's exclusive right to file a plan of reorganization or plan of liquidation, or (C) the expiration of any Loan Party's exclusive right to file a plan of reorganization or plan of liquidation;

(iii)    the entry of an order in any of the Chapter 11 Cases confirming a plan of reorganization or plan of liquidation that is not in accordance with the RSA or otherwise acceptable to the Required Lenders in their sole discretion (which acceptance may be communicated via an email from either of the Specified Lender Advisors), other than to the extent that such plan of reorganization or plan of liquidation provides for the termination of the Commitments and indefeasible repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan or plans;

(iv)    (x) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the DIP Order, the Cash Management Order or any other order with respect to any of the Chapter 11 Cases affecting in any material respect this Agreement and/or the other Loan Documents (including any order in respect of the Required Milestones specified herein) without the written consent of the Required Lenders or the filing by a Loan Party of a motion for reconsideration with respect to the DIP Order or the Cash Management Order shall otherwise not be in full force and effect or (y) any Loan Party or any Subsidiary shall fail to comply with the DIP Order, the Cash Management Order or any other order with respect to any of the Chapter 11 Cases affecting in any material respect this Agreement and/or the other Loan Documents, in any material respect;

(v)    the Bankruptcy Court's (A) entry of an order granting relief from the automatic stay under Section 362 of the Bankruptcy Code to permit foreclosure of security interests in assets of the Loan Parties of a value in excess of $100,000; or (B) entry of an order terminating exclusivity having been entered (or such an order is sought by any party and not actively contested by the Loan Parties);

(vi)    the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Agents, any Lender or any of the Collateral or against the Pre-Petition Agent, any Pre-Petition Lender or any Pre-Petition Collateral;

(vii)    the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a trustee receiver or an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties;

(viii)    (A) the dismissal of any Chapter 11 Case or (B) any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise;

(ix)    any Loan Party shall file a motion (without consent of the Required Lenders) seeking, or the Bankruptcy Court shall enter an order granting, relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor (other than the Administrative Agent) to execute upon or enforce a Lien on any Collateral, (B) approving any settlement or other stipulation not approved by the Required Lenders with any creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor (which approval may be communicated via an email from either of the Specified Lender Advisors) or (C) to permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole);

(x)    the entry of an order in the Chapter 11 Cases avoiding or requiring the disgorgement of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents or the Pre-Petition Obligations owing under the Pre-Petition Loan Documents;

(xi)    the failure of any Loan Party to perform any of its obligations under the DIP Order, the Cash Management Order, or any order of the Bankruptcy Court approving any Transaction or to perform in any material respect its obligations under any order of the Bankruptcy Court approving bidding procedures;

(xii)    the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than in respect of this Agreement and the other Loan Documents, or as otherwise permitted under the applicable Loan Documents or permitted under the DIP Order, entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code pari passu with or senior to the claims of the Administrative Agent and the Secured Parties under this Agreement and the other Loan Documents, or there shall arise or be granted by the Bankruptcy Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code or (ii) any Lien on the Collateral having a priority

senior to or pari passu with the Liens and security interests granted herein, except, in each case, as expressly provided in the Loan Documents or in the DIP Order then in effect (including the Carve-Out), whichever is in effect;

(xiii)    the DIP Order shall cease to create a valid and perfected Lien (which creation and perfection shall not require any further action other than the entry of and terms of the DIP Order) on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the Required Lenders;

(xiv)    an order in the Chapter 11 Cases shall be entered (i) charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Administrative Agent and the Secured Parties, or the "Secured Parties" under the Pre-Petition First Lien Term Loan Credit Agreement, or (ii) limiting the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Pre-Petition Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Loan Party after the Petition Date, or the commencement of other actions that is materially adverse to the Administrative Agent, the Secured Parties or their respective rights and remedies under the Loan Documents in any of the Chapter 11 Cases or inconsistent with any of the Loan Documents;

(xv)    any order having been entered or granted (or requested, unless actively opposed by the Loan Parties) by either the Bankruptcy Court or any other court of competent jurisdiction materially adversely impacting the rights and interests of the Agents and the Lenders, as determined by the Required Lenders, acting reasonably, without the prior written consent of the impacted Agent and the Required Lenders;

(xvi)    an order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Loan Parties authorized by the DIP Order;

(xvii)    if the Final Order does not include a waiver, in form and substance satisfactory to the Administrative Agent and the Lenders (which satisfaction may be communicated via an email from either of the Specified Lender Advisors), of (i) the right to subcharge the Collateral under Section 506(c) of the Bankruptcy Code and (ii) any ability to limit the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Pre-Petition Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Loan Party after the Petition Date;

(xviii)    any Loan Party shall challenge, support or encourage a challenge of any payments made to the Agents or any Lender with respect to the Obligations or to the Pre-Petition Agent or the Pre-Petition Lenders with respect to the Pre-Petition Obligations, or without the consent of the Administrative Agent and the

Required Lenders, the filing of any motion by the Loan Parties seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any Pre-Petition agent or lender that is inconsistent with the DIP Order;

(xix)    without the Administrative Agent's and the Required Lenders' consent, the entry of any order by the Bankruptcy Court granting, or the filing by any Loan Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court (in each case, other than the DIP Order and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral without the Administrative Agent's and the Required Lenders' consent or to obtain any financing under Section 364 of the Bankruptcy Code other than the Loan Documents;

(xx)    if, unless otherwise approved by the Administrative Agent and the Required Lenders (which approval of the Required Lenders may be communicated via an email from either of the Specified Lender Advisors, and which approval of the Administrative Agent may be communicated via an email from Wilmer Cutler Pickering Hale and Dorr LLP), an order of the Bankruptcy Court shall be entered providing for a change in venue with respect to the Chapter 11 Cases and such order shall not be reversed or vacated within 10 days;

(xxi)    without Required Lender consent (which approval may be communicated via an email from either of the Specified Lender Advisors), any Loan Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court seeking (a) to grant or impose, under Section 364 of the Bankruptcy Code or otherwise, liens or security interests in any Collateral, whether senior or equal to the Administrative Agent's liens and security interests (except as provided in the DIP Order); or (b) to modify or affect any of the rights of the Agents or the Lenders under the DIP Order, the Loan Documents, and related documents, other than in accordance with the Chapter 11 Plan;

(xxii)    any Loan Party or any Subsidiary thereof or any Debtor shall take any action in support of any matter set forth in this Section 7.01(r) or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal;

(xxiii)    any Debtor shall be enjoined from conducting any material portion of its business, any disruption of the material business operations of the Debtors shall occur, or any material damage to or loss of material assets of any Debtor shall occur;

(xxiv)    failure of the Borrower or any other Loan Party to use the proceeds of the Loans as set forth in and in compliance with the Approved Budget (subject to Permitted Variance) and this Agreement; or

(xxv)   the occurrence of any RSA Termination Event (unless waived in accordance with the terms of the RSA).

Section 7.02    <u>Remedies Upon an Event of Default</u>.

(a)      Subject to the terms of the DIP Order and to the Remedies Notice Period, if any Event of Default occurs and is continuing, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Bankruptcy Court, then, the Administrative Agent upon the direction of the Required Lenders (subject to Article IX) shall declare the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement immediately become due and payable, but without affecting the Administrative Agent's Liens or the Obligations, and the Administrative Agent upon the request of the Required Lenders (subject to Article IX) shall: (i) terminate, reduce or restrict the right or ability of the Loan Parties to use any cash collateral; (ii) declare the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement to be due and payable forthwith, whereupon the same shall immediately become due and payable, (iii) subject to the Remedies Notice Period, (A) exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable law or (B) take any and all actions described in the DIP Order; and (iv) deliver a Carve-Out Trigger Notice.

(b)      At any hearing during the Remedies Notice Period to contest the enforcement of remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred, and the Loan Parties hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in way impair or restrict the rights and remedies of the Administrative Agent or the Secured Parties, as set forth in this Agreement, the applicable DIP Order or other Loan Documents. Except as expressly provided above in this Article VII, to the maximum extent permitted by applicable law, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

Section 7.03    <u>License; Access; Cooperation</u>. Subject to any previously granted licenses, the Administrative Agent is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (to the extent permitted under the applicable licenses and without payment of royalty or other compensation to any Person) any or all intellectual property of Loan Parties, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral (with respect to trademarks subject to reasonable quality control in favor of the Borrower) in each case after the occurrence, and during the continuance, of an Event of Default. The Administrative Agent (together with its agents, representatives and designees) is hereby granted a non-exclusive right to have access to, and a rent free right to use, any and all owned or leased locations (including, without limitation, warehouse locations, distribution centers and store locations) for the purpose of arranging for and effecting the sale or disposition of Collateral, including the production, completion, packaging and other preparation of such Collateral for sale or disposition (it being understood and agreed that the Administrative Agent and its representatives (and persons employed on their behalf), may continue to operate,

service, maintain, process and sell the Collateral, as well as to engage in bulk sales of Collateral). Upon the occurrence and the continuance of an Event of Default and the exercise by the Administrative Agent or Lenders of their rights and remedies under this Agreement and the other Loan Documents, Borrower shall assist the Administrative Agent and Lenders in effecting a sale or other disposition of the Collateral upon such terms as are reasonably acceptable to the Administrative Agent and Required Lenders (which acceptance may be communicated via an email from either of the Specified Lender Advisors).

## ARTICLE VIII

## THE AGENTS

Section 8.01    Appointment.

(a)    Each of the Lenders, on behalf of itself and any of its Affiliates that are Secured Parties hereby irrevocably appoints Wilmington Savings Fund Society, FSB as Administrative Agent and Escrow Agent hereunder and under the other Loan Documents, and authorizes the Agents to take such actions on its behalf, including execution of the other Loan Documents, and to exercise such powers as are delegated to the Agents by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.  In addition, to the extent required under the laws of any jurisdiction other than the U.S., each of the Lenders hereby grants to the Agents any required powers of attorney to execute any Collateral Document governed by the laws of such jurisdiction on such Lender's behalf.  The provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and the Loan Parties shall not have rights as a third party beneficiary of any of such provisions.  It is understood and agreed that the use of the term "agent" as used herein or in any other Loan Documents (or any similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)    Each Lender hereby irrevocably authorizes the Administrative Agent, based upon the instruction of the Required Lenders (but subject in all respects to the RSA), to credit bid and purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted by the Administrative Agent under the provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC (or any equivalent provision of the UCC), at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, or at any other sale or foreclosure conducted by the Administrative Agent (whether by judicial action or otherwise) in accordance with applicable Requirements of Law.

(c)    Each Lender irrevocably appoints each other Lender as its agent and bailee for the purpose of perfecting Liens (whether pursuant to Section 8-301(a)(2) of the UCC or otherwise), for the benefit of the Secured Parties, in assets in which, in accordance with the UCC or any other applicable Requirement of Law a security interest can be perfected by possession or control.  Should any Lender (other than the Administrative Agent) obtain possession or control of any such Collateral, such Lender shall notify the Administrative Agent

thereof, and, promptly following the Administrative Agent's request therefor, shall deliver such Collateral to the Administrative Agent or otherwise deal with such Collateral in accordance with the Administrative Agent's instructions.

Section 8.02    Rights as a Lender.  If applicable, the bank serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with any Loan Party or any Subsidiary or any Affiliate thereof as if it were not an Agent hereunder.

Section 8.03    Duties and Obligations.  The Agents shall not have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) the Agents shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Agents shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Loan Documents that an Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02), and, (c) except as expressly set forth in the Loan Documents, the Agents shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Loan Party or any Subsidiary that is communicated to or obtained by the bank serving as an Agent or any of its Affiliates in any capacity.  The Agents shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence or willful misconduct as determined by a final nonappealable judgment of a court of competent jurisdiction.  The Agents shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Agents by the Borrower or a Lender, and the Agents shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or in connection with any Loan Document, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the creation, perfection or priority of Liens on the Collateral or the existence of the Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to an Agent.

Section 8.04    Reliance.  The Agents shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  The Agents also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.  The Agents may consult with legal counsel, independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 8.05   Actions through Sub-Agents.  The Agents may perform any and all of their duties and exercise their rights and powers by or through any one or more sub-agents appointed by such Agent.  The Agents and any such sub-agent may perform any and all of its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs and the indemnification provisions in Section 9.03 shall apply to any such sub-agent and to the Related Parties of the Agents and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agents.

Section 8.06   Resignation.  Subject to the appointment and acceptance of a successor Agent as provided in this paragraph, any Agent may resign at any time by notifying the Lenders and the Borrower.  Upon any such resignation, the Required Lenders shall have the right (in consultation with, but in no circumstances subject to the consent of, the Borrower), to appoint a successor.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent.  Upon the acceptance of its appointment as an Agent hereunder by its successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents.  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor, unless otherwise agreed by the Borrower and such successor.  Notwithstanding the foregoing, in the event no successor Agent shall have been so appointed and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its intent to resign, the retiring Agent may give notice of the effectiveness of its resignation to the Lenders and the Borrower, whereupon, on the date of effectiveness of such resignation stated in such notice, (a) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents, provided that, solely for purposes of maintaining any security interest granted to the Administrative Agent under any Collateral Document for the benefit of the Secured Parties, the retiring Administrative Agent shall continue to be vested with such security interest as collateral agent for the benefit of the Secured Parties and, in the case of any Collateral in the possession of the Administrative Agent, shall continue to hold such Collateral, in each case until such time as a successor Administrative Agent is appointed and accepts such appointment in accordance with this paragraph (it being understood and agreed that the retiring Administrative Agent shall have no duly or obligation to take any further action under any Collateral Document, including any action required to maintain the perfection of any such security interest), and (b) the Required Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, provided that (i) all payments required to be made hereunder or under any other Loan Document to the Agent for the account of any Person other than the Agent shall be made directly to such Person and (ii) all notices and other communications required or contemplated to be given or made to an Agent shall also directly be given or made to each Lender.  Following the effectiveness of an Agent's resignation from its capacity as such, the provisions of this Article, Section 2.17(d) and Section 9.03, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Loan Document, shall continue in effect for the benefit of such retiring Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent and in respect of the matters referred to in the proviso under clause (a) above.

Section 8.07    Non-Reliance.

(a)    Each Lender acknowledges and agrees that the extensions of credit made hereunder are commercial loans and letters of credit and not investments in a business enterprise or securities.  Each Lender further represents that it is engaged in making, acquiring or holding commercial loans in the ordinary course of its business and has, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Lender, and to make, acquire or hold Loans hereunder.  Each Lender shall, independently and without reliance upon the Agents or any other Lender and based on such documents and information (which may contain material, non-public information within the meaning of the United States securities laws concerning the Borrower and its Affiliates) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document, any related agreement or any document furnished hereunder or thereunder and in deciding whether or to the extent to which it will continue as a Lender or assign or otherwise transfer its rights, interests and obligations hereunder.

(b)    Each Lender hereby agrees that (i) it has requested a copy of each Report prepared by or on behalf of the Administrative Agent; (ii) the Administrative Agent (A) makes no representation or warranty, express or implied, as to the completeness or accuracy of any Report or any of the information contained therein or any inaccuracy or omission contained in or relating to a Report and (B) shall not be liable for any information contained in any Report; (iii) the Reports are not comprehensive audits or examinations, and that any Person performing any field examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel and that the Administrative Agent undertakes no obligation to update, correct or supplement the Reports; (iv) it will keep all Reports confidential and strictly for its internal use, not share the Report with any Loan Party or any other Person except as otherwise permitted pursuant to this Agreement; and (v) without limiting the generality of any other indemnification provision contained in this Agreement, it will pay and protect, and indemnify, defend, and hold the Administrative Agent and any such other Person preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including reasonable attorneys' fees) incurred by the Administrative Agent or any such other Person as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

Section 8.08    [Reserved].

Section 8.09    Not Partners or Co-Venturers; Administrative Agent as Representative of the Secured Parties.  (a) The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agents) authorized to act for, any other Lender.  The Administrative Agent shall have the exclusive right on behalf of the Lenders to enforce the payment of the principal of and interest on any Loan after the date such principal or interest has become due and payable pursuant to the terms of this Agreement.

(b)     In its capacity, the Administrative Agent is a "representative" of the Secured Parties within the meaning of the term "secured party" as defined in the New York Uniform Commercial Code.  Each Lender authorizes the Administrative Agent to enter into each of the Collateral Documents to which it is a party and to take all action contemplated by such documents.  Each Lender agrees that no Secured Party (other than the Administrative Agent) shall have the right individually to seek to realize upon the security granted by any Collateral Document, it being understood and agreed that such rights and remedies may be exercised solely by the Administrative Agent for the benefit of the Secured Parties upon the terms of the Collateral Documents.  In the event that any Collateral is hereafter pledged by any Person as collateral security for the Secured Obligations, the Administrative Agent is hereby authorized, and hereby granted a power of attorney, to execute and deliver on behalf of the Secured Parties any Loan Documents necessary or appropriate to grant and perfect a Lien on such Collateral in favor of the Administrative Agent on behalf of the Secured Parties.

Section 8.10    Lender Action.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures or cause any of the foregoing (through Affiliates or otherwise), with respect to any Collateral or any other Property of any such Loan Party, without the prior written consent of the Administrative Agent (at the direction of the Required Lenders).  Without limiting the foregoing, each Lender agrees that, except as otherwise provided in any Loan Documents or with the written consent of the Administrative Agent (at the direction of the Required Lenders), it will not take any enforcement action, accelerate Obligations under any Loan Documents, or exercise any right that it might otherwise have under applicable Legal Requirements to credit bid or purchase any portion of the Collateral at any sale or foreclosure thereof referred to in Section 8.01; provided that nothing contained in this Section shall affect any Lender's right to credit bid its pro rata share of the Obligations pursuant to Section 363(k) of the Bankruptcy Code.

Section 8.11    Collateral Documents and Loan Guaranties.

(a)     Agent under Collateral Documents and Loan Guaranties.  Each Secured Party hereby further authorizes the Administrative Agent, on behalf of and for the benefit of the Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Loan Guaranties, the Collateral and the Loan Documents.  Subject to Section 9.03, without further written consent or authorization from any Secured Party, the Administrative Agent (acting at the Required Lenders' direction) may execute any documents or instruments necessary to in connection with a sale or disposition of assets permitted by this Agreement, release any Lien encumbering any item of Collateral that is the subject of such sale or other disposition of assets.

(b)     Right to Realize on Collateral and Enforce Loan Guaranty.  Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrower, the Agents, each Secured Party and each Loan Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Loan Guaranty, it being understood and agreed that all powers, rights and remedies hereunder and under any of

the Loan Documents may be exercised solely by the Administrative Agent for the benefit of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Administrative Agent for the benefit of the Secured Parties in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by the Administrative Agent on any of the Collateral pursuant to a public or private sale or other disposition (including, without limitation, pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), the Administrative Agent (or any Lender, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code) may, upon instructions from the Required Lenders, be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Administrative Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities) shall be entitled, upon instructions from the Required Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Administrative Agent at such sale or other disposition.

(c)     Release of Collateral and Guarantees, Termination of Loan Documents.

(i)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent (at the direction of the Required Lenders) shall take such actions as shall be required to release its security interest in any Collateral subject to any sale or other disposition permitted by the Loan Documents.

(ii)     Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Secured Obligations have been paid in full and all Commitments have terminated or expired, upon request of the Borrower, the Administrative Agent shall (without notice to, or vote or consent of, any Lender, or any other Secured Party) take such actions as shall be required or reasonably requested to release its security interest in all Collateral, and to release all guarantee obligations provided for in any Loan Document.  Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Loan Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Loan Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(d)     The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the

Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

Section 8.12    Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim.  In case of the pendency of any proceeding under the Bankruptcy Code or any other debtor relief laws relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)    to file a verified statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure that, in its sole opinion, complies with such rule's disclosure requirements for entities representing more than one creditor;

(b)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its respective agents and counsel and all other amounts due the Administrative Agent under this Agreement) allowed in such judicial proceeding; and

(c)    to collect and receive any monies or other Property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under this Agreement.  To the extent that the payment of any such compensation, expenses, disbursements and advances of the Administrative Agent, its agents and counsel, and any other amounts due the Administrative Agent under this Agreement out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Lenders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, plan of liquidation, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

## ARTICLE IX

## MISCELLANEOUS

Section 9.01   Notices.  (a) Except in the case of notices and other communications expressly permitted to be given by telephone or Electronic Systems (and subject in each case to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

(i)      if to any Loan Party, to the Borrower at Akorn, Inc., 1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045, Attention: Duane Portwood; Joe Bonaccorsi (Telephone No. (212) 892-1008; Telecopy No. (212) 656-1219; (847) 220-3626; email: duane.portwood@akorn.com; joe.bonaccorsi@akorn.com));

(ii)      if to an Agent, to Wilmington Savings Fund Society, FSB, Attention: Geoffrey J. Lewis (Telephone No. (302)573-3218; email: glewis@wsfsbank.com), with copies by electronic mail (which shall not constitute notice) to: Wilmer Cutler Pickering Hale and Dorr LLP, Attention: Andrew Goldman (Telephone No. (212) 230-8836; email: andrew.goldman@wilmerhale.com); and

(iii)      if to any other Lender, to it at its address or facsimile number set forth in its Administrative Questionnaire.

All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, (ii) sent by facsimile shall be deemed to have been given when sent, provided that if not given during normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day of the recipient, or (iii) delivered through Electronic Systems to the extent provided in paragraph (b) below shall be effective as provided in such paragraph.

(b)      Notices and other communications to the Lenders hereunder may be delivered or furnished by Electronic Systems pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article II or to compliance and no Default certificates delivered pursuant to Section 5.01(d) unless otherwise agreed by the Administrative Agent and the applicable Lender.  Each of the Agents and the Borrower (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.  Unless the Administrative Agent otherwise proscribes, all such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if not given during the normal business hours of the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an

Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; <u>provided</u> that, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.

(c)     Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

(d)     <u>Electronic Systems</u>.

(i)     Each Loan Party agrees that the Administrative Agent may, but shall not be obligated to, make Communications (as defined below) available to the Lenders by posting the Communications on Debt Domain, Intralinks, Syndtrak, ClearPar or a substantially similar Electronic System.

(ii)     Any Electronic System used by the Administrative Agent is provided "as is" and "as available."  The Agent Parties (as defined below) do not warrant the adequacy of such Electronic Systems and expressly disclaim liability for errors or omissions in the Communications.  No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or any Electronic System.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Borrower or the other Loan Parties, any Lender any other Person or entity for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's, any Loan Party's or the Administrative Agent's transmission of communications through an Electronic System.  "**Communications**" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed by the Administrative Agent or any Lender by means of electronic communications pursuant to this Section, including through an Electronic System.

Section 9.02   <u>Waivers; Amendments</u>.  (a) No failure or delay by the Agents or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Agents and the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of

any provision of this Agreement or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Agents or any Lender may have had notice or knowledge of such Default at the time.

(b)    Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders (unless otherwise expressly provided herein with respect to modifications approved by the Required Lenders and communicated via an email from either or both of the Specified Lender Advisors); provided that no such agreement shall, without the consent of each Lender directly and adversely affected thereby (including any such Lender that is a Defaulting Lender but without the consent of the Required Lenders):  (i) increase the Commitment of such Lender (and no other Lender shall be deemed to be directly and adversely affected by the increase of another Lender's Commitment), (ii) reduce or forgive the principal amount of any Loan or reduce the rate of interest thereon, or reduce or forgive any interest or fees payable hereunder (it being understood that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the Default Rate or amend Section 2.13(c), to waive any Default or Event of Default or to waive Section 2.11(c)), or (iii) postpone any scheduled date of payment of the principal amount of any Loan, or any date for the payment of any interest, fees or other Obligations payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of such Lender (it being understood that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the Default Rate or amend Section 2.13(c), to waive any Default or Event of Default or to waive Section 2.11(c)); provided, further that no such agreement shall, without the consent of each Lender (other than any Defaulting Lender), (i) change any of the provisions of this Section or the definition of "**Required Lenders**" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, (ii) release all or substantially all of the value of the Loan Guarantors (taken as a whole) (except as otherwise permitted herein or in the other Loan Documents), (iii) except as provided in clause (c) of this Section or in any Collateral Document, release all or substantially all of the Collateral, or (iv) permit any Loan Party to assign its rights or obligations under any Loan Document.  In addition, no such agreement shall amend, modify or otherwise affect the rights or duties of the Agents hereunder without the prior written consent of the affected Agent.  The Administrative Agent may also amend the Commitment Schedule to reflect assignments entered into pursuant to Section 9.04.

(c)    The Lenders hereby irrevocably authorize the Administrative Agent, at its option and in its sole discretion, to release any Liens granted to the Administrative Agent by the Loan Parties on any Collateral (i) upon the termination of the Commitments, payment and satisfaction in full in cash of all Secured Obligations (other than Unliquidated Obligations), and the cash collateralization of all Unliquidated Obligations in a manner reasonably satisfactory to each affected Lender, (ii) constituting property being sold or disposed of pursuant to Section 6.05(a) if the Loan Party disposing of such property certifies to the Administrative Agent that the

sale or disposition is made in compliance with the terms of this Agreement (and the Administrative Agent may rely conclusively on any such certificate, without further inquiry), (iii) constituting property leased to a Loan Party under a lease which has expired or been terminated in a transaction permitted under this Agreement if the Loan Party leasing such property certifies to the Administrative Agent that the relevant transaction is made in compliance with the terms of this Agreement (and the Administrative Agent may rely conclusively on any such certificate, without further inquiry), or (iv) as required to effect any sale or other disposition of such Collateral in connection with any exercise of remedies of the Administrative Agent and the Lenders pursuant to Article VII.  Except as provided in the preceding sentence, the Administrative Agent will not release any Liens on Collateral without the prior written authorization of the Required Lenders.  Any such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of the Loan Parties in respect of) all interests retained by the Loan Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral.  Any execution and delivery by the Administrative Agent of documents in connection with any such release shall be without recourse to or warranty by the Administrative Agent.

(d)    If, in connection with any proposed amendment, waiver or consent requiring the consent of "each Lender" or "each Lender affected thereby," the consent of the Required Lenders is obtained, but the consent of other necessary Lenders is not obtained (any such Lender whose consent is necessary but not obtained being referred to herein as a "**Non-Consenting Lender**"), then the Borrower may elect to replace a Non-Consenting Lender as a Lender party to this Agreement, provided that, concurrently with such replacement, (i) another bank or other entity which is reasonably satisfactory to the Borrower and the Administrative Agent shall agree, as of such date, to purchase for cash at par the Loans and other Obligations due to the Non-Consenting Lender pursuant to an Assignment and Assumption and to become a Lender for all purposes under this Agreement and to assume all obligations of the Non-Consenting Lender to be terminated as of such date and to comply with the requirements of clause (b) of Section 9.04, and (ii) the Borrower shall pay to such Non-Consenting Lender in same day funds on the day of such replacement (1) all interest, fees and other amounts then accrued but unpaid to such Non-Consenting Lender by the Borrower hereunder to and including the date of termination, including without limitation payments due to such Non-Consenting Lender under Sections 2.15 and 2.17, and (2) an amount, if any, equal to the payment which would have been due to such Lender on the day of such replacement under Section 2.16 had the Loans of such Non-Consenting Lender been prepaid on such date rather than sold to the replacement Lender.

Section 9.03    Expenses; Indemnity; Damage Waiver.  (a) The Loan Parties shall, jointly and severally, pay promptly following demand all reasonable and documented legal, accounting, appraisal, consulting, financial advisory and other fees, costs and expenses (including, without limitation, in respect of the Specified Lender Advisors and the Agent Advisors) incurred by the Agents, the Ad Hoc Group of Lenders, the Lenders and their respective Affiliates in connection with the negotiation, preparation and administration of the Loan Documents, the Interim Order, and the Final Order or incurred in connection with:

(i)    amendment, modification or waiver of, consent with respect to, or termination of, any of the Loan Documents or advice in connection with the

syndication and administration of the Loans made pursuant hereto, including any Withdrawal, or its rights hereunder or thereunder;

(ii)    any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Agents, any Lender, the Borrower or any other Person and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the Loan Documents, the Pre-Petition Loan Documents, or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case or proceeding commenced by or against the Borrower or any other Person that may be obligated to the Agents or the Lenders by virtue of the Loan Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Loans during the pendency of one or more Events of Default; provided that no Person shall be entitled to reimbursement under this clause (ii) in respect of any litigation, contest, dispute, suit, proceeding or action to the extent any of the foregoing results from such Person's gross negligence or willful misconduct (as determined by a final non-appealable judgment of a court of competent jurisdiction);

(iii)    any attempt to enforce or prosecute any rights or remedies of the Agents or any Lender against any or all of the Loan Parties or any other Person that may be obligated to the Agents or any Lender by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Loans prior to or during the pendency of one or more Events of Default;

(iv)    any work-out or restructuring of the Obligations prior to or during the pendency of one or more Events of Default;

(v)    all Other Taxes in respect of the Loan Documents;

(vi)    the obtaining of approval of the Loan Documents by the Bankruptcy Court or any other court;

(vii)    the preparation and review of pleadings, documents and reports related to the Chapter 11 Cases and any Successor Cases, attendance at meetings, court hearings or conferences related to the Chapter 11 Cases and any Successor Cases, and general monitoring of the Chapter 11 Cases and any Successor Cases and any action, arbitration or other proceeding (whether instituted by or against the Agents, any Lender, any Loan Party, any representative of creditors of an Loan Party or any other Person) in any way relating to any Collateral (including the validity, perfection, priority or avoidability of the Administrative Agent's Liens with respect to any Collateral), the Pre-Petition Loan Documents, Loan Documents or the Obligations, including any lender liability or other claims;

(viii)    efforts to (1) monitor the Loans or any of the other Obligations, (2) evaluate, observe or assess any of the Loan Parties or their respective affairs, (3) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral or (4) settle or otherwise satisfy any taxes, charges or Liens with respect to any Collateral;

(ix)    any lien searches or request for information listing financing statements or liens filed or searches conducted to confirm receipt and due filing of financing statements and security interests in all or a portion of the Collateral; and

(x)    including, as to each of clauses (i) through (ix) above, all reasonable attorneys' and other professional and service providers' fees arising from such services and other advice, assistance or other representation, including those in connection with any appellate proceedings, and all reasonable expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 9.03, all of which shall be payable by Borrower to the Agents or the Lenders.

Without limiting the generality of the foregoing, such reasonable expenses, costs, charges and fees may include: reasonable fees, costs and expenses of accountants, sales consultants, financial advisors, the Agent Advisors, any Specified Lender Advisors, any Lender Advisor, environmental advisors, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; air express charges, and reasonable expenses for travel, lodging and food paid or incurred in connection with the performance of such legal, professional or other advisory services.

(b)    The Loan Parties shall, jointly and severally, indemnify the Agents and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all actual losses, claims, damages, penalties, incremental taxes, liabilities and related expenses, including the reasonable fees, charges and disbursements of the Specified Lender Advisors, any Lender Advisor and Agent Advisors, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby and the enforcement of the obligations thereunder, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by a Loan Party or a Subsidiary, or any Environmental Liability related in any way to a Loan Party or a Subsidiary, (iv) the failure of a Loan Party to deliver to the Administrative Agent the required receipts or other required documentary evidence with respect to a payment made by a Loan Party for Taxes pursuant to Section 2.17, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses (1) are determined by a court of competent jurisdiction by final and

nonappealable judgment to have resulted from (A) the gross negligence, bad faith or willful misconduct of such Indemnitee (or its Related Parties), or (B) a claim made by the Borrower alleging the material breach of the Loan Documents by such Indemnitee (or its Related Parties) or (2) arise from any disputes solely among Indemnitees (other than any claims against an Indemnitee in its capacity or in fulfilling its role as the Administrative Agent or similar role under the Loan Documents and any other claims arising out of any act or omission of the Borrower or any of its Affiliates).  This Section 9.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(c)    To the extent that a Loan Party fails to pay any amount required to be paid by it to an Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to such Agent such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount (it being understood that the payment by any Lender of any such amount shall not relieve such Loan Party of any default in the payment thereof); provided that the unreimbursed expense or indemnified loss, claim, damage, penalty, liability or related expense, as the case may be, was incurred by or asserted against the such Agent in its capacity as such.

(d)    To the extent permitted by applicable law, no party hereto shall assert, and each such party hereby waives, any claim against any other party hereto (i) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet) or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof; provided that, nothing in this paragraph (d) shall relieve any Loan Party of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(e)    All amounts reimbursable by the Borrower under this Section 9.03 shall constitute Obligations secured by the Collateral.  The agreements in this Section 9.03 shall survive the termination of the Commitments and repayment of all other Obligations.  All amounts due under this Section 9.03 shall be paid within ten (10) Business Days of receipt by the Borrower of an invoice relating thereto.  If the Borrower fails to pay when due any amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of the Borrower by the Administrative Agent in its discretion by charging any loan account(s) of the Borrower, without notice to or consent from the Borrower, and any amounts so paid shall constitute Obligations hereunder.

Section 9.04    Successors and Assigns.  (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be

construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Persons (other than an Ineligible Institution) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of:

(A)     the Borrower, provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within three (3) Business Days after having received notice thereof, and provided, further, no consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, or an Approved Fund, or, so long as made in accordance with the RSA, if an Event of Default has occurred and is continuing; and

(B)     the Administrative Agent, provided, that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Loan (but not an assignment of a Commitment) to a Lender, an Affiliate of a Lender, or an Approved Fund;

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender, an Affiliate of a Lender, or an Approved Fund, or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000;

(B)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500;

(C)     the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower, the other Loan Parties and their Related Parties or their respective securities) will be made available and who may receive

such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws; and

(D)    such assignment shall be permitted by, and in accordance with, the RSA.

For the purposes of this Section 9.04(b), the terms "**Approved Fund**" and "**Ineligible Institution**" have the following meanings:

"**Approved Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Ineligible Institution**" means a (a) natural person, (b) Defaulting Lender, (c) Disqualified Institution, (d) holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person or relative(s) thereof; provided that, such holding company, investment vehicle or trust shall not constitute an Ineligible Institution if it (x) has not been established for the primary purpose of acquiring any Loans or Commitments, (y) is managed by a professional advisor, who is not such natural person or a relative thereof, having significant experience in the business of making or purchasing commercial loans, and (z) has assets greater than $25,000,000 and a significant part of its activities consist of making or purchasing commercial loans and similar extensions of credit in the ordinary course of its business, or (e) Loan Party or Subsidiary or other Affiliate of a Loan Party.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.15, 2.16, 2.17 and 9.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from

time to time (the "**Register**").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection at Administrative Agent's offices by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  The Borrower hereby designates Administrative Agent to serve as the Borrower's agent solely for purposes of maintaining the Register as provided in this Section 9.04(b)(iv), and the Borrower hereby agrees that to the extent Administrative Agent serves in such capacity, Administrative Agent and its Related Parties shall be indemnified in accordance with Section 9.03(b) hereunder in connection with servicing in such capacity. This Section 9.04(b)(iv) shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Section 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury Regulations (or any other relevant or successor provisions of the Code or of such Treasury Regulations).

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to Section 2.18(d) or 9.03(c), the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)    Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "**Participant**") other than an Ineligible Institution in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged; (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations; and (C) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in clauses (ii) or (iii) of the first or second proviso to Section 9.02(b) that affects such

Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 (subject to the requirements and limitations therein, including the requirements under Section 2.17(f) and (g) (it being understood that the documentation required under Section 2.17(f) shall be delivered to the participating Lender and the information and documentation required under Section 2.17(g) will be delivered to the Borrower and the Administrative Agent)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (A) agrees to be subject to the provisions of Sections 2.18 and 2.19 as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Section 2.15 or 2.17, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.19(b) with respect to any Participant.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.18(d) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement or any other Loan Document (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans, or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 9.05    Survival.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the

Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of Sections 2.15, 2.16, 2.17 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any other Loan Document or any provision hereof or thereof.

Section 9.06    Counterparts; Integration; Effectiveness; Electronic Execution.  (a) This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents, the Fee Letters and any separate letter agreements with respect to fees payable to the Agents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(b)    Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 9.07    Severability.  Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.08    Right of Setoff.  Subject to Section 8.10 and the Carve-Out, if an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or

the account of the Borrower or any Loan Guarantor against any of and all the Obligations held by such Lender, irrespective of whether or not such Lender shall have made any demand under the Loan Documents and although such obligations may be unmatured.  The applicable Lender shall notify the Borrower and the Administrative Agent of such set-off or application, provided that any failure to give or any delay in giving such notice shall not affect the validity of any such set-off or application under this Section.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

Section 9.09    <u>Governing Law; Jurisdiction; Waiver of Jury Trial; Consent to Service of Process</u>.  (a) The Loan Documents (other than those containing a contrary express choice of law provision) shall be governed by and construed in accordance with the internal laws (and not the law of conflicts) of the State of New York, except to the extent the law of the State of New York is superseded by the Bankruptcy Code.

**(b)    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT.  EACH PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE ADMINISTRATIVE AGENT AT ITS ADDRESS FOR NOTICES AS SET FORTH HEREIN.  THE LOAN PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE AGENTS AND THE LENDERS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION. EACH PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN SUCH COURT AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.**

Section 9.10    <u>[Reserved]</u>.

Section 9.11    Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12    Confidentiality.  Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by any Requirement of Law or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies under this Agreement or any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Loan Parties and their obligations, (g) with the consent of the Borrower, or (h)) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Agents or any Lender on a non-confidential basis from a source other than the Borrower.  For the purposes of this Section, "**Information**" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to the Agents or any Lender on a non-confidential basis prior to disclosure by the Borrower; provided that, in the case of information received from the Borrower after the Closing Date, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

**EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 9.12 FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER, THE OTHER LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.**

**ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER,**

**THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES.  ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.**

Section 9.13    Several Obligations; Nonreliance; Violation of Law.  The respective obligations of the Lenders hereunder are several and not joint and the failure of any Lender to make any Loan or perform any of its obligations hereunder shall not relieve any other Lender from any of its obligations hereunder.  Each Lender hereby represents that it is not relying on or looking to any margin stock for the repayment of the Borrowings provided for herein.  Anything contained in this Agreement to the contrary notwithstanding, no Lender shall be obligated to extend credit to the Borrower in violation of any Requirement of Law.

Section 9.14    USA PATRIOT Act.  Each Lender that is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Act**") hereby notifies each Loan Party that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the Act.

Section 9.15    Disclosure.  Each Loan Party and each Lender hereby acknowledges and agrees that the Administrative Agent and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with any of the Loan Parties and their respective Affiliates.

Section 9.16    Appointment for Perfection.  Each Lender hereby appoints each other Lender as its agent for the purpose of perfecting Liens, for the benefit of the Administrative Agent and the other Secured Parties, in assets which, in accordance with Article 9 of the UCC or any other applicable law can be perfected only by possession or control.  Should any Lender (other than the Administrative Agent) obtain possession or control of any such Collateral, such Lender shall notify the Administrative Agent thereof, and, promptly upon the Administrative Agent's request therefor shall deliver such Collateral to the Administrative Agent or otherwise deal with such Collateral in accordance with the Administrative Agent's instructions.

Section 9.17    Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be

increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 9.18    No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees that:  (i) (A) the arranging and other services regarding this Agreement provided by the Lenders are arm's-length commercial transactions between the Borrower and its Affiliates, on the one hand, and the Lenders and their Affiliates, on the other hand, (B) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each of the Lenders and their Affiliates is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower or any of its Affiliates, or any other Person and (B) no Lender or any of its Affiliates has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except, in the case of a Lender, those obligations expressly set forth herein and in the other Loan Documents; and (iii) each of the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and no Lender or any of its Affiliates has any obligation to disclose any of such interests to the Borrower or its Affiliates.  To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against each of the Lenders and their Affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 9.19    Authorization to Distribute Certain Materials to Public-Siders.

(a)    If the Borrower does not file this Agreement with the SEC, then the Borrower hereby authorizes the Administrative Agent to distribute the execution version of this Agreement and the Loan Documents to all Lenders, including their Public-Siders.  The Borrower acknowledges its understanding that Public-Siders and their firms may be trading in any of the Loan Parties' respective securities while in possession of the Loan Documents.

(b)    The Borrower represents and warrants that none of the information in the Loan Documents constitutes or contains material non-public information within the meaning of federal and state securities laws.  To the extent that any of the executed Loan Documents constitutes at any time material non-public information within the meaning of the federal and state securities laws after the date hereof, the Borrower agrees that it will promptly make such information publicly available by press release or public filing with the SEC.

Section 9.20    [Reserved].

Section 9.21    Acknowledgement and Consent to Bail-In of EEA Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any

liability of any Bank that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Bank that is an EEA Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

## ARTICLE X

## LOAN GUARANTY

Section 10.01  <u>Guaranty</u>.  Subject to the entry of and terms of the DIP Order, each Loan Guarantor (other than those that have delivered a separate Guaranty) hereby agrees that it is jointly and severally liable for, and, as a primary obligor and not merely as surety, absolutely and unconditionally guarantees to the Secured Parties, the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Secured Obligations and all costs and expenses, including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent and the Lenders in endeavoring to collect all or any part of the Secured Obligations from, or in prosecuting any action against, the Borrower, any Loan Guarantor or any other guarantor of all or any part of the Secured Obligations (such costs and expenses, together with the Secured Obligations, collectively the "**Guaranteed Obligations**").  Each Loan Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal.  All terms of this Loan Guaranty apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of any Lender that extended any portion of the Guaranteed Obligations.

Section 10.02  <u>Guaranty of Payment</u>.  This Loan Guaranty is a guaranty of payment and not of collection.  Each Loan Guarantor waives any right to require the Administrative Agent or any Lender to sue the Borrower, any Loan Guarantor, any other guarantor of, or any other Person obligated for, all or any part of the Guaranteed Obligations (each, an "**Obligated Party**"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

Section 10.03  <u>No Discharge or Diminishment of Loan Guaranty</u>.  (a) Except as otherwise provided for herein, the obligations of each Loan Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including:  (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of the Borrower or any other Obligated Party liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Loan Guarantor may have at any time against any Obligated Party, the Administrative Agent, any Lender or any other Person, whether in connection herewith or in any unrelated transactions.

(b)     The obligations of each Loan Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)     Further, the obligations of any Loan Guarantor hereunder are not discharged or impaired or otherwise affected by:  (i) the failure of the Agents or any Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection or invalidity of any indirect or direct security for the obligations of the Borrower for all or any part of the Guaranteed Obligations or any obligations of any other Obligated Party liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the Agents or any Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Loan Guarantor or that would otherwise operate as a discharge of any Loan Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

Section 10.04  <u>Defenses Waived</u>.  To the fullest extent permitted by applicable law, each Loan Guarantor hereby waives any defense based on or arising out of any defense of the Borrower or any Loan Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of the Borrower, any Loan Guarantor or any other Obligated Party, other than the indefeasible payment in full in cash

of the Guaranteed Obligations.  Without limiting the generality of the foregoing, each Loan Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against any Obligated Party or any other Person.  Each Loan Guarantor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder.  The Administrative Agent may, at its election, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Loan Guarantor under this Loan Guaranty except to the extent the Guaranteed Obligations have been fully and indefeasibly paid in cash.  To the fullest extent permitted by applicable law, each Loan Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Loan Guarantor against any Obligated Party or any security.

Section 10.05  Rights of Subrogation.  No Loan Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification, that it has against any Obligated Party or any collateral, until the Loan Parties and the Loan Guarantors have fully performed all their obligations to the Agents and the Lenders.

Section 10.06  Reinstatement; Stay of Acceleration.  If at any time any payment of any portion of the Guaranteed Obligations (including a payment effected through exercise of a right of setoff) is rescinded, or must otherwise be restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise (including pursuant to any settlement entered into by a Secured Party in its discretion), each Loan Guarantor's obligations under this Loan Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Agents and the Lenders are in possession of this Loan Guaranty.  If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Loan Guarantors forthwith on demand by the Administrative Agent.

Section 10.07  Information.  Each Loan Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Loan Guarantor assumes and incurs under this Loan Guaranty, and agrees that neither the Agents nor any Lender shall have any duty to advise any Loan Guarantor of information known to it regarding those circumstances or risks.

Section 10.08  [Reserved].

Section 10.09  Taxes.  Each payment of the Guaranteed Obligations will be made by each Loan Guarantor without withholding for any Taxes, unless such withholding is required by law. If any Loan Guarantor determines, in its sole discretion exercised in good faith, that it is so required to withhold Taxes, then such Loan Guarantor may so withhold and shall timely pay the full amount of withheld Taxes to the relevant Governmental Authority in accordance with applicable law.  If such Taxes are Indemnified Taxes, then the amount payable by such Loan Guarantor shall be increased as necessary so that, net of such withholding (including such withholding applicable to additional amounts payable under this Section), the Administrative Agent or Lender (as the case may be) receives the amount it would have received had no such withholding been made.

Section 10.10  Maximum Liability.  Notwithstanding any other provision of this Loan Guaranty, the amount guaranteed by each Loan Guarantor hereunder shall be limited to the extent, if any, required so that its obligations hereunder shall not be subject to avoidance under Section 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law.  In determining the limitations, if any, on the amount of any Loan Guarantor's obligations hereunder pursuant to the preceding sentence, it is the intention of the parties hereto that any rights of subrogation, indemnification or contribution which such Loan Guarantor may have under this Loan Guaranty, any other agreement or applicable law shall be taken into account.

Section 10.11  Contribution.  (a)  To the extent that any Loan Guarantor shall make a payment under this Loan Guaranty (a "**Guarantor Payment**") which, taking into account all other Guarantor Payments then previously or concurrently made by any other Loan Guarantor, exceeds the amount which otherwise would have been paid by or attributable to such Loan Guarantor if each Loan Guarantor had paid the aggregate Guaranteed Obligations satisfied by such Guarantor Payment in the same proportion as such Loan Guarantor's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Loan Guarantors as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in cash of the Guarantor Payment and the Guaranteed Obligations (other than Unliquidated Obligations that have not yet arisen), and all Commitments have terminated or expired, and this Agreement, such Loan Guarantor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Loan Guarantor for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b)        As of any date of determination, the "**Allocable Amount**" of any Loan Guarantor shall be equal to the excess of the fair saleable value of the property of such Loan Guarantor over the total liabilities of such Loan Guarantor (including the maximum amount reasonably expected to become due in respect of contingent liabilities, calculated, without duplication, assuming each other Loan Guarantor that is also liable for such contingent liability pays its ratable share thereof), giving effect to all payments made by other Loan Guarantors as of such date in a manner to maximize the amount of such contributions.

(c)        This Section 10.11 is intended only to define the relative rights of the Loan Guarantors, and nothing set forth in this Section 10.11 is intended to or shall impair the

obligations of the Loan Guarantors, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Loan Guaranty.

(d)    The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Loan Guarantor or Loan Guarantors to which such contribution and indemnification is owing.

(e)    The rights of the indemnifying Loan Guarantors against other Loan Guarantors under this Section 10.11 shall be exercisable upon the full and indefeasible payment of the Guaranteed Obligations in cash (other than Unliquidated Obligations that have not yet arisen) and the termination or expiry, on terms reasonably acceptable to the Required Lenders (which acceptance may be communicated via an email from either of the Specified Lender Advisors), of the Commitments and the termination of this Agreement.

Section 10.12  <u>Liability Cumulative</u>.  The liability of each Loan Party as a Loan Guarantor under this Article X is in addition to and shall be cumulative with all liabilities of each Loan Party to the Agents and the Lenders under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**AKORN, INC.**

By _____
Name:
Title:

**OTHER LOAN PARTIES:**

AKORN (NEW JERSEY), INC.

By _____
Name:
Title:

**OAK PHARMACEUTICALS, INC.**

By _____
Name:
Title:

**ADVANCED VISION RESEARCH, INC.**

By _____
Name:
Title:

**AKORN OPHTHALMICS, INC.**

By: _____
Name:
Title:

**AKORN ENTERPRISES, INC.**


By _____
Name:
Title:

**AKORN ANIMAL HEALTH, INC.**


By _____
Name:
Title:

**AKORN SALES, INC.**


By _____
Name:
Title:

**INSPIRE PHARMACEUTICALS, INC.**


By _____
Name:
Title:

**WILMINGTON SAVINGS FUND SOCIETY, FSB**, as Administrative Agent


By _____
Name: Geoffrey J. Lewis
Title: Vice President

**<u>Exhibit E</u>**

**Plan Term Sheet**

EXECUTION VERSION

THIS TERM SHEET (THE "<u>PLAN TERM SHEET</u>") IS BEING ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT (THE "<u>RESTRUCTURING SUPPORT AGREEMENT</u>") AND SETS FORTH THE PRINCIPAL TERMS OF A PROPOSED RESTRUCTURING (THE "<u>TRANSACTION</u>") OF AKORN, INC. ("<u>AKORN</u>") AND ITS DIRECT AND INDIRECT SUBSIDIARIES (COLLECTIVELY, THE "<u>COMPANY</u>").

THIS PLAN TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE OR ANY OTHER PLAN OF REORGANIZATION OR SIMILAR PROCESS UNDER ANY OTHER APPLICABLE LAW.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS, PROVISIONS OF THE BANKRUPTCY CODE AND/OR OTHER APPLICABLE LAWS.

THIS PLAN TERM SHEET IS NOT BINDING AND IS SUBJECT TO THE SATISFACTORY COMPLETION OF DUE DILIGENCE AND APPROVAL BY THE REQUIRED CONSENTING TERM LENDERS AND THE BOARD OF AKORN.  IN ADDITION, NO PARTY SHALL BE BOUND WITH RESPECT TO ANY TRANSACTION CONTEMPLATED HEREUNDER UNTIL THE EXECUTION AND DELIVERY OF DEFINITIVE DOCUMENTATION ACCEPTABLE IN FORM AND SUBSTANCE TO THE COMPANY AND THE REQUIRED CONSENTING TERM LENDERS (AS DEFINED IN THE RESTRUCTURING SUPPORT AGREEMENT) AFTER OBTAINING ALL NECESSARY INTERNAL APPROVALS.

THIS PLAN TERM SHEET IS FOR SETTLEMENT DISCUSSION PURPOSES ONLY, IS SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE, AND CANNOT BE DISCLOSED TO ANY OTHER PERSON OR ENTITY WITHOUT THE CONSENT OF THE COMPANY AND THE REQUIRED CONSENTING TERM LENDERS.

| Akorn – Preliminary Non-Binding Summary Term Sheet[1] | |
|---|---|
| **Summary of Key Terms** | |
| **Implementation** | This Plan Term Sheet contemplates a sale of all or substantially all of the Company's assets to be implemented pursuant to section 363 of the Bankruptcy Code (the "<u>Sale Transaction</u>"), followed by confirmation of the Plan, which will distribute the proceeds from the Sale Transaction (as applicable) and otherwise wind-down the Company's Chapter 11 Cases. The key terms of the Plan are outlined in this Plan Term Sheet.<br><br>In exchange for support of the Plan and other material terms set forth herein, the Company will implement a chapter 11 process in accordance with the milestone deadlines (the "<u>Milestones</u>") set forth in the Restructuring Support Agreement. |

---

[1]  Capitalized terms used but not defined in the body of this Plan Term Sheet shall have the meaning ascribed to such terms in the Restructuring Support Agreement or **Annex I** hereto, as applicable.

| **Akorn – Preliminary Non-Binding Summary Term Sheet**[1] | |
|---|---|
| **Summary of Key Terms** | |
| **Sale Process and "Release Price"** | The Company will continue the third-party marketing process for the Sale Transaction (and such process, the "Sale Process") on the timeline contemplated by the Milestones and otherwise in accordance with the Bidding Procedures.<br><br>The Consenting Term Lenders shall, subject to the terms of the Restructuring Support Agreement and the Stalking Horse APA (which, in each case, shall be in form and substance acceptable to the Required Consenting Term Lenders), serve as the "stalking horse" bidder (the "Stalking Horse Bidder") in connection with the Sale Process.<br><br>At the conclusion of the Sale Process, the Company will sell to the Stalking Horse Bidder or, subject to the Release Price being met, the third-party purchaser(s) determined to have submitted the highest or otherwise best offer, all of the Debtors' right, title, and interest in, to and under certain properties identified by the purchaser(s) free and clear, to the maximum extent permitted by law, of any and all liens, encumbrances, claims, and other interests, subject to any agreed upon title exceptions, the terms and conditions of which sale will be consistent with this Plan Term Sheet, the Restructuring Support Agreement, and Stalking Horse APA (or such other asset purchase agreement as may be agreed to by the Company and any third-party purchaser(s)).<br><br>Subject to the Release Price being met, or as may otherwise be agreed by the Company and the Consenting Term Lenders, the Consenting Term Lenders agree to support a Sale Transaction to a third-party purchaser and, for the avoidance of doubt, agree to support confirmation of a Plan following consummation of the Sale Transaction (whether to the Stalking Horse Bidder or to a third-party purchaser). |
| **Wind-Down Amount** | To the extent the Stalking Horse Bidder is the Successful Bidder (as such term is defined in the Bidding Procedures), the Consenting Term Lenders agree to fund the wind-down of the Company pursuant to the Plan in accordance with the budget attached as Exhibit G to the Stalking Horse APA. |
| **Term Loan Credit Bid Transaction** | In the event the Sale Transaction is a Term Loan Credit Bid Transaction, the Term Loan Claims shall receive the treatment set forth in this Plan Term Sheet, and, subject to entry of the Sale Order and closing of the Sale Transaction, the Term Lenders shall be entitled to immediate possession of the Acquired Assets as and solely to the extent set forth in the Sale Order, with no further order of the Bankruptcy Court required. |

| Classification and Treatment of Claims | | |
| --- | --- | --- |
| **Type of Claim** | **Treatment** | **Impairment/ Voting** |
| **Administrative Claims** | Except with respect to Professional Fee Claims and DIP Facility Claims, or as otherwise set forth herein, subject to the provisions of sections 327, 330(a), and 331 of the Bankruptcy Code, and except to the extent that a Holder of an Allowed Administrative Claim and, as applicable, the Debtors or the Plan Administrator, agree to less favorable treatment or such Holder has been paid by any applicable Debtor prior to the Effective Date, the Debtors or the Plan Administrator shall, in consultation with the Required Consenting Term Loan Lenders, pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash, which payment shall be made (x) in the ordinary course of business, or (y) on the later of (i) the Effective Date and (ii) the date on which such Administrative Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter) with a Cash distribution; *provided that* any Allowed Administrative Claim that has been expressly assumed by the Purchaser under the Sale Transaction Documentation shall not be an obligation of the Debtors as of or after the Effective Date. | N/A |
| **Priority Tax Claims** | Except to the extent that a Holder of an Allowed Priority Tax Claim and, as applicable, the Debtors or the Plan Administrator, agree to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Priority Tax Claim, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, each Holder of such Allowed Priority Tax Claim shall receive, at the option of the Debtors or the Plan Administrator, in consultation with the Required Consenting Term Loan Lenders, as applicable, either (i) the full unpaid amount of such Allowed Priority Tax Claim in Cash on the later of the Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter), or (ii) equal annual installment payments in Cash, of a total value equal to the Allowed amount of such Priority Tax Claim, over a period ending not later than five (5) years after the Petition Date; *provided that* any Allowed Priority Tax Claim that has been expressly assumed by the Purchaser under the Sale Transaction Documentation shall not be an obligation of the Debtors. | N/A |

| Classification and Treatment of Claims | | |
|---|---|---|
| **Type of Claim** | **Treatment** | **Impairment/ Voting** |
| **DIP Facility Claims** | In full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, each DIP Facility Claim, except to the extent such DIP Facility Claims were credit bid pursuant to the terms of the Sale Transaction Documentation, shall be paid in full in Cash. | N/A |
| **Other Secured Claims** | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the election of the Debtors, in consultation with the Required Consenting Term Loan Lenders, and in each case, on the Effective Date: (a) payment in full in Cash; (b) delivery of the collateral securing any such Claim; (c) Reinstatement of such Claim; or (d) other treatment rendering such claim Unimpaired. | Unimpaired; deemed to accept. |
| **Other Priority Claims** | Except to the extent that a Holder of an Allowed Priority Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired, in each case on the Effective Date. | Unimpaired; deemed to accept. |
| **Term Loan Claims** | In the event the Sale Transaction is not a Term Loan Credit Bid Transaction, in full and final satisfaction, compromise, settlement, release, and discharge of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of an Allowed Term Loan Claim shall receive its Pro Rata share of the Distributable Proceeds pursuant to the Waterfall Recovery on the Effective Date. In the event the Sale Transaction is a Term Loan Credit Bid Transaction, the Term Loan Claims *less* the Credit Bid Amount (as defined in the Stalking Horse APA) (the "<u>Deficiency Claim</u>") shall be entitled to its Pro Rata share of the Distributable Proceeds, if any, pursuant to the Waterfall Recovery. | Impaired; entitled to vote. |
| **General Unsecured Claims** | In full and final satisfaction, compromise, settlement, release, and discharge of its Claim (unless the applicable Holder agrees to a less favorable treatment), Holders of Allowed General Unsecured Claims that are not assumed by the Purchaser will receive their Pro Rata share of the Distributable Proceeds, if any, pursuant to the Waterfall Recovery. | Impaired; entitled to vote. |

| Classification and Treatment of Claims | | |
|---|---|---|
| **Type of Claim** | **Treatment** | **Impairment/ Voting** |
| **Intercompany Claims** | In full and final satisfaction of each Allowed Intercompany Claim, each Allowed Intercompany Claim, unless otherwise provided for under the Plan and subject to the Description of Transaction Steps, will either be Reinstated, distributed, contributed, set off, settled, cancelled and released or otherwise addressed at the option of the Debtors, in consultation with the Required Consenting Term Loan Lenders; provided, that no distributions shall be made on account of any such Intercompany Claims. | Unimpaired; deemed to accept / Impaired; deemed to reject. |
| **Intercompany Interests** | In full and final satisfaction of each Allowed Intercompany Interest, subject to the Description of Transaction Steps, each Intercompany Interest shall be Reinstated solely to maintain the Debtors' corporate structure. | Unimpaired; deemed to accept. |
| **Section 510(b) Claims** | In full and final satisfaction, compromise, settlement, release, and discharge of its Claim, Holders of Section 510(b) Claims will receive their Pro Rata share of the Distributable Proceeds, if any, pursuant to the Waterfall Recovery; *provided that* for purposes of receiving the treatment provided in the Plan, each Holder of an Allowed Section 510(b) Claim shall be treated as if such Holder held a number of Allowed Akorn Interests equal in value to the amount of its Allowed Section 510(b) Claim. | Impaired; entitled to vote. |
| **Interests in Akorn** | On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of its Claim, Holders of all Class 8 Akorn Interests shall receive its Pro Rata share of the Distributable Proceeds, if any, pursuant to the Waterfall Recovery. | Impaired; entitled to vote. |

| Other Key Terms | |
|---|---|
| **Releases** | The Plan shall include discharge, release, exculpation and injunction provisions substantially similar to the provisions set forth in **Exhibit 1** attached hereto, in each case, to the maximum extent permitted under applicable law. |
| **Avoidance Actions** | Subject in all instances to the expiration of any "challenge period" under the DIP Order with respect to the prepetition Term Loan Claims, the Plan Administrator will retain all rights to commence and pursue any and all claims and causes of action arising under the sections 544, 545, 547, 548 and 550 of the Bankruptcy Code (collectively, the "Avoidance Actions") and other litigation, other than Avoidance Actions acquired in connection with the Sale Transaction. |

| **Other Key Terms** | |
|---|---|
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Effective Date, except as otherwise provided in this Plan Term Sheet, the Plan, or to the extent otherwise assumed by Purchaser, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements, shall be canceled, and the obligations of the Debtors and any non-Debtor Affiliates thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Conditions Precedent to Restructuring** | The following shall be conditions to the Effective Date of the Plan (the "<u>Conditions Precedent</u>"): |

The following shall be conditions to the Effective Date of the Plan (the "<u>Conditions Precedent</u>"):

(a)     The Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code;

(b)     The Bankruptcy Court shall have entered the Confirmation Order, which shall have become a Final Order that has not been stayed or modified or vacated and shall:

    (i)     authorize the Debtors and the Reorganized Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, and other agreements or documents created in connection with the Plan;

    (ii)     decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

    (iii)     authorize the implementation of the Plan in accordance with its terms; and

    (iv)     provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;

(c)     The Bankruptcy Court shall have entered the Sale Order;

(d)     The occurrence of the Closing (as such term is defined and described in the Sale Transaction Documentation);

(e)     There shall not be in effect any (i) order, opinion, ruling, or other decision entered by any court or other governmental unit or (ii) U.S. or other applicable law staying, restraining, enjoining, prohibiting, or otherwise making illegal the implementation of any of the transactions contemplated by the Plan;

(f)     All governmental and material third party approvals and consents, including Bankruptcy Court approval, that are necessary to implement the Restructuring Transactions shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods (including all applicable waiting periods under the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended) shall have expired without any action

| **Other Key Terms** |
|---|

|  |  | being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions; |
| | (g) | The Final DIP Order shall have been entered by the Bankruptcy Court, and shall not have been stayed or modified or vacated; |
| | (h) | The Debtors shall not be in default under the Final DIP Order (or, to the extent that the Debtors are in default on the proposed Effective Date, such default shall have been waived by the DIP Lenders or cured by the Debtors in a manner consistent with the Final DIP Order) and the DIP Facility shall remain in full force and effect and shall not have been terminated, and the parties thereto shall otherwise be in compliance therewith; |
| | (i) | The Restructuring Support Agreement shall not have terminated as to all parties thereto and shall remain in full force and effect and the Debtors and other parties then party thereto shall be in compliance therewith; |
| | (j) | The Debtors shall have implemented the Restructuring Transactions, and all transactions contemplated by the Restructuring Support Agreement, in a manner consistent in all respects with the Restructuring Support Agreement and the Plan; |
| | (k) | Each document or agreement constituting the Definitive Documents (as defined in the Restructuring Support Agreement) shall have been executed and/or effectuated and shall be in form and substance consistent with the Restructuring Support Agreement, including, without limitation, any consent rights included therein; |
| | (l) | The Debtors shall have paid or reimbursed all fees and out-of-pocket expenses of the Consenting Term Loan Lenders (as applicable), including the fees and expenses of the Ad Hoc Group Professionals; |
| | (m) | With respect to all actions, documents and agreements necessary to implement the Plan:  (a) all conditions precedent to such documents and agreements (other than any conditions precedent related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements; (b) such documents and agreements shall have been tendered for delivery to the required parties and been approved by any required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (c) such documents and agreements shall have been effected or executed, and in each case all such actions, documents and agreements shall be consistent with the Restructuring Support Agreement, including, without limitation, any consent rights included therein; |
| | (n) | All material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and the transactions contemplated in the Plan shall have been obtained; |
| | (o) | The establishment of a Professional Fee Escrow Account funded in the amount of estimated accrued but unpaid Professional fees incurred by the legal counsel |

| **Other Key Terms** | |
|---|---|
| | and other advisors to the Debtors and any statutory committees during the Chapter 11 Cases; |
| | (p)     The Wind-Down Amount has been funded in accordance with, and as limited by, the terms of the Sale Transaction Documentation; and |
| | (q)     Such other conditions precedent to the Effective Date, as are customary and otherwise reasonably acceptable to the Company, the Required DIP Lenders, and the Required Consenting Term Lenders. |
| | On the Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code. |
| **Waiver of Conditions Precedent to the Plan Effective Date** | The conditions to Consummation set forth in Article IX.B of the Plan may be waived by the Debtors with the consent of the Required Consenting Term Loan Lenders, such consent not to be unreasonably withheld, delayed, or conditioned, at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than a proceeding to confirm the Plan or consummate the Plan. |
| **Additional Plan Provisions and Documentation** | The Plan shall contain other customary provisions for chapter 11 plans of this type, which provisions, in each case, shall be in form and substance acceptable to the Required Consenting Term Lenders. |

**Exhibit 1**

**Discharge, Release, Injunction, and Exculpation Provisions**

| Discharge, Release, Injunction, and Exculpation Provisions | |
|---|---|
| **Exculpated Party** | Collectively:  (a) the Debtors; (b) the Consenting Term Loan Lenders; (c) the Term Loan Agent; (d) the DIP Lenders; (e) the DIP Agent; (f) the Committee and each of its members; and (g) with respect to each of the foregoing Entities in clauses (a) through (f), each Entity's current and former subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their respective capacities as such. |
| **Released Party** | Collectively, and in each case, in their respective capacities as such: (a) the Debtors; (b) the Consenting Term Loan Lenders; (c) the Term Loan Agent; (d) the DIP Lenders; (e) the DIP Agent; (f) all Releasing Parties; (g) the Acquired Entities; and (h) with respect to each Entity in clause (a) through (g), each such Entity's current and former subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (unless any such Entity or related party has opted out of being a Releasing Party, in which case such Entity or related party, as applicable, shall not be a Released Party). |
| **Releasing Party** | Collectively, collectively, and in each case, in their respective capacities as such: (a) the Debtors; (b) the Consenting Term Loan Lenders; (c) the Term Loan Agent; (d) the DIP Lenders; (e) the DIP Agent; (f) the Acquired Entities; (g) all Holders of Claims or Interests that are presumed to accept the Plan *and* who do not opt out of the releases in the Plan; (h) all Holders of Claims or Interests who vote to accept the Plan; (i) all Holders of Claims or Interests that (x) abstain from voting on the Plan *and* who do not opt out of the releases in the Plan, (y) vote to reject the Plan *and* who do not opt out of the releases in the Plan, or (z) are deemed to reject the Plan *and* who do not opt out of the releases in the Plan; (j) with respect to each Entity in clause (a) through (i), each such Entity's current and former  subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (unless any such Entity or related party has opted out of being a Releasing Party, in which case such Entity or related party, as applicable, shall not be a Releasing Party). |
| **Discharge of Claims and Termination of Interests** | Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or |

| **Discharge, Release, Injunction, and Exculpation Provisions** | |
|---|---|
| | compromised after the Effective Date by the Plan Administrator), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has voted to accept the Plan.  Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is Unimpaired by the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring. |
| **Releases by the Company** | Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, their Estates, the Plan Administrator, and the Acquired Entities from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, or their Estates, or the Plan Administrator, or the Acquired Entities would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in a Debtor, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Standstill Agreement, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the DIP Loan Documents, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Chapter 11 Cases, the DIP Loan |

| **Discharge, Release, Injunction, and Exculpation Provisions** | |
| --- | --- |
| | Documents, the Sale Transaction Documentation, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon the business or contractual arrangements between and Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, fraud or gross negligence.  Notwithstanding the inclusion of any Released Parties as a potential party to any Transferred Causes of Action or Retained Causes of Action, such parties shall remain Released Parties.<br><br>Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan, the releases contained in the Plan do not (i) release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) affect the rights of Holders of Allowed Claims and Interests to receive distributions under the Plan, or (iii) release any Claims or Causes of Action against any non-Released Party.<br><br>Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases herein, which includes by reference each of the related provisions and definitions contained herein, *and further*, shall constitute the Bankruptcy Court's finding that the releases herein are:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the claims released by the releases herein; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (vi) a bar to any of the Debtors asserting any claim released by the releases herein against any of the Released Parties. |
| **Third-Party Releases** | As of the Effective Date, except as otherwise provided herein, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Standstill Agreement, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the DIP Loan Documents, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document |

| **Discharge, Release, Injunction, and Exculpation Provisions** |
|---|

|  | (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, the Chapter 11 Cases, the DIP Loan Documents, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon the business or contractual arrangements between any Debtor and any Released Party, and any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, fraud or gross negligence. |
|---|---|
|  | Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan, the releases contained in the Plan do not (i) release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) affect the rights of Holders of Allowed Claims and Interests to receive distributions under the Plan, or (iii) release any Claims or Causes of Action against any non-Released Party. |
|  | Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the claims released by the Releasing Parties; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after notice and opportunity for hearing; and (vi) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties. |
| **Exculpation** | Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the DIP Loan Documents, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release or other agreement or document  (including providing any legal opinion requested by any Entity regarding any transaction, contract, |

| **Discharge, Release, Injunction, and Exculpation Provisions** | |
|---|---|
| | instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement or the Plan, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that constitutes actual fraud, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. |
| **Injunction** | Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan shall be discharged pursuant to the Plan, or are subject to Exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Released Parties, or the Exculpated Parties (to the extent of the Exculpation provided pursuant to the Plan with respect to the Exculpated Parties): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.  Notwithstanding anything to the contrary in the Plan, the Plan |

| Discharge, Release, Injunction, and Exculpation Provisions | |
|---|---|
| | Supplement, or the Confirmation Order, the automatic stay pursuant to section 362 of the Bankruptcy Code shall remain in full force and effect with respect to the Debtors until the closing of these Chapter 11 Cases. |

## ANNEX I

### Defined Terms

| Term | Definition |
|------|-----------|
| **Ad Hoc Group Professionals** | Gibson Dunn & Crutcher LLP, Greenhill & Co., LLC, and Young Conaway Stargatt & Taylor, LLP, in their capacities as advisors to certain Consenting Term Loan Lenders. |
| **Administrative Claim** | A Claim against any of the Debtors for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates; (b) Professional Fee Claims; (c) DIP Facility Claims; and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code. |
| **Affiliate** | As set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor. |
| **Allowed** | With respect to any Claim against any of the Debtors, except as otherwise provided in the Plan: (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date (or such other date as agreed by the Debtors pursuant to the Bar Date Order) or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date (or for which Claim a Proof of Claim or request for payment of Administrative Claim is not or shall not be required to be Filed under the Plan, the Bankruptcy Code, the Bar Date Order, or pursuant to a Final Order); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no contrary or superseding Proof of Claim, as applicable, has been timely Filed; or (c) a Claim allowed pursuant to the Plan or a Final Order; *provided that* with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or such an objection is so interposed and the Claim has been Allowed by a Final Order. Notwithstanding anything to the contrary in the Plan, no Claim of any Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Allowed, unless and until such Entity or transferee has paid the amount, or turned over any such property, for which such Entity or transferee is liable under sections 522(i), 542, 543, 550, or 553 of the Bankruptcy Code. For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date or a request for payment of an Administrative Claim Filed after the Administrative Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final |

| Term | Definition |
|---|---|
| | Order allowing such late-Filed Claim.  "*Allow*" and "*Allowing*" shall have correlative meanings. |
| **Cash** | Legal tender of the United States of America or the equivalent thereof, including bank deposits and checks. |
| **Causes of Action** | Any and all actions, claims, causes of action, controversies, demands, rights, actions, Liens, indemnities, interests, guaranties, suits, obligations, liabilities, damages, judgments, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  For the avoidance of doubt, "*Causes of Action*" includes:  (a) any rights of setoff, counterclaims, or recoupments and any claims for breach of contract or for breach of duties imposed by law or in equity; (b) any and all claims based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal Law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any and all rights to dispute, object to, compromise, or seek to recharacterize, reclassify, subordinate or disallow Claims or Interests; (d) any and all Claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any and all claims or defenses including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any and all state or foreign Law fraudulent transfer or similar claims. |
| **Distributable Proceeds** | All Cash of the Debtors on or after the Effective Date, after giving effect to the funding of the Professional Fee Escrow Account. |
| **Effective Date** | The date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date. |
| **Estate** | As set forth in section 101(15) of the Bankruptcy Code. |
| **File, Filed, or Filing** | File, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Notice and Claims Agent or the Bankruptcy Court. |
| **Fresenius Litigation Claims** | Any Claim arising from or relating to the Fresenius Litigation. |
| **Fresenius Litigation** | That certain litigation captioned *Akorn, Inc. v. Fresenius Kabi AG, Quercus Acquisition, Inc. and Fresenius SE & Co. KGaA*, No. 2018-0300-JTL (Del. Ch. Apr. 23, 2018). |

| Term | Definition |
|------|------------|
| **General Unsecured Claim** | Any unsecured Claim against any of the Debtors that is not:  (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) an Intercompany Claim; (d) an Other Priority Claim; (e) a Priority Tax Claim; (f) a Professional Fee Claim; (g) a Section 510(b) Claim; or (h) a Purchaser Assumed Claim. |
| **Holder** | An Entity holding a Claim or Interest in a Debtor, as applicable. |
| **Intercompany Claim** | Any Claim against a Debtor held by another Debtor or Non-Debtor Subsidiary. |
| **Intercompany Interest** | Any Interest held by a Debtor in another Debtor or Non-Debtor Subsidiary. |
| **Interest** | The common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor, and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement). |
| **Other Priority Claim** | Any Claim against any of the Debtors other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| **Other Secured Claim** | Any Secured Claim (including Secured Tax Claims) against any of the Debtors, other than a DIP Facility Claim or a Term Loan Claim. |
| **Plan Administrator** | The Person or Entity, or any successor thereto, designated by the Debtors, who will be disclosed at or prior to the Confirmation Hearing. |
| **Priority Claims** | Collectively, Administrative Claims, Priority Tax Claims, and Other Priority Claims. |
| **Priority Tax Claims** | Any Claim against the Debtors of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code. |
| **Professional Fee Claims** | Any Administrative Claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim. |
| **Professional Fee Escrow Account** | An account funded by the Debtors with Cash as soon as practicable after Confirmation and not later than the Effective Date in an amount equal to the Professional Fee Escrow Amount. |

| Term | Definition |
|------|-----------|
| **Professional Fee Escrow Amount** | The reasonable estimate of the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall, deliver to the Debtors as set forth in Article II.B of the Plan. |
| **Proof of Claim** | A proof of Claim Filed against any of the Debtors in the Chapter 11 Cases. |
| **Release Price** | A Qualified Bid for a going-concern Sale Transaction sufficient to pay in full, in cash, all allowed Term Loan Claims or such other amount as may be agreed by the Required Consenting Term Lenders. |
| **Sale Order** | The order of the Bankruptcy Court approving the Sale Transaction. |
| **Sale Transaction Documentation** | Definitive documentation for the Sale Transaction. |
| **Section 510(b) Claims** | Any Claim against any of the Debtors that is subordinated under section 510(b) of the Bankruptcy Code, including, for the avoidance of doubt, the Fresenius Litigation Claims and any Shareholder Litigation Claims not settled pursuant to the Shareholder Settlement. |
| **Settlement CVRs** | Those certain contingent value rights, issued and delivered by Akorn pursuant to the terms of the Shareholder Settlement. |
| **Shareholder Litigation Claims** | Any Claim relating to the Shareholder Litigation, including, for the avoidance of doubt, the Settlement CVRs. |
| **Shareholder Litigation** | That certain litigation captioned *In re Akorn, Inc. Data Integrity Securities Litigation*, Civ. A. No. 1:18-cv-01713 (N.D. Ill. Mar. 8, 2018). |
| **Shareholder Settlement** | The full and final settlement and resolution of any and all Shareholder Litigation Claims that did not "opt out" of such settlement pursuant to that certain *Order and Final Judgment Approving Class Action Settlement* [Document No. 190]. |
| **Term Loan Agent** | Wilmington Savings Fund Society, FSB,, in its capacity as successor administrative agent under the Term Loan Credit Agreement, or any of its predecessors or successors. |
| **Term Loan Claim** | Any Claim against any of the Debtors on account of the Term Loan Credit Agreement, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and obligations. |

| Term | Definition |
|------|-----------|
| **Term Loan Credit Bid Transaction** | A Sale Transaction to the Term Loan Agent or its designee on account of a credit bid of some or all of the Term Loan Claims, which credit bid is selected by the Debtors as the highest and best bid for the Purchased Assets as set forth in the Bidding Procedures Order and as approved by the Bankruptcy Court pursuant to the Sale Order. |
| **Waterfall Recovery** | Distributable Proceeds shall be allocated and paid to the Holders of Claims or Interests, as applicable, until paid in full from time to time in the following priority (in each case on a Pro Rata basis):  (a) *first,* on account of Allowed Administrative Priority Claims, DIP Facility Claims, and Priority Tax Claims, (b) *second*, on account of Allowed Other Secured Claims; (c) *third,* on account of Allowed Other Priority Claims; [(d) *fourth,* on account of Allowed Term Loan Claims;] (v) *fifth,* on account of any Allowed General Unsecured Claims that are not assumed by the Purchaser; and (e) *sixth,* on account of Allowed Section 510(b) Claims and Allowed Akorn Interests. |

## Exhibit F

### Provision for Transfer Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among Akorn, Inc. and its affiliates and subsidiaries bound thereto and the Consenting Term Lenders, including the transferor to the Transferee of any Term Loan Claims (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Term Lender" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

Signature: _____
Name:
Title:
Address:
E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| Term Loan Claims | |

---

[1] Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.