# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| AKORN, INC., *et al.*,[1] | ) ) ) | Case No. 20-11177 (KBO) |
| Debtors. | ) ) ) | (Jointly Administered) |
|  | ) ) ) ) | **Objection Deadline: June 17, 2020 at 4:00 p.m. (ET)**<br>**Hearing Date: June 24, 2020 at 1:00 p.m. (ET)** |

## DEBTORS' APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF PJT PARTNERS LP AS INVESTMENT BANKER FOR THE DEBTORS AND DEBTORS IN POSSESSION, EFFECTIVE AS OF THE PETITION DATE

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this application:[2]

### Relief Requested

1. The Debtors hereby seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (a) authorizing the employment and retention of PJT Partners LP ("PJT") as investment banker for the Debtors, in accordance with the terms and conditions set forth in that certain engagement letter, including any amendments and schedules thereto, dated as of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Akorn, Inc. (7400); 10 Edison Street LLC (7890); 13 Edison Street LLC; Advanced Vision Research, Inc. (9046); Akorn (New Jersey), Inc. (1474); Akorn Animal Health, Inc. (6645); Akorn Ophthalmics, Inc. (6266); Akorn Sales, Inc. (7866); Clover Pharmaceuticals Corp. (3735); Covenant Pharma, Inc. (0115); Hi-Tech Pharmacal Co., Inc. (8720); Inspire Pharmaceuticals, Inc. (9022); Oak Pharmaceuticals, Inc. (6647); Olta Pharmaceuticals Corp. (3621); VersaPharm Incorporated (6739); VPI Holdings Corp. (6716); and VPI Holdings Sub, LLC. The location of the Debtors' service address is: 1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.

[2] A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Duane Portwood, Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on May 20, 2020 (the "Petition Date").

March 20, 2020, attached to the Order as <u>Exhibit 1</u> (the "<u>Engagement Letter</u>"),[3] effective as of the Petition Date, and (b) modifying certain time keeping requirements.  In support of this application, the Debtors submit the Declaration of Mark Buschmann, a Partner in the Restructuring and Special Situations Group at PJT (the "<u>Buschmann Declaration</u>"), attached hereto as **Exhibit B**.

### Jurisdiction and Venue

2.  The United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), to the entry of a final order by the Court in connection with this application to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.  The statutory bases for the relief requested herein are sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016, and Local Rules 2014-1 and 2016-2.

### PJT's Qualifications

5.  As detailed in the Buschmann Declaration, PJT's Restructuring and Special Situations Group is one of the industry's leading advisors to companies and creditors in a variety

---

[3] Capitalized terms used but not otherwise defined in this application shall have the meanings ascribed to them in the Engagement Letter.

of complex restructurings and bankruptcies.  PJT was spun off from The Blackstone Group L.P. ("Blackstone"), effective October 1, 2015.[4]  Upon the consummation of the spinoff, Blackstone's Restructuring and Reorganization advisory group became a part of PJT, and Blackstone's restructuring professionals became employees of PJT.  The former Blackstone restructuring professionals, in their capacity as PJT employees, have been conducting business and providing their clients with the same high-quality restructuring services that Blackstone had itself provided since the formation of its restructuring advisory practice approximately 29 years ago.  PJT professionals have extensive experience working with financially troubled companies in complex financial restructurings.  Since 1991, PJT professionals have advised on more than 600 distressed situations, both in and out of court, involving more than $2.0 trillion of total liabilities.

6.     The partners and members of PJT's Restructuring and Special Situations Group have assisted and advised in numerous chapter 11 cases.  In particular, they have provided services to debtors, creditors' committees and other constituencies in numerous chapter 11 cases, including, among others: AbitibiBowater Inc.; Aegean Marine Petroleum Network Inc.; Adelphia Communications Corporation; Allen Systems Group, Inc.; Ambac Financial Group, Inc.; Apex Silver Mines Ltd.; Arch Coal, Inc.; Arsenal Resources Development LLC; Ascent Resources Marcellus Holdings, LLC; The Bon-Ton Stores, Inc.; Caesars Entertainment Operating Corporation; Cengage Learning, Inc.; Chaparral Energy LLC; CHC Group Ltd.; Cumulus Media Inc.; Delta Air Lines, Inc.; Dixie Electric, LLC; Dynegy Inc.; Eastman Kodak Company; Edison

---

[4]  On October 7, 2014, the board of directors of Blackstone's general partner approved a plan to spin off its financial and strategic advisory services, restructuring and reorganization advisory services and Park Hill fund placement businesses, and to combine these businesses with an independent financial advisory firm founded by Paul J. Taubman, to form an independent, publicly traded company called PJT Partners Inc.  PJT is a wholly-owned subsidiary of PJT Partners Holdings LP, a holding partnership that is controlled by PJT Partners Inc., as general partner.  PJT Partners Inc. is led by Paul J. Taubman, as chairman and chief executive officer.  This spinoff was effected via a multi-step transaction.

Mission Energy; Energy Future Holdings Corporation; Energy XXI Ltd.; Endeavor International Corporation; Energy & Exploration Partners, Inc.; Enron Corporation; EP Energy Corporation; Excel Maritime Carriers, Ltd.; EXCO Resources, Inc.; FirstEnergy Solutions Corp.; Flag Telecom Holdings Limited; Flying J. Inc.; FullBeauty Brands Holding Corp.; Fusion Connect, Inc.; Genco Shipping & Trading Limited; General Motors Corporation; Global Crossing Ltd.; Hálcon Resources Corporation; Hawker Beechcraft, Inc.; Hercules Offshore, Inc.; Homer City Generation, L.P.; Hostess Brands, Inc.; Houghton Mifflin Harcourt Publishing Company; Lee Enterprises Inc.; Legend Parent Inc.; LightSquared Inc.; Los Angeles Dodgers LLC; LyondellBasell Industries; Magnetation LLC; Magnum Hunter Resources Corporation; Merisant Worldwide, Inc.; Mirant Corp.; New Gulf Resources, LLC; NewPage Corporation; NTK Holdings, Inc.; Paragon Offshore plc; Patriot Coal Corporation; Penn Virginia Corporation; PES Holdings, LLC; PHI, Inc.; Quicksilver Resources, Inc.; Relativity Fashion, LLC; Sabine Oil & Gas Corp.; Samson Resources Corporation; SemGroup; Toisa Ltd.; TerreStar Networks Inc.; Triangle USA Petroleum Corporation; Trident Holding Company, LLC; Tribune Company; Ultra Petroleum Corp.; Venoco Inc.; VER Technologies Holdco LLC; Verso Corporation; Walter Energy, Inc.; Westinghouse Electric Company LLC; W.R. Grace & Co.; Windstream Holdings, Inc.; and Winn-Dixie Stores, Inc. In addition, the restructuring group has provided general restructuring advice to major companies such as Clearwire Corporation, Ford Motor Company, The Goodyear Tire & Rubber Company, and Xerox Corporation.

7.    PJT was retained by the Debtors on or around January 28, 2019 to provide certain advisory and investment banking services in connection with a possible restructuring or the sale, merger, or other disposition of all or a portion of the Debtors or their assets. Over the past sixteen months, PJT has engaged in extensive due diligence of the Debtors' business, including their

4

operations, assets, capital structure, contractual arrangements, cash flows, and liquidity to build a foundation for a restructuring strategy.

8. As a result of the prepetition and postpetition work performed by PJT on behalf of the Debtors over the past sixteen months, PJT has acquired significant knowledge of the Debtors' financial affairs, business operations, capital structure, assets, key stakeholders, financing documents, and other related material information. Likewise, in providing services to the Debtors, PJT's professionals have worked closely with the Debtors' management, Board of Directors, and other advisors. If this application is approved, several of PJT's professionals, all with substantial expertise in the areas discussed above, will continue to provide services to the Debtors and will work closely with the Debtors' management, Board of Directors, and other professionals throughout the reorganization process. Accordingly, as a result of PJT's representation of the Debtors prior to and after the commencement of these chapter 11 cases and PJT's extensive experience representing chapter 11 debtors, PJT is well qualified to provide these services and represent the Debtors during these chapter 11 cases.

9. Indeed, if the Debtors were required to retain an investment banker other than PJT in connection with these chapter 11 cases, the Debtors, their estates, and other parties-in-interest would be unduly prejudiced by the time and expense necessary to familiarize another investment banker with the intricacies of the Debtors and their business operations.

## Services Provided by PJT

10. Subject to further order of the Court, and consistent with the terms of the Engagement Letter, PJT's services performed prepetition and anticipated services in these

chapter 11 cases, to the extent necessary, appropriate, feasible, and as may be requested by the Debtors, include the following:[5]

a. assist in the evaluation of the Debtors' business and prospects;

b. assist in the development of the Debtors' long-term business plan and related financial projections;

c. assist in the development of financial data and presentations to the Debtors, the Board of Directors, various creditors, and other third parties;

d. analyze the Debtors' financial liquidity and evaluate alternatives to improve such liquidity;

e. analyze various restructuring scenarios and the potential impact of these scenarios on the recoveries of those stakeholders impacted by the Restructuring;[6]

f. provide strategic advice with regard to restructuring or refinancing the Debtors' Obligations;

g. evaluate the Debtors' debt capacity and alternative capital structures;

h. participate in negotiations among the Debtors and their creditors, suppliers, lessors, and other interested parties;

i. value securities offered by the Debtors in connection with a Restructuring;

j. advise the Debtors and negotiate with lenders with respect to potential waivers or amendments of various credit facilities;

---

[5] The summary of the Engagement Letter in this application is qualified in its entirety by reference to the provisions of the Engagement Letter. To the extent there is any discrepancy between the summary contained in this application and the terms set forth in the Engagement Letter, the terms of the Engagement Letter shall govern. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Engagement Letter.

[6] As provided for in the Engagement Letter, a "**Restructuring**" shall mean "collectively, but, in each case, excluding any Transaction (as defined below), (i) any restructuring, reorganization (whether or not pursuant to chapter 11 of the United States Bankruptcy Code ("**Chapter 11**")) and/or recapitalization of the Company affecting a substantial portion of its existing or potential debt obligations or other claims against the Company, including, without limitation, senior debt, junior debt, trade claims, general unsecured claims, and preferred stock (collectively, the "**Obligations**"), and/or (ii) an in-court sale or other in-court disposition of any material assets and/or equity of the Company (including, for the avoidance of doubt, any transfer of assets to or for the benefit of the Company's creditors pursuant to a credit bid in accordance with section 363 of Title 11 of the United States Code or a chapter 11 plan (collectively, a "**Transfer to Existing Creditors**")), and/or (iii) any repurchase, refinancing, extension or prepayment by the Company of a substantial portion of the Obligations (other than any trade claims in the ordinary course of business)."

      k.      assist in arranging financing for the Debtors, as requested;

      l.      assist the Debtors in preparing marketing materials in conjunction with a possible Transaction;[7]

      m.      assist the Debtors in identifying potential buyers or parties-in-interest to a Transaction and assist in the due diligence process;

      n.      assist and advise the Debtors concerning the terms, conditions, and impact of any proposed Transaction;

      o.      provide expert witness testimony concerning any of the subjects encompassed by the other investment banking services; and

      p.      provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a transaction similar to a potential Restructuring or Transaction, as requested and mutually agreed.

### No Duplication of Services

11. PJT's services are intended to complement, and not duplicate, the services to be rendered by any other professional retained by the Debtors in these chapter 11 cases. PJT has informed the Debtors that it understands that the Debtors have retained and may retain additional professionals during the term of the engagement and will use its reasonable efforts to work cooperatively with such professionals to integrate any respective work conducted by such professionals on behalf of the Debtors.

### Professional Compensation

12. PJT's decision to advise and assist the Debtors in connection with these chapter 11 cases is subject to its ability to be retained in accordance with the terms of the Engagement Letter pursuant to section 328(a), and not section 330, of the Bankruptcy Code.

---

[7] As provided for the Engagement Letter, a "Transaction" shall mean "any potential sale, merger or other disposition (whether in-court or out-of-court) of all or a portion of the Company's shares, assets and/or businesses."

7

13. In consideration of the services to be provided by PJT, and as more fully described in the Engagement Letter, subject to this Court's approval, the Debtors and PJT have agreed that PJT shall, in respect of its services, be compensated under the following fee structure (the "Fee Structure"):[8]

    a. **Monthly Fee**. The Debtors shall pay PJT a monthly advisory fee (the "Monthly Fee") of $150,000 per month. Fifty percent (50%) of all Monthly Fees paid to PJT after $900,000 in Monthly Fees have been paid shall be credited, only once and without duplication, against any Restructuring Fee (as defined below) payable hereunder;

    b. **Capital Raising Fee**. The Debtors shall pay PJT a capital raising fee (the "Capital Raising Fee") for any financing arranged by PJT, earned and payable upon receipt of a binding commitment letter. The Capital Raising Fee will be calculated as:

- Senior Debt. 1.00% of the total issuance size for senior debt financing;

- Junior Debt. 3.00% of the total issuance size for junior debt or preferred equity financing; and

- Equity Financing. 5.00% of the issuance amount for equity financing.

If financing arranged by PJT (and use of proceeds generated from such financing) is the only Restructuring undertaken, PJT, in its sole discretion, may choose to be paid either the Capital Raising Fee or the Restructuring Fee, but not both.

    c. **Amendment Fee**. To the extent an Amendment[9] is determined to be necessary, an amendment fee (the "Amendment Fee") in an amount to be agreed upon among the parties, earned and payable upon the closing of such Amendment.

    d. **Restructuring Fee**. In accordance with the terms of the Engagement Letter, the Debtors shall pay PJT an additional restructuring fee

---

[8] The summary of the Fee Structure in this application is qualified in its entirety by reference to the provisions of the Engagement Letter. To the extent there is any discrepancy between the summary contained in this application and the terms set forth in the Engagement Letter, the terms of the Engagement Letter shall govern.

[9] As provided for in the Engagement Letter, an "Amendment" shall mean any amendment, modification, and/or waiver in respect of any of the Debtors' existing obligations under that certain Loan Agreement, dated as of April 17, 2014, as amended prior to the effective date of the Engagement Letter (the "Loan Agreement").

       (the "Restructuring Fee") equal to $10,000,000 earned and payable upon consummation of a Restructuring as per the Engagement Letter.

  e. **Transaction Fee**. The Debtors shall pay PJT a transaction fee (the "Transaction Fee") payable in cash at the closing of such Transaction directly out of the gross proceeds of the Transaction calculated as 2.00% of the Transaction Value.[10] Upon consummation of a Transaction in which all or substantially all of the assets of the Debtors are sold, PJT, in its sole discretion, shall be entitled to either a Transaction Fee in respect of such Transaction or the Restructuring Fee, but not both.

  f. **Expense Reimbursements**.

- In addition to the fees described above, the Debtors agree to reimburse PJT for all reasonable and documented out-of-pocket expenses incurred during the engagement, including, but not limited to, travel and lodging, direct identifiable data processing, document production, publishing services and communication charges, courier services, working meals, reasonable fees and expenses of PJT's counsel (without the requirement that the retention of such counsel

---

[10] As provided for the Engagement Letter, "Transaction Value" shall mean "the gross value of all cash, securities and other properties paid or payable, directly or indirectly, in one transaction or in a series or combination of transactions, in connection with the Transaction or a transaction related thereto (including, without limitation, amounts paid (A) pursuant to covenants not to compete or similar arrangements and (B) to holders of any warrants, stock purchase rights, convertible securities or similar rights and to holders of any options or stock appreciation rights, whether or not vested). Transaction Value shall also include (i) (I) in the case of the sale, exchange or purchase of the [Debtors'] equity securities the principal amount of any indebtedness for borrowed money, preferred stock obligations, any pension liabilities, capital leases, guarantees and any other long-term liabilities as set forth on the most recent consolidated balance sheet of the [Debtors] prior to the consummation of such sale, exchange or purchase or (II) in the case of a sale or disposition of assets by the [Debtors] the principal amount of any indebtedness for borrowed money, preferred stock obligations, any pension liabilities, capital leases, guarantees and any other long-term liabilities indirectly or directly assumed or acquired, and (ii) any indebtedness for borrowed money, preferred stock obligations, any pension liabilities, capital leases, guarantees and any other long-term liabilities that are or otherwise repaid or retired, in connection with or in anticipation of the Transaction. Transaction Value shall also include the aggregate amount of any extraordinary dividend or distribution made by the [Debtors] from the date [of the Engagement Letter] until the Closing of the Transaction. Transaction Value shall include all amounts paid into escrow and all contingent payments payable in connection with the Transaction, with fees on amounts paid into escrow to be payable upon the establishment of such escrow and fees on contingent payments to be payable when such contingent payments are made. If the Transaction Value to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such Transaction Value is paid. In [the Engagement Letter], the value of any securities (whether debt or equity) or other property paid or payable as part of the Transaction Value shall be determined as follows: (1) the value of securities that are freely tradable in an established public market will be determined on the basis of the last market closing price prior to the public announcement of the Transaction; and (2) the value of securities that are not freely tradable or have no established public market or, if the Transaction Value utilized consists of property other than securities, the value of such other property shall be the fair market value thereof as mutually agreed by the [Debtors and PJT]."

    be approved by the court in any bankruptcy case), and other necessary expenditures.

- Further, in connection with the reimbursement, contribution, and indemnification provisions set forth in the Engagement Letter and Attachment A to the Engagement Letter (the "Indemnification Agreement"), which is incorporated therein by reference, the Debtors agree to reimburse each Indemnified Party (as defined in the Indemnification Agreement) for its legal and other expenses (including the cost of any investigation and preparation) as they are incurred in connection with any matter in any way relating to or referred to in the Engagement Letter or arising out of the matters contemplated by the Engagement Letter (including, without limitation, in enforcing the Engagement Letter), subject to certain exceptions set forth in the Indemnification Agreement.

14. As part of the overall compensation payable to PJT under the terms of the Engagement Letter, the Debtors have agreed to certain indemnification, contribution, and reimbursement obligations set forth in the Indemnification Agreement attached as Attachment A to the Engagement Letter.

15. The terms of the Engagement Letter and Indemnification Agreement were negotiated at arm's-length and the Debtors respectfully submit that the indemnification, contribution, and reimbursement provisions are reasonable and appropriate under the circumstances.

16. Moreover, consistent with the practice in this jurisdiction, the Debtors request, and PJT has agreed, that the Court approve the indemnification, contribution, and reimbursement provisions reflected in the Indemnification Agreement, subject to the modifications reflected in the Order as follows, during the pendency of these chapter 11 cases:

  a. subject to the provisions of subparagraphs (b) and (d), infra, the Debtors are authorized to indemnify, and to provide contribution and reimbursement to, and shall indemnify, and provide contribution and reimbursement to, any Indemnified Party (as defined in the Indemnification Agreement) in accordance with the Indemnification Agreement for any claim arising from, related to, or in connection with the services provided for in the Engagement Letter;

      b.      notwithstanding subparagraph (a) above or any provisions of the Indemnification Agreement to the contrary, the Debtors shall have no obligation to indemnify PJT or provide contribution or reimbursement to PJT (i) for any claim or expense that is judicially determined (the determination having become final and no longer subject to appeal) to have arisen from PJT's bad faith, self-dealing, breach of fiduciary duty (if any), willful misconduct, or gross negligence; (ii) for a contractual dispute in which the Debtors allege the breach of PJT's contractual obligations if the Court determines that indemnification, contribution, or reimbursement would not be permissible pursuant to *In re United Artists Theatre Company*, 315 F.3d 217 (3d Cir. 2003); or (iii) for any claim or expense that is settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by this Court, after notice and a hearing pursuant to subparagraph (c), *infra*, to be a claim or expense for which PJT should not receive indemnity, contribution or reimbursement under the terms of the Indemnification Agreement, as modified by the Order;

      c.      if, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these chapter 11 cases (that order having become a final order no longer subject to appeal), and (ii) the entry of an order closing these chapter 11 cases, PJT believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution, and/or reimbursement obligations under the Indemnification Agreement, as modified by the Order, including without limitation the advancement of defense costs, PJT must file an application therefor in this Court, and the Debtors may not pay any such amounts to PJT before the entry of an order by this Court approving the payment. This subparagraph (c) is intended only to specify the period of time during which this Court shall have jurisdiction over any request by PJT for indemnification, contribution, or reimbursement and is not a provision limiting the duration of the Debtors' obligation to indemnify, or make contribution or reimbursement to, PJT; and

      d.      notwithstanding any provision in the Engagement Letter to the contrary, (i) subject to the terms of, and the Debtors' indemnification, reimbursement and contribution obligations under, the Indemnification Agreement, there shall be no limitation of PJT's liability in connection with its engagement and (ii) the cap on PJT's contribution liability set forth in the Indemnification Agreement shall not be applicable.

    17.    The Debtors believe that the provisions of the Indemnification Agreement, as modified by the Order, are appropriate under the circumstances, consistent with recent orders entered in this jurisdiction, and should be approved.  The Debtors believe that such an

indemnification obligation is customary, reasonable, and necessary to retain the services of an investment banker in these chapter 11 cases.

18. To the best of the Debtors' knowledge, information, and belief, no promises have been received by PJT as to compensation in connection with these chapter 11 cases other than as outlined in the Engagement Letter, and PJT has no agreement with any other entity to share any compensation received with any person other than the principals and employees of PJT.

19. PJT intends to apply to the Court for allowance of compensation for professional services rendered and reimbursement of expenses incurred in connection with these chapter 11 cases, subject to the Court's approval and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any orders entered in these chapter 11 cases regarding professional compensation and reimbursement of expenses (to the extent compliance is not waived).

20. PJT will maintain records in support of any actual, necessary costs and expenses incurred in connection with the rendering of its services in these chapter 11 cases. However, because: (a) it is not the general practice of investment banking firms such as PJT to keep detailed time records similar to those customarily kept by attorneys; (b) PJT does not ordinarily keep time records on a "project category" basis; and (c) PJT's compensation is based on a fixed Monthly Fee, the Capital Raising Fee, the Restructuring Fee, and/or the Transaction Fee, the Debtors respectfully request that PJT's professionals only be required to maintain records (in summary format) of the services rendered for the Debtors, including summary descriptions of those services, the approximate time expended in providing those services (in one-half hour increments), and the identity of the professionals who provided those services. PJT will present such records to this Court in its fee applications. Moreover, the Debtors respectfully request that PJT's professionals

not be required to keep time records on a "project category" basis, that its non-investment banking professionals and personnel in administrative departments (including legal) not be required to maintain any time records, and that it not be required to provide or conform to any schedule of hourly rates. To the extent that PJT would otherwise be required to submit more detailed time records for its professionals by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or other applicable procedures and orders of the Court, the Debtors respectfully request that this Court waive or excuse compliance with such requirements or guidelines.

21. The Debtors believe that the Fee Structure described above and in the Engagement Letter is consistent with, and typical of, compensation arrangements entered into by PJT and other comparable firms in connection with the rendering of similar services under similar circumstances and is reasonable, market-based, and merited by PJT's restructuring expertise. After discussions and arm's-length negotiations, the Debtors believe that the Fee Structure is reasonable, market-based, and designed to compensate PJT fairly for its work and to cover customary expenses.

22. PJT's strategic and financial expertise, as well as its capital markets knowledge, financing skills, and restructuring capabilities, some or all of which has and will be required by the Debtors during the term of PJT's engagement, were all important factors to the Debtors in determining the Fee Structure. The Debtors believe that the ultimate benefit of PJT's services hereunder cannot be measured by reference to the number of hours to be expended by PJT's professionals in the performance of such services. The Debtors and PJT have agreed upon the Fee Structure in anticipation that a substantial commitment of professional time and effort will be required of PJT and its professionals in connection with these chapter 11 cases and in light of the fact that: (a) such commitment may foreclose other opportunities for PJT; and (b) the actual time

and commitment required of PJT and its professionals to perform its services under the Engagement Letter may vary substantially from week-to-week and month-to-month, creating "peak load" issues for PJT.

### PJT's Disinterestedness

23. PJT has reviewed the list of parties-in-interest provided by the Debtors. To the best of PJT's knowledge, as of the date hereof, and except to the extent disclosed herein or in the Buschmann Declaration, PJT: (a) is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code; (b) does not hold or represent an interest adverse to the Debtors' estates; and (c) has no connection to the Debtors, their creditors, or related parties.

24. Given the large number of parties-in-interest in these chapter 11 cases, and despite the efforts to identify and disclose PJT's relationships with parties-in-interest in these chapter 11 cases, PJT is unable to state with certainty that every client relationship or other connection has been disclosed in the Buschmann Declaration. PJT will make continued inquiries following the filing of the Application, on a periodic basis, with additional disclosures to this Court if necessary or otherwise appropriate.

25. According to the Debtors' books and records, during the ninety-day period before the Petition Date, the Debtors paid PJT $391,935.48 for monthly fees earned and $59,608.26 for expenses incurred. Prior to the Petition Date, PJT had also received advance payments in the aggregate amount of $243,064.52. Given the timing of the filing, PJT may not yet have accounted for all expenses it incurred before the Petition Date. In the event PJT subsequently becomes aware of additional prepetition expenses incurred on behalf of the Debtors, PJT will reduce its advance by such amounts. To the extent that amounts paid by the Debtors to PJT prior to the Petition Date

exceed amounts incurred by PJT prepetition, such excess will be held by PJT as security throughout these chapter 11 cases until PJT's fees and expenses are fully paid.

26.     The Debtors are informed that PJT will not share any compensation to be paid by the Debtors, in connection with services to be performed after the Petition Date, with any other person, other than other principals and employees of PJT, to the extent required by section 504 of the Bankruptcy Code.

## Basis for Relief Requested

27.     The Debtors seek authority to employ and retain PJT as their investment banker under section 327 of the Bankruptcy Code, which provides that a debtor is authorized to employ professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [Debtor] in carrying out the [Debtor's] duties under this title."  11 U.S.C. § 327(a).  Section 1107(b) of the Bankruptcy Code elaborates upon sections 101(14) and 327(a) of the Bankruptcy Code in cases under chapter 11 and provides that "a person is not disqualified for employment under section 327 of [the Bankruptcy Code] by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case."  11 U.S.C. § 1107(b).

28.     In addition, the Debtors seek approval of the Fee Structure and the Engagement Letter (including the Indemnification Agreement) pursuant to section 328(a) of the Bankruptcy Code, which provides, in relevant part, that debtors, "with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis."  11 U.S.C. § 328(a).  Accordingly, section 328 of the Bankruptcy Code permits the compensation of professionals, including investment bankers, on flexible terms that reflect the nature of their services and market conditions.

15

29.     Furthermore, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 amended section 328(a) of the Bankruptcy Code to read as follows:

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis.

11 U.S.C. § 328(a). It is thus clear that debtors may retain a professional on a fixed or percentage fee basis with Court approval, such as the Fee Structure for PJT in the Engagement Letter.

30.     The Fee Structure set forth in the Engagement Letter sets forth reasonable terms and conditions of employment and should be approved under section 328(a) of the Bankruptcy Code. The Fee Structure adequately reflects (a) the nature of the services to be provided by PJT and (b) fee structures and indemnification provisions typically utilized by PJT and other leading investment banking firms, which do not bill their time on an hourly basis and generally are compensated on a transactional basis. Furthermore, PJT did not vary its rate based on the location of these chapter 11 cases.

31.     As set forth above, and notwithstanding approval of the Engagement Letter under section 328 of the Bankruptcy Code, PJT intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with these chapter 11 cases, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable procedures and orders of the Court, with certain limited modifications.

32.     Specifically, the Debtors request that the requirements of Bankruptcy Rule 2016 and Local Rule 2016-2 be tailored to the nature of PJT's engagement and its compensation structure. PJT has requested, pursuant to section 328(a) of the Bankruptcy Code, payment of its fees on a fixed-rate and contingency basis and the payment of the fees described in the Engagement

Letter, which, as set forth above, is customary in the investment banking industry. Additionally, it is not the general practice of investment banking firms to keep detailed time records similar to those customarily kept by attorneys. As discussed above, however, PJT's personnel in these chapter 11 cases will keep summary time records in one-half hour increments describing their daily activities and the identity of persons who performed such tasks. In addition, apart from the time-recording practices described above, PJT's personnel do not maintain their time records on a "project category" basis. As such, the Debtors request modification of the requirements under Local Rule 2016-2.

33. In addition, the provisions of the Indemnification Agreement are reasonable and have been approved and implemented in other large chapter 11 cases by courts in and outside of this jurisdiction. Accordingly, the Debtors submit that the relief requested in this application is in the best interests of the Debtors, their estates, their creditors, and all parties-in-interest in these chapter 11 cases.

34. The Debtors will regularly monitor the fees and expenses of PJT to ensure that PJT's professionals are assisting the Debtors in the most cost-effective and efficient manner. The Debtors will employ similar procedures for reviewing professional invoices that they have employed prior to the commencement of these chapter 11 cases.

35. Denial of the relief requested herein will deprive the Debtors of the assistance of a uniquely qualified investment banking firm. Moreover, with the significant amount of services already provided to the Debtors over the past few months, a denial of PJT's employment would result in an unjust disadvantage to the Debtors and all parties-in-interest because of PJT's understanding of the Debtors' operations. Indeed, if the Debtors were forced to engage a new investment banker that lacks a thorough understanding of the Debtors' business and the initiatives

17

that have been implemented over the course of the past few months, such change would mandate the commitment of significant and costly resources to educate a replacement.

36.     Based on the foregoing, the Debtors submit that they have satisfied the requirements of the Bankruptcy Code, Bankruptcy Rules, and the Local Rules to support entry of an order authorizing the Debtors to retain and employ PJT in these chapter 11 cases on the terms described herein and in the Engagement Letter.

## Notice

37.     The Debtors will provide notice of this application to: (a) the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) Wilmington Savings Fund Society, FSB, in its capacity as successor administrative agent under the Term Loan Credit Agreement, or any of its predecessors or successors (the "Term Loan Agent"); (d) counsel to the Term Loan Agent; (e) counsel to the ad hoc group of the Debtors' Prepetition Lenders (the "Ad Hoc Group"); (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the Food and Drug Administration; (i) the Drug Enforcement Administration; (j) the Securities Exchange Commission; (k) the state attorneys general for all states in which the Debtors conduct business; and (l) any party that requests service pursuant to Local Rule 9013-1(m)(iii).

## No Prior Request

38.     No prior request for the relief sought in this application has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A**, (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

Wilmington, Delaware
June 3, 2020

/s/ *Joseph Bonaccorsi*
Joseph Bonaccorsi
Executive Vice President and General Counsel
Akorn, Inc.