## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AKORN, INC.,[1] | ) Case No. 20-11177 (KBO) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) **Re: Docket Nos. 103, 228, 233, 238, and 240** |

## DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (II) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF AKORN, INC. AND ITS DEBTOR AFFILIATES, (III) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, AND (IV) SCHEDULING CERTAIN DATES WITH RESPECT THERETO

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this reply (this "Reply") to the objections[2] to the relief requested by the Debtors in the *Debtors'*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Akorn, Inc. (7400); 10 Edison Street LLC (7890); 13 Edison Street LLC; Advanced Vision Research, Inc. (9046); Akorn (New Jersey), Inc. (1474); Akorn Animal Health, Inc. (6645); Akorn Ophthalmics, Inc. (6266); Akorn Sales, Inc. (7866); Clover Pharmaceuticals Corp. (3735); Covenant Pharma, Inc. (0115); Hi-Tech Pharmacal Co., Inc. (8720); Inspire Pharmaceuticals, Inc. (9022); Oak Pharmaceuticals, Inc. (6647); Olta Pharmaceuticals Corp. (3621); VersaPharm Incorporated (6739); VPI Holdings Corp. (6716); and VPI Holdings Sub, LLC. The location of the Debtors' service address is: 1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.

[2] In full, the following objections were filed (each as defined herein): (a) *Objection of Fresenius Kabi AG to the Debtors' Disclosure Statement Motion* [Docket No. 240] (the "Fresenius Objection" and the objector, "Fresenius"); (b) *Objection to Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Joint Chapter 11 Plan of Akorn, Inc. and its Debtor Affiliates, (III) Approving the Forms of Ballots and Notices in Connection Therewith, and (IV) Scheduling Certain Dates with Respect Thereto* [Docket No. 238] (the "Provepharm Objection" and the objector, "Provepharm"); (c) *Joint Objection of 1199SEIU Benefit Funds, DC47 Fund and SBA Fund to the Adequacy of Debtors' Disclosure Statement (DI #102)* [Docket No. 233] (the "MDL Plaintiffs Objection" and the objectors, the "MDL Plaintiffs"); and (d) *Opt-Out Plaintiffs' Limited Objection to Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures With Respect to Confirmation of the Joint Chapter 11 Plan of Akorn, Inc. and Its Debtor Affiliates, (III) Approving the Forms of Ballots and Notices in Connection Therewith, and (IV)*

*Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Joint Chapter 11 Plan of Akorn, Inc. and Its Debtor Affiliates, (III) Approving the Forms of Ballots and Notices in Connection Therewith, and (IV) Scheduling Certain Dates with Respect Thereto* [Docket No. 103] (the "Motion").[3]  In support of this Reply, and in further support of approval of the Disclosure Statement and entry of the Order (as defined in the Motion), the Debtors respectfully state as follows:

## Preliminary Statement

1.      The Debtors commenced these chapter 11 cases on the heels of a robust, months-long marketing process for a potential going-concern transaction, which itself followed on the heels of a separate process to raise new capital to refinance its secured debt obligations in August 2019.  Acutely aware that the overhang of the Debtors' litigation with Fresenius and the follow-on shareholder derivative and direct class action litigation created an obstacle to the Debtors' ability to consummate an out-of-court sale or refinancing transaction, the Debtors, beginning in the summer of 2019, pursued a comprehensive strategy to derisk their litigation profile through settlement of certain prepetition litigation.  The Debtors hoped that such efforts, if successful, might entice financial and other counterparties to either refinance their existing indebtedness or bid on their assets at valuations in excess of their secured debt, potentially avoiding a bankruptcy filing altogether.

---

*Scheduling Certain Dates With Respect Thereto* [Docket No. 228] (the "Opt-Outs Objection," the objectors, the "Opt-Outs," the Opt-Outs Objection collectively with the Fresenius Objection, the Prevepharm Objection, and the Funds Objection, the "Objections," and the objecting parties, collectively, the "Objectors").

[3]    On May 26, 2020, the Debtors filed the *Joint Chapter 11 Plan of Akorn, Inc. and its Debtor Affiliates* [Docket No. 101] and the *Disclosure Statement for the Joint Chapter 11 Plan of Akorn, Inc. and its Debtor Affiliates* [Docket No. 102].  Capitalized terms used but not defined herein shall have the meanings ascribed to them as set forth in the Motion, the Plan, or the Disclosure Statement, as applicable.

2.     Accordingly, in July 2019, the Debtors and the securities plaintiff class representatives reached an agreement in principle to resolve the securities class action litigation, and that settlement was preliminarily approved by a federal district court on August 26, 2019. Although a handful of plaintiffs, representing a small minority of total class claims, determined to "opt out" of that settlement, the Debtors and the settling class members proceeded with final approval of the settlement, which was ultimately granted on March 13, 2020.  Similarly, in December 2019, the Debtors finalized—and a court approved—a settlement of shareholder derivative litigation brought in Louisiana (Akorn, Inc.'s state of incorporation) that arose from, among other things, the conduct challenged in the Fresenius litigation (a key fact certain objectors like Fresenius overlooked in their objections).  Court-supervised and -approved notice of that settlement was provided to affected parties, and the settlement was finally approved by the Louisiana court on January 22, 2020.  As a result of that litigation and ensuing settlement, any claims that the Debtors may have had against current and former directors and officers were litigated, negotiated, and released.[4]  Thus, contrary to the claims of certain Objectors, there was no need for the Debtors to conduct an independent investigation into claims that no longer existed. Meanwhile, throughout 2019 the Debtors continued to defend against Fresenius's damages claims following unsuccessful efforts to settle those claims in February 2019 and then again in November 2019.

3.     Bankruptcy, therefore, was not the Debtors' first option.  But it emerged as the only viable option.  Despite their prepetition efforts, no transaction was available that provided for the payment in full of the Debtors' substantial secured debt obligations, and the Debtors filed these cases with a comprehensive path to exit that includes a credit bid by their prepetition term loan

---

[4]    Stockholder derivative litigation brought in federal and state courts in Illinois asserting substantially similar claims arising out of the conduct identified in the Fresenius litigation was dismissed with prejudice.

lenders with cash and non-cash consideration valued at approximately $1.05 billion and a subsequent wind-down of the Debtors' estates that provides a framework for distributing any additional value obtained through a postpetition market test process to stakeholders in accordance with their legal entitlements.  Notwithstanding what certain Objectors have implied by their filings, the Debtors have run, and will continue to run, a transparent process that takes advantage of the legal tools available in order to best position the Debtors for future success and ensure their viability as a going concern.  Indeed, as noted, the proposed sale transaction (the "Sale") is subject to a fair and transparent process to obtain higher and better bids through postpetition marketing.[5]

4.      The proposed Plan and Disclosure Statement work in tandem with the Sale and the Debtors believe that now is the time to advance the Disclosure Statement and Plan process. Although the Debtors acknowledge that various stakeholders have competing views on the transactions ultimately contemplated by the Sale and the Plan, the Disclosure Statement contains adequate information for all voting creditors to make an informed decision to vote to accept or reject the Plan and satisfies the Debtors' burden under section 1125 of the Bankruptcy Code.

5.      *First*, in response to formal objections and informal disclosure-based comments received from parties in interest, the Debtors have revised the Plan, the Disclosure Statement, and the Solicitation Procedures to address the Objectors' disclosure-related concerns.[6]  In particular, the Debtors, among other things:

---

[5]     Indeed, on June 15, 2020, the Court entered the *Order (A) Authorizing and Approving Bidding Procedures, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Establishing Notice and Procedures for the Assumption and Assignment of Certain Executory Contracts and Leases, and (E) Granting Related Relief* [Docket No. 181] (the "Bidding Procedures Order"), approving the Debtors' proposed market test process.

[6]     A summary of the Debtors' responses to the Objections, including the language the Debtors added to the Disclosure Statement to address certain of the concerns raised in the Objections, are summarized in the chart attached hereto as **Exhibit A** (the "Resolution Chart").  The Debtors' responses in the Resolution Chart are incorporated into this Reply as though fully set forth herein.

- Provided additional discussion regarding the subordination of claims pursuant to section 510(b) of the Bankruptcy Code.  Disclosure Statement Art. II.G;

- Clarified that, in the event the Stalking Horse Bid is the Successful Bid (as defined in the Bidding Procedures), there will likely be no cash proceeds available for distribution to junior creditors.  Disclosure Statement Art. II.K;

- Included a formula for *pro rata* allocation of Distributable Proceeds (if any) between Class 7 Section 510(b) Claims and Class 8 Akorn Interests.  Disclosure Statement Art. II.M;

- Added further explanation regarding the scope and reasonableness of the Debtor releases.  Disclosure Statement Art. VI.R.2;

- Revised the Plan and related solicitation materials to provide for an "opt in" third-party release.  Plan Art. I.A.103;

- Included further explanation of litigation identified by certain of the Objectors.  Disclosure Statement Art. IV.C;

- Included further description of the Stalking Horse Bid.  Disclosure Statement Art. V.F.1; and

- Revised the Solicitation Procedures to clarify that creditors who timely file proofs of claim will receive supplemental solicitation packages and provide parties with additional time to respond to claims objections for purposes of voting on the Plan.  Disclosure Statement Art. VII.E.2; Solicitation Procedures.

6.      These changes are in addition to multiple other revisions made to the Plan, Disclosure Statement, and Solicitation Procedures to address informal comments from the U.S. Trustee and the official committee of unsecured creditors (the "Committee"), who worked cooperatively with the Debtors to resolve their process- and disclosure-related concerns, while reserving argument on confirmation-related issues for a more appropriate time (*i.e.*, in connection with confirmation).  Although the Debtors expressed a willingness to accommodate reasonable requests for additional language from the Objectors—and remain willing to do so—not all Objectors accepted the Debtors' invitation to provide language that might further address their

disclosure concerns.[7]  Instead, Objectors such as Fresenius used their objections as yet another opportunity to restate issues that have already been litigated and begin crafting a self-serving narrative.  The Debtors have not tried to hide the prepetition conduct that was extensively and publicly explored in the Fresenius litigation.  Rather, these facts and circumstances—as well as the remedial efforts the Debtors took in response—have been disclosed in multiple pleadings filed to date, including the First Day Declaration, and the Disclosure Statement.[8]  Moreover, that prepetition conduct was the subject of many hotly contested prepetition lawsuits in state courts in Delaware, Louisiana, and Illinois and federal courts in Illinois, which gave rise to detailed and heavily publicized court proceedings and decisions, as well as settlements for valuable consideration prior to commencement of these chapter 11 cases.

7.      As for the remaining Objections, they raise issues that are not properly considered at a hearing on the Disclosure Statement.  Contrary to these Objectors' analysis, the Plan is not patently unconfirmable.  To succeed on a confirmation-related objection at this stage in the chapter 11 cases, the objecting parties must demonstrate that confirmation of the Plan is *impossible*.  The Objectors have not made—and cannot make—such a showing.  The Debtors recognize that certain stakeholders—particularly those that stand to receive little or no recovery through this process—may not support the Sale or the Plan, but that in itself is insufficient reason to arrest the progress of these chapter 11 cases.  Put simply, the Disclosure Statement addresses all

---

[7]     Counsel to the Opt-Outs also worked in good faith with the Debtors on language for the Disclosure Statement and Solicitation Procedures that the Debtors understand resolves the Opt-Outs Objection.  In addition, the Debtors received proposed language from Fresenius shortly prior to filing this Reply, but have not yet had an opportunity to review.  The Debtors will continue to engage with Fresenius and other stakeholders in advance of the hearing in an effort to narrow the scope of contested issues.

[8]     For example, the Debtors have taken significant steps to ensure compliance with FDA regulations and the discovery and remediation of any issues, including substantial completion of remediation efforts with respect to testing practices and other data integrity deficiencies.  The Debtors also replaced several members of their executive team and appointed new members to their board of directors.  *See* First Day Decl. ¶¶ 69–77.  Thus, Fresenius's insinuation that a "culture of noncompliance" continues to exist is not grounded in facts or reality.

of the disclosure-related objections and otherwise contains adequate information to satisfy the requirements of section 1125 of the Bankruptcy Code.  Accordingly, the Disclosure Statement Motion should be granted, and the Disclosure Statement should be approved.

<u>**Argument**</u>

I.        **The Disclosure Statement Contains "Adequate Information**."

8.        Section 1125 of the Bankruptcy Code sets forth a clear focus for approval of a Disclosure Statement:  "adequate information."  Section 1125's adequate information standard is not intended to be onerous, and it requires only that a debtor provide enough information for voting parties to make an informed judgment when deciding whether to accept or reject a chapter 11 plan.

9.        Courts have interpreted "adequate information" to mean information that is "reasonably practicable" to permit an "informed judgment" by creditors and interest holders, if applicable, to vote on a plan of reorganization.  *See In re Lower Buck Hosp.*, 571 Fed. Appx. 139, 142 (3d Cir. 2014).  On the other hand, however, "overburdening a proponent's disclosure statement with information significant and meaningful to lawyers alone may result ultimately in reducing the disclosure statement to an overlong incomprehensible, ineffective collection of words to those whose interests are to be served by disclosure."  *In re Stanley Hotel, Inc.*, 13 B.R. 926, 933–34 (Bankr. D. Colo. 1981) ("Thus, compounding a disclosure statement for the sake of a lawyer's notion of completeness, or because some additional information might enhance one's understanding, may not always be necessary or desirable, and the length of a document should not be the test of its effectiveness."); *see also In re Applegate Prop., Ltd.*, 133 B.R. 827, 829–30 (Bankr. W.D. Tex. 1991) ("[A] disclosure statement need not meet the extensive disclosure requirements of the securities laws for registration statements and the like."); *In re Waterville Timeshare Grp.*, 67 B.R. 412, 413 (Bankr. D.N.H. 1986) ("[O]verly technical and extremely numerous additions to a disclosure statement suggested by an objecting party may themselves be

self-defeating in terms of the resulting clarity and understandability of the document to the average investor.").

10.     The Disclosure Statement contains adequate information for it to be meaningfully understood by Holders of Claims and Interests whose votes on the Plan are being solicited.  The Disclosure Statement describes, among other things, the nature and anticipated amounts of Holders' recoveries under the Plan, the history and background of these chapter 11 cases, risk factors to be considered when voting on the Plan, and the Debtors' Court-approved sale process that provides the primary potential source of additional recoveries under the Plan.  *See In re Walker*, 198 B.R. 476, 479 (Bankr. E.D. Va. 1996) (holding that, in evaluating the sufficiency of a disclosure statement, "[a] debtor cannot be expected to unerringly predict the future, but rather must provide information on all factors *known to him at the time* that bear upon the success or failure of the proposals set forth in the plan." (emphasis added)).  To the extent the Objectors have additional language they would like included in the Disclosure Statement regarding matters specific to them, the Debtors are willing to meaningfully engage on the content of such language.[9] Tellingly, the objections filed by the MDL Plaintiffs and Fresenius do not suggest language that would be acceptable to them, and they have to date declined to provide such language despite invitations to do so.[10]

11.     Notwithstanding these efforts, the Objectors continue to raise certain Objections relating to the adequacy of the information in the Disclosure Statement.  Fresenius, for example, objects to the lack of inclusion of a quantitative liquidation analysis and financial projections with

---

[9]     The Debtors continue to engage with their stakeholders, including the Objectors, to address disclosure-based concerns in advance of the hearing to consider approval of the Disclosure Statement.

[10]    While the Debtors do not believe they are under an affirmative obligation to discuss any and all pending litigation against the Debtors—particularly litigation of speculative value and subject to defenses—the Debtors are willing to include (and have included) disclosures regarding pending litigation to the extent requested by litigation parties. Indeed, if it was the case that a bankrupt debtor was obligated to provide disclosure regarding any and all pending litigation, disclosure statements in large chapter 11 cases would routinely run several hundred pages.

the Disclosure Statement.  With respect to the former, the Plan provides for the liquidation and

wind-down of the Debtors' estates and distributions to Holders of Claims and Interests in

accordance with a priority waterfall.  In light of the requirement of section 1129(a)(7) of the

Bankruptcy Code that each Holder in an impaired Class "receive or retain under the plan on

account of such claim property of a value, as of the effective date of the plan, that is not less than

the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7

of this title on such date," the Debtors' qualitative liquidation analysis set forth in Article VII.I.1

of the Disclosure Statement is sufficient for voting parties to make an informed decision about the

Plan, as it has been for other large chapter 11 liquidating plans.  *See, e.g.*, *In re Barney's New York,*

*Inc.*, Case No. 19-36300 (CGM) (Bankr. S.D.N.Y. Dec. 19, 2019) (approving disclosure statement

containing qualitative liquidation analysis); *In re Toys "R" Us, Inc.*, Case No. 17-34665 (KLP)

(Bankr. E.D. Va. Sept. 6, 2018) (same); *In re Cobalt Int'l Energy, Inc.*, Case No. 17-36709 (MI)

(Bankr. S.D. Tex. Mar. 8, 2018) (same).

      12.     With respect to the latter, Fresenius misstates the legal standard.  Although financial

projections are common in *reorganization* plans to demonstrate that the proposed plan is "not

likely to be followed by the liquidation . . . of the debtor," this is unnecessary when the

"liquidation . . . is proposed in the plan" itself, as is the case here. 11 U.S.C. § 1129(a)(11); *see*

*also In re Wood*, Case No. 89-0111, 1991 WL 332637 at *3 (Bankr. W.D. Va. Nov. 11, 1991)

("[L]ogic and authorities suggest that the feasibility analysis under [liquidating] plans will vary

somewhat from that used in 'true' reorganizations.  When the debtor is engaged in an ongoing

business, information concerning capital structure, earning power, economic conditions, the skill

of management, and past performance, when considered by an expert allow for projections to be

based upon a solid historical basis.") (internal citations omitted).  Disclosure statements in large

chapter 11 cases with liquidating plans have been approved absent attached financial projections in similar circumstances. *See, e.g.*, *In re Barney's New York, Inc.*, Case No. 19-36300 (CGM) (Bankr. S.D.N.Y. Dec. 19, 2019) (approving disclosure statement for liquidating plan that did not include financial projections); *In re Toys "R" Us, Inc.*, Case No. 17-34665 (KLP) (Bankr. E.D. Va. Sept. 6, 2018) (same); *In re Cobalt Int'l Energy, Inc.*, Case No. 17-36709 (MI) (Bankr. S.D. Tex. Mar. 8, 2018) (same).

13.     A substantial number of the issues raised in the Objections relate to confirmation of the Plan as opposed to the narrow question of whether the Disclosure Statement satisfies the "adequate information" standard of section 1125 of the Bankruptcy Code.  The remaining issues relate to information that is already accounted for or is now included in the Disclosure Statement. To the extent that any of the points raised in the Objections are not addressed by specific changes to the Disclosure Statement, the Debtors respectfully submit that the Objections should be overruled.  Although many of the Objections are addressed in the Resolution Chart, the Debtors have addressed a few of the remaining Objections below.

## II.    The Debtors Have Revised the Solicitation Procedures in Response to Concerns Raised by Parties in Interest.

14.     Parties in interest, including certain Objectors, the Committee, and the U.S. Trustee, raised concerns with the Debtors regarding the Debtors' proposed Solicitation Procedures.  As evinced by the Debtors' intent to solicit votes to accept or reject the Plan from ***all*** Holders whose Claims and Interests may be entitled to a recovery—however unlikely—under the waterfall, the Debtors, at all relevant times, have sought to enfranchise stakeholders.  The Debtors have modified the timing surrounding "reduce and allow" objections to claims and resolution of claims objections for voting purposes.  *See* Solicitation Procedures § D.3.  The Debtors also clarified that unsecured creditors who timely file Proofs of Claim (and have not otherwise received a Solicitation Package)

will receive a Solicitation Package as part of a supplemental distribution.  The Debtors believe these changes are consistent with their overall objective—to ensure as many stakeholders as possible have an opportunity to participate in the process.  The proposed Solicitation Procedures otherwise are consistent with procedures routinely approved in this and other districts.  *See, e.g.*, *In re PES Holdings, LLC*, No. 19-11626 (KG) (Bankr. D. Del. Dec. 11, 2019) (approving solicitation procedures containing procedures for timely resolution of claims objections for voting purposes); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. May 2, 2019) (same); *see also In re RMBR Liquidation, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. May 7, 2019) (same).

III.    **Objections Raising Confirmation Issues Are Premature and the Objectors Cannot Show that the Plan Is Patently Unconfirmable**.

15.    The remaining issues raised by the Objectors relate to the confirmability of the Plan and are not appropriately raised at this juncture.  Specifically, the Objectors variously argue that (a) the Plan provides for impermissible third-party releases, (b) the Debtor release is impermissible and unsupported by the factual record, (c) the Plan provides for impermissible exculpation of non-estate fiduciaries and prepetition conduct, (d) the Plan is proposed in bad faith, (e) the classification scheme under the Plan, including the subordination of certain claims pursuant to section 510(b) of the Bankruptcy Code, is impermissible and, with respect to the Shareholder Settlement, a violation of the absolute priority rule, and (f) the transfer of Avoidance Actions to the Purchaser impermissibly deprives unsecured creditors of a recovery in these chapter 11 cases. None of these objections presents a bar to approval of the Disclosure Statement.

16.    As a general matter, courts universally agree that a disclosure statement that adequately describes the chapter 11 plan at issue should be approved unless the disclosure statement "describes a plan of reorganization which is so fatally flawed that confirmation is **impossible**" (*i.e.*, the plan is patently unconfirmable).  *In re Cardinal Congregate I*, 121 B.R. 760,

764 (Bankr. S.D. Ohio 1990) (emphasis added); *see also In re Unichem Corp.*, 72 B.R. 95, 98 (Bankr. N.D. Ill. 1987) (courts should disapprove of the adequacy of a disclosure statement on confirmability grounds only "where it is readily apparent that the plan accompanying the disclosure statement could ***never*** be legally confirmed") (emphasis added).  "A plan is patently unconfirmable where (1) confirmation defects [cannot] be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing."  *In re Am. Capital Equip., LLC*, 688 F.3d 145, 154–55 (3d Cir. 2012) (internal quotations and citation omitted) (alteration in original).

17.    The Debtors agree that the Plan must comply with the confirmation requirements set forth in section 1129 (as well as other applicable provisions) of the Bankruptcy Code, and are prepared to demonstrate as much at the appropriate time—the Confirmation Hearing.  Indeed, courts emphasize that objections related to compliance with section 1129 of the Bankruptcy Code do ***not*** rise to the level of making a plan "patently unconfirmable."  *See, e.g.*, *Cardinal Congregate I*, 121 B.R. at 763–64 (overruling objections to issues including treatment of claims and feasibility); *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987) (holding that objections bearing on confirmability must be limited to defects that could not be overcome by creditor voting results and must also concern matters upon which all material facts are not in dispute or have been fully developed).  Thus, issues bearing on debtor and third-party releases, exculpation, whether the plan has been proposed in good faith, and classification and subordination of claims are not properly raised in opposition to the Disclosure Statement.  *See In re Ellipso, Inc.*, No. 2012 WL 368281, at *2 (Bankr. D.D.C. Feb. 3, 2012) (finding that certain disclosure statement objections were confirmation issues "more appropriately dealt with at a confirmation hearing" including "(i) the contention that the classification of claims is improper; (ii) a claim that the

Proponents do not have the means to fund the plan; (iii) an objection to the disclosure statement's admission that if [certain] claims are allowed, there will be nothing left to pay the other creditors; and (iv) allegations that the plan is being proposed in bad faith.")

18.     Further, courts routinely approve disclosure statements despite the existence of disputed issues related to confirmation, which may require an evidentiary hearing.  *See, e.g.*, *In re Quigley Co., Inc.*, 377 B.R. 110 (Bankr. S.D.N.Y. 2007) (approving the disclosure statement while acknowledging that settlements with the debtors' non-debtor former parent "implicate several confirmation issues" regarding the rights and incentives of certain claimants under the proposed plan); *In re Hyatt*, 509 B.R. 707, 711 (Bankr. D.N.M. 2014) (approving the disclosure statement and finding that the "proposed classification scheme does not render the Plan patently unconfirmable as a matter of law" despite the fact that the debtor's proposed classification scheme required "additional evidence that may be presented at a confirmation hearing").  Indeed, courts caution that "care must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing."  *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988); *see also In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 n. 10 (Bankr. E.D. Pa. 1987) (stating that deciding confirmation issues before solicitation may have a disenfranchising effect because the disclosure statement itself is not mailed to all creditors until after court approval is obtained).

19.     If a bankruptcy court exercises its discretion to consider threshold confirmation issues, such issues should not impede approval of the disclosure statement unless it is established that the plan of reorganization is patently unconfirmable, *In re Cardinal Congregate I*, 121 B.R. at 764, and the "Court should view all inferences drawn from the underlying facts and matters

contained in the Plan and the Disclosure Statement in a light most favorable to the Debtor." *In re Spanish Lake Assocs.*, 92 B.R. 875, 877 (Bankr. E.D. Mo. 1988).

20.     The Objectors will have ample opportunity to prosecute their confirmation objections in connection with the Confirmation Hearing, to the extent these issues remain disputed. Nevertheless, to aid the Court's analysis, the Debtors briefly address certain confirmation issues raised in the Objections to eliminate any doubt that such issues would render the Plan patently unconfirmable.[11]

**A.     The Third Party Release Is Consensual and Permissible**.

21.     The third-party release is consensual and consistent with the standard in this jurisdiction.   The Objectors argue that the third-party release is non-consensual and does not conform to applicable law.   Courts in this jurisdiction routinely approve third-party releases where, as here, they are consensual.   *See In re Indianapolis Downs*, 486 B.R. 286, 304–05 (Bankr. D. Del. 2013) (approving third-party release that applied to unimpaired holders of claims deemed to accept the plan as consensual); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (same); *Wash. Mut.*, 442 B.R. at 352 (observing that consensual third-party releases are permissible); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (approving non-debtor releases for creditors that voted in favor of the plan).

22.     In response to concerns raised by various parties regarding the breadth of the Debtors' proposed solicitation in relation to an "opt out" third-party release, the Debtors have amended the third-party release to allow parties to "opt in" to giving a release, placing the consensual nature of the third-party release beyond reasonable dispute.   *Cf. In re Emerge Energy*

---

[11]   For the avoidance of doubt, the Debtors reserve the right to respond to any and all objections asserted in the Objections in connection with confirmation of the Plan.

*Svcs. LP*, No. 19-11563 (KBO), 2019 WL 7634308 at *17–18 (Bankr. D. Del. Dec. 5, 2019) ("[I]t cannot be said with certainty that those failing to return a ballot or Opt-Out Form did so intentionally to give the third-party release").

**B.    The Debtor Release is Reasonable and Permissible**.

23.    Certain of the Objectors—notably, Fresenius—argue that the Debtor release is overly broad and will foreclose the Debtors from pursuing potentially valuable claims and causes of action against certain of the Debtors directors and officers.  ***First***, to the extent Fresenius's theories of director and officer liability are based on claims for willful misconduct, fraud, or gross negligence, such claims are not subject to the Debtor release.  *See* Plan Art. VIII.E (providing for Debtor release of claims and causes of action "**other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, fraud or gross negligence**") (emphasis in original).

24.    ***Second***, as alluded to above (and discussed in the revised Disclosure Statement), the Debtors were the subject of prepetition shareholder derivative claims brought against the Debtors' directors and officers on the Debtors' behalf related to, among other things, the findings made in the Delaware Court of Chancery's opinion in the Akorn-Fresenius merger dispute (the "Fresenius Opinion").  These claims were extensively litigated.[12]  The litigation subsequently culminated in a settlement and release of claims against such directors and officers (the "Derivative Settlement").  The Derivative Settlement was approved by a court of competent jurisdiction in January 2020, is binding and enforceable on the Debtors, and released and precluded the pursuit of further claims based on the same underlying facts and circumstances, whether by or

---

[12]    Prior to the parties' agreement upon the Derivative Settlement (as defined below), the Louisiana court had in fact dismissed the claims asserted against present and former directors of the Debtors as a matter of law, based on the Louisiana Business Corporation Act, which, because Akorn is a Louisiana corporation, is the controlling statute establishing the legal standards for such claims.

on behalf of the Debtors.  The Debtors therefore do not believe that they have remaining material causes of action against their directors and officers (or other Released Parties) that would justify the risk, expense, and delay in pursuing such causes of action.  Fresenius conspicuously declines to acknowledge this point in its objection (despite generally decrying the inadequacy of the Debtors' disclosure of litigation-related matters).

25.     ***Third***, the Debtor release meets the applicable legal standard because it is fair, reasonable, and in the best interests of the Debtors' estates.  Fresenius, in particular, contends that the Debtors are derelict in their duty to investigate potential claims and causes of action that are subject to the Debtor release.  But such claims were subject to multiple derivative lawsuits that were filed and ultimately dismissed pursuant to the Derivative Settlement, which also included a variety of corporate governance reforms.  A better "investigation" than extensive, adversarial litigation that resulted in a heavily-negotiated settlement approved by a court cannot be imagined. *See In re Coram Healthcare Corp.*, 315 B.R. 321, 332 (Bankr. D. Del. 2004) (acknowledging investigation as a ***precursor*** to potential litigation and approving of trustee's decision not to litigate notwithstanding draft complaint supplied by investigator).  Moreover, the breadth of the Debtor release is consistent with those regularly approved in this jurisdiction and others.  *See, e.g.*, *In re Clover Techs. Grp., LLC*, No. 19-12680 (KBO) (Bankr. D. Del. Jan. 22, 2020) (approving similar debtor and third-party release provisions including, among other categories, directors, officers, direct and indirect equity holders, and professional and financial advisors); *In re PES Holdings, LLC*, No. 19-11626 (KG) (Bankr. D. Del. Feb. 13, 2020) (same); *In re Anna Holdings, Inc.*, No. 19-12551 (CSS) (Bankr. D. Del. Dec. 16, 2019) (same); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019) (same); *In re VER Techs. HoldCo LLC*, No. 18-10834 (KG) (Bankr. D. Del. July 26, 2018) (same).

26.     *Fourth*, the Debtor release is an integral part of the Plan.  Each of the released parties, as stakeholders and critical participants in the Debtors' reorganization process, share a common goal with the Debtors in seeing the Plan succeed, and have afforded value to the Debtors and aided in the reorganization process.  The Debtors have added language to the Disclosure Statement regarding their views on the appropriateness of the Debtor release and intend to further establish the bases for its approval at confirmation.  Accordingly, the Court should overrule the Objections to the scope of the Debtor release.

### C.     The Plan's Exculpation Provisions are Appropriate.

27.     Certain parties also raise concerns about the scope of the Plan's exculpation provision.  Although such concerns are premature and more properly brought as objections to the Plan, the Debtors have revised the definition of the Exculpated Parties to remove non-estate fiduciaries and limit the scope of exculpated conduct to acts or omissions that occurred postpetition and prior to the effective date of the Plan.  This change is reflected in the revised Plan.  *See* Plan Arts. I.A, VIII.G.   In any event, the Exculpated Parties have participated in good faith in formulating and negotiating the Plan as it relates to the Debtors, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties. The Debtors will be prepared to demonstrate this at the Confirmation Hearing.

### D.     The Plan Is Proposed in Good Faith.

28.     The MDL Plaintiffs argue that the Plan is proposed in bad faith.  The inquiry of whether a plan is proposed in "good faith" turns on "whether [the] plan will fairly achieve a result consistent with the results and purposes of the Bankruptcy Code."  *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984)).  One such permissible purpose and result is "the expeditious liquidation and distribution of the bankruptcy estate to its creditors."  *In re W.R. Grace & Co.*, 729 F.3d 332, 346 (3d Cir.

2013).[13]  That is precisely what the Plan provides:  following a value-maximizing market test, the

Debtors will distribute value to creditors and interest-holders in accordance with a "waterfall"

priority scheme consistent with the Bankruptcy Code and applicable nonbankruptcy law, after

which the Debtors will be wound down and dissolved.  The Debtors will be prepared to further

demonstrate this in connection with the Confirmation Hearing.

E.    **The Plan Properly Classifies Claims, Including Claims Subject to Mandatory Subordination Pursuant to Section 510(b) of the Bankruptcy Code**.

29.    Fresenius's objection to the Plan's classification scheme strikes two themes.  ***First***,

Fresenius contends that claims relating to the Shareholder Settlement should be subordinated

pursuant to section 510(b) and that the Shareholder Settlement should be somehow unwound to

provide distributions to unsecured creditors.   ***Second***, Fresenius objects to the proposed

subordination of its own claims under the Plan.  Both objections are without merit, and, in any

event, neither presents a bar to approval of the Disclosure Statement.

1.    **The Plan Properly Addresses the Shareholder Settlement.**

30.    Fresenius apparently takes issue with the Shareholder Settlement and claims

relating thereto, notwithstanding that such settlement was entered into in August 2019 and reduced

to final judgment by a court of competent jurisdiction in March 2020.  In particular, Fresenius

contends that any such unsecured claim arising from the Shareholder Settlement is also subject to

subordination, and that the proceeds of director and officer insurance policies used to resolve that

matter should instead be clawed back and reserved for the benefit of the Debtors' bankruptcy

estate.   In furtherance of this aim, Fresenius contends that the Shareholder Settlement is an

executory contract that should be rejected by the Debtors to "free up" consideration for general

unsecured creditors.  Even assuming that the Shareholder Settlement is an executory contract, the

---

[13]    *See also* MDL Objection at 15 (quoting *In re W.R. Grace & Co.*, 729 F.3d at 346).

Debtors are presently under no obligation to assume or reject it at this time.  The Debtors have not yet made a determination with respect to whether the Shareholder Settlement is an executory contract at this time and have added language to the Disclosure Statement to that effect to address any disclosure-related concerns.

31.     But even if the Shareholder Settlement could in fact be unwound or rejected, it would not *per se* entitle Fresenius or any other party in interest in these chapter 11 cases to access the $27.5 million in D&O insurance proceeds set aside pursuant to Shareholder Settlement.  As a preliminary matter, to do so would require the existence of estate claims that are covered by the policies.  As noted above, potential estate claims related to the conduct covered by the policies were settled in connection with the Derivative Settlement.  Moreover, the argument that, if the Shareholder Settlement is not unwound, the distribution of those proceeds to the settling shareholders would violate the absolute priority rule is also incorrect.  At this time, the proceeds are no longer property of the Debtors' estates (and thus not subject to the absolute priority rule):  those proceeds were funded into escrow by the Debtors' applicable insurers prior to the Petition Date and are not dealt with or otherwise addressed under the Plan.  *See* 11 U.S.C. § 1129(b)(2)(B)(ii) ("With respect to a class of unsecured claims . . . the holder of any claim or interest that is junior to the claims of such class will not receive or retain ***under the plan*** on account of such junior claim or interest any property . . . ") (emphasis added); *see also Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 451 (1999) ("So, under the commonsense rule that a given phrase is meant to carry a given concept in a single statute, the better reading of subsection (b)(2)(B)(ii) recognizes that a causal relationship between holding the prior claim or interest and receiving or retaining property [under a plan] is what activates the absolute priority rule") (internal citations omitted).

### 2.     The Plan's Proposed Treatment of Fresenius's Claims Is Appropriate.

32.     Fresenius contests the Debtors' proposed treatment of Fresenius's claims as Class 7 Section 510(b) Claims.  First and foremost, the question of whether Fresenius's claims are properly subject to mandatory subordination under section 510(b) of the Bankruptcy Code is a confirmation, not disclosure, issue.  In any event, Fresenius's claims are based on Fresenius's termination of an agreement to purchase Akorn securities, which agreement Fresenius sought to terminate because it viewed the "upside" of being an equity owner as no longer worth the price Fresenius originally agreed to pay.[14]  Such claims fall within the ambit of section 510(b), despite Fresenius's contrary contentions.  The Debtors intend to demonstrate as much at or prior to confirmation, and have added language to that effect to the Disclosure Statement to address any disclosure-related concerns on this point.

### F.     Fresenius's Sale-Based Objections Are Inapposite to Approval of the Disclosure Statement.

33.     Fresenius also argues that the transfer of Avoidance Actions to the Stalking Horse Bidder under the Stalking Horse APA is somehow improper.  The transfer of Avoidance Actions related to acquired assets and employees is customary in sale transactions because, among other things, it prevents third parties with no connection to the debtors or the purchaser from pursuing claims against the purchased entity's business partners and employees.  Although such claims may be of speculative monetary value in themselves in light of the costs and risks associated with pursuing such claims, they are typically of intangible value to the purchaser because the pursuit of even frivolous claims may damage the enterprise value of the acquired assets.  In any event, the Debtors have added language to the Disclosure Statement clarifying this position, *see* Disclosure

---

[14]     *See* Fresenius Opinion at 58 ("[Fresenius's CEO] candidly admitted that . . . he personally wanted to terminate the transaction.  He was 'very unhappy' with Akorn's performance, believed that 'the underperformance was more likely to be longer-lasting,' and felt that Fresenius had overpaid.").

Statement Art. V.F.2, and any issues with the Sale itself or the value obtained thereunder are more appropriately addressed in connection with approval of the Sale.

### Conclusion

34.      For the foregoing reasons, the Debtors respectfully submit that the Disclosure Statement should be approved because it satisfies the requirements of section 1125 of the Bankruptcy Code and because the relief provided in the Disclosure Statement Order is fair, appropriate, and in the best interests of their chapter 11 estates.  The Debtors respectfully request that the Court overrule the Objections and enter the Disclosure Statement Order.

[*Remainder of page intentionally left blank.*]

Wilmington, Delaware
June 30, 2020

/s/ *Paul N. Heath*

| | |
|---|---|
| **RICHARDS, LAYTON & FINGER, P.A.** | **KIRKLAND & ELLIS LLP** |
| Paul N. Heath (No. 3704) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Amanda R. Steele (No. 5530) | Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*) |
| Zachary I. Shapiro (No. 5103) | Gregory F. Pesce (admitted *pro hac vice*) |
| Brett M. Haywood (No. 6166) | Christopher M. Hayes (admitted *pro hac vice*) |
| One Rodney Square | 300 North LaSalle Street |
| 920 N. King Street | Chicago, Illinois 60654 |

RICHARDS, LAYTON & FINGER, P.A.
Paul N. Heath (No. 3704)
Amanda R. Steele (No. 5530)
Zachary I. Shapiro (No. 5103)
Brett M. Haywood (No. 6166)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:          heath@rlf.com
                steele@rlf.com
                shapiro@rlf.com
                haywood@rlf.com

*Co-Counsel for the Debtors and Debtors in
Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
Christopher M. Hayes (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
                patrick.nash@kirkland.com
                gregory.pesce@kirkland.com
                christopher.hayes@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          nicole.greenblatt@kirkland.com

*Co-Counsel for the Debtors and Debtors in
Possession*