## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| AKORN, INC., *et al.*,[1] | ) Case No. 20-11177 (KBO) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I)
AUTHORIZING THE SALE OF CERTAIN EQUITY INTERESTS
IN NON-DEBTOR AKORN INDIA PRIVATE LIMITED PURSUANT
TO 11 U.S.C. § 363 OF THE BANKRUPTCY CODE, (II) AUTHORIZING
THE RETENTION AND EMPLOYMENT OF PRICEWATERHOUSECOOPERS
CORPORATE FINANCE LLC IN CONNECTION THEREWITH, EFFECTIVE
AS OF THE PETITION DATE, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion:[2]

### Relief Requested

1.     The Debtors seek entry of an order (the "Order"), attached hereto as **Exhibit A**,

(a) pursuant to the terms and conditions of that certain Share Purchase Agreement, substantially in

the form attached hereto as **Exhibit B** (the "Share Purchase Agreement"), by and among Debtor

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Akorn, Inc. (7400); 10 Edison Street LLC (7890); 13 Edison Street LLC; Advanced Vision Research, Inc. (9046); Akorn (New Jersey), Inc. (1474); Akorn Animal Health, Inc. (6645); Akorn Ophthalmics, Inc. (6266); Akorn Sales, Inc. (7866); Clover Pharmaceuticals Corp. (3735); Covenant Pharma, Inc. (0115); Hi-Tech Pharmacal Co., Inc. (8720); Inspire Pharmaceuticals, Inc. (9022); Oak Pharmaceuticals, Inc. (6647); Olta Pharmaceuticals Corp. (3621); VersaPharm Incorporated (6739); VPI Holdings Corp. (6716); and VPI Holdings Sub, LLC. The location of the Debtors' service address is: 1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.

[2]     A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Duane Portwood in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on May 20, 2020 (the "Petition Date"). Capitalized terms used but not otherwise defined in this motion shall have the meanings ascribed to them in the First Day Declaration.

Akorn Inc. ("Akorn"), non-Debtor WorldAkorn Pharma Mauritius ("Akorn Mauritius"), non-Debtor Akorn India Private Limited ("AIPL"), and Biological E. Limited (the "Purchaser"), authorizing Akorn (together with Akorn Mauritius, the "Sellers") to sell its equity interests (the "Interests") in AIPL, free and clear of all liens, claims, and encumbrances (collectively, the "Liens"), with such Liens attaching only to the sale proceeds with the same validity, priority, force and effect such Liens had on the Interests immediately prior to the sale, (b) authorizing the retention of PricewaterhouseCoopers Corporate Finance LLC ("PwC CF") in connection therewith, and (c) granting related relief.

2.      In support of this motion, the Debtors respectfully submit the declaration of Jennifer Bowles (the "Bowles Declaration"), a copy of which is attached hereto as **Exhibit C**, and the declaration of Howard DeGraff Wolfe III (the "Wolfe Declaration"), a copy of which is attached hereto as **Exhibit D**.

### Jurisdiction and Venue

3.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory bases for the relief requested herein are sections 105, 327(a), 328, 363, and 1107(b) of the Bankruptcy Code, Bankruptcy Rules 6004 and 2014, and Local Rules 2014-1(a), 2016-1, 6004-1, and 9013 -1.

### Background

6.      Akorn, Inc., together with its Debtor and non-Debtor subsidiaries (collectively, the "Company") is a specialty pharmaceutical company that develops, manufactures, and markets generic and branded prescription pharmaceuticals, branded as well as private-label over-the-counter consumer health products, and animal health pharmaceuticals.  The Company is an industry leader in the development, manufacturing, and marketing of specialized generic pharmaceutical products in alternative dosage forms.  Headquartered in Lake Forest, Illinois, the Company has approximately 2,180 employees worldwide and maintains a global manufacturing presence, with pharmaceutical manufacturing facilities located in Illinois, New Jersey, New York, Switzerland, and India.  The Company's operations generated approximately $682 million in revenue and approximately $124 million of Adjusted EBITDA in 2019.  The Debtors commenced these chapter 11 cases to conduct an orderly sale process that will position the Debtors for sustained future success by right-sizing their balance sheet and addressing their litigation overhangs.

7.      On the Petition Date, each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 57].  On June 3, 2020, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee")

[Docket No. 125].  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

## Share Purchase Agreement

### I.    The Sellers' Interest in AIPL.

8.    AIPL is an Indian private limited company with a manufacturing facility for sterile injectable products for use in the pharmaceutical industry.  AIPL has 4,852,377 equity securities issued and outstanding, of which Akorn owns just 1,000 (or 0.02%).  Akorn Mauritius owns the remaining 4,851,377 (or 99.98%) of the equity securities in AIPL.[3]

9.    Prior to the commencement of these chapter 11 cases, Akorn determined that AIPL's operations were no longer part of Akorn's core, go-forward business strategy.  To facilitate the exit of its investment in AIPL's operations, Akorn, with the assistance of PwC CF, launched a process to market AIPL's operations for potential sale to third parties.  As discussed further herein, this led to hard-fought, arms'-length negotiations with multiple bidders, ultimately culminating in an agreement to convey the Interests to the Purchaser in exchange for $10 million in cash, subject to withholding taxes, if any, and adjustment for certain net working capital items, as specified in the Share Purchase Agreement (the "Purchase Consideration").  The terms and conditions of the sale (the "Sale Transaction") are set forth in the Share Purchase Agreement, and Akorn now, in an exercise of its sound business judgment, seeks to perform all obligations under the Share Purchase

---

[3]    Non-Debtor Akorn Mauritius is a subsidiary of Akorn and non-Debtor Akorn AG.  The property of a debtor's estates "does not include the property of the debtor's non-filing subsidiaries." *In re Am. Int'l Refinery*, 402 B.R. 728, 742 (Bankr. W.D. La. 2008).  This applies even if the debtor wholly owns the subsidiary. *See id.* (quoting *Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.)*, 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998)).  In addition, a non-filing subsidiary of a debtor is not prohibited from selling its assets simply because it would decrease the value of the debtor's shares in the subsidiary. *See Kreisler v. Goldberg*, 478 F.3d 209, 214 (4th Cir. 2007) (citing *In re Calvert*, 135 B.R. 398, 402 (Bankr. S.D. Cal.1991)); *see also Spring Real Estate, LLC v. Echo/RT Holdings, LLC*, No. CV 7994-VCN, 2016 WL 769586, at *3 (Del. Ch. Feb. 18, 2016) ("Further, an act of a subsidiary that decreases the value of the shares of the subsidiary owned by its parent does not confer to a trustee of the parent standing to challenge the subsidiary's transfer.").

Agreement, including the disposition of its 0.02% of AIPL Interests. The Debtors believe that it is beneficial to their reorganization to consummate the Sale Transaction as expeditiously as possible to minimize any further costs to the estate associated with its continued investment in AIPL's operations.

## II.    The Retention of PricewaterhouseCoopers Corporate Finance LLC.

10.    Following its decision to divest its AIPL operations, Akorn determined that a private sale following a competitive marketing process would be the most efficient and effective method by which to sell AIPL's operations. *See* Bowles Decl. ¶ 3. Through a private sales process, Akorn was able to conduct a comprehensive and thorough market-test of the Purchase Consideration without the high transaction costs and lack of certainty regarding financing and timing that are unavoidable in a public auction. In addition, Akorn was able to evaluate and consider offers to purchase the assets of AIPL and offers to purchase the Interests of AIPL. *See id*. This gave Akorn additional flexibility to achieve the best outcome and highest purchase price. To run the private sale, the Debtors retained PwC CF as financial advisor pursuant to engagement letter dated as of the April 25, 2019 (the "Engagement Letter"), a copy of which is attached hereto as **Exhibit 1** to **Exhibit D**.[4]

11.    Pursuant to the Engagement Letter, PwC CF is entitled to a $250,000 advisory fee (the "Advisory Fee") and a success fee (the "Success Fee"). The Advisory Fee is paid in two parts—$150,000 upon signing of the Engagement Letter, which has been paid, and $100,000 upon the signing of the Share Purchase Agreement, which is yet to be paid. The Success Fee is owed

---

[4]    Any summary of or reference to the terms and conditions of the Engagement Letter provided in this Application is for the Court's convenience. To the extent that any such summary or reference conflicts with the actual terms and conditions of the Engagement Letter, as the same may be limited or modified herein or by the Proposed Order, as entered by the Court, the actual terms and conditions of the Engagement Letter shall control. The term "Sale" is specifically defined in the Engagement Letter.

upon the closing of the Sale (as defined in the Engagement Letter) and is the greater of $700,000 or 2.00% of the Purchase Consideration.  Through this motion, the Debtors request approval of PwC CF's retention in connection with the Sale Transaction pursuant to section 327(a) of the Bankruptcy Code.[5]  PwC CF is a registered broker dealer and a member of FINRA and SIPC. PwC CF is a wholly owned subsidiary of PricewaterhouseCoopers LLP ("PwC LLP"), the United States-based firm of a global network of separate and independent member firms that operate locally in countries around the world.  The Debtors have submitted the Wolfe Declaration in support of its retention of PwC CF.

### III.    The Marketing Process.

12.    In May 2019, the Sellers initiated an extensive marketing process with respect to their Interests in AIPL.  The Sellers worked closely with PwC CF to identify potential purchasers, which resulted in PwC CF reaching out to approximately 90 parties during the marketing process. Over the next several months, potential purchasers engaged in discussions with PwC CF, with thirteen such potential purchasers executing a non-disclosure agreement and four completing a site visit.  On average, there were two to five potential purchasers actively engaged in the marketing process during this time.  *See* Bowles Decl. ¶ 4.

13.    In early February 2020, two of these potential purchasers (Purchaser and "Party B")[6] submitted non-binding offers ("NBOs") to purchase the Interests of AIPL and to continue to engage in the marketing process with PwC CF.[7]  Following the submission of the

---

[5]    The Debtors are also planning to separately retain the services of PricewaterhouseCoopers Advisory Services LLC ("PwC Advisory") to provide advisory services to the Debtors unrelated to the Sale (as defined in the Engagement Letter).

[6]    Due to confidentiality restrictions, the Debtors have not disclosed the names of the other interested parties.

[7]    A third party submitted an NBO back in October 2019, but ultimately decided not to fully engage in the marketing process.

NBOs, PwC CF granted these potential purchasers access to a virtual data room and responded to additional diligence requests.  Akorn established a March 20, 2020, deadline for binding offers.  *See* Bowles Decl. ¶ 5.

14.    On March 20, 2020, Akorn received a binding offer from Purchaser.  Party B requested an extension to March 31, 2020, to submit a binding offer due to COVID-19 related delays, while two additional parties ("Party C" and "Party D") remained in the preliminary stages of the marketing process.  Over the next few weeks, Party B remained actively engaged in the marketing process, but continued to ask for extensions to submit a binding bid.  Party D remained active in its review of initial materials but did not make any efforts to submit either a binding or non-binding offer, while Party C's interest waned.  *See* Bowles Decl. ¶ 6.

15.    In early April 2020, Akorn and the Purchaser began a non-exclusive negotiation of the definitive documentation necessary to implement the Sale Transaction.  During that process, Party B submitted its own binding offer on April 22, 2020, but was informed that its offer was not competitive.  In order to continue participating in the sale process, Akorn and PwC CF informed Party B that it needed to improve its offer.  On April 30, 2020, Party B submitted a revised binding offer that was competitive with the Purchaser's binding offer.  *See* Bowles Decl. ¶ 7.

16.    In May 2020, Akorn and the Purchaser continued their non-exclusive negotiation of the Share Purchase Agreement and other definitive documentation, while Party B, based on its revised binding offer, was provided a draft of the Share Purchase Agreement to begin negotiating key issues and terms in the event it was ultimately selected as the prevailing bidder.  Party D, who had previously declined to submit an offer, conducted another review of the materials and held a follow up call to address a number of questions.  *See* Bowles Decl. ¶ 8.

17.     In late May 2020, Akorn held principal-level discussions with both the Purchaser and Party B on the open commercial points with respect to the Sale Transaction.  Party D ultimately submitted a NBO on May 16, 2020, and was provided access to the virtual data room.  Given the advanced stages of discussions with Purchaser and Party B, however, Akorn informed Party D that it would not advance the process with Party D unless the other parties declined to proceed with the transaction.  *See* Bowles Decl. ¶ 9.

18.     Ultimately, following extensive, arms'-length negotiations with both the Purchaser and Party B, Akorn determined that the offer by the Purchaser represented the highest and otherwise best bid for the Interests of AIPL.  On June 17, 2020, the Sellers and the Purchaser finalized the form of Share Purchase Agreement attached hereto as **Exhibit B**, subject to approval of this Court authorizing Akorn's disposition of its 0.02% of Interests.  *See* Bowles Decl. ¶ 10.

## IV.     Summary of Terms.

19.     Pursuant to the terms and conditions of the Share Purchase Agreement, and subject to Court approval, Akorn will sell all Interests in AIPL to the Purchaser free and clear of all Liens[8] pursuant to section 363(f) of the Bankruptcy Code in exchange for the Purchase Consideration. The following is a summary[9] of the terms and conditions of the Share Purchase Agreement:[10]

| Provision | Summary Description |
|---|---|
| **Sellers** | Akorn and Akorn Mauritius |
| **Purchaser** | Biological E. Limited |
| **Acquired Assets** | 100% of the Interests of AIPL. |

---

[8]    Pursuant to the Standstill Agreement (as such term is defined in the First Day Declaration), Akorn pledged 100% of its ownership of AIPL to the Term Loan Lenders (as such term is defined in the First Day Declaration).

[9]    To the extent any summary of the Share Purchase Agreement included in this motion differs in any way from the terms and conditions of the Share Purchase Agreement, the actual terms of the Share Purchase Agreement shall control.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Share Purchase Agreement.

[10]    Pursuant to Local Rule 6004-1(b)(iv), a Sale Motion (as defined in the Local Rules) must highlight certain provisions.  Accordingly, the relevant provisions implicating Local Rule 6001-1(b)(iv) are included in this summary.

| | |
|---|---|
| | *See* Share Purchase Agreement, Preamble, § 3.4 |
| **Purchase Consideration** | USD $10,000,000 |
| | |
| | *See* Share Purchase Agreement, § 3.1, Schedule I, Part A |
| **Sale to Insider**<br><br>Local Rule 6004-1(b)(iv)(A) | The Purchaser is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code. |
| **Agreements with Management**<br><br>Local Rule 6004-1(b)(iv)(B) | The Share Purchase Agreement does not contemplate any agreements with management. |
| **Releases**<br><br>Local Rule 6004-1(b)(iv)(C) | Upon completion of the transfer of the Sale Shares from each of the Sellers to the Purchaser and/or the Purchaser Nominee in accordance with the terms hereof, each Seller hereby, for itself and each of its Affiliates, employees, officers, directors, representatives and any other Person claiming through such Seller (each, a "<u>Releasing Party</u>"), in respect of any matters, events or circumstances prior to the Closing Date, fully, finally, unconditionally and irrevocably: (i) waives and forever disclaims any and all of the rights to which they now or hereafter may be entitled to against AIPL or the shareholders of AIPL ("<u>Shareholders</u>"), and each of their respective officers, directors, shareholders, Affiliates and employees, (each, a "<u>Released Party</u>") resulting from, arising out of or in connection with any previous agreement amongst any of such parties (including the Ancillary Agreements and the Expired Agreements) or the Constitutional Documents; (ii) releases and absolutely forever discharges AIPL and the Shareholders from and against all Released Matters (*as defined hereinafter*); and (iii) confirms that no dues or claims are or will be payable or obligations will be due from any Released Party, whether presently known or unknown, or in existence now or in the future, against such parties resulting from, arising out of or in connection with the Constitutional Documents, the Ancillary Agreements, the Expired Agreements or the Released Matters, whether as indemnity or otherwise. For the purposes of this Clause, "<u>Released Matters</u>" shall mean any and all Losses, claims, liabilities, obligations, and causes of action of any nature whatsoever that such Releasing Party now has, or at any time previously had, or shall or may have in the future, all in respect of any matters, events or circumstances prior to the Closing and in each case relating to AIPL, whether in Law, contract, or otherwise.<br><br>*See* Share Purchase Agreement, § 2.4 |
| **Sale**<br><br>Local Rule 6004-1(b)(iv)(D) | The sale of the Interests of AIPL does not contemplate an auction. Pursuant to Local Rule 6004-11(b)(iv)(D), the business justifications for the sale are set forth in this motion. |
| **Conditions Precedent**<br><br>Local Rule 6004-1(b)(iv)(E) | The obligation of the Purchaser to purchase the Interests shall be subject to the fulfillment of all of the following conditions:<br><br>(i) The Sellers shall provide a written confirmation, as provided in Schedule II, to the Purchaser stating that: (i) there has been no breach of the Warranties and each of the Warranties shall be true, accurate and complete in all respects as on the Closing Date, with the same force and effect as if they had been made on and as of such date; (ii) AIPL is in compliance with the requirements of Clause 5 and Clause 11.4; and (iii) since the date of the Agreement nothing has occurred which has had or could reasonably be expected to have a Material Adverse Effect;<br><br>(ii) The Sellers and AIPL shall have finalized and delivered to the Purchaser and Purchaser Nominee (if so applicable), all necessary information, annexures and supporting documents with respect to the transfer of Akorn Mauritius Shares and |

Akorn Shares that are requested by the Purchaser and Purchaser Nominee (if so applicable) for the purposes of filing the Form FC-TRS;

(iii) AIPL shall have appointed a valuer who shall either be a registered chartered accountant in India or a merchant banker registered with the Securities Exchange Board of India, permitted to issue a valuation report under the Foreign Exchange Laws and shall have obtained from such valuer a valuation report, determining the fair market value of the Sale Shares, in accordance with the pricing guidelines prescribed by the Reserve Bank of India and shall deliver a copy of the same to the Purchaser;

(iv) AIPL shall make all necessary applications and take such other actions as required in relation to reserving new names of AIPL, intimated by the Purchaser in writing, without using the words "AKORN";

(v) A duly executed termination agreement terminating the Ancillary Agreements (as defined in the Share Purchase Agreement) with effect from the Closing Date, will be delivered to the Purchaser:  (a) Manufacturing and royalty agreement dated February 1, 2014, along with any addendum (if any), executed between AIPL and Akorn; (b) Trademark license agreement dated September 2016, along with any addendum (if any), executed between AIPL and Akorn; (c) Inter-company agreement dated September 9, 2019 executed between AIPL and Akorn; and (d) Secondment agreement dated September 9, 2019 executed between AIPL and Rishabh Jain;

(vi) Akorn shall procure an unconditional release of the Encumbrance created upon Akorn's Interests in favour of Wilmington Savings Fund Society to the satisfaction of the Purchaser ("Encumbrance Release Letter");

(vii) The Sellers shall deliver to the Purchaser the Transaction Tax Documents in form and substance satisfactory to the Purchaser;

(viii) Each of the Sellers shall have prepared and kept ready undated, executed share transfer forms for the transfer of the Sale Shares in favour of the Purchaser and/or the Purchaser Nominee, subject to payment of applicable stamp duty by the Purchaser on the share transfer forms;

(ix) AIPL shall have (a) provided the Purchaser with copy of the actuarial valuation as of March 31, 2020 of its obligation under the Payment of Gratuity Act, 1972 and payment of leave encashment towards its employees; and (b) undertaken an actuarial valuation, as of 30 June 2020, of its obligation under the Payment of Gratuity Act, 1972 and payment of leave encashment towards its employees;

(x) The Sellers shall obtain an order from the relevant bankruptcy court in United States approving the sale of Sale Shares in accordance with the terms of the Share Purchase Agreement;

(xi) Each of the Sellers shall provide to the Purchaser a no-objection certificate issued by the income tax assessing officer pursuant to Section 281 of the IT Act ("Section 281 Certificate") with respect to the sale of the Sale Shares and such Section 281 Certificate remaining valid as of the Closing Date. Provided if the Sellers are unable to procure the Section 281 Certificates within 30 days of the Execution Date, then each of the Sellers shall instead provide to the Purchaser a certificate from a reputed chartered accountant (in the form acceptable to the Purchaser) ("CA Certificate") confirming that there are no pending or threatened

| | |
|---|---|
| | (in writing) proceedings for any Tax liability of such Seller and/ or any pending Tax liability payable to the Tax Authority by such Seller under the IT Act as on the Closing Date; |
| | (xii) AIPL shall, and the Sellers shall cause AIPL to, undertake all necessary corporate actions to split any of share certificates held by Akorn Mauritius in such a manner so as to facilitate transfer of one (1) Sale Share in favor of the Purchaser Nominee; |
| | (xii) AIPL shall, and the Sellers shall cause AIPL to: (a) pay the DC Payables; (b) obtain no-dues certificates from Mr. Dheeraj Chopra in relation to the DC Payables; and (c) AIPL and the Sellers shall have provided a written confirmation (as provided in Schedule II) to the Purchaser stating that AIPL has fully and finally paid the DC Payables; |
| | (xiv) AIPL shall, and the Sellers shall cause AIPL to: (a) organize a virtual tour of the Manufacturing Facility for the Purchaser and/or its representatives; and (b) make best efforts to provide the Purchaser and/or its representatives with physical access to the Manufacturing Facility during a site visit; |
| | (xv) AIPL shall, and the Sellers shall cause AIPL to: (a) prior to the Closing Date, provide the Purchaser and/or its representatives access to necessary documents, records, work papers and information (in electronic or other format) with respect to AIPL and the relevant employees, as may be reasonably required by the Purchaser, for the purpose of integration of their respective ERP systems (including cost and profit center codes within such systems); and (b) on or immediately prior to the Closing Date, provide the Purchaser with a balance statement (as of one day prior to the Closing Date) setting out the true and accurate closing balances / amounts for each such cost and profit center codes ("Integration Exercise"); |
| | (xvi) AIPL shall and the Sellers shall cause AIPL to, provide the Purchaser with copies of the acknowledgement letters issued by the Reserve Bank of India pursuant to each Form FC-GPR relating to the allotments of: (i) 28,196 Shares to Akorn Mauritius on November 25, 2013; and (ii) 159,093 Shares to Akorn Mauritius on August 25, 2014, failing which, AIPL shall, if required, initiate actions for the filing of necessary compounding applications with the Reserve Bank of India for compounding of violation of Foreign Exchange Laws; |
| | (xvii) AIPL and the Sellers shall provide the Purchaser with a list of any corporate name, brand name, copyright, trademark, trade name, design or logos of each of the Sellers or their respective Affiliates (or any variations thereof) ("Identified Brands") that are necessary for the Purchaser to fulfil its obligations under Clause 7.7.1 below; and |
| | (xviii) AIPL shall and the Sellers shall cause AIPL to file applications with the trademark registry for effecting the change in proprietorship of the subsisting trademarks set out in Schedule VI from the Kilitch Drugs (India) Limited to Akorn Private Limited. |
| | *See* Share Purchase Agreement, §§ 4.1.1–4.1.18 |
| **Closing and Other Deadlines**<br><br>Local Rule 6004-1(b)(iv)(E) | The Closing (the "Closing") of the transaction shall take place at the registered office of AIPL or at such other place as may be mutually agreed in writing by the Parties. Subject to Clause 3.5.3 of the Share Purchase Agreement, the Closing shall occur within seven (7) Business Days from the date on which the CP Satisfaction Notice is received by the Purchaser (unless the Purchaser has notified |

| | |
|---|---|
| | AIPL and the Sellers, in writing, that any one or more of the Conditions Precedent have not been completed to its satisfaction), or such other date as may be mutually agreed in writing between the Parties ("the <u>Closing Date</u>").<br><br>Closing shall not occur unless all of the obligations specified in the Share Purchase Agreement, intended to take place on or prior to the Closing Date are complied with.<br><br>*See* Share Purchase Agreement, §§ 6.1, 6.5 |
| **Good Faith Deposit**<br><br>Local Rule 6004-1(b)(iv)(F) | None |
| **Interim Arrangements with Proposed Buyer**<br><br>Local Rule 6004-1(b)(iv)(G) | None |
| **Use of Proceeds**<br><br>Local Rule 6004-1(b)(iv)(H) | The proceeds from the Sale Transaction are expected to be used in accordance with Section 5.20 of that certain Senior Secured Super-Priority Term Loan Debtor-In-Possession Loan Agreement, dated as of May 2020, by and among the Debtors, the lenders party thereto, and Wilmington Savings Fund Society, FSB (the "<u>DIP Credit Agreement</u>"):[11]<br><br>(a) In the event that, at least ten (10) Business Days prior to the closing of the Agreement (the "<u>Stalking Horse APA</u>"), the Sale Transaction is consummated, then the Debtors shall, to the extent permissible under applicable law and any other legally binding obligations of any of its Subsidiaries who are not Loan Parties to, immediately prior to the closing of the Stalking Horse APA, declare and otherwise consummate any dividend, distribution or similar transaction (as may be requested by the Purchaser (the "<u>Stalking Horse Purchaser</u>")), or otherwise repay any intercompany Indebtedness, such that, subject to Section 5.20(d), all cash and cash equivalents of any such Person are held by a Loan Party as of immediately prior to the closing of the Stalking Horse APA.<br><br>(b) In the event that the Sale Transaction is consummated after the date that is ten (10) Business Days prior to the closing of the Stalking Horse APA, then subject to Section 5.20(d), the Debtors shall pay, or cause to be paid, to the Stalking Horse Purchaser all cash and cash equivalents of any such Person and the net cash proceeds received in consideration therefor no later than the later of the closing date of the Stalking Horse APA and the date that is five (5) Business Days following receipt thereof.<br><br>(c) In the event that the Sale Transaction is consummated after the closing of the Stalking Horse APA, then, subject to Section 5.20(d), the Debtors shall pay or cause to be paid, to the Stalking Horse Purchaser all cash and cash equivalents of any such Person and the net cash proceeds received in consideration therefor no later than the date that is five (5) Business Days following receipt therefor.<br><br>(d) The cash and cash equivalents contemplated by Section 5.20(a), 5.20(b) and 5.20(c) and the net cash proceeds contemplated by Section 5.20(b) and 5.20(c) shall be determined net of (i) any applicable fees, expenses, and Taxes of the Debtors or any of its Subsidiaries in connection with consummation of the Sale |

---

[11]  Capitalized terms used but not otherwise defined in this section only shall have the meanings ascribed to them in the DIP Credit Agreement.

| | |
|---|---|
| | Transaction or in connection with the distribution of such amounts from the applicable Subsidiary to the applicable Loan Party, and (ii) any holdbacks, reserves, escrows, or other similar amounts in respect of indemnification, purchase price adjustments, or other contingent obligations of the Debtors or any of its Subsidiaries in connection with such sale or disposition or in connection with such distribution; provided that upon release, expiration, or other applicable termination of such contingent obligations, any such amounts, subject to the immediately preceding clause (i), shall be promptly paid to the Stalking Horse Purchaser. *See* DIP Credit Agreement, § 5.20 [Docket No. 14, Exhibit B] |
| **Tax Exemption** <br><br> Local Rule 6004-1(b)(iv)(I) | None |
| **Record Retention** <br><br> Local Rule 6004-1(b)(iv)(J) | Not applicable |
| **Sale of Avoidance Actions** <br><br> Local Rule 6004-1(b)(iv)(K) | None |
| **Successor Liability** <br><br> Local Rule 6004-1(b)(iv)(L) | The Sellers are the sole legal and beneficial owners of their respective Sale Shares (as indicated against their names in **Part A** of **Schedule I** (*Shareholder Details*)). Akorn Mauritius has the right to exercise all voting and other rights over the Akorn Mauritius Shares. Subject to the pledge on Akorn Shares created in favour of Wilmington Savings Fund Society, Akorn has the right to exercise all voting and other rights over the Akorn Shares. Except as set out herein below each Seller, and, in case of Akorn, subject to the terms of the Encumbrance Release Letter, has, and shall have on the Closing Date, good, clear and marketable title to its respective Sale Shares, free and clear of any and all Encumbrances and claims whatsoever, with full right and authority to deliver the same to the Purchaser under this Agreement, which will convey to the Purchaser good, clear and marketable title to such Sale Shares, free and clear of all claims and Encumbrances. Other than the pledge of Akorn Shares in favour of Wilmington Savings Fund Society pursuant to resignation and appointment agreement dated 1 April 2020, no Person has a claim to be entitled to any such Encumbrance on any of the Sale Shares. On and from the Closing Date, no Person (including, but not limited to, Wilmington Savings Fund Society) shall be entitled to any Encumbrance on any of the Sale Shares. *See* Share Purchase Agreement, Schedule III, Part A § 3.1 |
| **Unexpired Leases** <br><br> Local Rule 6004-1(b)(iv)(M) | The Debtors are not attempting to sell the Interests of AIPL free and clear of a possessory leasehold interest. |
| **Credit Bid** <br><br> Local Rule 6004-1(b)(iv)(N) | None |
| **Relief from Bankruptcy Rule 6004(h)** <br><br> Local Rule 6004-1(b)(iv)(O) | To consummate the sale within the time constraints set forth in the Share Purchase Agreement and to realize significant value from the transaction, the Debtors have requested a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h) to the extent necessary to permit the sale to close within seven (7) Business Days from the date on which the CP Satisfaction Notice (as defined in the Share Purchase Agreement) is received by the Purchaser. *See* Share Purchase Agreement, § 6.1 |

20.     Because the Debtors believe that the Purchase Consideration offered by the Purchaser is fair and reasonable, the Debtors have determined, in an exercise of their sound business judgment, to enter into the Share Purchase Agreement and take all necessary actions in connection with implementing the Sale Transaction, including conveying Akorn's 0.02% of AIPL's Interests.

21.     For the reasons set forth herein, the Debtors submit that the relief requested herein is in the best interest of the Debtors, their estates, creditors, stakeholders, and other parties in interest, and therefore, should be granted.

## Basis for Relief

**I.     The Sale of the Interests of AIPL and the Debtors' Entry into the Purchase Agreements Should Be Approved as a Sound Exercise of the Debtors' Business Judgment.**

22.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Bankruptcy Rule 6004(f)(1) provides that "sales not in the ordinary course of business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f).

23.     Courts generally apply the "business judgment" standard in determining whether to approve a proposed transaction under section 363 of the Bankruptcy Code.  *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to the debtor's judgment concerning the proposed use of estate property under section 363(b) when there is a legitimate business justification); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (noting that the Third Circuit has adopted the "sound business purpose" standard for transactions under section 363).  In addition, section 105(a) of the Bankruptcy Code provides, in relevant part, that "[t]he court may issue any order, process or

judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

24.    Generally, courts in the Third Circuit have applied four factors in connection with the "sound business purpose" test:  (1) whether a sound business reason exists for the proposed transaction; (2) whether fair and reasonable notice has been provided to interested persons; (3) whether the debtor has obtained a fair and reasonable price; and (4) whether the transaction has been proposed and negotiated in good faith.  *Titusville Country Club v. Pennbank* (*In re Titusville Country Club*), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *Delaware & Hudson Ry.*, 124 B.R. at 176.  The proposed sale of the Interests of AIPL satisfies all four conditions, and therefore should be approved by this Court.

25.    Under the business judgment standard, the debtor has the initial burden of establishing that a valid business purpose exists for the use of estate property in a manner outside of the debtor's ordinary course of business.  *See Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). Once the debtor articulates a valid business justification for the proposed transaction, courts will generally presume that the decision was made "on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  *Official Comm, of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

26.    Thus, after a debtor satisfies its initial burden of establishing a valid business justification, the business judgment rule shields the debtor's management from judicial second-guessing and mandates that a court approve the debtor's business decision unless the decision is a product of bad faith or constitutes a gross abuse of discretion.  *See, e.g., In re Global Crossing*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003): *see also In re Johns-Manville Corp.,* 60

B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."); *In re Bridgeport Hldgs., Inc.*, 388 B.R. 548, 567 (Bankr. D. Del. 2008) (stating that directors enjoy a presumption of honesty and good faith with respect to negotiating and approving a transaction involving a sale of assets).

27.     Here, the Debtors submit that the sale of the Interests to the Purchaser is a sound exercise of their business judgment.  *First*, as set forth above, Akorn previously determined that their operations in India are no longer part of their core, long-term business strategy.  Authorizing the Sale Transaction is in line with that strategy and generates approximately $10 million of cash proceeds for the Sellers (subject to applicable withholding taxes and other working capital adjustments, as described in more detail in the Share Purchase Agreement).

28.     *Second*, Akorn provided fair and reasonable notice to interested persons as a part of the marketing process.  Akorn ran an extensive marketing process over the course of a year and engaged with numerous interested parties regarding a potential sale of AIPL, including engaging with parties that expressed interest after the initial NBO deadline and binding offer deadline.  The robust level of interest and the number of offers received reflects the comprehensiveness of this process.

29.     *Third*, as a result of this extensive, good-faith marketing process, Akorn believes that the Purchase Consideration is fair and reasonable under the circumstances.  Akorn evaluated all binding bids and determined that the Share Purchase Agreement provided the maximum value for the Interests of AIPL.  Moreover, the sale to the Purchaser relieves the Debtors of the burden of continuing to market and sell the Interests of AIPL during these chapter 11 cases, or otherwise obtaining the necessary funding to conduct an orderly wind-down of those operations.  Finally, the

sale of the Interests of AIPL has been proposed and negotiated in good faith. After the Purchaser was identified, the Sellers and the Purchaser continued negotiations to finalize the terms of the Share Purchase Agreement. *See* Bowles Decl. ¶ 13.

## II. The Purchaser Acted in Good Faith and Is Entitled to Full Protection Pursuant to Section 363(m) of the Bankruptcy Code.

30.    Because the Purchaser acted in good faith, it is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale Transaction. Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchase or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) of the Bankruptcy Code protects a purchaser or assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. Purchasers are provided this protection so long as they leased or purchased assets in "good faith." *Id*. Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit has stated that a good faith purchaser is "one who purchases in 'good faith' and for 'value.'" *In re Abbots Dairies*, 788 F.2d 143, 147 (3d Cir. 1986). Courts generally conclude that a purchaser has acted in good faith as long as the consideration is adequate and reasonable and the terms of the transaction are fully disclosed. *Id*. at 49–50. To constitute a lack of good faith, a party's conduct in connection with the sale usually must amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *Id*. (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

31.     Here, the Purchaser is an unaffiliated third party that is acting for bona fide commercial purposes.  Further, the Sellers, including Akorn, selected the Purchaser following an extensive marketing and negotiation process.  In connection with this process, Akorn engaged in good faith, arm's-length discussions to reach an agreement with the Purchaser that would be mutually beneficial to both parties.  The terms in the Share Purchase Agreement were fully disclosed to, and heavily negotiated by, Akorn and the Purchaser.  Akorn and the Purchaser were each represented by separate counsel in connection with the negotiation and documentation of the Share Purchase Agreement.  A fair and transparent marketing and negotiation process, such as that conducted by Akorn here, ensures the sale of the Interests of AIPL are at arm's-length, without collusion or fraud, and entered into in good faith.  Accordingly, the Debtors request that the Court determine that the Purchaser has negotiated and acted at all times in good faith and, as a result, is entitled to the full protections of good faith purchasers under section 363(m) of the Bankruptcy Code.

## III.    Private Sales Are Appropriate Under Bankruptcy Rule 6004 and Local Rule 6004-1.

32.     Bankruptcy Rule 6004(f)(1) and Local Rule 6004-1(b)(iv)(D) permit a debtor to sell estate property outside of the ordinary course of its business by private sale or public auction. Fed. R. Bankr. P. 6004(f)(1).  Private sales by a debtor outside of the ordinary course of business are appropriate where the debtor demonstrates that the sale is permissible pursuant to section 363 of the Bankruptcy Code.  *See, e.g.*, *In re Schipper*, 933 F.2d 513, 514 (7th Cir. 1991) (private real estate sale by debtor approved when purchase price was the same as independent appraisal); *In re Adamson*, 312 B.R. 16, 22 (Bankr. D. Mass. 2004) (approving private sale by debtor); *In re Pritam Realty, Inc.*, 233 B.R. 619, 624 (D.P.R. 1999) (upholding bankruptcy court order approving private

sale by debtor); *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (explaining that a trustee has ample authority to conduct a sale of estate property through a private sale).

33.    Bankruptcy courts generally have a "large measure of discretion" in determining, "based upon the facts and circumstances of the proposed sale," whether a private sale, as opposed to a public auction, is appropriate. *In re Embrace Sys. Corp.*, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995); *In re Blue Coal Corp.*, 168 B.R. 553, 564 (Bankr. M.D. Pa. 1994). In general, courts in this and other districts have approved private sales of less than all the assets of a debtor pursuant to section 363(b)(1) of the Bankruptcy Code as long as the debtor provides a valid business reason for not conducting an auction. *See, e.g.*, *In re RMBR Liquidation, Inc.*, No. 19-10234 (KBO) (Bankr. D. Del. Aug. 22, 2019) (approving private sale of real property for approximately $2.35 million); *In re Buffets Holdings, Inc.*, No. 08-10141 (MFW) (Bankr. D. Del. Feb. 3, 2009) (approving the private sale of real property for approximately $2.4 million); *In re W.R. Grace & Co.*, No. 0l-01139 (JKF) (Bankr. D. Del. Dec. 18, 2008) (approving the private sale of real property for approximately $3.8 million); *In re Wellman, Inc.*, No. 08-10595 (SMB) (Bankr. S.D.N.Y. Oct. 6, 2008) (approving private sale of industrial complex for $17.9 million); *In re W.R, Grace & Co.*, No. 01-01139 (JKF) (Bankr. D. Del. July 23, 2007) (authorizing private sale of business line for approximately $22 million); *In re Solutia, Inc.*, No. 03-17949 (SCC) (Bankr. S.D.N.Y. Dec. 28, 2006) (approving private sale of real property for approximately $7.1 million).

34.    In their sounds business judgment, the Debtors have determined that consummating the sale of Akorn's AIPL Interests on a private basis is appropriate in light of the facts and circumstances of these chapter 11 cases and is in the best interest of their estates and all parties in interest. *See* Bowles Decl. ¶ 14. A public auction would require the Debtors to incur substantial additional costs and the Debtors do not believe an auction would result in additional value

sufficient to justify the incurrence of such costs.  *Id*.  Furthermore, because Akorn holds a minimal amount of the Interests of AIPL, a public auction would require the consent and cooperation of non-debtors, including Akorn Mauritius, which may create additional time constraints and risks. The competitive and transparent marketing process for the Interests serves as market-based evidence that the Purchase Consideration maximizes value for the Debtors' estates.  Given these circumstances, the Debtors and their advisors believe that the Purchaser's offer is the highest and best offer and that the private sale of Akorn's AIPL Interests are appropriate under the circumstances.  *See id.*

**IV.    The Sale Should be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code.**

35.    Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property free and clear of any interest in such property of an entity other than the estate only if, among other things:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4) such interest is in *bona fide* dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

36.    Since section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Interests free and clear of the Liens.  *See Mich. Employment Sec. Comm'n v. Wolverine Radio Co.* (*In re Wolverine Radio Co.*), 930 F.2d 1132 (6th Cir. 1991); *In re Elliot*, 94 B.R. 343 (E.D. Pa. 1988). Here, the Prepetition Term Loan Lenders have consented to the sale and release of their liens

related to the Interests.  *See* Bowles Decl. ¶ 12; *see also* 11 U.S.C. § 363(f)(2).  Absent consent,

the Court could compel the Prepetition Term Loan Lenders to accept a money satisfaction of their

lien on the Interests because the Interests may be reduced to a monetary satisfaction.  *See In re*

*Kellstrom Indust. Inc.*, 282 B.R. 787, 794 (Bankr. D. Del. 2002) ("Any interest in property that

can be reduced to a money satisfaction constitutes a claim for purposes of section 363(f)(5).").

For these reasons, the Debtors submit that they may sell the Interests to the Purchaser free and

clear of the Liens.

37.    In light of the foregoing, the Debtors respectfully submit that the sale of the

Interests of AIPL to the Purchaser is in the best interests of the Debtors' estates, their creditors,

and all other parties in interest.

## V.    The Retention of PwC CF and Related Fees Are Appropriate Under Section 327 of the Bankruptcy Code.

38.    By this motion, the Debtors seek to employ and retain PwC CF on behalf of Akorn

as their financial advisor in the Sale Transaction.  The Debtors submit that the retention of PwC

CF under the terms described herein is appropriate under sections 327(a), 328, and 1107(b) of the

Bankruptcy Code.  Section 327(a) of the Bankruptcy Code empowers the trustee, with the Court's

approval, to employ professionals "that do not hold or represent an interest adverse to the estate,

and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's

duties under this title."  Section 101(14) of the Bankruptcy Code defines a "disinterested person"

as a person that:

(a)    is not a creditor, an equity security holder, or an insider;

(b)    is not and was not, within two (2) years before the date of the filing of the petition, a director, officer, or employee of the debtor; and

(c)    does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct

or indirect relationships to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14).

39.     Further, section 1107(b) of the Bankruptcy Code provides that "a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case." 11 U.S.C. § 1107(b).  PwC CF's prepetition relationship with Akorn and the Debtors is therefore not an impediment to PwC CF's retention.

40.     Section 328(a) of the Bankruptcy Code, in turn, authorizes the employment of a professional person "on any reasonable terms and conditions of employment, including on a . . . fixed or percentage fee basis . . . ." 11 U.S.C. § 328(a).  Section 328 of the Bankruptcy Code permits the compensation of professionals on more flexible terms that reflect the nature of their services and market conditions.  Pursuant to the Engagement Letter, PwC CF is entitled to a $250,000 Advisory Fee and a Success Fee.  The Advisory Fee is paid in two parts—$150,000 upon signing of the Engagement Letter, which has been paid, and $100,000 upon the signing of the Share Purchase Agreement, which is yet to be paid.  The Success Fee is owed upon the closing of the Share Purchase Agreement and is the greater of $700,000 or 2.00% of the Purchase Consideration.

41.     The Court's approval of the Debtors' retention of PwC CF in accordance with the terms and conditions of the Engagement Letter are warranted.  As discussed in the Wolfe Declaration, PwC CF satisfies the disinterestedness standard in section 327(a) of the Bankruptcy Code.  Additionally, PwC CF's professionals have extensive experience and an excellent reputation for providing high-quality services.  Further, the Debtors believe that PwC CF is well qualified to continue providing the services related to the Sale Transaction to Akorn in a cost-

effective, efficient, and timely manner due to its existing familiarity with Akorn's business and books and records as a result of the extensive prepetition marketing process.

42.     Likewise, the Debtors believe that the terms and conditions of the Engagement Letters are customary and reasonable for financial and marketing advice and are in the best interests of the Debtors' estates, creditors, and all parties in interest.  As such, the Debtors submit that the terms and conditions of PwC CF's retention as described herein and the Engagement Letter, including the proposed compensation, are reasonable and in keeping with the terms and conditions typical for engagements of this size and character.

### Relief Effective as of the Petition Date is Appropriate

43.     Pursuant to the Debtors' request, PwC CF has served as the financial advisor to Akorn since the Petition Date with the assurances that the Debtors would seek approval of its employment and retention effective as of the Petition Date so that PwC CF may be compensated for its pre-application services in these chapter 11 cases.  The Debtors believe that no party in interest will be prejudiced by the granting of the employment effective as of the Petition Date, as provided herein, because PwC CF has provided and continues to provide valuable services to the Debtors' estates in the interim period.  Based on the foregoing, the Debtors submit that it has satisfied the requirements of the Bankruptcy Code, Bankruptcy Rules, and the Local Rules. Accordingly, the Debtors respectfully request entry of the Order authorization the retention and payment of PwC CF in connection with the Sale Transaction pursuant to section 327(a) of the Bankruptcy Code, Bankruptcy Rule 2014, and Local Rules 2014-1(a), 2016-1, and 9013-1(f) approving this application to retain and compensate PwC CF in connection with the Sale Transaction, effective as of the Petition Date.

## Notice

38.     The Debtors will provide notice of this motion to:  (a) the U.S. Trustee for the District of Delaware; (b) counsel to the Committee; (c) Wilmington Savings Fund Society, FSB, in its capacity as successor administrative agent under the Term Loan Credit Agreement, or any of its predecessors or successors (the "Term Loan Agent"); (d) counsel to the Term Loan Agent; (e) counsel to the ad hoc group of the Debtors' Prepetition Lenders (the "Ad Hoc Group"); (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the Food and Drug Administration; (i) the Drug Enforcement Administration; (j) the Securities Exchange Commission; (k) the state attorneys general for all states in which the Debtors conduct business; (l) the Purchaser; and (m) any party that requests service pursuant to Bankruptcy Rule  2002.

## No Prior Request

39.     No previous request for the relief sought herein has been made to this Court or any other court.

## Conclusion

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A,** (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

Wilmington, Delaware
June 30, 2020

/s/ *Paul N. Heath*

<table>
<tr><td><b>RICHARDS, LAYTON & FINGER, P.A.</b></td><td><b>KIRKLAND & ELLIS LLP</b><br><b>KIRKLAND & ELLIS INTERNATIONAL LLP</b></td></tr>
<tr><td>Paul N. Heath (No. 3704)<br>Amanda R. Steele (No. 5530)<br>Zachary I. Shapiro (No. 5103)<br>Brett M. Haywood (No. 6166)<br>One Rodney Square<br>920 N. King Street<br>Wilmington, Delaware 19801<br>Telephone:    (302) 651-7700<br>Facsimile:    (302) 651-7701<br>Email:    heath@rlf.com<br>      steele@rlf.com<br>      shapiro@rlf.com<br>      haywood@rlf.com</td><td>Patrick J. Nash, Jr., P.C. (admitted <i>pro hac vice</i>)<br>Gregory F. Pesce (admitted <i>pro hac vice</i>)<br>Christopher M. Hayes (admitted <i>pro hac vice</i>)<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:    (312) 862-2000<br>Facsimile:    (312) 862-2200<br>      patrick.nash@kirkland.com<br>      gregory.pesce@kirkland.com<br>      christopher.hayes@kirkland.com<br><br>-and-</td></tr>
<tr><td><i>Co-Counsel for the<br>Debtors and Debtors in Possession</i></td><td><b>KIRKLAND & ELLIS LLP</b><br><b>KIRKLAND & ELLIS INTERNATIONAL LLP</b><br>Nicole L. Greenblatt, P.C. (admitted <i>pro hac vice</i>)<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:    (212) 446-4800<br>Facsimile:    (212) 446-4900<br>Email:    nicole.greenblatt@kirkland.com<br><br><i>Co-Counsel for the<br>Debtors and Debtors in Possession</i></td></tr>
</table>