**IN UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE**

--------------------------------------------------------- x
                                                          :
In re                                                     :   **Chapter 11**
                                                          :
**AKORN, INC.,** *et al.*,                                :   **Case No. 20–11177 (KBO)**
                                                          :   **(Jointly Administered)**
                                  **Debtors.**[1]          :
                                                          :
                                                          :
                                                          :
                                                          :
--------------------------------------------------------- x

**MOTION OF FRESENIUS KABI AG
TO RECLASSIFY CLAIMS PURSUANT TO BANKRUPTCY RULE 3013**

Fresenius Kabi AG ("Fresenius") files this motion (the "Motion") pursuant to Rule 3013

of the Federal Rules of Bankruptcy Procedures ("Rule 3013" and rules generally, the "Bankruptcy

Rules") requesting entry of an order, substantially in the form attached hereto as **Exhibit A**,

correcting the classification errors of the *Joint Chapter 11 Plan of Akorn, Inc. and Its Debtors*

*Affiliates* [Dkt. No. 258] (the "Plan")[2] by reclassifying (i) the Fresenius Contract Claim (as defined

below) in Class 4 as a General Unsecured Claim and (ii) the Shareholder Litigation Claims in Class

7 as Section 510(b) Claims. In support thereof, Fresenius respectfully states as follows:

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Akorn, Inc. (7400); 10 Edison Street LLC (7890); 13 Edison Street LLC; Advanced Vision Research, Inc. (9046); Akorn (New Jersey), Inc. (1474); Akorn Animal Health, Inc. (6645); Akorn Ophthalmics, Inc. (6266); Akorn Sales, Inc. (7866); Clover Pharmaceuticals Corp. (3735); Covenant Pharma, Inc. (0115); Hi-Tech Pharmacal Co., Inc. (8720); Inspire Pharmaceuticals, Inc. (9022); Oak Pharmaceuticals, Inc. (6647); Olta Pharmaceuticals Corp. (3621); VersaPharm Incorporated (6739); VPI Holdings Corp. (6716); and VPI Holdings Sub, LLC. The location of the Debtors' service address is: 1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.

[2]    Capitalized terms used but not defined herein have the meanings given to them in the Plan.

# TABLE OF CONTENTS

**Page**

Table of Authorities.................................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................. 2

JURISDICTION AND VENUE............................................................................................... 3

BACKGROUND....................................................................................................................... 4

      A.      Case Background ............................................................................................ 4

      B.      Plan Classification and Treatment..................................................................... 5

      C.      The Misclassified Claims ................................................................................. 6

          1. Fresenius' Contract Claim ............................................................................ 6

          2. The Shareholder Litigation Claims ............................................................... 9

RELIEF REQUESTED ..........................................................................................................10

      A.      The Court Should Determine the Proper Classification of the Fresenius Contract Claim and the Shareholder Litigation Claims Now ..............................10

      B.      The Fresenius Contract Claim Is a General Unsecured Claim ...........................13

      C.      The Shareholder Litigation Claims Are Section 510(b) Claims .........................15

NOTICE ....................................................................................................................................18

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re 500 Fifth Ave. Assocs.*,
    148 B.R. 1010 (Bankr. S.D.N.Y. 1993)........................................................................ 13, 15

*In re Akorn, Inc. Data Integrity Securities Litigation*,
    No. 18-cv-01713 (N.D. Ill. Apr. 22, 2019), Dkt. No. 101 ...................................................11

*In re Betacom of Phoenix, Inc.*,
    240 F.3d 823 (9th Cir. 2001) ...........................................................................................17

*In re DirecTV Latin Am., LLC*,
    2004 WL 302303 (D. Del. Feb. 4, 2004) ........................................................................16

*In re DRW Prop. Co. 82*,
    60 B.R. 505 (Bankr. N.D. Tex. 1986) .............................................................................15

*In re Highlands Grp. of Brunswick, LLC*,
    2012 WL 5385633 (Bankr. E.D.N.C. Nov. 1, 2012) ........................................................14

*In re Int'l Wireless Commc'ns Holdings, Inc.*,
    257 B.R. 739 (Bankr. D. Del. 2001), *aff'd*, 279 B.R. 463 (D. Del. 2002), *aff'd*,
    68 F. App'x 275 (3d Cir. 2003) .......................................................................................18

*In re Intervention Energy Holdings, LLC*,
    553 B.R. 258 (Bankr. D. Del. 2016).................................................................................20

*In re Kaiser Grp. Int'l, Inc.*,
    260 B.R. 684 (Bankr. D. Del. 2001).................................................................................19

*In re Khan*,
    846 F.3d 1058 (9th Cir. 2017) .........................................................................................17

*In re Marlow Manor Downtown, LLC*,
    2015 WL 667543 (B.A.P. 9th Cir. Feb. 6, 2015) .............................................................14

*In re Med Diversified*,
    Inc., 461 F.3d 251 (2d Cir. 2006).............................................................................. 16, 17

*In re Mirant Corp.*,
    No. 03-46590-DML-11, 2005 WL 6440372 (Bankr. N.D. Tex. May 24, 2005) ...................15

*In re Permian Producers Drilling, Inc.*,
    263 B.R. 510 (W.D. Tex. 2000).......................................................................................20

*In re Rexford Properties LLC*,
    558 B.R. 352 (Bankr. C.D. Cal. 2016) ...................................................................13

*In re SeaQuest Diving, LP*,
    579 F.3d 411 (5th Cir. 2009) .............................................................................20

*In re Telegroup, Inc.*,
    281 F.3d 133 (3d Cir. 2002) ...........................................................15, 16, 18, 20

STATUTES

11 U.S.C. § 510(b)............................................................................................. passim

11 U.S.C. § 1122 ..........................................................................................................5

Fed. R. Bankr. P. 2013...............................................................................................14

Fed. R. Bankr. P. 3013......................................................................................4, 5, 13

OTHER AUTHORITIES

9 *Collier on Bankruptcy* ¶ 3013.01 (16th ed.) ....................................................13, 14

*The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk
    of Illegal Securities Issuance Between Securityholders and the Issuer's
    Creditors*, 48 N.Y.U. L. Rev. 261 (1973) ...........................................................16

## PRELIMINARY STATEMENT

The Debtors' Plan repays the Term Loan Lenders in full, purports to deliver releases of the Debtors' current and former officers and directors (including individuals implicated in the misconduct that caused Akorn's bankruptcy), and secures recoveries for the Debtors' prepetition shareholders through millions of dollars of D&O cash insurance proceeds and a $30 million "Bankruptcy Protection Claim" that is classified as a General Unsecured Claim. At the same time, holders of *actual* General Unsecured Claims are left with nothing. Indeed, the Plan makes no provision for prosecuting potentially valuable estate causes of action, that could be a meaningful source of recovery for holders of General Unsecured Claims, which the Debtors release or transfer for apparently no consideration. To ensure confirmation of this Plan, the Debtors engage in improper classification gerrymandering: the Plan elevates holders of classic shareholder claims to general unsecured status, subordinates (or ignores altogether) general unsecured creditors holding hundreds of millions of dollars in litigation claims, and appears not to classify the vast majority of the Debtors' trade creditors whose claims are assumed by the Term Loan Lenders in connection with the Sale Transaction. This rigged classification scheme cannot be permitted to frame voting on, and classification of, the Plan.

Bankruptcy Rule 3013 provides the remedy. It allows the Court to enter an order before confirmation amending the Plan to properly classify equity with equity and general unsecured claims with general unsecured claims. As constituted, the Plan's classification scheme will compromise the integrity of the voting process because a major portion of the Debtors' stakeholders will be evaluating the Plan and voting in the wrong class. Just as relevant, unless these issues are decided prior to the confirmation hearing, the Debtors may be unable to confirm the Plan at the hearing, *regardless* of the voting results. Specifically, the Plan (including the releases) must be acceptable to the Term Loan Lenders under the Restructuring Support

Agreement. Moreover, the effectiveness of the Shareholder Settlement presumably depends on classifying the shareholders' $30 million contingent value claim as a General Unsecured Claim. Thus, if misclassification is corrected at the confirmation hearing, instead of now, the Debtors may not have the support of *any* impaired class at confirmation because releases may be withdrawn, the Shareholder Settlement may be breached, or the Term Loan Lenders may withdraw their support.

Classification in this case affects the very fabric of the Plan. Its resolution presents a discrete question that should be decided now: to what extent does section 510(b) of the Bankruptcy Code apply to the Shareholder Litigation Claims and the Fresenius Contract Claim? In situations such as this, a bankruptcy court is not required to, and should not, wait until confirmation to find that the Debtors cannot confirm their Plan due to gerrymandering of classes. This issue can and should be decided prior to confirmation. Rule 3013 allows this Court to "determine classes of creditors" in advance of confirmation for precisely this situation. Accordingly, Fresenius urges the Court to enter an order directing the Debtors to classify the Fresenius Contract Claim in Class 4 (General Unsecured Claims) and all Shareholder Litigation Claims (settling or not) in Class 7 (Section 510(b) Claims).

## JURISDICTION AND VENUE

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. Fresenius consents, pursuant to Bankruptcy Rule 7008, and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties,

cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief requested herein are section 1122 of the Bankruptcy Code and Bankruptcy Rule 3013.

## BACKGROUND

### A.     Case Background

4.     On May 20, 2020, each of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed a voluntary petition under chapter 11 of the Bankruptcy Code in this Court commencing these chapter 11 cases (the "Chapter 11 Cases").

5.     On June 3, 2020, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") [Dkt. No. 125].

6.     On June 23, 2020, the Court entered the Bar Date Order [Dkt. No. 214].  The general claims bar date for all claimants, other than governmental units, to file proofs of claim against the Debtors is August 3, 2020.  The governmental bar date is November 16, 2020.

7.     On June 30, 2020, the Debtors filed an amended Plan and Disclosure Statement [Dkt. No. 267] (the "DS").

8.     On July 1, 2020, the Court held a hearing to approve the Disclosure Statement Order.  Fresenius filed an objection to the Disclosure Statement [Dkt. No. 240] (the "Fresenius Objection"), which Fresenius resolved with the Debtors in advance of the hearing through the inclusion of agreed-upon language in Article II.H of the Disclosure Statement.  On July 2, 2020, the Court entered the Disclosure Statement Order, approving the adequacy of the Disclosure Statement and the Solicitation Procedures [Dkt. No. 318].

9.     The Solicitation Procedures establish August 14, 2020 at 5:00 p.m. (ET) as the Voting Deadline.   The Solicitation Procedures provide that any Ballot cast by a Holder of a contingent or unliquidated Claim will count for voting purposes only as a Claim in the amount of $1.00.   (DS Order § E.2(c).)   A Claim that is subject to an objection filed on or before July 30, 2020 (other than a "reduce and allow" objection) will be disallowed unless the Holder of such Claim successfully seeks a "Resolution Event" two business days before the Voting Deadline.   (*Id.* at § D.3(b).)

10.     The Confirmation Hearing is scheduled for August 20, 2020 at 1:00 p.m. (ET).

**B.     Plan Classification and Treatment**

11.     In relevant part, the Plan classifies Claims as follows:

- Fresenius Contract Claim is defined as, and therefore classified as, a Section 510(b) Claim.   (*See* Plan Art. I.113.)

- All Shareholder Litigation Claims of Holders who did *not* enter into the Shareholder Settlement (the "Non-Settling Shareholders" and their Claims, the "Non-Settling Shareholder Claims") are also defined as, and therefore classified as, Section 510(b) Claims.   (Plan Art. I.A.113.)[3]

- All Shareholder Litigation Claims of Holders who *did* enter into the Shareholder Settlement (the "Settling Shareholders" and their Claims, the "Settling Shareholder Claims") are classified as General Unsecured Claims under the Plan.   (Plan Art. I.A.66.)

- All Purchaser Assumed Claims, which presumably include the majority of the Debtors' trade claims and include those "Claims against the Debtors that were Assumed Liabilities under the Sale Transaction Documentation,"[4] are *not* classified as General Unsecured Claims and, in fact, are not classified under the Plan at all.   (Plan Art. I.A.99.)

---

[3]   On information and belief, the Debtors are also settling with the Non-Settling Shareholders, which, if successful, would elevate all the shareholder claims to the status of General Unsecured Claims, ensuring that all of the Debtors' insurance proceeds will benefit equity holders, to the detriment of true general unsecured claimants like Fresenius.

[4]   "Assumed Liabilities" is defined to include all "accrued trade and non-trade payables." (APA § 1.3(d).)

12.    The Plan contemplates the following treatment for holders of General Unsecured Claims and Section 510(b) Claims, respectively:

- <u>Holders of Class 4 General Unsecured Claims</u> – each Holder of Allowed General Unsecured Claims that are not assumed by the Purchaser will receive its Pro Rata share of Distributable Proceeds, if any, pursuant to the Waterfall Recovery.

- <u>Holders of Class 7 Section 510(b) Claims</u> – each Holder of an Allowed Section 510(b) Claim shall receive its Pro Rata share of the Distributable Proceeds, if any, pursuant to the Waterfall Recovery; *provided that* for purposes of receiving the treatment provided herein, each Holder of an Allowed Section 510(b) Claim shall be treated as if such Holder held a number of Allowed Class 8 Akorn Interests equal in value to the amount of its Allowed Section 510(b) Claim.

## C.    The Misclassified Claims

13.    The Fresenius Contract Claim is plainly a General Unsecured Claim. Equally clear is that *all* Shareholder Litigation Claims, whether settled or not, are Section 510(b) Claims and must be subordinated.

### 1.    Fresenius' Contract Claim

14.    By way of background, Fresenius and Akorn signed a merger agreement (the "<u>Merger Agreement</u>") in April 2017. In late 2017, Fresenius received anonymous whistleblower letters that "made disturbing allegations about Akorn's regulatory compliance. (Memorandum Opinion, Oct. 1, 2018, *Akorn, Inc.* v. *Fresenius Kabi AG et al.*, C.A. No. 2018–0300–JTL, at 3 (Del. Ch. Oct. 22, 2019) [Dkt. No. 238].) Following the receipt of the whistleblower letters, Fresenius conducted an in-depth investigation that "uncovered serious and pervasive data integrity problems" at several of Akorn's sites, rendering "Akorn's representations about its regulatory compliance sufficiently inaccurate." (*Id.* at 3–4.) As a result, in April 2018, Fresenius terminated the Merger Agreement, and Akorn filed a suit. (*Id.* at 4.) The Delaware Chancery Court held, and the Delaware Supreme Court later affirmed, that Fresenius lawfully terminated its $4.3 billion

Merger Agreement with Akorn based on Akorn's breaches of its contractual representations of regulatory compliance and covenant to operate business in the ordinary course, and a finding that the Debtors' business suffered a "Material Adverse Effect." (*Id.* at 47, 245.)

15.     After the Chancery Court adjudicated that the Debtors were *liable* for breach of contract, Fresenius moved for summary judgment to liquidate its damages. Fresenius produced nearly 2,000 pages of documents evidencing its right to payment. The summary judgment motion is fully briefed, and argued. It is presently *sub judice* before Vice Chancellor Laster, and stayed as a result of Akorn's bankruptcy filing.[5]

16.     As detailed in the summary judgment motion, the Merger Agreement specifically provides that Fresenius' valid termination did not "relieve [Akorn] from liability for damages to [Fresenius] resulting from a knowing and intentional breach of this Agreement or from fraud[.]" (Merger Agreement, JX-1, § 7.02.) As such, the Debtors are liable to make Fresenius whole for the very substantial damages that Fresenius has suffered (a) as a result of entering into and proceeding with the Merger Agreement in reliance on Akorn's knowingly false representations and (b) after signing, working diligently in good faith towards closing, as a result of both Akorn's knowingly false representations and its ongoing and intentional breaches of its ordinary course covenant through its attempts to conceal its regulatory violations.

17.     Fresenius' damages include tens of millions of dollars spent in pursuit of this aborted acquisition. The actual amount of these damages is pending before Vice Chancellor Laster and does not need to be liquidated by this Court. However, the *substance* of the claims is determinative of the Plan's classification of the Fresenius Contract Claim and includes the following:

---

[5]     At the appropriate time, in the interests of efficiency and otherwise, Fresenius may move to lift the automatic stay to permit Vice Chancellor Laster to determine the amount of Fresenius' claims.

a. *Investment Banking*: At and after the signing of the Agreement, Fresenius incurred costs totaling $10,857,028.68 as fees and expenses payable to Credit Suisse and Moelis, its investment bankers, for their work related to the Agreement and failed transaction, including identifying, formulating, negotiating, finalizing, and otherwise assisting with the potential purchase of Akorn. (*See* Transmittal Affidavit of Daniel Mason in Support of Counterclaim Plaintiffs' Motion for Summary Judgment and in Opposition to Counterclaim Defendants' Cross-Motion for Summary Judgment, Ex. 11, *Akorn, Inc.* v. *Fresenius Kabi AG*, C.A. No. 2018-0300-JTL (Del. Ch. Nov. 14, 2019). This amount includes $2.5 million that became payable to each of Credit Suisse and Moelis immediately upon signing the Agreement pursuant to the terms of their engagement agreements with Fresenius.

b. *Financing*: At or after signing, Fresenius spent $36,475,347.28 securing financing for its potential acquisition of Akorn—a deal which required Fresenius to pay $4.3 billion in cash in addition to assuming certain debt of Akorn. These fees included underwriting and commitment fees paid to Bank of America, BNP Paribas, Commerzbank, Credit Suisse, Goldman Sachs, Santander, Scotiabank, and UniCredit, in addition to certain accounting review and legal fees of those banks. (*See id.*)

c. *Integration Planning and Preparation*: After signing the Agreement and in anticipation of the merger, Fresenius engaged in a massive—and ultimately futile—exercise to plan and prepare for the integration of Akorn with its own business, which cost $16,975,263.06 out of pocket. Fresenius incurred costs of numerous consultants in connection with this exercise, including The Boston Consulting Group, CSC Corporation, and Deloitte Consulting. (*See id.*)

d. *Antitrust Clearance*: At and after signing, Fresenius incurred $4,475,064.87 in costs in connection with its effort to secure antitrust clearance and otherwise implement the merger. These costs included FTC filing fees and legal fees paid to Fresenius' deal counsel and FTC counsel, Allen & Overy. (*See id.*)

e. *Investigation*: After receiving whistleblower letters raising serious issues about Akorn's data integrity, Fresenius initiated its own investigation into the letters' allegations. In total, Fresenius paid $5,560,799.90 to third party advisors and consultants including Sidley Austin, Lachman, and EY to thoroughly investigate Akorn's quality failures. (*See id.*)

18.     These damages (collectively, the "Fresenius Contract Claim") represent only a fraction of Fresenius' total losses caused by the Debtors' breaches. In addition to its out-of-pocket costs, Fresenius suffered millions of dollars in damages because of the massive amount of time

dozens of management personnel spent on the failed transaction, and sustained significant additional losses because of the lost opportunity to develop its own generic drug business, which it could not fully pursue while planning to consummate the Akorn merger.

### 2.    The Shareholder Litigation Claims

19.    On March 8, 2018, relying on Vice Chancellor's extensive factual findings regarding Akorn's misconduct and the evidentiary record in the Merger Agreement trial, Akorn shareholders (the "Shareholders") filed a securities class action (the so-called Shareholder Litigation). The Shareholders alleged that Akorn made material misrepresentations and omissions regarding Akorn's regulatory compliance. According to the complaint, these material misrepresentations and omissions violated federal securities laws, causing shareholders to suffer economic harm when the truth about the nature of Akorn's lack of regulatory compliance was revealed through a series of disclosures. (Second Consolidated Am. Class Action Compl., *In re Akorn, Inc. Data Integrity Securities Litigation*, No. 18-cv-01713 (N.D. Ill. Apr. 22, 2019) [Dkt. No. 101].)

20.    The Shareholder Litigation settled two months before the Petition Date, on March 13, 2020. (DS at 33.) Several plaintiffs opted out of the class settlement and filed individual actions in 2019 and early 2020. In February 2020, the United States District Court for the Northern District of Illinois denied Akorn's motion to dismiss the opt-out cases.

21.    The Shareholder Settlement consideration includes: (a) up to $30.0 million in cash "consisting of 100% of the proceeds from Defendants' primary and excess director and officer (D&O) insurance policies;" (b) up to approximately 8,735,705 shares of Akorn common stock; and (c) contingent value rights ("CVR") that entitle the holders to annual cash payments over the CVR's five-year term "in an amount for any year equal to 33.3% of Akron's 'Excess EBITDA.'" (*See* Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness

Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, *In re Akorn, Inc. Data Integrity Securities Litigation*, No. 18-cv-01713 at 2-3 (N.D. Ill. Apr. 22, 2019) [Dkt. No. 127-3]) (the "Settlement Notice").) At the time the Shareholder Settlement was noticed to class members, it was estimated to provide approximately $53.6 million to $155.4 million in recovery to Settling Shareholders. (*Id.* at 2.) The actual value of the settlement was contingent on "the price of Akorn common shares on the dates they are issued to (or sold on behalf of) the Settlement Class as partial consideration for the Settlement and whether other conditions are met for the contingent future components of the Settlement." (*Id.*) In exchange, the Settling Shareholders agreed to grant releases to the Debtors and their directors and officers. (*Id.*)

## RELIEF REQUESTED

22.     In an effort to manufacture support for the Plan and the releases contained therein, the Debtors' classification scheme impermissibly elevates favored shareholders to general unsecured claimants, and subordinates the Fresenius Contract Claim to the status of equity. Fresenius accordingly requests entry of an order, substantially in the form attached hereto as **Exhibit A**, reclassifying its claim as General Unsecured Claim and those of the Shareholders as Section 510(b) Claims.

## BASIS FOR RELIEF

### A.  The Court Should Determine the Proper Classification of the Fresenius Contract Claim and the Shareholder Litigation Claims Now

23.     Bankruptcy Rule 3013 provides a mechanism through which the Court may "determine classes of creditors . . . pursuant to §§ 1122, 1222(b)(1) and 1322(b)(1) of the Code" in advance of confirmation. *See In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1017 n.7 (Bankr. S.D.N.Y. 1993) ("Issues of claim classification raised pursuant to a Rule 3013 may be ripe for

determination prior to a confirmation hearing."); *see also In re Rexford Properties LLC*, 558 B.R. 352, 355 (Bankr. C.D. Cal. 2016) ("Rule 3013 contemplates the consideration and approval of a proposed classification scheme in advance of the plan confirmation process"). Indeed, the Advisory Committee Note to Rule 3013 states that "[s]ections 1122, 1222(b)(1) and 1322(b)(1) set the standards for classifying claims and interests but provide that such classification is accomplished in the plan. This rule does not change the standards; rather it recognizes that it may be desirable or necessary to establish proper classification before a plan can be formulated." Judicial use of Rule 3013 minimizes the waste of resources by preventing a plan that does not satisfy classification requirements from moving to the confirmation phase. *See* Alan N. Resnick & Henry J. Sommer, 9 *Collier on Bankruptcy* ¶ 3013.01 n.4 (16th ed.) ("[Rule 3013] may also be useful as a means to test classification prior to undertaking an expensive and time-consuming solicitation and confirmation process.").

24.    Through a combination of gerrymandered classes and purported non-bankruptcy settlements, the Debtors attempt to circumvent the Bankruptcy Code's absolute priority rule and other fundamental creditor protections embodied in section 1129 of the Bankruptcy Code. First, the Debtors intend to use "a very substantial portion" of D&O insurance policy proceeds even beyond those being used to fund the Shareholder Settlement to pay the Shareholders in exchange for releases outside of the Plan process. (*See* Joint Status Report, No. 1:19-cv-03648 at 3 (N.D. Ill. July 6, 2020) [Dkt. No. 77].) Next, to ensure that estate causes of action based on the same misconduct underlying the Shareholder Litigation are also released, the Debtors propose a Plan with gerrymandered classes that virtually ensure its confirmability. This perversion of the Bankruptcy Code's absolute priority rule, and creditor protections, should not stand.

25.     Notably, Holders of General Unsecured Claims receive nothing under the Plan. The Debtors' transparent engineering is all the more significant because Class 4 (General Unsecured Claims) expressly excludes trade claims, most of which will be assumed by the Purchaser. Thus, it is unclear which claims (other than the Settling Shareholder Litigation Claims) comprise General Unsecured Claims in Class 4. With a $30.0 million allowed claim, it is safe to assume that the Settling Shareholders hold the majority of value in that class (at least, as the Debtors would have it) and control, or at least significantly influence, the vote in favor of the Plan.

26.     Allowing the solicitation and voting process to proceed when a significant portion of claims is misclassified will distort the Debtors' vote tabulation and put the Plan's confirmability, and the releases coveted by the Debtors and their Term Loan Lenders (*i.e.*, the stalking horse purchaser), at risk. Conversely, resolution now will conserve limited resources by ironing out obstacles to confirmation (including in respect of releases) in a more efficient manner. In situations like these, "when classification issues may be so obvious and their resolution so central to the confirmability of the plan . . . the question of proper classification is best addressed prior to consideration of a plan at a confirmation hearing." 9 *Collier on Bankruptcy* ¶ 3013.01. Importantly, the reclassification analysis only implicates an isolated legal issue—whether a claim is subject to mandatory subordination under section 510(b)—that can be decided without reference to other issues or parties in interest. Numerous courts have used Bankruptcy Rule 3013 to address obvious classification issues in advance of confirmation. *See, e.g.*, *In re Marlow Manor Downtown, LLC*, 2015 WL 667543, at *1 (B.A.P. 9th Cir. Feb. 6, 2015); *In re Highlands Grp. of Brunswick, LLC*, 2012 WL 5385633, at * 6 (Bankr. E.D.N.C. Nov. 1, 2012); *500 Fifth Ave. Assocs.*, 148 B.R. at 1013; *In re Mirant Corp.*, 2005 WL 6440372, at *1 (Bankr. N.D. Tex. May 24, 2005); *In re DRW Prop. Co. 82*, 60 B.R. 505, 511 (Bankr. N.D. Tex. 1986).

### B. The Fresenius Contract Claim Is a General Unsecured Claim

27.    Section 510(b) provides, in relevant part, that, "[f]or the purpose of distribution under this title," claims "arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor" or claims "for damages arising from the purchase or sale of such a security" are "subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security." 11 U.S.C. § 510(b).

28.    Congress enacted section 510(b) for a very specific purpose: "to prevent disaffected equity investors from recouping their investment losses in parity with general unsecured creditors in the event of bankruptcy." *In re Telegroup, Inc.*, 281 F.3d 133, 142 (3d Cir. 2002). Section 510(b) embodies the policy rationales articulated by John J. Slain and Homer Kripke in their influential law review article, *The Interface Between Securities Regulation and Bankruptcy— Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261 (1973): (1) the dissimilar risk and return expectations of shareholders and creditors; and (2) the reliance of creditors on the equity cushion provided by shareholder investment. *See In re Med Diversified*, Inc., 461 F.3d 251, 256 (2d Cir. 2006).

29.    To warrant mandatory subordination, a claim must have "some nexus of causal connection between the claim and the sale of the security." *Telegroup*, 281 F.3d at 138. Determining whether a particular claim has the requisite causal connection with a securities transaction to warrant mandatory subordination evades a "simple bright-line test." *In re DirecTV Latin Am., LLC*, 2004 WL 302303, at *4 (D. Del. Feb. 4, 2004); *see also Telegroup*, 281 F.3d at 138 ("[section] 510(b)'s language alone provides little guidance in delineating the precise scope of the required nexus"). The central inquiry courts apply, therefore, is whether the legislative history and underlying policies mandate subordination. In particular, a court will assess "whether subordinating the claim furthers the anti-bootstrapping intent of [section] 510(b) so that those who

have contractually accepted the risk of business failure, bear that burden in bankruptcy." *DirecTV Latin Am., LLC*, 2004 WL 302303, at *4.

30.     The Fresenius Contract Claim is not tethered to an interest in Akorn's equity value. Thus, subordinating the Fresenius Contract Claim does not further legislative intent. Fresenius never accepted the risk of Akorn's business failure (and indeed the Chancery Court so ruled) nor do its reliance damages claims reflect a bargain for the dissimilar risk and return expectations of shareholders. The Chancery Court in fact found exactly the opposite: Fresenius validly *terminated* the Agreement in accordance with its terms, *precisely because of* Akorn's litany of wrongful acts, and its stunning business collapse. Consistent with these findings, the Fresenius Contract Claim constitutes simple prepetition contract damages for investment banking, financing, integration and antitrust clearance expenses that Fresenius incurred and for which Akorn is contractually liable.

31.     The Debtors provide no legal basis for subordinating Fresenius' claims. The mere fact that the damages arose in the context of an unconsummated merger agreement does not suffice to subordinate the claims. To the extent the Debtors imply that *any* claim arising from a breach of a merger agreement *must always* be subordinated, no court has applied section 510(b) of the Bankruptcy Code in this bright-line fashion. *See In re Khan*, 846 F.3d 1058, 1064 (9th Cir. 2017) ("there is a limit to the reach of § 510(b), which stops short of encompassing every transaction that touches on or involves stock in a corporation"). The Debtors, unsurprisingly, fail to cite any authority to support their view—and there is none. The few cases involving breach of contract claims brought by would-be investors are invariably grounded in the company's failure to deliver promised equity and the damages, inevitably, are measured in reference to the attendant loss in equity value. *See, e.g.*, *In re Betacom of Phoenix, Inc.*, 240 F.3d 823, 832 (9th Cir. 2001) (former shareholders' action for breach of merger agreement for failure to deliver shares was properly

subordinated); *Med Diversified*, 461 F.3d at 256 (employee's claim for breach of termination agreement premised on the failure to receive stock was properly subordinated).

32.　　As detailed above, the Fresenius Contract Claim comprises direct, out-of-pocket cash costs that Fresenius incurred in reliance on a contract that Akorn breached. These include over $74 million in expenses for investment banking, financing, integration planning and preparation, and antitrust clearance costs. None of these damages had anything to do with Akorn's equity value at any point in time. Accordingly, the Fresenius Contract Claim is not subject to mandatory subordination under section 510(b) of the Bankruptcy Code. It is a General Unsecured Claim and should be classified as such under the Plan.[6]

### C.　The Shareholder Litigation Claims Are Section 510(b) Claims

33.　　The Plan also misclassifies the Settling Shareholder Litigation Claims. The Debtors recognize that the Shareholder Litigation Claims in fact constitute Section 510(b) Claims that must be subordinated, and classifies them as such. Indeed, the Debtors' own description of these claims removes any doubt that *all* of the Shareholder Litigation Claims represent investment damages for lost Akorn equity value, the textbook example of subordinated claims under section 510(b) of the Bankruptcy Code. (DS at 32-34.) With no explanation and citing no precedent, the Debtors nonetheless classify the Settling Shareholder Claims differently, excluding them from the Section 510(b) Claims and elevating them to the status of General Unsecured Claims.

34.　　Courts have consistently ruled that a shareholder cannot avoid mandatory subordination of its investment losses in bankruptcy by converting its equity damages into a claim.

---

[6]　　To be clear, Fresenius is not asking the Court to determine the amount or validity of the Fresenius Contract Claim or the Settling Shareholder Litigation Claims. As mentioned earlier, Fresenius' motion for summary judgment regarding the liquidated amount of Fresenius claims awaits determination by the Chancery Court. For purposes of these Chapter 11 Cases, Fresenius will vote its timely filed proofs of claim at $1.00 each in accordance with the Solicitation Procedures.

*See, e.g.*, *In re Intervention Energy Holdings, LLC*, 553 B.R. 258, 263 (Bankr. D. Del. 2016) ("The Bankruptcy Code pre-empts the private right to contract around its essential provisions."); *Telegroup*, 281 F.3d at 142 ("[section] 510(b) prevents [shareholders] from using their breach of contract claim to recover the value of their equity investment in parity with general unsecured creditors").

35.     As the Third Circuit determined in *Telegroup*, "[m]ore important than the timing of the actionable conduct, from a policy standpoint, is the fact that the claims in this case seek to recover a portion of claimants' equity investment." 281 F.3d at 142. In holding that section 510(b) of the Bankruptcy Code applied in that case, the court reasoned that "because claimants retained the right to participate in corporate profits if [the company] succeeded, we believe that [section] 510(b) prevents them from using their breach of contract claim to recover the value of their equity investment in parity with general unsecured creditors." *Id.; see also In re Int'l Wireless Commc'ns Holdings, Inc.*, 257 B.R. 739, 744 (Bankr. D. Del. 2001), *aff'd*, 279 B.R. 463 (D. Del. 2002), *aff'd*, 68 F. App'x 275 (3d Cir. 2003) (applying mandatory subordination where "shareholders [tried] to elevate their claims for damages from sale or purchase of a debtor's securities to general unsecured status simply by having their rights set forth in a document separate from the purchase agreement").

36.     In stark contrast to the Fresenius Contract Claim, *all* of the Shareholder Litigation Claims illustrate exactly the type of investment-based losses that courts *routinely* subordinate under section 510(b) of the Bankruptcy Code. In the Shareholder Litigation, the Lead Plaintiffs alleged, among other things, that the Debtors and their officers and directors "knew or recklessly disregarded widespread institutional data integrity problems at Akorn's manufacturing and research and development facilities while making or causing Akorn to make contrary misleading

16

statements and omissions of material fact concerning Akorn's data integrity at its facilities." (DS at 32.) This conduct allegedly caused "non-insider shareholders to lose over $1.07 billion and $613 million in value, respectively." (*Id.*) These losses constitute *quintessential* damages arising from the Shareholders' purchase of Akorn's equity, and must be subordinated pursuant to section 510(b) of the Bankruptcy Code. *See, e.g.*, *In re Kaiser Grp. Int'l, Inc.*, 260 B.R. 684, 687 (Bankr. D. Del. 2001) (subordinating shareholders' claims for breach of debtors' contractual obligation to pay cash or issue additional shares when shares proved to be less valuable than the debtors represented).

37.     The Shareholder Settlement, in turn, compensates the Settling Shareholders for these same damages and, thus, is also subordinated as a claim "for damages arising from the purchase or sale of a security of the debtor." 11 U.S.C. § 510(b). In fact, most of the consideration under the Shareholder Settlement comprises equity, either in the form of Akorn common stock or the CVRs, as is evidenced by the Debtors' agreement under the settlement to try to cause the CVRs to be traded on NASDAQ Global Markets or another national securities exchange. (Settlement Notice at 4.)

38.     The Plan doesn't attempt to characterize the Settling Shareholders as anything other than shareholders; *all* shareholder claims are defined as "Shareholder Litigation Claims." (Plan Art. I.118.) The *only* distinction between the shareholder claims in Class 4 (General Unsecured Claims) and those in Class 7 (Section 510(b) Claims) is that one group settled and liquidated their consideration for $30 million, while the other group did not (yet). Shareholders, however, cannot elevate their equity claims by contracting around the clear mandate of the Bankruptcy Code. Simply put, section 510(b) of the Bankruptcy Code subordinates *all* Shareholder Litigation Claims, settled or not, and provides no basis on which to distinguish between them. 11 U.S.C.

§ 510(b); *see, e.g.*, *In re Permian Producers Drilling, Inc.*, 263 B.R. 510, 520 (W.D. Tex. 2000) ("[t]he fact that Andrew's claim is predicated on the settlement agreement does not alter the fact that the underlying claim is a claim for damages arising from the purchase of a security"); *In re SeaQuest Diving, LP*, 579 F.3d 411, 424 n.8 (5th Cir. 2009) (judgment on breach of settlement agreement had sufficient causal nexus to the underlying rescission of equity stake in the debtor that the claim was subordinated under section 510(b) of the Bankruptcy Code).

39.     Accordingly, Fresenius respectfully requests that the Court reclassify the Shareholder Litigation Claims in Class 7 (Section 510(b) Claims).

## NOTICE

40.     Fresenius will provide notice of this motion to: (a) the U.S. Trustee; (b) counsel to the Committee; (c) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (d) Wilmington Savings Fund Society, FSB, in its capacity as successor administrative agent under the Term Loan Credit Agreement, or any of its predecessors or successors (the "Term Loan Agent"); (e) counsel to the Term Loan Agent; (f) counsel to the ad hoc group of the Debtors' Prepetition Lenders; (g) the United States Attorney's Office for the District of Delaware; (h) the Internal Revenue Service; (i) the Food and Drug Administration; (j) the Drug Enforcement Administration; (k) the Securities Exchange Case Commission; (l) the state attorneys general for all states in which the Debtors conduct business; and (m) any party that requests service pursuant to Local Rule 9013-1(m)(iii).

## NO PRIOR REQUEST

41.     No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, Fresenius respectfully requests that this Court enter an order, in substantially the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and granting such other relief as the Court deems just and proper.

Dated: July 24, 2020                     Respectfully submitted,
      Wilmington, Delaware

*/s/ L. Katherine Good*
L. Katherine Good (No. 5101)
Aaron H. Stulman (No. 5807)
POTTER ANDERSON & CORROON LLP
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801-3700
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: kgood@potteranderson.com
       astulman@potteranderson.com

– and –

Lewis R. Clayton, Esq.
Kelley A. Cornish, Esq.
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: lclayton@paulweiss.com
       kcornish@paulweiss.com

– and –

Claudia R. Tobler, Esq.
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
Email: ctobler@paulweiss.com

*Counsel for Fresenius Kabi AG*