## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ACORN, INC., *et al.*,[1] | ) | Case No. 20-11177 (KBO) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Obj. Deadline: 09/02/20 at 4:00 p.m. (ET)** |
| | ) | **Hearing Date: 09/15/20 at 11:00 a.m. (ET)** |

### MDL PLAINTIFFS' MOTION FOR RELIEF FROM THE AUTOMATIC STAY

The undersigned plaintiffs in *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 16-MD-2724, MDL No. 2724 (E.D. Pa) ("MDL Plaintiffs" or "Movants") respectfully state as follows in support of this motion:

### RELIEF REQUESTED

1.      By this motion the Movants seek entry of an order, substantially in the form attached hereto as Exhibit A, granting them relief from the automatic stay for cause and related relief.  In further support of this motion, the Movants state as follows:

### JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1(f) of the Local Rules

---

1       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Akorn, Inc. (7400); 10 Edison Street LLC (7890); 13 Edison Street LLC; Advanced Vision Research, Inc. (9046); Akorn (New Jersey), Inc. (1474); Akorn Animal Health, Inc. (6645); Akorn Ophthalmics, Inc. (6266); Akorn Sales, Inc. (7866); Clover Pharmaceuticals Corp. (3735); Covenant Pharma, Inc. (0115); Hi-Tech Pharmacal Co., Inc. (8720); Inspire Pharmaceuticals, Inc. (9022); Oak Pharmaceuticals, Inc. (6647); Olta Pharmaceuticals Corp. (3621); VersaPharm Incorporated (6739); VPI Holdings Corp. (6716); and VPI Holdings Sub, LLC. The location of the Debtors' service address is: 1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.

of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this

motion to the extent that it is later determined that the Court, absent consent of the parties,

cannot enter final orders or judgments in connection herewith consistent with Article III of the

United States Constitution.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The bases for the relief requested in this motion are sections 105(a) and 362(d) of

chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Bankruptcy Rule

4001.

## INTRODUCTION

7.      Akorn Inc., Akorn Sales, Inc., Hi-Tech Pharmacal Co, Inc., and VersaPharm, Inc.

(collectively "Akorn"), four debtors in these jointly-administered cases, are presently co-

defendants in the landmark multidistrict litigation before the Honorable Cynthia M. Rufe in the

Eastern District of Pennsylvania that has exposed an industry-wide conspiracy to fix the prices of

generic pharmaceuticals.  The MDL was first centralized in the Eastern District of Pennsylvania

in 2016.  After the denial of multiple motions to dismiss, the MDL is now in the middle of

document discovery, and is moving towards depositions and bellwether trials that will resolve

representative portions of the cases and possibly pave the way for global settlement.

8.      Akorn is important to these cases.  Akorn is named in 18 of the operative

complaints filed to date, including complaints by class plaintiffs, and some of the largest health

plans, including United Healthcare and Humana.  Akorn is alleged to have unlawfully conspired

with respect to at least 9 of the drugs at issue in the MDL, including one of the drugs at issue in

the bellwether trials.  There are 35 document custodians whose files must be produced in the

MDL.  Absent ongoing meaningful participation of Akorn in the MDL, the plaintiffs risk substantial prejudice not only to their case against Akorn, but also to a full and fair opportunity to prove their cases against Akorn's co-conspirators.

9.    Weighed against this prejudice, continuation of the MDL against Akorn would not create any serious burden or prejudice to the Debtors' plan of reorganization.  *First*, the directives of the District Court's case management order will not force Akorn to expend significant time or financial resources on the discovery process.  *Second*, the attention of high-ranking Akorn executives will not be diverted from the reorganization process.  Many of the Akorn-affiliated individuals involved in the MDL are former employees, and none of the current employees identified as document custodians for discovery purposes are directors or officers of Akorn.  *Third*, litigation in the District Court will be less burdensome to all parties, including Akorn, than beginning proceedings from scratch in the bankruptcy forum.  Continuing the MDL against Akorn in the District Court will conserve resources and prevent duplicative, possibly inconsistent, proceedings.

## FACTUAL BACKGROUND

### A.    Overview of the Generics MDL

10.    On August 5, 2016, the Judicial Panel on Multidistrict Litigation issued an order consolidating cases for pretrial purposes in the Eastern District of Pennsylvania.  *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 16-MD-2724, MDL No. 2724, ECF No. 44 (E.D. Pa. Aug. 5, 2016) (the "Generics MDL").  The Generics MDL arises from alleged conspiracies among more than 35 manufacturers of generic pharmaceuticals, including Akorn, to avoid competing with each other through market allocation and agreements to set and increase the prices of more than 200 generic pharmaceutical drugs to extraordinary levels—a conspiracy carried out through industry meetings and code words, such as "playing nice in the sandbox."

3

The far-reaching effects of this massive alleged conspiracy have been devastating for consumers, insurers, and all others who have paid inflated prices for these generic drugs.

11.    Dozens of complaints have been filed by several plaintiff groups against Defendants for violating Section 1 of the Sherman Act and numerous state laws.  These plaintiff groups include: (1) attorneys general for 54 states, territories, and commonwealths (collectively "States"), (2) a proposed class of Direct Purchaser Plaintiffs, which include drug purchasing cooperatives and retail pharmacy operators ("DPPs"), (3) a proposed class of End-Payer Plaintiffs, which include employee welfare benefit funds, labor unions, private insurers, and consumers ("EPPs"); (4) a proposed class of Indirect-Reseller Plaintiffs, which are independent retail pharmacies ("IRPs"); and (5) several Direct-Action Plaintiffs consisting of five large national health insurers (including United Healthcare, Cigna Corp., and Humana, Inc.), retail grocery store and pharmacy chains, and state counties from both New York and Texas.  These complaints have been consolidated in the Eastern District of Pennsylvania for coordinated pretrial proceedings before the Honorable Cynthia M. Rufe.[2]

12.    Initial complaints alleging individual drug conspiracies for the generic drugs digoxin and doxycycline were filed in 2016 by certain EPPs and DPPs.  Throughout 2016 and 2017, additional complaints alleging individual drug conspiracies for 16 other generic drugs were filed and added to the MDL.  In 2018, the State AGs and other plaintiff groups began to file

---

[2] Additional litigation has been commenced outside of the MDL by 94 health plans by way of Writ of Summons in the Pennsylvania Court of Common Pleas for Philadelphia County against Akorn and the other Defendants.  *America's 1st Choice of South Carolina, Inc., et al. v. Actavis Elizabeth, LLC, et al.*, No. 190702094 (Pa. Com. Pl., Phila. Cty.) (filed July 18, 2019); *Blue Cross and Blue Shield of North Carolina, et al. v. Actavis Elizabeth, LLC, et al.*, No. 200500347 (Pa. Com. Pl., Phila. Cty.) (filed May 6, 2020).  On December 12, 2019, the Philadelphia Court of Common Pleas placed the action, *America's 1st Choice of South Carolina, Inc., et al. v. Actavis Elizabeth, LLC, et al.,* in deferred status pending further developments in the Generics MDL.

multi-drug complaints alleging an overarching conspiracy adding more drugs and additional

defendants which has grown the MDL to its current size of more than 200 generic drugs

involving more than 35 manufacturers and their related entities, 8 wholesalers and distributors,

and 25 individual executives.

      13.    The DOJ has also brought several actions against manufacturers and top

executives, many of which have led to guilty pleas and deferred prosecution agreements.  These

actions include the following:

- **Heritage Pharmaceuticals**: On January 19, 2017, two former executives of Heritage Pharmaceuticals plead guilty to conspiring to fix prices of doxycycline hyclate and glyburide.  On May 31, 2019, Heritage entered into a Deferred Prosecution Agreement ("DPA") relating to a one-count Information for a conspiracy involving glyburide.  Heritage agreed to pay a criminal penalty of $225,000 and separately agreed to pay $7.1 million to resolve potential civil liability under the False Claims Act.

- **Rising Pharmaceuticals (n/k/a Kavod)**: On December 13, 2019, Kavod entered into a DPA relating to a one-count Information for a conspiracy involving Benazapril HCTZ.  Rising agreed to pay over $3 million in criminal penalty, restitution, and civil damages.

- **Taro Pharmaceuticals**: On February 4, 2020, the DOJ charged a former top executive at Taro, Ara Aprahamian, with participating in conspiracies to fix the prices of and allocate the market for generic drugs and making false statements to the FBI. On July 23, 2020, Taro Pharmaceuticals U.S.A., Inc. entered into a DPA relating to a two-count felony charge for conspiring with (1) Sandoz Inc., Mr. Aprahamian, and other individuals, between 2013 and 2015, and (2) a "generic drug company based in Pennsylvania" and other individuals, from at least May 2013 through December 2015. Taro agreed to pay a $205,653,218 criminal penalty and admitted that its sales affected by the charged conspiracies exceeded $500 million.

- **Sandoz**: On February 4, 2020, a former top executive at Sandoz plead guilty for his participation in the conspiracy.  Most recently on March 2, 2020, Sandoz entered into a DPA relating to a four-count Information for conspiracy involving benazepril HCTZ, clobetasol, Desonide, nystatin triamcinolone, and tobramycin.

- **Apotex**: On May 7, 2020, Apotex entered into a DPA relating to a one-count Information for a conspiracy involving pravastatin beginning in May 2013 and continuing through December 2015.  The company agreed to pay a $24.1 million criminal penalty.

- **Glenmark**: On June 30, 2020, the DOJ announced that it charged Glenmark for conspiring with Apotex and another company to increase and maintain prices of pravastatin and other generic drugs beginning in or around May 2013 and continuing until at least in or around December 2015.

14.    In 2014, the State of Connecticut initiated its own non-public investigation into suspicious price increases for certain generic pharmaceuticals in July 2014.  That investigation led to an initial civil complaint by Connecticut and certain other States relating to alleged individual conspiracies for two generic drugs.  The States amended that complaint in June 2018 to include overarching conspiracy allegations for 15 generic drugs (the "Heritage-Centric Complaint").  The States subsequently filed two additional overarching conspiracy complaints in May 2019 (the "Teva-Centric Complaint") and more recently in June 2020 (the "Topical Products Complaint").  The alleged conduct at the center of the MDL has been described by the Connecticut assistant attorney general as "the largest cartel in the history of the United States."[3]

## B.    Procedural Posture of the Generics MDL

15.    Despite the size and complexity of the Generics MDL and the four years in which it has been litigated, including appellate proceedings before the Third Circuit and U.S. Supreme Court, the litigation has been proceeding in a coordinated and efficient manner.

16.    Several motions to dismiss were filed in March 2017 and February 2019. Although some motions remain pending and a schedule for Defendants to respond to subsequent complaints has yet to be established, the District Court has issued certain key decisions that largely denied Defendants' motions, including motions brought by Akorn.

---

[3] Christopher Rowland, *Investigation of Generic "Cartel" Expands to 300 Drugs*. Wash. Post (Dec. 9, 2018), https://webcache.googleusercontent.com/search?q=cache:LGym2TrP-8wJ:https://www.washingtonpost.com/business/economy/investigation-of-generic-cartel-expands-to-300-drugs/2018/12/09/fb900e80-f708-11e8-863c-9e2f864d47e7_story.html+&cd=1&hl=en&ct=clnk&gl=us.

17.    On October 16, 2018, the MDL Court held that the Sherman Act claims for six individual drugs, including clobetasol—a drug for which Akorn is an alleged conspirator—were plausibly pled for purposes of Rule 12(b)(6).  ECF 721.[4]  On February 15, 2019, the Court largely denied Akorn and its co-defendants' motions to dismiss the EPPs and IRPs' state law claims for the same six drugs.  ECF 857.  Most notably, on August 15, 2019, the Court denied the Defendants' joint motion to dismiss Plaintiffs' overarching conspiracy claims.  ECF 1070.  The Court concluded that Plaintiffs' claims therefore "impose joint and several liability on Defendants not just for their participation in any individual drug conspiracy, but also for their participation in the alleged overarching scheme."  *In re Generic Pharmaceuticals Pricing Litigation*, 394 F. Supp. 3d 509, 515 (E.D. Pa. 2019).

18.    Discovery commenced in February 2018.  A Special Discovery Master, Special ESI Discovery Master, and General Discovery Master have been appointed to facilitate disputes over discovery and case management issues.

19.    On October 24, 2019, the Court issued a Case Management Order ("CMO") that established a schedule for the completion of discovery.  ECF 1135, *as amended*, ECF Nos. 1179, 1363.  As amended, the CMO currently provides that Defendants' must substantially complete their custodial document productions by November 16, 2020.  As of July 9, 2020, Defendants collectively have produced more than 12.4 million custodial documents, 5.2 million non-custodial documents, and transactional-level sales data and cost information.  The date for commencing depositions, as well as dates concerning other case management milestones

---

[4] Unless otherwise noted, references to the ECF docket refer to the main MDL action, *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 16-MD-2724, MDL No. 2724 (E.D. Pa.).

including class certification and summary judgment, are currently being negotiated by the parties

with the assistance of the Special Masters.

20.     Following entry of the October 25, 2019 CMO, Defendants petitioned the Third

Circuit for a Writ of Mandamus and then the U.S. Supreme Court for a Writ of Certiorari on the

basis that a provision in the CMO allegedly violated Rule 26 by requiring them to produce

documents without a relevance review.  Both the en banc Third Circuit and the U.S. Supreme

Court denied Defendants' petitions on December 6, 2019, and June 15, 2020, respectively.  *See*

*In re Actavis Holdco U.S., Inc.*, No. 19-3549, 2019 WL 8437021, at *1 (3d Cir. Dec. 6, 2019),

*cert. denied sub nom. Actavis Holdco, Inc. v. Connecticut*, No. 19-1010, 2020 WL 3146845 (U.S.

June 15, 2020).  The Third Circuit and the U.S. Supreme Court also both denied Defendants'

requests for a stay of the relevant CMO provision pending resolution of their petitions, which

allowed discovery to proceed as intended under the CMO.  *See id.*; *Actavis Holdco U.S., Inc. v.*

*Connecticut*, 140 S. Ct. 1290 (2020).

21.     The CMO also provides for the selection of "bellwether" claims or case(s) for

purposes of class certification, expert discovery, *Daubert* motions, summary judgment, and

trial(s).  The bellwether selections are intended "to create precedential rulings which would

reduce or minimize the number of motions and repetitive proceedings; and to provide

information and experience to guide possible settlement negotiations."  ECF 1244 at 2.

Discovery, however, is expected to proceed on all complaints.  On July 13, 2020, the District

Court adopted the Report and Recommendation of Special Master David Marion, which largely

endorsed Plaintiffs' proposed bellwether plan consisting of two parallel tracks: (1) the States'

May 10, 2019 Teva-Centric Complaint alleging an overarching conspiracy for over 100 drugs,

and (2) three single drug complaints alleging conspiracies to unnaturally inflate the prices of

clobetasol, clomipramine, and pravastatin.  ECF 1443.  Akorn is named as a defendant in the clobetasol complaint.

### C.    The Akorn Debtors in the Generics MDL

22.    Akorn was first named as a defendant in 2016 in the individual drug complaints filed by the proposed EPP and DPP classes for clobetasol and later for lidocaine-prilocaine. Akorn has since been named as a defendant in complaints filed by each of the three proposed classes and seven of the Direct-Action Plaintiffs,[5] all alleging an overarching conspiracy spanning more than 100 drugs with total sales in the tens of billions of dollars.  These overarching conspiracy allegations expose Akorn to expansive liability for its role in the collusive scheme.  The complaints also implicate Akorn in individual alleged sub-conspiracies for the following 10 drugs, which implicate billions of dollars of commerce:

- Clobetasol, various formulations
- Ethosuximide capsules and oral solution
- Fluticasone Propionate nasal spray inhalant
- Latanprost ophthalmic liquid eye (0.005%)
- Lidocaine HCL, various formulations
- Lidocaine/Prilocaine cream
- Progesterone tablets
- Tobramycin inhalation solution
- Vancomycin HCL capsules

---

[5] The class Plaintiffs bringing multi-drug overarching conspiracy complaints against Akorn are: (1) EPPs (filed December 19, 2019), (2) IRPs (filed December 20, 2019, as amended), and (3) DPPs (filed February 7, 2020).  The Direct-Action Plaintiffs bringing multi-drug overarching conspiracy claims against Akorn are: (1) The Kroger Co., Albertsons Companies, LLC, and H.E. Butt Grocery Company L.P. (the "Kroger Plaintiffs") (filed January 2, 2018, as amended); (2) Humana Inc. (filed August 3, 2018, as amended; filed October 18, 2019), (3) United HealthCare Services, Inc. (filed January 16, 2019; filed October 11, 2019), (4) Molina Healthcare, Inc. (filed December 27, 2019) (5) MSP Recovery Claims, Series LLP (filed December 16, 2019), (6) Harris County, Texas (filed March 1, 2020), and (7) Rite Aid Corporation and Rite Aid Hdqtrs. Corp. (filed July 9, 2020).

23.     Clobetasol is one of the drugs at issue in the single-drug bellwether cases brought by the class plaintiffs.

24.     On February 23, 2018, Plaintiffs served Akorn (and other Defendants) with Plaintiffs' First Request for Production of Documents, as amended March 23, 2020.  Plaintiffs, Akorn, and the other Defendants engaged in an extensive and protracted two-year meet and confer process to negotiate categories of non-custodial documents and global search terms, which required proceedings before the Special ESI Discovery Master, modifications to search terms unique to Akorn, two tiers of document custodians, and the scope of transactional-level sales data and cost information.

25.     The parties agreed that Akorn would search the custodial files of twenty-five individuals (6 tier-1 custodians; 19 tier-2 custodians), approximately half of which are former employees of Akorn.  Of those custodians that are current employees of Akorn, Movants are not aware of any high-ranking employee that is involved in the bankruptcy proceedings or from whom discovery would affect the bankruptcy proceedings in this Court.  Notably, none of the current employees identified as document custodians are corporate directors or officers with fiduciary responsibility for the Chapter 11 case.

26.     Prior to filing its Chapter 11 case, Akorn was proceeding with its discovery obligations.  As of May 20, 2020, the date of its Petition, Akorn had produced 53,758 non-custodial documents, 180,481 custodial documents, certain transactional data, and a privilege log for their non-custodial document productions.

27.     Plaintiffs also served Akorn with Plaintiffs' First Set of Interrogatories, on April 24, 2018, as amended March 23, 2020.  Akorn served their responses and objections on April 25, 2020, and November 6, 2019.

28.     After Akorn filed its petition for Chapter 11 reorganization in this Court, it stopped complying with the discovery obligations ordered by the District Court.  Akorn still owes the production of remaining documents from its custodian files and other documents, privilege logs for their custodial document productions, and complete transactional sales data and cost information.  Furthermore, plaintiffs have yet to take the depositions of key Akorn employees.  The MDL Plaintiffs have alleged a complex conspiracy, and each player in the unlawful price-fixing scheme holds important information.  By ceasing its compliance with the District Court's discovery orders, Akorn has stymied the progress of the MDL.

## ARGUMENT

## I.    LONG-STANDING, PRE-PETITION LITIGATION OFTEN MERITS RELIEF FROM THE AUTOMATIC STAY.

29.     By this motion, the MDL Plaintiffs request that the Court grant all parties in the Generics MDL relief from the automatic stay to litigate the claims and defenses in those cases; provided that to the extent that any judgment is entered against Akorn, it will become an allowed general unsecured claim against the Debtors' bankruptcy estates, given whatever treatment is applicable in these cases.

30.     The automatic stay "is not meant to be absolute, and in appropriate instances relief may be granted."  *In re SCO Grp., Inc*., 395 B.R. 852, 856 (Bankr. D. Del. 2007).  Section 362(d)(1) provides that a court shall grant relief from the stay "for cause, including the lack of adequate protection of an interest in property of such party in interest."  11 U.S.C. § 362(d)(1). Allowing prepetition litigation to continue in its original forum can constitute cause.  *See In re SCO Grp., Inc.*, 395 at 857 ("Relief from the stay may be granted 'when necessary to permit litigation to be concluded in another forum, particularly if the nonbankruptcy suit involves multiple parties or is ready for trial." (quoting Lawrence P. King, *Collier on Bankruptcy* §

362.07[3][a] (15th ed. 2006)); *In re Conference of African Union First Colored Methodist Protestant Church*, 184 B.R. 207, 218 (Bankr. D. Del. 1995) ("[T]he existence of a more appropriate forum than the bankruptcy court is 'cause' for relief under Code § 362(d)(1)").

31.    "Whether to terminate, modify, condition, or annul the bankruptcy stay under § 362(d) is within the discretion of the bankruptcy court." *In re Lincoln*, 264 B.R. 370, 372 (Bankr. E.D.Pa. 2001).  The standard for cause is "a flexible one" that requires courts to engage in a "case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay." *In re SCO Grp., Inc.*, 395 B.R. at 856.

32.    In a motion for relief from the automatic stay, the movant must establish a prima facie case that "cause" exists, at which point the burden shifts to the non-moving party to show that lifting the stay would cause harm. *See Matter of Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 718 (Bankr. D. Del. 1996) ("[Creditor] has the initial burden in proving a prima facie case of cause, which if proved, must be rebutted by [debtor] if the stay is not to be lifted."); *In re Abeinsa Holding, Inc.*, 2016 WL 5867039, at *3 ("[T]he burden to resist lifting of the stay rests entirely with the Debtor…The statute, by its burden shifting, seems almost . . . to ask, 'why shouldn't the stay be lifted?' . . .  It is not [Movant's] burden to show that the Debtor[] would not be harmed by stay relief.").

33.    Congress contemplated relief from the automatic stay "to allow litigation involving the debtor to continue in non-bankruptcy forums under certain circumstances." *Matter of United Imports, Inc.*, 203 B.R. 162, 166 (Bankr. D. Neb. 1996).  The legislative history of the Act provides:

> *It will often be more appropriate to permit proceedings to continue in their place of origin*, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum

> and to relieve the bankruptcy court from any duties that may be
> handled elsewhere.

*Rexene,* 141 B.R. at 576 (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess., 341 (1977) (emphasis

added).

34.     Consistent with the clear Congressional intent, bankruptcy courts in the Third

Circuit routinely grant relief from the automatic stay to allow long-standing litigation to which

the debtor is a party to continue in its original forum.  *See In re F-Squared Inv. Mgmt., LLC*, 546

B.R. at 548 ("Courts in this district have found that cause may exist to lift the stay when a party

seeks to continue prepetition litigation that is pending against a debtor in another forum."); *In re*

*Tribune Co.*, 418 B.R. 116 (Bankr. D. Del. 2009); *In re Conference of African Union First*

*Colored Methodist Protestant Church*, 184 B.R. at 210 ("[T]he interests of justice are best served

by having pending Delaware state court proceedings resolve the long standing disputes between

Debtor and the lift stay movant."); *In re Continental Airlines, Inc.*, 152 B.R. 420 (D. Del. 1993).

35.     In making the determination to grant or to deny relief from the automatic stay,

this Court considers three main factors: (1) whether any great prejudice to either the bankrupt

estate or the debtor will result from continuation of the civil suit; (2) whether the hardship to the

non-bankrupt party by maintenance of the stay considerably outweighs the hardship of the

debtor; and (3) whether the creditor has a probability of prevailing on the merits.  *Rexene*, 141

B.R. at 576.  In addition to these primary factors, courts also consider, among other things,

whether the alternative forum is a specialized tribunal with the necessary expertise to adjudicate

the claims and whether the interests of judicial economy will be served by the resolution of the

litigation in its original forum.  *See In re SCO Group*, 395 U.S. at 857; *see also Rexene*, 141 B.R

at 577.

36.     In light of the complexity and advanced nature of the District Court action, relief
from the automatic stay is particularly appropriate here.  The MDL, first consolidated in the
Eastern District of Pennsylvania in 2016, began as a collection of suits alleging an unlawful
price-fixing scheme against the makers of 18 generic drugs.  Since the actions in the MDL were
first filed, the allegations have expanded to include more than 200 drugs, with allegations against
more than 35 manufacturers and their related entities, 8 wholesalers and distributors, and 25
individual executives.  Plaintiffs in the MDL include attorneys general representing 54 states,
territories and commonwealths; three proposed class-action groups; and direct action plaintiffs
who have brought individual cases separate from the proposed classes.  The District Court has
referred to the MDL as "intricate," "ever evolving," and "complex."  *In re Generic Pharm.
Pricing Antitrust Litig.*, No. 16-MD-2724, slip op. at 6–7 (E.D. Pa. Oct. 24, 2019).

37.     Courts will lift the automatic stay when the ongoing prepetition litigation is
similarly complex and involves multiple non-debtor parties.  For example, in *In re Deep*, 2002
WL 1433883 (Bankr. N.D.N.Y June 18, 2002), the bankruptcy court granted relief from the
automatic stay to allow movants there to pursue a preliminary injunction against a debtor in a
multidistrict copyright litigation centralized in an alternate forum.  As here, the MDL was a
consolidation of numerous actions filed against the debtors making similar claims and seeking
similar relief.  The *In re Deep* court reasoned that transferring that complex litigation to the
bankruptcy forum would harm the movants, who had made trial preparations in the MDL forum,
without protecting the interests of the debtor or bankrupt estate.

38.     Likewise, to force Movants to continue the antitrust action against Akorn in this
Court while litigating the claims against Akorn's co-defendants in the Eastern District of
Pennsylvania would result in wasteful parallel proceedings.  Pursuing nearly identical actions in

multiple fora undermines the very purpose of multidistrict litigation: to consolidate similar actions "for the convenience of parties and witnesses" and to "promote the just and efficient conduct of such actions."  28 U.S.C. § 1407.

39.     Akorn, in its current Plan and Disclosure Statement, proposes no mechanism to liquidate presently-unliquidated claims, and no post-confirmation trust to liquidate claims and distribute proceeds pro rata to creditors.  Akorn is actively seeking bidders for its assets to fund a distribution for unsecured creditors.  The Creditors' Committee is likewise evaluating possible valuable assets.  Movants' claims are such that they are entitled to a substantial or even majority share of any distribution to unsecured creditors.  Without the ability to liquidate Movants' claims, Akorn cannot determine how much any unsecured creditor should be paid.  Allowing the bellwether cases involving Akorn to proceed will permit Movants' claims to be partially liquidated, which will serve as a basis for further liquidation or settlement of the claims.

## II.     THE BALANCE OF HARDSHIPS FAVORS RELIEF FROM THE AUTOMATIC STAY.

40.     Each of the three factors weighs in favor of granting Movants relief from the automatic stay.  *First*, lifting the stay will not prejudice Akorn's administration of these cases or plan of reorganization.  *Second*, the balance of hardships weighs in favor of allowing Movants to continue ongoing litigation in the District Court.  *Third*, Movants can meet the slight threshold in showing probability of success on the merits.

### A.     Continuation of the MDL in the District Court Will Not Cause Great Prejudice to the Bankrupt Estate or the Debtor.

41.     When determining whether to lift the automatic stay courts first consider "[whether] any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit." *Rexene*, 141 B.R. at 576.  Courts will find great prejudice to the

debtor if allowing litigation to proceed will further deplete the bankrupt estate, hinder the

reorganization process, or be more burdensome to debtor than litigating in the bankruptcy court.

*See In re Aleris Intern*, 456 B.R. 35, 48 (Bankr. D. Del. 2011) (denying creditor's motion for

relief from the automatic stay because lifting the stay would "cause the Debtor severe hardship

and . . . affect its ability to consummate an effective reorganization."); *In re Downey Financial

Corp.*, 428 B.R. 595 (Bankr. D. Del. 2010) (finding that debtor would not suffer great prejudice

if the automatic stay was lifted because the assets of the estate would not be substantially

reduced); *In re SCO Group*, 395 B.R. at 858 (holding that debtor would not suffer great

prejudice by lifting the stay because to restart the litigation in the bankruptcy court would be

more burdensome than allowing the longstanding district court litigation to proceed).  Here,

Debtor cannot establish any conceivable prejudice, let alone great prejudice, from lifting the stay.

42.    *First*, document discovery in the MDL has been designed in a way that will limit

substantial expenditures associated with document review or production.  On October 24, 2019,

the District Court issued a pre-trial order that prohibits Defendants from withholding "any

documents based on relevance or responsiveness."  *In re Generic Pharma. Pricing Antitrust

Litig.*, 2019 WL 8106511, at 1* (E.D. Pa. Oct. 24, 2019).  The expansive nature of this discovery

order will limit the number of hours that Debtor and its attorneys will expend on this matter

compared to the ordinary case because, per the court-ordered discovery protocols, Akorn's

production of documents would not incorporate any review for relevance before production, and

would at most involve screening and reviewing documents for privilege.  The District Court has

appointed three special masters to shepherd the discovery process and resolve any conflicts that

may arise.  The detailed CMO and robust oversight of the discovery process will make

participation in discovery less financially burdensome for Debtor.  The order of October 24

demonstrates that the District Court is intent on the efficient and speedy resolution of this

litigation. *See also In re Generic Pharm. Pricing Antitrust Litig.*, No. 16-MD-2724, ECF No.

1155, slip op. at 7 (E.D. Pa. Nov. 14, 2019) ("Now the MDL has been brought to the stage where

comprehensive discovery is proceeding, Moving Defendants attempt to halt the progress the

Court has made and disrupt the pace and the content of the administration of the MDL. . . .

There is no basis for such an action. ***The question of whether there has been a widespread***

***conspiracy to artificially inflate the cost of many generic pharmaceuticals is an issue that***

***directly affects many Americans, and it is time for discovery to show whether or not that has***

***occurred***." (emphasis added)). But even if litigation were more expensive in the District Court,

the ordinary burdens associated with defending litigation— "expenditure of defense costs, the

time and participation in completing discovery, and participating in motion practice"—are not

sufficient to constitute great prejudice. *In re Scarborough-St. James Corp.*, 535 B.R. 60, 68–69

(Bankr. D. Del. 2015); *In re ABC Learning Centres Ltd.*, 445 B.R. 318, 337 (Bankr. D. Del.

2010) (holding potential appeal costs not sufficient to establish great prejudice).

43.    *Second*, pre-trial proceedings in the MDL will not interfere with Akorn's

reorganization efforts or the proceedings in this Court. The high-ranking executives whose

attention the reorganization demands will not be burdened by liquidating Movants' claims

against Akorn in the District Court. *See SCO Grp.*, 395 B.R. at 858 (granting relief from

automatic stay and holding no great prejudice to the debtor, reasoning that "[w]hile the trial will

likely require the attendance of SCO's primary officers and directors, SCO's attention to the

Lawsuit will certainly not harm the estate"); *Scarborough*, 535 B.R. at 68–69 (holding no great

prejudice to debtor when proceedings in ongoing litigation would not change the duties of the

debtor's president, "managing the Shopping Center and conducting litigation"). Instead, the

individuals most intimately involved in the District Court litigation are either no longer affiliated with Akorn or are mid-level employees.  None of the current employees identified as document custodians are corporate directors or officers with fiduciary responsibilities in this Chapter 11 proceeding.

44.     *Third*, to switch the forum for this dispute at this stage would be more prejudicial to Akorn than lifting the stay and allowing the litigation to continue in the District Court.  As discussed below, because of the relative expertise of the two forums, resolution of Movants' claims in this forum will likely be more burdensome for Akorn because this Court is not familiar with the underlying facts or claims.  *See Scarborough*, 535 B.R. at 68 (holding no great prejudice when burden on the debtor would be lessened because other court had "familiarity with the parties and the facts of the case" and the debtor "may raise in the [other litigation] any and all arguments in support of its position."); *In re Schaffer*, 597 B.R. 777, 795 (Bankr. E.D. Pa.), *aff'd* 606 B.R. 228 (E.D. Pa. 2019) ("In fact, litigating in the bankruptcy forum which has no familiarity with the underlying substantive claims would likely be more burdensome to the Debtor and the estate.").  Furthermore, due to the advanced stage of the District Court litigation, restarting proceedings in this Court would present a substantial financial hardship to Akorn.  *See In re F-Squared Investment Management, LLC*, 546 B.R., at 548–49 ("The Trust has not shown any great prejudice to the estate.  The Trust argues that lifting the stay would prejudice the estate and creditors by delaying distribution. . . .  Conversely, moving forward in this court may create inefficiencies.").

**B.     Any Prejudice to Debtors Is Substantially Outweighed by the Harm to the Plaintiffs Caused by Continuation of the Automatic Stay.**

45.     "The second factor balances the hardship to Movants in continuing the stay with the hardship to Akorn in lifting the stay."  *Rexene*, 141 B.R. at 577.

1.    <u>Continuing the Litigation in the District Court Eliminates the Possibility of Duplicative and Potentially Inconsistent Litigation.</u>

46.    Akorn is one of multiple co-defendants in a sprawling, multidistrict antitrust litigation currently pending in the Eastern District of Pennsylvania.  "[R]elief from the stay may be granted when necessary to permit litigation to be concluded in another forum, particularly if the nonbankrupcy suit involves multiple parties."  *In re SCO Grp., Inc.*, 395 B.R., at 857.  The existence of multiple defendants in the District Court action weighs in favor of relief from the stay.

47.    *First*, even if this Court were to adjudicate Movants' claims, litigation would continue against Akorn's co-defendants in the District Court.  Judicial economy, and the interests of Akorn, Movants, and the other parties to the District Court action, are best served by proceeding against all defendants in a single forum.  *See, e.g.*, *Rexene*, 141 B.R. at 577 ("The duplicative litigation is burdensome both to Movants and the courts involved.  Judicial economy dictates a prompt resolution in a single forum and with the same judge who was originally assigned to the case.  This Court is of the opinion that to begin this litigation anew in this bankruptcy court would result in more of a hardship to the Movant and would certainly result in a waste of judicial resources." (quotation marks omitted)); *In re Chatkin*, 465 B.R. 54, 62 (Bankr. W.D. Pa. 2012) ("It is clear that the distinguishing and decisive feature in this case is the existence of parties defendant other than the Debtors in the RICO Action."); *In re Lagrotteria*, 42 B.R. 864, 866 (Bankr N.D. Ill. 1984) (automatic stay modified to permit plaintiffs to proceed with their district court action against debtor, which was one of many cases in a class action consolidated for pretrial purposes in district court because "modification of the stay will result in a conservation of judicial resources").

48.     *Second*, two parallel proceedings create a risk of inconsistent and potentially conflicting judgments over the same issues—namely, whether Akorn and its alleged co-conspirators in the District Court action engaged in an anticompetitive conspiracy to fix the price of generic drugs.  *In re Chatkin*, 465 B.R. at 62 (granting relief from automatic stay because "[n]ot only would that eliminate the need for two litigations of the same issues, it would also prevent the possibility of inconsistent judicial outcomes, something which is always a concern").

49.     *Third*, if this litigation proceeds in both courts, Movants and Akorn's co-defendants will be prejudiced by the need to litigate the same issues on multiple fronts.  Because the District Court action alleges a conspiracy among Akorn and its co-defendants, those co-defendants will both have a substantial interest in the litigation in this Court and be relevant third-party witnesses.  Conversely, Akorn will have a substantial interest in the District Court action and will be a relevant third-party witness.  This will require Movants to subpoena the co-defendants as third-party witnesses in this Court, and Akorn as a third-party witness in the District Court, creating substantial and unnecessary delay, expense, and effort.

50.     *Fourth*, the Judicial Panel on Multi-District Litigation ("JPML") has already concluded that the most convenient forum for these claims is the Eastern District of Pennsylvania.  The JPML has explained, "as we previously recognized when we centralized this litigation in the Eastern District of Pennsylvania, that district is a convenient venue for the majority of the parties, as many of the pharmaceutical companies involved in this litigation are located in the Philadelphia area, as is the federal grand jury investigation of the generic pharmaceutical market."  MDL No. 2724, Doc. 336 (Aug. 3, 2017); MDL 2724, Doc. 44 (Aug. 5, 2016) ("[A] significant proportion of potential witnesses and documentary evidence will be located within or near the district.").

2.    The District Court is the Most Appropriate and Efficient Forum to Determine the MDL Plaintiffs' Claims.

51.    The District Court action—a large MDL consolidated in the Eastern District of Pennsylvania—is the most appropriate forum to adjudicate Movants' claims.

52.    *First*, the presiding judge in the District Court, Judge Rufe, is already well-versed with the facts, issues, and parties in this action after years of litigation.  *See In re SCO Grp., Inc.*, 395 B.R. at 860 ("It is undeniable that the Lawsuit involves many highly technical issues that the District Court has already addressed and mastered.  Debtor concedes that it is unreasonable to expect this Court to spend a significant amount of time learning and resolving the Liability Issues when the District Court already has the knowledge required to adjudicate the Liability Issues.").  The JPML specifically reasoned in several transfer orders that Judge Rufe and the Eastern District of Pennsylvania have particular experience with these cases.  MDL No. 2724, Doc. 336 (Aug. 3, 2017) ("The Honorable Cynthia M. Rufe, to whom this MDL is assigned, has expended considerable time and effort to organize this litigation for efficient adjudication— effort that would be wasted were we to reassign this MDL at this stage.").

53.    *Second*, the District Court action involves state and federal antitrust claims. Because Movants' claims against Akorn and its co-defendants do not involve any aspect of bankruptcy law or procedure, the expertise of this tribunal is not required to resolve the litigation.  In a case with a similar posture—a longstanding MDL with multiple non-debtor defendants—the Bankruptcy Court for the Central District of California held that it would be presumptively "unreasonable for the Bankruptcy Court to conclude that it is better equipped" to resolve the claims in question.  *In re Roger*, 539 B.R. 837, 851 (C.D. Cal. 2015); *see also In re Consol. Distributors, Inc.*, No. 13-40350 (NHL), 2013 WL 3929851, at *11 (Bankr. E.D.N.Y. July 23, 2013) ("The District Court is the most appropriate and efficient forum to determine the

claims in the District Court Action because . . . the claims in that action concern, among other things, the application and interpretation of federal and state intellectual property law, not bankruptcy law . . . .").

54.     *Third,* it is doubtful this Court has jurisdiction to enter a judgment against the many other defendants in the Generics MDL.  Because of the entanglement between Akorn's alleged conduct and the conduct of those other defendants, it would be impractical to resolve Movants' claims against Akorn without resolving their claims against the other defendants. Given the limitations on this Court's jurisdiction under 28 U.S.C. §§ 157 and 1409 and *Stern v. Marshall,* 564 U.S. 462 (2011), and its progeny, it is unlikely that this Court would be able to afford complete relief against the other defendants.  Judge Rufe has already been appointed by the JPML to adjudicate all claims against the multiple defendants, and there is no reason litigate those claims in two courts.

> 3.     Without the Requested Injunctive Relief, the MDL Plaintiffs Will Continue to Suffer Irreparable Harm.

55.     The relief sought by some Movants and others in the Generics MDL includes prospective, injunctive relief against the improper activities that gave rise to their claims in retrospect. Causing the parties in the Generic MDL to wait potentially years for the relief requested in that litigation might cause Movants, others in the Generics MDL, and even the general public to suffer additional and future harm from conduct that should be stopped as soon as possible.

**C.     The MDL Plaintiffs Have a Probability of Prevailing on the Merits.**

56.     "Even a slight probability of success on the merits may be sufficient to support lifting an automatic stay in an appropriate case."  *In re Cont'l Airlines, Inc*., 152 B.R., at 426; *see also Rexene*, 141 B.R. at 578 ("The required showing is very slight.").

57.    Here, the Plaintiffs have more than a reasonable probability of succeeding on the merits.  *First*, a review of Plaintiffs' complaints demonstrates the enormous level of detail in which the allegations describe the misconduct of Akorn and the Defendants, including an extensive web of phone calls, emails, and other communications between the conspirators, internal meetings and communications, and coordinated price increases to extraordinary levels. As one example (of many), the States' June 10, 2020 Complaint details communications in 2014 between Akorn subsidiary Hi-Tech's "E.B." and contacts for its conspirators, as well as internal Hi-Tech meetings, concerning the conspiracy involving clobetasol.  *Connecticut v. Sandoz, Inc.*, No. 3:20-cv-00802, ECF No. 1 at ¶¶ 857, 871, 877–78, 881–83 (D. Ct. June 10, 2020) (States' June 10, 2020 Complaint).  These communications align with a sudden spike in the Wholesale Acquisition Cost ("WAC") for clobetasol beginning in August 2014 after years of a stable market; Hi-Tech took the largest increase on clobetasol ointment increasing its WAC by 2,316% in August 2014.  *See, e.g.*, *Id.* ¶¶ 175, 863, 883; *In re Clobetasol Cases (End-Payer)*, No. 16-cv-27242, ECF No. 167 at ¶ 96 (E.D. Pa. April 1, 2019) (EPPs' clobetasol complaint).

58.    *Second*, the MDL Court sustained Plaintiffs' single drug conspiracy complaints brought against the MDL Debtors for clobetasol and lidocaine/prilocaine *and* Plaintiffs' overarching conspiracy claims.  Importantly, as the District Court concluded, the overarching conspiracy claims seek to "impose joint and several liability on Defendants not just for their participation in any individual drug conspiracy, but also for their participation in the alleged overarching scheme."  *In re Generic Pharmaceuticals Pricing Litigation*, 394 F. Supp. 3d at 515.

59.    *Third*, the Justice Department's criminal investigation has already resulted in prosecution of Akorn's co-conspirators, leniency applications, cooperation, and guilty pleas.  On March 2, 2020, the Justice Department filed Information against Defendant Sandoz and its

Senior Director of Pricing and Contracts, Hector Armando Kellum, for their alleged involvement in the conspiracy to allocate the market and fix the price of clobetasol from March 2013 through December 2015. Sandoz and the Justice Department entered into a Deferred Prosecution Agreement for the allegations that it conspired *with other persons and entities* with respect to clobetasol and other generic drugs.

60.     On February 4, 2020, the Department indicted Taro Pharmaceuticals' Vice President of Sales and Marketing, Ara Aprahamian, for his role in conspiracies to allocate customers and fix prices for generic drugs, including lidocaine ointment (an alleged conspiracy involving Akorn). According to the indictment, Aprahamian engaged in conversations with unnamed co-conspirators preparing to launch lidocaine ointment, to discuss what share of the market the launching company wanted to obtain. Although the indictment did not name the co-conspirators, the States' June 10, 2020 Complaint details the relationship between a confidential witness of Sandoz's generics subsidiary, Fougera, and a senior sales executive at Akorn subsidiary Hi-Tech as Hi-Tech prepared to launch lidocaine in late 2011. These allegations include several phone calls that preceded Hi-Tech's entry into the market at a price-match with Fougera and subsequent, more frequent, emails and calls that allocated customers among them. *Id.* at ¶¶ 546–52. The Justice Department's investigation is ongoing and additional criminal proceedings against other conspirators seem likely.

61.     *Fourth*, as noted above, the MDL Court has already largely denied most of Akorn's motions to dismiss the Generics MDL. This suggests that the court having the most experience with this litigation has already determined that Movants have at least colorable claims against the defendants, including but not limited to Akorn.

62.     These facts, among many others detailed in the numerous complaints on file, are more than sufficient to demonstrate a probability of success on the merits and weigh in favor of lifting the automatic stay.

### III.    IN THE ALTERNATIVE, CAUSE EXISTS FOR THE MDL PLAINTIFFS TO CONTINUE DISCOVERY OF AKORN IN THE MDL

63.     Movants have established that there is sufficient cause to lift the automatic stay, and Akorn cannot conceivably meet its burden to rebut this showing.  But should this Court find otherwise, movants respectfully request in the alternative to continue discovery against Akorn in the MDL, rather than restart that process in the Bankruptcy Court.

64.     For many of the same reasons discussed above, compelling participation in the MDL discovery process would not unduly prejudice Akorn.  *First*, the District Court has issued a detailed plan for discovery in the MDL.  That plan prohibits the MDL defendants from screening documents for relevance, which will conserve Akorn's resources.  *In re Generic Pharma. Pricing Antitrust Litig.*, 2019 WL 8106511 (E.D. Pa. Oct. 24, 2019) (pretrial order establishing discovery plan).  *Second*, the persons involved in the MDL discovery are not the same as the high-ranking directors and officers whose attention will be occupied by the Akorn reorganization.  *Third*, discovery in the District Court would not impose a burden on Akorn any greater than the time and expense borne by all defendants in civil cases.  And as previously discussed, these normal obligations are not sufficient to deny relief from or modification of the automatic stay.  *See In re Anton*, 145 B.R. 767, 770 (Bankr. E.D.N.Y. 1992) ("The cost of defending litigation, by itself, has not been regarded as constituting 'great prejudice,' precluding relief from the automatic stay.").

65.     Finally, as an alleged co-conspirator, Akorn will have to respond to discovery in the MDL as a third-party even if the proceedings against it as a defendant remain stayed.  Courts

have noted that the automatic stay does not preclude third-party discovery against debtors.  For example, in *In re Miller*, 262 B.R. 499 (B.A.P. 9th Cir. 2001), the Ninth Circuit Bankruptcy Appeals Panel held that the automatic stay did not protect a Chapter 13 debtor from discovery obligations in a multi-defendant case when the discovery requests were related to claims against the debtor's co-defendants.  The panel explained, "Information is information, and we believe the discovery of it as part of the development of a case against non-debtor parties is permissible, even if that information could later be used against the party protected by the automatic stay." *Id.* at 505.  Similarly, in *Matter of Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 140 B.R. 969, 977 (N.D. Ill. 1992), the district court allowed continuing discovery against a Chapter 11 debtor that was party to complex multidistrict, patent litigation.  There, the district court reasoned that discovery was permissible "if the discovery has utility other than to facilitate recovery against [debtor]." *Id.* at 977.  Like in those cases, Akorn has documents and other information in its possession that are crucial for the development of the case against its co-defendants in the MDL.  Continuing discovery against Akorn is even more urgent now that the complaint alleging a conspiracy surrounding clobetasol, has been selected by the District Court as one of the precedent-setting bellwether trials.

66.    Movants note that while it may be tempting to "split the baby" and grant the partial relief requested in this alternative, relief to pursue the entirety of the claims and defenses in the Generics MDL is still preferable.  By the time the MDL proceeds to trial, it is likely that a plan will have been confirmed in this case, and this matter will be well into a post-confirmation claims administration posture.  There would be little value in forcing Movants and other parties to come back to this Court to seek further relief in order to continue pursuit of the MDL, which is

a large, multi-district, multi-plaintiff case in which Akorn is only one of many defendants when the main purpose of the bankruptcy proceeding would be claims administration.

## IV.    WAIVER OF STAY PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001(A)(3)

67.    Orders granting relief from the stay are themselves stayed for fourteen (14) days unless the Court orders otherwise "for cause."  Fed. R. Bankr. P. 4001(a)(3).

68.    Movants respectfully submit that the rationale above for granting relief from the stay also supports waiver of the fourteen (14) day stay pursuant to Federal Rule of Bankruptcy Procedure 4001(a)(3) to enable Movants to immediately exercise their rights in the District Court.

## V.    CONCLUSION

69.    For the reasons set forth above, Movants respectfully request that the Court grant Movants relief from the automatic stay, and a waiver of the fourteen (14) day stay pursuant to Federal Rule of Bankruptcy Procedure 4001(a)(3) to permit litigation to continue in the District Court.

Dated: August 19, 2020
           Wilmington, Delaware

**KLEIN LLC**

*/s/ Julia Klein*
Julia Klein (DE 5198)
919 North Market Street, Suite 600
Wilmington, Delaware 19801
(302) 438-0456
klein@kleinllc.com

*Bankruptcy Counsel to Movants*

**LOWEY DANNENBERG, P.C.**
Peter D. St. Phillip, Jr.
Jennifer Risener

**BOIES SCHILLER FLEXNER LLP**
Duane L. Loft
Brianna S. Hills

27

Thomas Griffith
44 South Broadway, Suite 1100
White Plains, New York 10601
(914) 997-0500
PStPhillip@lowey.com

Laura K. Mummert
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, Pennsylvania 19428
(215) 399-4785
LMummert@lowey.com

*Attorneys for Humana Inc., Health Care
Service Corp., and Molina Healthcare, Inc.*

Todd M. Schneider
Jason Kim
2000 Powell Street, Suite 1400
Emeryville, California 94608
(415) 421-7100
tschneider@schneiderwallace.com

Garrett W. Wotkyns
8501 North Scottsdale Road, Suite 270
Scottsdale, Arizona 85253
(480) 428-0144
gwotkyns@schneiderwallace.com

*Attorneys for Humana Inc., Health Care
Service Corp., and Molina Healthcare, Inc.*

**NASTLAWLLC**
Dianne Nast
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
(215) 923-9300
dnast@nastlaw.com

*Lead and Liaison Counsel for Direct
Purchaser Plaintiffs*

Jonathan W. Cuneo
Victoria Sims
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016

55 Hudson Yards
New York, New York 10001
(212) 909-7606
dloft@bsfllp.com

Hamish P.M. Hume
Abby L. Dennis
Kyle Smith
1401 New York Ave, NW
Washington, D.C. 20005
(202) 895-7580
hhume@bsfllp.com

*Attorneys for United HealthCare Services,
Inc.*

Judith Zahid
Eric W. Buetzow
44 Montgomery Street, Suite 3400
San Francisco, California 94104
(415) 693-0700
jzahid@zelle.com

James R. Martin
Jennifer Duncan Hackett
1775 Pennsylvania Ave, NW, Suite 375
Washington, D.C. 20006
(202) 899-4100
jmartin@zelle.com

Rory D. Zamansky
500 Washington Ave. South, Suite 4000
Minneapolis, Minnesota 55415
(612) 339-2020
rzamansky@zelle.com

*Attorneys for United HealthCare Services,
Inc.*

**FINE, KAPLAN AND BLACK, R.P.C.**
Roberta D. Liebenberg
Jeffrey S. Istvan
Paul Costa

(202) 789-3960
jonc@cuneolaw.com

Peter Gil-Montllor
Christian Hudson
16 Court Street, Suite 1012
Brooklyn, New York 11241
(202) 789-3960
pgil-montllor@cuneolaw.com

*Lead Counsel for Indirect Reseller Plaintiffs*

W. Joseph Nielsen
55 Elm Street
P.O. Box 120
Hartford, Connecticut 06141-0120
(860) 808-5040
Joseph.Nielsen@ct.gov

*Liaison Counsel for the Plaintiff States*

Adam J. Pessin
One South Broad Street, 23rd Floor
Philadelphia, Pennsylvania 19107
(215) 567-6565
rliebenberg@finekaplan.com

*Lead and Liaison Counsel for End-Payer Plaintiffs*

**KENNY NACHWALTER, P.A.**
William J. Blechman
1441 Brickwell Avenue, Suite 1100
Miami, Florida 33131
(305) 373-1000
wblechman@knpa.com

*Counsel for the Kroger Plaintiffs*
Lizabeth Brady
Patricia A. Conners
Timothy M. Fraser
PL-01 The Capitol
Tallahassee, FL 32399
(850) 414-3300
Liz.brady@myfloridalegal.com

*Attorneys for State of Florida Attorney General*