IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| AKORN, INC., *et al.,* | Case No. 20-11177 (KBO), *et seq.* |
| Debtors. | Jointly Administered |

**IRP CLAIMANTS' OBJECTION TO
CONFIRMATION OF JOINT CHAPTER 11 PLAN
OF AKORN, INC. AND ITS DEBTOR AFFILIATES**

The Pharmacy and Hospital Plaintiffs, also know as the IRP Class Claimants (the "IRP Claimants"),[1] by their undersigned attorneys, hereby file this objection to confirmation of the Joint Chapter 11 Plan (the "Plan") proposed by Akorn Inc. and its affiliated debtors in possession (the "Debtors"), and in support hereof states as follows:

<u>INTRODUCTION</u>

1.    The IRP Claimants have no opposition to confirmation of a plan that provides for the purposes of, and complies with, §§ 1123 and 1129 of the Bankruptcy Code, but certain aspects of the Plan as proposed are improper. The Plan's treatment of general unsecured claims in this case looks straightforward at

---

[1] The IRP Claimants consist of Reliable Pharmacy, Inc., Halliday's & Koivisto's Pharmacy, Russell's Mr. Discount Drugs, Inc., Falconer Pharmacy, Inc., Chet Johnson Drug, Inc., and North Sunflower Medical Center, on behalf of themselves and as representatives of certain classes pending class certification under Fed. R. Civ. P. 23. Class certification in the MDL (as described below) has been pled but the class has not yet been certified.

first blush, but upon closer analysis its success hinges on a skewed voting process consisting of gerrymandering, treating "nothing" as something, a violation of the Absolute Priority Rule, and rushing to confirmation before the results of an asset sale and a claims review may be realized.

2.     Even if the Court were inclined to confirm a plan similar in structure to the Plan, the IRP Claimants believes that certain revisions are necessary to the release, exculpation, automatic stay, and injunction provisions, most notably:

(i)     The Exculpation provisions may improperly apply to the claims set forth in the Generics MDL (as described more fully below);

(ii)     The Plan purports to keep the automatic stay intact without incorporating the provisions for relief from stay under § 362(d) of the Bankruptcy Code; and

3.     Given the complexity of the scope of the third-party releases and the ambiguities in some of the defined terms in the Plan, the IRP Claimants are entitled to a provision in the proposed confirmation order expressly excluding them from any third-party releases and related injunctive provisions.

4.     Moreover, to the extent that the Plan's ambiguous definition of "Restructuring Transactions" can be interpreted to incorporate the Debtors' proposed sale of substantially all their assets into the Plan, the IRP Claimants' objections to the sale motion apply equally to confirmation of the Plan.

5.     As more fully described below, the IRP Claimants are among the plaintiffs in very extensive multi-district litigation proceedings pending in the Eastern District of Pennsylvania against the Debtors and approximately 40 other defendants. While the Debtors should be permitted to confirm a plan to the extent authorized under § 1129 of the Bankruptcy Code, confirmation of the Plan in this instance should not be used as a tool to limit allowance of the claims asserted by the Generics MDL plaintiffs (including but not limited to the IRP Claimants), limit the plaintiffs' rights to non-monetary relief, or limit their rights in any way against third parties.

<u>FACTS AND PROCEDURAL BACKGROUND</u>

6.     On May 20, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"). Since the Petition Date, the Debtors have managed their affairs and remained in possession of their assets as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

I.     <u>The Multi-District Litigation</u>.

A.    **Overview.**

7.     Four of the Debtors in the above-captioned cases, Akorn Inc., Akorn Sales, Inc., Hi-Tech Pharmacal Co, Inc., and VersaPharm, Inc. (collectively,

"Akorn"), are presently co-defendants in the landmark multidistrict litigation before the Honorable Cynthia M. Rufe in the Eastern District of Pennsylvania that has exposed an industry-wide conspiracy to fix the prices of generic pharmaceuticals. *In re Generic Pharmaceuticals Pricing Antitrust Litigation,* MDL No. 2724 (E.D. Penn) (the "Generics MDL" or "MDL"). The Generics MDL was first centralized in the Eastern District of Pennsylvania in 2016. After the denial of multiple motions to dismiss, the MDL is now in the middle of document discovery, and is moving towards depositions and bellwether trials that will resolve representative portions of the cases and pave the way for global settlement.

8.     The Debtors are central to the Generics MDL. They are named in 16 of the operative complaints filed to date, including complaints by class plaintiffs and some of the largest health plans, including United Healthcare and Humana. Akorn is alleged to have unlawfully conspired with respect to at least 34 of the drugs at issue in the MDL, including several of the drugs at issue in the bellwether trials. There are 35 document custodians whose files must be produced in the MDL. Absent ongoing Akorn's meaningful participation in the MDL, the plaintiffs risk severe prejudice not only to their cases against Akorn, but also to a full and fair opportunity to prove their cases against Akorn's co-conspirators.

9.    On August 5, 2016, the Judicial Panel on Multidistrict Litigation issued an order consolidating cases for pretrial purposes in the Eastern District of Pennsylvania. *In re Generic Pharmaceuticals Pricing Antitrust Litigation,* MDL No. 2724, ECF No. 44 (Aug. 5, 2016).   The Generics MDL arises from conspiracies among more than 40 manufacturers and distributors of generic pharmaceuticals, including Akorn, to avoid manufacturers competing with each other through market allocation and agreements to set and increase the prices of more than 200 generic pharmaceutical drugs to extraordinary levels—a conspiracy carried out through industry meetings and code words, such as "playing nice in the sandbox."   The far-reaching effects of this massive conspiracy, which allegedly began at least as early as 2009, have been devastating for consumers, insurers, and all others who have paid inflated prices for these generic drugs.

10.    Dozens of complaints have been filed by several plaintiff groups against Defendants for violating Section 1 of the Sherman Act and numerous state laws.  These plaintiff groups include: (1) attorneys general for 54 states, territories, and commonwealths (collectively "States"), (2) a proposed class of Direct Purchaser Plaintiffs, which include drug purchasing cooperatives and retail pharmacy operators ("DPPs"), (3) a proposed class of End-Payor Plaintiffs, which include employee welfare benefit funds, labor unions, private insurers, and consumers ("EPPs"); (4) a proposed class of the IRP Claimants; and (5) several

Direct-Action Plaintiffs consisting of five large national health insurers (including United Healthcare, Cigna Corp., and Humana, Inc.), retail grocery store and pharmacy chains, and state counties from both New York and Texas.

11.    Initial complaints alleging individual drug conspiracies for the generic drugs digoxin and doxycycline were filed in 2016 by certain EPPs and DPPs. Throughout 2016 and 2017, additional complaints alleging individual drug conspiracies for 16 other generic drugs were filed and added to the MDL.  In 2018, the State AGs and other plaintiff groups began to file multi-drug complaints alleging an overarching conspiracy adding more drugs and additional defendants which has grown the MDL to its current size of more than 200 generic drugs involving more than 35 manufacturers and their related entities, eight wholesalers and distributors, and 25 individual executives.

12.    The DOJ has also brought several actions against manufacturers and top executives, many of which have led to guilty pleas and deferred prosecution agreements. In addition to the Justice Department, the State of Connecticut initiated its own non-public investigation into suspicious price increases for certain generic pharmaceuticals in July 2014.  That investigation led to an initial civil complaint by Connecticut and certain other States for individual conspiracies for two generic drugs. The States amended that complaint in June 2018 to include overarching conspiracy allegations for 15 generic drugs (the "Heritage-Centric

Complaint"). The States subsequently filed two additional overarching conspiracy complaints in May 2019 (the "Teva-Centric Complaint") and more recently in June 2020 (the "Topical Products Complaint"). The alleged conduct at the center of the MDL has been described by the Connecticut assistant attorney general as "the largest cartel in the history of the United States."

**B.      Procedural Posture of the Generics MDL.**

13.      Despite the size and complexity of the Generics MDL and the four years in which it has been litigated, including appellate proceedings before the Third Circuit and U.S. Supreme Court, the litigation has been proceeding in a coordinated and efficient manner.

14.      Several motions to dismiss were filed in March 2017 and February 2019. Although some motions remain pending and a schedule for Defendants to respond to subsequent complaints has yet to be established, the District Court has issued certain key decisions that largely denied Defendants' motions, including motions brought by Akorn.

15.      On October 16, 2018, the MDL Court held that the Sherman Act claims for six individual drugs, including clobetasol—a drug for which Akorn is an alleged conspirator—were plausibly pled for purposes of Rule 12(b)(6). ECF 721. On February 15, 2019, the Court largely denied Akorn and its co-defendants' motions to dismiss the EPPs and IRPs' state law claims for the same six drugs.

ECF 857.  Most notably, on August 15, 2019, the Court denied the Defendants'
joint motion to dismiss Plaintiffs' overarching conspiracy claims.  ECF 1070.  The
Court concluded that Plaintiffs' claims therefore "impose joint and several liability
on Defendants not just for their participation in any individual drug conspiracy, but
also for their participation in the alleged overarching scheme."  *In re Generic
Pharmaceuticals Pricing Litigation,* 394 F. Supp. 3d 509, 515 (E.D. Pa. 2019).

16.    Discovery commenced in February 2018.  A Special Discovery
Master, Special ESI Discovery Master, and General Discovery Master have been
appointed to facilitate disputes over discovery and case management issues.

17.    On October 24, 2019, the Court issued a Case Management Order
("CMO") that established a schedule for the completion of discovery.  ECF 1135,
*as amended,* ECF Nos. 1179, 1363.  As amended, the CMO currently provides that
Defendants must substantially complete their custodial document productions by
November 16, 2020.  As of July 9, 2020, Defendants collectively have produced
more than 12.4 million custodial documents, 5.2 million non-custodial documents,
and transactional-level sales data and cost information.  The date for commencing
depositions, as well as dates concerning other case management milestones
including class certification and summary judgment, are currently being negotiated
by the parties with the assistance of the Special Masters.

18.     Following entry of the October 25, 2019 CMO, Defendants petitioned the Third Circuit for a Writ of Mandamus and then the U.S. Supreme Court for a Writ of Certiorari on the basis that a provision in the CMO violates Rule 26 by requiring them to produce documents without a relevance review.  Both the Third Circuit and the U.S. Supreme Court denied Defendants' petitions on January 6, 2020 (rehearing *en banc*), and June 15, 2020, respectively. The Third Circuit and the U.S. Supreme Court also both denied Defendants' requests for a stay of the relevant CMO provision pending resolution of their petitions, which allowed discovery to proceed as intended under the CMO.

19.     The CMO also provides for the selection of "bellwether" claims or case(s) for purposes of class certification, expert discovery, *Daubert* motions, summary judgment, and trial(s).  The bellwether selections are intended "to create precedential rulings which would reduce or minimize the number of motions and repetitive proceedings; and to provide information and experience to guide possible settlement negotiations."   ECF 1244 at 2.   Discovery, however, is expected to proceed on all complaints.  On July 13, 2020, the District Court adopted the Report and Recommendation of Special Master David Marion, which largely endorsed Plaintiffs' proposed bellwether plan consisting of two parallel tracks: (1) the States' May 10, 2019 Teva-Centric Complaint alleging an overarching conspiracy for over 100 drugs, and (2) three single drug complaints

alleging conspiracies to unnaturally inflate the prices of clobetasol, clomipramine, and pravastatin.  ECF 1443.  Akorn is named as a defendant in the clobetasol complaint.

## C.    Effect of the Debtors' Bankruptcy on the Generics MDL.

20.    After the Petition Date, the Debtors stopped complying with the discovery obligations ordered by the District Court. Akorn still owes the production of remaining documents from its custodian files and other documents, privilege logs for their custodial document productions, and complete transactional sales data and cost information.  Furthermore, plaintiffs have yet to take the depositions of key Akorn employees.  The MDL plaintiffs have alleged a complex conspiracy, and each player in the unlawful price-fixing scheme holds important information.  By ceasing its compliance with the District Court's discovery orders, Akorn is derailing the progress of the MDL.

21.    On August 3, 2020 the IRP Claimants filed proof of claims on behalf of themselves and the IRP Claimants' class in each of Akorn's cases, asserting general unsecured claims on account of the claims asserted in the Generics MDL. While this reserves the IRP Claimants' rights to allowance and payment of their claims under a confirmed plan or otherwise under the Bankruptcy Code, it addresses neither claims against the non-debtor co-defendants in the Generics

MDL nor the declaratory and injunctive relief in connection with the conduct giving rise to the claims and prevention of future misconduct.

## GROUNDS FOR OBJECTION AND AUTHORITIES

A.    The Plan improperly treats general unsecured creditors.

22.    Under the Plan, the holders of general unsecured claims not otherwise classified are classified in Class 4 of the Plan, which is proposed to receive the following treatment:

> In full and final satisfaction, compromise, settlement, and release of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of Allowed General Unsecured Claim that is not assumed by the Purchaser shall receive its Pro Rata share of the Distributable Proceeds, if any, pursuant to the Waterfall Recovery.
>
> For the avoidance of doubt, all General Unsecured Claims that are assumed by the Purchaser pursuant to the Sale Transaction Documentation shall be satisfied by the Purchaser in full in Cash following the Effective Date in the ordinary course of business; provided that any Allowed General Unsecured Claim that has been expressly assumed by the Purchaser under the Sale Transaction shall not be an obligation of the Debtors as of or after the Effective Date.

Plan Art. III(B)(5). This class is treated as impaired and entitled to vote on the Plan. *Id.*

23.    Class 4 is therefore comprised of two entirely separate categories of claims: those entitled to full satisfaction from the Purchaser, and those that are not. The former category is not impaired, and therefore not eligible to vote on the Plan. See § 1126(f) of the Bankruptcy Code. The latter category is impaired and (for the

reasons described below) should be deemed to reject the Plan without voting. See § 1126(g) of the Bankruptcy Code. Imposing the same treatment on the latter category in reliance upon the votes from creditors in the former category is impermissible gerrymandering.

24.     It is not known at this time in which category the IRP Claimants' claims would be classified because they have not received notice whether their claims will be "Assumed Liabilities" under the Sale, the sale process being on the same track as confirmation. It will be presumed (for purposes of this objection only) that their claims will not be Assumed Liabilities.

25.     Votes from Class 4 claimants should not be counted for two reasons. First, votes from creditors whose claims will be fully satisfied should not be counted towards the class vote because their claims are not impaired and it was not possible to know what claims those were as of the voting deadline. Under § 1126(c) of the Bankruptcy Code, for a class to accept the plan, at least two thirds in amount and more than one half in number of the allowed claims in that class must vote to accept the plan. Creditors whose claims will be fully satisfied improperly skew those formulae.

26.     Second, although Class 4 claimants (other than Assumed Liabilities) technically receive something more than "absolutely nothing," the property they are receiving—their "Pro Rata share of the Distributable Proceeds, if any, pursuant

to the Waterfall Recovery"—is expected to be nothing. See Disclosure Statement, pp. 7 ("0%") and 12 ("The Debtors do not anticipate any distribution to Class 4, Class 7, or Class 8 at this time."). Therefore, there is no basis to treat Class 4 in any way other than presumed rejection of the Plan under § 1126(g).[2]

27.    This is important because it requires the Debtors to meet the standards of cramdown for purposes of confirmation, rather than soliciting votes (presumably from trade creditors whose claims will be satisfied in full pursuant to the asset sale and will be satisfied outside the Plan) in the hopes of not having to meet the standards for cramdown. In order for a plan to be confirmed, the plan proponents are required to meet all the requirements of § 1129(a) of the Bankruptcy Code, except that if not all classes accept the plan under subsection (8), the plan may still be confirmed if it is "fair and equitable" and does not "discriminate unfairly" with respect to the non-accepting classes (known as cramdown).

28.    The Plan is not fair and equitable to and unfairly discriminates against the IRP Claimants for several reasons. First, there are two classes of non-priority unsecured claims, Class 4 (general unsecured claims) and Class 5 (inter-company claims). Unlike Class 4, which receives a *pro rata* share of nothing, Class 5 claims "will either be Reinstated, distributed, contributed, set off, settled, cancelled and

---

[2] The Debtors must also show under § 1129(a)(10) that at least one impaired class has accepted the Plan. For the same reasons that Class 4 should be deemed to reject the Plan, the votes of other classes expected to receive nothing under the Plan (including but not limited to Class 7) according to the Disclosure Statement should not be counted for purposes of accepting the Plan under that subsection.

released or otherwise addressed at the option of the Debtors, in consultation with the Required Consenting Term Loan Lenders . . . ." The term "Reinstated" is defined to mean that "the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code." Art. I(A)(101). It is extremely unclear what becomes of Class 5 claims under the Plan, but the most natural reading is that the Plan gives discretion to the Debtors to give these claims whatever treatment they want.[3]

29.     Moreover, with respect to a class of unsecured claims not provided with the full value on its claims, the term "fair and equitable" is defined under the Bankruptcy Code to require that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . . ." § 1129(b)(2)(B), also called the Absolute Priority Rule. Under the Plan, however, even though Class 4 claims are not being paid in full, holders of Class 6 interests, which are comprised of intercompany equity interests, are "Reinstated." This violates the Absolute Priority Rule.

---

[3] Interestingly, the treatment provisions of Class 5 claims contain the following caveat at the end: "provided, that no distributions shall be made on account of any such Intercompany Claims." So in essence, the treatment of Class 5 Claims is that the Debtors may choose to "Reinstate" them— *i.e.,* to "render[ them] unimpaired in accordance with section 1124 of the Bankruptcy Code" but make no distributions on account of them. This circular definition draws into question whether the Plan's treatment of these claims has any rational interpretation.

30.     Moreover, the definition of "fair and equitable" under § 1129(b)(2) "by it[s] terms, is not exclusive. Indeed a court may and should take additional factors into consideration in determining whether a plan is fair and equitable with respect to a dissenting class." *In re Johns-Manville Corp.,* 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (citations omitted), *aff'd,* 78 B.R. 407 (S.D.N.Y. 1987), *aff'd,* 843 F.2d 636 (2nd Cir. 1988). The Plan in this case has been rushed to confirmation in less than four months, providing for the treatment of claims hinging upon a sale process the results of which were unknown as of the voting deadline, and a creditor base that could be fixed by a claims bar date only two weeks earlier. Given these onerous results, a fairer result to general unsecured creditors might be conversion to cases under Chapter 7. Therefore, the IRP Claimants request that confirmation of the Plan be denied, without prejudice to modification to bring its terms within the requirements of cramdown.

B.      Given the Complexity of the Definitions, the IRP Claimants Are Entitled to a Provision in the Proposed Confirmation Order Expressly Excluding Them from any Third-Party Releases and Injunctive Provisions.

31.     As noted above, the IRP Claimants do not oppose confirmation of a plan that provides for the purposes of, and complies with, § 1123 of the Bankruptcy Code, but the Plan may not contain provisions that exceed the authority set forth in the Bankruptcy Code.

32.    The Plan contains a number of release and exculpatory provisions, which are largely based on defined terms, such as "Released Parties" and "Releasing Parties," which are then stacked with other defined terms, some of which are especially broad or loosely defined.

33.    One of these provisions, Article VIII(F) entitled "Releases by Holders of Claims and Interests," provides for the releases of claims by any "Releasing Party" against "each Debtor and Released Party" (a redundancy, as the term "Released Party" includes the Debtors). The IRP Claimants will not be returning a ballot on the Plan or "opting in" to the releases in the Plan, so according to the IRP Claimants' best reading of the Plan, they are not bound by the releases in Art. VIII(F). Given the complexity of the release provisions, the number of co-defendants in the Generics MDL, and the amounts at stake in that litigation, it is critical to the IRP Claimants that the claims in the MDL be undisturbed by confirmation of the Plan.

34.    Therefore, the IRP Claimants request that any confirmation order entered by the Court contain an express provision excluding the IRP Claimants from the definition of the "Releasing Parties" under the Plan and the effect of Article VIII.

35.    Similarly, presumably to give teeth to the foregoing release provisions, the Plan also contains onerous injunctive relief against "all Entities that

have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan or are subject to Exculpation pursuant to the Plan" from performing a laundry list of acts similar in most respects to the provisions of the automatic stay set forth in § 362(a) of the Bankruptcy Code. To complete the relief requested above, the IRP Claimants also request that any confirmation order entered by the Court contain an express provision excluding the IRP Claimants from such injunctive provisions.

      C.      <u>The Exculpation Provisions of the Plan Are Too Broad.</u>

36.      Another of the release provisions referenced above is set forth in Plan Article VIII(G), entitled "Exculpation," which provides in relevant part:

> Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the DIP Loan Documents, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the DIP Loan Documents, the Disclosure Statement or the Plan, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan,

including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that constitutes willful misconduct, actual fraud, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

37.    "It is acceptable to provide exculpations for [plan proponents] for the role they played in the bankruptcy process . . . ." *In re Washington Mutual, Inc.,* 442 B.R. 314, 348 (Bankr. D.Del. 2011). According to Judge Walrath's interpretation of the Third Circuit's opinion in *PWS Holding,* an "exculpation clause in plan which provided that committee members and estate professionals had no liability to creditors or shareholders for their actions in the case except for willful misconduct or gross negligence *merely conformed to the standard applicable to such fiduciaries*" but is not a separate release. *Id.* (emphasis added) (citing *In re PWS Holding Corp.,* 228 F.3d 224, 246 (3rd Cir. 2000)). Judge Walrath found that the exculpatory provisions in the plan in *Washington Mutual* extended too broadly beyond that standard, both in connection with the scope of the exculpation and the parties entitled to exculpatory protection.

38.    The sheer breadth of the exculpation provisions of the Plan in the instant case suggests that they may later be argued to create a blanket release of any and all liabilities for anything that occurred after the Petition Date. This is improper. The opinions in *Washington Mutual* and *PWS Holding* are clear that

exculpatory provisions are supposed to create a standard for fiduciary conduct, not create separate release provisions.

39.     Although the foregoing analysis applies with equal force to all creditors, the IRP Claimants' primary interest is to protect the claims made against Akorn in the Generics MDL. The generous exculpatory language in the Plan may be interpreted to release any and all continuing actions or omissions by the Debtors' officers and agents, even those occurring after the Petition Date. As the class of general unsecured claims would typically include only prepetition claims, an overly broad exculpatory provision could create an end-run around the purpose of the bankruptcy and a windfall to the Debtors' agents and professionals whose conduct gave rise to postpetition claims, not to mention references to unnamed former agents, Committee members, and professionals as described below.

40.     Moreover, the parties protected by the exculpation provisions in the Plan exceed the permissible scope under *Washington Mutual* and *PWS Holding*:

> "Exculpated Party" means, collectively: (a) the Debtors; (b) the Committee and each of its members; and (c) with respect to each of the foregoing Entities in clauses (a) and (b), each Entity's current and former subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their respective capacities as such.

Plan, Art. I(A)(57). While the Court may find it appropriate to exculpate the Debtors—which filed the Plan—and their officers and agents that assisted in

that process, it would be improper to include many of the others, such as their "former" officers and other insiders and professionals.

41.     As noted above, the IRP Claimants' primary interest is to protect the claims made against Akorn in the Generics MDL and therefore request the inclusion of language in any order confirming the Plan stating that the exculpation provisions of the Plan do not apply to any of the claims and causes of action asserted in the Generics MDL.

D.      The Plan purports to keep the automatic stay intact without incorporating the provisions for relief from stay under § 362(d) of the Bankruptcy Code.

42.     Under Plan Art. VIII(H), "notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, the automatic stay pursuant to section 362 of the Bankruptcy Code shall remain in full force and effect with respect to the Debtors until the closing of these Chapter 11 Cases." Similarly, under Plan Art. XII(I), "Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date."

43.    While it is not atypical for a Chapter 11 plan and/or an order confirming a plan to provide for the continuation of the automatic stay after confirmation, there should be a corresponding provision permitting parties to seek relief from the stay in accordance with the provisions of § 362(d) of the Bankruptcy Code.[4]

RELIEF REQUESTED

44.    For the reasons set forth herein, confirmation of the Plan in its current form should be denied.

45.    In the event that a new or modified plan are proposed to address the §§ 1126 and 1129 issues described above, the IRP Claimants request that confirmation be conditioned upon the addition of the following language:

(i)    To be added to the definition of "Releasing Parties" in Plan Art. I(A)(103): "; provided that none of the plaintiffs in the Generics MDL[5], including but not limited to the IRP Claimants[5], shall be deemed Releasing Parties except as otherwise agreed in writing";

(ii)    To be added as a separate paragraph to Plan Art. XIII(F): "Notwithstanding anything herein to the contrary, none of the plaintiffs in the Generics MDL, including but not limited to the IRP Claimants, shall be treated as Releasing Parties except as otherwise agreed in writing, and none of the

---

[4] The IRP Claimants note that they, along with other MDL Plaintiffs, have filed a motion for relief from the automatic stay (Docket No. 500).

[5] An appropriate definition should be included in the Definitions section of the plan for this defined term.

releases, discharges, injunctions, or exculpations shall apply to the claims asserted in the Generics MDL"; and

(iii)   To be added at the end of Plan Art. VIII(H) and Plan Art. XII(I): "The provisions of 11 U.S.C. § 362(d) shall also remain in effect."

Dated:  August 21, 2020
        Wilmington, Delaware

Respectfully submitted,

HILLER LAW, LLC

 **/s/ Adam Hiller**
Adam Hiller (DE No. 4105)
1500 North French Street
Wilmington, Delaware 19801
(302) 442-7677 telephone
ahiller@adamhillerlaw.com

and

Jonathan W. Cuneo, Esquire
Christian Hudson, Esquire
CUNEO GILBERT & LaDUCA, LLP
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
Ph: (202) 789-3960
Fax: (202) 789-1813
jonc@cuneolaw.com
christian@cuneolaw.com

*Attorneys for the IRP Claimants*