# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AKORN, INC., *et al.*,[1] | ) Case No. 20-11177 (KBO) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## DEBTORS' MEMORANDUM OF LAW
## IN SUPPORT OF AN ORDER CONFIRMING THE JOINT
## CHAPTER 11 PLAN OF AKORN, INC. AND ITS DEBTOR AFFILIATES

Paul N. Heath (No. 3704)
Amanda R. Steele (No. 5530)
Zachary I. Shapiro (No. 5103)
Brett M. Haywood (No. 6166)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:     heath@rlf.com
     steele@rlf.com
     shapiro@rlf.com
     haywood@rlf.com

*Co-Counsel for the*
*Debtors and Debtors in Possession*

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
Christopher M. Hayes (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
     patrick.nash@kirkland.com
     gregory.pesce@kirkland.com
     christopher.hayes@kirkland.com

-and-

Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:     nicole.greenblatt@kirkland.com

*Co-Counsel for the*
*Debtors and Debtors in Possession*

Dated:  August 28, 2020

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are:  Akorn, Inc. (7400); 10 Edison Street LLC (7890); 13 Edison Street LLC; Advanced Vision Research, Inc. (9046); Akorn (New Jersey), Inc. (1474); Akorn Animal Health, Inc. (6645); Akorn Ophthalmics, Inc. (6266); Akorn Sales, Inc. (7866); Clover Pharmaceuticals Corp. (3735); Covenant Pharma, Inc. (0115); Hi-Tech Pharmacal Co., Inc. (8720); Inspire Pharmaceuticals, Inc. (9022); Oak Pharmaceuticals, Inc. (6647); Olta Pharmaceuticals Corp. (3621); VersaPharm Incorporated (6739); VPI Holdings Corp. (6716); and VPI Holdings Sub, LLC.  The location of the Debtors' service address is:  1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.

# TABLE OF CONTENTS

**Page(s)**

**Preliminary Statement** ..................................................................................................1

**Background** .................................................................................................................9

I.      Company Background. ......................................................................................10

II.     The Debtors' Restructuring Discussions. .........................................................10

III.    The Plan and Solicitation Process. ...................................................................13

IV.     Committee Settlement.......................................................................................16

V.      Objections to Confirmation..............................................................................17

**Argument** .................................................................................................................18

I.      The Shareholder Settlements Do Not Violate the Bankruptcy Code................18

        A.      The Shareholder Settlements Do Not Release Claims by the Debtors
                Against Current and Former Directors and Officers...............................18

        B.      The Debtors Do Not Have Any Claims Against the Current and Former
                Directors and Officers in Connection with the Issues Identified by the
                Chancery Court. ....................................................................................20

                1.      The *Kogut* Litigation..................................................................21

                2.      The *Trsar* and *Glaubach* Litigation ..........................................23

                3.      The *Pulchinski* and *Booth* Actions............................................23

                4.      The *Kogut* Settlement ................................................................24

        C.      The D&O Policies Are Not Available for Distribution to Fresenius or
                Other Creditors......................................................................................26

II.     The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code................28

        A.      The Plan Complies with the Applicable Provisions of the Bankruptcy
                Code (§ 1129(a)(1)). ..............................................................................28

                1.      The Plan Satisfies the Classification Requirements of Section 1122
                        of the Bankruptcy Code. ...........................................................29

2.     The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code........................................34

3.     The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code........................................38

4.     The Plan Complies with Section 1123(d) of the Bankruptcy Code...........53

B.     The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2))........................................................53

1.     The Debtors Complied with Section 1125 of the Bankruptcy Code. ........54

2.     The Debtors Complied with Section 1126 of the Bankruptcy Code. ........55

C.     The Plan Was Proposed in Good Faith (§ 1129(a)(3)). .........................................56

D.     The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)). .....................................59

E.     The Plan Does Not Require Additional Disclosures Regarding Directors, Officers, and Insiders (§ 1129(a)(5)). ......................................................60

F.     The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6))............................................................................................61

G.     The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).............................................................................................61

H.     The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code. ...........................................64

I.     The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).............................................................................................64

J.     At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).........................................................................................66

K.     The Plan Is Feasible (§ 1129(a)(11)). ....................................................72

L.     All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)). ...........................74

M.     Sections 1129(a)(13) through 1129(a)(16) Do Not Apply to the Plan. .................74

N.     The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code...........................................................................75

1.     The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii))................................75

2.      The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (§ 1129(b)(1))............................................................................................79

O.      The Debtors Complied with Section 1129(d) of the Bankruptcy Code................81

III.     The Waiver of a Stay of the Confirmation Order and the Proposed Modifications to the Plan Are Appropriate. ............................................................................................81

A.      Good Cause Exists to Waive the Stay of the Confirmation Order. .......................81

B.      Modifications to the Plan. ....................................................................................82

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999)....................................................................................61, 75, 78

*Brite* v. *Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*,
  764 F.2d 406 (5th Cir. 1985) ...................................................................................56

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
  699 F.2d 599 (2d Cir. 1983)......................................................................................40

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*,
  116 F.3d 790 (5th Cir. 1997) ...................................................................................56

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
  10 F.3d 944 (2d Cir. 1993)........................................................................................29

*Gillman v. Continental Airlines (In re Continental Airlines)*,
  203 F.3d 203 (3d Cir. 2000).................................................................................46, 47

*In re 203 N. LaSalle St. Ltd. P'ship.*,
  190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *Bank of Am.*,
  526 U.S. 434 (1999)...................................................................................................79

*In re 47th and Belleview Partners*,
  95 B.R. 117 (Bankr. W.D. Mo. 1988)........................................................................72

*In re 500 Fifth Ave. Assocs.*,
  148 B.R. 1010 (Bankr. S.D.N.Y. 1993)....................................................................29

*In re Abbotts Dairies of Pa., Inc.*,
  788 F.2d 143 (3d Cir. 1986).......................................................................................56

*In re Abeinsa Holding, Inc.*,
  562 B.R. 265 (Bankr. D. Del. 2016) .........................................................................41

*In re Adelphia Commc'ns. Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007)................................................................61, 67

*In re Aegean Marine Petroleum Network, Inc.*,
  599 B.R. 717 (Bankr. S.D.N.Y. 2019)......................................................................50

*In re Akorn, Inc. Data Integrity Securities Litigation*,
  C.A. No. 18-cv-1713 (N.D. Ill.).................................................................................17

iv

*In re Aleris Int'l, Inc.*,
   2010 WL 3492664 (Bankr. D. Del. May 13, 2010).........................................................53, 79

*In re Ambanc La Mesa L.P.*,
   115 F.3d 650 (9th Cir. 1997) ........................................................................................75, 79

*In re Armstrong World Indus., Inc.*,
   348 B.R. 111 (D. Del. 2006)...................................................................................28, 29, 79

*In re Arsenal Res. Dev. LLC*,
   No. 19-12347 (BLS) ................................................................................................................50

*In re Atl. Gulf Communities Corp.*,
   369 B.R. 156 (Bankr. D. Del. 2007) .................................................................................35

*In re Aztec Co.*,
   107 B.R. 585 (Bankr. M.D. Tenn. 1989) .........................................................................79

*In re Blackhawk Mining LLC*,
   No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019)................................................44

*In re Burns & Roe Enters., Inc.*,
   No. 08-4191 (GEB), 2009 WL 438694 (D.N.J. Feb. 23, 2009) .............................82

*In re Capmark Fin. Grp. Inc.*,
   No. 09-13684 (CSS), 2011 WL 6013718 (Bankr. D. Del. Oct. 5, 2011) ..............72

*In re Century Glove*,
   Cir. A. Nos. 90-400 and 90-401, 1993 WL 239489 (D. Del. Feb. 10, 1993) ...................56, 61

*In re Chapel Gate Apartments, Ltd.*,
   64 B.R. 569 (Bankr. N.D. Tex. 1986)............................................................................59, 60

*In re Checkout Holding Corp.*,
   No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019) ...............................................44

*In re Conseco, Inc.*,
   301 B.R. 525 (Bankr. N.D. Ill. 2003) ...........................................................................45

*In re Coram Healthcare Corp.*,
   315 B.R. 321 (Bankr. D. Del. 2004) .......................................................................40, 45, 79

*In re DBSD N. Am., Inc.*,
   419 B.R. 179 (Bankr. S.D.N.Y. 2009) *aff'd* 2010 WL 1223109 (S.D.N.Y.
   March 24, 2010), *modified on other grounds*, 634 F.3d 79 (2d Cir. 2011) ...........................45

*In re Dex Media, Inc.*,
   No. 16-11200 (KG) (Bankr. D. Del. Jul. 15, 2016) ...............................................50

*In re Dex One Corp.*,
No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013)................................................81

*In re Drexel Burnham Lambert Grp. Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992)......................................................................29

*In re Dwellco I Ltd. P'ship*,
219 B.R. 5 (Bankr. D. Conn. 1998) ...................................................................68, 69

*In re Enron Corp.*,
326 B.R. 497 (S.D.N.Y. 2005)..................................................................................49

*In re Exaeris, Inc.*,
380 B.R. 741 (Bankr. D. Del. 2008) .........................................................................40

*In re Exide Techs.*,
607 F.3d 957 (3d Cir. 2010).......................................................................................8

*In re FAH Liquidating Corp.*,
No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) ................................................48

*In re Flintkote Co.*,
486 B.R. 99 (Bankr. D. Del. 2012) ...........................................................................72

*In re Freymiller Trucking, Inc.*,
190 B.R. 913 (Bankr. W.D. Okla. 1996) ..................................................................79

*In re Friese*,
103 B.R. 90 (Bankr. S.D.N.Y. 1989).........................................................................67

*In re Future Energy Corp.*,
83 B.R. 470 (Bankr. S.D. Ohio 1988)........................................................................59

*In re Gatehouse Media, Inc.*,
No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013) .............................................81

*In re Generics Pharmaceuticals Pricing Antitrust Litigation*,
No. 16-MD-2724, MDL No. 2724 (E.D. Pa.)..............................................................6

*In re Genesis Health Ventures, Inc.*,
266 B.R. 591 (Bankr. D. Del. 2001) ...................................................................28, 47

*In re Geokinetics Inc.*,
No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013) ...............................................81

*In re Glob. Safety Textiles Holdings LLC*,
No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009)................82

Page(s)

*In re Global Ocean Carriers Ltd.*,
    251 B.R. 31 (Bankr. D. Del. 2000) ..................................................................68, 76

*In re GSE Envtl., Inc.*,
    No. 13-11126 (MFW) (Bankr. D. Del. July 25, 2014) ........................................81

*In re Heritage Org., L.L.C.*,
    375 B.R. 230 (Bankr. N.D. Tex. 2007)..........................................................29, 72

*In re Horsehead Holding Corp.*,
    No. 16-10287 (CSS) (Bankr. D. Del. Sep. 9, 2016) ...........................................44

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) .........................................................40, 45, 52

*In re ION Media Networks, Inc.*,
    419 B.R. 585 (Bankr. S.D.N.Y. 2009) ...............................................................76

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987)..............................................................................29

*In re L & J Anaheim Assoc.*,
    995 F.2d 940 (9th Cir. 1993) ..................................................................67, 68, 69

*In re Laboratory Partners, Inc.*,
    No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) .....................................48, 50

*In re Lapworth*,
    1998 WL 767456 (DWS) (Bankr. E.D. Pa. Nov. 2, 1998) ...................................53

*In re Lason, Inc.*,
    300 B.R. 227 (Bankr. D. Del. 2003) ...................................................................61

*In re Lernout & Hauspie Speech Prods., N.V.*,
    301 B.R. 651 (Bankr. D. Del. 2003) ...................................................................79

*In re Lisanti Foods*,
    329 B.R. 491 (Bankr. D.N.J. 2005), *aff'd*, 241 F. App'x 1 (3d Cir. 2007)............................59

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994)............................................................40, 41

*In re Monclova Care Ctr., Inc.*,
    254 B.R. 167 (Bankr. N.D. Ohio 2000) ...............................................................67

*In re NII Holdings, Inc.*,
    288 B.R. 356 (Bankr. D. Del. 2002) ...................................................................56

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) .....................................................28

*In re One Aviation Corp.*,
No. 18-12309 (CSS) (Bankr. D. Del. Sep. 18, 2019) .............................44

*In re PPI Enters. (U.S.), Inc.*,
324 F.3d 197 (3d Cir. 2003)...................................................................67

*In re Pero Bros. Farms, Inc.*,
90 B.R. 562 (Bankr. S.D. Fla. 1988)......................................................72

*In re Physiotherapy Holdings, Inc.*,
No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) .............................81

*In re Premier Int'l Holdings, Inc.*,
2010 WL 2745964 (CSS) (Bankr. D. Del. Apr. 29, 2010) .....................49

*In re Prussia Assocs.*,
322 B.R. 572 (Bankr. E.D. Pa. 2005) ....................................................72

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000)........................................................49, 52, 56

*In re S&W Enter.*,
37 B.R. 153 (Bankr. N.D. Ill. 1984) ......................................................28

*In re Safety-Kleen Corp.*,
380 B.R. 716 (Bankr. D. Del. 2008) ......................................................32

*In re Samson Resources Corp.*,
No. 14-11934 (CSS) (Bankr. D.Del. Feb. 13, 2017) .............................44

*In re Sea Garden Motel & Apartments*,
195 B.R. 294 (D. N.J. 1996) ..................................................................72

*In re Seasons Apartments, L.P.*,
215 B.R. 953 (Bankr. W.D. La. 1997)....................................................67

*In re Source Home Entm't, LLC*,
No. 14-11553 (KG) (Bankr. D. Del. Feb. 20, 2015)........................50, 81

*In re Spansion*,
2010 WL 2905001 (Bankr. D. Del. April 16, 2010)...............................49

*In re Spansion, Inc.*,
426 B.R. 114 (Bankr. D. Del. 2010) ..........................................40, 45, 47

*In re Specialty Equip. Corp.*,
   3 F.3d 1043 (7th Cir. 1993) ...................................................................45

*In re TK Holdings Inc.*,
   No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) ...............................44

*In Re Trans World Airlines, Inc.*,
   No. 01-00056 (PJW), 2001 WL 1820326 (Bankr. D. Del. Apr. 2, 2001)........................33, 35

*In re Tribune Co.*,
   464 B.R. 126 (Bankr. D. Del. 2011), *overruled in part on other grounds,* 464
   B.R. 208 (Bankr. D. Del. 2011) ...............................................................72

*In re Two Streets, Inc.*,
   597 B.R. 309 (Bankr. S.D. Miss. 2019)....................................................72

*In re U.S. Truck Co.*,
   47 B.R. 932 (E.D. Mich. 1985), *aff'd,* 800 F.2d 581 (6th Cir. 1986) ......................72

*In re Verso Corp.*,
   No. 16-10163 (KG) (Bankr. D. Del. June 23, 2016) .........................................50, 51

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012)..................................................................56, 72

*In re Wash. Mut., Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011) ...............................................40, 41, 47, 49

*In re Washington Capital Aviation & Leasing*,
   156 B.R. 167 (Bankr. E.D. Va. 1993).....................................................32

*In re World Health Alts., Inc.*,
   344 B.R. 291 (Bankr. D. Del. 2006) .......................................................40

*In re Zenith Elecs. Corp.*,
   241 B.R. 92 (Bankr. D. Del. 1999) ......................................................40, 41

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
   987 F.2d 154 (3d Cir. 1993)...............................................................29, 75

*Kane v. Johns-Manville Corp.*,
   843 F.2d 636 (2d Cir. 1988)...............................................................72

*Kogut v. Akorn, Inc., et al.*,
   No. 646,174 (La. Dist. Ct. June 10, 2016) .................................................21, 22

*Magnetar Constellation Fund II-PRA LP, et al. v. Akorn, Inc.*,
   C.A. No. 19-cv-8418 (N.D. Ill.).............................................................19

*Manikay Master Fund, LP et al. v. Akorn, Inc.*,
  C.A. No. 19-cv-4651 (N.D. Ill.) ............................................................... 18

*Matsushita Elec. Indus. Co. v. Epstein*,
  516 U.S. 367 (1996) ................................................................................. 25

*Matter of Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986) ................................................... 33, 79

*Matter of TTS, Inc.*,
  158 B.R. 583 (D. Del. 1993) ................................................................... 35

*Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*,
  25 F.3d 1132 (2d Cir. 1994) ................................................................... 54

*Pension Ben. Guar. Corp. v. Enron Corp.*,
  No. 04 CIV. 5499 (HB), 2004 WL 2434928 (S.D.N.Y. Nov. 1, 2004) ...... 33

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
  761 F.2d 1374 (9th Cir. 1985) ............................................................... 72

*Pulchinski v. Abramowitz et al.*,
  2019CH11186 (Ill. Cir. Ct.) ................................................................... 23

*The Booth Family Trust v. Kapoor et al.*,
  2019CH12793 (Ill. Cir. Ct.) ................................................................... 23

*Trsar v. John N. Kapoor, et al.*,
  C.A. 18-cv-7374 (N.D. Ill. Nov. 6, 2018) .............................................. 23

*Twin Master Fund, Ltd. et al. v. Akorn, Inc.*,
  C.A. No. 19-cv-3648 (N.D. Ill.) .............................................................. 18

*United Artists Theatre Co. v. Walton*,
  315 F.3d 217 (3d Cir. 2000) ................................................................... 47

*Universal Bonding v. Gittens & Sprinkle Enterprises, Inc.*,
  960 F.2d 366 (3d Cir.1992) ................................................................... 35

XL Specialty Insurance Company
  Policy No. US00075683DO17A ......................................................... 26, 27

**Statutes**

11 U.S.C. 365(k) ..................................................................................... 32

11 U.S.C. §§ 101–1532 ............................................................................... 1

11 U.S.C. § 326(a) ................................................................................... 62

11 U.S.C. § 363(f) ................................................................................................59

11 U.S.C. § 365 ............................................................................................36, 53

11 U.S.C. § 365(f) ................................................................................................80

11 U.S.C. § 503(b) ..............................................................................................64

11 U.S.C. § 503(b)(2) ..........................................................................................62

11 U.S.C. § 507(a)(1) ..........................................................................................64

11 U.S.C. § 507(a)(2) ....................................................................................64, 73

11 U.S.C. § 507(a)(8) ..........................................................................................65

11 U.S.C. § 510(b) .......................................................................................... *passim*

11 U.S.C. §§ 701-784 ..........................................................................................61

11 U.S.C. §§ 1101-1195 .................................................................................. *passim*

11 U.S.C. § 1102 ..................................................................................................9

11 U.S.C. § 1107(a) ............................................................................................9

11 U.S.C. § 1108 ..................................................................................................9

11 U.S.C. § 1122 .......................................................................................... *passim*

11 U.S.C. § 1122(a) ............................................................................................29

11 U.S.C. § 1123 ........................................................................28, 29, 40, 81

11 U.S.C. § 1123(a) ......................................................................................34, 67

11 U.S.C. § 1123(a)(1) ......................................................................................34

11 U.S.C. § 1123(a)(2) ......................................................................................34

11 U.S.C. § 1123(a)(3) ..........................................................................34, 50, 56, 59

11 U.S.C. § 1123(a)(4) .................................................................................. *passim*

11 U.S.C. § 1123(a)(5) ..................................................................................36, 37

11 U.S.C. § 1123(a)(6) ......................................................................................37

11 U.S.C. § 1123(a)(7) ..................................................................................37, 38

**Page(s)**

11 U.S.C. § 1123(b) ................................................................................ *passim*

11 U.S.C. § 1123(b)(1) ....................................................................................39

11 U.S.C. § 1123(b)(1)–(6) .........................................................................38, 39

11 U.S.C. § 1123(b)(2) ....................................................................................39

11 U.S.C. § 1123(b)(3)(A) ................................................................................40

11 U.S.C. § 1123(d) ....................................................................................52, 53

11 U.S.C. § 1124(1) .........................................................................................67

11 U.S.C. § 1125 ..........................................................................28, 53, 54, 55

11 U.S.C. § 1125(a) .........................................................................................54

11 U.S.C. § 1125(a)(1) .....................................................................................54

11 U.S.C. § 1125(b) .........................................................................................54

11 U.S.C. § 1125(c) .........................................................................................54

11 U.S.C. § 1126 .................................................................................. *passim*

11 U.S.C. § 1126(a) .........................................................................................67

11 U.S.C. § 1126(c) .........................................................................................56

11 U.S.C. § 1126(e) .........................................................................................56

11 U.S.C. § 1126(f) .........................................................................................55

11 U.S.C. § 1126(g) ....................................................................................55, 67

11 U.S.C. § 1127 .............................................................................................82

11 U.S.C § 1127(a) .........................................................................................81

11 U.S.C. § 1129 ..........................................................................2, 17, 28, 29

11 U.S.C. § 1129(a) .........................................................................................74

11 U.S.C. § 1129(a)(1) .....................................................................................28

11 U.S.C. § 1129(a)(2) ..............................................................................50, 53, 56

11 U.S.C. § 1129(a)(3) .....................................................................................56

**Page(s)**

11 U.S.C. § 1129(a)(5)..............................................................................................................60

11 U.S.C. § 1129(a)(5)(A)(i) ....................................................................................................60

11 U.S.C. § 1129(a)(6)..............................................................................................................61

11 U.S.C. § 1129(a)(7)........................................................................................................61, 62

11 U.S.C. § 1129(a)(7)(A) ........................................................................................................61

11 U.S.C. § 1129(a)(8)..................................................................................................64, 66, 74

11 U.S.C. § 1129(a)(9)..................................................................................................64, 65, 66

11 U.S.C. § 1129(a)(9)(A) ..................................................................................................64, 65

11 U.S.C. § 1129(a)(9)(B) ..................................................................................................64, 65

11 U.S.C. § 1129(a)(9)(C) ........................................................................................................65

11 U.S.C. § 1129(a)(10)..............................................................................66, 67, 69, 71

11 U.S.C. § 1129(a)(11)..............................................................................................71, 72, 73

11 U.S.C. § 1129(a)(12)............................................................................................................73

11 U.S.C. § 1129(a)(14)-1129(a)(16)......................................................................................74

11 U.S.C. § 1129(b)........................................................................................68, 74, 75, 79

11 U.S.C. § 1129(b)(1) ......................................................................................74, 79, 80

11 U.S.C. § 1129(b)(2)(B)(i) ....................................................................................................75

11 U.S.C. § 1129(b)(2)(B)(ii) ............................................................................................75, 76

11 U.S.C. § 1129(d)..................................................................................................................80

28 U.S.C. § 1930......................................................................................................................73

28 U.S.C. § 1930(a) ..................................................................................................................73

Bankruptcy Code Chapter 11 .......................................................................................... *passim*

Bankruptcy Code section 510 ..................................................................................................82

Bankruptcy Code section 1125(e)............................................................................................50

Bankruptcy Code Section 1129(a)(5)(A)(ii) ...........................................................................60

**Page(s)**

Company Wrongful Act...................................................................................................27

Full Faith and Credit Act, 28 U.S.C. § 1738................................................................25

Optional Extension Period, for a Company Wrongful Act............................................26

Optional Extension Period, for a Wrongful Act ...........................................................26

UCC ..............................................................................................................................71

Wrongful Act ................................................................................................................27

**Rules**

Fed. R. Bankr. P. 1015(b) ..............................................................................................9

Fed. R. Bankr. P. 1019(2) ............................................................................................62

Fed. R. Bankr. P. 3017..................................................................................................53

Fed. R. Bankr. P. 3018..................................................................................................53

Fed. R. Bankr. P. 3019............................................................................................81, 82

Fed. R. Bankr. P. 3020..................................................................................................81

Fed. R. Bankr. P. 3020(e).............................................................................................80

Fed. R. Bankr. P. 6004..................................................................................................81

Fed. R. Bankr. P. 6004(h).............................................................................................80

Fed. R. Bankr. P. 6006..................................................................................................81

Fed. R. Bankr. P. 6006(d).............................................................................................80

Fed. R. Bankr. P. 9019..................................................................................................40

Rule 2015.3 ....................................................................................................................4

**Other Authorities**

Akorn's website a Current Report on Form 8-K ...........................................................25

*First Amendment* ........................................................................................................70

Class Settlement. Part II...............................................................................................18

*Debtors' Reply in Support of the Sale Transaction* (the "Sale Reply")........................58

**Page(s)**

Disclosure Statement Order, Schedule 2 § E.3 ...........................................................33

Effective Date *for prosecution, settlement, or other action as determined by the Plan Administrator*................................................................................................77

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C. C.A.N. 5963 (1977) .........................28

H.R. Rep. No. 595, 95th Cong., 1st Sess. (1977) ........................................................53

*Investor's Business Daily*.............................................................................................25

*IRP Claimants' Objection to Confirmation of Joint Chapter 11 Plan of Akorn, Inc. and Its Debtor Affiliates* (the "IRP Plan Objection"), ¶ 23...............................35

Plan, *the releases contained in the Plan do not* (i).....................................................77

S. Rep. No. 95-989, *reprinted in* 1978 U.S.C. C.A.N. 5787 (1978)............................28

S. Rep. No. 989, 95th Cong., 2d Sess. (1978) .............................................................53

*Term Loan Pledge and Security Agreement* § 5.2(a)(iv) .............................................69

Voting Report, Exhibit B ..............................................................................................46

The above-captioned debtors (collectively, the "Debtors")[2] submit this memorandum of law (this "Memorandum") in support of confirmation of the *Modified Joint Chapter 11 Plan of Akorn, Inc. and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan") [Docket No. 547],[3] pursuant to sections 1125, 1126, and 1129, respectively, of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").   In support of confirmation of the Plan and in response to the objections thereto (collectively, the "Objections"), the Debtors respectfully state as follows.

## **Preliminary Statement**

1.     The Debtors commenced these Chapter 11 Cases on May 20, 2020, with two important goals:  (a) maximizing stakeholder value through the sale of substantially all of their assets; and (b) administering these Chapter 11 Cases in an efficient and responsible manner that provides finality through a confirmed chapter 11 plan and orderly wind down of the Debtors' Estates.  The Debtors stand ready to achieve both goals.  ***First***, the Debtors seek authority to consummate the Sale Transaction pursuant to the Sale Order, which contemplates the sale of the Debtors' assets to the Purchaser.  The Purchaser will continue to operate the Debtors as a going-concern and will assume certain liabilities and substantially all trade claims as part of the transaction.  Significantly, as part of a settlement with the unsecured creditors' committee, the Purchaser has agreed to assume substantially all of the Debtors' undisputed unsecured claims related to the operation of the Debtors' business, *including* rejection damages claims.  ***Second***, the Debtors seek to confirm the Plan, which will wind down the Debtors' Estates in an orderly

---

[2]    A detailed description of the Debtors and their businesses, and the facts and circumstances surrounding the Debtors' Chapter 11 Cases, are set forth in greater detail in the *Declaration of Declaration of Duane Portwood in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration").

[3]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or the Confirmation Order (as defined herein), as applicable.

fashion through the appointment of the Plan Administrator and the funding of a Wind-Down Budget through consideration provided by the Purchaser contemporaneous with closing of the Sale.

2.      The Plan satisfies all applicable provisions of the Bankruptcy Code, including section 1129, and represents the best available alternative to maximize creditor recoveries. Nevertheless, despite the robust marketing process conducted by the Debtors and their advisors and the value provided for the vast majority of the Debtors' stakeholders through the Sale— including preserving the business as a going-concern and saving thousands of jobs—certain parties object to the Plan and take aim at the process and certain provisions in the Plan. Although these Objections—mostly by holders of contingent, unsecured litigation claims that ultimately may never entitle these holders to any recovery—identify a litany of perceived deficiencies in the Plan, the Objections essentially can be distilled into two core issues: *first*, that the Debtors proposed the Plan in bad faith and, *second*, that substantial unencumbered value exists for these stakeholders in the form of speculative causes of action against the Debtors' employees and vendors (which would be subject to substantial defenses) or causes of action premised on claims that have already been finally adjudicated. This is simply not true. More concerning, their speculative arguments threaten to derail a value-maximizing Sale that provides meaningful recoveries for substantially all of the Debtors' stakeholders.

3.      ***The Debtors negotiated and proposed the Plan in good faith.*** First, the Objections strain to craft a narrative whereby the Debtors, their directors and officers, their advisors, and their term loan lenders effectively all conspired to the sell the company to the term loan lenders for an inflated credit bid and leave all unsecured creditors with nothing. This is false and unsupported by any credible evidence. More specifically, certain Objections—most notably the Objections

filed by the Objecting MDL Plaintiffs[4] and Fresenius Kabi AG ("Fresenius")—are rife with unsubstantiated allegations against the Debtors and other parties regarding, among other things, their "intentional and criminal misconduct" and "intentionally misleading disclosures" with respect to valuable claims and assets. Such assertions are not only wrong, but also irresponsible. The Debtors therefore feel it is important to correct the record at the outset, and respond to some of the more egregious allegations in turn:

- The Objecting MDL Plaintiffs suggest that they were somehow "entitled" to inclusion on the Debtors' list of the thirty largest unsecured creditors and the Debtors' failure to include them was a deliberate attempt to deprive them of due process. They further assert that this precluded their ability to obtain appointment to the Committee (again, presuming that they are entitled to serve on the Committee as matter of right). This is false. First, as is customary, the Debtors identified their *liquidated* unsecured claims, and the Debtors are aware of no case law that compels them to list every contingent, unliquidated, and disputed claim on such a list. Second, the Objecting MDL Plaintiffs did in fact reach out to the U.S. Trustee to seek appointment to the Committee and that request was denied.[5] Finally, as evidenced by their robust participation in this bankruptcy proceeding, the Objecting MDL Plaintiffs have been anything but deprived of due process.

- The Objecting MDL Plaintiffs allege that the Debtors did not appropriately disclose intercompany transfers. [Docket No. 553]. In fact, the Debtors provided a detailed description of their intercompany cash management system in the cash management motion, including the accounting treatment of such transactions. [Docket No. 3]. Such intercompany transactions are ordinary course and were approved by the Bankruptcy Court. [Docket Nos. 84, 177]. No party since has provided any evidence that such transfers are not in the ordinary course or give rise to claims not otherwise subject to defense.

- The Objecting MDL Plaintiffs also suggest that the Debtors knowingly withheld their ownership structure and the value of their interests in certain non-Debtor affiliates. [Docket No. 555]. This is false. The Debtors disclosed these interests at multiple points during the chapter 11 process, including, among others: (a) in the corporate organizational structure attached as Exhibit A to the First Day

---

[4]  "Objecting MDL Plaintiffs" means the 1199SEIU Benefit Funds, the DC47 Fund, and the SBA Fund (as defined in [Docket No. 553], filed under seal).

[5]  The Objecting MDL Plaintiffs also incorrectly imply that Rising Pharmaceutical, a member of the Committee, is the same entity that admitted to illegal price-fixing (and somehow unfit to serve notwithstanding its fiduciary obligations). In fact, the Rising Pharmaceutical that serves on the Committee is the successor to that entity following a bankruptcy and sale process. This reckless inattention to detail is troubling.

Declaration; (b) the description of intercompany transfers in the cash management motion [Docket No. 3]; (c) the motion requesting authorization to sell the Debtors' equity interests in non-Debtor Akorn India Private Limited [Docket No. 269]; (d) the Stalking Horse APA, attached as <u>Exhibit 1</u> to <u>Exhibit B</u> of the bidding procedures motion [Docket No. 18]; (e) the Bankruptcy Court-approved Disclosure Statement [Docket No. 318, Art. III.B.9]; (f) in the amended Schedules filed on July 28, 2020 (nearly a month prior to the Plan Objection Deadline) [Docket No. 390]; and (g) in their initial Rule 2015.3 report [Docket No. 463]. To the extent the Debtors' ownership structure has "remained a mystery" to the Objecting MDL Plaintiffs, it is through no fault of the Debtors.

- The Objecting MDL Plaintiffs baldly assert that holders of Purchaser Assumed Claims are being "tricked into believing they will be paid in full, but will actually receive nothing." [Docket No. 553]. There is no "trickery." The Plan simply reflects the legal reality that once a claim is assumed by the Purchaser, it is no longer a claim against the Debtors' Estates. The Sale Order and the Stalking Horse APA provide for the assumption of certain liabilities (including the Purchaser Assumed Claims), which, upon entry of the Sale Order will be enforceable against the Purchaser by the holders of such claims, as well as the Debtors (to the extent the Purchaser fails to abide by its contractual obligations). *See, e.g.*, Stalking Horse APA § 1.3; Sale Order, ¶ 16.

- The Objecting MDL Plaintiffs allege that the Debtors "knowingly" misrepresented claims due to their failure to accept at face value unliquidated, contingent, and disputed litigation claims. This is not "misrepresentation," but rather a reflection of the legal reality that unliquidated claims are of an inherently uncertain value.

- The Objecting MDL Plaintiffs make broad assertions that the Debtors and their directors and officers have participated in "intentional and criminal misconduct," again without providing any factual basis for such a sweeping statement. [Docket No. 553]. In fact, not one past or ongoing government agency investigation resulted in any charges against the Debtors or their directors and officers for any intentional wrongful or criminal liability whatsoever. And, significantly, no government agency has objected to the Sale or Plan based on any alleged "intentional and criminal misconduct."

- Fresenius alleges the Debtors "remarkably" have failed to disclose the terms of a settlement with the shareholders that opted out of the Shareholder Settlement (the "<u>Opt-Out Shareholders</u>" and such cases, the "<u>Opt-Out Cases</u>"). [Docket No. 566]. Although it is true the Debtors have not disclosed such a settlement, it is because ***no such settlement exists***. Although the Debtors, together with the non-Debtor defendants in the Opt-Out Cases, discussed the contours of a potential settlement in the event a superior bid to the Stalking Horse Bid may be obtained, such a bid never materialized and, therefore, no settlement was ever reached.

- Finally, the Objecting MDL Plaintiffs allege that the Debtors intentionally omitted disclosures regarding employee bonuses. This also is false. Debtor Akorn, Inc. is

a public company and reported such bonuses in multiple SEC disclosures. *See* Akorn, Inc., Annual Report (Form 10-K) (Feb. 26, 2020); Akorn, Inc., Quarterly Report (Form 10-Q) (May 11, 2020).    Moreover, the Debtors' compensation programs generally were discussed at length in the Debtors' first-day wages motion [Docket No. 5], and the foregoing bonuses specifically were disclosed in the Bankruptcy Court-approved Disclosure Statement [Docket No. 318].    More importantly, the bonuses were market-tested and developed with the benefit of compensation experts, and approved by the Debtors' board of directors following a thorough, deliberative process whereby they concluded that these were necessary to ensure the retention and engagement of key management during a difficult and uncertain process.

4.    Simply put, these Objections scream not of inadequate disclosure by the Debtors, but rather of inattention to detail by the Objectors.  Moreover, the insinuation that the ad hoc group of term loan lenders (the "Ad Hoc Group") acted with anything other than good-faith intentions is belied by the clear facts.  Both prior and subsequent to the Petition Date, the Ad Hoc Group vigorously advocated for their interests, as the Debtors did for theirs.  This included hard-fought negotiations and required the Ad Hoc Group to navigate the disparate views of members of a widely-syndicated loan.  Any allegation that the Debtors or the Ad Hoc Group manufactured a default in order to effectuate an elaborate "loan-to-own" transaction is unsupported by facts or common sense.  In fact, the Ad Hoc Group has supported the Debtors' efforts to maximize value and facilitate a transaction to a third-party.  This included:

- Providing a $30 million debtor-in-possession financing facility to fund operations during the post-petition marketing process;

- Assuming in excess of *$115 million* of administrative and unsecured claims through the Sale Transaction and agreeing to provide an additional *$35 million* to fund the wind-down of the Debtors' Estates;

- Negotiating a settlement with the Committee whereby they agreed to assume up to an additional $5 million of undisputed, unsecured liabilities, paving the way to the satisfaction of substantially all undisputed, unsecured claims through the Sale Transaction; and

- Notwithstanding that the bid deadline had already passed, extending the sale and confirmation-related milestones from August 20, 2020, to September 1, 2020, to allow time for the Debtors to pursue the viability of an alternative transaction

proposal that may have provided value in excess of the Stalking Horse Bid, if consummated.

In short, and as the Debtors will demonstrate at the Confirmation Hearing, the Ad Hoc Group has at all times acted (and continues to act) in a manner consistent with its economic and legal entitlements, and in good-faith pursuit of a value-maximizing transaction.

5.      Similarly, the Debtors' directors and officers acted at every turn in an effort to preserve the value of the business and maximize value for their stakeholders.  This included frequent meetings of the Debtors' board of directors throughout this process, including multiple meetings per month and, at times, multiple meetings per week.  In fact, the Debtors' full board of directors met *68* times between November 2018 and August 2020.  At all times the Debtors' directors and officers made informed decisions based on the available facts and circumstances and the advice of their advisors.  Yet, the Objecting MDL Plaintiffs, which notably represent just a small subset of the plaintiffs in the Generics MDL, make sweeping allegations of criminal misconduct that have no factual basis whatsoever.  Moreover, the Debtors are just one of approximately 35 other pharmaceutical company defendants in the Generics MDL,[6] many of whom, unlike the Debtors, have been criminally prosecuted and/or settled and paid criminal fines.

6.      ***No significant unencumbered value exists***.  Second, the Objectors bemoan the release of potentially "valuable" estate causes of action under the Plan and argue that D&O policy proceeds may exist to satisfy these claims.  As discussed further herein, that ignores critical facts.  As an initial matter, these policies cover direct securities claims (which necessarily are not estate causes of action) and certain derivative claims.  With respect to the latter, parties like Fresenius and the Objecting MDL Plaintiffs point to findings of the Delaware Chancery Court in the

---

[6]     "Generics MDL" means that certain litigation captioned *In re Generics Pharmaceuticals Pricing Antitrust Litigation*, No. 16-MD-2724, MDL No. 2724 (E.D. Pa.).

Fresenius litigation as giving rise to potential estate claims. Any such claims, however, were the subject of extensive, prepetition adversarial *derivative* litigation in Louisiana state court and Illinois federal court. The derivative claims asserted in the Louisiana lawsuit were settled following arm'-length negotiations with opposing counsel and ultimately approved by a court of competent jurisdiction. In light of the scope of the claims released through the Louisiana derivative settlement, the similar claims asserted in the Illinois court were dismissed *with* prejudice. As such, the Debtors do not believe further estate claims related to the failed Fresenius merger exist for any parties to pursue. Fresenius, the Objecting MDL Plaintiffs, and ProvePharm are operating under the misconception that if the escrowed D&O proceeds from the class action settlement are released, these proceeds will somehow simply be available as a pool of recovery for the Debtors' stakeholders. This is not so. Because the D&O policies do not provide coverage for the direct claims asserted by Fresenius, the Objecting MDL Plaintiffs, or ProvePharm, there is no guarantee that any claims would exist that would entitle the Debtors' Estates to recovery from those policies. In fact, the only parties who may benefit in that scenario are the D&O insurers, who no longer have to pay out under the policies.

7.    Further, these and any additional claims, including claims related to the bonus payments and ordinary course trade payments, were the subject of an independent investigation by the Committee. As a result of that investigation, the Committee determined that the settlement negotiated with the Ad Hoc Group provided a far greater likelihood of recovery for the majority of the Debtors' unsecured creditors than the pursuit of myriad claims that are subject to defenses and would be costly and time-consuming to pursue (and with no amounts in the wind-down budget to fund the prosecution of such claims).

8.      The Debtors therefore concluded in their business judgment, as did the Committee, that re-litigating claims that had already been finally adjudicated was not in the best interests of their creditor base as a whole, particularly once the Purchaser agreed to assume substantially all undisputed, unsecured claims through the Stalking Horse APA.  Moreover, the Debtors made overtures to certain of the contingent litigation claims about potential settlements that may present a path to a global resolution, but those parties were unwilling or unable to engage on realistic terms.   Having overplayed their hand, they would now have the Debtors further embroil themselves in complex and costly litigation solely for the benefit of contingent litigation claims that are themselves potentially years away from any sort of resolution (and for which resolution ultimately may entitle them to no economy recovery whatsoever).

9.      The preeminent purpose of the Bankruptcy Code is to facilitate the successful rehabilitation of the debtor.[7]  Yet, what the Objectors propose would do anything but.  Instead, if accepted, the Objectors' "solution" would undermine implementation of the Sale—jeopardizing the ability of the Debtors as a going concern—and effectively force the liquidation of the company based on the mere hope that there may be potential value for contingent claimants related to claims that have already been fully adjudicated.  In short, it seems these stakeholders are motivated to see the Debtors fail because it serves their parochial interests.  For example, Fresenius is a direct competitor of the Debtors, and, therefore, it may be in their economic interest for the Debtors' restructuring to fail because it removes another market participant.  And the Objecting MDL Plaintiffs have a vested interest in holding up a sale free and clear of their liabilities because doing so may deter other defendants in the MDL from pursuing a similar strategy.  Moreover, due to

---

[7]     *See In re Exide Techs.*, 607 F.3d 957, 962 (3d Cir. 2010) ("The policy behind Chapter 11 of the Bankruptcy Code is the 'ultimate rehabilitation of the debtor.'").

lagging performance based on, among other things, the prolonged impact of COVID-19 on certain of the Debtors' business segments, the Debtors have serious concerns about the ability to withstand a further marketing process, and the Term Loan Lenders currently fully support proceeding with the current transaction notwithstanding these businesses uncertainties.  Simply put, the Court should not let a few malcontents hold hostage the only value-maximizing transaction on the table based on unsubstantiated and baseless allegations of misconduct.

10.    The Debtors wish that this process produced value for all of their stakeholders—including unliquidated litigation claims and equity interests.  Unfortunately, the market has spoken, and the process did not result in such an outcome.  The Debtors are therefore left with pursuing the only viable path forward to preserve their business, provide the new company and its management team with a fresh start, and maximize value for as many of their stakeholders as they can.  As a result, and for the reasons set forth more fully in this Memorandum and at the hearing on confirmation, the Bankruptcy Court should confirm the Plan and overrule any remaining Objections.

## **Background**

11.    On May 20, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 57].  No party has requested the appointment of a trustee or examiner in these chapter 11 cases.  On June 3, 2020, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 125].

I.      **Company Background.**

12.     Akorn, Inc., together with its Debtor and non-Debtor subsidiaries (collectively, "Akorn") is a specialty pharmaceutical company that develops, manufactures, and markets generic and branded prescription pharmaceuticals, branded and private-label over-the-counter consumer health products, and animal health pharmaceuticals.  Akorn is an industry leader in the development, manufacturing, and marketing of specialized generic pharmaceutical products in alternative dosage forms.  Headquartered in Lake Forest, Illinois, Akorn has approximately 1,916 employees and maintains a global manufacturing presence, with pharmaceutical manufacturing facilities located in Illinois, New Jersey, New York, and Switzerland.  Akorn's operations generated approximately $682 million in revenue and approximately $124 million of Adjusted EBITDA in 2019.  The Debtors commenced these chapter 11 cases to conduct an orderly sale process that will position the Debtors for sustained future success by right-sizing their balance sheet and addressing their litigation overhangs.

II.     **The Debtors' Restructuring Discussions.**

13.     As detailed in the First Day Declaration, the chapter 11 cases are the culmination of an extensive, prepetition process designed to identify a transaction that would refinance the Term Loan Claims and position the Debtors for future operational success.  These efforts included hard-fought negotiations with their Term Loan Lenders and a comprehensive pre-and post-petition marketing process to market the Debtors' assets.

14.     *Standstill Negotiations*.  At all times, the Debtors negotiated in good faith to resolve the disputes with their Term Loan Lenders.  On or around November 27, 2018, the Debtors received a letter from certain of their lenders alleging that they were in default under the Term Loan Credit Agreement.  A subsequent email to that effect was sent to the Debtors on December 11, 2018.  Although the Debtors disputed that they were in default, they understood

10

there was a possibility of protracted litigation over the matter, the ultimate outcome of which could have been yet another adverse judgment against the Debtors.  Instead, the Debtors negotiated and entered into the Standstill Agreement to provide some breathing room to negotiate a comprehensive solution.  Far from "manufacturing a default" or engaging in collusion, these actions demonstrate careful, calculated business decisions that weighed the risks of litigation against the benefits of time and constructive dialogue with their lenders.  This included beginning to engage on the terms of a Standstill Agreement that would provide the necessary breathing room to find a potential resolution.

15.     Further, in response to the November 27 letter, the Debtors engaged PJT Partners ("PJT") to prepare to meaningfully negotiate with their lenders.  A revised Standstill Agreement was sent to PJT on March 11, 2019, and was executed by the parties in May 2019.  In the same month, the Debtors and their advisors prepared a business plan and drafted strategic alternatives for the Debtors on an expedited basis.  In October 2019, PJT requested an extension of the standstill period to June 2020.  At this point, however, the lenders were not willing to submit a proposal that would be acceptable for a comprehensive amendment.  The Debtors provided a proposal in January 2020 that was subject to extensive and detailed negotiation.  Moreover, each of the Standstill Agreements and amendments were publicly disclosed by the Debtors via filings with the Securities Exchange Commission (the "SEC").

16.     At the same time, PJT conducted a refinancing process to either (a) fully refinance the existing Term Loans or (b) pay down the Debtors' existing Term Loans to effectuate a refinancing.    Ultimately, after contacting numerous parties, many of whom executed confidentiality agreements, no parties were willing to refinance the Debtors' capital structure in its entirety despite the Debtors having significantly less net debt in Q3 2019 than today.  Further,

given feedback from the remaining junior capital investors regarding the importance of resolving outstanding litigation as part of consummating a transaction, it became clear these investors would not be able to provide binding junior financing proposals on an out-of-court basis.  As a result, the Debtors pivoted to pursuing an in-court sale of their business, but always retained the optionality to pursue an out-of-court transaction had one presented itself.  Moreover, the Debtors did not make these decisions in a vacuum:  they were made in light of the facts and circumstances at the time and with the benefit of a thorough, deliberative decision-making process.

17.    *Sale Process*.  Leading up to and since the Petition Date, the Debtors and their advisors engaged with interested parties to market test the Stalking Horse Bid to ensure the Debtors obtained the highest or otherwise best offer or combination of offers for their businesses or a portion of their assets.  More specifically, the Debtors and their advisors embarked on a comprehensive, months-long marketing and sale process under Court supervision to maximize value for all stakeholders.  At the conclusion of this process, the Debtors did not receive any actionable, competing bids for their assets.

18.    At the same time, starting in early July, the Debtors and their advisors engaged with a group of new-money investors on the terms of a potential topping bid or alternative transaction for the Debtors' assets.  This group of investors was represented by sophisticated advisors that performed countless hours of diligence, gaining access to a data room and conducting multiple telephone conferences with the Debtors' advisors and management team.  As this alternative transaction began to develop, the Debtors and their advisors engaged with the Ad Hoc Group, which agreed to extend the milestones under the DIP Financing and RSA to allow this investor group to conduct its diligence and obtain the necessary financing commitments and negotiate resolutions with the Debtors' litigation counterparties to facilitate a global resolution of these

Chapter 11 Cases.  The Confirmation Hearing was adjourned from August 20 to September 1 to allow all parties, including the Debtors and the Ad Hoc Group, to work collaboratively toward a value-maximizing transaction.  Unfortunately, and despite the monumental efforts of the parties, this alternative transaction failed to materialize.  As a result, the Debtors and the Ad Hoc Group determined to proceed with the Stalking Horse Bid—the ***only*** actionable transaction available for the Debtors.

19.      In short, despite the extensive marketing efforts undertaken by the Debtors and their advisors described above, including contacting 72 potential bidders, executing approximately 37 non-disclosure agreements, hosting various meetings with the Debtors' advisors, the Debtors' key constituents, and bidders, and responding to extensive due diligence requests through hundreds of emails and telephone conferences, the Debtors did not receive one single qualified bid.  Here, the market has spoken:  the Stalking Horse Bid represents the highest, best, and indeed the ***only*** offer for the Debtors' assets and is the only actionable alternative to a liquidation of the Debtors' business operations.

### III.    The Plan and Solicitation Process.

20.      On May 26, 2020, the Debtors filed their initial Plan and Disclosure Statement.  On July 2, 2020, the Bankruptcy Court entered the Disclosure Statement Order.  Leading up to the entry of the Disclosure Statement Order, the Debtors filed a revised Plan and Disclosure Statement incorporating clarifying edits in response to both informal comments and formal objections by parties in interest regarding, among other things, the treatment of Claims and Interests and the means for implementation of the Plan.  On August 7, 2020, the Debtors filed the Plan Supplement [Docket No. 434] and on August 21, 2020, the Debtors filed the First Amended Plan Supplement [Docket No. 521].  Additionally, after solicitation, the Debtors filed a modified version of the Plan on August 25, 2020 [Docket No. 547], which, as detailed further herein, made technical

clarifications and resolved certain formal and informal comments to the Plan by parties in interest, including changes to incorporate the terms of the Committee Settlement, as discussed herein.

21.     On or about July 10, 2020, the Debtors caused the Notice and Claims Agent to serve the Solicitation Packages and the Confirmation Hearing Notice in accordance with the terms of the Disclosure Statement Order.[8]  The Debtors also caused the Publication Notice (as defined in the Disclosure Statement Order) to be published in *USA Today* (national edition) on July 9, 2020, as evidenced by the *Verification of Publication* [Docket No. 337], *The New York Times* (national edition) on July 9, 2020, as evidenced by the *Proof of Publication* [Docket No. 338], as well as in *U.S. Pharmacist* on August 13, 2020, as evidenced by the *Verification of Publication* [Docket No. 577].  On August 7, 2020, the Debtors caused the notice of filing of the Plan Supplement to be served upon parties in interest and on August 21, 2020, the Debtors caused the notice of filing of the First Amended Plan Supplement to be served upon parties in interest.

22.     Pursuant to the Disclosure Statement Order, the Voting Deadline for all Holders of Claims in classes entitled to vote on the Plan was August 25, 2020, at 12:00 p.m. (prevailing Eastern Time).  In compliance with the Bankruptcy Code, only Holders of Claims and Interests in Impaired Classes receiving or retaining property on account of such Claims or Interests were entitled to vote on the Plan.[9]  Holders of Claims and Interests were not entitled to vote if their rights are Unimpaired.  The following Classes of Claims and Interests were ***not*** entitled to vote on the Plan, and the Debtors did not solicit votes from Holders of such Claims and Interests:[10]

---

[8]     *See Certificate of Service* [Docket No. 363] (the "Affidavit of Solicitation") and the *Supplemental Certificate of Service* [Docket No. 417].

[9]     *See* 11 U.S.C. § 1126.

[10]    The Plan constitutes a separate Plan for each of the Debtors, and any classification of Claims and Interests set forth herein applies separately to each of the Debtors.  For purposes of administrative convenience, the Plan

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

23.    The Debtors solicited votes on the Plan only from Holders of Claims in Impaired Classes receiving or retaining property on account of such Claims.  Contemporaneously herewith, the Debtors filed the voting certification of the Bankruptcy Court-appointed solicitation agent, KCC (the "Voting Report"), which is summarized below in detail:

| Class | Claims and Interests | Number Accepting (%) | Amount Accepting (%) | Number Rejecting (%) | Amount Rejecting (%) | Result |
|-------|---------------------|----------------------|----------------------|----------------------|----------------------|--------|
| Class 3 | Term Loan Claims | 100.0 | 100.0 | 0.0 | 0.0 | Accepted |
| Class 4 | General Unsecured Claims | 28.57 | 97.11 | 71.43 | 2.89 | Rejected |
| Class 7 | Section 510(b) Claims | 0.0 | 0.0 | 100.0 | 100.0 | Rejected |
| Class 8 | Akorn Interests | 80.28 | 52.57 | 19.72 | 47.43 | Rejected |

24.    As set forth above and in the Voting Report, Holders of Claims and Interests in Classes 3, 4, 7, and 8 were entitled to vote to accept or reject the Plan (collectively, the "Voting Classes").

25.    The Plan maximizes the value of the Debtors' Estates on terms supported by major parties in interest in these Chapter 11 Cases.  More specifically, the Plan details, among other things:  (a) the sources of consideration for Plan distributions; (b) the Restructuring Transactions; (c) the vesting of assets in the Plan Administrator; (d) authorization of the Debtors and Plan Administrator, as applicable, to take all actions necessary to effectuate the Plan; (e) the settlement

---

consolidates the process by which distributions will be made under the Plan, but the Plan does not contemplate substantive consolidation.

and discharge of Claims and Interests as set forth in the Plan; and (f) the preservation and vesting

of Causes of Action that were not acquired by the Purchaser in the Debtors and Plan Administrator,

as applicable.

26.     Concurrently herewith, the Debtors have filed proposed findings of fact,

conclusions of law, and order confirming the Plan (the "Confirmation Order").

**IV.    Committee Settlement.**

27.     Consistent with its fiduciary duties and in accordance with its investigation rights

under the DIP Order, the Committee conducted a thorough, independent investigation of the

Debtors, their assets, and affairs.  Specifically, the Committee investigated potential challenges to

the liens held by the Term Loan Lenders, as well as the extent to which the Debtors might have

potential estate claims and causes of action against other parties, including the Debtors' insiders.

This investigation included multiple witness interviews of representatives of the Debtors or their

advisors and the collection and review of a substantial number of documents produced by the

Debtors and the Term Loan Lenders.

28.     As detailed in the Committee's statement in support of the Sale and the Plan

[Docket No. 560], the Committee took seriously its obligations to maximize value for the benefit

of their unsecured constituents.  As a result of these efforts, the Purchaser ultimately agreed to

assume up to an additional $5 million of undisputed, Unsecured Claims under the Stalking Horse

APA.  Together with the Assumed Liabilities previously contemplated by the Stalking Horse APA,

this settlement (the "Committee Settlement") contemplates full recoveries for substantially all of

the Debtors' undisputed trade creditors in excess of $150 million.

29.     Absent the Committee Settlement, the Committee likely would have proceeded

with pursuing potential claims against the Term Loan Lenders, the same parties who have

supported the Debtors' restructuring through the provision of the DIP Financing and the only

parties to provide a meaningful path to exit from bankruptcy through their credit bid.  In short, this may have threatened the Debtors' ability to pursue the Sale and, in the face of worsening business performance and increasingly tight liquidity, could have had a devastating impact on the Debtors' ability to survive such delay and the attendant uncertainties.  Instead, the Committee Settlement reflects a comprehensive resolution that preserves the viability of the Sale Transaction and maximizes recoveries for a substantial majority of the Debtors' unsecured stakeholders.

## V.    Objections to Confirmation.

30.    The Debtors received several formal Objections (the parties thereto, the "Objectors") and informal comments to the Plan.  The Debtors have engaged the various Objectors in good faith to address their respective concerns and have narrowed the scope of open issues in advance of the Confirmation Hearing, as more fully specified in the Objection Summary Chart.[11]  The Debtors will update the Bankruptcy Court regarding the status of all Objections at or prior to the Confirmation Hearing.  To the extent any Objections are not resolved, the Debtors respectfully submit that such unresolved Objections should be overruled for the reasons set forth herein.

31.    The Debtors' responses to Objections to certain factors of section 1129 of the Bankruptcy Code are set forth in the Debtors' case-in-chief in support of confirmation.  Given the central focus of many of the Objections on the prepetition class action settlement (the "Class Settlement") executed on August 9, 2019 (nine months before the chapter 11 filing in the instant proceedings), granted preliminary approval on August 26, 2019 and granted final approval on March 13, 2020, in *In re Akorn, Inc. Data Integrity Securities Litigation*, C.A.

---

[11]    Attached hereto as **Exhibit A** is a chart summarizing the formal and informal objections to the Plan (the "Objection Summary Chart").

No. 18-cv-1713 (N.D. Ill.) (the "<u>Class Action</u>") and the potential D&O insurance proceeds that may be available if the Class Settlement is avoided, the Debtors feel it is important to address those arguments at the outset of this brief, before addressing the typical Confirmation requirements.

<u>**Argument**</u>

32.    This Memorandum is divided into three parts.  <u>Part I</u> responds to certain Objections regarding the Class Settlement.  <u>Part II</u> establishes the Plan's compliance with each of the applicable requirements for Confirmation, including that certain of the discretionary contents of the Plan, such as the Plan's release provisions, are appropriate and should be approved. <u>Part III</u> establishes that the waiver of a stay of the Confirmation Order and the proposed modifications to the Plan are appropriate.  <u>Part IV</u> addresses any remaining unresolved objections to the Plan.

33.    For the reasons stated herein and in light of the evidentiary support to be offered at the Confirmation Hearing, the Debtors respectfully request that the Bankruptcy Court find that the Debtors have satisfied their burden and confirm the Plan.

**I.    The Shareholder Settlements Do Not Violate the Bankruptcy Code.**

**A.    The Shareholder Settlements Do Not Release Claims by the Debtors Against Current and Former Directors and Officers.**

34.    Certain of the Objectors assert that the settlements with shareholders release potential derivative causes of action that arise from the Debtors' and their management's prepetition misconduct.   This is incorrect.  The settlements do not release any causes of action Akorn could have against any current or former directors or officers.

35.    Fresenius' Objection uses the defined term "Shareholder Settlements" to refer to (a) the Class Settlement; and (b) a notional future settlement with certain individual plaintiffs that opted out of and elected not to participate in the Class Settlement, *see Twin Master Fund, Ltd. et*

18

*al. v. Akorn, Inc.*, C.A. No. 19-cv-3648 (N.D. Ill.), *Manikay Master Fund, LP et al. v. Akorn, Inc.*, C.A. No. 19-cv-4651 (N.D. Ill.), *Magnetar Constellation Fund II-PRA LP, et al. v. Akorn, Inc.*, C.A. No. 19-cv-8418 (N.D. Ill.), AQR Funds – AQR Multi-Strategy Alternative Fund, et al. v. Akorn, Inc., et al., C.A. No. 20-cv-0434 (N.D. Ill.) (collectively, the "Opt-Out Litigation").

36.     There is nothing in the Class Settlement that releases claims held by the Debtors against their current and former directors and officers.  The Class Settlement resulted in the dismissal and release of *direct* claims for violations of securities law against Akorn's directors and officers.  The release that was approved and entered by the Court in the Class Settlement covered only "Settled Claims," which were defined, in pertinent part, as claims asserted "by or on behalf of the Lead Plaintiffs and/or any and all Settlement Class Members," *see* Stipulation and Agreement of Settlement ¶ 1.59, Class Action, dkt. 127-1 (Aug. 9, 2019)—*not* claims asserted by or on behalf of Akorn.

37.     Moreover, pursuant to the Class Settlement, the Settled Claims were released only by the "Releasing Persons," who were defined as:

> Lead Plaintiffs, Settlement Class Members and, to the extent acting as such, Lead Plaintiffs' or any Settlement Class Members' current and former directors, officers, shareholders, employees, servants, partners, agents, affiliates, subsidiaries, parents, joint ventures, successors or assigns, and any representatives, trustees, executors, heirs, assigns or transferees, attorneys, accountants, investment bankers, commercial bankers, advisors or insurers of any of the foregoing, jointly and severally, individually and collectively, whether in an individual, class, representative, legal, equitable or any other type or in any other capacity. As used in this paragraph, "affiliates" means entities controlling, controlled by or under common control with any Releasing Person.

*Id*. ¶ 1.55.  Nothing in this language in any way includes Akorn or its affiliates among the Releasing Persons.  Fresenius identifies no provision of the Class Settlement that is to the contrary.

38.     As for the Opt-Out Litigation, there has been and is, at present, no settlement. Moreover, the Opt-Out Litigation is not derivative in nature:  it consists of direct securities and common law fraud claims being pursued by individual Akorn shareholders against Akorn and its current and former directors and officers.  There is no claim asserted on behalf of the Debtors in the Opt-Out Litigation, and there is no basis whatsoever for the speculation that a potential future settlement of the Opt-Out Litigation would release "potential derivative causes of action arising from the Debtors' and their management's prepetition misconduct found by the Chancery Court" (Fresenius Objection ¶ 32).  Because the Opt-Out Litigation involves direct, not derivative claims, a dismissal of that litigation with prejudice would not affect claims by or on behalf of the Debtors. Neither the plaintiffs nor the individual defendants in the Opt-Out Litigation have authority to release claims that might otherwise be asserted by or on behalf of the Debtors, and any settlement purporting to release such claims would be invalid absent the consent of the Debtors and the approval of the Court.

### B.     The Debtors Do Not Have Any Claims Against the Current and Former Directors and Officers in Connection with the Issues Identified by the Chancery Court.

39.     Fresenius argues:

> Significantly, had the Debtors actually pursued a proper investigation, the outcome could very well have generated significant value for general unsecured creditors.  The claims at issue are not "nuisance value" estate claims that are asserted in many chapter 11 cases by "out-of-the- money" constituents.  They are based on a significant record of misconduct found by the Chancery Court and affirmed by the Delaware Supreme Court.  Indeed, if the Debtors' willingness to give settling shareholders at least $30 million in cash, a $30 million General Unsecured Claim, and almost 9 million Akorn shares is any measure, these estate causes of action are quite valuable.

Fresenius Objection ¶ 34.[12]  This, too, is incorrect.

40.    To the contrary, as explained above, potential derivative claims on behalf of the Debtors have been extensively litigated by highly motivated shareholder plaintiffs in a series of derivative suits.  Those claims were definitively resolved in a derivative settlement that was executed in December 2019 and reduced to a final judgment in January 2020.  As a result, the Debtors have no viable causes of action against their current and former directors and officers that relate to the findings of the Delaware Chancery Court.

### 1.    The *Kogut* Litigation

41.    On February 23, 2016, before discussions concerning any merger with Fresenius, Merry A. Kogut ("Kogut"), a purported holder of Akorn common stock, served a demand on Akorn to investigate possible breaches of fiduciary duties related to a financial restatement the Company had announced the previous year.[13]  On March 8, 2016, Plaintiff Kogut filed a Class Action Complaint for Equitable and Injunctive Relief, which she then amended on June 10, 2016, alleging that certain Akorn executive officers and members of its Board breached their fiduciary duties to Akorn's shareholders in connection with the financial restatement.[14]

42.    On May 22, 2018, Kogut served a second demand on the Akorn Board alleging breaches of fiduciary duties related to Akorn's compliance with FDA data-integrity guidelines.[15]  On September 21, 2018, Kogut filed a second amended and restated complaint (the "Second

---

[12]    *See also* Fresenius Objection ¶ 3 ("the Bankruptcy Code requires the Debtors to evaluate the viability of and, if appropriate, pursue [derivative] claims for the benefit of all of their stakeholders.  Given the Chancery Court's factual record on the nature of the misconduct giving rise to these claims, the Debtors' failure to do so is significant."); *id.* ¶ 32 ("The Shareholder Settlements also release potential derivative causes of action arising from the Debtors' and their management's prepetition misconduct found by the Chancery Court.").

[13]    First Kogut Demand (Feb. 23, 2016).

[14]    *See* Amended Complaint, *Kogut v. Akorn, Inc., et al.*, No. 646,174 (La. Dist. Ct. June 10, 2016).

[15]    Second Kogut Demand (May 22, 2018).

Amended *Kogut* Complaint"), alleging, among other things, that "current and former members of Akorn's Board of Directors . . . and executive officers . . . have, *inter alia*, knowingly abdicated their responsibility to make a good faith effort to oversee the Company's . . . compliance with U.S. Food and Drug Administration ('FDA') data integrity requirements" and that they made false or misleading statements in SEC filings concerning the Company's regulatory compliance.[16]

43.    On December 3, 2018, Akorn and the other named defendants moved to dismiss the Second Amended *Kogut* Complaint.[17]  The Louisiana Court appointed a Special Master who, on May 13, 2019, recommended *dismissal* of all claims in the *Kogut* Case except for breach of fiduciary duty claims against Akorn's former Executive Vice President for Global Quality.  This ruling was subsequently adopted by the Louisiana Court on October 7, 2019, with leave to amend.

44.    On July 11, 2019, the plaintiff in the *Kogut* Case filed a proposed third amended petition (the "Third Amended *Kogut* Petition"), alleging that four former officers of Akorn, "intentionally inflicted harm on the Company and intentionally violated criminal law by deliberately taking action to prevent Akorn from complying with U.S. Food and Drug ("FDA") data integrity requirements and actively thwarting and discouraging remediation of Akorn's non-compliance, which was pervasive and well known to the Individual Defendants".[18]  The Third Amended *Kogut* Petition included extensive allegations that quoted from or referenced the findings of the Chancery Court.

---

[16]    Second Amended *Kogut* Complaint at 2.

[17]    Defendants' Motion to Dismiss, *Kogut v. Akorn, Inc., et al.*, No. 646,174 (La. Dist. Ct. Dec. 3, 2018) (Dkt. No. 41-8).

[18]    Third Amended *Kogut* Petition at 2.

### 2.   The *Trsar* and *Glaubach* Litigation

45.   On November 6, 2018, Plaintiff Trsar filed a shareholder derivative complaint in the U.S. District Court for the Northern District of Illinois, alleging that Defendants breached their fiduciary duties by, and were unjustly enriched as a result of, alleged failures to ensure regulatory compliance at Akorn.  *See* Complaint, *Trsar v. John N. Kapoor, et al.*, C.A. 18-cv-7374 (N.D. Ill. Nov. 6, 2018) (the "*Trsar* Action").  The *Trsar* complaint included extensive allegations quoting from or citing to the findings of the Chancery Court.

46.   On January 11, 2019, the Northern District of Illinois consolidated the *Trsar* Action with another shareholder derivative suit filed by Felix Glaubach, designating the *Trsar* complaint as operative.

47.   On January 14, 2019, Defendants moved to dismiss the *Trsar* complaint.  Briefing on the motion to dismiss was completed on February 28, 2019.

### 3.   The *Pulchinski* and *Booth* Actions

48.   On September 26, 2019, Plaintiff Dennis Pulchinski filed a putative derivative complaint for breach of fiduciary duty against current and former directors and officers of Akorn in the Circuit Court of Cook Count, Illinois.  *See Pulchinski v. Abramowitz et al.*, 2019CH11186 (Ill. Cir. Ct.).  The complaint purported to allege derivatively on behalf of Akorn that (i) the defendants breached their fiduciary duties to Akorn and its shareholders by failing to address Akorn's alleged noncompliance with FDA regulations; and (ii) the defendants breached their fiduciary duties to Akorn and its shareholders by selling Akorn stock while in possession of material non-public information.

49.   On November 1, 2019, Plaintiff the Booth Family Trust filed a putative derivative suit against certain current and former directors and officers of Akorn in the Circuit Court of Cook Count, Illinois.  *See The Booth Family Trust v. Kapoor et al.*, 2019CH12793 (Ill. Cir. Ct.).  This

complaint, too, purported to allege derivatively on behalf of Akorn that the defendants breached

their fiduciary duties to Akorn and its shareholders by failing to address Akorn's alleged non-

compliance with FDA regulations.

50.    Both the *Pulchinski* and *Booth* complaints included extensive allegations quoting

from and citing to the findings of the Chancery Court.

### 4.    The *Kogut* Settlement

51.    On December 12, 2019, the parties to the *Kogut* Case executed a derivative

settlement (the "*Kogut* Settlement"), providing that:

> Plaintiff (acting on her own behalf and derivatively on behalf of
> Akorn), Akorn, and each and every . . . Akorn stockholder claiming,
> now or in future, by, through, in the right of derivatively, or on
> behalf of Akorn . . . shall fully, finally, and forever release,
> relinquish, discharge, and dismiss, with prejudice, the Released
> Persons from any and all Released Plaintiff's Claims.[19]

52.    Released Plaintiff's Claims were defined to include:

> any and all actions, suits, [or] claims . . . that have been or that might
> have been asserted by Plaintiff and/or any Akorn stockholder
> against any Released Persons derivatively, or otherwise pursuant to
> the internal affairs doctrine under the law of the State of Louisiana,
> based upon or related to the facts, transactions, events, occurrences,
> acts, disclosures, statements, omissions or failures to act which were
> alleged in the *Kogut* Action or the [d]emands.[20]

53.    Released Persons include each of Akorn's past and present directors, officers,

agents and advisors.[21]  The Louisiana Court granted preliminary approval to the *Kogut* Settlement

on December 16, 2019.

---

[19]    Stipulation of Settlement § 4.1.

[20]    *Id.* at §  1.17.

[21]    *Id.* at §§ 1.12, 1.17.

54.     On December 20, 2019, Akorn filed with the U.S. Securities and Exchange Commission and posted on Akorn's website a Current Report on Form 8-K disseminating notice of the proposed settlement and providing that any objections be filed no later than January 8, 2020.[22]  On December 23, 2019, Akorn caused a copy of the court-approved notice to be published in the *Investor's Business Daily*.

55.     On January 22, 2020, after finding the notice due, adequate and sufficient, and with no objections having been filed, the Louisiana Court entered the *Kogut* Judgment, granting final approval and giving effect to the release.

56.     The *Kogut* Judgment provides that the Louisiana Court "has jurisdiction over the subject matter of [the *Kogut* Case]", and that "the Released Persons may file the Stipulation and/or the Judgment in any action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, full faith and credit, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim".[23]

57.     The Full Faith and Credit Act, 28 U.S.C. § 1738, "directs all courts to treat a state court judgment with the same respect that it would receive in the courts of the rendering state." *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 375 (1996).  Following the entry of the *Kogut* Judgment, each of the *Trsar*, *Pulchinski* and *Booth* Actions was dismissed with prejudice.

58.     Because the *Kogut* Judgment is a valid, final judgment releasing on behalf of Akorn any claims that could be brought derivatively against its current and former directors and officers

---

[22]     Akorn, Inc., Form 8-K § 8.01 (Dec. 20, 2019).

[23]     *Kogut* Judgment ¶ 9.

arising from or relating to the issues identified by the Chancery Court, there are no such claims for Akorn to pursue in connection with this chapter 11 proceeding.

59.     Fresenius fails to identify any other potential derivative claim Akorn might have against its current or former directors and officers, aside from the released claims relating to the Chancery Court findings.

**C.     The D&O Policies Are Not Available for Distribution to Fresenius or Other Creditors.**

60.     Fresenius asserts that "[a] key component of the Shareholder Settlements is the distribution of at least $30 million in D&O insurance proceeds.  If some or all of these insurance proceeds comprise estate property, the residual value belongs to the general unsecured creditors . . ."  (Fresenius Objection ¶ 32.)  This, too, is incorrect.

61.     Akorn's D&O insurance policies are not a cash (or cash-like) asset that can be accessed and distributed at Akorn's discretion.  Proceeds from the D&O policies are available only to Akorn only to pay certain "Company Loss[es]" resulting (a) "from a Claim first made against the Insured Persons during the Policy Period or, if applicable, the Optional Extension Period, for a Wrongful Act" or (b) "resulting solely from any Securities Claim first made against the Company during the Policy Period or, if applicable, the Optional Extension Period, for a Company Wrongful Act."[24]

62.     Under the policies, "'Loss' means damages, judgments, settlements or other amounts (including punitive, exemplary or multiplied damages, where insurable by law) and Defense Expenses in excess of the Retention that the Insured is legally obligated to pay."[25]

---

[24]   *See* XL Specialty Insurance Company Policy No. US00075683DO17A, Insuring Agreements I.(B) and I.(C).

[25]   *See* XL Specialty Insurance Company Policy No. US00075683DO17A, Amend Definition of Loss Endorsement.

"'Defense Expenses' means reasonable legal fees and expenses incurred in the defense of any Claim."[26]

63.     To the extent relevant here, "Insured Person[s]" are defined as "any past, present or future director or officer, or member of the Board" of Akorn,[27] whereas "Company" refers to Akorn.

64.     In the case of "Insured Person[s]", "Wrongful Act" refers to any "any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty" while acting in their capacity as an officer or director.[28]  On the other hand, a "'Company Wrongful Act' means any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the Company in connection with a Securities Claim."[29]

65.     The D&O proceeds were available to fund the Class Settlement because Akorn had experienced a "Loss" (a settlement) as a result of a "Company Wrongful Act" (in this case alleged misstatements and omissions in securities filings).

66.     In the event that the Class Settlement were somehow voided—as the Objectors appear to advocate—there would be no "Loss" in the form of a settlement to trigger coverage.  The proceeds of the policies would revert back to the carriers, and Akorn would have no ability to access them absent some other recognized Loss under the policies.

67.     While a recognized Loss under the policy might arise as a result of claims for "Wrongful Acts" by any of the "Insured Persons", as set forth above, any derivative claims that

---

[26]     *Id*. Definitions II.(F).

[27]     *Id*. Definitions II.(J).

[28]     *Id*. Definitions II.(S).

[29]     *Id*. Definitions II.(E).

the Debtors might have against the Insured Persons arising from or relating to the findings of the Chancery Court have been validly released.  The claims by Fresenius and the unsecured creditors do not constitute such covered Losses, and Fresenius does not identify any other covered Loss that would enable Akorn to access the proceeds of the D&O policies.

68.    Contrary to the Objectors' assertions, the D&O insurance proceeds do not "belong[] to the general unsecured creditors".  Indeed, they are not available at all absent a covered "Loss".

## II.    The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code.

69.    To confirm the Plan, the Bankruptcy Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[30]  As set forth herein, the Plan fully complies with all relevant sections of the Bankruptcy Code— including sections 1122, 1123, 1125, 1126, and 1129—as well as the Bankruptcy Rules and applicable non-bankruptcy law.

### A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).

70.    Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan of reorganization, respectively.[31]  As explained below, the Plan complies with the

---

[30]    *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120, n.15 (D. Del. 2006); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 616 n.23 (Bankr. D. Del. 2001).

[31]    S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368 (1977); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008).

requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code, as well as other applicable provisions.

### 1. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

71.    The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

72.    For a classification structure to satisfy section 1122 of the Bankruptcy Code, not all substantially similar claims or interests need to be grouped in the same class.[32]  Instead, claims or interests designated to a particular class must be substantially similar to each other.[33]  Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[34]

---

[32]    *Armstrong World Indus., Inc.*, 348 B.R. at 159.

[33]    *Id.*

[34]    Courts have identified grounds justifying separate classification, including:  (a) where members of a class possess different legal rights, and (b) where there are good business reasons for separate classification.  *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (holding that, as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *see also Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had a rational basis on account of the bankruptcy court-approved settlement); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) (explaining that "the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (holding that, although discretion is not unlimited, "the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case") (internal quotations omitted); *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims.  It does not require that similar classes be grouped together . . . .").

73.    The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into ten separate Classes, with Claims and Interests in each Class differing from the Claims and Interests in each other Class in a legal or factual way or based on other relevant criteria.[35]  Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

    a.     <u>Class 1</u>:  Other Priority Claims;

    b.     <u>Class 2</u>:  Other Secured Claims;

    c.     <u>Class 3</u>:  Term Loan Claims;

    d.     <u>Class 4</u>:  General Unsecured Claims;

    e.     <u>Class 5</u>:  Intercompany Claims;

    f.     <u>Class 6</u>:  Intercompany Interests;

    g.     <u>Class 7</u>:  Section 510(b) Claims; and

    h.     <u>Class 8</u>:  Akorn Interests.

74.    Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class.  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.  Namely, the Plan separately classifies the Claims because each Holder of such Claims or Interests may hold (or may have held) rights in the estates legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience resulted from such classification.

---

35    *See* Plan Art. III.

75.   For example, the classification scheme distinguishes between Holders of Term Loan Claims (Class 3) from Holders of DIP Claims (unclassified), because of the different circumstances of each Class.  Other Priority Claims (Class 1) are classified separately due to their required treatment under the Bankruptcy Code.  In addition, the Plan classifies Akorn Interests (Class 8) separately from Interests that a Debtor holds in another Debtor because the Debtors' corporate structure is dependent upon maintaining the Intercompany Interests and, therefore, the Intercompany Interests, to the extent not acquired as part of the Sale Transaction, may be preserved under the Plan for the administrative convenience of ensuring the preservation of the Debtors' corporate structure after the Effective Date in order to facilitate an efficient wind-down of those entities in accordance with applicable law.  Accordingly, the Claims or Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class and the distinctions among Classes are based on valid business, factual, and legal distinctions.

76.   Certain of the Objections accuse the Debtors of impermissible gerrymandering to "manufacture" class acceptance and exclude Purchaser Assumed Claims while paying them nothing.  As a preliminary matter, most of these Objections are predicated on the inclusion in Class 4 of claims related to the contingent value rights (the "CVR Claims") provided to plaintiffs who opted into the Class Settlement, with the apparent purpose of manufacturing class acceptance. As noted above, Class 4 did not vote in favor so, if that was the Debtors' plan (and it was not), they did not succeed.  More importantly, the Plan as modified clarifies that any CVR Claims are Section 510(b) Claims, effectively mooting Objections on this basis.[36]

---

36   *See* Plan Art. I.A.113.

77.    In addition, the assertion that the Debtors intentionally excluded the Purchaser Assumed Claims in order to deprive them of a recovery is unsupported by any evidence and ignores the plain language of the Plan and the economic reality of the overall Sale Transaction.[37]  The Plan was drafted to accommodate a dual-track sale process.  As such, the Plan mechanics around class treatment were intended to provide flexibility in the event that a higher and better bid was obtained through the sale process, and to ensure that all Claims were appropriately treated, whether through the Sale Transaction or otherwise.  The Plan therefore provides that Claims that are contractually assumed by the Purchaser are no longer Claims against the estate and, as such, are not treated under the Plan.[38]  Otherwise, such creditors could seek a double recovery to the detriment of the General Unsecured Claims not assumed through the Sale Transaction.  Instead, Purchaser Assumed Claims survive as claims against the Purchaser.[39]  Any unsecured, non-subordinated Claims that are not Assumed Liabilities under the Stalking Horse APA are treated as General Unsecured Claims under the Plan and receive a recovery (if any) consistent with the Plan.

78.    Moreover, none of the Objectors cites any precedent for the proposition that the Purchaser cannot assume certain liabilities and leave others behind.  To the contrary, this is ***exactly***

---

[37]    Purchaser Assumed Claims, as defined in the Plan, includes "Claims against the Debtors that were Assumed Liabilities under the Sale Transaction Documentation; *provided that* Purchaser Assumed Claims shall not include any claims resulting from the rejection of an Executory Contract or Unexpired Lease except as otherwise agreed to by the Purchaser."  Plan, Art.I.A.98.

[38]    *See, e.g.*, 11 U.S.C. 365(k) (stating that assignment "relieves the trustee and the estate from any liability for any breach" occurring after assignment); *In re Washington Capital Aviation & Leasing*, 156 B.R. 167, 175 n.3 (Bankr. E.D. Va. 1993) ("A party subject to a contractually created obligation ordinarily cannot divest itself of liability by substituting another in its place without the consent of the party owed the duty. While the assignee may be entitled to perform for the original obligor, the original obligor remains ultimately liable until discharged by performance or otherwise. Section 365(k) changes this common law rule and relieves the estate from all liability under the [executory contract] following assignment.").

[39]    *See, e.g.*, *In re Safety-Kleen Corp.*, 380 B.R. 716, 740 (Bankr. D. Del. 2008) (finding that assumed liabilities under a sale order were not subject to injunction as against the purchaser).

what the Stalking Horse Purchaser is permitted to do through a section 363 sale.  As Judge Walsh explained nearly two decades ago:

> Many § 363(b) sale transactions have the effect of causing disparate treatment of similarly situated creditors . . . The treatment of creditors in a § 363(b) context is dictated by the fair market value of those assets of the debtor that the purchaser in its business judgment elects to purchase. A purchaser cannot be told to assume liabilities that do not benefit its purchase objective. Thus, the disparate treatment of creditors occurs as a consequence of the sale transaction itself and is not an attempt by the debtor to circumvent the distribution scheme of the Code . . . There is nothing in the statute that requires a § 363(b) sale to provide a pro rata distribution to all unsecured creditors or even any distribution to all unsecured creditors.[40]

79.    Moreover, the Objecting MDL Plaintiffs misunderstand the purpose behind assigning a valuation (for voting purposes) of $1.00 to contingent, unliquidated claims.[41]  Rather than some nefarious plot to "neuter" the voting power of the Objecting MDL Plaintiffs, such a valuation prevents a creditor with a contingent, unliquidated claim (such as the Objecting MDL Plaintiffs and other litigation claimants) from artificially inflating the value of its claim (if any) in an attempt to *itself* manipulate the voting results of any particular class.[42]  To be clear, it is not evident that the Objecting MDL Plaintiffs are "likely the largest creditor group in these bankruptcy

---

[40]    *In Re Trans World Airlines, Inc.*, No. 01-00056 (PJW), 2001 WL 1820326, at *11 (Bankr. D. Del. Apr. 2, 2001).

[41]    *See* Disclosure Statement Order, Schedule 2 § E.3.

[42]    *See, e.g.*, *Matter of Johns-Manville Corp.*, 68 B.R. 618, 631 (Bankr. S.D.N.Y. 1986) (finding that voting procedures that assigned a value of $1.00 to contingent, unliquidated claims promoted "the desideratum of expanded sufferage and participation in the reorganization by all parties in interest"); *Pension Ben. Guar. Corp. v. Enron Corp.*, No. 04 CIV. 5499 (HB), 2004 WL 2434928, at *6 (S.D.N.Y. Nov. 1, 2004) (holding voting procedures that limited the value contingent, unliquidated claims to prevent such creditors from "improperly controll[ing] the vote and confirmation of the reorganization plan to the detriment of other creditors" was reasonable).

cases," or that any of the Objectors holding contingent, unliquidated, and disputed litigation claims, are creditors *at all*.[43]

80.    In short, the Plan was not intentionally manufactured to secure the accepting votes of unsecured creditors, and that is belied by the plain language of the Plan itself:  Purchaser Assumed Claims are excluded from General Unsecured Claims and, thus, their votes are not counted with respect to whether General Unsecured Claims have voted in favor of the Plan.[44]

81.    The Debtors therefore submit that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code and any Objections to the contrary should be overruled.

**2.    The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.**

82.    Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy.  The Plan satisfies each of these requirements as set forth below.

*(a)    Designation of Classes of Claims and Equity Interests (§ 1123(a)(1)).*

83.    For the reasons set forth above, Article III of the Plan properly designates Classes of Claims and Interests and thus satisfies the requirement of section 1122 of the Bankruptcy Code.

*(b)    Specification of Unimpaired Classes (§ 1123(a)(2)).*

84.    Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan."  The Plan meets this requirement by identifying each Class in Article III that is Unimpaired.[45]

---

[43]    As another example, ProvePharm, in its Objection, asserts that it holds a $136 million unsecured claim, which is not true.  As of today, no judgment has been entered fixing the amount of ProvePharm's claim, if any, and the Debtors' dispute any liability in connection therewith.

[44]    *See* Plan, Arts. I.A.65, III.B.4.

[45]    *See* Plan, Art. III.A–B.

*(c)    Treatment of Impaired Classes (§ 1123(a)(3)).*

85.    Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan." The Plan meets this requirement by setting forth the treatment of each Class in Article III that is Impaired.

*(d)    Equal Treatment within Classes (§ 1123(a)(4)).*

86.    Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[46] The Plan meets this requirement because Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class.

87.    Certain Objectors have asserted that holders of Class 4 General Unsecured Claims do not receive equal treatment under the plan.[47] Such parties assert that because certain General Unsecured Claims are assumed by the Purchaser while others are not, holders of Class 4 General Unsecured Claims do not receive equal treatment as required by section 1123(a)(4) of the Bankruptcy Code. General Unsecured Claims, as defined in the Plan, however, expressly excludes Purchaser Assumed Claims.[48] As a result, Purchaser Assumed Claims are not treated under the Plan because they are assumed by the Purchaser under the Sale Transaction Documentation. And,

---

[46]    11 U.S.C. § 1123(a)(4).

[47]    *See IRP Claimants' Objection to Confirmation of Joint Chapter 11 Plan of Akorn, Inc. and Its Debtor Affiliates* (the "IRP Plan Objection"), ¶ 23 [Docket No. 520].

[48]    Plan, Art.I.A.65 ("'*General Unsecured Claim*' means any unsecured Claim against any of the Debtors that is not . . . a Purchaser Assumed Claim.").

as set forth above, a purchaser is allowed to select which assets and liabilities it will assume and which it will leave behind.[49]  Such a result does not result in disparate treatment.

88.     Other Objectors attempt to argue that shareholders that opted into the Class Settlement (the "Opt-In Shareholders") will receive a greater recovery under the Plan than other creditors in Class 7 because *prior* to the Petition Date, insurance proceeds were distributed into escrow for their benefit pursuant to the court-approved Class Settlement.  First, to the extent such proceeds are released from escrow to those shareholders, it is not from property of the Estates and therefore is not a distribution of property *under the Plan*.[50]  Second, the Objectors suggest that by retaining the right to those proceeds, these settling shareholders are "retaining an avoidable preference" under the Plan.  Even assuming a viable preference claim existed (and the Objectors have provided no legal or factual basis for so-asserting), the Opt-In Shareholders are not *receiving the right to pursue* any such preference claim under the Plan.  Furthermore, even if such a preference claim existed for the Estates, it is unlikely to provide meaningful value for the Debtors' estates due to the D&O policy limitations and other considerations discussed above.  Accordingly, there is no disparate treatment under the Plan and the Plan satisfies the equal treatment standard of section 1123(a)(4) of the Bankruptcy Code.

> (e)     *Means for Implementation (§ 1123(a)(5)).*

89.     Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[51]  The Plan satisfies this requirement because Article IV

---

[49]     *See Trans World Airlines*, 2001 WL 1820326, at *11 (Bankr. D. Del. 2001).

[50]     *See, e.g.*, *Matter of TTS, Inc.*, 158 B.R. 583, 587 (D. Del. 1993) (holding that the escrow account was not property of the debtor's estate and noting that section 541 can provide the debtor's estate no greater interest in property after filing for bankruptcy than the debtor had prior to filing") (citing *Universal Bonding v. Gittens & Sprinkle Enterprises, Inc.*, 960 F.2d 366, 372 (3d Cir.1992)); *In re Atl. Gulf Communities Corp.*, 369 B.R. 156, 163–64 (Bankr. D. Del. 2007) (holding that escrow account was not property of debtor's Chapter 7 estate).

[51]     11 U.S.C. § 1123(a)(5).

of the Plan, as well as other provisions thereof, provide for the means by which the Plan will be

implemented.  Among other things, Article IV of the Plan provides for:

    a.  the good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan and the entry of the Confirmation Order;

    b.  the sources of consideration for Plan distributions, including, among other things, Cash on hand, borrowings under the DIP Facility, the Distributable Proceeds, if any, the Wind-Down Amount, the Debtors' rights under the Sale Transaction Documentation, payments made directly by the Purchaser on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of Cure Costs made by the Purchaser pursuant to sections 365 or 1123 of the Bankruptcy Code;

    c.  the dissolution of the existing boards of directors or managers, as applicable, and the dismissal of any remaining officers, directors, managers, or managing members of any Debtor;

    d.  the appointment of the Plan Administrator to act for the Debtors and to implement the Plan and to make distributions thereunder and to take any action necessary to wind down and dissolve the Debtors' Estates pursuant to the terms of the Plan;

    e.  the establishment of the Wind-Down Amount in accordance with the terms of the Sale Transaction Documentation;

    f.  the authorization and approval in all respects of all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, including the Restructuring Transactions;

90.    The Debtors submit that the Plan satisfies section 1123(a)(5) of the Bankruptcy

Code and the Debtors should be authorized to implement all transactions and pay all related

necessary payments contemplated by the Plan and Plan Supplement.

*(f)    Issuance of Non-Voting Securities (§ 1123(a)(6)).*

91.    Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate

constituent documents prohibit the issuance of nonvoting equity securities.[52]   Following the

---

[52]   11 U.S.C. § 1123(a)(6).

transfer of all of the Debtors' assets pursuant to the Sale Order, the Plan contemplates the orderly wind-down of the Debtors' operations and affairs, and does not provide for the issuance of equity or other securities of the Debtors.  Accordingly, the requirements of section 1123(a)(6) of the Bankruptcy Code are inapplicable to the Plan.

(g)    <i>Directors and Officers (§ 1123(a)(7)).</i>

92.    Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy." In accordance with Article IV.M of the Plan, as of the Effective Date, the existing boards of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required.  Article IV.F of the Plan further provides that as of the Effective Date, a Plan Administrator shall be appointed who shall act as the sole officer, director, and manager, as applicable, of the Debtors and in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions of the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

### 3.    The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.

93.    Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may:  (a) impair or leave unimpaired any class of claims or

38

interests; (b) modify or leave unaffected the rights of holders of secured or unsecured claims; (c) provide for the settlement or adjustment of claims against or interests in a debtor or its estate or the retention and enforcement by a debtor, trustee, or other representative of claims or interests; (d) provide for the assumption or rejection of executory contracts and unexpired leases; (e) provide for the sale of all or substantially all of the property of the Debtors' estates, and the distribution of the proceeds of such sale among holders of claims or interests; or (f) "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[53]

94.    The Plan is consistent with section 1123(b) of the Bankruptcy Code.  Specifically, under Article III of the Plan, Classes 1, 2, and 6 are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims and Interests within such Classes.[54]  On the other hand, Classes 3, 4, 7, and 8 are Impaired because the Plan modifies the rights of the Holders of Claims and Interests within such Classes as contemplated by section 1123(b)(1) of the Bankruptcy Code.[55]  Class 5 may be impaired or unimpaired under the Plan at the option of the Debtors.  In addition, Article V of the Plan provides for the rejection of all Executory Contracts and Unexpired Leases under sections 365(a) and 1123(b)(2) of the Bankruptcy Code.[56]

95.    Each of these provisions are appropriate because, among other things, they (a) are the product of arm's-length negotiations, (b) have been critical to obtaining the support of the various constituencies for the Plan, (c) are given for valuable consideration, (d) are fair and

---

[53]    *See* 11 U.S.C. § 1123(b)(1)–(6).

[54]    *See* Plan Art. III.

[55]    *See id.*

[56]    *See* Plan Art. V.

equitable and in the best interests of the Debtors, their estates, and these Chapter 11 Cases, and (e) are consistent with the relevant provisions of the Bankruptcy Code and Third Circuit law.  Such provisions are discussed in turn below, but, in summary, satisfy the requirements of section 1123(b).

96.     The Plan also contains provisions implementing certain releases and exculpations, compromising claims and interests, and permanently enjoining certain causes of action.  These discretionary provisions are proper because, among other things, they are the product of extensive good-faith, arm's-length negotiations, are supported by the Debtors and their key constituents, and are consistent with applicable precedent.

> (a)     *The Debtor Release Is Appropriate Under Section 1123(b) of the Bankruptcy Code.*

97.     Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[57]  Further, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[58]  Article VIII.E. of the Plan provides for releases by the Debtors and their Estates, the Plan Administrator, and the Acquired Entities, as of the Effective Date, of, among other things, certain Claims, rights, and causes of action that the Debtors and their Estates,

---

[57]   *See In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004) (holding that standards for approval of settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019).  Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness."  *In re Exaeris, Inc.*, 380 B.R. 741, 746–47 (Bankr. D. Del. 2008) (citation omitted); *see also Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (examining whether settlement "fall[s] below the lowest point in the range of reasonableness") (alteration in original) (citation omitted); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be within reasonable range of litigation possibilities).

[58]   *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.") (internal citations omitted).

the Plan Administrator, and the Acquired Entities may have against the Released Parties (the "Debtor Release").[59]

98.      Courts in this jurisdiction generally analyze five factors when determining the propriety of a debtor release, commonly known as the *Zenith* or *Master Mortgage* factors.[60] The analysis includes an inquiry into whether there is:  (a) identity of interest between the debtor and non-debtor; (b) substantial contribution to the plan by the non-debtor; (c) the necessity of the release to the reorganization; (d) overwhelming acceptance of the plan and release by creditors and interest holders; and (e) payment of all or substantially all of the claims of the creditors and interest holders.[61]  These factors are "neither exclusive nor conjunctive requirements" but rather serve as guidance to courts in determining fairness of a debtor's releases.[62]  The Debtor Release meets the applicable standard because it is fair, reasonable, and in the best interests of the Debtors' estates. As an analysis of the *Zenith* factors demonstrates, the Debtor Release embodied in Article VIII.E of the Plan should be approved.

- ***First***, an identity of interest exists between the Debtors and the parties to be released.  Each of the Released Parties, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed and would have been unlikely to participate in the negotiations and compromises that led to the ultimate formation of the

---

[59]    "Released Parties" means, collectively, and in each case, in their respective capacities as such: (a) the Debtors; (b) the Consenting Term Loan Lenders; (c) the Term Loan Agent; (d) the DIP Lenders; (e) the DIP Agent; (f) all Releasing Parties; (g) the Acquired Entities; and (h) with respect to each Entity in clause (a) through (g), each such Entity's current and former subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (unless any such Entity or related party has opted out of being a Releasing Party, in which case such Entity or related party, as applicable, shall not be a Released Party).  *See* Plan Art. I.A.102.

[60]    *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999)); *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994).

[61]    *See In re Washington Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (citing *In re Zenith Elecs. Corp.*, 241 B.R. at 110 and *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. at 937)

[62]    *Id*. (citing *In re Master Mortg.*, 168 B.R. at 935).

Plan and Purchase Agreement without the Debtor Releases.  Like the Debtors, these parties seek to confirm the Plan and implement the Sale Transaction.[63]

- ***Second***, the substantial contributions are clear.  The Released Parties played an integral role in the formation of the Plan and have expended significant time and resources analyzing and negotiating the issues present in these Chapter 11 Cases to reach a value-maximizing transaction and avoid a liquidation.  As Delaware bankruptcy courts have recognized, a wide variety of acts may illustrate a substantial contribution to a debtor's reorganization.[64]  Moreover, the Released Parties have expended time and resources analyzing and negotiating the issues presented by the Debtors' capital structure and the material barriers to the resolution thereof.  Here, the value contributed by the Released Parties is certainly substantial.  The Debtors' directors, officers, and employees acted at every turn in an effort to preserve the value of the business and maximize value for their stakeholders, including: (i) attending frequent meetings of the Debtors' board of directors, for a total of 68 meetings of the full board of directors throughout this nearly two-year process, (ii) participating in diligence meetings with prospective purchasers, and (iii) expending countless hours preparing materials and responding to diligence requests, additional reporting, and other tasks relating to the bankruptcy and sale process, all in addition to managing their day-to-day responsibilities to the Company.  The Term Loan Lenders, in addition to providing significant non-monetary value, provided a $30 million DIP Facility to fund the chapter 11 cases and sale process, participated in the transaction in order to ensure the success of the Plan, and provided meaningful value for unsecured and other stakeholders through the Committee Settlement—representing up to an additional $5 million of value not initially included in the sale consideration.  Without these contributions, the Plan and the transaction contemplated therein would not be possible.

- ***Third***, the Debtor Release is essential to the Debtors' restructuring because it constitutes an integral term of the Plan.  Indeed, absent the Debtor Release, it is highly unlikely the Released Parties would have agreed to support the Plan and the Restructuring Transactions contemplated therein.  As described above, each of the Released Parties contributed substantial value to these Chapter 11 Cases, and did so with the understanding that they would receive releases from the Debtors.  In the absence of these parties' support, the Debtors would not be in a position to confirm the Plan and conclude the Debtors' Chapter 11 Cases.  The Debtor Release, therefore, was a critical component to ensuring that the Debtors maximized the value of their assets.

- ***Fourth***, although the Plan was only accepted by creditors in Class 3, 100 percent of such creditors voted to accept in both amount and number.  With respect to the non-accepting

---

[63]  *See In re Abeinsa Holding, Inc.*, 562 B.R. 265, 284 (Bankr. D. Del. 2016) (finding that "there is an identity of interest between the Debtors and the released parties arising out the shared common goal of confirming and implementing the Plan."); *see also Zenith*, 241 B.R. at 110 (concluding that certain releasees who "were instrumental in formulating the Plan" shared an identity of interest with the debtor "in seeing that the Plan succeed and the company reorganize").

[64]  *See Id.* at 304 (finding that the non-debtor party had substantially contributed by performing services for the debtors post-petition without receiving compensation); *In re Wash. Mut., Inc.*, 442 B.R. at 347 (finding substantial contribution required the contribution of "cash or anything else of a tangible value to the [plan of reorganization] or to creditors"); *In re Zenith Elecs. Corp.*, 241 B.R. at 111 (finding that prepetition contribution of work in negotiating a plan constituted adequate consideration for debtor's release).

Classes, they are not receiving any recovery under the Plan and therefore this factor should not be dispositive of the appropriateness of the Debtor Release (particularly in light of the discussion herein regarding the absence of meaningful causes of action being released under the Plan).

- *Fifth*, the Plan provides for meaningful recoveries under the circumstances for all creditors potentially giving up colorable claims under the releases as demonstrated by the transaction and marketing process. Further, as discussed below, and contrary to the assertions of certain Objectors, the Debtors do not believe valuable causes of action will be released pursuant to the Debtor Release.

99. Although the Debtors did not conduct a separate review of certain potential claims and causes of action held by the Debtors' estates related to alleged prepetition misconduct, such claims have been subject to extensive investigations related to adversarial derivative litigation, as discussed at length above. The Debtors also were subject to an investigation by the SEC with respect to such prepetition derivative litigation. The SEC informed Akorn that it concluded the investigation as to Akorn and does not intend to recommend an enforcement action against Akorn.

100. In negotiating the Committee Settlement, the Committee also conducted its own investigation with respect to certain potential claims and causes of action that may be asserted on behalf of the Debtors' estates. Ultimately, the Committee concluded that the likelihood of success on the merits of any potential claims were greatly outweighed by the risk, delay, and expense of pursuing such claims. *First*, pursuing such claims did not provide a viable option for maximizing value for the unsecured creditors as a whole because pursuing such claims likely would have required pursuing claims against the very same parties who are providing the *only* path to exit from these chapter 11 cases—the Term Loan Lenders—even after an extensive marketing and Plan process. *Second*, absent resolution on these issues, the Debtors may have faced far grimmer prospects, including a potential liquidation, instead of the value-maximizing transaction that is before the Bankruptcy Court, which preserves thousands of jobs and business relationships.

101.    Certain Objections also attack the release of any claims related to executive compensation payments made in 2019 and 2020.  Contrary to the assertions of certain Objectors, there is no merit to any claims relating to these executive compensation payments.  *First*, the 2019 bonuses were paid pursuant to company performance metrics that were set based on comparable market data.  The Company achieved these performance metrics in 2019.  As a result, the bonus payments were fully earned and consistent with the market.

102.    *Second*, the 2020 executive payments simply provided management with the compensation they expected to receive in 2020.  As such, these payments were provided in lieu of any further compensation in 2020 and subject to clawback under certain conditions.  To that end, the 2020 executive compensation payments were designed to retain the Debtors' management team—a result they achieved—and avoid the harm that would befall the Debtors if any of these employees left prior to or during the bankruptcy proceeding.  Most importantly, the Debtors relied on Willis Towers Watson, their independent compensation consult, to assist in the structure and terms of this compensation program.  Based on the advice Willis Towers Watson provided, the bonus payments in the aggregate were within the 50th percentile of other comparable companies. In short, litigating any claims based on the 2019 and 2020 executive compensation payments would be costly, time-consuming, and unlikely to realize any recoveries because the Debtors received reasonably equivalent value based on past and future performance and ensured the Debtors would have a team in place to shepherd the Company through the a challenging bankruptcy process and economic environment.

103.    For the reasons set forth above, the *Zenith* factors supports approval of the Debtor Release.  Moreover, the breadth of the Debtor Release is consistent with those regularly approved

in this jurisdiction and others.[65]  The Debtors have satisfied the business judgment standard in granting the Debtor Release under the Plan.  The Debtor Release meet the applicable standard because it is fair, reasonable, and in the best interests of the Debtors' Estates.  Thus, the Bankruptcy Court should approve the Debtor Release in the Plan.

      (b)      *The Third-Party Release is Wholly Consensual and Is Appropriate Under Section 1123(b) of the Bankruptcy Code.*

104.    Article VIII.F of the Plan provides that each Releasing Party shall release any and all Causes of Action such parties could assert against the Debtors and other Released Parties (the "Third-Party Release," and together with the Debtor Release, the "Releases").  The Releasing Parties include, among others, the Debtors and their Estates, the Plan Administrator, the Acquired Entities, and all Holders of Claims or Interests that vote to accept the Plan.[66]  The Third-Party Release is consensual, consistent with established Third Circuit law, and integral to the Plan and therefore should be approved.

105.    Numerous courts have recognized that a chapter 11 plan may include a release of non-debtors by other non-debtors when such release is consensual.[67]  Consensual releases are permissible on the basis of general principles of contract law.[68]  The law is clear that a release is

---

[65]  *See, e.g.*, *In re One Aviation Corp.*, No. 18-12309 (CSS) (Bankr. D. Del. Sep. 18, 2019) (approving Plan providing for definition of Released Parties including, among others, the Debtors' directors and officers); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019) (same); *In re Checkout Holding Corp.*, No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019) (same); *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) (same); *In re Samson Resources Corp.*, No. 14-11934 (CSS) (Bankr. D.Del. Feb. 13, 2017) (same); *In re Horsehead Holding Corp.*, No. 16-10287 (CSS) (Bankr. D. Del. Sep. 9, 2016) (same).

[66]  "*Releasing Parties*" means, collectively, and in each case, in their respective capacities as such:  (a) the Debtors; (b) the Consenting Term Loan Lenders; (c) the Term Loan Agent; (d) the DIP Lenders; (e) the DIP Agent; (f) the Acquired Entities; (g) all Holders of Claims or Interests that are presumed to accept the Plan *and* who opt into the releases in the Plan; (h) all Holders of Claims or Interests who vote to accept the Plan; (i) all Holders of Claims or Interests that (x) abstain from voting on the Plan *and* who opt into the releases in the Plan, (y) vote to reject the Plan *and* who opt into the releases in the Plan, or (z) are deemed to reject the Plan who opt into the releases in the Plan; (j) with respect to each Entity in clause (a) through (i), each such Entity's current and former subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.  *See* Plan Art. I.A.103.

[67]  *See, e.g.*, *Indianapolis Downs*, 486 B.R. at 305 (collecting cases); *Spansion*, 426 B.R. at 144 (stating that "a third party release may be included in a plan if the release is consensual").

[68]  *In re Coram Healthcare Corp.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004).

consensual where parties have received sufficient notice of a plan's release provisions and have

had an opportunity to manifest consent to the release, whether by failing to object to or opt out of

the release or by affirmatively opting into the release.[69]  Here, all parties in interest had ample

opportunity to evaluate and exercise their right to manifest consent to the Third-Party Release.

The ballots distributed to Holders of Claims entitled to vote on the Plan quoted the entirety of the

Third-Party Release provision in the Plan and clearly informed such of Holders of the steps they

should take if they disagreed with the scope of the Third-Party Release.  Likewise, the notices

distributed to Holders of Claims or Interests not entitled to vote on the Plan informed such Holders

of their ability to manifest consent to the Third-Party Release by contacting the Notice and Claims

Agent with a request to opt into the Third-Party Release.  Thus, affected parties were on notice of

the Third-Party Release and of their ability to opt in.  Tellingly, approximately 40 parties in interest

have opted into the Third-Party Release, demonstrating that Holders were in fact adequately put

on notice of their ability to opt in and that the Third-Party Release was entirely consensual.[70]  As

such, the Third-Party Release is consensual as to all Claims and Interest Holders who decided to

affirmatively opt in to the Third-Party Release.

106.    Based on the foregoing, the Debtors have established that the Third-Party Release

is consensual, and there is no need to consider the factors governing non-consensual third-party

---

[69]    *See, e.g.*, *In re Indianapolis Downs*, *LLC*, 486 B.R. at 306 ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots. Under these circumstances, the Third-Party Releases may be properly characterized as consensual and will be approved."); *In re DBSD N. Am.*, *Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009) ("Except for those who voted against the Plan, or who abstained and then opted out, I find the Third Party Release provision consensual and within the scope of releases permitted in the Second Circuit."); *aff'd* 2010 WL 1223109 (S.D.N.Y. March 24, 2010), *modified on other grounds*, 634 F.3d 79 (2d Cir. 2011); *In re Conseco, Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) ("The Article X release now binds only those creditors who agreed to be bound, either by voting for the Plan or by choosing not to opt out of the release.  Therefore, the Article X release is purely consensual and within the scope of releases that *Specialty Equipment* permits.") (citing *In re Specialty Equip. Corp.*, 3 F.3d 1043 (7th Cir. 1993)).

[70]    *See* Voting Report, Exhibit B.

releases under *Continental*[71] and its progeny.  Nonetheless and given that certain parties have objected to the Plan on the grounds that the Third-Party Release is non-consensual, the Third-Party Release is appropriate and should be approved even if the Bankruptcy Court determines that such releases are non-consensual.

107.    Courts in the Third Circuit have held that a non-consensual release may be approved if such release is fair and necessary to the reorganization, and the court makes specific factual findings to support such conclusions.[72]  In addition, the Third Circuit has found that, for such releases to be permissible, fair consideration must be given in exchange for the release.[73]

108.    The circumstances of these Chapter 11 Cases warrant the Third-Party Release because it is critical to the success of the Plan and it is fair and appropriate.  Without the efforts of the Released Parties both in providing the DIP Financing and consensual use of cash collateral and actively participating in the transaction and Plan negotiations, the Debtors would not be seeking confirmation of the Plan in parallel with entry of the Sale Order.  In addition, many of the Released Parties have been instrumental in supporting these Chapter 11 Cases and facilitating a smooth administration thereof.  Moreover, for parties that opted in and consented to the Third-Party Release, that was such party's prerogative and they received valuable consideration in exchange for a mutual release by the other Releasing Parties.  Finally, throughout these chapter 11 cases and

---

71    *See Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 213-14 (3d Cir. 2000).

72    *See id.* (noting that the "hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, specific factual findings to support these conclusions"); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (evaluating certain factors to determine whether the "hallmarks" of permissible non-consensual releases are met, including "(i) the non-consensual release is necessary to the success of the reorganization, (ii) releases have provided a critical financial contribution to the Debtors' plan; (iii) the releasee's financial contribution is necessary to make the plan feasible; and (iv) the release is fair to the non-consenting creditors, i.e., whether the non-consenting creditors received reasonable compensation in exchange for the release"); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607-08 (Bankr. D. Del. 2001) (evaluating similar factors to determine whether non-consensual third party releases were permissible); *cf. Washington Mutual*, 442 B.R. at 355 ("[T]he Court concludes that any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of third party releases.").

73    *See United Artists Theatre Co. v. Walton*, 315 F.3d 217, 227 (3d Cir. 2000) (citing *In re Continental Airlines*, 203 F.3d at 215)).

all these negotiations, the Debtors' directors and officers steadfastly maintained their duties to maximize value for the benefit of all stakeholders.

109.    Moreover, the third parties bound by the Releases have received sufficient consideration in exchange for the release of their Claims against the Released Parties to justify the Third-Party Release.  The DIP Lenders, the DIP Agent, the Term Loan Lenders, the Term Loan Agent, and other Released Parties have made massive concessions and commitments that have allowed the Debtors to maximize the value of their Estates and enabled the Debtors to effectuate the Sale Transaction and swiftly proceed to confirmation of the Plan.  The Released Parties have been active and important participants in the development of the Plan and have expended significant time and resources analyzing and negotiating the issues presented by the Debtors' capital structure and the material barriers to the resolution thereof.  Specifically, as discussed above, in addition to providing significant non-monetary value, the Term Loan Lenders provided a $30 million DIP Facility to fund the chapter 11 cases and sale process and participated in the transaction in order to ensure the success of the Plan.  Without the contributions of each of these parties, the Sale Transaction and the ensuing Plan would not be possible.  Each of the Released Parties made the contributions discussed above in exchange for, among other things, the Third-Party Release.

110.    The Debtors submit that the Third-Party Release is consensual or otherwise appropriate under *Continental* and its progeny.  Accordingly, the Third-Party Release should be approved.

       (c)    *The Exculpation Provision Is Appropriate Under Section 1123(b) of the Bankruptcy Code.*

111.    Article VIII.G of the Plan provides for the exculpation of the Exculpated Parties. Certain Objectors misunderstand the purpose and scope of the exculpation and object to its

approval.  Notwithstanding the assertions of the Objectors, the exculpation is narrowly tailored, fair, and appropriate under both applicable law[74] and the facts and circumstances of these Chapter 11 Cases.  The Plan's exculpation provision is the product of arm's-length negotiations, was critical to obtaining the support of various constituencies for the Plan, and, as part of the Plan, has received support from the Debtors' major stakeholders.  The exculpation provision was important to the development of a feasible, confirmable Plan, and the Exculpated Parties participated in these Chapter 11 Cases in reliance upon the protections afforded to those constituents by the exculpation.

112.    Courts evaluate the appropriateness of exculpation provisions based on a number of factors, including whether the plan was proposed in good faith, whether liability is limited, and whether the exculpation provision was necessary for plan negotiations.[75]  Exculpation provisions that are limited to claims not involving actual fraud, willful misconduct, or gross negligence, are customary and generally approved in this district under appropriate circumstances.[76]  Critically, unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se*, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring.[77]  A properly-tailored exculpation provision, which the Exculpation is, simply makes

---

[74]  *See In re Laboratory Partners, Inc.*, No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) (finding that exculpation was appropriately extended to secured lender who funded the chapter 11 case); *In re FAH Liquidating Corp.*, No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) (finding that exculpation as applied to a non-debtor Plan Sponsor was appropriate under section 1123(b)).

[75]  *See, e.g.*, *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (evaluating the exculpation clause based on the manner in which the clause was made a part of the agreement, the necessity of the limited liability to the plan negotiations, and that those who participated in proposing the plan did so in good faith).

[76]  *See Wash. Mut.*, 442 B.R. at 350-51 (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate).

[77]  *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code");

explicit the legal consequences of the "good faith" findings inherent to an order confirming a chapter 11 plan where, as here, multiple stakeholder groups came together to negotiate an arm's-length restructuring of the debtor that is fair and equitable and in the best interests of the debtor's estate and creditors.  Indeed, as one bankruptcy judge recently clarified:

> To some extent, these exculpation provisions are based on the theory that court-supervised fiduciaries are entitled to qualified immunity for their actions.  While the reported case law is thin, however, I think that a proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions.  If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should not be subject to claims that effectively seek to undermine or second guess this Court's determinations.  In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do.[78]

113.    Moreover, section 1125(e) of the Bankruptcy Code likewise establishes that a person that "participates" in good faith in the formulation and solicitation of a chapter 11 plan shall not be liable on account of such participation or solicitation.  Here, the Exculpated Parties have participated in good faith in formulating and negotiating the Plan as it relates to the Debtors, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties.  Moreover, the exculpation provision and the liability standard it sets represents a conclusion of law that flows logically from certain findings of fact that the Bankruptcy Court must reach in confirming the Plan as it relates to the Debtors, something courts routinely approve in comparable chapter 11 cases.[79]  As discussed herein, this Bankruptcy Court must find,

---

[78] *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019) (internal citations omitted).

*see also In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964, at *10 (CSS) (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion*, 2010 WL 2905001, at *16 (Bankr. D. Del. April 16, 2010) (same).

[79] *See, e.g.*, *In re Arsenal Res. Dev. LLC*, No. 19-12347 (BLS) (confirming plan that exculpated any party, including non-estate fiduciaries, otherwise entitled to exculpation under 1125(e)); *In re Dex Media, Inc.*, No. 16-11200 (KG) (Bankr. D. Del. Jul. 15, 2016) (confirming plan

under section 1129(a)(2) of the Bankruptcy Code, that the Debtors have complied with the applicable provisions of the Bankruptcy Code.  Additionally, this Bankruptcy Court must find that, under section 1129(a)(3) of the Bankruptcy Code, the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, to the Debtors' officers, directors, employees, and professionals.  Further, these findings imply that the Plan was negotiated at arm's-length and in good faith.

114.    Here, the Debtors and their officers, directors, and professionals, actively negotiated with Holders of Claims and Interests across the Debtors' capital structure in connection with the Plan and these Chapter 11 Cases.  Such negotiations were extensive and the resulting agreements were implemented in good faith with a high degree of transparency, and as a result, the Plan enjoys support from Holders of Claims entitled to vote.[80]  The Exculpated Parties played a critical role in negotiating, formulating, and implementing the Disclosure Statement, the Plan, the Stalking Horse APA, and related documents in furtherance of the Sale Transaction and the parallel consummation of the Plan.[81]  Furthermore, the exculpation provision is limited to acts during these Chapter 11 Cases and does not extend beyond such time period.  Accordingly, the Bankruptcy Court's findings of good faith vis-à-vis the Debtors' Chapter 11 Cases should also extend to the Exculpated Parties.

---

that exculpated non-estate fiduciaries); *In re Verso Corp.*, No. 16-10163 (KG) (Bankr. D. Del. June 23, 2016) (confirming plan that exculpated non-estate fiduciaries who participated in compliance with the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the plan); *In re Source Home Entm't, LLC*, No. 14-11553 (KG) (Bankr. D. Del. Feb. 20, 2015) (approving exculpation of non-estate fiduciaries who participated in the sale of the debtors' business and the development of the plan); *In re Lab. Partners, Inc.*, No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) (finding exculpation was appropriately extended to Prepetition Lenders, DIP Agent, and DIP Lender who funded the chapter 11 case).

80      *See* Voting Report.

81      *See* Hr'g Tr. 58:18–19, *In re Verso Corp.*, No. 16-10163 (KG) (Bankr. D. Del. June 23, 2016) ("[T]he debtors did not do this alone; they did it with the help of many others.").

115.     Additionally, the expectation of exculpation played a role in facilitating Plan negotiations.  All of the Exculpated Parties played a key role in developing the Plan that paved the way for a successful reorganization, and may not have been so inclined to participate in the plan process without the promise of exculpation.  Exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.  Moreover, the exculpation provision is limited to the enumerated conduct related to the Chapter 11 Cases and Article VIII.G of the Plan expressly provides that "nothing in this Article VIII.G shall release or exculpate any Exculpated Party for any act or omission arising before the Petition Date or after the Effective Date."

116.     Under the circumstances, it is appropriate for the Bankruptcy Court to overrule the Objections and approve the exculpation provision, and to find that the Exculpated Parties have acted in good faith and in compliance with the law.[82]

>    (d)     *The Injunction Provision Is Appropriate Under Section 1123(b) of the Bankruptcy Code.*

117.     The injunction provision set forth in Article VIII.H of the Plan merely implements the Plan's release, discharge, and exculpation provisions, in part, by permanently enjoining all entities from commencing or maintaining any action against the Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such claims or interests released, discharged, or subject to exculpation.  Thus, the injunction provision is a key provision of the Plan because it enforces the release, discharge, and exculpation provisions that are centrally important to the Plan.  As such, to the extent the Bankruptcy Court finds that the exculpation and release provisions are appropriate, the Debtors respectfully submit that the

---

[82]     *See PWS Holding Corp.*, 228 F.3d at 246–47 (approving plan exculpation provision with willful misconduct and gross negligence exceptions); *In re Indianapolis Downs, LLC*, 486 B.R. at 306 (same).

injunction provision must also be appropriate.  Moreover, this injunction provision is narrowly tailored to achieve its purpose.

### 4. The Plan Complies with Section 1123(d) of the Bankruptcy Code.

118. Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."

119. The Plan complies with section 1123(d) of the Bankruptcy Code.  The Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned under the Plan by payment of the cure amount, if any, on or about the Effective Date, subject to the limitations described in Article V.[83] In accordance with the Confirmation Order and the amounts set forth in the Plan Supplement, if any, and section 365 of the Bankruptcy Code, the Debtors, the Plan Administrator, or the Purchaser, as applicable, will satisfy monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned under the Plan on or about the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases otherwise agree.

### B. The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).

120. The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires the plan proponent to comply with the applicable provisions of the Bankruptcy Code.[84] The legislative history to section 1129(a)(2) provides that section 1129(a)(2) is intended to

---

[83]   *See* Plan Arts. IV.D, V.C.

[84]   *See* 11 U.S.C. § 1129(a)(2).

encompass the disclosure and solicitation requirements set forth in section 1125 and the plan acceptance requirements set forth in section 1126 of the Bankruptcy Code.[85]  As set forth below, the Debtors have complied with these provisions, including sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting acceptances of the Plan through their Notice and Claims Agent in accordance with the Disclosure Statement Order.

### 1.   The Debtors Complied with Section 1125 of the Bankruptcy Code.

121.     Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[86] Section 1125 ensures that parties in interest are fully informed regarding the debtor's condition so that they may make an informed decision whether to approve or reject the plan.[87]

122.     Section 1125 is satisfied here.  Before the Debtors solicited votes on the Plan, the Bankruptcy Court approved the Disclosure Statement in accordance with section 1125(a)(1) of the Bankruptcy Code.[88]  The Bankruptcy Court also approved the contents of the solicitation materials provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to

---

[85]   *See In re Lapworth*, 1998 WL 767456, at *3 (DWS) (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Aleris Int'l, Inc.*, 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) ("[S]ection 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the solicitation and disclosure requirements under sections 1125 and 1126 of the Bankruptcy Code."); S. Rep. No. 989, 95th Cong., 2d Sess., at 126 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess., at 412 (1977).

[86]   11 U.S.C. § 1125(b).

[87]   *See Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) (finding that section 1125 of the Bankruptcy Code obliges a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[88]   *See generally* Disclosure Statement Order.

parties not entitled to vote on the Plan, and the relevant dates for voting and objecting to the Plan.[89] As stated in the Voting Report, the Debtors, through the Notice and Claims Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.[90]  The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular Class.  Here, the Debtors caused the Disclosure Statement to be transmitted to all parties entitled to vote on the Plan.[91]

123.    Based on the foregoing, the Debtors submit that they have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order.

### 2.    The Debtors Complied with Section 1126 of the Bankruptcy Code.

124.    Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.[92]  As noted above, the Debtors did not solicit votes on the Plan from the following Classes:

- Classes 1 (Other Priority Claims), 2 (Other Secured Claims), and 6 (Intercompany Interests) are Unimpaired under the Plan (collectively, the "Unimpaired Classes").[93]  Pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in the Unimpaired Classes are conclusively presumed to have accepted the Plan and, therefore, were not entitled to vote on the Plan.

---

89    *Id.*

90    *See* Voting Report ¶¶ [6]–[7]; *see also* Affidavit of Solicitation.

91    *See* Voting Report ¶¶ [6]–[11]; *see also generally* Affidavit of Solicitation.

92    *See* 11 U.S.C. § 1126.

93    *See* Plan, Art. III.A.

- Class 5 (Intercompany Claims) is either Unimpaired or Impaired under the Plan at the option of the Debtors.[94]  Pursuant to sections 1126(f) or 1126(g) of the Bankruptcy Code, Holders of Claims in Class 5 are either conclusively presumed to have accepted or deemed to have rejected the Plan and, therefore, were not entitled to vote on the Plan.

125.    Accordingly, the Debtors solicited votes only from the Voting Classes, Holders of Allowed Claims and Interests in Classes 3, 4, 7, and 8, because, as of the commencement of solicitation, each of these Classes is Impaired and entitled to receive a distribution under the Plan.[95] With respect to the Voting Classes of Claims, section 1126(c) of the Bankruptcy Code provides that:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of [section 1126], that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of [section 1126], that have accepted or rejected such plan.[96]

126.    The Voting Report, summarized above, reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.[97]   Based on the foregoing, the Debtors submit that they have satisfied the requirements of section 1129(a)(2).

## C.    The Plan Was Proposed in Good Faith (§ 1129(a)(3)).

127.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."  Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement

---

[94]    *Id.*

[95]    *Id.  See generally* Affidavit of Solicitation.

[96]    11 U.S.C. § 1126(c).

[97]    *See generally* Voting Report, Exhibit B.

of section 1129(a)(3) of the Bankruptcy Code is satisfied.[98]  To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[99]

128.     The Plan was proposed with honesty, good intentions, and the goal of maximizing stakeholder recoveries.  Throughout these Chapter 11 Cases, the Debtors, their board of directors, and their senior management team have upheld their fiduciary duties to stakeholders and protected the interests of all constituents with an even hand.  The Plan follows an extensive marketing process to solicit interest in the Debtors and extensive arm's-length negotiations among the Debtors, the DIP Lenders, and other parties interested in ensuring that stakeholders realize the highest possible recoveries under the circumstances.  Indeed, the Debtors' management team and advisors expended countless hours to conduct comprehensive and complex marketing and recovery processes and evaluating and negotiating the Sale Transaction to be implemented pursuant to the Sale Order to provide the most value for their stakeholders.  Importantly, the Plan is supported by the Debtors' key economic stakeholders, namely, the Term Loan Lenders and the Committee.

129.     Nevertheless, certain Objectors assert that the Plan was not proposed in good faith.  These Objectors incorrectly assert that the Debtors "manufactured" a default to effectuate a "friendly" turnover of the company to their Term Loan Lenders.  As detailed above, and as will be further demonstrated through testimony at the Confirmation Hearing, the Debtors did nothing of

---

[98]   *E.g.*, *PWS Holding Corp.*, 228 F.3d at 242 (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997) (quoting *Brite* v. *Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985)); *In re Century Glove, Inc.*, Civ. A. Nos. 90-400 and 90-401, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993); *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002).

[99]   *E.g.*, *T-H New Orleans*, 116 F.3d at 802 (quoting *In re Sun Country Dev., Inc.*, 764 F.2d at 408); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012); *Century Glove*, 1993 WL 239489, at *4.

the sort.  **First**, the Debtors did not "manufacture" a default.  Due to the adverse ruling in the Fresenius litigation, the Debtors had a credible fear that their secured lenders could assert a default under the Term Loan Credit Agreement, miring them in further, contentious litigation that their business may not withstand.  With the wounds of the litigation with Fresenius fresh in the Debtors' mind, the Debtors, in their business judgment, elected to pursue a more constructive approach that would preserve the value of the business and allow time for the Debtors and their advisors to pursue more comprehensive solutions to their capital structure rather than engaging in a further protracted litigation, the result of which could have been an adverse judgment that the Debtors were in default.  The Objectors' broad assertions to the contrary are unsubstantiated and fail to credibly assert an allegation of bad faith.

130.    **Second**, the Objectors identify a variety of allegedly "calculated" efforts by the Debtors to depress the value of the company, "drag out" the Standstill Agreement, and inflate the value of the credit bid.  These allegations misinterpret (perhaps intentionally) basic principles of restructuring transactions such as this one or mischaracterize the facts.  The Objectors imply that the Debtors' outperformance of their forecasted financial metrics in 2019 by $6 million is somehow indicative of a ploy to undervalue the enterprise.  In fact, financial forecasts are simply that: predictions of future performance, and they tend to be conservative.  There is nothing unusual or untoward about this and, if anything, demonstrates the success of the management team in implementing operational initiatives aimed at *increasing* enterprise value.

131.    The Objectors also make much of the Debtors' prepetition "failure to close" two non-binding bids at values that exceeded the Term Loan Debt.  Although it is true the Debtors did not "close" these bids, it is because there was no binding agreement to close a transaction at such levels.  The Debtors cannot "close" a bid if the other party is unwilling or unable to do so.  As

described in the *Debtors' Reply in Support of the Sale* (the "Sale Reply"), filed contemporaneously herewith, the Debtors ran a fulsome prepetition *and* postpetition marketing process and ultimately received no bids at values necessary to pay their secured debt obligations.  The Debtors likewise did not intentionally inflate the price of the credit bid, as discussed in the Sale Reply.

132.    Finally, the Objectors imply that the Debtors acted in bad faith by pursuing a bankruptcy to, among other things, eliminate contingent litigation liabilities that were adversely impacting the Debtors' ability to continue as a going-concern.  Unsurprisingly, the Objectors cite to no law to support this wild assertion because this is one of the chief purposes of the Bankruptcy Code: providing a company with the tools to successfully rehabilitate.  It cannot be bad faith to pursue a restructuring strategy expressly contemplated by the Bankruptcy Code.[100]   If the Objectors do not like this outcome, their quarrel is with Congress, not the Debtors or this Bankruptcy Court.

133.    The Objectors also point to perceived inadequate disclosures that, for the reasons discussed above, are without merit or evidentiary support.  Accordingly, the Plan and the Debtors' conduct satisfy section 1129(a)(3) of the Bankruptcy Code, and the Objections should be overruled.

> **D.    The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)).**

134.    Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Bankruptcy Court as reasonable.  Courts have construed

---

[100]    *See, e.g.*, 11 U.S.C. § 363(f) ("The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate.").

this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Bankruptcy Court as to their reasonableness.[101]

135.    The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  All payments made or to be made by the Debtors for services or for costs or expenses in connection with these Chapter 11 Cases prior to the Effective Date, including all Professional Fee Claims, have been approved by, or are subject to approval of, the Bankruptcy Court.[102]   Article II.B of the Plan provides that all final requests for payment of Professional Fee Claims shall be filed no later than 45 days after the Effective Date for determination by the Bankruptcy Court, after notice and a hearing, in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, including the Interim Compensation Order.[103] Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

**E.     The Plan Does Not Require Additional Disclosures Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).**

136.    The Bankruptcy Code requires the plan proponent to disclose the affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan.[104]   Section 1129(a)(5)(A)(ii) of the Bankruptcy Code further requires that the

---

101  *Lisanti Foods*, 329 B.R. at 503 ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court"), *aff'd*, 241 F. App'x 1 (3d Cir. 2007); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

102  *See* Plan, Art. II

103  *Id.*

104  11 U.S.C. § 1129(a)(5)(A)(i).

appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[105]

137.     Because the Plan provides for the wind-down of the Estates' remaining assets and dissolution of the Debtors following the Sale Transaction, section 1129(a)(5) of the Bankruptcy Code is inapplicable.  In any event, Article IV.F of the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code, to the extent applicable, by providing for the appointment of the Plan Administrator.  Accordingly, the Plan complies with section 1129(a)(5) of the Bankruptcy Code.

**F.      The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).**

138.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.  Section 1129(a)(6) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases.

**G.      The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).**

139.     Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
>
> (A)      each holder of a claim or interest of such class—
>
>          (i)      has accepted the plan; or
>
>          (ii)     will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if

---

[105]   11 U.S.C. § 1129(a)(5)(A)(ii).

the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .

140.     The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes, and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[106] As section 1129(a)(7) of the Bankruptcy Code makes clear, the best interests test applies only to holders of non-accepting impaired claims or interests.  Class 3 has voted to accept the Plan.

141.     Consistent with the liquidation analysis (the "Liquidation Analysis") prepared by the Debtors' management and advisors and filed contemporaneously herewith, a chapter 7 liquidation beginning on the date the chapter 11 cases are converted to chapter 7 would provide the same or less recovery for creditors than the Plan.  The delay of the chapter 7 trustee becoming familiar with the assets could easily cause bids already obtained to be lost, and the chapter 7 trustee would not have the technical expertise or knowledge of the Debtors' business to sell their assets pursuant to the Plan.  Moreover, the distributable proceeds in a chapter 7 liquidation would be lower due to a chapter 7 trustee's fees and expenses.

142.     Sale proceeds in chapter 7 also would likely be significantly lower, particularly in light of the highly regulated nature of the Debtors' business and the time delay associated with the chapter 7 trustee's learning curve in connection therewith.  In addition to the expected material reduction in sale proceeds, recoveries would be further reduced (in comparison with those provided for under the Plan) due to the expenses that would be incurred in a chapter 7 liquidation,

---

[106]  *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *Century Glove*, 1993 WL 239489, at *7; *In re Adelphia Commc'ns. Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation"); *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'") (internal citations omitted).

including added expenses for wind-down costs and costs incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors' technical assets, and these specific Chapter 11 Cases, in order to complete the administration of the Debtors' Estates.[107] Moreover, the conversion to chapter 7 would also require entry of a new bar date for filing claims that would be more than ninety days following conversion of the case to chapter 7.[108] Thus, the number and dollar amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries relative to those available under the Plan.

143.   A chapter 7 liquidation would also trigger a termination event under the Stalking Horse APA.[109] If terminated, it is unclear whether the Purchaser would continue to show interest in purchasing the Debtors' assets, especially in light of the substantial business disruption a chapter 7 conversion would create.  Even if the Purchaser retained an interest, it is unlikely that the Purchaser would agree to fund secured, administrative, and priority Claims in a chapter 7 proceeding.  Therefore, the chapter 7 trustee may have to either renegotiate the terms of the current Stalking Horse APA or run another sale process.  The outcome of any additional sale process is inherently uncertain, given that the Debtors only received one qualified bid after an extensive marketing effort.  Further, the Wind-Down Amount, which is being used to wind down the Debtors' operations and pay administrative expenses, would not be available in a chapter 7 liquidation.  Similarly, the Stalking Horse APA provides for a substantial amount of Purchaser Assumed Claims, which are excluded from treatment under the Plan.  If terminated, Purchaser

---

[107]   *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).

[108]   *See* Fed. R. Bankr. P. 1019(2); 3002(c).

[109]   *See* Stalking Horse APA, § 8.1(d).

Assumed Claims currently treated as assumed liabilities would revert back as General Unsecured Claims against the Debtors.

144.     In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in materially reduced sale proceeds, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases.

**H.     The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.**

145.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.  Of the impaired Classes of Claims and Interests entitled to vote under the Plan, Class 3 (Term Loan Claims) voted to accept the Plan.

146.     Holders of Claims and Interests in Class 4 (General Unsecured Claims), Class 7 (Section 510(b) Claims), and Class 8 (Akorn Interests), who are Impaired under the Plan, voted to reject the plan, and Holders of Claims and Interests in Class 5 are either Unimpaired and conclusively presumed to have accepted the Plan (to the extent reinstated) or Impaired and conclusively deemed to have rejected the Plan, and, therefore, were not entitled to vote.  While the Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code with respect to the impaired Classes that voted to reject or were deemed to reject, the Plan is confirmable nonetheless because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code, as discussed below.

**I.     The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).**

147.     Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy

Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.  Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).  Finally, section 1129(a)(9)(C) of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.

148.    The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  ***First***, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each Holder of an Allowed Administrative Claim will receive the full unpaid amount of such Allowed Administrative Claim in Cash, which payment shall be made (a) in the ordinary course of business, or (b) on the later of (i) the Effective Date and (ii) the date on which such Administrative Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter) with a Cash distribution.  ***Second***, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of Claims specified by 1129(a)(9)(B) are impaired under the Plan.  ***Third***, Article II.C of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that Holders of Allowed Priority Tax Claims receive either (a) the full unpaid amount of such Allowed Priority Tax Claim in Cash on the later of the Effective Date and the date on which

such Priority Tax Claim becomes an Allowed Claim or as soon as reasonable practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter), or (b) equal annual installment payments in Cash, of a total value equal to the Allowed amount of such Priority Tax Claim, over a period ending not later than five (5) years after the Petition Date. *Finally*, Article II of the Plan also provides that any Allowed Administrative Claim or Allowed Priority Tax Claim that has been expressly assumed by the Purchaser under the Sale Transaction Documentation shall not be an obligation of the Debtors as of or after the Effective Date. Notably, the wind-down budget includes sufficient funds to pay such Claims in full as contemplated in the Plan. The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code.

**J.    At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).**

149.    Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.

150.    The Objecting MDL Plaintiffs erroneously assert that the Plan is "actually structured so that the Secured Lender's [sic] rights are entirely unimpaired."[110] This is based on a fundamental misunderstanding of the Plan and applicable law. Because no party submitted a higher or better bid, the Plan, as a practical matter, provides for only one treatment for Class 3 Term Loan Claims: Holders thereof shall receive "immediate possession of the Purchased Assets

---

110    [Docket No. 553].

as and solely to the extent set forth in the Sale Order, with no further order of the Bankruptcy Court required."[111]    This treatment is not "minor impairment," as the Objecting MDL Plaintiffs suggest—it is a wholesale alteration of the "legal, equitable, and contractual rights" to which Holders of Term Loan Claims are entitled under the applicable Term Loan documents (the "Term Loan Documents").  The Term Loan Claims are Impaired under the Plan, and Class 3's ***unanimous*** vote to accept the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

151.    "A class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan . . . leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."[112]  Unless an impaired creditor is deemed to reject the plan pursuant to section 1126(g) of the Bankruptcy Code, such creditor has a right to vote to accept or reject the plan.[113]  As the Third Circuit has explained:

> "Impairment" is a term of art crafted by Congress to determine a creditor's standing in the confirmation phase of bankruptcy plans. Each creditor has a set of legal, equitable, and contractual rights that may or may not be affected by bankruptcy.  If the debtor's Chapter 11 does not leave the creditor's rights ***entirely "unaltered,"*** the creditor's claim will be labeled as impaired under § 1124(1) of the Bankruptcy Code.  If the creditor's claim is impaired, the Code provides the creditor with a vote that, depending on the value of the creditor's claim, may be sufficient to defeat confirmation of the bankruptcy plan.[114]

---

[111]    Plan Art. III.B.3.

[112]    11 U.S.C. § 1124(1).

[113]    11 U.S.C. § 1126(a) ("The holder of a claim or interest allowed under section 502 of this title may accept or reject a plan.").  *See also, e.g., In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 223 (Bankr. S.D.N.Y. 2007) ("Listed among the things that a plan must contain, under section 1123(a), are classes for various kinds of claims, which, if impaired, will then be entitled to vote, individually, for or against acceptance of the plan."); *In re Friese*, 103 B.R. 90, 91–92 (Bankr. S.D.N.Y. 1989) ("The conclusion from all of this is that the court cannot deem an impaired class to have accepted a plan if no creditors in that class have voted . . . Because there is an impaired class and it has not accepted the plan, the plan cannot be confirmed.").

[114]    *See In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 202 (3d Cir. 2003) (emphasis added) (citing *In re L & J Anaheim Assoc.*, 995 F.2d 940, 942–43 (9th Cir. 1993)).

Section 1124(1) of the Bankruptcy Code creates a ***presumption*** of impairment.[115] The burden is on the objector to overcome the presumption of impairment by demonstrating that a creditor's legal, equitable, and contractual rights are not altered under the plan.[116]

152. Consistent with the plain language of the statute, numerous courts have repeatedly recognized that ***any*** alteration of the creditor's rights impairs the creditor's claims and entitles them to vote. Courts have held that a creditor was impaired where (a) the plan gave the debtors access to a restricted cash account while granting the creditor more favorable loan terms,[117] (b) the plan provided for use of the secured creditor's cash collateral to pay administrative, priority, and unsecured creditors' claims,[118] and (c) the plan required the secured creditor's collateral to be sold at a public auction under procedures mandated by the Bankruptcy Code instead of permitting the secured creditor to exercise "all rights and remedies" available to it under applicable state law.[119]

153. In *In re L & J Anaheim Associates*, the secured creditor proposed a plan that provided for an auction of the debtor's assets and to use the proceeds to pay off all outstanding liens in order of their priority.[120] The secured creditor was the only creditor to vote in favor of the plan, which the bankruptcy court confirmed, over the debtor's objection, pursuant to the

---

[115] *Id.* at 203 ("The Bankruptcy Code creates a presumption of impairment 'so as to enable a creditor to vote on acceptance of the plan.'") (citing *In re Monclova Care Ctr., Inc.*, 254 B.R. 167, 178–79 (Bankr. N.D. Ohio 2000); *In re Seasons Apartments, L.P.*, 215 B.R. 953, 958 (Bankr. W.D. La. 1997))

[116] *See id.* (placing the burden on the party asserting a claim is unimpaired to overcome the presumption of impairment by demonstrating that the plan leaves the creditor's rights unaltered).

[117] *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 40–41 (Bankr. D. Del. 2000) (citing *In re L & J Anaheim Assocs.*, 995 F.2d 940 (9th Cir. 1993) and *In re Dwellco I Ltd. P'ship*, 219 B.R. 5 (Bankr. D. Conn. 1998)).

[118] *In re Dwellco I Ltd. P'ship*, 219 B.R. at 13.

[119] *In re L & J Anaheim Assocs.*, 995 F.2d at 943.

[120] 995 F.2d at 941.

"cramdown" provisions of section 1129(b) of the Bankruptcy Code.[121]   The debtor appealed, arguing that the secured creditor was not impaired under the plan and thus could not constitute an impaired accepting class for purposes of cramdown.[122]   The Ninth Circuit, addressing the "narrow question" of whether the secured creditor's legal, equitable, or contractual rights were changed by the plan, upheld confirmation on the basis that the plan required that the collateral be sold at public auction and did not permit the secured creditor to exercise the remedies to which it was entitled under the applicable loan documents.[123]

154.    In *In re Dwellco I Limited Partnership* ("*Dwellco*"), an undersecured nonrecourse creditor proposed a liquidating plan under which the creditor would receive its collateral and satisfy administrative, trade, and employee wage and benefit claims in cash.[124]   The secured creditor's vote comprised the only impaired class voting to accept the plan.[125]   The debtor objected that the creditor's claim was not impaired because the treatment it received under the plan was identical to the treatment it sought when, prepetition, it accelerated the debt and attempted to foreclose on its lien, and thus its vote could not satisfy section 1129(a)(10) of the Bankruptcy Code.[126] The bankruptcy court overruled the debtor's "groundless" objection, finding that the

---

121    *Id.*

122    *Id.* at 942.

123    *Id.* at 943.

124    219 B.R. at 7.

125    *Id.* at 13.

126    *Id.*

creditor's rights were impaired under the plan because its cash collateral would be used to pay administrative, tax, trade, and employee wage and benefit claims, and confirmed the plan.[127]

155.    These cases are instructive.  Outside of the Chapter 11 Cases, the Term Loan Lenders would be permitted to, through the Term Loan Agent, take possession of their collateral upon default and conduct a public or private sale of such collateral, through self-help and without judicial process.[128]  But the Sale Transaction, pursuant to which Holders of Term Loan Claims receive their Plan treatment (*i.e.*, "immediate possession of the Purchased Assets") has been conducted by the Debtors, under the supervision of the Bankruptcy Court, and subject to the Bankruptcy Code, Bankruptcy Rules, and applicable Local Rules.  This is precisely the treatment the Ninth Circuit recognized as impairment in *In re L & J Anaheim Associates*.

156.    Further, not only are the Term Loan Lenders not simply taking possession of their collateral and realizing its value at a non-judicial sale, but they, like the undersecured lender in *Dwellco*, are **contributing cash** (including their cash collateral) to the Debtors' estates to fund administrative and other priority expenses in connection with the Wind-Down and to provide certain recoveries to Holders of General Unsecured Claims pursuant to the Committee Settlement **and** assuming in excess of **$150** million of liabilities that the Term Loan Lenders would be under no obligation to assume if exercising remedies under the Term Loan Credit Agreement.  As in *Dwellco*, the Term Loan Lenders' cash contribution comprises an independent ground on which the Term Loan Claims are impaired.

---

[127]    *Id.*

[128]    The *Term Loan Pledge and Security Agreement*—which was not amended or modified by the Standstill Agreement—permits the Term Loan Agent to, among other things, to, through self-help and without judicial process, "collect, receive, assemble, process, appropriate, sell, lease, assign, grant an option or options to purchase or otherwise dispose of, deliver, or realize upon" collateral at public or private sale or sales "for cash, on credit or for future delivery without assumption of any credit risk, and upon such other terms as the [Term Loan] Agent may deem commercially reasonable."  *Term Loan Pledge and Security Agreement* § 5.2(a)(iv).

157.    The Objecting MDL Plaintiffs also argue that the Standstill Agreement[129] "bound" the Term Loan Lenders to credit bid for substantially all of the Debtors' assets and that, because of this, selection of the Stalking Horse Bidder as the winning bidder leaves Term Loan Claims unimpaired.[130]  This argument is unavailing.  **First**, Term Loan Claims are Claims "arising against any of the Debtors on account of the Term Loan Credit Agreement," not the Standstill Agreement. The Term Loan Credit Agreement entitles the Term Loan Lenders to repayment of the Term Loans.[131]  **Second**, the Standstill Agreement did not supplant the Term Loan Lenders' rights under the Term Loan Documents—at all relevant times, the Term Loan Documents remained in full force and effect, notwithstanding the agreement of a requisite number of Term Loan Lenders to abstain from exercising remedies thereunder.  **Third**, the Standstill Agreement **expressly contemplated** the Term Loan Agent's right to, at the direction of the required Term Loan Lenders, "exercise any rights and remedies provided to the Administrative Agent under the [Term] Loan Documents or at law or equity, including all remedies provided under the UCC," as distinct from the ad hoc group's commitment to provide a stalking horse credit bid in the event the Debtors' prepetition sale process did not produce an actionable third-party stalking horse bid.[132]  In other words, even if the Court was to consider the Objecting MDL Plaintiffs' erroneous suggestion that the Debtors' implementation of an in-court sale process as contemplated by the Standstill Agreement somehow overrides all other rights to which the Term Loan Lenders are entitled under the Term Loan

---

[129]    The "Standstill Agreement" is that certain *Standstill Agreement and First Amendment to Loan Agreement*, dated as of May 6, 2019, by and among Akorn, Inc., the other Loan Parties (as defined in the Term Loan Credit Agreement), an ad hoc group of Term Loan Lenders, certain other Term Loan Lenders, and the Term Loan Agent (as amended, supplemented, or otherwise modified from time to time).

[130]    [Docket No. 553].

[131]    *See* Term Loan Credit Agreement § 5.04.

[132]    *See* Standstill Agreement at 27 (amending and restating Article VII of the Term Loan Credit Agreement).

Documents, there are rights under the Standstill Agreement **_unrelated to the sale process_** that are not being reinstated under the Plan, which is itself impairment.

158.    Accordingly, Class 3 is impaired and the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

### K.    The Plan Is Feasible (§ 1129(a)(11)).

159.    Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that a plan is feasible as a condition precedent to confirmation.  Specifically, the Bankruptcy Court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[133]

To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[134] Rather, a debtor must provide only a reasonable assurance of success.[135]  There is a relatively low threshold of proof necessary to satisfy the feasibility requirement.[136]  Moreover, where the plan contemplates a liquidation of the estates, as here, courts have either held that such plans inherently

---

[133]  11 U.S.C. § 1129(a)(11).

[134]  *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *W.R. Grace & Co.*, 475 B.R. at 115; *In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd*, 800 F.2d 581 (6th Cir. 1986).

[135]  *Kane*, 843 F.2d at 649; *Flintkote Co.*, 486 B.R. at 139; *W.R. Grace & Co.*, 475 B.R. at 115; *see also Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (citations omitted) (holding that "[t]he purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation"); *accord In re Capmark Fin. Grp. Inc.*, No. 09-13684 (CSS), 2011 WL 6013718, at *61 (Bankr. D. Del. Oct. 5, 2011) (same).

[136]  *See, e.g., In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal citations omitted); *In re Sea Garden Motel & Apartments*, 195 B.R. 294, 305 (D. N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *overruled in part on other grounds*, 464 B.R. 208 (Bankr. D. Del. 2011).

satisfy section 1129(a)(11), or performed a limited inquiry into whether the liquidation itself is feasible.[137]

160.    Under either standard, the Plan is feasible.  *First*, the Plan provides for the liquidation of the Debtors' Estates following the consummation of the Sale Transaction. Accordingly, the Plan obligations will be satisfied without the need for further reorganization of the Debtors because the Plan contemplates a liquidation.  *Second*, a significant number of the Debtors' liabilities will be assumed by the Purchaser in accordance with the Sale Transaction Documentation.  *Third*, Article II.B.2 of the Plan provides that as soon as possible after confirmation and not later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount to pay Allowed Professional Fee Claims in these chapter 11 cases.  *Fourth*, upon the Effective Date, the Sale Transaction Documentation will provide for the Wind-Down Amount of approximately $35 million to wind-down the Debtors' Estates.  *Finally*, in negotiating the Sale Transaction and Plan in parallel, the Debtors thoroughly analyzed their ability to meet their respective obligations under the Plan.  As such, the Debtors positioned themselves to close the Sale Transaction on the contemplated timeline and project that the amounts reserved in the Professional Fee Escrow Account, the Wind-Down Amount, and the proceeds under the DIP Facility will be sufficient to satisfy all Priority and Administrative Claims under the Plan, including all DIP Facility Claims, Professional Fee Claims, and Priority Tax Claims.

---

[137]    *See Heritage Org.*, 375 B.R. at 311 ("Several courts take a narrow approach and interpret the plain language of § 1129(a)(11) to say that feasibility need not be established when liquidation is proposed in the plan. . . . Other courts take a broader approach and apply the feasibility test to plans of liquidation, focusing their analysis on whether the liquidation itself, as proposed in the plan, is feasible."); *compare In re 47th and Belleview Partners*, 95 B.R. 117, 120 (Bankr. W.D. Mo. 1988) (holding that feasibility is inapplicable to plans proposing to sell all estate assets), *and In re Pero Bros. Farms, Inc.*, 90 B.R. 562, 563 (Bankr. S.D. Fla. 1988) (same), *with In re Two Streets, Inc.*, 597 B.R. 309, 317 (Bankr. S.D. Miss. 2019) (holding that, where a plan proposes to sell all estate assets, feasibility means the sale itself, as proposed in the plan, is feasible)

161.    The Debtors have therefore established that the Debtors' Estates will have sufficient funds to satisfy all requirements and obligations under the Plan.  Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(11) of the Bankruptcy Code.

**L.    All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)).**

162.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.

163.    The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article XII.C of the Plan provides that all fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid by the Debtors for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

**M.    Sections 1129(a)(13) through 1129(a)(16) Do Not Apply to the Plan.**

164.    The Debtors have no obligations to pay retiree benefits and, as such, section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan. Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  Since the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.  Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.  Because none of the Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.  Finally, each of the Debtors are a moneyed, business, or commercial corporation, and therefore, section 1129(a)(16) of the Bankruptcy Code, which provides that

property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in accordance with any applicable provisions of non-bankruptcy law, is not applicable to these Chapter 11 Cases.

**N.    The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.**

165.    Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[138]

166.    As noted above, Class 3 (Term Loan Claims), which is an Impaired Class of Claims entitled to vote on the Plan, has voted in favor of the Plan.  However, Holders of Claims in Class 4 (General Unsecured Claims), Class 5 (Intercompany Claims), Class 7 (Section 510(b) Claims), and Class 8 (Akorn Interests), rejected or may be deemed to have rejected the Plan.  Nonetheless, as set forth below, the Plan satisfies the requirements under section 1129(b) of the Bankruptcy Code.

**1.    The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii)).**

167.    A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[139]

---

[138]  *John Hancock*, 987 F.2d at 157 n.5; *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997) ("the [p]lan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan.").

[139]  *Bank of Am.*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative,  if 'the holder of any claim or

This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[140]

168.     The Plan satisfies section 1129(b) of the Bankruptcy Code.  Notwithstanding the fact that Class 4, Class 7, and Class 8 rejected the Plan, the Plan is confirmable.[141]  Contrary to ProvePharm's assertion that "the Plan . . . appears to unfairly discriminate between Class 4 and Class 5, and elevate Class 6 above Class 4 in violation of the Absolute Priority Rule,"[142] under the Plan, no Holder of a Claim or Interest junior to an impaired Class of Claims or Interests will receive any recovery under the Plan on account of such Claim or Interest.  Although Class 5 (Intercompany Claims) may be unimpaired and Class 6 (Intercompany Interests) is unimpaired, such treatment is not "on account of" such Intercompany Claims or Intercompany Interests within the meaning of section 1129(b)(2)(B)(ii) of the Bankruptcy Code.    Rather, Intercompany Claims and Intercompany Interests will be unimpaired, if at all, for purposes of administrative convenience and effectuation of an efficient reorganization by maintaining the Debtors' existing corporate structure and interrelationships and will not affect, in any way, the treatment of any claims in Class 4.  The unimpairment of Intercompany Claims or Intercompany Interests, if any, affects neither the economic substance of the Plan, nor any recoveries to the Debtors' creditors.[143]

---

interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).  That latter condition is the core of what is known as the 'absolute priority rule.'").

[140]     *Id.*

[141]     To the extent any rejecting class amends its vote and determines to accept the Plan, the Debtors will file an amended voting report to reflect such update.

[142]     [Docket No. 552] at ¶ 34.

[143]     *See In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 47–48 (Bankr. D. Del. 2000) (holding that "the retention of the corporate structure among the Debtors will not adversely affect any creditors" and does not violate absolute priority rule); *accord In re ION Media Networks, Inc.*, 419 B.R. 585, 601 (Bankr. S.D.N.Y. 2009) ("This technical preservation of equity is a means to preserve the corporate structure that

Moreover, the Plan expressly provides that "no distributions shall be made on account of any such Intercompany Claims," even though such Claims may be rendered unimpaired.

169.    The Objecting MDL Plaintiffs also assert that the Plan retains the Retained Assets and the Retained Causes of Action "without a new value contribution," in violation of the absolute priority rule because the Plan releases the Retained Causes of Action upon confirmation.[144]  This argument wildly misinterprets the Plan and prevailing case law.  As explained above, no *Class of Claims against or Interests in the Debtors* that is junior to the Objectors receives or retains any property or interest *on account of their Claims or Interests* under the Plan.  To the extent the Objecting MDL Plaintiffs suggest that the Debtors' retaining the Retained Causes of Action somehow invokes the "new value" corollary demonstrates a fundamental misunderstanding of the Bankruptcy Code and the seminal case on that corollary.

170.    Following approval of the Sale Transaction, the Plan contemplates the orderly wind-down of the Debtors' Estates by the Plan Administrator.[145]  As part of the Plan Administrator's duties (acting for the Debtors in the same fiduciary capacity as applicable to a board of managers and officers), the Plan Administrator will wind-down the Debtors including "liquidating, receiving, holding, investing, supervising, and protecting the assets of the Debtors remaining after consummation of the Sale Transaction," *i.e.*, the Retained Assets, *for the benefit of creditors*.[146]  Similarly, Article IV.E of the Plan states that the Retained Causes of Action "shall vest in the Debtors on the Effective Date *for prosecution, settlement, or other action as*

---

does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan.").

[144]    [Docket No. 553].

[145]    *See* Plan, Art. IV.G–I.

[146]    *Id.*

*determined by the Plan Administrator*."[147]  The Plan clearly does not provide for the release of the Retained Causes of Action.  And, if any doubt remained, both the Third-Party Release and the Debtor Release also contain an express carve-out that provides:

> Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan, *the releases contained in the Plan do not* (i) release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) affect the rights of Holders of Allowed Claims and Interests to receive distributions under the Plan, or (iii) *release any Claims or Causes of Action against any non-Released Party*.[148]

171.    Moreover, any contention that the Debtors are somehow retaining the Retained Causes of Action without providing "new value" defies logic and demonstrates a fundamental misunderstanding the Bankruptcy Code and prevailing case law.  As discussed above, the Plan Administrator will prosecute the Retained Causes of Action for the benefit of the Debtors' Estates (and their creditors) to the extent such Retained Causes of Action are valuable, with such proceeds being distributed to the Debtors' creditors in accordance with the Bankruptcy Code's priority scheme.  Moreover, the "new value" corollary discussed in *203 N. LaSalle* stands for the proposition that a debtor's pre-bankruptcy equity holders may not, over the objection of a senior class of impaired creditors, contribute new capital and receive ownership interests in the reorganized entity, when that opportunity is given exclusively to the old equity holders under a plan adopted without consideration of alternatives,[149] and not that a debtor may not retain causes of action without providing new value.  The "exclusive opportunity" mentioned in *203 N. LaSalle*

---

[147]    Plan, Art. IV.E.

[148]    Plan, Art. VIII (emphasis added).

[149]    *Bank of Am. Nat'l Tr. and Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 437 (1999).

was the benefit of equity ownership in the reorganized debtor being offered **exclusively** to old equity without any market test.[150]  Indeed, the Retained Causes of Action are not claims against or interests in the Debtors—accordingly, the Debtors are not receiving value on account of a claim against or interest in **themselves**.  Taking the MDL Plaintiffs' argument to its logical conclusion, **every** chapter 11 plan that retains causes of action would violate the 'new value" corollary.  The Debtors are not aware of any case law reaching such a conclusion, and for good reason—the "new value" corollary does not, and was never meant to, address a situation where a **debtor** retained its own causes of action.

172.    Accordingly, the Plan does not violate the absolute priority rule and is "fair and equitable" with respect to all Impaired Classes of Claims and Interests and satisfies section 1129(b) of the Bankruptcy Code, and any objections to the contrary should be overruled.

### 2.    The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (§ 1129(b)(1)).

173.    Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.[151]  In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling

---

[150]    *Id.* at 454.

[151]    *In re 203 N. LaSalle St. Ltd. P'ship.*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *Bank of Am.*, 526 U.S. 434 (1999) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established."); *In re Aztec Co.*, 107 B.R. 585, 589–91 (Bankr. M.D. Tenn. 1989) ("Courts interpreting language elsewhere in the Code, similar in words and function to § 1129(b)(1), have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination."); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

justifications for doing so.[152]   A threshold inquiry to assessing whether a proposed plan of reorganization unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to a class allegedly receiving more favorable treatment.[153]

174.   Here, the Plan's treatment of potential non-accepting impaired classes (*i.e.*, Classes 4, 5, 7, and 8) is proper because all similarly situated Holders of Claims and Interests will receive substantially similar treatment and the Plan's classification scheme rests on a legally acceptable rationale.  Claims in Class 4 (General Unsecured Claims), and Class 7 (Section 510(b) Claims) and Interests in Class 5 (Intercompany Interests) and Class 8 (Akorn Interests) are not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Interests.  Specifically, classifications and recoveries under the Plan are based on factors such as the applicable Debtor entity and claims against such entity and assets at each entity and the legal rights of holders of Claims and Interests, including rights under applicable credit and debt agreements and security interests against the Debtors.  Thus, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code and the Plan may be confirmed notwithstanding the rejection by Classes 4, 7, and 8.

---

[152]  *See Coram*, 315 B.R. at 349 (citing cases and noting that separate classification and treatment of claims is acceptable if the separate classification is justified because such claims are essential to a reorganized debtor's ongoing business); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination); *Ambanc La Mesa*, 115 F.3d at 656–57 (same); *Aztec Co.*, 107 B.R. at 589–91 (stating that plan which preserved assets for insiders at the expense of other creditors unfairly discriminated); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (stating that interests of objecting class were not similar or comparable to those of any other class and thus there was no unfair discrimination).

[153]  *See Aleris Int'l, Inc.*, 2010 WL 3492664, at *31 (citing *Armstrong World Indus.*, 348 B.R. at 121).

**O.      The Debtors Complied with Section 1129(d) of the Bankruptcy Code.**

175.      The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.  Moreover, no governmental unit or any other party has requested that the Bankruptcy Court decline to confirm the Plan on such grounds.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**III.     The Waiver of a Stay of the Confirmation Order and the Proposed Modifications to the Plan Are Appropriate.**

**A.      Good Cause Exists to Waive the Stay of the Confirmation Order.**

176.      Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise." Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits modification of the imposed stay upon court order.

177.      The Debtors submit that good cause exists for waiving and eliminating any stay of the Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the Confirmation Order will be effective immediately upon its entry.[154]  As noted above, these Chapter 11 Cases and the related transactions have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information.  Additionally,

---

[154]    *See, e.g.*, *In re Source Home Entm't, LLC*, No. 14-11553 (KG) (Bankr. D. Del, Feb. 20, 2015) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re GSE Envtl., Inc.*, No. 13-11126 (MFW) (Bankr. D. Del. July 25, 2014) (same); *In re Physiotherapy Holdings, Inc.*, No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) (same); *In re Gatehouse Media, Inc.*, No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013) (same); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) (same); *In re Geokinetics Inc.*, No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013) (same).

each day the Debtors remain in chapter 11 they incur significant administrative and professional costs.

178.    Based on the foregoing, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the Confirmation Order may be effective immediately upon its entry.

### B.    Modifications to the Plan.

179.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.  Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.  Interpreting Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.[155]

180.    After solicitation, the Debtors filed a modified version of the Plan on August 25, 2020 [Docket No. 547], which made technical clarifications and resolved certain formal and informal comments to the Plan by parties in interest, including changes to incorporate the terms of the Committee Settlement (collectively, the "Modifications").  The Modifications are

---

[155]    *See, e.g.*, *In re Glob. Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation);  *In re Burns & Roe Enters., Inc.*, No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

immaterial or otherwise do not adversely affect the treatment of creditors and stakeholders and thus comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  The class representative for the Opt-In Shareholders (the "Class Representative") does not expressly object to the Plan on this basis, but asserts confirmation should be denied due to an "eleventh hour" revision to the Plan to clarify that the CVR Claims are Section 510(b) Claims.  Although the Class Representative may bemoan the belated re-classification of their CVR Claims, the Plan has in fact always contemplated this possibility.  Specifically, Article III.G states that "[p]ursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto."  Upon further consideration of the legal issues, the Debtors arrived at the same conclusion that all other parties other than the Class Representative have: that the CVR Claims are subject to mandatory subordination, and the Debtors felt it was appropriate to amend the Plan to reflect that. Further, the Class Representative is not prejudiced by this re-classification from a voting perspective because it did not even submit a Ballot in the first instance and, in any event, neither Class 4 nor Class 7 voted to accept the Plan.[156]  Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the Modifications, and that such Modifications should be deemed accepted by all creditors that previously accepted the Plan.

181.    Code by entering the proposed Confirmation Order, overruling any remaining objections, and granting such other and further relief as is just and proper.

*[Remainder of page intentionally left blank]*

---

[156]    *See generally* Voting Report.

Wilmington, Delaware
August 28, 2020

/s/ *Paul N. Heath*

| | |
|---|---|
| **RICHARDS, LAYTON & FINGER, P.A.** | **KIRKLAND & ELLIS LLP** |
| Paul N. Heath (No. 3704) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Amanda R. Steele (No. 5530) | Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*) |
| Zachary I. Shapiro (No. 5103) | Gregory F. Pesce (admitted *pro hac vice*) |
| Brett M. Haywood (No. 6166) | Christopher M. Hayes (admitted *pro hac vice*) |

**RICHARDS, LAYTON & FINGER, P.A.**
Paul N. Heath (No. 3704)
Amanda R. Steele (No. 5530)
Zachary I. Shapiro (No. 5103)
Brett M. Haywood (No. 6166)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:      heath@rlf.com
            steele@rlf.com
            shapiro@rlf.com
            haywood@rlf.com

*Co-Counsel for the*
*Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
Christopher M. Hayes (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email      patrick.nash@kirkland.com
            gregory.pesce@kirkland.com
            christopher.hayes@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:      nicole.greenblatt@kirkland.com

*Co-Counsel for the*
*Debtors and Debtors in Possession*