| UNITED STATES BANKRUPTCY FOR THE DISTRICT OF DELAWARE | |
|---|---|
| In re: | Chapter 11 |
| Akorn Inc., et al.<br>          Jointly Administered Debtors. | Lead Case No. 20-11177-KBO<br>Honorable Karen B. Owens |

**OBJECTION OF 1199SEIU BENEFIT FUNDS, DC47 FUND AND SBA FUND TO THE DEBTORS' MOTION TO SELL (DI #18) AND CONFIRMATION OF THE DEBTORS' PLAN (DI #258)**

1199SEIU National Benefit Fund, 1199SEIU Greater New York Benefit Fund, 1199SEIU National Benefit Fund for Home Care Workers, and 1199SEIU Licensed Practical Nurses Welfare Fund, all of which are jointly administered health and welfare funds (together, "1199SEIU Benefit Funds"), AFSCME District Council 47 Health and Welfare Fund ("DC47 Fund") and Sergeants Benevolent Association Health and Welfare Fund ("SBA Fund")[1] by and through undersigned counsel Obermayer Rebmann Maxwell & Hippel LLP, file this Objection (the "Objection") to the Debtors' Motion to Sell Debtors' Assets to Akorn Holdings Topco LLC (DI #18) (the "Sale") and to confirmation of the Debtors' plan of reorganization (DI #258) (the "Plan").

## I.    PRELIMINARY STATEMENT

The Objectors are likely the largest creditor group in these bankruptcy cases. They are owed hundreds of millions – potentially even billions – of dollars by the Debtors because of the Debtors' participation in an illegal anticompetitive conspiracy to fix and raise the prices of generic drugs. The current proposed Plan and Sale convey all the Debtors' assets to their Secured Lender on a credit bid. The transaction pays nothing to any unsecured creditor.

The Plan is fundamentally unconfirmable as to lead Debtor Akorn, as it contemplates Akorn surrendering valuable rights due from its affiliates for no consideration, to the detriment of Akorn's creditors. The Plan does not comply with the absolute priority rule, as it allows the

---

[1] 1199SEIU Benefit Funds, DC47 Fund and SBA Fund are referred to collectively as the "Objectors."

Debtors to retain valuable assets without a contribution of new value in violation of 11 U.S.C. 1129(b)(2)(B)(ii). The Plan and Sale transfer valuable unencumbered assets to the Secured Lender without consideration by exaggerating the amount of the Secured Lender's credit bid and the scope of its prepetition lien.  The Plan improperly gerrymanders claims, placing some into incorrect classes and excluding others from the Plan entirely in order to artificially generate an accepting class, in violation of 11 U.S.C. §§ 1122, 1129(a)(10).  The Plan fails to provide for equal distribution between claimants in each class in violation of 11 U.S.C. §1129(a)(4).  The Plan does not contain any impaired classes which may vote to accept the Plan under 11 U.S.C. §1129(a)(10), (b)(1).  The Plan pays the Objectors less than they would receive in a liquidation, in violation of 11 U.S.C. §1129(a)(7).  The Plan contains unconstitutional releases, exculpations and injunctions. The Plan is not fair and equitable, since it either transfers all valuable assets to the Secured Lender for insufficient consideration or releases valuable causes of action while paying unsecured creditors nothing.  The Plan was proposed in bad faith as the culmination of a process of intentionally increasing the secured debt to effect a friendly sale that would allow the Debtors to escape all liability.  The Debtors furthered this bad faith process by intentionally failing to comply with their disclosure responsibilities, to hide the impact of their Plan on interested parties and ensure certain valuable assets would be sold without proper consideration.  For these reasons, as described extensively below, the Plan cannot be confirmed and the Sale cannot be approved.

## II.    FACTUAL BACKGROUND

### A.  Generics Litigation Background

The factual background relating to In re Generic Pharmaceuticals Pricing Antitrust Litigation, No. 16-MD-2724, MDL No. 2724 (E.D. Pa.) (the "MDL") is described extensively in the MDL Plaintiffs' Motion for Relief from Stay, incorporated herein by reference.  (DI #500 at

2

3-11). 1199SEIU Benefit Funds and SBA Fund are named plaintiffs for the putative End-Payer Purchaser ("EPP") class and DC47 Fund is a member of the putative EPP class. The EPP class includes the persons and entities that are at the end of the chain of distribution of generic pharmaceuticals. This includes employee welfare benefit funds, labor unions, private insurers, and consumers.

### B. The Fresenius Merger, Failure and Shareholder Suit

While the MDL was being litigated, the Debtors negotiated a merger deal with Fresenius Kabi AG ("Fresenius"), whereby Fresenius would acquire the Debtors for a price in excess of $4 billion. Following the leaked disclosure of regulatory failures by the Debtors, Fresenius terminated the merger agreement. According to the Debtors, a whistleblower disclosed flawed or corrupt testing results to the FDA. Fresenius obtained a judgment against the Debtors for approximately $74 million for damages arising out of the failed merger on the basis that a material adverse effect ("MAE") had occurred that justified Fresenius's termination of the merger. That MAE was, specifically, "that Akorn's breach of its regulatory representations and warranties under Section 3.18 could reasonably be expected to cause an MAE." Akorn, Inc. v. Fresenius Kabi AG, 198 A.3d 724 n.4 (Del. 2018)

The failure of the Fresenius merger brought on a federal securities class action by investors. These shareholders brought derivative claims against the Debtors and certain of the directors, officers and key employees ("Directors"), alleging that the Debtors and Directors breached their duties to the Debtors, and thus indirectly to shareholders, by engaging in active misconduct. These shareholders alleged damages exceeding $450 million. On March 13, 2020, the Debtors settled a portion of the securities litigation (the "Shareholder Settlement"). Under the terms of the Shareholder Settlement, the Debtors escrowed the proceeds of certain directors and officers

3

insurance policies ("D&O Insurance") and issued stock and Contingent Value Rights ("CVR") to certain shareholders that opted into the Shareholder Settlement (the "Settling Shareholders").

### C.  The Standstill and Lockup

At the time the Fresenius litigation concluded and the shareholder derivative litigation was ongoing, the Debtors' business prospects and revenue projections began to improve.  At the time the Debtors had one (1) material lender, JPMorgan Chase (the "Secured Lender").  In early 2019, the Debtors, who were not in default, approached the Secured Lender and negotiated an agreement whereby the interest rate on the loan was increased, the Secured Lender imposed additional fees and charges, obtained a security interest in additional intellectual property rights held by the Debtors and added all Debtors as direct borrowers on the loan instead of guarantors.  The Debtors paid approximately $28 million in order to negotiate these amended terms.  This agreement (the "Standstill Agreement") purportedly provided the Debtors with an opportunity to solicit offers from equity investors and lenders to restructure their finances.  If no third-party investor, lender or purchaser could be located that satisfied extant debt on acceptable terms, the Secured Lender would have the ability to credit bid the amount of its secured debt in a sale, likely through a chapter 11 proceeding.  The Debtors received a number of proposals for investment or lending, some of which would have partially restructured the Debtors' finances, others of which would have effected a complete restructuring.  The Debtors rejected all these proposals.

### D.  The Bankruptcy

On May 20, 2020, the Debtors filed the instant bankruptcies, jointly administered under lead case In re Akorn Inc., No. 20-11177-KBO.  The Objectors did not receive notice of the bankruptcy in time to seek appointment to the Official Committee of Unsecured Creditors, and as

a result were not made members of the Committee.  Rising Pharmaceutical, which has admitted to illegal price-fixing in the MDL, was placed on the Debtors' Committee instead.

On May 26, 2020, the Debtors filed their Plan (DI #101) and Disclosure Statement (DI #102).  The Debtors' Disclosure Statement did not mention the MDL, or the Objectors, or the EPP class's very substantial claims against the Debtors.  The Disclosure Statement disclosed a number sources of recovery that could be used to pay creditors: the sale of a non-debtor India affiliate AIPL, D&O Insurance proceeds currently in escrow, a claim against Provepharm for $30 million, and others.  This Disclosure Statement also included unconstitutional opt-out releases of Directors in exchange for no consideration.  On June 24, 2020, the Objectors filed an objection to Debtors' Disclosure Statement which is incorporated by reference.  (DI #233).  On June 30, 2020, after the deadline to object to the Disclosure Statement had passed, the Debtors filed an amended disclosure statement (the "Amended Disclosure").  (DI #267).  The Amended Disclosure mentioned the MDL offhandedly in a single paragraph.  The Amended Disclosure finally disclosed that the Debtors did not believe the D&O Insurance proceeds were an estate asset, valued all avoidance claims as worthless, valued all prepetition litigation claims as worthless and projected a 0% distribution to unsecured creditors.  The Debtors also disclosed, for the first time, that they had paid top executives $13.8 million in February 2020.

The Plan, as described by the Debtors, contemplates a sale of the Debtors' valuable assets, with the existing Secured Lender as the "stalking horse" bidder with the right to credit bid the value of its secured claim.  The purchaser assumes certain vendor liabilities of the Debtors in order to preferentially pay certain general unsecured creditors in full.  The Plan contemplates that the purchaser will purchase certain of the Debtors' causes of action on the condition that it never pursue them.  The Debtors will retain certain other causes of action and will be bound by the Plan

to release them.  On July 2, 2020, the court entered an order approving the Debtors' Amended

Disclosure.  On July 31, 2020, the Objectors filed unliquidated proofs of claims on behalf of the

EPP class.  No party has objected to these claims.

### III.    LEGAL ARGUMENT

#### A.  The Plan is not Confirmable as to all Debtors

A jointly-administered bankruptcy simplifies case administration without altering the legal

rights of any interested party.  Bunker v. Peyton (In re Bunker), 312 F.3d 145, 153 (4th Cir. 2002)

("Joint administration does not affect the substantive rights of either the debtor or his or her

creditors.").  In a joint plan, the plan must be confirmable for each debtor.  In re Tribune, 464 B.R.

126 (Bankr. D. Del. 2011).

The Debtors disclosed that they "maintained a centralized cash management system

through which certain Debtors made payments on behalf of certain Debtor affiliates" – effectively

a complex system of intra-affiliate transfers.  See Akorn Statement of Financial Affairs (DI #275)

Global Note at 17.  The Debtors "have excluded ordinary course intercompany Debtor-to-Debtor

transfers" from their schedules and statements altogether, and have made the determination of

which transfers are in the ordinary course without any oversight or appropriate disclosure.  Id.  The

SOFA of Hi-Tech Pharmacal Co. Inc. discloses approximately $13.6 million in potentially-

avoidable intra-affiliate transfers of value to the affiliate's creditors.  (DI #292 at 24-132).  The

SOFA of Akorn (New Jersey) Inc. ("ANJ") discloses $6.3 million in similarly-avoidable transfers.

(DI #282 at 24-100). This only addresses simple preference claims under 11 U.S.C. §547.  A

number of the Debtors are holding entities for intellectual property ("IP") with no other assets.

See Transcript of 341 Meeting, July 15, 2020, a true and correct copy of which is attached as

**Exhibit A** at 20-21.  Debtor CFO Duane Portwood ("Portwood") testified that he did not know if

the schedules he signed accurately reflected the current ownership of IP rights. <u>See</u> Ex. A at 23.

Portwood testified that the IP might have been transferred between entities on an uncertain date,

testifying that "I guess I'll have to get back with that to you and the trustee. That's clearly where

[IP rights] were housed to begin with. If they've been moved in the interim, then I may have

misspoken." <u>Id.</u> This testimony shows intra-affiliate transfers of IP rights at unknown times for

unknown (or no) value that left certain Debtors fundamentally without any assets. If these transfers

occurred within the last four (4) years prepetition, they are prime targets for a fraudulent transfer

action under 11 U.S.C. §548.[2]

      The Objectors are creditors of some, but not all, Debtors. The Objectors are, for example,

creditors of Akorn but not ANJ. Within 90 days of the petition date, Akorn transferred $6.3 million

to ANJ's creditors, a transfer clearly made for the benefit of an insider. This payment allowed

both ANJ and ANJ's creditors to receive more than they would have in a liquidation, and ensured

that Akorn's creditors, including the Objectors, would receive less.

      The Debtors propose their current Plan for confirmation on a 'holistic' basis, without

allocation for intra-affiliate receivables or associated avoidance causes of action. The chapter 5

causes of action exist to allow a trustee to correct the improper allocation of value that has occurred

in the past history of a debtor when it disadvantages creditors. <u>Fiber Lite Corp. v. Molded</u>

<u>Acoustical Prods. (In re Molded Acoustical Prods.)</u>, 18 F.3d 217 (3d Cir. 1994) (Avoidance powers

promote equitable division of a debtor's limited assets in accordance with the priorities in the

Bankruptcy Code). A chapter 11 DIP has the same powers and the same fiduciary duties as a

trustee, and cannot simply disregard those duties because they would turn one joint debtor against

---

[2]    Even if they occurred earlier, a trustee or DIP may use 11 U.S.C. §544 and other applicable law to reach
even further back. <u>Finkel v. Polichuk (In re Polichuk)</u>, 506 B.R. 405, 427 (Bankr. E.D. Pa. 2014) (trustee may use
IRS's ten-year lookback period in avoiding transfers via 11 U.S.C. §544)

another.  In re Insilco Techs., Inc., 480 F.3d 212, 2007 WL 823849, at *1 n.3 (3d Cir. 2007)

("When acting as debtor in possession, the debtor is bound by all of the fiduciary duties of a

bankruptcy trustee.").

If Akorn was proposing a plan for its sole reorganization, and it disclosed some $19.9

million in avoidable insider transfers just within the 90 days prepetition, refused to disclose any

intra-affiliate transfers it considered, in its sole discretion, to be in the ordinary course or for

reasonably equivalent value, and alleged that it had only begun to make intra-affiliate transfers

during the 90-day non-insider lookback period, that plan could not be confirmed.  If such a solo

plan for Akorn's reorganization explicitly vowed to never pursue these receivables and adamantly

opposed assigning them to some form of litigation trust, that plan would inappropriately retain

valuable assets without a contribution of new value, in violation of the absolute priority rule, and

could not be confirmed.  The failure of the Plan to make any provision that could possibly address

insider chapter 5 actions makes the Plan unconfirmable as to Akorn.  Since Akorn is the lead

Debtor and holds most Debtor assets, there is no substantially-similar plan that can be confirmed

without making Akorn's Plan compliant on these issues.

**B.  The Plan allows the Debtors to Retain Value in Violation of the Absolute Priority Rule**

Pursuant to 11 U.S.C. 1129(b)(2)(B)(ii), a plan is not fair and equitable, and is

unconfirmable, if  the "holder of any claim or interest that is junior to the claims of such class will

not receive or retain under the plan on account of such junior claim or interest any property."  This

absolute priority rule permits only two (2) exceptions.  The debtor must either pay unsecured

creditors in full on the effective date, or must obtain a contribution of up-front new value "in

money or in money's worth, reasonably equivalent" to the retained value.  Case v. L.A. Lumber

Prods. Co., 308 U.S. 106, 122 (1939).  Such a new value contribution must be "(1) new, (2)

4820-0252-9734

substantial, (3) money or money's worth, (4) necessary for a successful reorganization, and (5) reasonably equivalent to the value or interest received." In re Abeinsa Holding, Inc., 562 B.R. 265, 277 (Bankr. D. Del. 2016). A debtor receives, on account of its prepetition interest, every nonexempt valuable estate asset it possesses after confirmation. Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship, 526 U.S. 434 (1999). A new value contribution is *per se* insufficient if it is less than "top dollar" – what some third party would have paid for the asset. It is "necessary for old equity to demonstrate its payment of top dollar" by some non-exclusive competitive mechanism, either through competing plans, a formal valuation of the asset by a third party or a proposed free-market proffer of the asset. Id. at 457. The debtor has the burden of proof to show the propriety of confirmation. In re Genco Shipping & Trading Ltd., 513 B.R. 233 (S.D.N.Y. 2014). The debtor must show, by a preponderance of the evidence, that any retained asset is either worthless or appropriately covered by necessary, substantial up-front new value of equivalent worth.

The Debtors' Plan admits the existence of retained assets, specifically defining them as "Retained Assets" which include "Retained Causes of Action." Plan ¶I.A.107, 108. The Debtors' Plan actually releases the targets of these causes of action from any liability. Plan VIII.E, F, G. That is, the Debtors propose to not only retain these causes of action without a new value contribution, but to forfeit and release them upon confirmation.

The Debtors filed a Plan Supplement on August 7, 2020 purporting to detail the Retained Causes of Action. The Plan Supplement states that the Debtors will retain "Claims, defenses, crossclaims and counter-claims related to litigation and possible litigation" in numerous pieces of litigation. (DI #434-1). The Plan Supplement identifies the Debtors as defendants in all but one of these litigations and does not explain how these "causes of action" could result in affirmative

recovery.  For example, the Debtors seek to preserve and effectuate their prepetition settlement with Settling Shareholders, but purport via the Plan Supplement to retain affirmative claims against these Settling Shareholders that were resolved in the Shareholder Settlement.  (DI #434-1 at 6). To the extent that the Debtors have attempted to value these Retained Causes of Action, their valuation is not covered by any new value.  The Plan Supplement lists counterclaims against Provepharm.  The Debtors' Amended Disclosure states that "Akorn is seeking in excess of $30 million due to Provepharm's alleged monopolistic behavior, which amount may be further increased if treble damages are also awarded."  Amended Disclosure ¶IV.C.  Provepharm's own proof of claim alleges that there is no right to setoff between its claim and Akorn's counterclaim. (Claim #80 at Q11).  As a result, even if Provepharm's claim is valid, Akorn's counterclaim would provide a valuable affirmative recovery for the estate that the Debtors value at between $30 million and $90 million.  The Debtors propose to retain this claim for no consideration.

The Debtors' Plan and Amended Disclosure do not provide any other valuation of the Retained Assets, which include a wider array of assets than just causes of action.  The sum total of valuation information for these assets is found in the Amended Disclosure, which reads:

> The Objecting Creditors also believe that valuable avoidance actions may exist based on, among other things, the approximately $13.8 million in prepetition payments that the Debtors made to their executives…**The Debtors disagree. The Debtors' executives— and all employees—have provided and continue to provide valuable services to the Debtors and their estates in exchange for reasonable, market-based compensation (whether paid pre- or postpetition)…To the extent any such claims even exist, the Debtors do not believe the value of such claims justifies the risk, expense, and delay in pursuing such causes of action.**

Amended Disclosure ¶II.P.1 (emphasis added).

These highlighted selections are the entirety of the Debtors' attempt to value any Retained Assets.  All other causes of action, and all other Retained Assets, are not discussed at all.  This attempt at valuation simply cannot satisfy the 'top dollar' requirement imposed by the Supreme

Court in <u>Lasalle</u>.  It is also in inherent conflict with the Plan Supplement, which purports to disclose valuable causes of action.  The <u>Lasalle</u> court addressed whether the 'top dollar' requirement could be excused and the overall worth of the transaction considered holistically, and rejected that argument.  <u>Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship</u>, 526 U.S. at  456 ("It is no answer to this to say that the exclusive opportunity should be treated merely as a detail of the broader transaction that would follow its exercise, and that in this wider perspective no favoritism may be inferred").   What offends the Bankruptcy Code is not the propriety of an overall transaction, but a debtor's exclusivity in valuing and retaining certain assets.  The Supreme Court determined that, to show it is exercising that exclusive right properly, the debtor must affirmatively show proper valuation.  Proper valuation can only be accomplished through some non-exclusive means for each retained asset, not to the transaction as a whole.

The Debtors' Plan and Amended Disclosure do not even include the words "new value," let alone any actual new value contribution.  If the Debtors retain any valuable assets at all, their Plan proposes no new value and cannot be confirmed.  The Plan proposes to allow the Debtors to retain numerous assets not sold to the purchaser.  The Amended Disclosure and Plan value certain of these causes of action as worthless, without justification, ignore others and do not even mention the non-litigation Retained Assets.  In reality, these causes of action and assets are valuable.  Permitting the Debtors to retain them without a contribution of new value violates the absolute priority rule.

**C.  The Sale Transfers Valuable Unencumbered Assets to a Credit Bidder**

A credit bid allows a secured creditor to bid an amount equal to its validly-secured prepetition claim without making an out-of-pocket distribution of money.  <u>In re Free Lance-Star Publishing Co. of Fredericksburg, VA</u>, 512 B.R. 798, 805 (Bankr. E.D. Va. 2014).  Credit bidding

protects the validly-secured portion of a secured lender's loan: "The ability to credit-bid helps to protect a creditor against the risk that its collateral will be sold at a depressed price. It enables the creditor to purchase the collateral for what it considers the fair market price (up to the amount of its security interest) without committing additional cash to protect the loan." RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 644 n.2 (2012).  Pursuant to 11 U.S.C. §363(k), a secured creditor is permitted to credit bid against "property that is subject to a lien that secures an allowed claim."  See In re Philadelphia Newspapers, LLC, 599 F.3d 298 (3d Cir. 2010). Nonbankruptcy law allows floating liens that automatically attach to after-acquired property, but such liens do not attach to "property acquired by the estate or by the debtor after the commencement of the case." 11 U.S.C. §552(a).  Avoidance causes of action "arise post-petition and must be considered after-acquired property belonging to the estate" that cannot be encumbered by a prepetition security interest.  Official Comm. of Unsecured Creditors v. UMB Bank (In re Residential Capital, LLC), 497 B.R. 403, 414 (Bankr. S.D.N.Y. 2013); Grossman v. Durham Commer. Capital Corp. (In re Connolly Geaney Ablitt & Willard, P.C.), 585 B.R. 644 (Bankr. D. Mass. 2018).

The current Sale and Plan, as described in the associated asset purchaser agreement (the "APA") (DI #18-1), allow the Secured Lender to credit bid its prepetition secured claim in order to acquire Debtor assets that are not encumbered by its prepetition lien.[3]

The Debtors have provided an itemization of the amounts required for outbidding in the Secured Lender's credit bid, attached as **Exhibit B**.  This overbid analysis is fatally flawed.  It

---

[3]      The APA permits the Secured lender to credit bid the Credit Bid Amount, defined as the aggregate value of "(i) the assumption of Assumed Liabilities, (ii) the credit bid of all of the Loan Agreement Indebtedness."  APA ¶2.1.  In the APA, "Loan Agreement Indebtedness means all Prepetition Obligations outstanding as of the date hereof under the Loan Agreement and the other Loan Documents, including all interest due and owing thereunder and all accrued and unpaid fees and expenses."  APA ¶XI.11.1(bbb).  These interlocking defined terms do no more than allow the Secured Lender to exercise commonly-understood credit bid rights: it may bid the amount of its prepetition secured debt against its collateral, the properly-secured assets of the Debtors.

includes the DIP loan in the credit bid amount, when the credit bid must, by the APA's own explicit terms, be based solely on prepetition amounts. It permits interest to run postpetition on the Secured Lender's claim, which necessarily implies that the claim is oversecured. Till v. SCS Credit Corp., 541 U.S. 465 (2004). The overbid analysis includes no additional consideration for the purchase of unencumbered Debtor assets: the Secured Lender may credit bid for chapter 5 claims held by the Debtors. The Secured Lender certainly cannot acquire these valuable unencumbered assets for no consideration via a credit bid, since they are not part of the prepetition collateral pool.

The Shareholder Settlement was funded by transfers of three (3) types of valuable asset: stock, CVR and insurance proceeds. Stock owned by Akorn is clearly a Debtor asset. CVR are also transferred Debtor assets, and any value in CVR or payments made upon CVR can be avoided as preferential transfers. The D&O Insurance proceeds are or would have been prepetition assets of the Debtors. The applicable insurance policies are attached as **Exhibit C**. "[W]hen there is coverage for the directors and officers and the debtor, the proceeds will be property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution." SN Liquidation, Inc. v. Icon Int'l, Inc. (In re SN Liquidation, Inc.), 388 B.R. 579, 584 (Bankr. D. Del. 2008) quoting In re Allied Digital Techs. Corp., 306 B.R. 505, 512 (Bankr. D. Del. 2004). The D&O Insurance policies provide direct coverage for the Debtors. The Directors sued in the shareholder litigation were defended jointly alongside the Debtors by the same counsel, in line with the Directors' right to indemnification and defense from the Debtors. Any insurance proceeds paid out on behalf of the Directors protected the Debtors' prepetition assets from diminution, and are also estate property. All D&O Insurance proceeds transferred in the Shareholder Settlement would have been Debtor property on the petition date and the entire amount is avoidable. The Plan and Sale would sell this

valuable unencumbered avoidance cause of action worth in excess of $34 million to the Secured Lender for no consideration.

The Debtors have produced a document called "Akorn Unencumbered Assets" which purports to be a list of assets not subject to the Secured Lender's lien, attached as **Exhibit D**. These are valuable assets to which the Secured Lender has no right. In fact, it is likely that the Secured Lender could not operate the Debtors' businesses post-Sale without them, making them especially valuable to the Purchaser. Again, the Secured Lender will obtain these assets for no consideration.

Postpetition, the Debtor applied for new tax opportunities created by the coronavirus relief CARES Act, attached as **Exhibit E**, entitling the Debtors' estates to a tax refund of $34,019,524.00. This unencumbered tax benefit is being sold to the Secured Lender upon the credit bid, for no consideration.

Even more troubling, the Debtors have avoidance causes of action against the Secured Lender itself. On February 9, 2019, the Debtors executed certain "Confirmatory Grants" of security interests in certain intellectual property, attached as **Exhibit F**. These grants were made on behalf of the original loan agreement with the Secured Lender, not as additional consideration for the Standstill Agreement. This "exchange" was made without the Secured Lender giving any value. The grant of these assets is avoidable. The resulting avoidance cause of action is, apparently, being sold to the avoidance defendant upon a credit bid for no consideration, in total derogation of the principles of credit bidding.

The Court should not approve the Sale or confirm the Plan because this would allow the Secured Lender to acquire numerous valuable assets, including litigation claims against itself, for an improper inflated credit bid upon a security interest that does not even cover these postpetition assets, in bad faith.

4820-0252-9734

### D. **The Plan Improperly Gerrymanders Claims**

A plan must "designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title." 11 U.S.C. §1123(a)(1). "The Code was not meant to allow a [plan proponent] complete freedom to place substantially similar claims in separate classes," John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assocs., 987 F.2d 154, 158 (3d Cir. 1993). "Where the sole purpose and effect of creating multiple classes is to mold the outcome of the voting to effectuate a "cram down," each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in determining whether the proposed reorganization should proceed." In re Coram Healthcare Corp., 315 B.R. 321, 349 (Bankr. D. Del. 2004). The same is true for attempts to lump together dissimilar claims that will reject the plan or place friendly accepting claims into improper classes in order to create an impaired accepting class. The impropriety of gerrymandering has been forbidden in biblical pronouncements. In re Greystone III Joint Venture, 995 F.2d 1274, 1279 (5th Cir. 1991) ("thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan"). A proper determination of whether claims are "substantially similar" focuses on the nature of the claims, not on the claimants. In re FF Holdings Corp. & Farm Fresh, Inc., 1998 U.S. Dist. LEXIS 10741 *13 (D. Del. Feb. 17, 1998).

Proper classification of claims is necessary to uphold the policy purposes of Section 1129(a)(10). The case of In re Combustion Eng'g, Inc., 391 F.3d 190 (3d Cir. 2004) is instructive on this point. In that case, the debtor made prepetition payment to certain current asbestos claimants who received some 95% of their claims prepetition. The plan provided for a release of all avoidance and preference actions against all parties, including these paid-up current claimants. The paid-up current claimants were then classified such that the plan was "ratified by a majority

15

of "stub votes" cast by the very claimants who obtained preferential treatment from the debtor." Id. at 245. The Third Circuit vacated the confirmation order for these, and other, deficiencies.

The Debtors kept certain claims based upon ongoing executory contract relationships out of the Plan on the assurance that the purchaser would take over ongoing liabilities and pay any required prepetition cure costs. The overbid analysis allocates $8 million to these cure costs and $107 million to these Purchaser Assumed Claims. Id. The Debtors have begun to send out cure notices to these unclassified vendors alleging that the vendors are owed nothing on their cure payments. These vendors have objected to this treatment and asserted their unpaid claims including Douglas Pharmaceuticals ($3,225,513.90) (DI #437); PrimePharma ($160,000.00) (DI #448, 470); Premier Healthcare (Undetermined) (DI #450); Amerisource (Undetermined) (DI #454); Premier Group ($25,688.29) (DI #455); Cleaver Brooks ($21,933.51) (DI #457); Express Scripts ($17,607.01) (DI #458); Express Scripts Senior Care ($174,986.09) (DI #459); Ascent Health Services ($214,763.88) (DI #460); Walgreen ($14,589,097.88) (DI #464); Quantic ($209,279.40) (DI #471); Catalent Pharma (Undetermined) (DI #485).

The Plan also classifies Settling Shareholder claims as general unsecured claims, despite the fact that these are clearly claims "arising from rescission of a purchase or sale of a security of the debtor" that must be subordinated pursuant to 11 U.S.C. §510(b). Fresenius filed a motion to reclassify these claims (DI #379). The Objectors joined that motion, and the joinder of the Objectors (DI #420) is incorporated by reference. The claims of Settling Shareholders and opt-outs from that settlement arose out of the same facts, circumstances and causes of action. The Debtor chose, inexcusably, to classify them into different classes. The Amended Disclosure put forth a voluminous defense of the Debtors' justification for doing so. Amended Disclosure ¶II.H. However when placed under direct scrutiny by Fresenius's motion to reclassify, the Debtors took

no position in support of their own actions.  (DI #423).  This shows the Debtors did not believe their own gerrymandered classification.

The Plan assigns unliquidated claims a voting dollar value of $1.00.  This valuation, plus the improper classification of Settling Shareholders and the removal of Purchaser Assumed Claims from the Plan all work towards a common purpose.  The Debtors supposed they could win the affirmative vote of the Settling Shareholders and win the general unsecured class.  The Debtors estimated that the general unsecured class would contain $42 million in claims, and that the Settling Shareholders' claims liquidated at $30 million would allow them to obtain the required impaired dollars voting for the Plan.  Plan ¶III.A, B.

The net effect of these machinations is to keep unpaid vendors out of the unsecured class while paying them nothing, neuter the voting power of MDL creditors, keep adverse creditors in the §510(b) class and place a friendly §510(b) claimant that already received 20% recovery prepetition in the unsecured class.  This classification scheme is unsupported by law, forbidden by the Code and specifically designed to allow the Debtors to win the vote of the unsecured class in order to obtain confirmation of their Plan.

### E.  **The Plan Improperly Discriminates Between Creditors**

"Equality of distribution among creditors is a central policy of the Bankruptcy Code." Begier v. IRS, 496 U.S. 53, 58 (1990).  Section 1123(a)(4) requires that a plan of reorganization "provide the same treatment for each claim or interest of a particular class."  The Bankruptcy Code includes a number of unique powers to ensure equal treatment.  "The preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally."  Union Bank v. Wolas, 502 U.S. 151, 160-61 (1991).  When certain

4820-0252-9734

creditors receive avoidable or preferential payment prepetition, that payment must be taken into account when considering the equality of their treatment.  In re Combustion Eng'g, Inc., 391 F.3d at 240 (Because of prepetition preferential transfers to accepting creditors, "we consider the bankruptcy scheme as an integrated whole in order to evaluate whether Plan confirmation is warranted.").

Regardless of which class Settling Shareholders are placed in, the Plan provides for unequal treatment within that class.  In the shareholder litigation, shareholders brought claims against the Debtors and derivative claims on behalf of their equity in the Debtors against certain Directors.  The Debtors and their Directors settled prepetition with the Settling Shareholders. Amended Disclosure ¶IV.B.  The Shareholder Settlement was approved, and thus became a binding perfected transfer, within 90 days of the petition date.  The Shareholder Settlement was funded by the transfer of CVR, stock and approximately $30 million in D&O Insurance proceeds. At the time the Debtors transferred the required 6.7 million shares of stock, the 0.65 per share price of Akorn stock represented a transfer of Debtors' assets worth $4.36 million.  According to the Amended Disclosure, the shareholders had alleged over $600 million in damages.  Amended Disclosure ¶IV.B.  The Settling Shareholders apparently alleged claims approximating $450 million.  Id.  Between insurance proceeds, stock and the maximum CVR payout, the Settling Shareholders agreed to an aggregate recovery of $90 million, so the settlement represented at least 20% payment on their liquidated claims.  The Debtors placed Settling Shareholders in the general unsecured class, and estimated that this class would receive nothing under the Plan.  The Objectors are members of this class, and will receive 0% recovery while Settling Shareholders obtain 20% recovery and escape any liability for their preferential treatment.  Even if the Debtors' gerrymandered classification is upheld, the Plan does not treat Objectors and Settling Shareholders

18

equally.  If the Settling Shareholders are properly classified in the §510(b) class, the disparate treatment is even worse: not only are Settling Shareholders getting more than shareholder opt-outs in that same class, they are retaining an avoidable preference while the senior general unsecured class receives nothing.  In either case, Settling Shareholders receive better treatment than the rest of their class.  Such a Plan violates Section 1129(a)(4) and cannot be confirmed.

**F.  <u>There is no Impaired Accepting Class</u>**

In order to confirm a nonconsensual plan via 11 U.S.C. §1129(b), at least one impaired class of claims must vote to accept the Plan.  11 U.S.C. §1129(a)(10), (b)(1).  A class of claims is impaired unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. §1124.  A "class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests."  11 U.S.C. §1126(g).  Such a class "is conclusively deemed to have rejected the Plan."  <u>In re Maremont Corp.</u>, 601 B.R. 1, 23 (Bankr. D. Del. 2019).

The Plan contains three (3) classes of purportedly impaired claims purportedly entitled to vote on the Plan: Class 3 Term Loan Claims owed to the Secured Lender, Class 4 general unsecured claims and Class 7 subordinated 510(b) claims.  In fact, Class 3 is unimpaired and cannot provide the necessary vote in favor of the Plan.  The Secured Lender is the winning purchaser, so the Class 3 claims receive Debtor assets and are entitled to immediate possession. Plan ¶III.B.  On the petition date the Secured Lender was bound by the terms of the Standstill Agreement to make a credit bid for all the Debtors' assets and obtain those assets if it put forward the winning bid.  That is, it was legally entitled to participate in a certain way in the bankruptcy

process.  The Secured Lender is now the winning bidder and will receive exactly its legal due under the Standstill Agreement, without even the most minor impairment of its rights.

Classes 4 and 5 are certainly impaired classes.  They are so impaired that they will receive nothing under the current Plan.  A purchase by the Secured Lender will pay Classes 4 and 5 nothing.  This means that the impaired classes are conclusively deemed to reject the Plan.

### G.  The Plan Pays Less than a Liquidation

Pursuant to Section 1129(a)(7), each impaired class must either accept the Plan or "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date."  Every plan must treat creditors better than they would be treated in a liquidation, unless they agree otherwise.  The Objectors have identified numerous unencumbered assets throughout this Objection.  The Debtors assert that the value of their validly-encumbered assets is roughly equivalent to the amount of secured debt and that priority debt is negligible given the scale of the transactions.  Amended Disclosure ¶II.D.  The Objectors belong to the next class in the distributional waterfall, and are entitled to their *pro rata* share of the unencumbered assets.  The Plan pays them nothing.  The Objectors would receive better treatment in a liquidation of the Debtors' assets than they receive in the current Plan.  The Plan cannot be confirmed.

### H.  The Plan Contains Impermissible Releases and Injunctions

If a plan provides for an injunction, the plan and disclosure statement "shall describe in specific language. . . all acts to be enjoined and identify the entities that would be subject to the injunction." Fed. R. Bankr. P. 3016(c); In re Lower Bucks Hosp., 571 Fed. Appx. 139, 144 (3d Cir. 2014) (affirming rejection of third party releases that were not adequately disclosed in debtor's

disclosure statement). "In evaluating releases, courts distinguish between the debtor's release of non-debtors and third parties' release of non-debtors". <u>In re Wash. Mut., Inc.</u>, 442 B.R. 314, 352 (Bankr. D. Del. 2011) citing <u>In re Exide Techs.</u>, 303 B.R. 48, 71-74 (Bankr. D. Del. 2003). Courts use "different analyses to evaluate releases by a debtor of non-debtor third parties and releases by a non-debtor or other non-debtor third parties." <u>Id</u>. The Third Circuit recently clarified the outer bounds of permissible nonconsensual third-party releases, stating that "we are not broadly sanctioning the permissibility of nonconsensual third-party releases in bankruptcy reorganization plans." <u>In re Millennium Lab Holdings II, LLC</u>, 945 F.3d 126, 139 (3d Cir. 2019). In <u>Millennium</u>, the releases passed constitutional muster because they were necessary to the plan and specifically negotiated with the releasing parties that contributed new value.

The Plan originally contained unconstitutional involuntary third-party releases; the Debtors have amended these into opt-in releases (the "Releases"). Plan ¶VIII.E, F. The Plan also contains another set of releases, the "Exculpations," that are overly-broad, undefined and completely involuntary. Plan ¶VIII.G. Confirmation of the Plan will make the Exculpations enforceable against the Debtors and all Committee members and every person ever within their circles of interest. Plan ¶I.A.57. All parties bound by the Plan involuntarily release these Exculpated Parties, including the Objectors. The Directors are offering nothing in exchange for these Exculpations.

The Exculpations are broad enough to include chapter 5 causes of action and state law avoidance causes of action that arose upon the filing of the petition or are related to prepetition restructuring activities. While "it is acceptable to provide exculpations for [plan proponents] for the role they played in the bankruptcy process," the Exculpations appear to go far beyond that limited role. <u>In re Washington Mutual, Inc.</u>, 442 B.R. 314, 348 (Bankr. D.Del. 2011). The Exculpations cut off the rights of parties that could bring avoidance actions if the Debtors refuse

to do so.  In re Wilton Armetale, Inc., No. 19-2907, 2020 WL 4460000 (3d Cir. Aug. 4, 2020) (creditors may bring avoidance causes of action when debtor will not).

The Plan provides for an injunction (the "Injunction") that prevents any party bound by the Releases or Exculpations from "taking any of the following actions…(i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests…" Plan ¶VIII.H.  This limitation applies to all actions connected with a Claim.  The Objectors will still have a valid, unpaid Claim against the Debtors once this proceeding concludes, and will need to continue discovery against the Debtors in order to bring the price-fixing conspiracy to justice in the MDL.  The Objectors' discovery in the MDL will, apparently, be in violation of the Injunction.  The Exculpations and Injunction will not only free many persons from their avoidance liability to the Debtors' bankruptcy estate, but will also enjoin the continuation of the MDL.

### I.   The Plan is not Fair and Equitable

Section 1129(b) requires that a plan be fair and equitable.  "Fair and Equitable" "includes" fulfilling the absolute priority rule under Section 1129(b)(2)(A), (B), (C).  The Plan does not do so, as discussed above.  However, 'fair and equitable' is not limited to a mechanical application of the absolute priority rule.  In re D & F Constr., Inc., 865 F.2d 673, 675 (5th Cir. 1989) ("technical compliance with all the requirements in § 1129(b)(2) does not assure that the plan is 'fair and equitable.'").  A plan must also be fair and equitable in a general sense.  A fair and equitable plan is one that "improves the likelihood of recovery by unsecured creditors and causes no injury to any creditor."  In re Regatta Bay, LLC, 406 B.R. 875, 882 (Bankr. D. Ariz. 2009).  Such a plan "preserves equity of the estate," furthers the recognized reorganizational goals of the Bankruptcy Code and does not improperly increase a debtor's powers over those permitted by the Code.  In re

Tucker, 479 B.R. 873, 879 (Bankr. D. Or. 2012); In re Dollar Assocs., 172 B.R. 945, 951 (Bankr. N.D. Cal. 1994).   The determination of fairness and equity includes more fundamental determinations of whether the plan accomplishes the permissible social, legal and policy purposes of a reorganization.

The Plan does nothing of the kind.  The Debtors are laboring under massive MDL liability, and liability to Fresenius, and liability to shareholders, all caused by the intentional and criminal misconduct of the Debtors and their Directors.  It is the statutory policy of the Bankruptcy Code that such bad-acts debts cannot be discharged.  11 U.S.C. §523(a)(2), (4), (6).  To the extent that chapter 11 permits a debtor to obtain releases of bad acts debts, the debtor must give value in exchange.  The Plan as currently proposed does not give any value, and does not propose to release any debts owed to the Objectors on account of intentional misconduct.  Instead, the Plan elects an improper third option: placing all valuable assets out of the reach of the Objectors.  This is an improper enhancement of the Debtors' powers beyond those permitted by the Bankruptcy Code, and is unfair and inequitable.

Confirmation of this Plan in its present form will ensure that friendly Settling Shareholders get 20% recovery but unfriendly shareholders get nothing.  Vendors are being tricked into believing they will be paid in full, but will actually be paid nothing.  Directors were paid millions of dollars more than usual simply to run the normal operations of the company leading up to sale, but will escape this bankruptcy with their bonuses intact, plus personal releases for which they gave no value.  The Debtors will perform a reorganization-by-liquidation, selling everything of value to the sole benefit of the colluding Secured Lender and immediately reconstituting as an increasingly-profitable company.  Meanwhile the unsecured creditors will receive nothing and all

valuable assets will be placed beyond any possible execution.  This is not the "recognized reorganizational goal" contemplated by the Bankruptcy Code, and is unfair and inequitable.

The Debtors are increasingly profitable and have settled or concluded the major portions of the shareholder and Fresenius litigations. ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████  See Ex. I at 13.  ████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████  Id.  The Plan and Sale effect an improper reorganization-by-liquidation that transfers over $850 million in assets to a new operating company in exchange for ████████████████████, while paying other creditors nothing and securing releases for Settling Shareholders and Directors.  The Plan and Sale do not maximize the value of the estate, and instead contemplate an unfair and inequitable exchange.

To understand the unfair and inequitable nature of the Plan and Sale, it is helpful to consider them from the perspective of an unassociated outsider.  The Debtors run a valuable, increasingly-profitable business.  The Debtors also participated in an illegal price-fixing conspiracy that siphoned money out of the pockets of governments, union health and welfare funds and individual consumers.  The Debtors tried to sell their company to an investor, but during the merger process they got caught engaging in additional wrongdoing not even included in the price-fixing scheme.  After all this, the Debtors created a settlement with a particular group of friendly stockholders and paid them millions of dollars.  The Debtors also approached their main lender and voluntarily offered to modify their loan so that the terms were worse, in order to stave off a default that the lender was not asserting.  The Debtors then paid their top executives bonuses valued in the tens of

millions of dollars, that were several times as large as usual to retain them through just the portion of the year leading up to a bankruptcy sale. Then the Debtors filed bankruptcy intending to transfer all valuable assets into a newly-formed entity with the consent and collusion of the lender and pay no other parties. The Plan and its associated processes release the top executives from liability, give the Secured Lender assets it is not entitled to, and prevent anyone harmed by the illegal price-fixing from ever recovering a dime. When all the legal technicalities and jargon are stripped away, it becomes clear that the Sale and Plan do not appropriately balance the Debtors' need for reorganization with the needs of creditors. Instead, the entire edifice is designed to improperly privilege those who don't need help while paying those harmed by the Debtors' actions nothing. The Plan is fundamentally unfair and fundamentally inequitable.

### J.  **The Plan and Sale are Proposed in Bad Faith**

i.    Bad Faith Basics

Pursuant to 11 U.S.C. §1129(a)(3), a plan must be "proposed in good faith and not by any means forbidden by law." "The Bankruptcy Code does not define the term "good faith," but case law has defined the term as requiring, alternatively that (1) the plan be consistent with the objectives of the Bankruptcy Code ; (2) the plan be proposed with honesty and good intentions and with a basis for expecting that reorganization can be achieved; or (3) there was fundamental fairness in dealing with the creditors." Stonington Partners, Inc. v. Official Comm. of Unsecured Creditors (In re Lernout & Hauspie Speech Prods. N.V.), 308 B.R. 672, 675 (D. Del. 2004) (citing cases). A plan is consistent with the Bankruptcy Code if it preserves a going concern or maximizes value for creditors. In re Integrated Telecom Express, Inc., 384 F. 3d 108, 119 (3d Cir. 2004). Given the Bankruptcy Code's strong policy preference for reorganization and the considerably lower cost for liquidation via a chapter 7 filing, liquidating plans in chapter 11 come under

especially strong scrutiny. A debtor proposing a liquidating plan must have a reasonable good

faith belief that such liquidation is in the best interest of its creditors. In re Gillette Assocs., Ltd.,

101 B.R. 866, 873 (Bankr. N.D. Ohio 1989). A plan must be proposed with honesty and good

intentions. "In analyzing whether a plan has been proposed for honest and good reasons, courts

routinely consider whether the debtor intended to abuse the judicial process, whether the plan was

proposed for ulterior motives, or if no realistic probability for effective reorganization exists." In

re W.R. Grace & Co., 475 B.R. 34, 88 (D. Del. 2012) aff'd, 729 F.3d 332 (3d Cir. 2013). A debtor's

intentional obfuscation or withholding of information can constitute bad faith, even if the

information is eventually disclosed. In re Frascella Enters., Inc., 360 B.R. 435 (Bankr. E.D. Pa

2007). In order to meet the requirement of fundamental fairness, "the plan must treat all parties

fairly and ensure that its confirmation comports with due process." In re W.R. Grace & Co., 475

B.R. 34, 89 (D. Del. 2012) aff'd, 729 F.3d 332 (3d Cir. 2013). Fundamental fairness is "the most

important feature" of the Section 1129(a)(3) analysis. In re Coram Healthcare Corp., 271 B.R.

228, 234 (Bankr. D. Del. 2001). A plan that achieves its purposes without proper notice or

disclosure "circumvents basic due process." In re N.S. Garrott & Sons, 48 B.R. 13, 18 (Bankr.

E.D. Ark. 1984).

ii.    The Debtors Manufactured a Default to the Secured Lender

The Plan was proposed in bad faith because it was the culmination of a process begun by

the Debtors with the ulterior motive of artificially increasing the amount of secured debt to provide

a friendly, unbeatable credit bidder to purchase all Debtor assets.

The Debtors have attempted to portray their 2019 negotiations with the Secured Lender as

adversarial, and the resulting Standstill Agreement as the best possible deal that could be made.

In the Amended Disclosure, the Debtors assert that "On November 7, 2018, Akorn received a letter

from the legal representatives of the Ad Hoc Group asserting that the Delaware Chancery Court's finding that Akorn had suffered a "material adverse effect" and had failed to operate in the ordinary course of business may have significant implications under the Term Loan Credit Agreement. The letter further stated that the Ad Hoc Group wanted to engage in a dialogue with Akorn." Amended Disclosure ¶IV.D.

This disclosure is carefully worded to imply that the Debtors were under threat of a default. In fact, Portwood testified under oath that at the time the Debtors entered the Standstill Agreement, "really, technically, we weren't in default." Ex. A at 24. He further elaborated that the Debtors purportedly feared a default caused by an MAE. He testified that the Debtors entered the Standstill Agreement because the "the debt agreement that we had also had entered into, into this type of [MAE] clause in different states -- one was Delaware and was one New York -- but we felt that rather than kind of to litigate that and to have a chance of losing, it would be much better to enter into the standstill agreement such that we could have more constructive talks with our creditors and look for a solution and a refinancing solution, so that's why we made that decision." Id.

The MAE in the Fresenius litigation was a violation of certain regulatory representations and warranties made to Fresenius during merger discussions. There is no colorable argument that that particular MAE, which was indeed adverse to a merger, was also an MAE under the standard secured lending agreements with the Secured Lender. The Secured Lender, lending in 2014, could not possibly have relied on representations and warranties made to Fresenius years later. To the extent the Debtors purported to fear such a default, their fear was a pretext.

In fact, the Debtors made the first move: they approached the Secured Lender on March 6, 2019 with a Standstill Agreement drawn up by the Debtors' advisors. A copy of an email exchange regarding the initial Standstill Agreement is attached as **Exhibit G**. The purported purpose of the

Standstill Agreement was to give the Debtors time to evaluate alternatives for refinance, lending or investment. ████████████████████████████████████████████ attached as **Exhibit H**. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ attached as **Exhibit I**.

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ attached as **Exhibit J**.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

Between the initial Standstill Agreement and the Debtors' public commitment to a bankruptcy sale with the Secured Lender as the stalking horse purchaser, the Debtors amended the Standstill Agreement twice. A summary of the terms changed by each amendment is attached as **Exhibit K**. In order to obtain the three (3) standstills required to evaluate and reject every potential lender, the Debtors paid $11 million in standstill fees, $12 million in amendment fees, $5 million in fees for failure to amend the underlying loan, increased the interest rate by 4.5%, added a 2% exit fee to the loan, and added a 1.5% call premium to the loan. This exit fee was timed such that it would apply fully to any bankruptcy sale that closed after August 15, 2020. Unsurprisingly, the Debtors' original proposed closing date was August 15, 2020, maximizing the exit fee to be paid to the Secured Lender.

An exit fee is not a proper line item to include in a bankruptcy sale's credit bid. This fact was known to Debtors' counsel. On May 19, 2020, Debtor counsel Christopher Hayes noted in an email, attached as **Exhibit L**, that "BUFs and expense reimbursements are not typical in credit bids like this one." "BUFs" refers to break-up fees, such as exit fees and call premiums. The next day, the Debtors' financial advisors discussed adding exit fees and the call premium to the credit bid amount, and decided to do so. A copy of this discussion is attached as **Exhibit M**. The exit fee and call premium were indeed included in the credit bid amount. See Ex. B.

These last-minute discussions were the final steps in building an unbeatable friendly credit bid for the Secured Lender by improperly exaggerating the amount of the debt and the scope of the lien. The final overbid analysis includes postpetition interest at the higher Standstill Agreement rate, a call premium, an exit fee, the DIP loan balance, exaggerated cure costs the Debtors never intended to actually have paid, and an otherwise-undisclosed 2% transaction fee enumerated at **Exhibit N**. The total amount of these improper or exaggerated fees is some $90 million, on top of additional unitemized increased expenses the Debtors paid in order to drag out the Standstill Agreement. The overbid analysis also includes $107 million for assumed liabilities. Given the Debtors' practice of sending zero-dollar cure notices to Purchaser Assumed Claimants, it is not clear if any of this amount will actually make its way to these parties. The credit bid includes some $200 million in charges that are not properly part of a credit bid, on top of intentionally-increased interest and fees that the Objectors cannot completely quantify, that either depleted the Debtors' cash reserves or increased the secured loan principal.

Portwood testified that the Debtors were not firmly committed to a bankruptcy sale to the Secured Lender even as late as December 2019. See Ex. A at 26. However, in August 2019 the Debtors were already discussing ways to manipulate a bankruptcy filing to benefit certain parties.

29

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████  **Exhibit O** at 4.  ████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████  Id.  The Debtors now propose a billion-dollar Sale transaction that pays unsecureds nothing.  The entire course of action taken by the Debtors after August 2019 is directed towards increasing the credit bid amount to eliminate any "leakage" that would result in payments to unsecured creditors.

The Debtors manufactured their current situation.  They were not in default with their Secured Lender.  Their business prospects were improving and major litigation with shareholders and Fresenius was concluded.  However, with these positive projections and no specific reason to doubt their ability to remain current with their Secured Lender, the Debtors voluntarily approached the Secured Lender to negotiate a Standstill Agreement.  During the standstill period, the Debtors purportedly sought additional financing or refinancing.  The Debtors received several offers from lenders or investors.  Accepting one or more of these offers would have permitted the Debtors to either pay their Secured Lender in full or access sufficient capital to remain current on terms superior to those in the existing lending arrangement.  The Debtors rejected all such offers and instead larded all possible additional charges into the Secured Lender's credit bid, as a shield against an outside purchaser at a chapter 11 sale.

What is more, the Debtors negotiated the Standstill Agreement such that the Secured Lender would have the ability to credit bid for much more than the value of its secured debt.  That is, the Secured Lender had a claim for $854 million, purportedly fully-secured.  The Sale, APA

and Plan propose to permit the Secured Lender to credit bid $1.06 billion, $210 million in excess

of the purported secured claim.  This is a transparent attempt to ward off other purchasers, and

ensure that the friendly Secured Lender buys all assets, spikes all avoidance causes of action

against Settling Shareholders and Directors, re-employs all top directors and officers and permits

the Debtors to effectively continue business free of all litigation liability.

   The Debtors feely admit that this bankruptcy is intended to allow the Debtors to continue

as a going concern free of litigation liability.  "The Debtors' underlying business is sound today

and improving with each passing quarter, the Debtors continue to face significant nonoperational

headwinds, including, first and foremost, the Debtors' significant lingering litigation overhang."

Amended Disclosure ¶IV.E.  The Debtors have settled with the vast majority of their shareholders.

The Fresenius liability is, at maximum, around $110 million.  A multi-billion dollar company like

the Debtors does not file chapter 11 in order to escape a hundred million dollars in liability that

could easily be paid over time.  It files bankruptcy to escape the kind of liability brought against

the Debtors in the MDL.  The Debtors would not have been able to propose the current Sale and

Plan with a straight face unless they increased their secured obligations to a level that drove away

potential purchasers.  The Debtors' entire course of conduct prepetition and during this bankruptcy

has been to maximize the debt owed to the Secured Lender in order to propose a bad faith Plan.

In order to succeed, the Debtors have intentionally neglected to present an honest picture of their

current financial and legal situation.

   iii.   <u>The Notice and Disclosure Process was Undertaken in Bad Faith</u>

   *a. The MDL Plaintiffs were not Notified Timely*

   The Plan was proposed in bad faith because it was the culmination of a process of false or

intentionally misleading disclosures and nondisclosures intended to confuse interested parties in

taking positions opposite their own interests, or to freeze them out of meaningful participation in the bankruptcy process.

When the Debtors filed the petitions, they also filed the required list of the thirty (30) largest unsecured creditors.  (DI #1).  This list includes unliquidated claims and claims of as little as $252,644.00.  The Debtors did not list the Objectors, the EPP putative class or any other litigant in the MDL.  The Debtors must have known, after over four (4) years of litigation in the MDL, that the MDL plaintiffs had claims which were large enough that all classes in the MDL were top-30 creditors.  The Debtors certainly knew how to list unliquidated claims, as they listed Fresenius's liquidated claim as "unliquidated."

The Debtors filed a list of creditors under seal (DI #17) which the Objectors and their counsel cannot access. The Objectors did not receive notice of the bankruptcy in time to seek appointment to the Committee of Unsecured Creditors, and as a result were not made members of the Committee.  Rising Pharmaceutical, which has admitted to illegal price-fixing in the MDL, was placed on the Debtors' Committee instead.  See United States Department of Justice Press Release 19-1,929, December 3, 2019, a true and correct copy of which is attached as **Exhibit P**.

*b.  The Debtors Did Not Accurately Disclose Assets or Liabilities*

On May 26, 2020, the Debtors filed their Plan (DI #101) and Disclosure Statement (DI #102).  The Disclosure Statement does not mention the MDL, or the Objectors, or the EPP class's very substantial claims against the Debtors.

The Disclosure Statement disclosed a number sources of recovery that could be used to pay creditors: the sale of a non-debtor affiliate in India, D&O Insurance proceeds currently in escrow, a claim against Provepharm for $30 million, and others.  However, the Disclosure Statement also asserted that there were no excess proceeds to distribute to creditors.

After the time to object to the Disclosure Statement had run, the Debtors filed the Amended Disclosure.  The Amended Disclosure explicitly valued all avoidance and other causes of action as worthless, without any reasonable justification, asserting that the mere cost of valuing them would outweigh any potential recovery.  It disclosed that any such avoidance actions would either be sold to the purchaser on condition that they never be pursued, or retained by the Debtors with the intent to release them.  The Amended Disclosure mentioned the MDL offhandedly in a single paragraph, despite MDL liability being a massive nondischargeable debt owed by the Debtors.

The Amended Disclosure vociferously opposed the creation of any litigation or reorganization trust, on the assumption that the Debtors' unjustified valuation of their causes of action was accurate.

The initial Schedules filed by the Debtors omitted all ownership interest in affiliates.  (DI #272).  On July 28, 2020, after the deadline to object to the Disclosure Statement had already run, the Debtors filed amended schedules (the "Amended Schedules") in which Akorn disclosed an ownership interest in some, but not all, Debtors as well as non-Debtor India and Mauritius affiliates.  (DI #390 at Q15).  On August 14, 2020, the Debtors filed a Rule 2015.3 Report which finally disclosed the Debtors' interest in non-Debtor Akorn AG.  (DI #463).  The Objectors do not know whether all affiliates have been disclosed.  The ownership structure of the disclosed affiliates cannot have been a mystery to the Debtors on the petition date, but remained a mystery to other interested parties until August 14, 2020, which was the original deadline to object to confirmation of the Plan.  Had that deadline held, the Objectors would have been deprived of vital information due to the inexcusable and knowing nondisclosures of the Debtors.

With each disclosure statement, schedule, motion and amendment thereto, the Debtors have revealed more and more potential claims and assets implicated in this bankruptcy.  The timing

4820-0252-9734

of these disclosures has impaired the ability of interested parties to evaluate the worth of these assets. The Debtors have insisted from the start of this case that there are no valuable assets that are not being sold in the Sale, but each disclosure reveals these falsity of the Debtors' position. The eventual disclosure of known prepetition assets is not curative: late disclosures demonstrate that the Debtors are not operating with the honesty required of them by the Bankruptcy Code.

> *c. The Debtors Intentionally Omitted Required Material Disclosures Regarding Director Bonuses*

The Amended Disclosure disclosed, for the first time, that the Debtors paid $13.8 million in "retention bonuses" in February 2020. Amended Disclosure ¶III.B.4(a). Portwood testified that these bonuses were explicitly structured to vest upon a bankruptcy sale. See Ex. A at 9-11. Portwood also testified that bonuses were paid out in two (2) installments as the start and end of the year. Id. at 11. This appears to be false: the Debtors produced a record of Director compensation going back four (4) years, a true and correct copy of which is attached as **Exhibit Q**. This historical compensation record shows that bonuses were either paid at the start of a year or the end of a year, but not both.

In fact, the disruption in Debtor business in 2017 and 2018 and reduction in Adjusted EDITDA meant that bonuses were substantially reduced or not paid for those years. In 2019 the Debtors changed the bonus structure via the 2019 Salaried Executive Plan attached as **Exhibit R**. This change was explicitly made in order to allow top Directors to receive bonuses they would not have been entitled to under the prior bonus structure. In December 2019 the Debtors altered the bonus structure again, accelerating bonus payments so that they would be paid on December 13, 2019 instead of the regularly-scheduled timing at the end of the first business quarter of 2020. A copy of such an accelerated bonus payment agreement is attached as **Exhibit S**.

This accelerated prepayment of bonuses caused concern within Akorn.  <u>See</u> **Exhibit T**.  Portwood wrote that he was in favor of accelerating bonuses for himself and others, but in light of the Debtors' preparations for a bankruptcy filing he wanted to "make sure we are aware of any potential impacts it could have with respect to the process so that we go in with eyes open."  <u>Id</u>.  In early 2020, after they had committed to a bankruptcy sale, the Debtors altered their bonus structure yet again, instituting a "prepaid retention program" whereby all bonuses earned during 2020 would be prepaid in February 2020 and would vest upon a bankruptcy sale.  A copy of the Debtors' internal summary of the new compensation structure is attached as **Exhibit U**.  These 2020 bonuses were approved by the Debtors' Board of Directors on February 4, 2020 and paid on February 7, 2020.  The 2020 bonuses were explicitly structured as "retention" bonuses, not based on company performance.  They were also substantially higher than the total non-salary compensation in prior years.  CCO Johnathan Kafer was paid $284,500.00 in bonuses in 2018, $562,929.66 in 2019 and $1,155,000.00 in 2020.  <u>See</u> Ex. Q.  CEO Douglas Boothe obtained a bonus of $1,306,720.39 in 2019, and $3,600,000.00 in 2020.  <u>Id</u>.  The 2020 bonuses were intentionally structured so that they would irrevocably vest upon a bankruptcy sale by the end of Q3 2020.  Once annualized, it becomes clear that the Debtors' CEO received a 2020 bonus that was 369% of his 2019 bonus.[4]

The Debtors knew that their changes to the compensation structure would cause issues.  In response to public disclosure of the 2020 bonuses, the Debtors' financial advisors sent panicked emails, since the bonus payment might impact pending offers for lending or investment.  A copy of these exchanges, demonstrating that "everyone is asking the obviously [sic] questions" is attached as **Exhibit V**.  In fact, these bonus payments did indeed cause issues for the Debtors.  As

---

[4] A bonus of $3.6 million for three (3) quarters is equivalent to an annual bonus of $4.8 million.  This is 3.69 times the 2019 bonus.

demonstrated by Debtors' financial advisors' emails, attached as **Exhibit W**, the Debtors were missing their liquidity targets once the 2020 bonuses were factored into forecasts.

The Debtors knew long before their bankruptcy that the 2020 bonuses would be problematic, but failed to disclose them in the Disclosure Statement.  Had the Objectors relied on the disclosures made by the Debtors they might have believed the Debtors' assertion that the bonuses were not avoidable because they were paid in the ordinary course according to market terms.  The Objectors would never have known that bonus terms and timing were changed at the start of 2019 or changed again, twice between December 9, 2019 and February 4, 2020, or that bonuses were massively increased for 2020, or that the Debtors knew of their obligation to disclose this information and did not do so.  More clearly than any other disclosure failure, the saga of the 2019 and 2020 bonuses demonstrates the improper smash-and-grab nature of the instant bankruptcy.

These facts and the intentional concealment of the particulars show that the Debtors are not engaged in an honest process of disclosure.  Further, it demonstrates the ulterior motive for the instant bankruptcies: to pay key executives unjustifiable amounts of money, then sell the company in order to escape existing litigation debt.

### d.  The Debtors Knowingly Misrepresented Claims

In the Amended Disclosure the Debtors disclosed that Provepharm had sued them for $57 to $62 million, which could potentially be trebled at the discretion of the court.  The Debtors disclosed that they had countersued for $30 million, which might also be trebled.  Amended Disclosure ¶IV.C.  The Amended Disclosure estimated the general unsecured creditor body at $42 million dollars maximum, $30 million of which is actually the improperly-classified Settling Shareholder claims.  Amended Disclosure ¶II.D.  Completely ignoring the issue of unliquidated

36

claims, the Debtors disclosed that they knew of a single unsecured claim of <u>at least</u> $57 million, then estimated the entire unsecured body of claims would be some $42 million <u>at most</u>.

As discussed above, the Debtors intentionally misclassified the Settling Shareholders in order to win the vote of an impaired class.  Even worse than the gerrymandering, which was so intentionally wrongful that the Debtors would not defend it in court, ██████████████

████████████████████████████████████████

████████████████   ████████████████████████

████████████████████████████████████████

██████████   Ex. O at 2.  These knowing misrepresentations show the Debtors' subjective bad faith in proposing the Plan.

> e.   *The Debtors Intentionally Obfuscated the Material Benefits of the*
> *Sales of Their Foreign Affiliates*

The Amended Disclosure mentions that the Debtors would sell their interest in the India affiliate AIPL for "for $10 million in cash."  Amended Disclosure ¶III.B.9(b).  This disclosure was intentionally misleading, as the Debtors would realize only $2,000.00 from the sale, the remainder of which would flow to the Mauritius affiliate WAPM.  (DI #269).  The Debtors then proposed to sell their interest in WAPM to WAPM in order to quickly upstream realizable valuable benefits. (DI #446).  The Objectors objected to the sale of the WAPM shares on the basis that it was unclear how profits would be distributed.  (DI #488).  In response to their objection, the Objectors learned that the entire series of foreign sales was actually a mechanism to realize certain tax deductions exceeding $100 million.  These benefits would flow to Akorn and Akorn AG, which the Debtors disclosed for the first time to be a wholly-owned subsidiary of Akorn.  That is, the most material terms of the series of transactions were fundamentally undisclosed on any Schedules or in the relevant motions.  This tax benefit, which might be worth upwards of $40 million, is apparently

being sold to the purchaser on the credit bid, despite the fact that it is not validly encumbered by the Secured Lender's lien.  In re TCMI Elecs., 279 B.R. 552, 555 (Bankr. N.D. Cal. 1999) (tax attribute acquired postpetition is not encumbered by prepetition security interest, notwithstanding 11 U.S.C. §552(b)).

The effect of the Debtors' failure to disclose the real material terms of this sale demonstrates that the Debtors are hiding valuable unencumbered assets.  The current Plan, which was proposed with the knowledge of these assets, sells them for no consideration or retains and releases them.  The Plan was proposed in bad faith to allow undisclosed economic benefits to flow to friendly parties and pay creditors nothing.

      iv.     <u>The Debtors Refuse to Pursue Valuable Assets for the Benefit of the Estate</u>

The Plan was proposed in bad faith because the Debtors refuse to pursue valuable assets, intentionally failing to maximize the value of the estate.  As discussed above, the Debtors have disclosed a large number of valuable assets and postpetition causes of action.  The Objectors have shown that these assets are indeed valuable and not subject to the Secured Lender's prepetition lien.  Despite that fact, the Plan and Sale will sell unencumbered assets for no consideration and retain others in order to release them.

The Debtors value all these causes of action as worthless, but also oppose assigning them to the Committee or a trust.  The only course of action the Debtors will accept is if these causes of action are not pursued by any party in interest.  This is a violation of the Debtors' fiduciary duties as trustees of their own bankruptcy estate.  The Debtors have a higher purpose in this case than maximizing the return to creditors: the purpose of this case is to free the Debtors of all liability – especially MDL liability – to allow them to return to profitable operations.  In disregarding their duties as debtors-in-possession, the Debtors have chosen to prefer their current Directors, friendly

Secured Lender and shareholders over the actual objects of their fiduciary duties: their creditors. The Debtors made massive, unjustifiable distributions to Directors, but will not pursue them because the purpose of this bankruptcy is to provide a windfall and liability protection for those Directors.  The Debtors made avoidable transfers to Settling Shareholders, but instead of pursuing them for recovery for the general pot, the Debtors allege than none of the payments made on the Debtors' behalf involve estate property.

4820-0252-9734

## IV.    <u>CONCLUSION</u>

For the reasons enumerated in this Objection, the Sale and the Plan violate 11 U.S.C. §§

363, 1122, 1123, 1129(a), (b) and cannot be confirmed or approved.


Respectfully submitted,

Dated:  August 25, 2020
       Wilmington, Delaware

By: /s/Leslie B. Spoltore
Leslie B. Spoltore, Esquire (DE Bar No. 3605)
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
123 Justison Street, Suite 100
Wilmington, Delaware 19801
Telephone: (302) 238-6947
Facsimile: (302) 655-1092
Email: leslie.spoltore@obermayer.com

-and-

Edmond M. George, Esquire (*pro hac vice*)
Michael D. Vagnoni, Esquire (*pro hac vice*)
Turner N. Falk, Esquire (*pro hac vice*)
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
Telephone: (215) 665-3140
Facsimile: (215) 665-3165
Email: Edmond.george@obermayer.com
*Counsel to AFSCME District Council 47 Health and Welfare Fund, 1199SEIU National Benefit Fund, 1199SEIU Greater New York Benefit Fund, 1199SEIU National Benefit Fund for Home Care Workers, 1199SEIU Licensed Practical Nurses Welfare Fund and Sergeants Benevolent Association Health and Welfare Fund*

4820-0252-9734