# Exhibit A

1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2
                                   .  Chapter 11
3    IN RE:                        .  Case No.: 20-11177 (KBO)
                                   .
4    AKORN, INC., *et al.,*        .
                                   .
5                                  .
                  Debtors.         .  844 King Street
6                                  .  Wilmington, Delaware 19801
                                   .
7    . . . . . . . . . . . . . . . Wednesday, July 15, 2020

8

                 TRANSCRIPT OF TELEPHONIC SECTION 341 MEETING
9                  (CONTINUED FROM MONDAY, JUNE 29, 2020)

10

    APPEARANCES:
11
    For the Trustee:          Jane Leamy, Esquire
12                            OFFICE OF THE UNITED STATES TRUSTEE
                              J. Caleb Boggs Federal Building
13                            844 King Street
                              Suite 2207, Lockbox 35
14                            Wilmington, Delaware 19801

15

16   For the Debtors:         Christopher M. Hayes, Esquire
                              KIRKLAND & ELLIS, LLP
17                            300 North LaSalle Street
                              Chicago, Illinois 60654

18

19
    (APPEARANCES CONTINUED)
20
    Audio Operator:           Electronically Recorded
21
    Transcription Service:    Reliable
22                            1007 N. Orange Street
                              Wilmington, Delaware 19801
23                            Telephone: (302) 654-8080
                              E-Mail: gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.

1  APPEARANCES (CONTINUED):

2  For the Official
   Committee of
3  Unsecured Creditors:        William A. Williams, Esquire
                               JENNER & BLOCK, LLP
4                              353 North Clark Street
                               Chicago, Illinois 60654
5

6  ALSO APPEARING:

7                              Edith Morris

8                              Richard Clemens

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                            INDEX

2  MOTIONS:                                   PAGE

3  341 Creditors' Meeting                        4

4      CONTINUED EXAMINATION OF DUANE PORTWOOD:

5          Examination by Ms. Leamy              4

6          Examination by Mr. Williams          25

7  Transcriptionist's Certificate               30

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Audio commenced)

2         MS. LEAMY:  All right.  Good morning, everyone.

3    Today is July 15th, 2020.  This is the date scheduled for the

4    continued Section 341 meeting of creditors for Akorn, Inc.

5    and affiliated debtors, Case Number 20-11177, pending before

6    Judge Owens.

7         We had the first initial 341 meeting a few weeks

8    ago and Mr. Portwood was the witness.  I understand he's on

9    the phone as well today, so he was sworn in the first time

10   so, that will continue through to today.

11        But I would just ask that counsel for Akorn

12   introduce themselves at this time, please.

13        MR. HAYES:  Yes.  Hi, this is Christopher Hayes of

14   Kirkland & Ellis.

15        MS. LEAMY:  All right.  And then, if you could

16   just introduce the witness again, please.

17        MR. HAYES:  Yes, apologies.

18        With us on the line is Duane Portwood, chief

19   financial officer of Akorn, Inc.

20        MS. LEAMY:  All right.  Thank you.

21      DUANE PORTWOOD, DEBTORS' WITNESS, PREVIOUSLY SWORN

22                  EXAMINATION (CONTINUED)

23   BY MS. LEAMY:

24   Q    Mr. Portwood, before we get started on the review of

25   the schedules, I was hoping that you could just give us an

1  update from the last time.  I think I had asked for a status

2  of how that company was operating in light of the COVID

3  pandemic.  I think you had indicated that operations were,

4  under the circumstances, were as normal as could be expected.

5        Has there been any change from that?

6  A    No.  We continue to operate.  All of our facilities are

7  functioning and all of our marketing activities and

8  development activities continue.  No changes.

9  Q    All right.  And then since the last time, the

10 disclosure statement was approved by the Court and you're

11 continuing with the sale efforts, I assume.

12       Are there any updates on that front?

13 A    Yes.  We did continue with the sale efforts, I think,

14 in concert with the bidding procedures and the timeline

15 that's laid out in the plan.  There is activity to relate to

16 folks that are doing -- companies or entities that are doing

17 diligence, so that process is well underway.

18 Q    All right.  Good.

19       All right.  So, turning the schedules, I just wanted to

20 ask some background questions on how they were prepared.

21 Can you tell me -- I assume that they were prepared at your

22 direction by the company and the consultants; is that

23 correct?

24 A    Yes, they were prepared, yeah, under my direction,

25 supervision, both with a number of company financial

1  personnel, as well as the assistance of consultants,

2  particularly AlixPartners --

3  Q    And today --

4  A    -- as well as Grant Thornton.

5  Q    Today I'm going to be focusing on the schedules and the

6  statement of financial affairs for Akorn, Inc. and I wanted

7  to have you verify your signature.

8       Do you have the schedules for Akorn in front of you?

9  This would be oh?

10 A    Yes, one second.  So, it's all electronic, so ...

11 Q    I know, I have the same problem.

12      So, this one, it's Docket 272, but it's the schedules

13 for Akorn, Inc.

14 A    All right.  One second.

15 Q    Okay.  Just let me know when you get there.

16           MR. HAYES:  Hey, Jane, this is Chris.

17           Are we looking at the schedules first or the

18 statement of financial affairs?

19           MS. LEAMY:  I was looking at the schedules.

20 I have 272.  Is that the schedules?

21           THE WITNESS:  Okay.  I've got the Akorn, Inc.;

22 it's opened up.

23 BY MS. LEAMY:

24 Q    Okay.  Is what you have, have a docket number at the

25 top of it, like a header at the --

1  A      Case Number 20-11177-KBO.

2  Q      Yeah.  What does it say right after that docket number?

3  A      Docket 275 -- Doc 275.

4  Q      275, okay.

5         I'll switch to that one since you have that one open,

6  but while I'm doing that, can you look at the very last page

7  of that document.  I just want to have you verify your

8  signature.

9  A      Sure.  Yeah, so, it's Page 423 of 423.  That is my

10  signature.

11  Q      All right.  And that's the same for each of the other

12  schedules and statements for the affiliated debtors?

13  A      Yes, ma'am.

14  Q      All right.  And you reviewed -- can you confirm that

15  you reviewed each document before you signed them.

16  A      Yes, I can firm that.

17  Q      And to the best of your knowledge, the information in

18  the documents is true and correct?

19  A      Yes.

20  Q      Are you aware of any changes -- sometimes after people

21  file these, they become aware of changes or updates that need

22  to be made -- are you aware of any such changes or amendments

23  that need to be made to any of these documents?

24  A      I am not.

25  Q      Okay.  All right.  I'm just trying to get to the

1  same -- I'm in that document, but I'm trying to get to the

2  last page.  That one took a long time to load --

3  A    It's large.

4  Q    Yeah, that's why you had trouble with it and I did,

5  too.

6       Okay.  The questions that I'm going to have on this

7  document are Part 4.  I'm going to try to get you the page

8  number, but if you just want to start scrolling down.

9       So, I think it's starting at page -- so, that header,

10 it would be Page 370 of 423.

11 A    Okay.  I'm there.

12 Q    All right.

13            MR. HAYES:  Jane, can you say that again.

14            MS. LEAMY:  Oh, I'm sorry.

15            So, it's three -- Page 370 of 423, Part 4,

16 Payments Or Other Transfers of Property Made Within One Year

17 of the Filing That Benefited Insiders.

18            THE WITNESS:  No.  I have a different title.  I

19 apologize.

20            So, my 370 of 423 is, well, it's actually Part 2,

21 but it says -- is this the one with Alan Weinstein on it?

22 BY MS. LEAMY:

23 Q    Yeah.  I guess I was reading Part 4 right underneath

24 it, yeah.

25 A    Gotcha.

1  Q     Okay.  So, for Alan Weinstein on that page, it appears

2  that the board fees increased from the end of 2019 to the

3  beginning of 2020, where it went from thirty-seven five to

4  one oh six something.

5       Was that an acceleration or did the fees just increase?

6  A     I'm not sure.  I think it might have been a bit of

7  both, but I'll have to confirm with you.

8  Q     Okay.

9  A     He might have taken on another -- he's the chairman,

10 but he might have taken on -- he started coming to all of the

11 other committee meetings and still has a business along the

12 com meeting as well.  So, it may be more meetings and it may

13 be slightly higher fees, but I'll have to confirm that.

14 Q     Okay.  The next question I had -- and it seems like

15 there's something wrong with this form -- I didn't see this

16 last night when I was looking at it.

17       I'm not -- well, it's a general question; it's not

18 specific as to an individual, but my question is for the

19 retention bonuses that were paid in February prior to the

20 filing, can you tell me the conditions under which those have

21 to be repaid if the employee were to leave the company.

22 A     Yeah.  So, those amounts vest under two conditions.

23 One is I guess the earlier of two conditions here; a

24 transaction is closed, the transaction that we're

25 contemplating now or December 31st, 2020.  If an individual

1 leaves prior to the vesting, then that amount would need to

2 be repaid.

3 Q     Prior -- so, it would be prior to a sale or prior to

4 the date you specified?

5 A     Prior to the earlier --

6 Q     All right.  Okay.

7 A     -- prior to one of those conditions happening.

8 Q     All right.  So, are you supposed to be lifted on this

9 page?  Do you see the problem that I'm having?

10       It kind of skips from -- it lives Christopher Young and

11 then it -- there's a total, but all the other people aren't

12 listed.

13             MR. HAYES:  Hey, Jane.  This is Chris.

14             I see Duane on Page 367.

15             MS. LEAMY:  Oh, okay.  Thank you.

16             Oh, because I somehow went too far.  Thank you.

17 BY MS. LEAMY:

18 Q     Okay.  Here's the other question I had, Mr. Portwood.

19 Some of the employees, in addition to the February retention

20 bonus, had, in December, were paid an annual bonus and some

21 were also paid a retention bonus at that time.

22       Can you explain to me the terms of the retention bonus

23 that were paid in December, if there's any provision for

24 where they would have to be repaid, similar to the February

25 bonuses.

1  A     The retention bonuses that were paid in December of

2  last year were actually awarded at the beginning of 2019, so

3  those were actually retention and awards for 2019.  Half was

4  paid at the beginning of the year and then the last half was

5  paid at the end of the year when they would have vested in

6  the service period and then (indiscernible).

7  Q     All right.  So, the first part of that bonus isn't

8  reflected here because it's outside the period?

9  A     Yeah, it would have been in very early 2019.

10 Q     Okay.  All right.

11        So, those are completely vested and --

12 A     They are.

13 Q     -- and no conditions for repayment.  Okay.

14        All right.  Yeah, a lot of the problems that we're

15 having is having to do this electronically, so I apologize.

16 I'm having issues, too.

17 A     I feel your pain.

18 Q     I'm just going to quickly scroll through here and see

19 if I had any more questions.

20        Okay.  Let me just find the spot, make sure I have the

21 right -- okay.  So, I think this is the other thing that I

22 wanted to focus on for the SOFA is -- so, I'm at page -- make

23 sure I'm at the beginning of it -- Page 375, on actions or

24 assignments.

25 A     Okay.

1  Q     And I just wanted to go through some of the ones that

2  are listed as pending.  So, starting on that page, so

3  Item 7.7, there was an investigation regarding a data breach.

4        Have you had any further update on that?

5  A     I would have to get you an update unless Mr. Hayes has

6  an update.  I don't think there's been any new activity since

7  we filed this, but I can't say for sure, so I'd have to get

8  you an update if there is one.

9  Q     Okay.  And what type of information was at issue --

10           MR. HAYES:  I'm sorry, Jane.

11           Which litigation matter were you referring to?

12           MS. LEAMY:  Oh, it's, actually, Item 7.7.  There's

13  a data breach investigation.

14           Can you tell me what kind of information was

15  subject to the data breach.

16           THE WITNESS:  Yeah, so this was, I guess, back in

17  2017, one of -- we suspected one of our employees.  It had to

18  do with the -- it had to do with -- it had to do with --

19  there was some data that was deleted in our Somerset facility

20  and we think by an employee, but it had to do with production

21  processes and quality processes and the like and it was

22  information that should not have been deleted and was.

23  BY MS. LEAMY:

24  Q     All right.  I wanted to ask you next about the next

25  page entry or Line Item 7.10, <u>Provepharm v Akorn</u> for false

1   advertising.

2        What's the -- that says it's pending -- what's the

3   status of that one?

4   A    Yeah, I'm sorry.  Is it on the next page?

5   Q    Yeah, it's at the very top, 7.10.

6   A    I gotcha.

7   Q    Okay.

8   A    Apologies, but I'll have to -- again, from any updates.

9   I'll have to get the details for you.  I don't think there's

10  been any notable movements since then, but maybe as we go on,

11  I'll get some information.

12  Q    All right.  On the next page, the Page 3 --

13  A    What I can tell you on that one is the pretrial motions

14  are before the judge and we're waiting for a trial date.

15           MR. HAYES:  Yeah, this is Chris.

16           Jane, that's the latest update I'm aware of and I

17  don't think there's any further activity than the stay.

18           MS. LEAMY:  Okay.

19  BY MS. LEAMY:

20  Q    On the next page, 7.19, the first three entries, 7.19,

21  7.20, and 7.21, these are all antitrust matters that are

22  pending; is that correct?

23  A    Yes.

24  Q    Okay.

25  A    Those are all MDL cases.

1  Q     Okay.  And then down at nearly the bottom of the page,

2  7.27, there's a SEC subpoena.  It says it's pending, but have

3  you provided information and you're waiting to hear if

4  there's anything further?

5  A     Yes.

6  Q     Okay.

7  A     All information in there has been provided.

8  Q     Okay.  And approximately when was that, if you

9  remember?

10  A     I don't know that I can get that really quickly.

11  Q     Okay.

12  A     This was around six months ago.  We're not the target.

13  We are cooperating.

14  Q     I'm trying not to ask you about ones that have been

15  described in papers elsewhere.

16        Okay.  I think that's all I had on this one.  If you

17  want to switch to the schedules for this debtor, and that's

18  Docket 272, and just let me know when you get there.

19  A     This is for Akorn, Inc.?

20  Q     Yes.

21  A     Yep, I'm there.

22  Q     Okay.  So, the first -- I just had -- the first

23  question was on Item -- so, it's Page 22, Part 1.  Just let

24  me know when you get there.

25  A     Okay.

1  Q     So, this page shows the bank balances at the time of

2  filing.

3        Are there any significant deviations from these at this

4  point?

5  A     No.  Obviously, there's -- the bank balance can go up

6  and down.  Actually, right now, it's above this.

7  Q     Okay.  The next question I wanted to ask you was on

8  Page 31.

9  A     Okay.

10 Q     This -- so, it's Part 3, Accounts Receivable.

11 A     Okay.

12 Q     I just wanted to ask about the over-90-days-old --

13 there's about 11 million.  Is that -- do you anticipate being

14 able to collect that?

15 A     Our write-offs are quite small, so whether we collected

16 that over the last 20 days, I'm not clear, but I expect *de*

17 *minimis* write-offs for the quarter.

18       I guess one thing to note is these are gross

19 receivables and in our industry, there's a significant amount

20 of deductions, so I would imagine the net receivable on that

21 11 million is about 10 percent of that balance and I would

22 expect our write-offs to be south of, you know, like a

23 hundred grand.

24 Q     All right.  The next question I have is on Page 32,

25 Investments.

1    A      Yep.

2    Q      Item or Question 14 lists the N-I-C-O-X S-A.

3           Can you explain what that is.

4    A      Nicox?

5    Q      Yes.

6    A      Yeah, I believe we had an agreement with Nicox.  Nicox

7    included a French company, but stock in that company is not

8    liquid.  We have a little bit of stock in there so,

9    anything -- of them -- and any value there is, again, going

10   to be pretty *de minimis*, and by "pretty *de minimis*," I mean

11   less than 500 grand, probably less than 250,000.

12   Q      All right.  On Page 36 is my next question.

13   A      Okay.

14   Q      So, question 50.1, that you listed machinery and

15   equipment with a value of 43.9 million.

16   A      Yes.

17   Q      Is there a schedule available that breaks this down,

18   that the company has?

19   A      I'm wrong.  Yes, I'm sure we can -- we'll --

20   Q      I'm not necessarily asking for it to be filed.  I'm

21   just asking if it's available.

22          And I assume the equipment is at different locations?

23   A      Yeah, that's not just one piece of machinery; that's

24   probably many.  So, we could break that down further, yes.

25   Q      Okay.  Is it located in one -- it's not located -- it's

1  at more than one location, correct?

2  A    Correct.

3  Q    Okay.

4  A    Yeah, we have multiple manufacturing and distribution

5  facilities.

6  Q    All right.  And then on Page -- I'm sorry -- Page 37,

7  the next page there's kind of a footnote that says, Specific

8  notes locations include -- are these all owned locations?

9  A    They're a combination of owned and leased.  So, for

10 example, the ones in Decatur are owned.  Gurney is leased.

11 Lake Forest is leased.  Vernon Hills is leased.

12 Q    So, if I want to find out the value of the debtors'

13 owned real estate, is there a way to determine that from this

14 page, the numbers that are listed here?

15 A    Well, I guess the way that I would characterize it is

16 the land under 55.2 and 55.4, the various locations, that

17 would be owned.  The lease improvements are the -- I was just

18 stating the obvious that the improvements or the work that's

19 been done at the leased facilities, we're amortizing as we

20 use those, but any more details, I'd have to get that for

21 you.

22 Q    All right.

23 A    I would have to say that anything that's not under the

24 self-improvements would be owned.

25 Q    Okay.  I'm not going to ask for any amendments on this

1  issue today.  If, for some reason, there need to be made --

2  you know, you and counsel determine other amendments need to

3  be made at a later date, perhaps this, you know -- the note

4  at the bottom could be flushed out as to the owned locations

5  versus the leased locations.

6  A    Understood.

7  Q    Okay.  I'm just scrolling through real quick to see if

8  I have any other questions.

9       MS. MORRIS:  Hello?  Hello, my name is Edith

10  Morris (phonetic) and I'm just joining the call.

11       MS. LEAMY:  All right.  Are you on for the Akorn

12  call?

13       MS. MORRIS:  For the what?

14       MS. LEAMY:  What call are you on the call for?

15       MS. MORRIS:  Case 20-11648.

16       MS. LEAMY:  Okay.  I think this is -- I think

17  you're on the wrong call.

18       MS. MORRIS:  I put in the PIN number and I think

19  the number is not --

20       MS. LEAMY:  Yeah, this is a -- hold on one second,

21  ma'am.  If you could email -- somebody else gave out this

22  number in my office by accident, they told me yesterday, for

23  the same time.

24       You called email linda.casey --

25       MS. MORRIS:  Hold on.  Linda --

```
1              MS. LEAMY:  -- dot Casey.

2              MS. MORRIS:  -- dot --

3              MS. LEAMY:  C-A    -S-E-Y --

4              MS. MORRIS:  Uh-huh.

5              MS. LEAMY:  -- at usdoj.gov.

6              MS. MORRIS:  USDOJ?

7              MS. LEAMY:  Dot gov.

8              And she'll give you the information for the other

9   call.

10             MS. MORRIS:  Okay.

11             MS. LEAMY:  I'm sorry for the inconvenience.

12             MS. MORRIS:  That's okay.

13             MS. LEAMY:  Okay.  Bye-bye.

14             MS. MORRIS:  Bye-bye.

15             MS. LEAMY:  All right.  Sorry about that everyone.

16             Let's see.  I'm just running through the schedule

17  here.

18  BY MS. LEAMY:

19  Q    Okay.  I don't have any further questions on this

20  document.

21        I did, right before the call, I emailed over the

22  corporate chart to make sure you had that in front of you.  I

23  don't know if counsel was able to email that to you.

24  A    Yeah, I have it.

25  Q    Okay.  I just -- what I wanted to is go through each --
```

1  since I'm not going through every schedule and statement for

2  each debtor today; I have reviewed them, but I don't have any

3  questions at this point -- I wanted to see if we could go

4  through the corporate chart that I emailed you.

5       The -- what I -- excuse me -- I emailed to counsel who

6  forwarded it to you and what I'd sent had been docketed at --

7  or is an Exhibit to Docket 15 in the case filed in May.

8       If you could just start on the -- whatever way makes

9  sense to you, but, you know, we just went through with Akorn,

10 that's obviously the holding company, but maybe start at the

11 left-hand side and go through each debtor entity and just

12 tell me the corporate purpose, you know, what it's around

13 for.

14 A    So, most of the activity occurs in like two or three of

15 these.  So many of these have very low activity.

16 Q    And if that's the case, you can just say that and move

17 on.  Yeah, that's fine.  Thank you.

18 A    So, just generally speaking, so if I go left, the DPI

19 Holdings Corp., back in 2014, the company acquired another

20 company called Versapharm, and this legal entity and the

21 entities underneath hold the -- there really wasn't too much

22 in the way of physical assets -- it was basically a virtual

23 company -- but these entities hold all the intellectual

24 assets that were acquired back in 2014.  The company is based

25 in Georgia, which is why a couple of these are Georgia

1  facilities.

2       Going right, Akorn Animal Health, we have a small

3  animal health business where we provide prescription drugs to

4  animal health distributors.  This entity holds the

5  intellectual property related to the filings that we have

6  there on various molecules.

7       Akorn Ophthal- -- I won't even try to say it because I

8  have a tough time saying it -- is -- we have -- the original

9  Akorn purpose was to be an ophthalmic distributor and later

10 we became a producer of those assets.  So, it has -- the

11 purpose of that is to hold those molecules and that part of

12 our business.

13      Advanced Vision Research, same thing probably put

14 together at a different point in time versus the old

15 Ophthalmics.

16      Akorn Sales, those are -- I think it was our sales

17 entity, so our sales transactions are recorded through that.

18 Hi-Tech Pharmacal was an acquisition, again, in 2014,

19 actually just prior to the Versapharm acquisition that I

20 mentioned earlier, and so the assets that were required in

21 that transaction in 2014 are in that facility and the two

22 below it.

23      Akorn New Jersey, I believe, holds -- so, we have a

24 Somerset facility, a Somerset, New Jersey, facility and I

25 believe that that's what is out there.

1      And then Oak Pharmaceuticals, again, is a sale entity,

2  somewhat similar to Akorn Sales.

3  Q    Okay.  And then the others are just subs of the --

4  A    Yeah, the other -- the Luxembourg facility, which --

5  I'm sorry -- entity, which is the parent of -- we have a

6  Swiss facility in Hettlingen, Switzerland.

7  Canada is just a small sales entity.  We have a little bit of

8  business in Canada.

9      And then on the far right is a Mauritius entity which

10  is -- owns the majority of our Indian facility.

11  Q    Okay.  And then I think at the last meeting we

12  discussed filing MORs and quarterly fees and I think you're

13  working on the first monthly operating report in the case and

14  that will be filed later on in this month; is that correct?

15  A    That is correct.

16  Q    Okay.

17      MS. LEAMY:  I don't have any further questions at

18  this time.  I know there are some creditors or other people

19  on the phone, so at this time, I would invite those of you

20  that have questions to go ahead.  Just identify yourself

21  before speaking and who you represent.

22      MR. WILLIAMS:  Hi, this is Bill Williams from

23  Jenner & Block on behalf of the creditors committee.  I guess

24  I'll go ahead and kick things off.

25  //

1                              EXAMINATION

2   BY MR. WILLIAMS:

3   Q    One question, just following up on (indiscernible) the

4   chart.  The Versapharm entity, I understand that they were

5   acquired in '14 for around $440 million.  I believe that you

6   said they hold the intellectual property assets related to

7   those operations.

8        My question is, in the schedules, it looks like the

9   schedules for each of these entities is listed as no assets,

10  so is that a mistake or are they currently not holding any

11  assets?

12  A    Possibly.  I guess I'll have to get back with that to

13  you and the trustee.  That's clearly where they were housed

14  to begin with.  If they've been moved in the interim, then I

15  may have misspoken.

16  Q    Okay.  Well, to the extent that they've moved, I think

17  we would just want to know, you know, when that happened.

18       Another kind of high-level question, so we understand

19  that the company entered into this standstill agreement in

20  May of 2019.  Can you just give a little bit of color to that

21  and into this vision to go ahead and move forward with this

22  standstill agreement.  My understanding is that there was no

23  monetary default, at least under the terms of the term loan

24  agreement.

25       What prob- -- what was kind of the rationale for

1  deciding to go ahead and do it at that time instead of

2  waiting, you know, a little bit later, closer to when the

3  term loans became due in April 2021?

4  A    Yeah, you're correct, really, technically, we weren't

5  in default.  I would say that there was -- and given the

6  reason, plain and simple reason for entering into the

7  standstill agreement was that the fact that coming out of the

8  Delaware Court case where -- that the (indiscernible) deal

9  was terminated because there was a material, adverse effect,

10  that being, plain and simple, the debt agreement that we had

11  also had entered into, into this type of clause in different

12  states -- one was Delaware and was one New York -- but we

13  felt that rather than kind of to litigate that and to have a

14  chance of losing, it would be much better to enter into the

15  standstill agreement such that we could have more

16  constructive talks with our creditors and look for a solution

17  and a refinancing solution, so that's why we made that

18  decision.

19  Q    And at what point during that process did bankruptcy

20  start to emerge as, you know, number one, as potentially a

21  consideration and at what point did it turn into, you know,

22  the likely path forward?

23  A    Well, we had -- upon entering into the standstill, we

24  concluded a different things.  One is we attempted to renew

25  our asset-backed line.  We had a-hundred-and-fifty-million-

1   dollar line with three different banks.  Those efforts were

2   unsuccessful, as were efforts to get a new ABL.

3        You know, I guess a lot of concern from the outside as

4   it related to status of our facilities from an FDA

5   perspective, status of various litigation that was going on

6   and the like.  So, from there, later that summer we embarked

7   on a refinancing effort with the thought of issuing some type

8   of equity instrument in order to pay down some of the debt to

9   a more reasonable level, given our current level of sales and

10  profitability.

11       And in the mid-fall area I guess is when that effort, I

12  guess, certainly appeared to be -- it wasn't going to be

13  successful in terms of the amount of equity that would need

14  to be issued in order to reduce the debt to a more reasonable

15  level, and I guess it was at that time, you know, call it

16  mid-November, late-November, early-December time frame where

17  we, you know, knew that the sale of the company was probably

18  the way it needed to go and there was a chance that we could

19  do that through bankruptcy.

20  Q    But the bankruptcy was not seriously considered until,

21  you're saying, around November, December?

22  A    Yes, that's my recollection.

23  Q    So, I understand that there was a provision in the

24  standstill agreement that essentially required the company to

25  enter into a comprehensive amendment by November 15 in order

1  to avoid certain penalties and then a few weeks later they

2  did enter into an amendment to the standstill agreement.

3       What was the -- how did the terms of the negotiations

4  changed from say, November 14th to mid-December when they

5  entered into the amendment?  Was there a -- did the lenders

6  (indiscernible) something that allowed the amendment to

7  happen in December to go forward then that it did not have in

8  mid-November or was it basically just the company realized

9  this was as good as they were going to get.  They needed to

10  go ahead and agree to the same terms that had kind of been on

11  the table that whole time?

12  A    As far as the timing goes, I mean, again, obviously

13  we -- so, the lender group has their advisors with whom we

14  have been working very closely with their advisors since the

15  standstill agreement, but I think it was more or less was

16  just our timing, the timing between mid-November and mid-

17  December was more about making sure that we could finalize

18  the refinancing process and see that to the end to see if it

19  was possible.  I don't think there was -- I don't think they

20  conceded anything, if that's the question.

21  Q    In that case, was there ever any discussion of

22  potentially asking us to waive the penalties that were going

23  to take effect on November 15th, if it was materially just a

24  matter of a chance to finalize the interest and terms?

25  A    We've gone through this process at all times, trying to

1  minimize the amount of fees that were being paid.

2  Q    Okay.

3         MR. WILLIAMS:  I think that's all the questions I

4  have for now.

5         MS. LEAMY:  All right.  Thank you.

6         Is there anyone else on the line that has a

7  question, just, you know, identify yourself and who you

8  represent.  Thank you.

9         MR. CLEMENS:  Hello.  My name is Richard Clemens

10  (phonetic).

11         MS. LEAMY:  All right.  Go ahead with your

12  question.

13         MR. CLEMENS:  Okay.  Yeah.

14         I was an employee of Maines in Rochester, New

15  York, and drove a truck for them for nine years and I was

16  laid off on March 28th and as far as I knew, I had three

17  weeks' vacation pay coming from the company and as of 2013

18  when I went out with a back problem and ended up with an

19  operation, I had -- the next year I had accrued two weeks of

20  vacation back then and I was -- my vacation was half of it

21  was taken away because I was out of work for 26 weeks.

22         So, I'm sure that the company -- you accrue your

23  vacation the year before and now I have three weeks of

24  vacation and they're not paying me for the three weeks of

25  vacation.  So, I don't know if I'm entitled to that as far as

1   this statement goes or this letter that I got.  That's why

2   I'm calling.

3          THE WITNESS:  Sir, I've got to -- this is -- the

4   case that we're talking about now is for Akorn, Inc.  I don't

5   know the company that you're referring to.

6          MR. CLEMENS:  Okay.  Well, I think --

7          MS. LEAMY:  I think you might have gotten the

8   wrong -- you may have inadvertently received this dial-in

9   information.

10          If you're comfortable giving me your phone number

11   here, I can call you back at the conclusion of this and get

12   you in contact with the right person, okay.

13          MR. CLEMENS:  Yes, okay.

14          It's 585 --

15          MS. LEAMY:  Okay.

16          MR. CLEMENS:  -- 520-2070.

17          MS. LEAMY:  All right.  And your name was

18   Mr. Clemens?

19          MR. CLEMENS:  Yes, correct.

20          MS. LEAMY:  All right.  I'll give you a call back

21   afterwards.  I'm sorry for the inconvenience.

22          MR. CLEMENS:  Okay.  Thank you.  Bye.

23          MS. LEAMY:  Okay.  All right.

24          Is there anyone else on the line that has a

25   question for Akorn?

1       (No verbal response)

2           MS. LEAMY:  All right.  I'm going to ask one more

3   time before we conclude the meeting.  This is the chance if

4   you're a creditor with questions for Akorn.

5       (No verbal response)

6           MS. LEAMY:  No?  Okay.

7           All right.  I'm going to go ahead and conclude the

8   341 meeting at this time.  The schedules and statements have

9   been filed and that will conclude the meeting.

10           Thank you, everyone.

11           THE WITNESS:  Thank you.

12           MS. LEAMY:  Thank you.  Bye-bye.

13       (End of audio)

14

15

16

17

18

19

20

21

22

23

24

25

1                             CERTIFICATION

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9    /s/ William J. Garling                    July 23, 2020

10   William J. Garling, CET**D-543

11   Certified Court Transcriptionist

12   For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25